UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FILED
JAN 10 2017
1-10-17
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

|  |  |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>    Plaintiff,<br><br>v.<br><br>CREDIT BUREAU CENTER, LLC, *et al.*,<br><br>    Defendants. | Case No.<br><br>**17-cv-00194**<br>**Judge Matthew F. Kennelly**<br>**Magistrate Judge Maria Valdez** |

**DECLARATION AND CERTIFICATION OF PLAINTIFF'S COUNSEL
PURSUANT TO FED. R. CIV. P. 65(b) AND LOCAL RULE 5.5(d) IN
SUPPORT OF PLAINTIFF'S *EX PARTE* MOTION FOR A TEMPORARY
RESTRAINING ORDER AND MOTION TO TEMPORARILY SEAL FILE**

I, Guy G. Ward, hereby declare as follows:

    1.    I am an attorney employed by Plaintiff, Federal Trade Commission ("FTC" or "Commission"). I am representing the FTC in this matter. My business address is 55 West Monroe Street, Suite 1825, Chicago, Illinois 60603. The following facts are known to me either personally or upon information and belief, and if called as a witness I could competently testify thereto.

    2.    Plaintiff has not attempted to notify Defendants of the FTC's *Ex Parte* Motion for a Temporary Restraining Order With Asset Freeze, Appointment of a Receiver, Other Equitable Relief, and Order to Show Cause Why a Preliminary Injunction Should Not Issue ("TRO Motion"), nor should such notice be given, for the following reasons.

    3.    The evidence set forth in Plaintiff's Memorandum in Support of its TRO Motion, and accompanying exhibits, filed concurrently herewith, which I have personally reviewed,

shows that the four Defendants—a limited liability company, its owner, and two affiliate marketers—have for at least the last three years engaged, and are likely to continue to engage, in a nationwide scheme causing millions of dollars in consumer injury.

4. Defendants' scheme involves several steps. They target consumers seeking housing by posting fake advertisements for rental properties on Craigslist and posing as landlords when consumers respond. In emails to consumers, Defendants falsely claim to be currently offering the properties for rent, and promise consumers tours of the properties if they will first click on a hyperlink to get their credit reports. In this way, Defendants lure consumers to specially designed websites promising consumers "free" credit reports and scores if consumers will enter their Social Security numbers, birthdates, account numbers and other personal information. By entering this information, however, consumers are deceptively enrolled in a separate credit monitoring service with recurring charges. Many consumers are charged for the credit monitoring service without their knowledge or consent until they notice the charges on their account statements, sometimes after several billing cycles, and attempt to stop them. Additionally, after obtaining their credit reports as instructed, and emailing the purported landlord to arrange the property tour, consumers get no response. Consumers never get the promised tours because Defendants have no properties to show or rent to anyone.

5. Defendants' ongoing conduct violates multiple consumer protection laws, including Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a), Section 4 of the Restore Online Shoppers' Confidence Act, 15 U.S.C. § 8403, Section 612(g)(1) of the Fair Credit Reporting Act, 15 U.S.C. § 1681j(g)(1), and the Free Annual File Disclosures Rule, 12 C.F.R. § 1022.138.

6. Defendants attempt to evade responsibility for their conduct by using myriad fictitious names, Internet domains, email accounts, and mail drops, and using different versions of their websites, one consisting of the deceptive webpages linked to the fake landlord emails, and the other consisting of cleaned-up versions for public display. Defendants have continued their deceptive practices for years despite a flood of consumer complaints and repeated cancellations of their merchant accounts for excessive chargebacks.

7. In the FTC's experience, defendants engaged in similar conduct have withdrawn funds from bank accounts and moved or destroyed inculpatory documents when given notice of the FTC's action. Indeed, such behavior seems probable in this case given the pervasive, systematic nature of Defendants' fraud, the personal responsibility of the individuals for that fraud, and the steps they have taken to evade detection. Without an *ex parte* asset freeze, funds may not be available to satisfy a final order granting restitution to defrauded consumers.

8. The following examples, provided upon information and belief, illustrate the FTC's experience that defendants who receive notice of the FTC's intent to file or filing of an action alleging consumer fraud have immediately taken steps to dissipate or conceal assets, and/or destroy documents:

    a. In *FTC v. E.M.A. Nationwide, Inc., et al.*, No. 1:12-cv-02394 (N.D. Ohio 2012), the FTC moved for a TRO and corporate asset freeze and the defendants were given notice. Within a week of obtaining notice the defendants had withdrawn more than $152,000 from a corporate bank account.

    b. In *FTC v. Prime Legal Plans*, No. 12-61872 (S.D. Fla. 2012), the FTC obtained an *ex parte* TRO with asset freeze and appointment of a receiver. Within hours of

learning of the action, the defendants moved approximately $2 million to bank accounts belonging to several non-party individuals, at least $200,000 of which was never recovered.

      c.      In *FTC v. Asia Pacific Telecom, Inc. et al.*, No. 10-cv-3168 (N.D. Ill. 2010) (Hart, J.), the FTC obtained an *ex parte* TRO freezing the defendants' assets and prohibiting them from destroying documents. After being served with the TRO, one of the individual defendants, Hans Smit, deleted an email account used to conduct many of the illegal practices at issue in the FTC's complaint. Smit took this step despite being served with a discovery request by the FTC for documents in the account and despite multiple demands from the court-appointed receiver for access to the account. The court ultimately held Smit in contempt for deleting the account in violation of the TRO.

      d.      In *FTC v. Fereidoun "Fred" Khalilian et al.*, No. 10-21788 (S.D. Fla. 2010), the FTC obtained an *ex parte* TRO freezing the assets of defendants operating a telemarketing scam. After being served with the TRO, one of the defendants, Fred Khalilian, directed his employee to withdraw $71,000 in cash from a frozen corporate account. While conducting an asset deposition, the court-appointed receiver learned that individuals were using a rented truck to remove tens of thousands of dollars' worth of furniture and other valuables from a luxury apartment occupied by Khalilian and paid for with proceeds of the scam. The receiver immediately ended the deposition and, with the assistance of law enforcement, prevented Khalilian's associates from absconding with the property.

      e.      In *FTC v. Transcontinental Warranty, Inc., et al.*, No. 09-cv-2927 (N.D. Ill. 2009) (Grady, J.), the FTC did not seek *ex parte* relief or to have the file sealed. Although the court granted the FTC's motion for a TRO freezing all of the defendants' assets and

appointing a receiver over the corporate defendant, when the receiver and counsel for the FTC arrived at the corporate defendant's premises pursuant to the Court order, hundreds of file folders with labels indicating that they contained records of the defendants' most recent transactions were found empty, five computers (including that of the corporate defendant's CFO) were allegedly stolen the night before the receiver and FTC arrived, and various third-party trade debtors of the defendants froze payments due to the corporate defendant. These actions resulted in extensive litigation involving the receiver and ultimately cost the receivership estate hundreds of thousands of dollars.

   f. In *FTC v. Global Marketing Group, Inc., et al.*, No. 06 CV 2272 (M.D. Fla. 2006), the FTC obtained an *ex parte* TRO with an asset freeze and served the order on banks where the defendants were known or suspected to have accounts. After being served with the TRO, one defendant successfully withdrew over $500,000 from accounts previously unknown to the FTC. Most of these funds were wired to offshore bank accounts. The defendant was ultimately held in contempt and fled the country after failing to appear at a show cause hearing.

   g. In *FTC v. Dennis Connelly, et al.*, SACV06-701 DOC (C.D. Cal. 2006), the FTC requested an *ex parte* TRO and asset freeze against all defendants. The court declined to issue an asset freeze against two of the three individual defendants and issued an order to show cause why an asset freeze should not issue as to them. The defendant whose assets were frozen and one of the other defendants then withdrew amounts totaling close to $750,000 from a joint account within 24 hours. The judge subsequently extended the asset freeze over all defendants. Although some of the funds were recovered, more than $300,000 was not recovered.

   h. In *FTC v. 4049705 Canada Inc., et al.*, No. 04 C 4694 (N.D. Ill. 2004)

5

(Kennelly, J.), Canadian authorities executed a search warrant on the business premises of Canadian defendants. The FTC subsequently filed its complaint, and its motion for a temporary restraining order with asset freeze, and provided notice to the defendants. The FTC subsequently discovered only through its own investigation that the defendants had made several transfers totaling approximately $70,000 after receiving notice of the FTC's action but before the asset freeze was imposed. The FTC was unable to recover the $70,000. The individual defendant was later held in contempt for transferring real estate in violation of the court-imposed asset freeze.

   i. In *FTC v. National Consumer Council, et al.*, No. SACV04-0474 CJC (C.D. Cal. 2004), the FTC obtained an *ex parte* TRO with asset freeze and prohibition against destruction of business records against all of the defendants, and the appointment of a temporary receiver over all but one of the corporate defendants. One individual defendant deleted electronic files on the defendants' shared network server by accessing his account through a computer under the control of the corporate defendant not under the receivership. The files were never recovered.

   j. In *FTC v. QT, Inc., et al.*, No. 03 C 3578 (N.D. Ill. 2003) (St. Eve, J.), the FTC obtained an *ex parte* TRO with asset freeze and when served with the TRO the defendants immediately violated the Order by withdrawing and transferring substantial sums of money from several bank accounts, totaling more than $2 million in one day.

   k. In *FTC v. Bay Area Business Council, Inc., et al.*, No. 02 C 5762 (N.D. Ill. 2002) (Darrah, J.), as soon as the Court entered a final order for more than $12 million, the defendants took advantage of the termination of a nearly two year old asset freeze and immediately withdrew nearly all of their assets from their accounts before the FTC was able to

obtain a turnover order.

l. In *FTC v. Physicians Healthcare Development, Inc., et al.*, No. CV02-2936 RMT (C.D. Cal. 2002), the FTC provided notice of filing an *ex parte* action to the individual defendants. The Court issued a TRO with asset freeze and prohibition against destruction of records, and the defendants were served with the TRO the same day. The next day when FTC staff went to the defendants' offices to take control of the business records, they found that business records, including computers, had been removed from the premises or shredded. Witnesses advised FTC staff that, on the day of the hearing on the TRO, they observed defendants' employees removing computers and other items from the business premises. The records that were removed were never recovered.

m. In *FTC v. SkyBiz.com, Inc., et al.*, No. 01-CV-396(K) (N.D. Okla. 2001), within days of the service of the TRO with an asset freeze provision, one of the primary defendants convinced an overseas trustee to withdraw $1,000,000 from the offshore account of a foreign affiliate. Because a domestic correspondent bank had been served with the TRO, it refused to transfer the funds. The money in the offshore account was preserved, and ultimately used to provide $20 million for consumer redress.

n. In *FTC v. Intellicom Services, Inc., et al.*, No. CV-97-4572 TJH (C.D. Cal. 1997), the FTC obtained an *ex parte* TRO with an asset freeze, which it then served on banks at which the defendants were known to have accounts. One defendant, whose bank was served earlier in the day, called the bank and sought to wire approximately $100,000 from an account that was specifically designated in the TRO as frozen. The branch manager encountered a red flag in the system, discovered the account had been frozen, and refused to release the funds.

    o. In *FTC v. United Consumer Services, et al.*, No. 94-CV-3164-CAM (N.D. Ga. 1994), the FTC attempted to serve a TRO with asset freeze upon a defendant who was traveling on business. When the defendant's lawyer notified his client of the order, the defendant went directly to his bank and removed $100,000 from a corporate bank account. The FTC learned of the withdrawal only after receiving the account statements from the bank. After being served with an order to show cause why the defendant should not be held in contempt for violating the asset freeze, the defendant finally produced the money at a deposition.

    p. In *FTC v. Academic Guidance Services, Inc., et al.*, No. 92-3001 (AET) (D. N.J. 1992), defendants discovered that the FTC intended to file a case against them (and seek an *ex parte* TRO) the following week. An informant told the FTC that the defendants then leased a document shredder and spent the weekend destroying documents, a fact subsequently confirmed by one of the defendants' employees.

    q. In *FTC v. Applied Telemedia Engineering and Management, Inc., et al.*, No. 91-635 (S.D. Fla. 1991), the defendants were advised, pursuant to an agreement with the FTC, that the FTC had filed its complaint and intended to seek a TRO with an asset freeze from the court. When the FTC's agents went to the defendants' offices to serve process, they observed defendants removing boxes of documents from the premises. The FTC moved for, and received, an *ex parte* TRO the following day.

    9. As an additional consideration, reporters sometimes check district court filings for matters of interest. If the file in this matter is not sealed, the fact that the FTC has filed this suit may therefore come to the attention of, and be published by the media, and Defendants may learn of the issuance of the requested TRO before they have been served.

10. In the FTC's past experience, new case filings also may come to the attention of a docket monitoring service. In *FTC v. Wazzu Corp., et al.*, SACV99-762 AHS (Anx) (S.D. Cal. 1999), when FTC staff arrived at the defendants' business premises to serve the TRO, the defendants said that they had previously learned from a monitoring service to which their attorney subscribed that the FTC had filed a case against them. This was later confirmed by speaking to the employee of the monitoring service who had discovered the FTC's lawsuit. The monitoring service would not have learned of the FTC's action at the time of filing if that case had been temporarily sealed.

11. As discussed above, the risk that Defendants will conceal or dissipate assets or destroy or conceal evidence if given notice of a TRO is extremely high. Accordingly, Plaintiff respectfully submits that it is in the interest of justice and the public interest that the Plaintiff's *ex parte* motion for a TRO be heard without notice to Defendants and that the file in this matter be temporarily sealed.

12. Plaintiff has not made a previous application for similar relief in this matter.

I declare under penalty of perjury that the foregoing statement is true and correct.

Executed on January 10, 2017

Guy G. Ward
Staff Attorney
Federal Trade Commission
55 West Monroe Street, Suite 1825
Chicago, Illinois 60603
(312) 960-5634 [phone]
(312) 960-5600 [facsimile]
E-mail: gward@ftc.gov