IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 17 C 194 |
| ) | |
| CREDIT BUREAU CENTER, LLC and ) | |
| MICHAEL BROWN, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

On January 10, 2017, the Federal Trade Commission (FTC) filed a complaint against Credit Bureau Center, LLC, Michael Brown, Danny Pierce, and Andrew Lloyd seeking a permanent injunction and equitable relief. The FTC alleges that defendants violated section 5(a) of the FTC Act, 15 U.S.C. § 45(a); section 612(g)(1) of the Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681j(g)(1), and the Free Annual File Disclosures Rule (Free Reports Rule), 12 C.F.R. § 1022.138; and the Restore Online Shoppers' Confidence Act (ROSCA), 15 U.S.C. § 8403.

The FTC moved *ex parte* for a temporary restraining order including an asset freeze, appointment of a receiver, and other relief. On January 11, 2017, Judge Sharon Johnson Coleman, acting as emergency judge in the undersigned judge's absence, granted the requested TRO.

The FTC also moved for a preliminary injunction against all of the defendants. Lloyd and Pierce agreed to entry of a preliminary injunction, and CBC and Brown

opposed the FTC's motion. The Court held an evidentiary hearing on the preliminary injunction motion on February 13-14, 2017 and extended the TRO through 5:00 p.m. on February 21, 2017 to permit consideration of the evidence and arguments presented at the preliminary injunction hearing. For the following reasons, the Court grants the FTC's motion for preliminary injunction.

## Background

CBC, formerly known as MyScore LLC, also doing business as eFreeScore.com, Creditupdates.com, and FreeCreditNation.com, is a single-member LLC that is owned and run by Brown. CBC has only one employee, Brown himself. It uses independent contractors for sales, marketing, customer service, and accounting.

CBC offers online credit scores and credit monitoring services to consumers. Brown says that CBC engaged in two primary lines of business: (1) the offering of credit monitoring solutions that take the form of "white-labeled" or "co-branded" credit reports, scores and monitoring, and (2) the offering of credit monitoring solutions through an affiliate marketing program to consumers. For white-label websites, CBC offers credit reporting services under the name of its affiliate on the affiliate's website. For co-branded credit report offerings, CBC will create a custom landing page for the affiliate or partner where the page will contain wording to the effect that the partner is offering the credit monitoring services but that the services are powered by CBC. CBC's other line of business is direct sales of credit monitoring services driven by affiliate marketers. Pl.'s Mot. for Prelim. Inj., Ex. 10 ¶ 6. In order to do this, CBC hires affiliates or affiliate networks to attract consumers and drive traffic to its websites. *Id.* In exchange, CBC's affiliates are paid commission on the sales they generate for CBC.

*Id.*; Pl.'s Reply, Ex. 12, Att. A, pp. 28-30. This wrongdoing alleged in this case concerns CBC's affiliate marketing business.

From the company's inception in the second half of 2011 through January 19, 2017, CBC generated more than $10.1 million in revenue, net of chargebacks, returns, and other adjustments. CBC's total net income from its inception to January 19, 2017 was approximately $1.67 million, of which $659,159 was distributed to Brown. The lion's share of CBC's revenue was obtained in 2014, 2015, and 2016 (its total revenue for 2013, its best year up to that point, was under $600,000). In early 2014, CBC hired Revable Network LLC, a company owned and run by Pierce, to perform affiliate marketing to drive consumer traffic to CBC's websites. Pierce, in turn engaged Lloyd, who established and ran a fraudulent advertising campaign to generate business for CBC. Lloyd posted Craigslist ads purporting to offer attractive rental properties. When a consumer responded to one of these ads, Lloyd replied by impersonating the owner or manager of the purported rental property—which did not actually exist—and inviting the consumer to take a tour of the property. Visiting the property, however, was conditioned on the consumer first obtaining his or her credit report. The phony landlord letter included a link that Lloyd identified as a credit report service. When the consumer clicked on the link, she would arrive at a landing page that showed an offer from CBC for a free credit report and credit score. When the consumer signed up, she received a free credit score but was also enrolled in CBC's credit monitoring service, which carried an automatic monthly charge of twenty to thirty dollars.

CBC, Brown, Pierce, and Lloyd all received significant monetary benefit from Lloyd's fraudulent Craigslist advertisements. Generally, an affiliate earns a "cost per

3

click" commission by inducing a consumer to click on a link that leads the consumer to the merchant's website. Pl.'s Mot. for Prelim. Inj., Ex. 10 ¶ 6. From December 2014 to January 2017, Pierce and Lloyd generated over 146,000 sales for CBC, from which CBC made at least $6.8 million in revenue. CBC, in turn, paid Pierce approximately $2.3 million. Of that $2.3 million, Pierce kept $441,148 and paid Lloyd $1,919,581.

Consumer complaints filed with the FTC and the Better Business Bureau prompted the FTC to investigate the fraudulent advertisements. The FTC then filed this lawsuit, alleging that CBC, Brown, Pierce, and Lloyd knowingly participated in the Craigslist campaign and other violations of federal law. Pierce and Lloyd do not dispute the FTC's findings. CBC and Brown concede that Pierce and Lloyd defrauded customers but deny any involvement or knowledge of the fraud.

## Discussion

Injunctive relief is available under the FTC Act "[w]henever the Commission has reason to believe . . . that any person, partnership, or corporation is violating . . . any provision of law enforced by the Federal Trade Commission." 15 U.S.C. § 53(b). In determining whether to grant a preliminary injunction, the Court must 1) determine that there is a likelihood that the FTC will succeed on the merits and 2) balance the private and public equities. *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1029 (7th Cir. 1988). "In framing the probability of success necessary for a grant of injunctive relief . . . the plaintiff's chances of prevailing need only be better than negligible." *D.U. v. Rhoades*, 825 F.3d 331, 338 (7th Cir. 2016). In balancing private and public equities, "public equities must receive far greater weight." *World Travel Vacation Brokers, Inc.*, 861 F.2d at 1029. And unlike private litigants, "it is not necessary for the FTC to

demonstrate irreparable injury." *Id.* "The greater the plaintiff's likelihood of success on the merits . . ., the less harm from denial of the preliminary injunction the plaintiff need show in relation to the harm that the defendant will suffer if the preliminary injunction is granted." *FTC v. Elders Grain, Inc.*, 868 F.2d 901, 903 (7th Cir. 1989).

**A.     Likelihood of success**

   **1.     Section 5(a) of the FTC Act**

Section 5 of the FTC Act prohibits "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1). The "FTC may establish corporate liability under section 5 with evidence that a corporation made material representations likely to mislead a reasonable consumer." *FTC v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 635 (7th Cir. 2005); *FTC v. QT, Inc.*, 512 F.3d 858, 863 (7th Cir. 2008) (citing *Kraft, Inc. v. FTC*, 970 F.2d 311, 314 (7th Cir. 1992)). The FTC need not prove intent to deceive in order to establish liability, because the primary purpose of § 5 is to protect public consumers "rather than to punish the wrongdoer." *FTC v. Freecom Commc'ns, Inc.*, 401 F.3d 1192, 1202 (10th Cir. 2005). Indeed, "an advertiser's good faith does not immunize it from responsibility for its misrepresentations." *World Travel Vacation Brokers*, 861 F.2d at 1029 (internal quotation marks omitted). Accordingly, to make a finding that a corporation's practice is deceptive, the Court looks to the "practice's likely effect on [the] mind of ordinary consumer." *Bay Area Bus. Council*, 423 F.3d 627 at 635 (citing *Freecom Commc'ns*, 401 F.3d at 1202). "The existence of some satisfied customers does not constitute a defense under the FTCA." *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 572 (7th Cir. 1989).

It is undisputed that Pierce and Lloyd's method of generating sales for CBC constituted a fraud on consumers and violated section 5 of the FTC Act. Lloyd (with Pierce's knowledge) created advertisements for fake rental listings on Craigslist to direct consumers to CBC's websites to obtain a "free credit report," knowing that signing up for the report would result in a monthly charge for credit monitoring. What is disputed is whether and the extent to which CBC and Brown were aware of or legally responsible for Lloyd's false advertising campaign.

### a. Liability of CBC

It is well established that "[p]rincipals are liable for the misrepresentations of their agents under the FTC Act." *FTC v. Lifewatch Inc.*, 176 F. Supp. 3d 757, 779 (N.D. Ill. 2016). To bind a principal, the "agent must have either actual authority, apparent authority, or the principal must ratify [the agent's] actions." *Anetsberger v. Metro. Life Ins. Co.*, 14 F.3d 1226, 1234 (7th Cir. 1994). Actual authority may be express or implied. *Opp v. Wheaton Van Lines, Inc.*, 231 F.3d 1060, 1064 (7th Cir. 2000). An agent acts with express authority when the "principal explicitly grants the agent the authority to perform a particular act." *Id.* A principal may also grant actual authority to an agent through conduct "which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account." *Moriarty v. Glueckert Funeral Home, Ltd.*, 155 F.3d 859, 866 (7th Cir. 1998) (internal quotation marks omitted). Finally, "ratification requires that the principal have full knowledge of the facts and the choice to either accept or reject the benefit of the transaction." *Sphere Drake Ins. Ltd. v. Am. Gen. Life Ins. Co.*, 376 F.3d 664, 677 (7th Cir. 2004) (internal quotation marks omitted); *see also NECA–IBEW Rockford Local Union 364 Health & Welfare*

6

*Fund v. A&A Drug Co.*, 736 F.3d 1054, 1059 (7th Cir. 2013)). A party may show ratification through circumstantial evidence, "including long-term acquiescence, after notice, to the benefits of an allegedly unauthorized transaction." *Sphere Drake Ins.*, 376 F.3d at 677 (internal quotation marks omitted).

The FTC has established a reasonable likelihood of succeeding on a contention that Pierce and Lloyd acted, directly or indirectly, as CBC's agents. Pierce and his affiliate network had express authority to use advertisements to direct traffic to CBC's websites. Brown testified that CBC's engagement of Pierce and his affiliate network permitted Pierce to delegate to others the work of driving traffic to CBC's websites.

Pierce was fully aware of Lloyd's fraudulent advertisements from the inception of Lloyd's Craigslist campaign. Pierce was directly involved in aspects of Lloyd's mailing campaign, such as giving Lloyd his approval to continue mailing advertisements. Pl.'s Reply, Ex. 12, Att. C, p. 10.

There is also evidence that CBC and Brown were anything but removed from the Lloyd/Pierce marketing campaign. Text messages between Brown and Pierce reflect that Brown, on behalf of CBC, instructed Pierce to increase or decrease the level of traffic to its website depending on CBC's needs. *Id.*, Att. A, pp. 15, 17-18, 37. Another text message indicates that Brown, on behalf of CBC, directed Pierce to change the content of the landlord letter that directed consumers to its website. Specifically, on September 4, 2015 at 8:02 p.m., Brown advised Pierce to change the wording of the offer made in the landlord letter in order to reduce complaints of phishing against CBC, saying, "Please change your template to say something [like] don't email me the report just print it out." *Id.*, p. 35. A few minutes later, at 8:08 p.m., Pierce contacted Lloyd,

7

saying, "Hey man, in your message can you make it say, 'please don't email the report, print it out and bring it on the tour.'" *Id.*, Att. C, p. 24. This evidence, taken together, gives the FTC a reasonable likelihood of showing that Pierce and Lloyd acted with CBC's actual authority, either express or implied.

Second, even if Pierce and Lloyd did not have express or implied actual authority from CBC, the FTC has shown a reasonable likelihood of succeeding on a contention that CBC had knowledge of the fraudulent Craigslist advertisements and ratified these activities. CBC received 16,000 inbound calls to its customer service center over a sixty-day period preceding the filing of the lawsuit. Of these calls, over 10,000 were recorded. Pl.'s Reply, Ex. 11, McKenney Supp. Decl. ¶ 3. At least 87 calls were marked in CBC's call logs under the disposition, "Cancellation – [Craigslist] Post." *Id.* ¶ 4. Brown testified that in 2015 he read a complaint about a fraudulent advertisement that traced back to Craigslist, asked for more information on the matter, did not receive the information, but simply stopped investigating. In addition, the Better Business Bureau received 200 complaints against CBC, a number of which referenced Lloyd's fraudulent Craigslist advertisements. Although Brown denies knowledge of the BBB complaints, he admitted that in July 2016, the BBB informed him that CBC had a pattern of complaints regarding fraudulent Craigslist advertisements. In addition, the evidence reflects that CBC had the ability to trace any particular BBB complaint to the affiliate responsible for soliciting the consumer who made the complaint. Yet CBC did nothing to track the complaints to the originating affiliate, investigate their basis, attempt to modify Lloyd's and Pierce's practices, or terminate its relationship with Pierce and Lloyd. Indeed, the thrust of Brown's testimony at the hearing was that CBC's customer service

center, which was located in the country of Colombia, was never directed to advise Brown of specific complaints or even the types of complaints that it was receiving. For example, Brown initially testified that there were no types of complaints that he instructed CBC's customer service team to forward to him directly. At a later point in the hearing, Brown seemed to change course, saying that some types of complaints were to be "escalated" to him, but he was vague on what these were, and in any event he said only two or three complaints had ever been "escalated" to him this way. The FTC has established a reasonable likelihood of succeeding on a contention that CBC hid its head in the sand and deliberately avoided knowledge of complaints so that it could keep raking in the benefits of Lloyd's and Pierce's activities.

### b. Liability of Brown

Under the FTC Act, an individual defendant is liable for corporate misconduct if he (1) participated directly in, or had some control over, a corporation's deceptive practices, and (2) had actual or constructive knowledge of the practices. *Amy Travel Serv.*, 875 F.2d at 574; *FTC v. World Media Brokers*, 415 F.3d 758, 764 (7th Cir. 2005). The FTC may establish this by "showing that the individual had actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth." *Amy Travel Serv.*, 875 F.2d at 574.

There is evidence that Brown had the ability to control Pierce and Lloyd's marketing activities. Brown testified that CBC had an internal and two external tracking systems that monitored sales and refunds per affiliate. Brown also testified that it had the power to deactivate an affiliate at any point in time. And, although Pierce and Lloyd

had their own custom landing page, CBC had authority to modify it. As discussed in the previous section, Brown had the ability to control the volume of traffic generated by Pierce and Lloyd to CBC's websites, and he had the power to control the content of Lloyd's advertisements.

The FTC has established a reasonable likelihood of showing that Brown had actual or constructive knowledge of the fake Craigslist advertisements. Brown either read BBB complaints regarding the fake advertisements or deliberately or at least recklessly ignored them. When Brown sought BBB accreditation, he received an email from the BBB informing him that it had received several complaints from customers regarding false advertisements for homes for rent on Craigslist. The BBB email also included three complaints on the topic. Brown wrote to the BBB, "It's our policy that once we identify a pattern of potential abuse we disable the offending party which we have done." Pl.'s Mot. for Prelim. Inj., Ex. 11-3, Att. I, p. 2. Brown testified, however, that he looked at only two of the complaints, and he made no effort to search CBC's internal tracking system to find out which affiliate(s) were responsible for the particular customers. And as indicated earlier, Brown's establishment of and dealings with CBC's Colombia-based customer service center seemed geared toward *preventing* knowledge of fraud-based complaints from filtering up to him. Finally, the texts between Pierce and Brown discussed earlier are arguably suggestive of some level of knowledge on Brown's part of the deceptive conduct.

In sum, the FTC has shown a reasonable likelihood of success on its contention that Brown was aware of, was recklessly indifferent about, or deliberately avoided knowledge of the deceptive activity.

### 2. Fair Credit Reporting Act

The FTC argues that CBC's website violates section 612(g)(1) of the FCRA and the Free Reports Rule, 12 C.F.R. § 1022.138. "[A] violation of any requirement or prohibition imposed under [the FCRA] shall constitute an unfair or deceptive act or practice in commerce, in violation of section 5(a) of the Federal Trade Commission Act." 15 U.S.C. § 1681s(a)(1). Section 612(g)(1) states that "any advertisement for a free credit report in any medium shall prominently disclose in such advertisement that free credit reports are available under Federal law at: 'AnnualCreditReport.com.'" 15 U.S.C. § 1681j(g)(1). The Free Reports Rule specifies that a website offering free credit reports must display a disclosure, inside a box, "across the top of each page where the disclosure is required to appear," that states the following:

> THIS NOTICE IS REQUIRED BY LAW. Read more at consumerfinance.gov/learnmore. You have the right to a free credit report from AnnualCreditReport.com or 877-322-8228, the ONLY authorized source under federal law.

15 U.S.C. § 1681j(g)(1).

The FTC has submitted several images from landing pages that were linked through Lloyd's fraudulent Craigslist advertisements. None of these landing pages included the disclaimer required by section 612(g)(1) of the FCRA and the Free Reports Rule. Accordingly, the FTC has established a reasonable likelihood of success on this claim. And on this claim, there is no question regarding Brown and CBC's knowledge or involvement; they are directly responsible for the content of the website.

### 3. Restore Online Shoppers' Confidence Act

The FTC contends that CBC's websites violates ROSCA. ROSCA states, in relevant part:

11

> It shall be unlawful for any person to charge or attempt to charge any consumer for any goods or services sold in a transaction effected on the Internet through a negative option feature . . . unless the person (1) provides text that clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information [and] (2) obtains a consumer's express informed consent before charging the consumer's credit card, debit card, bank account, or other financial account for products or services through such transaction.

15 U.S.C. § 8403.

The landing pages for CBC linked in Lloyd's advertisements expressly offers consumers a "free" credit report and credit score. The offer is conveyed in a large, bold-type heading on the landing page, "**Get Your Free Credit Score and Report as of [Date].**" Pl.'s Mot. for Prelim. Inj. at 18. In order to get the free report, a consumer is required to provide her credit card information for a $1.00 refundable charge. The offer states, "Tell us which card you would like to use for your $1.00 processing fee and membership." *Id.*, Ex. 11-4, Att. E, p. 5. Just below the section where a consumer enters her credit card information, in smaller, fainter print, the website states:

> When you place your order here you will begin your membership in eFreeScore.com. You will be billed $1.00 today and start your trial membership. After your 7-day trial period you will be charged $29.94 every month.

*Id.*

The FTC has established a reasonable likelihood of success on its claim that CBC's landing page and disclosure violate ROSCA. A reasonable determination may be made that CBC does not clearly disclose all of the material terms of its credit monitoring services offer and does not obtain the informed consent of consumers who sign up for it. The landing page contains bold, large print referencing the free credit report and score, but the disclosure of the credit monitoring offer and the automatic

deduction of the monthly fee is placed at the bottom of the page in fainter, smaller font. And although CBC's offer tells the customer that her membership will begin after a 7-day trial period, it does not actually describe what the membership involves. Finally, there is no question that both CBC and Brown have direct responsibility for the terms of the offer.

**B.     Balancing of private and public interests**

The FTC has established a reasonable likelihood of success on the merits of each of its claims. Thus the next step is for the Court to balance the private and public interests at stake. Private equities are not entitled to controlling weight, but they are given serious consideration, particularly if the defendant can show irreparable injury from the grant of an injunction. *Elders Grain*, 868 F.2d at 903. In that case, courts apply a sliding scale approach in which the FTC's probability of success on the merits is factored into the balance of harms. *Id.*

The TRO entered by Judge Coleman transferred all of CBC's assets and operations to a receiver, and the receiver has temporarily suspended the operations of CBC. The preliminary injunction would maintain that same state of affairs until the time of trial.

CBC contends that it had two lines of businesses, one of which, it says, is unrelated to Pierce, Lloyd, or the alleged deceptive practices. It contends that the proposed preliminary injunction (like the TRO) would unfairly prevent it from operating this allegedly untainted line of business. CBC also contends that the preliminary injunction will prevent it from collecting receivables from its customers, although it is unclear which customers CBC is referring to. CBC further contends that its customers

will be adversely impacted because it will be unable to provide them with credit monitoring services, and there is no way for the customers to reach out to CBC because the receiver shut down its customer service center. Finally, CBC claims that a preliminary injunction, like the TRO that is in place, will injure many of its affiliates and partners economically.

On the public interest side of the ledger, there has been readily apparent harm to a large number of consumers from CBC's violations of the FCRA, the Free Reports Rule, the FTC Act, and ROSCA. There is a serious concern about the FTC's ability to obtain restitution for consumers who were victimized. Although the receiver has been to capture approximately $2.1 million from CBC, consumer damages may be as high as $6.8 million. Pl.'s Reply at 4. In addition, following entry of the TRO, Brown transferred over $40,000 to a newly formed company, Credit Data Center LLC, as well as $150,000 to his attorney (the latter amount is currently being held in the attorney's trust account). And although CBC contends that many of its customers actually want the credit monitoring service that they signed up for, as of the date of the hearing it had not provided the receiver with usable contact and other information that would enable determination of whether this is true, and if so how many consumers want to maintain the service.[1] Given these circumstances, collection of the "receivables" claimed by CBC would be problematic, as at least a good portion of CBC's receivables, to the extent it has any, are reasonably likely to have resulted from the unlawful practices

---

[1] The TRO required CBC and Brown to produce this information to the receiver, but this was not done until the eve of the preliminary injunction hearing, and even then the information was not accessible.

14

alleged in the FTC's complaint.[2]

As indicated earlier, CBC maintains that it has a separate line of business unrelated to Pierce and Lloyd that has been effectively shut down by the TRO. But the receiver was unable to distinguish this other line of businesses due to the state of CBC and Brown's accounting records, and Brown has confirmed that there is no separate accounting that would allow distinguishing the two lines of business. Thus at present the Court is unable to sort out what revenues came from each line of business and whether, in fact, the allegedly separate line of business is untainted by the deceptive and unlawful practices that are the subject of the FTC's complaint.

CBC also misstates the receiver's role in its customer service operations. The receiver could not get in contact with CBC's customer service center, which is located in the country of Colombia, to direct it regarding how to handle customer complaints. And CBC and Brown did not provide the receiver with timely information on how to reach and communicate with the Colombian call center. Finally, the only evidence that the TRO has had a negative impact on CBC's affiliates is Brown's own testimony, which is unsupported on the present record. Brown did not identify any particular injured affiliates (aside from Lloyd and Pierce, who made their money via deceptive conduct) and did not describe the extent to which each was harmed.

Under the circumstances, the Court concludes that the public interests cited by the FTC—including preserving funds for consumer redress—outweigh the private interests cited by CBC and Brown. The Court therefore grants the FTC's motion for a

---

[2] The Court also notes that the receiver testified at the preliminary injunction hearing that CBC's books do not reflect any receivables. This testimony is uncontradicted on the current record.

15

preliminary injunction. The Court is willing to consider modifying the injunction to permit CBC to carry on its purportedly separate line of business if CBC and Brown can make a satisfactory showing that this business is indeed separate and untainted by the deceptive and unlawful practices cited by the FTC (as well as commercially viable), and if they can offer a workable mechanism for modifying the injunction to allow them to continue or resume that business.

## Conclusion

For the foregoing reasons, the Court grants plaintiff's motion for a preliminary injunction against defendants Credit Bureau Center, LLC and Michael Brown. The FTC is directed to immediately provide a Word version of its proposed order via the undersigned judge's proposed order e-mail address. The Court reserves the right to make appropriate modifications to the proposed order. The case is set for a status hearing on Monday, February 27, 2017 at 9:30 a.m.

```
                                    _____
                                          MATTHEW F. KENNELLY
                                          United States District Judge
```

Date: February 21, 2017