**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION | § | Case No. 17-cv-194 |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | Judge Kennelly |
| | § | |
| CREDIT BUREAU CENTER, LLC, *et al.,* | § | |
| | § | |
| Defendants. | § | Magistrate Judge Valdez |

---

**TABLE OF CONTENTS FOR REPLY MEMORANDUM IN SUPPORT OF**
**DEFENDANTS' MOTION FOR RETAINER FOR NEW COUNSEL**

**Table of Contents** …………………………………………………………………… **1**

**Table of Authorities** …………………………………………………………… **3**

**Reply Memorandum in Support of Defendant's Motion for Retainer for New Counsel …. 4**

    **I.**    **Defendants Have a Right to Untainted Funds for their Defense.**
        **There is Substantial Authority That the FTC's Statutory**
        **Remedies of Disgorgement Are Constitutionally Infirm** …………………………… **7**

    **II.**    **Fees Are Necessary for Counsel to Conduct Discovery and**
        **Advocate for CBC Operating its Separate Line of Business** …………………….. **9**

    **III.**    **Settlement Has Been Complicated By the FTC's Position on Fees**
        **and Defendants' Attorneys Denying That They Gave Defendants**
        **Bad Advice That Violated the Court's Orders** ………………………………… **10**

      **A.**  **Non-Lawyers Need and Rely Upon Advice of Counsel in Litigation.**
        **Mssrs. Zini and McKay Advised Mr. Brown That He Could Operate**
        **Zenfia, LLC and Use CBC's Data As Part of This Business Activity** …………… **11**

      **B.**  **When Mr. Brown Wanted to Rely on their Advice, His Attorneys**
        **Told Him and the Court That They Would Have to Withdraw**
        **and Deny That They Gave Such Advice.** ………………………………………… **12**

    C.  **Representations to the Court at the Contempt Hearing** ……………………….. **12**

    D.  **The Text Messages Between Zini, Parker and Brown Tell the Real Truth** ……. **13**

    E.  **Further Representations to Brown's New Counsel Prior to Filing This Motion** …………………………………………………………………. ……… **14**

**IV.**    **Defendants Counsel Breached Their Fiduciary Duty of Loyalty to Defendants** …………………………………………………………………….. **15**

**V.**    **The ROSCA and FCRA Findings Do Not Appear to be Supported by Law** .... **16**

**VI.**    **There is Additional Evidence Subject to Discovery Regarding Count 1** ………**19**

**VII.**    **Conclusion** …………………………………………………………………..... **24**

# TABLE OF AUTHORITIES

**Supreme Court**

*Austin v. United States*, 113 S. Ct. 2801, 125 L .Ed. 2d 484 (1993) ……………………………… 7

*Kokesh v. S.E.C.,* 137 S. Ct. 1635, 156 L.Ed.2d 86 (2017)  ………………………………… 7 - 11

*Luis v United States*,  136 S.Ct.1083, 194 L.Ed 2d 256 (2016) ………………………………… 7

**Court of Appeals**

*FTC v. Amy Travel Serv., Inc.,* 875 F.2d 564, 575 (7th Cir.1989) ……………………………… 11

**District Court**

Parus Holdings, Inc. v. Banner & Witcoff, Ltd., 585 F.Supp.2d 995, 1005-1006 (N.D. Ill. 2008) …………………………………………………………………………  16

**Constitution**

U.S. Amend 5 ………………………………………………………………………………… 5

**Federal Rules**

15 U.S. Code §1681 ……………………………………………………………………… 19, 20

15 U.S. Code §8403 …………………………………………………………… 16, 17, 19, 20

**State Rules**

Illinois Rules of Evidence, Rule 502 …………………………………………………... 23, 24

Illinois Rules of Professional Conduct Rule 1.3 …………………………………………….. 16

Illinois Rules of Professional Conduct Rule 3.3 …………………………………………….. 16

Illinois Rules of Professional Conduct Rule 4.1 …………………………………………….. 16

Illinois Rules of Professional Conduct Rule 8.4 …………………………………………….. 16

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION | § | Case No. 17-cv-194 |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | Judge Kennelly |
| | § | |
| CREDIT BUREAU CENTER, LLC, *et al.*, | § | |
| | § | |
| Defendants. | § | Magistrate Judge Valdez |

## REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR RETAINER FOR NEW COUNSEL

The FTC seems to be arguing that counsel should receive no fees because there is a possibility that he will be incurring fees for work previously performed by prior counsel and any payment of fees in this case would be inappropriate because victims must be compensated. Such extreme positions ("No-Fees-No-Way") rarely serve the ends of justice and ignore the actual language of the Court's Memorandum Opinion and Order and Order on Attorney's Fees. The FTC also seems to be suggesting that the Court should refuse to grant fees because the case should be settled and then martials evidence to support their view of the case. Settlement may be achieved in this case, but recent decisions by the Supreme Court works substantial changes to the FTC's authority to seek disgorgement of funds and to limit access to "untainted" funds.

The FTC's opposition memorandum seeks to vilify Michael Brown in a case where, *at best*, individual liability is based on an alleged disregard of complaints of a fraudulent scheme by Lloyd and Pierce. Unlike the vast majority of courts that have imposed individual liability against corporate owners, Mike Brown was not directing fraudulent operations conducted by Lloyd &

4

Pierce, and did not actually know that the real estate listings were a sham and fraud.[1]   Indeed, Brown would have insisted on using legitimate real estate listings because the marketing concept was legitimate, cost-effective and created satisfied customers.   Injunctive relief is preliminary and allows the parties to fully develop the facts through discovery.   This Court recognized the preliminary nature of its findings and also recognized that Defendants should have access to funds for their defense.

The request for retainer should not be denied because there are *significant* issues material to the outcome of this case that justify expenditure of attorney's fees.[2]   Defendants ask this Court to overrule the FTC's objections to the requested retainer for the following reasons:

1. Defendants are entitled to funds from untainted assets not properly attributable to the alleged violations of the FTC Act.  The Receiver was unable to determine which revenues came from which website and the extent to which funds seized from CBC contained untainted funds.  Defendants must be allowed access to customer data to establish that untainted funds exist, and may be used toward their defense.  Counsel recently made informal and formal requests for CBC's data base.

2. Disgorgement is not allowed as a remedy under the FTC Act because the intention is to penalize individual offenders and deter others similarly situated.  Simply stated, the *in terrorem* threat of disgorgement and justification for an asset freeze is improper because individuals accused by the FTC are subjected to the threat of losing everything they own despite legitimate defenses under the constitution.  See U.S. Amend 5.

3. At the very least, if Defendants are to be subjected to punishment, they should be allowed access to untainted funds to defend themselves.  As a matter of Fifth Amendment due process, CBC must have funds to allow competent counsel to present their defense.  As set out below, it appears that the disgorgement claims and seizure of the entire business and Brown's assets constitutes "punishment"

---

[1] There is a distinction between knowing that non-existent listings are being used to defraud customers and recklessly disregarding customer complaints that have, over time, been resolved through refunds.  A court may be empowered to impose liability for both, but fairness and due process requires that the severity of the remedy be tempered with the level of culpability.  See U.S. Amend 5.

[2] It is important to note that counsel does not intend to ask the court to authorize fees covering all of counsel's fees associated with coming up to speed in this case.

and therefore entitles Defendants to rights guaranteed under the Sixth, Seventh and Eighth Amendments. Further analysis is required so that Defendants can make an informed judgment on how or when to squarely raise these issues with the Court.

4. Defendants' overall position in this case was undermined when their then-counsel advised Defendants that they could re-start the business using the very same customer information subject to specific prohibitions under the Preliminary Injunction. Mr. Brown wanted to raise the defense to the contempt charges. Incredibly, counsel told the Court that if Mr. Brown asserted the advice-of-counsel defense, they would deny the allegations. **Counsel did, in fact, advise Mr. Brown that Defendants could re-start the business and use prohibited customer data.** Simply stated, it appears that counsel suppressed the truth while their client was punished for doing what clients should do when it comes to legal matters--- following their attorney's advice.

5. Michael Brown was denied effective assistance of counsel in contempt proceedings because his attorneys had a conflict of interest, breached their fiduciary duty to their client and effectively misled the Court about their advice of counsel to Mr. Brown.

6. Finally, the FTC's settlement position turns on voluminous documents and various legal issues some of which are in their complaint and some which are evidentiary in nature. The issues require legal and factual analysis as opposed to shoot-from-the-hip" rhetoric.

Counsel has requested a modest retainer of $20,000 to get started in the case subject to this Court's entry of an order balancing the need to pay reasonable fees against the potential recovery by alleged victims.[3]

---

[3] Counsel has been practicing law since 1979 serving as a Navy JAGC, Assistant United States Attorney, Chief Disciplinary Counsel and in AV-rated law firms. The hourly rate is reasonable given the complexity of the issues and counsel's experience in complex fraud and DTPA matters. Counsel notes that Mr. Rubin billed at $425 per hour. While at Epstein Becker & Green in Houston over a seven year period (leaving in 2010), the undersigned was billed at $425 per hour. Counsel will discount a substantial amount of time expended in coming up to speed in the case and will identify entries that fall into that category.

I.  **Defendants Have a Right to Untainted Funds for their Defense.  There is Substantial Authority That the FTC's Statutory Remedies of Disgorgement Are Constitutionally Infirm.**

Addressing Points 1 through 3 above, denial of access to untainted funds violates constitutional standards recently set out in *Kokesh v. S.E.C.,* 137 S. Ct. 1635, 156 L.Ed.2d 86 (2017) and *Luis v United States*, 136 S.Ct.1083, 194 L.Ed 2d 256 (2016).  In *Kokesh,* the Court *unanimously* held that disgorgement was a penalty designed to punish violations of the securities laws.  "Disgorgement, as it is applied to SEC proceedings, operates as a <u>penalty</u> under § 2462." 137 S.Ct. at 1645 (emphasis supplied). Because the penalty is tantamount to a criminal fine under the rubric of "equitable relief", the Court must assure that proceedings against Defendants are constitutionally sound. *Luis* is a criminal forfeiture case where the Court held that a district court committed reversible error by refusing to hold a hearing to determine the availability of untainted fund to retain counsel of choice.

These two Supreme Court decisions make it clear that the awesome power of government regulators to shut businesses down is limited by the Fifth, Sixth, Seventh and Eighth Amendments to the United States Constitution.   Counsel has not thoroughly evaluated the law supporting these claims and believes that there are legitimate legal issues that must be briefed to assist the Court in resolving these issues.  Finally, the Supreme Court's decision in *Austin v. United States*, 113 S. Ct. 2801, 125 L .Ed. 2d 484 (1993) analyzes the excessive fines clause in the Eighth Amendment. *Austin* was an asset forfeiture case but provides some guidance in analyzing whether the disgorgement remedy is an excessive fine under the Eighth Amendment.

Disgorgement requires that the defendant give up "those gains…properly attributable to the defendant's interference with the claimant's legally protected right."  *Kokesh*, at 1640.  Use of disgorgement is a powerful tool to extract one-sided settlements from alleged violators and has

7

become a profit center for the United States treasury.[4] To date, Defendants do <u>not</u> have access to the information that would show the existence and amount of untainted funds. In the instant case, the FTC's claim for disgorgement and asset freeze reflects a disturbing trend in government agencies suing for relief, immediately freezing all of Defendant's assets and aggressively limiting the individual's ability to use untainted assets and access to critical information to defend themselves in an FTC action.

Like the Securities Act, the "FTC Act" does <u>not</u> specifically authorize disgorgement.[5] FTC restitution is imposed for violating a public law; it is intended to deter and punish; and it does not necessarily compensate alleged victims because the FTC has no obligation to make restitution to consumers and often merely hands over funds to the U.S. Treasury.[6] Justice Sotomayor authored *Kokesh*. The unanimous decision by the Supreme Court in *Kokesh* indicates that even the justices that one might expect to support a "consumer protection" remedy take a dim view of judge-made

---

[4] See https://www.forbes.com/sites/insider/2017/07/11/chronicle-of-disgorgements-death-foretold-kokesh-v-sec/#6593ef3c61b8. No doubt, statistics are probably available and will be obtained for the court's consideration.

[5] The FTC's remedies of disgorgement and restitution are <u>not</u> derived from an express statutory grant but have emerged from court decisions that have "read" these remedies into Section 13(b), a general statutory that authorizes only injunctions. Courts have created this remedy by exercising "inherent equitable powers as a form of ancillary "equitable" relief. Regardless of the label used, Kokesh makes it clear that disgorgement and restitution under the FTC's statutory structure is a penalty subject to constitutional limitations. "A modern statutory forfeiture is a "fine" for purposes of the Eighth Amendment." *Kokesh* at 1645. Counsel understands that the SEC has obtained *billions* through disgorgement and that the FTC may not be far behind on matching the SEC's efforts. Government regulators are understandably attracted to disgorgement like catnip to a cat.

[6] Forbes on line reported that: Justice Anthony Kennedy asked if "specific statutory authority … makes it clear that the district court can entertain [the disgorgement] remedy." Both Justices Samuel Alito and Sotomayor asked for the source of authority seeking disgorgement. Justice Neil Gorsuch specifically noted that there was no statute governing disgorgement. He said, "We're just making it up." ttps://www.forbes.com/sites/insider/2017/07/11/chronicle-of-disgorgements-death-foretold-kokesh-v-sec/#6593ef3c61b8

remedies of disgorgement and restitutionary remedies being exercised by regulators to penalize and deter other violators.[7]

In sum, the Court should exercise caution in denying attorney's fees where, as here, the FTC alleges millions must be frozen but then opposes any attorney's fees and either limits or blocks any effort to get real statistics to either support or refute its claims. Defendants' position on the constitutional issues are preliminary, but appear to have firm grounding in the trilogy of cases cited above. Thus, defendants reserve potential arguments to dismiss the FTC's disgorgement and restitutionary remedies and arguments regarding the constitutional limits of such remedies for another day.

## II. Fees Are Necessary for Counsel to Conduct Discovery and Advocate for CBC Operating its Separate Line of Business.

This Court recognized that Defendants had a right to seek modification of the Court's order to "permit CBC to carry on its purportedly separate line of business if CBC and Brown can make a satisfactory showing this business is indeed separate and untainted by the deceptive and unlawful practices cited by the FTC…." Memorandum Opinion at 16. Defendants cannot make any showing without the information and a lawyer to help them martial the evidence.

Plaintiff has not had an opportunity to conduct meaningful discovery and make an informed request to this Court regarding the non-Lloyd/Pierce line of businesses, which includes white label and co-branding businesses. This would necessarily require access to the data bases seized by the FTC. Simply stated, the Receiver either did not have the expertise or the incentive to determine the sources of revenue from non-Lloyd/Pierce line of business. The data must be made available

---

[7] In light of *Kokesh*, Defendants reserve the right to seek dissolution of CBC and Michael Brown's assets.

to Defendants to analyze.[8]  Defendants believe that a substantial percentage of CBC's revenues are attributable to revenues not generated through Lloyd and Pierce.  The data will clearly demonstrate volume from each website and mobile site.

### III. Settlement Has Been Complicated By the FTC's Position on Fees and Defendants' Attorneys Denying That They Gave Defendants Bad Advice That Violated the Court's Orders.

In their response, the FTC complains that settlement discussions have been ongoing for six months.  Dkt. 128 at 5-6.    Part of the problem is that the FTC has not addressed the impact of *Kokesh* in seeking disgorgement and restitution.

Historically, the dynamics of settlement in any FTC case involving disgorgement, restitution and frozen assets allows the FTC to impose a stranglehold on defendants who cannot afford legal services without court approval, are facing complete destruction of their business and, in the case of the owners, complete loss of anything they ever owned.   The settlement discussion is even more one-sided because the FTC also threaten life-long bans in the industry if defendant resists their settlement position.  As illustrated by their response, the FTC invokes the spectre that victims will not be compensated if the Court allows fees.  Assets of $2.1 million have been seized; yet, evidence of complaints about the service provided by CBC is limited.

Even assuming *arguendo* that the advertising may be deceptive, that does not automatically mean that thousands of customers were dissatisfied with the service.   Indeed, even in the Lloyd/Pierce line of business, all the customers were looking for rental property and all of them wanted to demonstrate good credit to potential landlords.  While Pierce and Lloyd tricked these

---

[8] In fairness to the FTC' attorneys, they are concerned about misuse of the data by Defendants. This can be done by providing customer data redacting customer information (name, address, phone, credit card data, etc) but leaving the numerical designations automatically assigned by CBC's system.  This should be relatively easy to accomplish with the real data be provided on an attorneys eyes only basis, with redacted data being available to Defendants.

customers, they still received the credit products offered by CBC. While this Court has made a preliminary finding that Michael Brown recklessly disregarded complaints about Pierce and Lloyd's conduct, the Supreme Court's decision in *Kokesh* casts serious doubt on the imposition of disgorgement in this case.

The FTC's position in settlement has hardened since the Court found Mr. Brown in contempt seeking sanctions that Defendants believe exceed the scope of the statute and which are not reasonably related to the alleged violations. In some cases, a contempt finding may justify more stringent sanctions, but the FTC *knew* that Brown had a conflict of interest with his current counsel and refused to fund counsel to come in and represent Mr. Brown on the contempt issue.[9] Counsel does not blame the FTC's attorneys who are likely implementing a Commission policy opposing *any* attorney's fees in this type of case. However, Mr. Brown's inability to retain independent counsel resulted in serious harm to his defense in this case.

### A. Non-Lawyers Need and Rely Upon Advice of Counsel in Litigation. Mssrs. Zini and McKay Advised Mr. Brown That He Could Operate Zenfia, LLC and Use CBC's Data As Part of This Business Activity.

While the principle is well established, non-lawyers rely on the "guiding hand" of counsel to make decisions on how to proceed when it comes to complying with Court orders where, as here, violating the Court order may result in contempt. Mr. Brown is a non-lawyer whose education consists of a GED, some community college and on the job training while employed at Experian. **Exhibit A,** Declaration of Michael Brown. Like most non-lawyers, Mr. Brown looked to, and relied upon highly educated, experienced attorneys to give him advice about the FTC

---

[9] There was a debate at the hearing on the availability of the advice of counsel defense. "[R]eliance on advice of counsel [is] not a valid defense on the question of knowledge" required for individual liability." *FTC v. Amy Travel Serv., Inc.,* 875 F.2d 564, 575 (7th Cir.1989). However, advice of counsel is available where, as here, counsel *affirmatively* advised Defendants to violate a court order, resulting in Defendants being held in contempt.

complaint and this Court's orders.   Undersfortunately, his attorneys gave him bad advice and told Mr. Brown that he could re-start CBC's business through Zenfia, LLC and use the old customer data base.

**B.  When Mr. Brown Wanted to Rely on their Advice, His Attorneys Told Him and the Court That They Would Have to Withdraw and Deny That They Gave Such Advice.**

When the FTC pursued contempt proceedings, counsel then advised Mr. Brown that he should not raise the advice of counsel defense to this Court. **Exhibit A,** Brown Declaration.  Zini and Parker then represented to the Court that if Brown raised the defense, they would deny the allegations and filed a motion to that purpose.  Dkt 86 Motion to Withdraw.  As set out below, Brown tried to retain independent counsel to represent him on the contempt issue but could not retain counsel because the FTC denied funds for at least two attorneys who contacted the FTC to discuss the matter. **Exhibit A,** Brown Declaration.

**C.  Representations to the Court at the Contempt Hearing**

During the contempt hearing, Greg Zini represented to the Court the following regarding the "miscommunication" between client and counsel:

> Mr. Zini: What we can say without revealing the contents of any communications and without waiving any privilege, is that we sincerely believe there was a miscommunication between counsel and clients with respect to what could or could not be done pursuant ot paragraph 6B of the preliminary injunction which deals with use of customer data. Either counsel misunderstood questions posed by the client or the client misunderstood answers provided by counsel or both. **Exhibit B**  at 10, Dkt 113.

Mr. Zini characterizes a miscommunication between himself and the client, when in reality the questions that Mr. Brown had regarding the data were very straightforward and Mr. Zini did not seem to have any confusion regarding when these questions were asked.

Additionally, Zini and MacKay told me that they would split the costs of the contempt fine three ways with me and actually mentioned to the Court that they would be willing to give up some of their costs in order for Brown to pay the contempt finding. *Dckt 113* at 53-54; **Exhibit A**, Brown Declaration, ¶15g.  Zini stated to the Court: "I'll take a little bit less, and Parker MacKay saying, I'll take a little be less, and Mike Brown saying, I'll take a little bit less on living expenses application that we sent on . . . But if we need to create a set – a fund of assets that way, both Mr. MacKay and I are willing to be flexible on that." In reality neither MacKay or Zini were willing to part with any of their fees, and wanted to take the $150,000 that Brown gave them at the beginning of this case.

### D.  The Text Messages Between Zini, Parker and Brown Tell the Real Truth.

The text messages between lawyers and client tell the real truth----that Zini and Parker did, in fact, advise Brown that he could re-start the business and use CBC's customer data:

    a.  On March 3, 2017 I was told by MacKay and Zini that I would be able to use old customer data and it would not violate the preliminary injunction.  The text message exchange between myself, MacKay and Zini is below:

> Mike: Parker or Greg do you have 5 min now or sometime today? Ling want to do a quick call and confirm we allowed to use the past customer data and bill them (the good ones only)

> Greg: Yes in a few. But the short answer is I think so.

> Mike: Ok please be more confident thank I think so lol. Call me in a few.

> Greg: I can't be more confident than I think so right at the moment. I need to look at the order again and I'm not in a place where I can do that right now. Want to talk in the am instead?

> Mike: [Picture of excerpt of Order] We were relying on page 14 last sentence of paragraph "A". Only limits customer data if obtained b the bad activities alleged in the complaint. If

that screenshot is enough to be more confident let's do now.
I know parker already said was ok. AM EST is hard for Ling
since he pacific time

Greg: Looks good to me. I will upgrade my response to "yes
but anything can happen." **Exhibit C.**

### E. Further Representations to Brown's New Counsel Prior to Filing This Motion.

Prior to filing this Motion, counsel asked Mssrs. Zini and Mackay to explain why they
moved to withdraw. The purpose was to find out their side of the "story" before drawing any
conclusions and to give both Parker and Mackay an *opportunity* to reconsider the damage done to
their client. The following exchange occurred:

**From:** Stephen Cochell [mailto:srcochell@gmail.com]
**Sent:** Monday, October 09, 2017 10:17 PM
**To:** Parker MacKay; Zini, Gregory
**Cc:** Jonathan L. Slotter
**Subject:** Contempt Order

Gentlemen:

I had a lengthy discussion with our client today regarding the contempt of court
issue. I'm at a loss as to why you took took the position that you took vis a vis the
contempt. I assume that you were prepared to explain your position to the Court
when you filed your motion to withdraw and that you probably prepared an
affidavit.

Mike says you advised him that he could restart the business and use the old
customer data base. Regardless of other issues, is that true?

What advice, if any, did you give Michael Brown after it became clear that he
wanted to tell the court that you advised him that he could restart the business and
use the prohibited customer information. The impact of a contempt order on the
defense of this lawsuit is devastating to CBC and reflects adversely on Mike's
credibility with the Court.

We are contemplating a motion to set aside the contempt order. Thus, we request
that you provide us with a detailed explanation of what you contend happened and
your factual and legal basis for your actions. In that vein, we believe that you
have a fiduciary [duty] to this client to provide this explanation in order to avoid
filing this motion if at all possible.

If we do not receive a response from you by or before October 15, 2017, we will take steps to file a motion with the Court to vacate the Order.

---

**From: Zini, Gregory**                                         1:21 PM (5 hours ago)

to me, Parker, Jonathan

Hi Steve,

I think the basic issue here is that we did not tell him to restart the business and use the old customer database.  Accordingly, we could not ethically interpose a defense stating otherwise.

Because the issue concerned advice of counsel, which always is privileged, I did not prepare an affidavit concerning my discussions with Mr. Brown.

**Exhibit D.**  Unfortunately, Mr. Zini apparently forgot that he sent texts to Mr Brown that directly contradicted the position taken with his client and contrary to representations made to the Court.

## IV.    Defendants Counsel Breached Their Fiduciary Duty of Loyalty to Defendants.

Prior to the hearing, Mr. Brown tried to retain counsel to represent him on the contempt issue.  Mr. Brown was informed that the FTC refused to support any funds expended on representing Mr. Brown.   In the face of being held contempt, Mr. Brown was not able to make an informed judgment on how to proceed so he did nothing.  Indeed, the FTC's refusal to fund independent counsel left his conflicted counsel free to advise him not to oppose the contempt, threatened to withdraw from the case, represented to the Court that they did not advise him to open Zenfia, essentially telling him and the Court that they would take the position that he was either lying or mistaken about asserting the advice of counsel defense.

15

Attorneys who make mistakes in representing clients have a duty to step up to the plate and be candid to their lawyers and to the Court. Instead, Mssrs. Parker and Zini breached their fiduciary duty of loyalty to their client and their duty as officers of the Court leaving Mr. Brown to fend for himself.[10] *See* Illinois Rules of Professional Conduct Rule 1.3, Rule 3.3(a) (Candor to the Tribunal); Rule 4.1 (Honesty in Dealing With Third Persons); Rule 8.4 (a) –(d) (Misconduct) While the FTC may <u>not</u> have been privy to the precise communications, invocation of the advice of counsel defense to these contempt charges leaves no room for imagination. It appears that the FTC was satisfied to stand by while Defendants' own lawyers pressured and took advantage of a client causing this Court to hold him in contempt. The FTC's hardened settlement positions are a function of a contempt finding obtained because Mr. Brown was not represented by conflict-free counsel.

Instead of having attorneys serve as his advocate, Michael Brown **stood alone** and was found to have intentionally violated a court order. Intent to specifically violate the Order by this non-lawyer is negated by reliance on advice of counsel. The Court should vacate the Contempt Order to preserve the integrity of the Court, to uphold the standards of the legal profession and to remedy any violations of Mr. Brown's right to due process. *A separate motion will be submitted to the Court.*

## V. The ROSCA and FCRA Findings Do Not Appear to be Supported by Law.

Simply put, the FTC asserted that Brown violated the Restore On Line Shopper's Credit Act ("ROSCA's") negative option disclosure requirements. However, there are negative option

---

[10] See *Parus Holdings, Inc. v. Banner & Witcoff, Ltd.*, 585 F.Supp.2d 995, 1005-1006 (N.D. Ill. 2008) (J. Hart) (Regardless of characterization as breach of fiduciary duty or legal malpractice, an attorney's "throwing one client to the wolves to save the other is malpractice, [citations omitted] whatever the plaintiff chooses to call it. [Citation omitted.]).

disclosures that appeared exactly where they are supposed to appear---at a location before the customer submits the billing information. Brown patterned the design of CBC's website to a website established by FreeScore360.com that was modified after an action by the FTC. In other words, he thought it complied with that Consent Decree and therefore complied with FTC regulations. Apparently, the FTC believes that the negative option warning must accompany every statement representing that a product is "free" or a "trial offer." Such disclosures are impossible to include on google advertising. Moreover, the statute does not require the disclosure on a "home page" which merely describes the service. The requirement that the disclosure appear whenever the words "Trial" or "Free" is used goes far beyond what the statute requires and cannot be implemented as a practical matter. **Exhibit A** Declaration of Michael Brown ¶5. ROSCA provides, in pertinent part, that:

> i)        *(a) REQUIREMENTS FOR CERTAIN INTERNET-BASED SALES.—It shall be unlawful for any post-transaction third party seller to charge or attempt to charge any consumer's credit card, debit card, bank account, or other financial account for any good or service sold in a transaction effected on the Internet, unless— (1)* **_before obtaining the consumer's billing information_**, *the post-transaction third party seller has clearly and conspicuously disclosed to the consumer all material terms of the transaction, including— .....*

The following disclosure appeared on Creditupdate.com:

**-SEE NEXT PAGE-**



●●○○○ AT&T   LTE          9:13 PM              ⌁ 55% ◼▮

# Verification and Payment Information

Tell us which card you would like to use for your $1.00 refundable processing fee and membership

**Credit Card Number:**

**CVV Code:**

**Expiration Date:**

01 - Janua ▼          2017 ▼

Payment Information
When you place your order here you will begin your membership in CreditUpdates.com. You will be billed $1.00 today and start your trial membership. After your 7-day trial period you will be charged $29.95 every month. If you wish to cancel just call us at (800) 720-6627 to stop your membership.



Moreover, CBC sent "Welcome" letters that restated the ROSCA disclosure stating: "Thank you for enrolling in your 7-day trial membership to CreditUpdates.com After your 7-day trial period you will be charged $29.94 every month until cancelled. If you wish to cancel just call us at (800) 720-8627 to stop your membership." **Exhibit A** Declaration of Michael Brown ¶6. This disclosure was not required by ROSCA and supports Defendants' contention that they were doing the right thing the right way.

Again, Mr Brown does not fall into the class of alleged violators who set out defraud consumers but has also been victimized by people who were legally and ethically bound to follow all government rules and regulations. **Exhibit A** Declaration of Michael Brown ¶5.

Moreover, the statute does not require that the disclosure be provided anywhere except prior to obtaining the customer's payment information. The FTC may want to engraft new statutory requirements into ROSCA, but the Court may not create new requirements that were not authorized by Congress.

The FTC's allegations in Count 5 regarding the Fair Credit Reporting Act ("FCRA") also raises concerns about the FTC's position. The FCRA places additional restrictions on marketing "Free Credit Reports". When that requirement was added, the credit reporting industry changed to market "Free Credit Scores" instead of reports. Thus, customers were offered free credit scores, but not free credit reports. Either of these options are lawful. Experian is a prime example of this change in marketing, which occurred while Mr. Brown was employed at Experian. **Exhibit A** Declaration of Michael Brown ¶2.

## VI.     There is Additional Evidence Subject to Discovery Regarding Count 1.

As a threshold matter, it appears to counsel that the FTC's claims in Count 1 depend, in large part, on whether Defendants violated ROSCA and the FCRA.  In other words, if the Court ultimately determines that the ROSCA and FCRA claims fail, the only claims that may go to trial are the claims arising out of Lloyd and Pierce's fraudulent conduct.

There was some confusion and failure to present evidence regarding the level of responsibility that CBC and Mike Brown had for conduct undertaken by Lloyd and Pierce and why Mr. Brown was not alerted to the various complaints that came through CBC's Customer Service Department.  First, it should be noted that Mr. Brown was never the subject of any prior FTC or other consumer lawsuits alleging deceptive trade practices.  **Exhibit A,** Brown Declaration ¶3-6 .Secondly, CBC has marketed numerous credit products through approximately thousands of real estate agents, including the California Association of Realtors, Realty Times, Business Lenders, and many credit repair companies and other substantial companies that wanted to co-brand, white label, or direct traffic to CBC.  *Id.* Pierce represented that he had a data base called RTO (Rent to Own) Data Base that queried MLS Multiple Listing Service Data Source) to feature rental properties for interested renters to access his data base properties.   The RTO Data Base appeared legitimate and Pierce told Brown that he was "killing it" meaning that he was very successful in obtaining customers. Pierce had access to real rental properties from the MLS data source or misrepresented he did to deceive CBC. *Id.*

Unbeknownst to Brown, Pierce knowingly engaged Lloyd to advertise **non-existent** properties on Craig's list to induce customers to use Pierce's website to link to go to CBC's website.   The first time that Mike Brown became aware of Lloyd was the day that his accounts were frozen.  CBC was a successful credit reporting service that was growing quickly, about

20

doubling year over year.   While the pace of CBC's growth increased dramatically after CBC affiliated with Pierce, it made no sense to get involved in a patently fraudulent scheme.   The marketing plan used by Pierce would have worked just as well with genuine real estate listings. Exhibit A,  Brown Declaration ¶22  .If Brown actually suspected that Pierce website was populated with non-existent listings, he would have terminated CBC's relationship with Pierce and either established this type of service through CBC or located a legitimate company who would have established a legitimate service with legitimate properties for interested renters.  Indeed, access to the MLS data base to allow identification of rental properties by area costs only $699 per month.*Id.*

CBC's customer service managers, supervisors, and agents worked to resolve any complaints.  Mike was aware that Customer Service was creating an email template for questions and/or complaints through Craig's List.  The known scams for Craig's List at that time was for websites advertising food stamps, government housing (HUD), gift cards (incentive offers) that required a credit report or score from the customer to earn the gift card.  Exhibit A,  Brown Declaration ¶ 23. Mr. Brown directed customer Service to escalate those know scams and complaints to him. *Id.*

For first year and a half, Mike Brown was intimately involved with customer service.  As the company grew, Mike allowed the Customer Service Department to handle all complaints. They would handle all questions, inquiries or complaints from customers and from the Better Business Bureau ("BBB").  There were *approximately* 2 to 4 complaints per month with many thousand sign-ups per month.  Customer service had between 80 to 400 calls per**.  Exhibit A,** Brown Declaration ¶24  .These were handled by, at many times, a dozen or more Customer Service Representatives with one to two supervisors and one manager.

With this volume, customers signing up for CBC's products and services, the number of complaints was not statistically significant.   Of course, that does <u>not</u> immunize anyone from compliance with the law but it does go to notice of alleged improper consumer practices.   BBB has a proprietary formula that evaluates at least the following: (1) the age of the business; (2) the number of complaints relative to the size of the business; (3) if there is a response to the complaint; and (4) if the customer is satisfied with your response to the complaint.   BBB submits complaints listing the website involved.  During the life of the creditupdate.com website, about one to two years, CBC had an A+ rating with the BBB even though there was a total of 72 BBB complaints. Mike Brown did not recall reviewing these complaints regarding the Pierce website because they were generally handled by customer service. Mike did see two complaints in summer, 2016 when CBC applied for BBB accreditation but did not appreciate that the real estate listings were non-existent.

Hindsight is 20:20 vision.  When customers want to terminate service, many of them call and complain that they are a victim of a scam.   The Customer Service Representatives were skilled at helping customers understand CBC's credit-related products and services, but were not skilled at detecting potential fraud or patterns potential fraud in CBC's affiliates.  Blatant fraud, such as people calling in with the same credit card number, for example, would be escalated to Mike Brown.

When Mike Brown reviewed the two BBB complaints that asserted that a landlord that did not reply to the website, it did not set off alarm bells that there must be fraud afoot.  Both complaints were resolved with a refund and one was especially old.   While one can exercise 20:20 hindsight and conclude that Mike Brown should have launched a full fraud investigation, the Craig's List real estate looked legitimate to him. Even the apparently fraudulent non-existent

22

properties referenced in the FTC investigators reports appear real and it would now seem the property photos and property descriptions were stolen from actual real properties.

Further discovery of the data base and of the FTC's information is necessary to validate the number of complaints, their source and nature of the complaint.

## VII. Brown's Waiver of the Privilege Is Narrow.

There is a temptation for attorneys accused of misconduct to exceed the scope of an appropriate response to the alleged misconduct by unnecessarily disclosing privileged communications that are either irrelevant or simply calculated to embarrass or even hurt the client. The narrow issue being raised by Mike Brown related solely to advice he received from Greg Zini and Parker MacKay as to whether they recommended that he start Zenfia using CBC data. The client says they did. The attorneys deny the allegations. The text messages support the Client's allegations. The attorneys have a right to disclose additional information that concerns the same subject matter and ought in fairness should be considered with Mr. Brown's disclosures on the issue of restarting the business using CBC data and their discussions regarding the advice of counsel defense.

The law of waiver of privilege is stated in Rule 502, Illinois Rules of Evidence.

Rule 502 states:

> **(a) Disclosure Made in an Illinois Proceeding or to an Illinois Office or Agency; Scope of a Waiver.** When the disclosure is made in an Illinois proceeding or to an Illinois office or agency and waives the attorney-client privilege or work-product protection, the waiver extends to an undisclosed communication or information in any proceeding only if:
>
> > **(1)** the waiver is intentional;
> >
> > **(2)** the disclosed and undisclosed communications or information concern the same subject matter; and

(3) they ought in fairness to be considered together.

To the extent that counsel believe that a disclosure may run afoul of the privilege, they have the option to file that material under seal with the Court. Otherwise, they run the risk of breaching the attorney-client privilege.

## VIII.   Conclusion

Defendants filed this reply to amplify the fact that there are significant legal issues that may have to be resolved by the Court unless the parties can reach settlement in this case. Counsel understands that the Court must balance an award of fees based on the need for compensating alleged victims in this case, but also believes that FTC's power of disgorgement, life time bans and other sanctions historically imposed by courts are no longer viable due to new Supreme Court precedent. If the Court agrees with Defendants on one or more of these issues, the FTC's right to recovery against Defendants is greatly affected. While constitutional issues may be interesting, settlement is usually the best result for a client. Other issues have emerged in this case that counsel would have preferred to avoid.

Counsel takes no pleasure in filing a motion that questions the honesty of lawyers representing a client. However, counsel has a duty to report such matters to the Court, and must do so particularly where, as here, the client was harmed as a result of the advice given. See IRPC Rule 8.3.

WHEREFORE, Defendants Credit Bureau Center, LLC and Michael Brown request this Court enter an order directing the Receiver to pay $20,000 to The Cochell Law Firm, P.C. within

five days of the date of an order on this matter, said retainer subject to submission of billable time being submitted to the Court for approval and subject to recoupment of fees that are not deemed reasonable by the Court.

By: /s/ Stephen R. Cochell

Stephen R. Cochell
Texas Bar No.: 24044255
2616 South Loop West, Ste 470
Houston, Texas 77054
Telephone:  (346) 800-3500
Facsimile:   (281) 783-6800

**Attorney for Defendants Credit Bureau Center, LLC and Michael Brown**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has been served upon all counsel of record pursuant to the Court's ECF system.

/s/ Stephen R. Cochell
Stephen R. Cochell

25