**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF ILLINOIS**

**EASTERN DIVISION**

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION | § | Case No. 17-cv-194 |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | Judge Kennelly |
| | § | |
| CREDIT BUREAU CENTER, LLC, *et al.*, | § | |
| | § | |
| Defendants. | § | Magistrate Judge Valdez |

---

**DECLARATION OF MICHAEL BROWN**

---

**MICHAEL BROWN**, under penalty of perjury in accordance with 28 U.S.C. Section 1746, states and declares the following is true and correct:

1. I am currently age 32. My educational background includes getting a GED. I have always been interested in computer software and began programming from a young age. I did take a few courses in college one related to computers.

2. Because of my knowledge in computer programming, I developed a program in which made the customer service department at Experian more efficient. Eventually I was moved

EXHIBIT
A

to the software development department. After my approx 6 years working at Experian I started my own business.

3. I was employed at Experian (FreeCreditReport.com) when at least one of the FTC lawsuits was filed and settled in 2005. Because of this I became aware of the procedures necessary to ensure compliance with the FTC regulations regarding negative options, specifically within the credit reporting and monitoring business.

**Compliance and CBC Websites**

4. My websites, eFreeScore.com and CreditUpdates.com were designed around the FreeScore360.com (owned by OneTechnologies) that was recently modified to comply with a FTC order regarding negative options. **Exhibit A-1** is the webpages of FreeScore360.com. This website was modified for compliance after the after a FTC consent order was handed down to FreeScore360.com,[1] therefore it was reasonable to rely on this as a model for which would comply to FTC standards.

5. Furthermore, I made sure to have certain aspects of the website go above and beyond certain FTC recommendations made in the Free Score 360 consent order. *Id.* **Exhibit A-3** is an article from the FTC in which I relied upon to meet FTC font size and other recommendations. The recommendations were that the payment information no smaller than 12 point font. *Id.* Additionally, we made the payment information one inch away from the submit button so that it could not be missed by the consumer. Experian, my former employer, was also forced by the FTC to use no small than 12-point font when describing disclosures of payment. **Exhibit A-4 at 10-11.** I complied with both these items. Additionally, I made sure to have the payment information below the title of my landing

[1] Consent Order against Free Score 360 is attached as **Exhibit A-2.**

page to decrease confusion to the customer although it was not necessary to do. **Exhibit A-5.** All that is required by the ROSCA and many FTC consent orders is to inform the consumer of the costs and information regarding the credit monitoring program before obtaining the consumer's billing information.

6. We also send out the negative option disclosure with our "Welcome" letter after customers sign up for membership. **Exhibit A-6.**

7. Negative Option provisions have been allowed and used for over ten years and are used by large and small companies alike, such as Amazon, Ancestary.com, Experian, and many others. Virtually anyone who has gone on on-line to buy products or services has become acquainted with their rights under a negative option payment plan.

8. Despite the fact that I am familiar with the business of credit reporting, I relied heavily on Greg Zini and Parker Mackay's advice because of my unfamiliarity with the legal system and court orders. Because of this, I asked my attorneys a host of questions in order to ensure that I was complying with everything the FTC and the Court were asking of me. I took the orders of the Court and the FTC very seriously.

9. It is important to understand the broader context of my business. We had 250,000 people sign up through creditupdates.com and other similar sites. I recall (but cannot currently verify) that approximately half of the customers signing for membership cancelled the service during the trial period. Obviously, they understood their rights and exercised them. Some customers called after the trial period and asked for refunds, we generally had a great customer service policy and refunded unsatisfied customers. We generally did not want to keep money if the consumers did not want or felt they did not receive value for their dollar. About 20% of the people who signed up for membership called to discuss the possibility

of terminating the service and receiving a refund, but concluded that they wanted to continue the service after talking to a Customer Service Representative.

10. Of the customers who cancelled their memberships, we understood that CBC was giving value to customers during the trial period, but the customer got that service for $1. Other customers did call and considered cancellation, but decided that they were receiving value for our services.

11. Membership was not just receiving a credit score and credit report, but also included credit monitoring, and identity theft insurance. Our terms and conditions always made it clear that, under some circumstances, we might not be able to provide the credit monitoring as it requires successful identity verification and additional enrollment requests with the credit bureaus. **Exhibit A-7.**

12. This is an industry that has a substantial number of customer complaints. We maintained a large customer service department, with at times more than a dozen service representatives, up to two supervisors and one manager to talk to customers about any issues, help or concerns about our services. Our Customer Service Department was available by email or phone sixteen hours a day, seven days a week. If a customer requested a refund because they did not understand the negative option or felt they had been misled about our services, we generally had a liberal refund policy and gave them a refund.

13. I understood that the Court's Preliminary Injunction allowed me to start up a new business and that Parker MacKay and Greg Zini, informed me that I could resume operating Zenfia,

the main business that I operated, if I did not use the "bad data" that had been compromised

by Pierce and Lloyd. A timeline of events is detailed below:

a.   On January 24, 2017 I had a phone conversation with MacKay and Zini regarding the "Report New Business Activity" notice provision required by the preliminary injunction. MacKay and Zini informed me that Zenfia was not under receivership and not a "Receivership Defendant" defined in the order.

b.   On January 24, 2017 Zini intimated to Guy Ward that I was going to re-start Zenfia, and one of the ways that it could be done was through a new contract with Experian or another data provider. **Exhibit A-8**.

c.   On February 24, 2017, I reached out to MacKay and Zini in a text message and stated: "Bottom line is I need your direction for this ASAP so that I can do it the legal and compliant way whatever it is . . . . Just let me know the best way to move forward please." **Exhibit A-9.**

d.   On February 27, 2017 I had a phone conference with MacKay. He told me that using the customer data for marketing and billing past receivables was acceptable. He said that this would be compliant with the Preliminary Injunction.

e.   On March 3rd 2017 following previous conversations informing me I was allowed to use the past customer data to bill them I again reached out to MacKay and Zini that I would be able to use old customer data and it would not violate the preliminary injunction.  The text message exchange between myself, MacKay and Zini is below:

> Mike: Parker or Greg do you have 5 min now or sometime today? Ling want to do a quick call and confirm we allowed to use the past customer data and bill them (the good ones only)
>
> Greg: Yes in a few. But the short answer is I think so.
>
> Mike: Ok please be more confident thank I think so lol. Call me in a few.
>
> Greg: I can't be more confident than I think so right at the moment. I need to look at the order again and I'm not in a place where I can do that right now. Want to talk in the am instead?

> Mike: [Picture of excerpt of Order] We were relying on page 14 last sentence of paragraph "A". Only limits customer data if obtained b the bad activities alleged in the complaint. If that screenshot is enough to be more confident let's do now. I know parker already said was ok. AM EST is hard for Ling since he pacific time
>
> Greg: Looks good to me. I will upgrade my response to "yes but anything can happen." **Exhibit A-9.**

f. On March 3, 2017, imeddialy after the above text message exchange with MacKay and Zini we had a phone call between MacKay, Zini, David Ling, and I, Zini assured Ling that using past customer data would be fine to use as long as it was not from the customer group from Pierce or Lloyd.

Because of the representations made by my counsel at the time, I believed that I was in compliance with the Court's order and was allowed to use past customer data in order to operate Zenfia.

14. Counsel even wrote to me in an email on May 25, 2017, before the Contempt hearing, that they would be willing to represent to the Court that their advice was a misunderstanding when, in fact, there was no misunderstanding. Zini, speaking for himself and MacKay states:

> To the extent that you want us to interpose a defense stating that there was a misunderstanding of the advice of counsel in you and/or David Ling billing former customers of CBC under old contracts with CBC, we are willing to do so. We reasonably believe that to be the case. **Exhibit A-10.**

However, again, Zini and MacKay denied ever giving me the advice or claimed to not understand my questions, which were very direct *.Id.* Additionally, Zini and MacKay did not go any further into advising how this defense would result in a limited waiver of my attorney-client privilege regarding this specific scenario and made it seem very unknown.

Their advice was to either mislead the court by misrepresenting their advice or to not raise the defense at all.

15. Prior counsel have denied giving me this advice as well and misrepresented with the re-starting of Zenfia in court records as well as emails to current counsel:

   **a.** On May 24, 2017, Zini denies the fact that he knows who David Ling is and represented to the FTC and I that he has never spoken to him before obviously forgetting about phone records and text messages to highlight his inaccurate statements. Additionally, he reiterated that he would never give advice to bill these past customers in light of the Court Order.

   b. Later that day MacKay and Zini had a phone conference with me informing me that they never advised me to bill these customers. Zini also confirmed to me that he told the Court he did not know who Ling was. When confronted with the fact that there was a conversation with Ling just three months prior, Zini stated something to the effect that he could not recall.

   c. On May 25, 2017, I sent an email to MacKay and Zini citing my confusion as to their reneging on the advise that was given in February. **Exhibit A-10.** I received a response of denial.

   d. On June 1, 2017 Zini and MacKay filed a motion to withdraw.

   e. Zini filed a Declaration attached to the Motion to Withdraw in which he stated there was a fundamental disagreement between Zini and I. **Exhibit A-11, Dckt 86-1**. Furthermore, Zini stated that "continuing as counsel to Defendants will contravene my duties and obligations under Rule 1.16 of the Illinois Rules of Professional Conduct." *Id.* I never asked Zini to participate in something that would jeopardize his standing with the bar, as every decision that I made was based upon advice from Zini and MacKay. I have to believe that making these representations to the Court would violate an ethical rule.

   f. Zini and MacKay represented to the Court in the Motion to Withdraw hearing that they would deny making the representations to me that I could re-start the business with the prohibited consumer information . [Dkt 86 Motion to Withdraw].

   g. Before and during the Contempt proceeding, Zini and Mackay represented I should not raise the advice of counsel defense, that they would deny they gave the advice and that it would hurt me and anger the Judge. They promised that they would share the contempt fine and led me to believe to believe that they would do it in the form of a fee waiver (or some other mechanism) to cover their share of the costs

incurred due to their advice so that we would effectively split the costs one third for each of us. As a result, I did not raise the advice of counsel defense.

h. Lastly, in an email to current counsel, Zini denied the fact that he and MacKay told me to restart the business. **Exhibit A-12**.

18. I'm not a lawyer and I don't know if I was entitled to an advice of counsel defense to the contempt charges and had conflicted counsel continuing to give me bad advice, but I do know that, if I am held responsible for contempt, Greg Zini and Parker Mackay should also be held responsible for their advice and counsel as well as the fact that they did not tell the truth to the Court. I should not be punished for something that my lawyers told me did not violate the Court's order. Lawyers should not be allowed to tell a client one thing and then turn around and deny that they gave advice that got the client into trouble. I understand that the FTC may allege violations that have nothing to do with legal advice. In that vein, I am fully prepared to take responsibility but I also believe that the Court should require my lawyers to pay half of the contempt fine because none of this would have happened if they had not told me not to go forward with Zenfia and that I could use the non Pierce/Lloyd customer data. In addition, I feel the Court should impose some sort of sanction for their misrepresentations to the Court.

**Issues Not Raised at the Preliminary Injunction**

19. Prior counsel failed to make several arguments during the preliminary injunction hearing in which would have potentially persuaded the court to take another direction regarding my websites.

a. It was not argued by prior counsel that the website complied with FTC terms. As stated earlier, I sought to ensure that the website stated the price one inch from hitting the submit button on the payment page as well as used the correct sized font. Furthermore, I had the price at the top of the landing page even though it is not required by the FTC. The FTC argued that the price was not visible on the mobile

landing page. However, this is irrelevant because price information is not legally required to be on the landing page; only required to be shown before the collection of the consumers billing information.

b. In Counts 2, 3 and 4 of their Complaint, the FTC asserted that I violated the Restore On Line Shopper's Credit Act ("ROSCA's") negative option disclosure requirements. However, the negative option disclosures appeared exactly where they are supposed to appear---at a location before the customer submits the billing information. A copy of my webpages for creditupdate.com is attached as **Exhibit A-13.**

1. I patterned the design of CBC's website to a website established by FreeScore360.com which was modified after an action by the FTC to become complaint. I thought it complied with that Consent Decree and therefore complied with FTC regulations.

2. I am now informed that the FTC believes that the negative option warning must accompany every statement, including statements on the home page representing that a product is "free" or a "trial offer."

3. Such disclosures are impossible to include in all advertising, especially space constrained advertising such as google advertising. A sample of Google advertising is attached as **Exhibit A-14.**

4. The statute does not require the disclosure on a "home page" or "any" representation of "free" or a "trial offer" which merely describes the service. Any requirement that the disclosure appear whenever the words "Trial" or "Free" is used goes far beyond what the statute requires and cannot be implemented as a practical matter.

c. The FTC's allegations in Count 5 regarding the Fair Credit Reporting Act ("FCRA") also raises concerns about the FTC's position. The FCRA places additional restrictions on marketing "Free Credit Reports". When that requirement was added, the credit reporting industry changed to market "Free Credit Scores" instead of reports. Thus, customers were offered free credit scores, but not free credit reports. I understood that either of these options are lawful from following the websites of respected companies in the industry. Experian and OneTechnologies is a prime example of this change in marketing, Experian of which occurred while I was employed at Experian.

20. I have never been the subject of any prior FTC or other consumer lawsuits alleging deceptive trade practices. CBC has marketed numerous credit products through thousands of real estate agents, including with California Association of Realtors, Realty Times,

Business Lenders, many credit repair companies, and other substantial companies that wanted to co-brand, white label, or direct traffic to CBC. Any conclusion by the FTC or Receiver that this business line is not viable is simply wrong and can be easily demonstrated by data from CBC's data base.

21. Pierce represented that he had a data base called RTO (Rent to Own) Data Base that queried MLS Multiple Listing Service Data Source) to feature rental properties for interested renters to access his data base properties. The RTO Data Base appeared legitimate and Pierce told Brown that he was "killing it" meaning that he was very successful in obtaining customers. This obviously demonstrates Pierce had access to MLS data including rental properties or perhaps was additionally used to mislead CBC

22. Unbeknownst to me, Pierce knowingly engaged Lloyd to advertise **non-existent** properties on Craig's list to induce customers to use Pierce's website to link to go to CBC's website. The first time that I became aware of Lloyd was the day that CBC's accounts were frozen. CBC was a successful credit reporting service that was growing quickly, about doubling year over year. While the pace of CBC's growth increased dramatically after CBC affiliated with Pierce, it made no sense to get involved in a patently fraudulent scheme. The marketing plan used by Pierce would have worked just as well with genuine real estate listings. If I actually suspected and determined that Pierce's website was populated with non-existent listings, I would have terminated CBC's relationship with Pierce and either established this type of service through CBC or located a legitimate company who would have established a legitimate service with legitimate properties for interested renters. Indeed, access to the MLS data base to allow identification of rental properties by area costs as low as $699 per month.

23. CBC's customer service managers, supervisors, and agents worked to resolve any complaints. I was aware that Customer Service was creating an email template for questions and/or complaints through Craig's List. The known scams for Craig's List at that time was for websites advertising food stamps, government housing (HUD), gift cards (incentivized offers) that required a credit report or score from the customer to earn the gift card. I directed customer Service to escalate those know scams and complaints to me.

24. For first year and a half, I was intimately involved with customer service and complaints. As the company grew, I had to delegate customer service to the Customer Service Department to handle all complaints. They would handle all questions, inquiries or complaints from customers and from the Better Business Bureau ("BBB"). While I do not currently have access to exact figures, I understand there was approximately 2 to 4 BBB complaints per month with many thousands of sign-ups per month. Customer service had between 80 to 400 calls per day. These were handled by at many times a dozen or more Customer Service Representatives with one to two supervisors and one manager.

25. With this volume of customers signing up for CBC's products and services, the number of complaints was not statistically significant. That does not mean that we ignored them. BBB has a proprietary formula that evaluates at least the following: (1) the age of the business; (2) the number of complaints relative to the size of the business; (3) if there is a response to the complaint; and (4) if the customer is satisfied with your response to the complaint. BBB submits complaints listing the website involved.

26. Hindsight is 20:20 vision. As a general matter, when some customers want to terminate service, they call and complain that they are a victim of a scam or that they did not understand either the services or the payment. If a customer wanted a refund we had a

liberal refund policy. The Customer Service Representatives were skilled at helping customers understand CBC's credit-related products and services, but were not skilled at detecting potential fraud or patterns potential fraud in CBC's affiliates. I directed that any fraud, such as people calling in with the same credit card number, for example, be escalated to me. This was not a perfect system, but we did our best to serve our customers.

27. When I reviewed the two BBB complaints that asserted that a landlord that did not reply to the website, it did not set off alarm bells that there must be fraud afoot. Both complaints were resolved with a refund and one was especially old. While one can exercise 20:20 hindsight and conclude that I should have launched a full fraud investigation, the Craig's List real estate looked legitimate to me. Even the apparently fraudulent non-existent properties referenced in the FTC investigators reports appear real and it would now seem the property photos and property descriptions were stolen from actual real properties.

28. I do think any business can improve its customer service and protect customers from fraud. I deeply regret that I did not detect the false properties with Pierce and Lloyd.

29. This is a summary of my testimony. Due to constraints of time in filing a Reply Memorandum in Support of Defendants Motion for Retainer, I have not covered all the relevant points regarding the contempt, and reserve the right to supplement and/or clarify my testimony by supplemental affidavit or at hearing or trial.

Executed on October 12, 2017

Michael Brown

Michael Brown



Freescore360.com, LLC [US] https://www.freescore360.com/index_freescore360.com-2017

FreeScore360
Powered By scoresense

TransUnion EQUIFAX Experian

# Get Your Free Credit Scores From All 3 Bureaus as of Aug. 10, 2017

EXHIBIT
A-1

7-day free trial ends Aug. 17, 2017 | Monthly membership of $39.95 automatically charged after free trial | For questions or to cancel, just call 1-800-972-7204

SAMPLE SCORES
Your Credit Scores
TransUnion
780
Equifax
792
Experian
760
Delivered in Seconds!
Account History
START HERE
SERVING OVER 1 MILLION CONSUMERS SINCE 2006
First Name
Last Name
Email
Zip Code
Yes, please send special offers from ScoreSense® and partners to my email.
Your Scores - Now!
Checking your credit will NOT harm your scores!
McAfee SECURE
Norton SECURED
powered by Symantec
BENEFITS
INSTANTLY access your credit scores from all 3 bureaus**
SECURE online delivery for your convenience

**Why do I need to check my Credit Scores?**

Good credit scores are your passport to competitive interest rates for mortgages, cars, credit card offers, insurance premiums, and more. Strong scores are worth money because they can save you in excess costs.

POOR
FAIR
GOOD
GREAT
350-619
620-649
650-749
750-849
Credit Score Rating

Credit FAQs | View Sample

EXHIBIT A-2

SARAH E. SCHROEDER, Calif. Bar No. 221528
KENNETH H. ABBE, Calif. Bar No. 172416
EVAN ROSE, Calif. Bar No. 253478
YAN FANG, Calif. Bar No. 279737
901 Market Street, Suite 570, San Francisco, CA 94103
415-848-5100 (T); 415-848-5184 (F); sschroeder@ftc.gov
Attorneys for Plaintiff FEDERAL TRADE COMMISSION

LISA MADIGAN, Attorney General
PAUL A. ISAAC, Ill. Bar No. 6300087
500 South Second Street, Springfield, IL 62706
217-782-4436 (T); 217-782-1097 (F); pisaac@atg.state.il.us
Attorney for Plaintiff STATE OF ILLINOIS

MIKE DEWINE, Attorney General
JEFFREY R. LOESER, Ohio Bar No. 0082144
30 E. Broad Street, 14th Floor, Columbus, OH 43215
614-728-1172 (T); 877-650-4712 (F); jeff.loeser@ohioattorneygeneral.gov
Attorney for Plaintiff STATE OF OHIO

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br>STATE OF ILLINOIS, and<br>STATE OF OHIO,<br>Plaintiffs,<br>v.<br>ONE TECHNOLOGIES, LP, a limited partnership, also d/b/a SCORESENSE, ONE TECHNOLOGIES, INC., and MYCREDITHEALTH,<br>ONE TECHNOLOGIES MANAGEMENT, LLC, a limited liability company, individually and as general partner of ONE TECHNOLOGIES, LP, and<br>ONE TECHNOLOGIES CAPITAL, LLP, a limited liability partnership, individually and as a limited partner of ONE TECHNOLOGIES, LP,<br>Defendants. | CASE NO. 3:14-CV-05066-JSC<br><br>[~~PROPOSED~~]<br>**STIPULATED ORDER FOR PERMANENT INJUNCTION & MONETARY JUDGMENT** |

Plaintiffs, the Federal Trade Commission ("Commission" or "FTC"), the State of Illinois, and the State of Ohio, filed their Complaint for Permanent Injunction and Other Equitable Relief in this matter, pursuant to Sections 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b), 57b, Sections 5 and 6 of the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. §§ 8404–05, the Ohio Consumer Sales Practices Act, O.R.C. §§ 1345.01 *et seq.*, and Section 7(a) of the Illinois Consumer Fraud and Deceptive Business

Practices Act ("Illinois Consumer Fraud Act"), 815 ILCS § 505/7(a). Plaintiffs and Defendants stipulate to the entry of this Stipulated Order for Permanent Injunction and Monetary Judgment to resolve all matters in dispute in this action between them.

THEREFORE, IT IS ORDERED as follows:

## FINDINGS

1. This Court has jurisdiction over this matter.

2. The Complaint charges that Defendants participated in deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), Section 4 of ROSCA, 15 U.S.C. § 8403, the Ohio Consumer Sales Practices Act, O.R.C. §§ 1345.01 *et seq.*, and Section 2 of the Illinois Consumer Fraud Act, 815 ILCS § 505/2, in the marketing of their credit monitoring programs.

3. Defendants neither admit nor deny any of the allegations in the Complaint, except as specifically stated in this Order. Only for purposes of this action, Defendants admit the facts necessary to establish jurisdiction.

4. Defendants waive any claim that they may have under the Equal Access to Justice Act, 28 U.S.C. § 2412, concerning the prosecution of this action through the date of this Order, and agree to bear their own costs and attorney fees.

5. Defendants waive all rights to appeal or otherwise challenge or contest the validity of this Order.

## DEFINITIONS

For the purpose of this Order, the following definitions apply:

A. **"Advertisement"** means a commercial message in any medium that directly or indirectly promotes a consumer transaction.

B. **"Charge"** or **"charging"** means causing billing information to be submitted for payment, including against a consumer's credit card, debit card, bank account, phone bill, or other account, or otherwise attempting to collect money or other consideration.

///

///

C. **"Clear and conspicuous"** or **"clearly and conspicuously"** means as follows:

1. In print communications, the disclosure shall be presented in a manner that stands out from the accompanying text so that it is sufficiently prominent, because of its type size, contrast, location, or other characteristics, for an ordinary consumer to notice, read, and comprehend it;

2. In communications made through an electronic medium (such as television, video, radio, and interactive media such as the Internet, online services, and software), the disclosure shall be presented simultaneously in both the audio and visual portions of the communication. In any communication presented solely through visual or audio means, the disclosure shall be made through the same means through which the communication is presented. In any communication disseminated by means of an interactive electronic medium such as software, the Internet, or online services, the disclosure must be unavoidable. Any audio disclosure shall be delivered in a volume and cadence sufficient for an ordinary consumer to hear and comprehend it. Any visual disclosure shall be presented in a manner that stands out in the context in which it is presented so that it is sufficiently prominent, due to its size and shade, contrast to the background against which it appears, the length of time it appears on the screen, and its location, for an ordinary consumer to notice, read, and comprehend it; and

3. Regardless of the medium used to disseminate it, the disclosure shall be in understandable language and syntax. Nothing contrary to, inconsistent with, or in mitigation of the disclosure shall be used in any communication.

D. **"Defendants"** means One Technologies, LP, One Technologies Management, LLC, One Technologies Capital, LLP, and their successors and assigns, individually, collectively, or in any combination.

E. **"Material"** means likely to affect a person's choice of, or conduct regarding, goods or services.

F. **"Negative Option Feature"** means, in an offer or agreement to sell or provide any good or service, a provision under which the consumer's silence or failure to take affirmative action to

Case3:14-cv-05066-JSC Document24 Filed11/21/14 Page4 of 20

reject a good or service or to cancel the agreement is interpreted by the seller or provider as acceptance or continuing acceptance of the offer.

**I. PROHIBITION AGAINST MISREPRESENTATIONS**

IT IS ORDERED that Defendants, Defendants' officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with any of them who receive actual notice of this Order, whether acting directly or indirectly, in connection with the advertising, marketing, promoting, or sale of any good or service with a Negative Option Feature, are permanently restrained and enjoined from misrepresenting, expressly or by implication, any material fact, including but not limited to:

A. The cost or price of a good or service;

B. That a good or service is free, a bonus, a gift, without cost, or without obligation;

C. That consumers can obtain a good or service for a minimal processing, service, or administrative fee with no further obligation;

D. The purpose for which a consumer's payment information will be used;

E. The timing or manner of any charge or bill (including but not limited to the date of the charge and whether it will be a credit card charge or checking account debit);

F. The length of any trial period before the consumer is charged or billed; or

G. That a transaction has been authorized by a consumer.

**II. REQUIRED DISCLOSURES**

IT IS FURTHER ORDERED that Defendants, Defendants' officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with any of them who receive actual notice of this Order, whether acting directly or indirectly, in connection with the advertising, marketing, promoting, or sale of any good or service with a Negative Option Feature, are permanently restrained and enjoined from:

A. Before a customer consents to pay for such good or service, failing to disclose, clearly and conspicuously:

1. The name of the seller or provider of the good or service or the name of the good or service as it appears in billing statements;

Case3:14-cv-05066-JSC Document24 Filed11/21/14 Page5 of 20

2. A description of the good or service, including but not limited to its duration;

3. The cost or price of the good or service;

4. The length of any trial period; and

5. The mechanism to stop any recurring charges.

B. For any transaction involving a sale of a service to a consumer, within 10 days after the date of the sale, failing to send the consumer written confirmation of the transaction, either by email or first class mail, clearly and conspicuously identified as such in the email subject line or on the outside of the envelope. Such written confirmation shall include clear and conspicuous disclosure of all the information required by Subsection A of this Section and of the procedures by which consumers can cancel or request a refund.

**III. EXPRESS INFORMED CONSENT**

IT IS FURTHER ORDERED that Defendants, Defendants' officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with any of them who receive actual notice of this Order, whether acting directly or indirectly, in connection with the advertising, marketing, promoting, or sale of any good or service with a Negative Option Feature, are permanently restrained and enjoined from using billing information to obtain payment from a consumer, unless, prior to using such billing information to obtain payment, Defendants obtain the express informed consent of the consumer. Express informed consent shall consist of:

A. For all written offers (including over the Internet or other web-based applications or services): a check box, signature space or line, or another substantially similar method by which consumers must affirmatively select to accept the Negative Option Feature. Immediately adjacent to an affirmative selection method, Defendants shall disclose the information identified in Subsection A of the Section entitled "Required Disclosures." This disclosure shall contain no additional information and shall be clear and conspicuous in relation to any other information provided on the page relating to costs, risks, or obligations associated with the Negative Option Feature, including any terms referring to "free," "trial," and "processing fee."

B. For all oral offers: the consumer's express, informed agreement to the Negative Option Feature, as evidenced by:

1. The consumer's authorization of payment for the good or service described;

2. The consumer's name and the date of the authorization;

3. The consumer's understanding of what account will be charged; and

4. The consumer's receipt of the disclosures required by this Order in Subsection A of the Section entitled "Required Disclosures."

Defendants shall maintain for each such transaction a voice recording of the entire transaction, including the sales representations. Each recording must be retrievable by the consumer's name, telephone number, or billing information and must be provided upon request to the consumer, the consumer's bank, or any law enforcement entity.

**IV. PROHIBITIONS CONCERNING REFUNDS & CANCELLATIONS**

IT IS FURTHER ORDERED that Defendants, Defendants' officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with any of them who receive actual notice of this Order, whether acting directly or indirectly, in connection with the advertising, marketing, promoting, or sale of any good or service, are permanently restrained and enjoined from:

A. Misrepresenting, expressly or by implication, any material term of any refund or cancellation policy or practice;

B. Failing to disclose, clearly and conspicuously, before a consumer consents to pay for such good or service through a Negative Option Feature, all material terms, limitations, and conditions of any cancellation or refund policy, including but not limited to prohibitions against cancellations or refunds;

C. Failing to honor a cancellation or refund request that complies with any policy to make refunds or allow cancellations; and

D. Failing to provide and disclose, clearly and conspicuously, a simple mechanism for a consumer to immediately stop any recurring charge for such good or service. Such

mechanism must not be difficult, costly, confusing, or time consuming, and it must be at least as simple as the mechanism the consumer used to initiate the recurring charge. For the purposes of this Subsection, a toll-free telephone call is a sufficiently simple cancellation mechanism so long as:

1. Defendants disclose, clearly and conspicuously, the toll-free telephone number on all websites and direct customer communications relating to the recurring charge and the underlying good or service;

2. Defendants include the toll-free telephone number in billing descriptors for the recurring charge;

3. Defendants maintain a call center that is open from 9:00 a.m. to 9:00 p.m. (Eastern Time) Monday through Friday, 9:00 a.m. to 6:00 p.m. (Eastern Time) Saturday, and 1:00 p.m. to 6:00 p.m. (Eastern Time) Sunday;

4. Defendants immediately accept a consumer's cancellation request, provided, however, that Defendants may then attempt to retain the consumer. If at any time during the retention efforts the consumer expresses a desire that Defendants cease their retention efforts, Defendants shall immediately cease their retention efforts; and

5. The mechanism is not otherwise difficult, costly, confusing, or time consuming.

**V. PROHIBITION ON VIOLATING THE RESTORE ONLINE SHOPPERS' CONFIDENCE ACT**

IT IS FURTHER ORDERED that Defendants, Defendants' officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with any of them who receive actual notice of this Order, whether acting directly or indirectly, in connection with the advertising, marketing, promoting, or sale of any good or service, are permanently restrained and enjoined from violating the Restore Online Shoppers' Confidence Act, 15 U.S.C. §§ 8401–05, a copy of which is attached.

///

///

## VI. MONETARY JUDGMENT

IT IS FURTHER ORDERED that:

A. Judgment in the amount of twenty-two million dollars ($22,000,000) is entered in favor of Plaintiffs against Defendants, jointly and severally, as equitable monetary relief. All money paid to Plaintiffs pursuant to this Order is compensatory and not punitive in nature. Such money is not intended as nor shall it be treated or construed as a penalty or fine of any kind.

B. Defendants are ordered to pay to Plaintiffs, by making payment to the Commission, twenty-two million dollars ($22,000,000). Defendants stipulate that such funds will be held in escrow by a third party pursuant to a written escrow agreement, which provides for payment to Plaintiffs within 7 days of entry of this Order by electronic fund transfer in accordance with instructions previously provided by a representative of the Commission, should this Order be entered by on or before the end of February 2015.

## VII. ADDITIONAL MONETARY PROVISIONS

IT IS FURTHER ORDERED that:

A. Defendants relinquish dominion and all legal and equitable right, title, and interest in all assets transferred pursuant to this Order and may not seek the return of any assets.

B. The facts alleged in the Complaint will be taken as true, without further proof, in any subsequent civil litigation by or on behalf of any Plaintiff, including in a proceeding to enforce its rights to any payment or monetary judgment pursuant to this Order, such as a nondischargeability complaint in any bankruptcy case.

C. The facts alleged in the Complaint establish all elements necessary to sustain an action by any Plaintiff pursuant to Section 523(a)(2)(A) of the Bankruptcy Code, 11 U.S.C. § 523(a)(2)(A), and this Order will have collateral estoppel effect for such purposes.

D. Defendants acknowledge that their Taxpayer Identification Numbers (Social Security numbers or Employer Identification Numbers), which Defendants must submit to the Commission, may be used for collecting and reporting on any delinquent amount arising out of this Order, in accordance with 31 U.S.C. § 7701.

///

E. All money paid to Plaintiffs pursuant to this Order shall be deposited into a fund administered by the Commission or its designee to be used for equitable relief, including consumer redress and any attendant expenses for the administration of any redress fund.

F. If a representative of the Commission, in consultation with the States of Illinois, Ohio, and Texas, decides that direct redress to consumers is wholly or partially impracticable or money remains after redress is completed, such funds shall be divided among Plaintiffs as follows: fifty-thousand dollars ($50,000) to the State of Illinois; fifty-thousand dollars ($50,000) to the State of Ohio Consumer Protection Enforcement Fund established by O.R.C 1345.51; and the remainder to the Commission. The amount paid to the State of Illinois shall be deposited into the Attorney General Court Ordered and Voluntary Compliance Payment Projects Fund for subsequent expenditure as authorized by the Attorney General. The Commission may apply any remaining money for such other equitable relief (including consumer information remedies) as it determines to be reasonably related to Defendants' practices alleged in the Complaint. Any money not used for such equitable relief by the Commission shall be deposited to the United States Treasury as disgorgement. Any funds paid to the State of Illinois or the State of Ohio not used for equitable relief may be used by the State to the full extent authorized by the State's laws, including but not limited to as payment for the State's costs of investigating and litigating the instant case. Defendants have no right to challenge any actions any Plaintiff may take pursuant to this Subsection.

**VIII. CUSTOMER INFORMATION**

IT IS FURTHER ORDERED that Defendants, Defendants' officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with any of them who receive actual notice of this Order, whether acting directly or indirectly, in connection with the advertising, marketing, promoting, or sale of any good or service, must provide sufficient customer information to enable any Plaintiff to efficiently administer consumer redress. If a representative of any Plaintiff requests in writing any information related to redress, Defendants must provide it, in the form prescribed by the Plaintiff, within 14 days.

///

Case3:14-cv-05066-JSC Document24 Filed11/21/14 Page10 of 20

**IX. ORDER ACKNOWLEDGMENTS**

IT IS FURTHER ORDERED that Defendants obtain acknowledgments of receipt of this Order:

A. Each Defendant, within 7 days of entry of this Order, must submit to each Plaintiff an acknowledgment of receipt of this Order sworn under penalty of perjury.

B. For 5 years after entry of this Order, each Defendant must deliver a copy of this Order to:

1. All principals, officers, directors, and LLC managers and members;

2. All employees, agents, and representatives who participate in conduct related to the subject matter of the Order; and

3. Any business entity resulting from any change in structure as set forth in the Section titled Compliance Reporting. Delivery must occur within 7 days of entry of this Order for current personnel. For all others, delivery must occur before they assume their responsibilities.

C. From each individual or entity to which a Defendant delivered a copy of this Order, that Defendant must obtain, within 30 days, a signed and dated acknowledgment of receipt of this Order.

**X. COMPLIANCE REPORTING**

IT IS FURTHER ORDERED that Defendants make timely submissions to Plaintiffs:

A. One year after entry of this Order, each Defendant must submit a compliance report, sworn under penalty of perjury. Each Defendant must:

1. Identify the primary physical, postal, and email address and telephone number, as designated points of contact, which representatives of any Plaintiff may use to communicate with the Defendant;

2. Identify all of that Defendant's businesses by all of their names, telephone numbers, and physical, postal, email, and Internet addresses;

3.  Describe the activities of each business, including the goods and services offered, the means of advertising, marketing, and sales, and the involvement of any other Defendant;

4.  Describe in detail whether and how that Defendant is in compliance with each Section of this Order; and

5.  Provide a copy of each Order Acknowledgment obtained pursuant to this Order, unless previously submitted to all Plaintiffs.

B.  For 20 years after entry of this Order, each Defendant must submit a compliance notice, sworn under penalty of perjury, within 14 days of any change in the following:

1.  Any designated point of contact; or

2.  The structure of any Defendant or any entity that Defendant has any ownership interest in or controls directly or indirectly that may affect compliance obligations arising under this Order, including: creation, merger, sale, or dissolution of the entity or any subsidiary, parent, or affiliate that engages in any acts or practices subject to this Order.

C.  Each Defendant must submit to Plaintiffs notice of the filing of any bankruptcy petition, insolvency proceeding, or similar proceeding by or against such Defendant within 14 days of its filing.

D.  Any submission to Plaintiffs required by this Order to be sworn under penalty of perjury must be true and accurate and comply with 28 U.S.C. § 1746, such as by concluding: "I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on: _____" [and supplying the date, signatory's full name, title (if applicable), and signature].

E.  Unless otherwise directed by a Commission representative in writing, all submissions to the Commission pursuant to this Order must be emailed to DEbrief@ftc.gov or sent by overnight courier (not the U.S. Postal Service) to: Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW,

Washington, DC 20580. The subject line must begin: FTC v. One Technologies, LP, matter number 1323021.

F. All submissions to Plaintiff State of Illinois must be emailed to pisaac@atg.state.il.us or sent by overnight courier (not the U.S. Postal Service) to: Assistant Attorney General Paul Isaac, Illinois Attorney General's Office, 500 South Second Street, Springfield, IL 62706, (217) 782-4436 (P). (Or other contact as provided to Defendants by the Illinois Attorney General's Office).

G. All submissions to Plaintiff State of Ohio must be emailed to jeff.loeser@ohioattorneygeneral.gov or sent by overnight courier (not the U.S. Postal Service) to: Assistant Attorney General Jeffrey Loeser, Consumer Protection Section, Ohio Attorney General's Office, 30 East Broad Street, 14th Floor, Columbus, Ohio 43215. (Or other contact as provided to Defendants by the Ohio Attorney General's Office).

## XI. RECORDKEEPING

IT IS FURTHER ORDERED that Defendants must create certain records for 10 years after entry of the Order, and retain each such record for 5 years. Specifically, Defendants, in connection with the sale of any good or service with a Negative Option Feature, must create and retain the following records:

A. Accounting records showing the revenues from all goods or services sold;

B. Personnel records showing, for each person providing services, whether as an employee or otherwise, that person's: name; address(es); telephone number(s); job title or position; dates of service; and (if applicable) the reason for termination;

C. Records of all consumer complaints and refund requests, whether received directly or indirectly, such as through a third party, and any response; and

D. All records necessary to demonstrate full compliance with each provision of this Order, including all submissions to Plaintiffs.

## XII. COMPLIANCE MONITORING

IT IS FURTHER ORDERED that, for the purpose of monitoring Defendants' compliance with this Order, including any failure to transfer any assets as required by this Order:

A. Within 14 days of receipt of a written request from a representative of any Plaintiff, each Defendant must: submit additional compliance reports or other requested information, which must be sworn under penalty of perjury; appear for depositions; and produce documents for inspection and copying. Any Plaintiff is also authorized to obtain discovery, without further leave of court, using any of the procedures prescribed by Federal Rules of Civil Procedure 29, 30 (including telephonic depositions), 31, 33, 34, 36, 45, and 69.

B. For matters concerning this Order, any Plaintiff is authorized to communicate directly with any Defendant. Defendants must permit representatives of any Plaintiff to interview any employee or other person affiliated with any Defendant who has agreed to such an interview. The person interviewed may have counsel present.

C. Plaintiffs may use all other lawful means, including posing, through its representatives, as consumers, suppliers, or other individuals or entities, to Defendants or any individual or entity affiliated with Defendants, without the necessity of identification or prior notice. Nothing in this Order limits the Commission's lawful use of compulsory process, pursuant to Sections 9 and 20 of the FTC Act, 15 U.S.C. §§ 49, 57b-1.

**XIII. RETENTION OF JURISDICTION**

IT IS FURTHER ORDERED that this Court retains jurisdiction of this matter for purposes of construction, modification, and enforcement of this Order.

**PURSUANT TO STIPULATION, IT IS SO ORDERED.**

Dated: November 21, 2014

UNITED STATES DISTRICT JUDGE

**SO STIPULATED AND AGREED:**

**FOR PLAINTIFFS:**

JONATHAN E. NUECHTERLEIN
General Counsel

SARAH E. SCHROEDER
KENNETH H. ABBE
EVAN ROSE
YAN FANG
Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

LISA MADIGAN
Attorney General
State of Illinois

PAUL A. ISAAC
Attorney for Plaintiff
STATE OF ILLINOIS

MIKE DEWINE
Attorney General
State of Ohio

JEFFREY R. LOESER
Attorney for Plaintiff
STATE OF OHIO

**SO STIPULATED AND AGREED:**

**FOR PLAINTIFFS:**

JONATHAN E. NUECHTERLEIN
General Counsel

SARAH E. SCHROEDER
KENNETH H. ABBE
EVAN ROSE
YAN FANG
Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

LISA MADIGAN
Attorney General
State of Illinois

PAUL A. ISAAC
Attorney for Plaintiff
STATE OF ILLINOIS

MIKE DEWINE
Attorney General
State of Ohio

JEFFREY R. LOESER
Attorney for Plaintiff
STATE OF OHIO

**FOR DEFENDANTS:**

JEFFREY KNOWLES, ESQ.
ROGER COLAIZZI, ESQ.
AMY R. MUDGE, ESQ.
MATTHEW FARLEY, ESQ.
Venable LLP
575 7th St. NW
Washington, DC 20004
Telephone: 202-344-4860
Fax: 202-344-8300
Email: jknowles@venable.com
Attorneys for Defendants ONE TECHNOLOGIES, LP; ONE TECHNOLOGIES MANAGEMENT, LLC; ONE TECHNOLOGIES CAPITAL, LLP

**DEFENDANTS: One Technologies, LP; One Technologies Management, LLC; One Technologies Capital, LLP**

One Technologies, LP

By: ______________________

One Technologies Management, LLC

By: ______________________

One Technologies Management Capital, LLP

By: ______________________

Case3:14-cv-05066-JSC Document24 Filed11/21/14 Page17 of 20

S. 3386

# One Hundred Eleventh Congress of the United States of America

**AT THE SECOND SESSION**

***Begun and held at the City of Washington on Tuesday, the fifth day of January, two thousand and ten***

## An Act

To protect consumers from certain aggressive sales tactics on the Internet.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "Restore Online Shoppers' Confidence Act".

**SEC. 2. FINDINGS; DECLARATION OF POLICY.**

The Congress finds the following:

(1) The Internet has become an important channel of commerce in the United States, accounting for billions of dollars in retail sales every year. Over half of all American adults have now either made an online purchase or an online travel reservation.

(2) Consumer confidence is essential to the growth of online commerce. To continue its development as a marketplace, the Internet must provide consumers with clear, accurate information and give sellers an opportunity to fairly compete with one another for consumers' business.

(3) An investigation by the Senate Committee on Commerce, Science, and Transportation found abundant evidence that the aggressive sales tactics many companies use against their online customers have undermined consumer confidence in the Internet and thereby harmed the American economy.

(4) The Committee showed that, in exchange for "bounties" and other payments, hundreds of reputable online retailers and websites shared their customers' billing information, including credit card and debit card numbers, with third party sellers through a process known as "data pass". These third party sellers in turn used aggressive, misleading sales tactics to charge millions of American consumers for membership clubs the consumers did not want.

(5) Third party sellers offered membership clubs to consumers as they were in the process of completing their initial transactions on hundreds of websites. These third party "post-transaction" offers were designed to make consumers think the offers were part of the initial purchase, rather than a new transaction with a new seller.

(6) Third party sellers charged millions of consumers for membership clubs without ever obtaining consumers' billing information, including their credit or debit card information, directly from the consumers. Because third party sellers

Case3:14-cv-05066-JSC Document24 Filed11/21/14 Page18 of 20

acquired consumers' billing information from the initial merchant through "data pass", millions of consumers were unaware they had been enrolled in membership clubs.

(7) The use of a "data pass" process defied consumers' expectations that they could only be charged for a good or a service if they submitted their billing information, including their complete credit or debit card numbers.

(8) Third party sellers used a free trial period to enroll members, after which they periodically charged consumers until consumers affirmatively canceled the memberships. This use of "free-to-pay conversion" and "negative option" sales took advantage of consumers' expectations that they would have an opportunity to accept or reject the membership club offer at the end of the trial period.

**SEC. 3. PROHIBITIONS AGAINST CERTAIN UNFAIR AND DECEPTIVE INTERNET SALES PRACTICES.**

(a) REQUIREMENTS FOR CERTAIN INTERNET-BASED SALES.—It shall be unlawful for any post-transaction third party seller to charge or attempt to charge any consumer's credit card, debit card, bank account, or other financial account for any good or service sold in a transaction effected on the Internet, unless—

(1) before obtaining the consumer's billing information, the post-transaction third party seller has clearly and conspicuously disclosed to the consumer all material terms of the transaction, including—

(A) a description of the goods or services being offered;

(B) the fact that the post-transaction third party seller is not affiliated with the initial merchant, which may include disclosure of the name of the post-transaction third party in a manner that clearly differentiates the post-transaction third party seller from the initial merchant; and

(C) the cost of such goods or services; and

(2) the post-transaction third party seller has received the express informed consent for the charge from the consumer whose credit card, debit card, bank account, or other financial account will be charged by—

(A) obtaining from the consumer—

(i) the full account number of the account to be charged; and

(ii) the consumer's name and address and a means to contact the consumer; and

(B) requiring the consumer to perform an additional affirmative action, such as clicking on a confirmation button or checking a box that indicates the consumer's consent to be charged the amount disclosed.

(b) PROHIBITION ON DATA-PASS USED TO FACILITATE CERTAIN DECEPTIVE INTERNET SALES TRANSACTIONS.—It shall be unlawful for an initial merchant to disclose a credit card, debit card, bank account, or other financial account number, or to disclose other billing information that is used to charge a customer of the initial merchant, to any post-transaction third party seller for use in an Internet-based sale of any goods or services from that post-transaction third party seller.

Case3:14-cv-05066-JSC Document24 Filed11/21/14 Page19 of20

(c) APPLICATION WITH OTHER LAW.—Nothing in this Act shall be construed to supersede, modify, or otherwise affect the requirements of the Electronic Funds Transfer Act (15 U.S.C. 1693 et seq.) or any regulation promulgated thereunder.

(d) DEFINITIONS.—In this section:

(1) INITIAL MERCHANT.—The term "initial merchant" means a person that has obtained a consumer's billing information directly from the consumer through an Internet transaction initiated by the consumer.

(2) POST-TRANSACTION THIRD PARTY SELLER.—The term "post-transaction third party seller" means a person that—

(A) sells, or offers for sale, any good or service on the Internet;

(B) solicits the purchase of such goods or services on the Internet through an initial merchant after the consumer has initiated a transaction with the initial merchant; and

(C) is not—

(i) the initial merchant;

(ii) a subsidiary or corporate affiliate of the initial merchant; or

(iii) a successor of an entity described in clause (i) or (ii).

**SEC. 4. NEGATIVE OPTION MARKETING ON THE INTERNET.**

It shall be unlawful for any person to charge or attempt to charge any consumer for any goods or services sold in a transaction effected on the Internet through a negative option feature (as defined in the Federal Trade Commission's Telemarketing Sales Rule in part 310 of title 16, Code of Federal Regulations), unless the person—

(1) provides text that clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information;

(2) obtains a consumer's express informed consent before charging the consumer's credit card, debit card, bank account, or other financial account for products or services through such transaction; and

(3) provides simple mechanisms for a consumer to stop recurring charges from being placed on the consumer's credit card, debit card, bank account, or other financial account.

**SEC. 5. ENFORCEMENT BY FEDERAL TRADE COMMISSION.**

(a) IN GENERAL.—Violation of this Act or any regulation prescribed under this Act shall be treated as a violation of a rule under section 18 of the Federal Trade Commission Act (15 U.S.C. 57a) regarding unfair or deceptive acts or practices. The Federal Trade Commission shall enforce this Act in the same manner, by the same means, and with the same jurisdiction, powers, and duties as though all applicable terms and provisions of the Federal Trade Commission Act (15 U.S.C. 41 et seq.) were incorporated into and made a part of this Act.

(b) PENALTIES.—Any person who violates this Act or any regulation prescribed under this Act shall be subject to the penalties and entitled to the privileges and immunities provided in the Federal Trade Commission Act as though all applicable terms and provisions of the Federal Trade Commission Act were incorporated in and made part of this Act.

Case3:14-cv-05066-JSC Document24 Filed11/21/14 Page20 of 20

(c) AUTHORITY PRESERVED.—Nothing in this section shall be construed to limit the authority of the Commission under any other provision of law.

**SEC. 6. ENFORCEMENT BY STATE ATTORNEYS GENERAL.**

(a) RIGHT OF ACTION.—Except as provided in subsection (e), the attorney general of a State, or other authorized State officer, alleging a violation of this Act or any regulation issued under this Act that affects or may affect such State or its residents may bring an action on behalf of the residents of the State in any United States district court for the district in which the defendant is found, resides, or transacts business, or wherever venue is proper under section 1391 of title 28, United States Code, to obtain appropriate injunctive relief.

(b) NOTICE TO COMMISSION REQUIRED.—A State shall provide prior written notice to the Federal Trade Commission of any civil action under subsection (a) together with a copy of its complaint, except that if it is not feasible for the State to provide such prior notice, the State shall provide such notice immediately upon instituting such action.

(c) INTERVENTION BY THE COMMISSION.—The Commission may intervene in such civil action and upon intervening—

(1) be heard on all matters arising in such civil action; and

(2) file petitions for appeal of a decision in such civil action.

(d) CONSTRUCTION.—Nothing in this section shall be construed—

(1) to prevent the attorney general of a State, or other authorized State officer, from exercising the powers conferred on the attorney general, or other authorized State officer, by the laws of such State; or

(2) to prohibit the attorney general of a State, or other authorized State officer, from proceeding in State or Federal court on the basis of an alleged violation of any civil or criminal statute of that State.

(e) LIMITATION.—No separate suit shall be brought under this section if, at the time the suit is brought, the same alleged violation is the subject of a pending action by the Federal Trade Commission or the United States under this Act.

*Speaker of the House of Representatives.*

*Vice President of the United States and*
*President of the Senate.*



Monday,
January 31, 2005

**Part VIII**

# Federal Trade Commission

**16 CFR Parts 642 and 698**
**Prescreen Opt-Out Disclosure; Final Rule**

EXHIBIT
A-3

**FEDERAL TRADE COMMISSION**

**16 CFR Parts 642 and 698**

**[RIN 3084–AA94]**

## Prescreen Opt-Out Disclosure

**AGENCY:** Federal Trade Commission.

**ACTION:** Final rule.

**SUMMARY:** The Fair and Accurate Credit Transactions Act of 2003 (''FACT Act'' or ''Act'') directs the Federal Trade Commission (''FTC'' or ''Commission''), in consultation with the Federal banking agencies and the National Credit Union Administration, to adopt a rule to improve the required notice to consumers regarding their right to opt out of prescreened solicitations for credit or insurance. This final rule implements this requirement.

**EFFECTIVE DATE:** This rule is effective on August 1, 2005.

**FOR FURTHER INFORMATION CONTACT:** Jeanne-Marie Burke or Kellie Cosgrove Riley, Attorneys, (202) 326–3224, Division of Financial Practices, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue, NW., Washington, DC 20580.

**SUPPLEMENTARY INFORMATION:**

## Statement of Basis and Purpose

## I. Background

Section 615(d) of the Fair Credit Reporting Act (''FCRA'') requires that any person who uses a consumer report in order to make an unsolicited firm offer of credit or insurance to the consumer (''prescreened offer'' or ''prescreened solicitation''), shall provide with each written solicitation a clear and conspicuous statement that: (A) Information contained in the consumer's consumer report was used in connection with the transaction; (B) the consumer received the offer of credit or insurance because the consumer satisfied the criteria for credit worthiness or insurability under which the consumer was selected for the offer; (C) if applicable, the credit or insurance may not be extended if, after the consumer responds to the offer, the consumer does not meet the criteria used to select the consumer for the offer or any applicable criteria bearing on credit worthiness or insurability or does not furnish any required collateral; (D) the consumer has a right to prohibit information contained in the consumer's file with any consumer reporting agency from being used in connection with any credit or insurance transaction that is not initiated by the consumer; and (E) the consumer may exercise the right referred to in subparagraph (D) by notifying a notification system established under section 604(e) [of the FCRA].

Section 615(d)(1) of the FCRA [15 U.S.C. 1681m(d)(1)] [1]

The Fair and Accurate Credit Transactions Act of 2003, Public Law 108–159, 117 Stat. 1952 (FACT Act or the Act) was signed into law on December 4, 2003. Section 213(a) of the FACT Act amends FCRA section 615(d) to require that the statement mandated by section 615(d) ''be presented in such format and in such type size and manner as to be simple and easy to understand, as established by the Commission, by rule, in consultation with the Federal banking agencies and the National Credit Union Administration.''

On September 27, 2004, the Commission issued, and sought comment on, a proposed Rule implementing the requirements of section 213(a) of the FACT Act (''the proposed Rule'').[2] In response to the proposed Rule, the Commission received approximately 60 comments from a variety of trade associations, creditors, insurers, consumer advocacy groups, and individual consumers. After carefully considering the comments received, the Commission adopts the proposed Rule with some modifications.

The final Rule carries out the Commission's mandate to improve the prescreen notice so that it is simple and easy to understand. The FACT Act specifies that ''simple and easy to understand'' is to be achieved by establishing a format, type size, and manner for the presentation of the notice. These three factors indicate that ''simple and easy to understand'' is meant to include both (1) the content, such as language and syntax, of the notice so that it effectively conveys the intended message to readers, and (2) the presentation and format of the notice such that it calls attention to the notice and enhances its understandability. Thus, the final Rule establishes certain baseline requirements for these two components to ensure that the notices meet the statutory mandate. As stated in the proposed Rule, the determination of whether a notice meets the ''simple and easy to understand'' standard is based on the totality of the disclosure and the manner and format in which it is presented, not on any single factor. Modifications have been made to the final Rule to make it clearer that the ''simple and easy to understand'' standard is a flexible one.

The final Rule: (1) Sets forth the purpose and scope of the Rule; (2) defines ''simple and easy to understand''; (3) requires a notice that consists of an initial statement that provides basic opt-out information (''short notice''), and a separate longer explanation that offers further information (''long notice''); (4) adds a definition for ''principal promotional document,'' the document in which the short notice must appear; (5) establishes the effective date for the Rule; and (6) proposes model notices that may be used for compliance.

Therefore, having consulted with the Office of the Comptroller of the Currency, Board of Governors of the Federal Reserve System, Federal Deposit Insurance Corporation, Office of Thrift Supervision, and National Credit Union Administration, the FTC issues the following Rule.

## II. Overview of Comments Received

The Commission received approximately 60 comments concerning the proposed Rule.[3] The vast majority of these comments were from industry trade organizations [4] and the business community.[5] Individual consumers, five

[1] Section 604(e) of the FCRA requires that any consumer reporting agency that provides prescreened lists to marketers shall maintain a notification system through which consumers may choose to have their names and addresses excluded from such lists. That section also requires that consumer reporting agencies that compile and maintain files on consumers on a nationwide basis establish a joint notification system. The nationwide consumer reporting agencies have done so, and the current telephone number for the joint notification system is 1–888–5–OPT–OUT (1–888–567–8688).

[2] The notice of proposed rulemaking and proposed Rule were published in the **Federal Register** on October 1, 2004. 69 FR 58861.

[3] The public comments relating to this rulemaking may be viewed at *http://www.ftc.gov/os/comments/prescreenedoptout/index.htm*. Citations to comments filed in this proceeding are made to the name of the organization (if any) or the last name of the commenter, and the comment number of record.

[4] These included the Consumer Data Industry Association (''CDIA'') (the trade association that represents the nationwide consumer reporting agencies and a variety of other consumer reporting agencies), America's Community Bankers, American Bankers Association, American Council of Life Insurers, American Financial Services Association, the Coalition to Implement the FACT Act (representing trade associations and companies that furnish, use, collect, and disclose consumer information), Consumer Bankers Association, Credit Union National Association, Florida Association of Mortgage Brokers, Independent Community Bankers of America, Michigan Credit Union League, Mortgage Bankers Association, National Association of Federal Credit Unions, National Independent Automobile Dealers Association, National Retail Federation, Pennsylvania Credit Union Association, and Property Casualty Insurers Association of America.

[5] These included financial institutions, such as Bank of America Corporation, Countrywide Home Loans, MasterCard International Incorporated, MBNA America Bank, N.A., Navy Federal Credit Union, Union Federal Bank, and Visa U.S.A. Inc.;

Case: 1:17-cv-00194 Document #: 133-1 Filed: 10/12/17 Page 36 of 120 PageID #:2774

members of Congress,[6] and consumer advocacy groups[7] also submitted comments on the proposed Rule. In addition to considering the comments received, the Commission reviewed and considered the Board of Governors of the Federal Reserve System's Report to the Congress on Further Restrictions on Unsolicited Written Offers of Credit or Insurance (''FRB Prescreen Report'').[8]

The Commission received comments on nearly all of the provisions contained in the proposed Rule. Most commenters, including consumers, businesses, trade associations, and consumer groups, expressed general support for a Rule requiring an improved and more understandable prescreen notice. However, commenters disagreed on what manner and format would best accomplish the goals of the FACT Act and what information should be contained in the notices.

The majority of industry commenters opposed the layered notice approach, asserting that a layered notice exceeds the FTC's statutory authority, would overshadow other important notices, and would lead consumers to make uninformed decisions about whether to opt out.[9] Some industry members, as well as consumer advocacy groups, supported the layered notice as an appropriate means of effecting the statutory directive of providing a simple and easy format for disclosing the required information.[10] Commenters also disagreed on whether the type-size requirements should be larger[11] or smaller[12] than proposed, and whether the notice should include additional information, such as the benefits of prescreened offers,[13] or prohibit any additional information from being included in the notice.[14]

In general, commenters also approved of the definition of ''simple and easy to understand,'' but some expressed concern that the proposed Rule's list of factors to be considered in determining whether a notice met this definition might be considered a ''checklist'' rather than examples.[15] In addition, commenters generally agreed that the Rule should also include a definition for ''principal promotional document.''[16]

Although commenters generally supported the proposed Rule's inclusion of model notices,[17] some commenters suggested changes or additions to the language of those notices to achieve various goals, including using more ''neutral'' language for the short notice,[18] adding language regarding collateral requirements,[19] and adding language regarding the benefits of prescreened offers.[20]

All of these comments, as well as others, are discussed more fully below.

## III. Section-By-Section Analysis

### *A. Section 642.1: Purpose and Scope*

Proposed section 642.1(a) set forth the purpose of the proposed Rule, which was to implement section 213(a) of the FACT Act. Section 213(a) requires the FTC to establish the format, type size, and manner in which the notices to consumers regarding the right to opt out of prescreened solicitations are to be presented. The Commission received no comments regarding this section and it is adopted as proposed.

Proposed section 642.1(b) set forth the scope of the proposed Rule. The Rule applies to any person who uses a consumer report on any consumer in connection with any credit or insurance transaction that is not initiated by the consumer, pursuant to section 604(c)(1)(B) of the FCRA. The Commission received no comments regarding this section and it is adopted as proposed.

### *B. Section 642.2: Definitions*

#### 1. ''Simple and Easy to Understand''

The proposed Rule contained one definition in section 642.2. ''Simple and easy to understand'' was defined to mean ''plain language designed to be understood by ordinary consumers.'' Proposed section 642.2 also listed eight factors that would be considered in determining whether a statement is ''simple and easy to understand.''[21]

The Commission received several comments concerning this definition. Some commenters noted that they supported the definition, did not suggest any changes, and encouraged the Commission to retain it in the final Rule.[22] Other commenters suggested that the Commission eliminate the eight factors from the definition. These commenters expressed various concerns about the factors, including that they unduly complicate an otherwise uncomplicated definition and could be interpreted as a checklist of requirements that must each be present in order to meet the definition.[23]

As the Commission noted in the notice of proposed rulemaking (''NPRM'') accompanying the proposed Rule, the eight factors are intended to provide guidance to companies in

insurers, such as Progressive; and credit reporting agencies, such as Equifax Information Services LLC, Experian Information Solutions, Inc., and TransUnion LLC.

[6] Congressman Spencer Bachus, Chair of the Subcommittee on Financial Institutions and Consumer Credit, of the House Financial Services Committee (R–AL); Congressman Paul Kanjorski (D–PA); Congressman John Sweeney (R–NY); Senator George Allen (R–VA); and Senator Jim Bunning (R–KY).

[7] These included the Consumer Action, National Consumers League, Consumer Federation of America, and Privacy Rights Clearinghouse.

[8] See *http://www.federalreserve.gov/boarddocs/rptcongress/*.

[9] *See, e.g.*, Comment, America's Community Bankers #OL–100013; Comment, Discover Bank #OL–100016; Comment, Financial Services Roundtable #EREG–000004; Comment, Juniper Financial Corp., #000009; Comment, MasterCard International Incorporated #000012; Comment, Visa U.S.A. Inc. #000005; Comment, Wells Fargo & Company #000007; Comment, Wilmer Cutler Pickering Hale and Dorr LLP #OL–100045.

[10] *See, e.g.*, Comment, Boeing Employees' Credit Union #000020; Comment, Commerce Bancshares, Inc. #OL–100045; Comment, National Consumers League, *et al.* #OL–100011; Comment, Pennsylvania Credit Union Association #OL–100024; Comment, Privacy Rights Clearinghouse #OL–100015.

[11] *See, e.g.*, Comment, National Consumers League, *et al.* #OL–100011; Comment, Privacy Rights Clearinghouse #OL–10015.

[12] *See, e.g.*, Comment, Commerce Bancshares, Inc. #OL–100045; Comment, Mortgage Bankers Association #OL–100036; Comment, National Independent Automobile Dealers Association #OL–100021; Comment, Union Federal Bank #OL–100044.

[13] *See, e.g.*, Comment, Discover Bank #OL–100016; Comment, Financial Services Roundtable #EREG–000004; Comment, MBNA America Bank #OL–100031.

[14] *See, e.g.*, Comment, Connors #OL–100014; Comment, National Consumers League, *et al.* #OL–100011; Comment, Privacy Rights Clearinghouse #OL–100015.

[15] *See, e.g.*, Comment, Coalition to Implement the FACT Act #OL–100042; Comment, Juniper Financial Corp. #000009; Comment, MasterCard International Incorporated #000012.

[16] *See, e.g.*, Comment, Commerce Bancshares, Inc. #OL–100045; Comment, Credit Union National Association #000003; Comment, Mortgage Bankers Association #OL–100036; Comment, National Association of Federal Credit Unions #OL–100020; Comment, National Consumers League, *et al.* #OL–100011; Comment, Privacy Rights Clearinghouse #OL–100015.

[17] *See, e.g.*, Comment, Countrywide #000010; Comment, Visa U.S.A. Inc. #000005.

[18] *See, e.g.*, Comment, Juniper Financial Corp. #000009; Comment, MasterCard International Incorporated #000012; Comment, Visa U.S.A. Inc. #000005; Comment, Wells Fargo & Company #000007.

[19] *See, e.g.*, Comment, Mortgage Bankers Association #OL–100036.

[20] *See, e.g.*, Comment, JPMorgan Chase Bank #OL–100019; Comment, Juniper Financial Corp. #000009.

[21] The eight factors to be considered in determining whether a statement is ''simple and easy to understand'' were: (1) Use of clear and concise sentences, paragraphs, and sections; (2) use of short explanatory sentences; (3) use of definite, concrete, everyday words; (4) use of active voice; (5) avoidance of multiple negatives; (6) avoidance of legal and technical business terminology; (7) avoidance of explanations that are imprecise and reasonably subject to different interpretations; and (8) use of language that is not misleading.

[22] *See, e.g.*, Comment, Discover Bank #OL–100016; Comment, Wells Fargo & Company #000007.

[23] *See, e.g.*, Comment, Coalition to Implement the FACT Act #OL–100042; Comment, Equifax Information Services LLC #OL–100023; Comment, Juniper Financial Corp. #000009; Comment, MasterCard International Incorporated #000012.

complying with the Rule, while allowing them to maintain flexibility to determine how best to meet the definition.

The Commission has revised the Rule to clarify that use of clear and concise sentences, paragraphs, and sections is a mandatory part of the definition, but the remaining seven factors are simply examples to be considered in meeting the ''simple and easy to understand'' definition. These factors should neither be considered to be mandatory, nor to constitute an exhaustive list.

In addition, the Commission has determined to specify in the final Rule that the layered notice is a required component of the ''simple and easy to understand'' definition. The Commission has determined that the layered format makes the prescreen disclosures simpler and easier to understand, and it is appropriate that it specifically be incorporated into the definition.[24]

2. ''Principal Promotional Document''

Proposed section 642.3(a)(2) required that the short form of the layered notice be placed on the first page of the principal promotional document. The Commission noted in the NPRM that the question of what constitutes the ''principal promotional document'' is fact specific, but that, in general, the Commission would consider the cover letter or the document that is designed to be seen first by the consumer to be the ''principal promotional document.'' The proposed Rule did not define ''principal promotional document,'' however, and the Commission requested comment on whether such a definition was necessary.

The Commission received several comments requesting that the Commission provide a definition for ''principal promotional document.''[25] Some commenters suggested specific definitions for the term, such as the document intended to be seen first by the consumer, the document that addresses the consumer directly with the offer, the cover letter or other document used to introduce the offer, or the cover letter or other document that the consumer sees first when opening the solicitation. At least one commenter asserted that the proper location for the disclosure is in the application or the offer of credit.[26] Another commenter suggested that factors to be considered in determining whether a document is the principal promotional document should include (1) whether the document is the first page of a letter to a consumer, or (2) whether the document contains the credit terms being offered.[27]

In addition, some commenters expressed concern that the concept of a principal promotional document would not translate well to an electronic prescreened offer. Specifically, these commenters were concerned that a pop-up advertisement that appeared on the consumer's computer screen would have to contain the short notice.[28] These commenters suggested that pop-up advertisements should be considered similar to envelopes, and therefore not considered the principal promotional document.

The Commission agrees with the commenters that a definition would help companies to comply with the Rule and has considered all of the suggested definitions. The final Rule defines principal promotional document as the document that is designed to be seen first by the consumer, such as the cover letter. Requiring that the disclosure appear early in the solicitation enhances the noticeability of the disclosure, thereby aiding in making the disclosure simple and easy to understand. The final Rule does not link the definition to the credit terms or the application, because many different documents within the solicitation may contain some or all of the credit terms, and those consumers who are interested in opting out of receiving solicitations for future offers may not be likely to review the terms and conditions of the offer at hand. Therefore, linking the definition to credit terms would not provide guidance to businesses, nor would it ensure that those interested in opting out could easily locate the notice.

In addition, the Commission has considered the concerns expressed by the commenters regarding the application of the definition to electronic offers. The Commission is in agreement with those commenters who equated a pop-up promotional screen with an envelope. Therefore, the Commission will consider the principal promotional document in those circumstances to be the page designed to be seen first by the consumer who clicks on the pop-up promotional screen.

*C. Section 642.3: Prescreen Opt-Out Notices*

The proposed Rule required a ''layered'' notice—that is, a notice that includes both an initial short portion and a longer portion contained later in the solicitation. The short portion of the notice informed consumers about the right to opt out of receiving prescreened solicitations and specified a toll-free number for consumers to call to exercise that right. No additional information could be included in the short notice. The long portion of the notice provided consumers with all of the additional information required by section 615(d) of the FCRA. The long notice could contain additional information that did not interfere with, detract from, contradict, or otherwise undermine the purpose of the opt-out notice. The proposed Rule set forth certain baseline requirements for the type size of the notice, as well as the presentation of the notice.

Most of the comments the Commission received focused on various aspects of this section of the proposed Rule. Commenters addressed several topics pertaining to this section, including the Commission's statutory authority to prescribe a layered notice, the Commission's statutory authority to require the notice to appear in electronic solicitations, the content of the notice, the type size of the notice, and the format and manner in which the notice is presented, including within electronic solicitations. Each of these is addressed in turn below.

1. Statutory Authority for the Layered Notice

Several commenters questioned whether the Commission had exceeded its statutory authority by mandating a layered notice.[29] Many of these

[24] The Commission also notes that, in addition to meeting the ''simple and easy to understand'' definition set forth by the Rule, prescreen opt-out notices must continue to meet the ''clear and conspicuous'' standard required by the FCRA. One recent case from the Court of Appeals for the Seventh Circuit noted that, in determining whether a prescreen notice is ''clear and conspicuous,'' factors to be considered are: ''the location of the notice within the document, the type size used within the notice as well as the type size in comparison to the rest of the document * * * whether the notice is set off in any other way—spacing, font style, all capitals, etc.'' *Cole* v. *U.S. Capital, Inc.*, 389 F.3d 719, 731 (7th Cir. 2004). The court concluded, ''In short, there must be something about the way the notice is presented in the document such that the consumer's attention will be drawn to it.'' *Id.* Thus, the ''simple and easy to understand'' standard overlaps to some extent with the ''clear and conspicuous'' standard.

[25] *See, e.g.*, Comment, Commerce Bancshares, Inc. #OL–100045; Comment, Credit Union National Association #000003; Comment, Mortgage Bankers Association #OL–100036; Comment, National Association of Federal Credit Unions #OL–100020; Comment, National Consumers League, *et al.* #OL–100011; Comment, Privacy Rights Clearinghouse #OL–100015.

[26] Comment, Michigan Credit Union League #OL–100030.

[27] Comment, Mortgage Bankers Association #OL–100036.

[28] *See, e.g.*, Comment, Financial Services Roundtable #EREG–000004; Comment, GE Consumer Finance-Americas #OL–100018.

[29] See, *e.g.*, Comment, Consumer Bankers Association #OL–100028; Comment, HSBC North

commenters stated that the Commission was improperly specifying a definition of the clear and conspicuous standard contained in section 615(d) of the FCRA, including imposing a prominence requirement.[30] These commenters argued that Congress did not intend this disclosure to be more prominent than other disclosures required by law, such as the so-called ''Schumer box,''[31] or that any one element of the disclosure be more prominent than another. One commenter opined that the layered notice was actually two notices and therefore was contrary to the language in section 615(d) of the FCRA requiring ''a clear and conspicuous statement.''[32]

The Commission has considered these comments and has decided to retain the layered notice approach in the final Rule. The FACT Act requires that the notice be ''*presented* in a *format* and in such *type size* and *manner* as to be simple and easy to understand, as established by the Commission.'' (Emphasis added). Thus, the plain language of the statute provides that ''simple and easy to understand'' encompasses presentation of the notice. The Commission has concluded that the layered notice is an appropriate and effective means of achieving this goal, and that nothing in the FACT Act or the FCRA prohibits the use of a layered notice approach.

Under section 615(d) of the FCRA, the prescreen disclosure must be clear and conspicuous. Section 213(a) of the FACT Act imposed the *additional requirement that the disclosure be ''simple and easy to understand.'' Therefore, the statutory scheme establishes a different standard for the prescreen disclosure than it imposes on other disclosures that must only be clear and conspicuous. There is no evidence in the record that the layered notice required by this Rule will compromise the communication of other required disclosures in prescreened solicitations.*

Some commenters stated that, even if the Commission has authority to require a layered notice, it was improper for the Commission to rely upon the consumer survey that the Commission undertook as part of developing the proposed Rule as support for the layered notice requirement. These commenters criticized the methodology of the survey as unrepresentative of consumer reactions in a real-world setting.[33] The Commission recognizes the limitations of any survey testing methodology because of the artificial setting of the test environment, but maintains that the study approximated real-world conditions to the extent feasible.[34] The Commission believes that the survey provides probative evidence of the comparative effectiveness of the three versions of notices it tested (''current,'' ''improved,'' and ''layered'').[35] The survey found that the layered notice better communicated the central messages—consumers' right to opt out and how to exercise the right—than did the current version.[36]

A layered notice is particularly useful in cases such as this, where the information that must be disclosed consists of a relatively simple central proposition accompanied by a larger quantity of explanatory or ancillary information. The layered approach allows for clear communication of the central message with a clear reference to the additional required information. Those consumers interested in the additional information have the opportunity to view that information in another location.[37]

2. Statutory Authority To Require Notice in Electronic Solicitations

Several commenters suggested that the FCRA does not apply to solicitations that are transmitted electronically because such documents are not ''written,'' as that term is used in the FCRA.[38] The Commission believes that ''written'' refers to information that is capable of being preserved in a tangible form and read, as opposed to an oral statement that is intangible and transitory. As with information presented on paper, consumers using electronic media can read the information and preserve it for possible later review either by printing it on paper, saving it on disk, or by some other means. The Commission believes that the purpose of section 213(a) of the FACT Act was to enhance consumers' awareness of opt-out rights, under section 615(d) of the FCRA, whenever they receive a written solicitation in any form, regardless of the means of transmission. Therefore, the Commission has determined that the Rule should apply to all written solicitations, even if they are transmitted electronically.

3. Content of the Notice

Commenters expressed two primary concerns with the content of the short portion of the notice: (1) Whether it is appropriate to include a statement of the opt-out right and the telephone number of the opt-out system in the short portion of the notice; and (2) whether companies should be permitted to include additional information, beyond

---

American Holdings #000004; Comment, Juniper Financial Corp. #000009; Comment, MasterCard International #000012; Comment, Visa U.S.A. Inc. #000005; Comment, Wachovia Corporation #OL–100017.

[30] See, *e.g.*, Comment, Juniper Financial Corp. #000009; Comment, MasterCard International #000012; Comment, Wachovia Corporation #OL–100017.

[31] See 12 CFR 226.5a.

[32] Comment, Visa U.S.A. Inc. #000005.

[33] *See, e.g.*, Comment, Wilmer Cutler Pickering Hale and Dorr LLP #OL–100046. (For a discussion of the consumer survey, *see* 69 FR 58861, 58864.)

[34] The study used standard consumer testing methodology and consisted of an *initial exposure*, in which the test instrument was presented to the consumer and then removed from view, and a *forced exposure*, in which the consumer's attention was focused on specific information in the test instrument. *See* Manoj Hastak, Ph.D., *The Effectiveness of ''Opt-Out'' Disclosures in Pre-Screened Credit Card Offers*, at 3–4, located at *http://www.ftc.gov/reports/prescreen/040927optoutdiscprecreenrpt.pdf*. In the view of the Commission's consumer research expert consultant, the initial exposure was designed to simulate ''fairly natural viewing conditions.'' *Id.* at 4. The FRB Prescreen Report indicates that, for most of those consumers who actually open and review prescreened solicitations, this approach may indeed approximate real-world conditions. In a nationwide survey of consumers, the FRB found that 56% of consumers throw prescreened solicitations away without opening them, 34% merely ''glance'' at them, and the remaining 10% read them closely. *See* FRB Prescreen Report at 32. The initial exposure may have simulated the experience of consumers who glance at prescreened solicitations but do not examine them closely, that is, the experience of most consumers who actually open prescreened solicitations.

[35] The Commission has long recognized that methodological perfection is not required before a consumer survey can be probative and reliable; rather, imperfections in methodology affect the weight that is given to the survey. See, *e.g.*, *In re Stouffer Foods Corp.*, 118 F.T.C. 746, 799 (1994); *In re Bristol-Meyers Co.*, 85 F.T.C. 688, 743–44 (1975).

[36] *See* 69 FR 58861, 58864. In addition, although there was not a statistical difference between the improved and layered versions in the communication of the opt-out right, the layered version was more effective in the initial ''natural'' exposure (as compared to the second ''forced'' exposure) at communicating how to exercise that right.

[37] The results reported in the FRB Prescreen Report indicate that a layered notice may be a very effective means to ensure that consumers who open prescreened solicitations will see the prescreen disclosure. As noted, *supra* note 34, the FRB Prescreen Report found that 56% of consumers throw prescreened solicitations away without opening them, 10% of consumers open the solicitations and examine them, and the remainder (34%) open the solicitations and ''glance'' at them. *Id.* Those consumers who immediately throw the solicitation away are not likely to see the notice wherever it is located; those who examine the solicitation closely might see any disclosure, even one on the back of the page or in fine print; but those consumers who ''glance'' at the solicitation may be more likely to see a prescreen disclosure located on the first page of the principal promotional document that is printed in a noticeable type size and set apart from other text on the page. Thus, a layered notice seems more likely to be seen by the majority of consumers who open prescreened solicitations.

[38] *See, e.g.*, Comment, American Financial Services Association #OL–100038; Comment, Discover Bank #OL–100016.

that mandated by the statute, in any part of the layered notice.

*Inclusion of opt-out right and telephone number in the short notice.*

Several commenters suggested that it was improper for the Commission in the proposed Rule to require presentation of the opt-out right and the telephone number to opt out for placement in the short portion of the notice, while relegating other statutorily-required information to the long portion of the notice.[39] Some of these commenters stated that the Commission did not have the authority to make certain elements of the disclosure (in particular, the telephone number) more prominent than others by placing them in the short portion of the notice. Some were concerned that consumers would not read the long portion of the notice if they could obtain all of the information necessary to opt out from the short portion, which might lead them to make decisions about opting out without the benefit of all pertinent information.[40] Other commenters expressed concern that consumers may mistakenly assume they can use the opt-out telephone number to reply to the offer itself, leading to frustration and confusion.[41]

As stated above, Congress has directed the Commission to prescribe the presentation of the notice, including its manner and format. In exercising that authority, the Commission has determined to include the opt-out right and telephone number in the short notice in the final Rule.[42] Nothing in the statute prohibits the Commission from exercising its authority in this manner, and, in fact, the only legislative history specifically discussing the content of the required notice supports this result and indicates Congress' interest in highlighting the opt-out right.[43]

The FRB Prescreen Report seems to confirm Congress' concern that the existing notice under FCRA section 615(d) has not been especially effective at communicating to consumers that they have a right to opt out of prescreened solicitations. The FRB conducted a nationwide survey of consumers and found that only 20% of consumers were aware of the opt-out right, and that less than half of those had learned of it through the section 615(d) notice.[44] The Report cites the pending ''review of the presentation and the placement of the notice in written prescreened solicitations' mandated by the FACT Act (that is, the Commission's rulemaking proceeding), as one basis for its recommendation that further legislative changes are not necessary at this time.

The Commission has concluded that the statute's purpose is best accomplished by requiring that the short notice include the essential information that consumers need if they choose to opt out. Those consumers who are seeking more information about prescreened offers and their options are invited by the short notice to obtain further information from the long notice.

Finally, the Commission is not persuaded that consumers will be confused about the purpose of the telephone number, given that the short notice will explicitly state that the number is to be used for opting out of future prescreened offers.

*Additional information in the notices.*

The proposed Rule prohibited senders of prescreened solicitations from including information in the short portion of the notice other than that specified by the Rule—that is, consumers' right to opt out and how to exercise it. The proposed Rule contained no such restriction on the content of the long portion of the notice, so long as any additional content did not interfere with, detract from, contradict, or otherwise undermine the purpose of the notice.

Some commenters supported the proposed Rule's prohibition on additional information being included in the short notice, and encouraged the Commission to prohibit additional information in the long notice as well. These commenters argued that allowing additional information in the notices would be contrary to the Commission's statutory mandate, confuse consumers, and allow marketers to discourage consumers from opting out.[45] Other commenters, however, advocated allowing additional information, such as the benefits of prescreened offers and the consequences of opting out, in both the short and long notices in order to provide consumers with sufficient information to make an informed decision about whether to opt out.[46] Some of these commenters cited to an exchange between Representatives Bachus and Kanjorski during the House of Representatives' consideration of the bill, in which the Congressmen stated that consumers should be aware ''not only of the right to opt out of receiving prescreened solicitations, but also of the benefits and consequences of opting out.''[47] Representatives Bachus and Kanjorski submitted a comment to the Commission expressing the importance of consumer awareness of the benefits and consequences of opting out.

The Commission recognizes that prescreened offers may confer many benefits on consumers. As discussed in several of the comments, such offers may be an easy and efficient means for consumers to learn of competing credit or insurance offers and to identify those that best suit their needs. The Commission also acknowledges, as stated in certain of the comments, that the growth in prescreened offers has coincided with a general trend towards lower initial interest rates and certain other more favorable terms, and that a substantial percentage of credit card enrollments result from prescreened offers. Moreover, the Commission recognizes that if prescreened offers

[39] *See, e.g.*, Comment, Coalition to Implement the FACT Act #OL–100040; Comment, Direct Marketing Association #OL–100035; Comment, TransUnion LLC #000022; Comment, Wachovia Corporation #OL–100017.

[40] *See, e.g.*, Comment, American Bankers Association #OL–100040; Comment, Capital One Financial Corporation #OL–100033.

[41] *See, e.g.*, Comment, American Financial Services Association #OL–100038; Comment, Capital One Financial Corporation #OL–100033.

[42] Although the FCRA specifically mentions both the address and telephone number for the notification system, the Commission has determined that it is appropriate to require only the telephone number in the short notice because: (1) the Commission understands that space is at a premium in prescreened solicitations, particularly on the first page of the principal promotional document, and therefore does not want to require more information than necessary in the short notice; and (2) the communication of the central message is likely to be more effective with less verbiage in the short notice. The telephone number requires less space and less verbiage than the address.

[43] For example, FACTA section 213(a), amending FCRA section 615(d)(2), is entitled, ''Enhanced Disclosure of the Means Available to Opt Out of Prescreened Lists.'' Although the title of a statutory section cannot limit that section, it may assist in explaining what was intended by that section. *See also, e.g.,* 149 Cong. Rec. S13851–52 (daily ed. Nov. 4, 2003) (statement of Sen. Sarbanes) (noting that the amendments to the FCRA ''will require a summary of consumers'' rights to opt out of prescreened offers.''); 149 Cong. Rec. S13855 (daily ed. Nov. 4, 2003) (statement of Sen. Johnson) (noting that the amendments to the FCRA ''take[] important new steps to empower consumers to reduce unwanted credit solicitations.''); 149 Cong. Rec. S15806–07 (daily ed. Nov. 24, 2003) (statement of Sen. Sarbanes) (noting that the amendments to the FCRA will ''help ensure that consumers are aware of how to opt out of the prescreening process * * *. The FTC * * * will be required to write rules on the size and prominence of the disclosure of the opt-out telephone number that is included with offers of credit to consumers.'')

[44] FRB Prescreen Report at 32.

[45] *See, e.g.*, Comment, Connors #OL–100014; Comment, National Consumers League, *et al.* #OL–100011; Comment, Privacy Rights Clearinghouse #OL100015.

[46] *See, e.g.*, Comment, CDIA #OL–100026; Comment, Direct Marketing Association #OL–100035; Comment, Wilmer Cutler Pickering Hale and Dorr LLP #OL–100046.

[47] Congressional Record, November 21, 2003, page H12219. *See also infra* note 51.

became less viable, marketers may switch to direct mail solicitations, which may be more costly and carry less favorable terms.[48] At the same time, the Commission notes the concerns raised by certain commenters about the alleged costs of prescreening, such as the privacy implications for those consumers who do not wish to have their personal financial information shared or used to make unsolicited credit and insurance offers.[49]

Regardless of the costs and benefits of prescreening, the FCRA provides that consumers may opt out of prescreened offers, and simply directs the Commission to determine how best to inform consumers of this right and how to exercise it. Moreover, the FCRA does not require that marketers notify consumers of the consequences of opting out, nor does it direct the Commission to require such a disclosure. The final Rule, therefore, requires only the statutorily-mandated messages, but permits additional information where appropriate.

The Commission has concluded that permitting additional information in the short notice could significantly diminish the communication of the statutorily-mandated message.[50] The final Rule, like the proposed Rule, does allow additional information, including information about the benefits of prescreening, in the long notice, if that information does not interfere with, detract from, contradict, or undermine the purpose of the prescreen notices. The Commission believes this approach allows marketers to provide consumers with information that may be useful to them in making their decisions, while at the same time not interfering with the statutory mandate to make the notices simple and easy to understand. The Commission also notes that marketers are free to include information about prescreening elsewhere in their solicitations. Finally, section 213(d) of the FACT Act requires the Commission to undertake a public awareness campaign to alert consumers to the availability of the opt-out right. The Commission intends to use this campaign to educate consumers about the benefits and consequences of opting out.[51]

4. Type Size of the Notice

The proposed Rule required the short portion of the notice to be in a type size that is larger than the principal text on the same page, but in no event smaller than 12-point type, and the long portion of the notice to be in a type size that is no smaller than the type size of the principal text on the same page, but in no event smaller than 8-point type.

Some commenters asserted that the type size prescribed for the short notice was adequate, but that the type size for the long notice was too small.[52] Others found the type size required for the long notice to be appropriate, but opined that the type size for the short notice was too large.[53] Still others proposed that the Commission adopt the approach used in the commentary to the Truth in Lending Act's implementing Regulation Z, which deems disclosures in 12-point type to be readily noticeable, but permits smaller type size to be used.[54] A few commenters suggested that the Commission not impose a type-size requirement at all,[55] or that the requirement only be relative to surrounding text rather than specifying an absolute size.[56]

The Commission has considered these comments, but has determined not to change the type-size requirements for written prescreened solicitations. The FACT Act directs the Commission to prescribe a rule that establishes, among other things, a type size that is sufficient to render the notice simple and easy to understand. It is important that the notices be large enough to be noticed and readable by ordinary consumers. At the same time, the Commission understands that space is at a premium in prescreened solicitations. Requiring the short portion of the notice to be in a type size that is larger than the principal text on the same page, combined with a minimum 12-point type-size requirement, is sufficient to ensure that it is noticeable and readable without imposing unnecessary expense on marketers.

The long notice, which contains additional information, presents a somewhat different calculus. Consumers who see the short notice and are interested in learning further information are directed by the short notice to the long notice. Accordingly, the Commission believes that the long notice should be in a type size that is sufficiently large to be readable, but that there is less need for the long notice to be readily noticeable. Balancing these interests, the Commission concludes that the long notice should be no smaller than 8-point type and no smaller than the principal text on the same page.

Some commenters also expressed concerns about complying with the type-size requirements in electronic solicitations. Several commenters pointed out that because the settings of the computer on which a solicitation is viewed can alter a solicitation's format, meeting a specific minimum point requirement would be burdensome.[57] These commenters suggested that the Commission instead impose a standard of relative prominence for electronic solicitations, which would require, for example, that the short notice be larger than the principal text.[58] The Commission agrees that, for electronic solicitations, a standard of relative prominence is an appropriate means by which to accommodate the vast range of electronic devices that may be used to view the offer. Thus, the final Rule provides that, for electronic solicitations, marketers must take reasonable steps to ensure that the short notice is in a type size that is larger than the principal text on the same page. The long notice must be in a type size no smaller than the principal text on the same page.

[48] *See also* FRB Prescreen Report at 28–36 (discussing the benefits of receiving prescreened offers).

[49] *See also* FRB Prescreen Report at 37–46 (discussing the costs of receiving prescreened offers).

[50] *See, e.g.*, Funkhouser, *An Empirical Study of Consumers' Sensitivity to the Wording of Affirmative Disclosure Messages,* 3 J. Pub. Pol. & Mktg. at 31, 33 (finding that *''information must be presented simply and straightforwardly,''* and ''affirmative disclosures should say *exactly* what they are intended to mean.'') (Emphasis in the original).

[51] The colloquy between Representatives Bachus and Kanjorski cited by some commenters refers to this public awareness campaign as a vehicle for informing consumers of the benefits and consequences of opting out. *See* 149 Cong. Rec. H12,218–19 (daily ed. Nov. 21, 2003) (''Mr. KANJORSKI. Mr. Speaker, does the gentleman share with me the understanding that the FTC's public awareness campaign is to be designed to increase public awareness, not only of the right to opt out of receiving prescreened solicitations, but also of the benefits and consequences of opting out? Mr. BACHUS. Mr. Speaker, yes, I share that understanding.'').

[52] *See, e.g.*, Comment, National Consumers League, *et al.* #OL–100011. *See also* Comment, Privacy Rights Clearinghouse #OL–100015 (commenting that the long notice type size requirement was too small).

[53] *See, e.g.*, Comment, Boeing Employees' Credit Union #000020; Comment, Michigan Credit Union League #OL–100030; Comment, Mortgage Bankers Association #OL–100036; Comment, National Independent Automobile Dealers Association #OL–100021; Comment, Union Federal Bank #OL–100044.

[54] *See, e.g.*, Comment, Credit Union National Association #000003; Comment, Navy Federal Credit Union #000006.

[55] *See, e.g.*, Comment, Coalition to Implement the FACT Act #OL–100042; Comment, Consumer Bankers Association #OL–100028; Comment, TransUnion LLC #000022.

[56] *See, e.g.*, Comment, Countrywide #000010.

[57] *See, e.g.*, Comment, Credit Union National Association #000003; Comment, Countrywide #000010; Comment, Progressive #OL–100010.

[58] *See, e.g.*, Comment, Countrywide #000010; Comment, National Independent Automobile Dealers Association #OL–100021; Comment, Progressive #OL–100010.

5. Form of the Notice

The proposed Rule set forth certain baseline requirements for the form of both the long and the short portions of the notice. The proposed Rule required the short notice to be on the front side of the first page of the principal promotional document in the solicitation, or, if provided electronically, on the first screen; located on the page and in a format so that it is distinct from other text; and in a type style that is distinct from other type styles used on the same page. The proposed Rule required the long notice to begin with a heading identifying it as the ''*OPT-OUT NOTICE*''; be in a type style that is distinct from other type styles used on the same page; and be set apart from other text on the page. The Commission received several comments concerning these requirements generally, as well as specific comments regarding the required location, type style, and heading requirements. These are addressed in turn below.

*General comments.*

Some commenters asserted that the requirements regarding form did not provide companies with enough flexibility to determine the best method for making the notices clear and conspicuous, as well as simple and easy to understand.[59] Conversely, other commenters were concerned that the requirements were not specific enough to ensure that the notices would meet the statutory standards.[60] These commenters suggested, for example, that the Rule require businesses to use bolded type style, rather than allowing them the flexibility to determine how to comply with the distinct type style requirement.

The Commission has considered these comments and declines to alter the baseline requirements in the final Rule. The requirements are not overly restrictive and allow companies flexibility to determine how best to use the basic formatting tools set forth in the Rule to make a statement noticeable and understandable. At the same time, the requirements provide sufficient specificity to ensure that the notices are simple and easy to understand.

*Location of notices in one-page solicitations.*

Several commenters noted that certain prescreened solicitations may consist of only a single page, and recommended that the final Rule not require a layered format in that circumstance.[61] Others requested that the Commission clarify that the short and long portions of the notice could both appear on the first page of the principal promotional document.[62] Others stated that, because prescreened offers of insurance usually consist of a single page or a fold-out self mailer, the final Rule should not apply to prescreened offers of insurance.[63]

Section 615(d) of the FCRA clearly covers prescreened offers of insurance, and the Commission declines to establish an exemption for such offers from the final Rule. The Commission also declines to provide an exception from the layered notice requirement for one-page solicitations. Even in a one-page solicitation, the layered format contributes to making the notice simple and easy to understand. The Commission agrees that both the short and long portions of the notice may appear on the first page of the principal promotional document. As in the proposed Rule, the final Rule allows businesses to place the long notice in any location within the solicitation so long as that location is referenced in the short notice.

*Location of notices in electronic solicitations.*

Because the settings of the device on which an electronic solicitation is viewed can alter a solicitation's format, some commenters objected to the requirement that the short-form notice appear on the first screen of an electronic solicitation.[64] Some commenters proposed that the short portion of the notice simply be required to appear on the first page of an electronic solicitation,[65] or ''reasonably proximate to, or included in, the main marketing message,''[66] in order to accommodate variations among viewing devices. By contrast, other commenters supported requiring the short notice to appear on the first screen of the offer.[67]

The Commission has determined that, for the reasons stated in the comments, it is not practicable to require that the short portion of the notice always appear on the first page or first screen of electronic solicitations. Thus, the final Rule requires that, for electronic solicitations, the short notice be included on the same page and in close proximity to the principal marketing message. This standard ensures that consumers viewing the solicitation will be reasonably likely to see the short notice.

*Distinct type style requirement.*

Some commenters requested that the Commission modify the proposed Rule to clarify that the type style of the notice must contrast only with the *principal* type style used on the same page, rather than with all type styles on the page.[68] The Commission agrees that this clarification should be made. Companies should not be precluded, for example, from presenting the notices in bolded type style simply because a small portion of the text on the page is in bold.[69] Therefore, the final Rule specifies that both the short and long portions of the notice must be in a type style that is distinct from the type style of the principal text on the same page.

*Long notice heading.*

The proposed Rule required that the long portion of the notice include the heading ''*OPT-OUT NOTICE.*'' Some commenters suggested that this heading should reflect the totality of information in the long notice, rather than focusing on the opt-out information in the notice.[70] These commenters suggested a variety of new headings, such as ''*PRESCREEN DISCLOSURES.*''

The Commission has considered these comments and agrees that the long notice heading should be modified to reflect the totality of the information contained in that portion of the notice. Therefore, the final Rule requires that the long notice begin with a heading identifying it as the ''*PRESCREEN & OPT-OUT NOTICE.*''

*D. Section 682.4: Effective Date*

The Commission initially proposed to make the Prescreen Opt-Out Disclosure Rule effective 60 days after publication of the final Rule. Many industry commenters requested a longer effective date in order to allow covered entities to implement changes to their prescreened solicitations. These commenters explained that prescreened solicitations are generally prepared several months in advance, and

[59] *See, e.g.*, Comment, Property Casualty Insurers Association of America #000008.

[60] *See, e.g.*, Comment, National Consumers League, *et al.* #OL–100011; Comment, Privacy Rights Clearinghouse #OL–100015.

[61] *See, e.g.*, Comment, Coalition to Implement the FACT Act #OL–100042.

[62] *See, e.g.*, Comment, National Independent Automobile Dealers Association #OL–100021.

[63] *See, e.g.*, Comment, American Council of Life Insurers #OL–100027.

[64] *See, e.g.*, Comment, Credit Union National Association #000003.

[65] *See, e.g.*, Comment, Credit Union National Association #000003.

[66] *See, e.g.*, Comment, Wachovia Corporation #OL–100017.

[67] *See, e.g.*, Comment, Financial Services Roundtable #EREG–000004; Comment, MasterCard International Incorporated #0000012.

[68] *See, e.g.*, Comment, MasterCard International Incorporated #0000012.

[69] For example, 12 CFR part 226, appendix G, requires that the headings in certain Truth-in-Lending disclosures be in bolded type style. This would not preclude companies from also placing the prescreen disclosure in bolded type style.

[70] *See, e.g.*, Comment, Consumer Bankers Association #OL–100028; Comment, Juniper Financial Corp. #000009; Comment, MasterCard International Incorporated #100012.

therefore they need more time to comply with the final Rule in order to exhaust existing inventories of solicitations and to prepare and disseminate new compliant solicitations.[71] These commenters suggested time periods ranging from 90 days to 1 year after publication of the final Rule. After considering the comments, the Commission has extended the effective date to August 1, 2005. The Commission believes that this time period will provide businesses with sufficient time to implement the new requirements, while ensuring that the benefits to consumers of the improved opt-out notice occur as soon as reasonably practicable.

*E. Appendix A to Part 698: Model Prescreen Opt-Out Notices*

In the proposed Rule, the Commission set forth model notices, including both a short and long portion, in both English and Spanish. These notices included model language and also illustrated proper placement and display of the language.

Several commenters suggested changes to the language in the model notices, including specifying more ''neutral'' language for the short notice, adding information to the long notice, providing model language for collateral requirements, and clarifying that the telephone number is for the consumer reporting agencies, not the prescreen marketer. The Commission agrees that some changes to the proposed model notices are appropriate, and is making the modifications described below. Otherwise, the proposed notices are retained.

These model notices adopted in the final Rule may be used for purposes of complying with the Rule.[72]

1. Model Language in the Short Notice

The proposed Rule's model short notice stated, ''To stop receiving 'prescreened' offers of [credit or insurance] from this and other companies, call toll-free, [toll free number]. See *OPT-OUT NOTICE* on other side [or other location] for details.'' According to several commenters, this language implies that prescreened offers are undesirable and encourages consumers to opt-out.[73] These commenters requested that the Commission revise the model short notice to use less negative language.

The Commission has determined to revise the short notice language to remove any possible negative characterization of prescreened solicitations. The first sentence of the short notice in the final Rule states, ''You can choose to stop receiving 'prescreened' offers of [credit or insurance] from this and other companies by calling toll-free [toll-free number].'' The Commission believes that this language does not imply a recommendation of any course of action, but rather simply informs consumers of their statutory right.

In addition, for the same reasons that commenters suggested that the long notice heading should be modified, the Commission has determined that the model short notice's reference to the long notice should be modified to reflect to totality of the information in the long notice. Therefore, the second sentence of the model short notice in the final Rule states, ''See *PRESCREEN & OPT-OUT NOTICE* on other side [or other location] for more information about prescreened offers.''

2. Additional Information in Long Notices

Several commenters suggested that the model long notice should contain additional information, including information about the benefits and drawbacks of prescreening,[74] that opting out will not stop all offers of credit and insurance, or that consumers may be asked to provide their Social Security numbers when exercising the opt-out right.[75] The Commission believes that each of these messages can be useful to consumers, and notes that it tested the communication of each of these messages as part of its consumer survey.[76]

The Commission has considered these comments, but has determined not to include information beyond that required by the statute in the model notice. The model notice contains plain language statements of the statutorily-required information. Rather than single out other particular messages for inclusion in the model, and thereby imply that certain information is required or that other information is prohibited, the final Rule allows companies flexibility to determine what, if any, additional information should be included (so long as the additional information does not interfere with, detract from, contradict, or undermine the purpose of the opt-out notices).[77]

3. Collateral Requirement

The proposed Rule's model long notice contained a plain-language summary of the information required by section 615(d) of the FCRA to be included in prescreened offers. At least one commenter noted that, among other things, it must be disclosed when a prescreened offer is contingent upon the consumer providing adequate collateral. This commenter stated that the model notice did not specifically include this information, and requested that the Commission revise the model notices to include it.[78]

The Commission has considered this argument and agrees that the model long notice should contain additional language regarding the collateral requirement for use by creditors and insurers in appropriate circumstances. Therefore, the final Rule modifies the second sentence of the model long notice to state, ''This offer is not guaranteed if you do not meet our criteria [including providing acceptable property as collateral].''

4. Telephone Number

Some commenters recommended that the Commission make clear in the

[71] *See, e.g.*, Comment, American Council of Life Insurers #OL–100027; Comment, Boeing Employees' Federal Credit Union #000020; Comment, Wachovia Corporation #OL–100017; Comment, Wells Fargo & Company #000007.

[72] Some commenters suggested that the final Rule require marketers to use notices that substantially conform with the model notices. *See, e.g.*, Comment, National Consumers League, *et al.* #OL–100011. However, the Commission believes that there are sufficient requirements in the Rule to make the notices effective, and therefore it is not necessary to require that marketers' notices substantially conform with the model notices.

[73] *See, e.g.*, Comment, Direct Marketing Association #OL–100035; Comment, Discover Bank #OL–100016; Comment, Juniper Financial Corp. #000009; Comment, MasterCard International Incorporated #000012; Comment, Visa U.S.A. Inc. #000005; Comment, Wells Fargo & Company #000007.

[74] *See supra* text accompanying notes 48 and 49 discussing the benefits and drawbacks of prescreening that were raised by the commenters.

[75] *See, e.g.*, Comment, Coalition to Implement the FACT Act #OL–100042; Comment, Consumer Bankers Association #OL–100028; Comment, Wachovia Corporation #OL–100017. The potential benefits of prescreening were described above in Section III.C.3. In addition, as discussed in the NPRM, not all credit card or insurance offers consumers receive are prescreened offers. For example, some such offers are mass-mailed to consumers and do not derive from prescreened lists. Therefore, opting out of precreened offers will not end all mail solicitations. Finally, as explained in the NPRM, the opt-out system operated by the nationwide consumer reporting agencies requires a Social Security number for verification; including the need to provide a Social Security number in the notice might alleviate consumers' concerns about revealing this sensitive information.

[76] The survey found that the tested language used to convey these ancillary messages did not communicate well to consumers; at the same time, it does not appear that the tested language, at least under the conditions of the study, detracted from the primary message that consumers could choose to opt out. *See* 69 FR 58861, 58864.

[77] The Commission also notes that appropriate additional information might be a website address where consumers can obtain additional information about prescreening and the opt-out right.

[78] *See, e.g.*, Comment, Mortgage Bankers Association #OL–100036.

model notice that consumers would be calling the consumer reporting agencies that operate the toll-free number for opting out, and not the creditor or insurer, when exercising their opt-out right.[79]

The Commission has considered these comments and agrees that language should be added to the model long notice to clarify that the telephone number is that of the consumer reporting agencies, not the creditor or insurer. Therefore, the final Rule modifies the third sentence of the model long notice to state, ''If you do not want to receive prescreened offers of [credit or insurance] from this and other companies, call the consumer reporting agencies [or name of consumer reporting agency] toll free, [toll free number]; or write: [consumer reporting agency name and address].''

### IV. Paperwork Reduction Act

In accordance with the Paperwork Reduction Act, as amended, 44 U.S.C. 3501, *et seq.*, the Commission submitted the proposed Rule to the Office of Management and Budget (''OMB'') for review. The OMB approved the Rule's information collection requirements through November 30, 2007, and assigned OMB control number 3084–0132. In response to comments received, the Commission has revised its estimate of the burden for companies that issue many different prescreened solicitations and therefore will be required to revise multiple solicitations in order to comply with the Rule. On December 8, 2004, the OMB approved the new burden estimate.

As set forth in the NPRM, the Rule imposes certain disclosure requirements on makers of prescreened credit solicitations, as required by the FACT Act. Specifically, such solicitations must include a statement containing a short-form and a long-form notice, which provides consumers with information concerning prescreened solicitations and how to opt out of receiving such solicitations in the future. In addition, the Rule contains a model disclosure that companies may use to comply with the Rule's requirements.

The NPRM estimated the time to revise and re-format an existing solicitation to be about 8 hours per firm. At the same time, the NPRM estimated that between 500 and 750 entities would be affected, so that the total annual burden to the industry would be between 4000 and 6000 hours and the estimated total annual cost would be between $110,000 and $167,000.[80] Numerous commenters stated that the NPRM underestimated the costs of revising solicitations by failing to calculate the additional costs to be borne by larger companies that issue multiple solicitations.[81]

At the outset, the Commission notes that any new disclosure format, as required by the FACT Act's mandate to improve the existing opt-out disclosure, requires affected firms to revise their prescreened solicitations. Moreover, the Commission does not believe that the layered notice format of the final Rule appreciably increases the burdens on affected entities. Nevertheless, the Commission recognizes that companies that offer multiple solicitations will incur added costs to revise these notices. Thus, the Commission now estimates that the total annual burden to the industry will be between 43,600 and 45,600 hours. This figure reflects the Commission's estimate that approximately 100 entities will need additional time to revise multiple notices as follows: for each of these 100 entities, an additional four hours each for an estimated 99 solicitations not accounted for in the NPRM. Based on the time needed to bring these additional solicitations into compliance, the Commission now estimates that the total cost to the industry will be between $1,157,894 and $1,213,329. This figure reflects the 39,600 additional hours of skilled technical labor (at $26.44 per hour) that the Commission estimates will be required to revise the multiple solicitations.[82]

Although some commenters also estimated that more time would be needed to format and develop a disclosure than the eight hours estimated by the NPRM,[83] or that the labor costs to revise each notice would be higher than estimated,[84] the Commission has concluded that it is feasible to design a solicitation according to its original estimates. Nevertheless, in order to permit companies to implement such changes in a more cost-effective manner, the Commission has extended the time to comply with the rule to August 1, 2005.

### V. Final Regulatory Flexibility Analysis

The Regulatory Flexibility Act (''RFA''), 5 U.S.C. 601–612, requires that the Commission provide an Initial Regulatory Flexibility Analysis (''IRFA'') with a proposed Rule and a Final Regulatory Flexibility Analysis (''FRFA''), with the final Rule, unless the Commission certifies that the Rule will not have a significant economic impact on a substantial number of small business entities.

The Commission hereby certifies that the final Rule will not have a significant economic impact on a substantial number of small business entities. The FCRA previously mandated the prescreen disclosure. The FACT Act requires the Commission to adopt a rule to make the required disclosure simple and easy to understand. The proposed Rule applies to any entity that makes prescreened offers of credit or insurance. The Commission has been unable to determine the number of small entities that purchase prescreened lists from consumer reporting agencies. However, the Commission believes that only a small number of small entities make prescreened offers. The Commission did not receive any comments to the IRFA that would allow it to determine the precise number of small entities that will be affected. Although there may be some small entities among the entities making prescreened offers, the economic impact of the final Rule is not likely to be significant on a particular entity, nor is the final Rule likely to have a significant economic impact on a substantial number of small entities. The minimal impact on creditors and insurers would likely consist of revising disclosures that they already give in order to make the disclosures simple and easy to understand.

The Commission requested comment on the IRFA and the proposed Rule's impact on small businesses. The Commission received a few comments in response. These comments, which are discussed in more detail below, requested more time to comply with the Rule[85] and suggested that the layered

---

[79] *See, e.g.*, Comment, Bank of America Corporation #OL–100032; Comment, Mortgage Bankers Association #OL–100036.

[80] This estimate was based on Bureau of Labor Statistics data (as of July, 2002), as follows: 2 hours of managerial/professional time at $31.55 per hour; plus 6 hours of skilled technical labor at $26.44 per hour; multiplied by 500 and 750 companies, for a total of $110,870 and $166,305, respectively.

[81] *See, e.g.*, Comment, Bank of America Corporation #OL–100032; Comment, JPMorgan Chase Bank #OL–100019; Comment, MasterCard International Incorporated #000012; Comment, Wachovia Corporation #OL–100017; Comment, Wells Fargo & Company #000007; Comment, Wilmer Cutler Pickering Hale and Dorr LLP #OL–100046.

[82] As in the NPRM, the hourly rate is based on Bureau of Labor Statistics data, as of July, 2002.

[83] *See, e.g.*, Comment, Countrywide #000010; Comment, JPMorgan Chase Bank #OL–100019; Wachovia Corporation #OL–100017.

[84] *See, e.g.*, Comment, American Bankers Association #OL–100040; Comment, Capitol One Financial Corporation #OL–100033.

[85] *See, e.g.*, Comment, Credit Union National Association #000003; Comment, National Independent Automobile Dealers Association #OL–100021.

notice requirement may be difficult for some small businesses.[86]

The Commission continues to believe that a precise estimate of the number of small entities that fall under the Rule is not currently feasible. However, based on the comments received and the Commission's own experience and knowledge of industry practices, the Commission also continues to believe that the cost and burden to small business entities of complying with the Rule is minimal and that the final Rule will not have a significant impact on a substantial number of small entities. Accordingly, this document serves as notice to the Small Business Administration of the agency's certification of no effect. Nonetheless, the Commission has decided to publish a Final Regulatory Flexibility Analysis with this final Rule. Therefore, the Commission has prepared the following analysis:

*A. Need for and Objectives of the Rule*

Section 213 of the FACT Act directs the FTC to adopt a rule to improve the required notice to consumers regarding their right to opt out of prescreened solicitations for credit or insurance. In this action, the FTC promulgates a final Rule that would implement this requirement of the FACT Act. The Rule is authorized by and based upon section 213 of the FACT Act.

*B. Significant Issues Received by Public Comment*

The Commission received a few comments in response to its IRFA. Some commenters, in particular, trade associations representing small businesses, were primarily concerned about the time allowed for compliance with the Rule. These commenters asserted that small businesses, which have more limited resources than larger marketers, needed more than the proposed 60 days to comply with the Rule. The commenters suggested an effective date ranging from 120 days to 6 months from the date the final Rule is issued.[87] The final Rule changes the effective date to August 1, 2005. Therefore, small businesses, as well as other entities, should have sufficient time to comply.

Other commenters suggested that the layered notice requirement may be difficult for some small entities.[88] Some of these comments noted that small entities often have one-page solicitations, and that the layered notice would likely require them to increase the length of their marketing materials, at great expense. As an alternative, these commenters suggested that a one-part notice, rather than the layered notice, should be permitted. The Commission has considered these comments, but does not believe that the layered notice requirement is overly burdensome for small businesses. The Commission has clarified in the statement of basis and purpose that accompanies the final Rule that both parts of the layered notice may appear in a single page solicitation, obviating the need for an additional page or document. Even on a single page solicitation, the layered format contributes to a notice that is simple and easy to understand. The Rule also allows companies flexibility as to the precise formatting and language of the notices. The Commission considers this flexibility sufficient to allow all entities, including small entities, to determine an appropriate means of complying with the Rule within the framework of their own solicitations.

*C. Small Entities To Which the Rule Will Apply*

As described above, the Rule applies to any entity, including small entities, that makes prescreened offers of credit or insurance. The Commission has been unable to ascertain a precise estimate of the number of small entities that are creditors or insurers, and received no specific comments to the IRFA that allow it to determine the precise number of small entities that will be affected. Entities potentially covered by the Rule include any entity that extends credit or insurance, including insurance companies, retailers, department stores, and banking institutions, if they are engaging in prescreened offers of credit. For these kinds of entities, the Small Business Administration defines small business to include, in general, a business whose annual receipts do not exceed $6 million in total receipts for insurance companies and retailers, and $23 million in total receipts for department stores. For banking institutions, the Small Business Administration defines small business to include entities whose total assets do not exceed $150 million.[89]

However, not all businesses that extend credit or insurance are required to comply with the Rule. Rather, only such entities that make prescreened solicitations will be subject to the Rule's requirements. Although the number of small businesses that offer credit or insurance is large, the Commission believes that only a small number of those businesses engage in prescreened solicitations. The Commission believes that many small businesses find it more cost effective to engage in other forms of solicitation, including point-of-sale solicitations and/or solicitations of existing customers.

*D. Projected Reporting, Recordkeeping, and Other Compliance Requirements*

Under the final Rule, any entity making a prescreened offer of credit or insurance will be required to provide recipients of the offer with a disclosure regarding their right to opt out of such offers. (There are no filing or recordkeeping requirements in the Rule.) These disclosures are to be in a form that is simple and easy to understand. As noted in the Paperwork Reduction Act analysis above, the estimated time to revise the notice and re-format solicitations is approximately 8 hours (one business day), and the total cost for all entities to comply with this Rule is between $1,157,894 and $1,213,329.

*E. Steps Taken To Minimize Significant Economic Impact of the Rule on Small Entities*

The Commission considered whether any significant alternatives, consistent with the purposes of the FACT Act, could further minimize the Rule's impact on small entities. The FTC asked for comment on this issue. Some commenters suggested that the layered notice requirement may be difficult for small businesses, and that a single notice would be more appropriate.[90] However, as discussed above, the Commission has determined that the layered format is the best way to ensure that the disclosures are simple and easy to understand and does not find that the layered notice approach poses a particular burden to small entities. The Rule allows small entities flexibility in determining how best to present the layered notice within the framework of their solicitations, and therefore does not impose a substantial burden.

The Commission also requested comment on the need to adopt a delayed

[86] *See, e.g.*, Comment, ChoicePoint Precision Marketing, Inc. #OL–100025; Comment, Wilmer Cutler Pickering Hale and Dorr LLP #OL–100046.

[87] *See, e.g.*, Comment, Credit Union National Association #000003; Comment, National Independent Automobile Dealers Association #OL–100021.

[88] *See, e.g.*, Comment, ChoicePoint Precision Marketing, Inc. #OL–100025; Comment, Wilmer Cutler Pickering Hale and Dorr LLP #OL–100046.

[89] These numbers represent size standards for most entities in the industries mentioned above. A list of the SBA's size standards for all industries can be found at *http://www.sba.gov/size/indextableofsize.html*.

[90] *See, e.g.*, Comment, ChoicePoint Precision Marketing, Inc. #OL–100025; Comment, Wilmer Cutler Pickering Hale and Dorr LLP #OL–100046.

effective date for small entities in order to provide them with additional time to come into compliance. The Commission received some comments on this issue;[91] the Commission has decided to extend the effective date for all entities subject to the Rule to August 1, 2005. This additional time will allow small entities to assess their compliance obligations and make cost-sensitive decisions concerning how best to comply with the Rule.

**VI. Final Rule**

**List of Subjects**

*16 CFR Part 642*

Consumer reporting agencies, Consumer reports, Credit, Fair Credit Reporting Act, Trade practices.

*16 CFR Part 698*

Consumer reporting agencies, Consumer reports, Credit, Fair Credit Reporting Act, Trade practices.

■ The Federal Trade Commission amends chapter I, title 16, Code of Federal Regulations, as follows:

■ 1. Add new part 642 to read as follows:

## PART 642—PRESCREEN OPT-OUT NOTICE

Sec.
642.1 Purpose and scope.
642.2 Definitions.
642.3 Prescreen opt-out notice.
642.4 Effective date.

**Authority:** Pub. L. 108–159, sec. 213(a); 15 U.S.C. 1681m(d).

### § 642.1 Purpose and scope.

(a) *Purpose*. This part implements section 213(a) of the Fair and Accurate Credit Transactions Act of 2003, which requires the Federal Trade Commission to establish the format, type size, and manner of the notices to consumers, required by section 615(d) of the Fair Credit Reporting Act (''FCRA''), regarding the right to prohibit (''opt out'' of) the use of information in a consumer report to send them solicitations of credit or insurance.

(b) *Scope*. This part applies to any person who uses a consumer report on any consumer in connection with any credit or insurance transaction that is not initiated by the consumer, and that is provided to that person under section 604(c)(1)(B) of the FCRA (15 U.S.C. 1681b(c)(1)(B)).

### § 642.2 Definitions.

As used in this part:

(a) *Simple and easy to understand* means:

(1) A layered format as described in § 642.3 of this part;

(2) Plain language designed to be understood by ordinary consumers; and

(3) Use of clear and concise sentences, paragraphs, and sections.

(i) *Examples*. For purposes of this part, examples of factors to be considered in determining whether a statement is in plain language and uses clear and concise sentences, paragraphs, and sections include:

(A) Use of short explanatory sentences;

(B) Use of definite, concrete, everyday words;

(C) Use of active voice;

(D) Avoidance of multiple negatives;

(E) Avoidance of legal and technical business terminology;

(F) Avoidance of explanations that are imprecise and reasonably subject to different interpretations; and

(G) Use of language that is not misleading.

(ii) [Reserved]

(b) *Principal promotional document* means the document designed to be seen first by the consumer, such as the cover letter.

### § 642.3 Prescreen opt-out notice.

Any person who uses a consumer report on any consumer in connection with any credit or insurance transaction that is not initiated by the consumer, and that is provided to that person under section 604(c)(1)(B) of the FCRA (15 U.S.C. 1681b(c)(1)(B)), shall, with each written solicitation made to the consumer about the transaction, provide the consumer with the following statement, consisting of a short portion and a long portion, which shall be in the same language as the offer of credit or insurance:

(a) *Short notice*. The short notice shall be a clear and conspicuous, and simple and easy to understand statement as follows:

(1) *Content*. The short notice shall state that the consumer has the right to opt out of receiving prescreened solicitations, and shall provide the toll-free number the consumer can call to exercise that right. The short notice also shall direct the consumer to the existence and location of the long notice, and shall state the heading for the long notice. The short notice shall not contain any other information.

(2) *Form*. The short notice shall be:

(i) In a type size that is larger than the type size of the principal text on the same page, but in no event smaller than 12-point type, or if provided by electronic means, then reasonable steps shall be taken to ensure that the type size is larger than the type size of the principal text on the same page;

(ii) On the front side of the first page of the principal promotional document in the solicitation, or, if provided electronically, on the same page and in close proximity to the principal marketing message;

(iii) Located on the page and in a format so that the statement is distinct from other text, such as inside a border; and

(iv) In a type style that is distinct from the principal type style used on the same page, such as bolded, italicized, underlined, and/or in a color that contrasts with the color of the principal text on the page, if the solicitation is in more than one color.

(b) *Long notice*. The long notice shall be a clear and conspicuous, and simple and easy to understand statement as follows:

(1) *Content*. The long notice shall state the information required by section 615(d) of the Fair Credit Reporting Act (15 U.S.C. 1681m(d)). The long notice shall not include any other information that interferes with, detracts from, contradicts, or otherwise undermines the purpose of the notice.

(2) *Form*. The long notice shall:

(i) Appear in the solicitation;

(ii) Be in a type size that is no smaller than the type size of the principal text on the same page, and, for solicitations provided other than by electronic means, the type size shall in no event be smaller than 8-point type;

(iii) Begin with a heading in capital letters and underlined, and identifying the long notice as the ''PRESCREEN & OPT-OUT NOTICE'';

(iv) Be in a type style that is distinct from the principal type style used on the same page, such as bolded, italicized, underlined, and/or in a color that contrasts with the color of the principal text on the page, if the solicitation is in more than one color; and

(v) Be set apart from other text on the page, such as by including a blank line above and below the statement, and by indenting both the left and right margins from other text on the page.

### § 642.4 Effective date.

This part is effective on August 1, 2005.

## PART 698—[AMENDED]

■ 2. Amend § 698.1 by revising paragraph (b) to read as follows:

### § 698.1 Authority and purpose.

* * * * *

[91] *See, e.g.*, Comment, Credit Union National Association #000003; Comment, National Independent Automobile Dealers Association #OL–100021.

Case: 1:17-cv-00194 Document #: 133-1 Filed: 10/12/17 Page 46 of 120 PageID #:2784

(b) *Purpose*. The purpose of this part is to comply with sections 607(d), 609(c), 609(d), 612(a), and 615(d) of the Fair Credit Reporting Act, as amended by the Fair and Accurate Credit Transactions Act of 2003, and Section 211 of the Fair and Accurate Credit Transactions Act of 2003.

■ 3. Add Appendix A to Part 698 as follows:

## Appendix A to Part 698—Model Prescreen Opt-Out Notices

In order to comply with part 642 of this title, the following model notices may be used:

BILLING CODE 6750–01–P

(a) *English language model notice.* (1) *Short notice.*

# Here's a Line About Credit

J.S. Name
12345 Friendly Street
City, ST 12345

Dear Ms. Name,

Back in the last century, we saw how technology was changing the way people do things. So we set out to create a the last century, we saw how technology was changing the way people do things. Back in the last century, we saw how technology was changing the way people do things. So we set out to create a the last century, we saw how technology was changing the way people do things.

Back in the last century, we saw how technology was changing the way people do things. So we set out to create a smart kind of credit card. Back in the last century, we saw how technology was changing the way. Back in the last century, we saw how technology was changing the way people do things. So we set out to create a the last century, we saw how technology was changing the way people do things.

Back in the last century, we saw how technology was changing the way people do things. So we set out to create a smart kind of credit card. Back in the last century, we saw how technology was changing the way peop. So we set out to create a smart kind of credit card. Back in the last century, we saw how technology was changing the way people do things. So we set out to create a smart kind of credit a smart kind of credit card.

So we set out to create a smart kind of credit card. Back in the last century, we saw how technology was changing the way people. Back in the last century, we saw how technology was changing the way people do things. So we set out to create a smart kind of credit card.

We saw how technology was changing the way people do things. So we set out to create a smart kind of credit card. Back in the last century, we saw how technology.

Sincerely,

John W. Doe
President, Credit Card Company

PFOR 00 MON
FIXED ABC

■

BALANCE TR
FOR 00 MONTHS

■

NO MONTHS FEE

■

INTERNET SECURITY
SECURITY

■

ONLINE FRAUD PRO
GUARANTEE

■

YOUR BALANCE
PAY YOUR BILL

■

FEE-FREE REWARDS
PROGRAM

**You can choose to stop receiving "prescreened" offers of [credit or insurance] from this and other companies by calling toll-free [toll-free number]. See PRESCREEN & OPT-OUT NOTICE on other side [or other location] for more information about prescreened offers.**

(2) *Long notice.*

Back in the last century, we saw how technology was changing the way people do things. So we set out to create a smart kind of credit card. Back in the last century, we saw how technology was changing the way. Back in the last century, we saw how technology was changing the way people do things. So we set out to create a the last century, we saw how technology was changing the way people do things.

HEADER

| Percent Rate for | Other ABCs | Variable info material | Grace or repases Are placed here | Computing the balast | Annual Fee | Usual Place Finance Charge |
|---|---|---|---|---|---|---|
| Back in the last century, we saw how technology was changing the way people do things. So we set out to create a smart kind of credit card. | Back in the last century, we saw how technology was changing the way people do things. So we set out to create a smart kind of credit card. Back in the last century, we saw how technology was changing the way. | Back in the last century, we saw how technology was changing the way people do things. So we set out to create a smart kind of credit card. | Back in the last century, we saw how technology was changing. | Back in the last century, we saw how technology was changing the way people do things. So we set out to create a smart kind of credit card. | Back long ago. | Back in the last century, we saw how technology. |

Back in the last century, we saw how technology was changing the way people do things. So we set out to create a smart kind of credit card. Back in the last century, we saw how technology was changing the way. Back in the last century, we saw how technology was changing the way people do things. So we set out to create a smart kind of credit card. Back in the last century, we saw how technology was changing the way. Back in the last century, we saw how technology was changing the way people do things. So we set out to create a smart kind of credit card. Back in the last century, we saw how technology was changing the way.

Back in the last century, we saw how technology was changing the way people do things. So we set out to create a smart kind of credit card. Back in the last century, we saw how technology was changing the way. Back in the last century, we saw how technology was changing the way people do things. So we set out to create a smart kind of credit card. Back in the last century, we saw how technology was changing the way. Back in the last century, we saw how technology was changing the way people do things. So we set out to create a smart kind of credit card. Back in the last century, we saw how technology was changing the way. Back in the last century, we saw how technology was changing the way people do things. So we set out to create a smart kind of credit card. Back in the last century, we saw how technology was changing the way. Back in the last century, we saw how technology was changing the way people do things. So we set out to create a smart kind of credit card. Back in the last century, we saw how technology was changing the way.

Back in the last century, we saw how technology was changing the way. Back in the last century, we saw how technology was changing the way people do things. So we set out to create a smart kind of credit card. Back in the last century, we saw how technology was changing the way.

Back in the last century, we saw how technology was changing the way. Back in the last century, we saw how technology was changing the way people do things. So we set out to create a smart kind of credit card. Back in the last century, we saw how technology was changing the way.

**TERMS AND CONDITIONS**

Back in the last century, we saw how technology was changing the way people do things. So we set out to create a smart kind of credit card. Back in the last century, we saw how technology was changing the way. Back in the last century, we saw how technology was changing the way people do things. So we set out to create a smart kind of credit card. Back in the last century, we saw how technology was changing the way. Back in the last century, we saw how technology was changing the way people do things. So we set out to create a smart kind of credit card. Back in the last century, we saw how technology was changing the way. Back in the last century, we saw how technology was changing the way people do things. So we set out to create a smart kind of credit card. Back in the last century, we saw how technology was changing the way. Back in the last century, we saw how technology was changing the way people do things. So we set out to create a smart kind of credit card. Back in the last century, we saw how technology was changing the way. Back in the last century, we saw how technology was changing the way people do things. So we set out to create a smart kind of credit card. Back in the last century, we saw how technology was changing the way. Back in the last century, we saw how technology was changing the way people do things. So we set out to create a smart kind of credit card. Back in the last century, we saw how technology was changing the way. Back in the last century, we saw how technology was changing the way people do things. So we set out to create a smart kind of credit card. Back in the last century, we saw how technology was changing the way. Back in the last century, we saw how technology was changing the way people do things. So we set out to create a smart kind of credit card. Back in the last century, we saw how technology was changing the way. Back in the last century, we saw how technology was changing the way. Back in the last century, we saw how technology was changing the way people do things. So we set out to create a smart kind of credit card. Back in the last century, we saw how technology was changing the way. Back in the last century, we saw how technology was changing the way people do things. So we set out to create a smart kind of credit card. Back in the last century, we saw how technology was changing the way. Back in the last century, we saw how technology was changing the way people do things. Back in the last century, we saw how technology was changing the way. Back in the last century, we saw y, we saw how technology was changing the way. Back in the last century, we saw how technology was changing the way people do things.

Act Notice: the a smart kind of credit card. Back in the last century, we saw how technology was changing the way people do things. So we set out to create a smart kind of credit card. Back in the last century, we saw how technology was changing the way. Back in the last century, we saw.

**<u>PRESCREEN & OPT-OUT NOTICE</u>: This "prescreened" offer of [credit or insurance] is based on information in your credit report indicating that you meet certain criteria. This offer is not guaranteed if you do not meet our criteria [including providing acceptable property as collateral]. If you do not want to receive prescreened offers of [credit or insurance] from this and other companies, call the consumer reporting agencies [or name of consumer reporting agency] toll-free, [toll-free number]; or write: [consumer reporting agency name and mailing address].**

**Notice to Some Residents:** te a smart kind of credit card. Back in the last century, we saw how technology was changing the way. Back in the last century, we saw how technology was changing the way people do things. So we set out to create a smart kind of credit card. Back in the last century, we saw how technology was changing the way. Back in the last century. So we set out to create a smart kind of credit card. Back in the last century, we saw how technology was changing the way.

(b) *Spanish language model notice.*

(1) *Short notice.*

# Aquí están líneas crédito

J.S. Nombre
1234 Calle Amistosa
Ciudad, ST 12345

Estimada Señora Nombre:

En el siglo pasado vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. Así que creamos una tarjeta de crédito inteligente, vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. En el siglo pasado vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. Así que creamos una tarjeta de crédito inteligente. Vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas.

Así que creamos una tarjeta de crédito inteligente. Vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. En el siglo pasado vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. Así que creamos una tarjeta de crédito inteligente, vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas.

Vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. En el siglo pasado vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. Así que creamos una tárjeta de crédito inteligente, vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. En el siglo pasado vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas.

Así que creamos una tarjeta de crédito inteligente. Vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. En el siglo pasado vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. Así que creamos una tarjeta de crédito inteligente. Vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas.

Sinceramente,

John W. Doe
Presidente, Compañía

PFOR 00 MON FIJO ABC

■

TRANSFERENCIA DE BALANCE POR MESES

■

SIN CUOTA MENSUAL

■

PAGO ELECTRÓNICO SEGURO

■

PROTECCIÓN CONTRA FRAUDE EN LÍNEA GARANTIZADO

■

SU BALANCE PAGA SU CUENTA

■

PROGRAMA DE RECOMPENSAS SIN CUENTA

**Usted puede elegir no recibir más "ofertas de [crédito o seguro] pre-investigadas" de esta y otras compañías llamando sin cargos al [número sin cargo]. Ver la <u>NOTIFICACIÓN DE PRE-INVESTIGACIÓN Y EXCLUSIÓN VOLUNTARIA</u> al otro lado de esta página [o en otro lugar] para más información sobre ofertas pre-investigadas.**

Case: 1:17-cv-00194 Document #: 133-1 Filed: 10/12/17 Page 50 of 120 PageID #:2788

(2) *Long notice.*

En el siglo pasado vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. Así que creamos una tarjeta de crédito inteligente, vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. En el siglo pasado vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. Así que creamos una tarjeta de crédito inteligente.

AQUÍ ESTÁN

| Protección Contra Fraude | Programa de Recompensas | Su Balance Paga | Sin Cuota Mensual | Protección Contra Fraude | Recompensas Sin Cuenta | Sin Cuota Mensual |
|---|---|---|---|---|---|---|
| En el siglo pasado vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. | Vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. Vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. | En el siglo pasado vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. En el siglo pasado vimos como la gente hace las cosas. Así que cremos. | Así que creamos una tarjeta de crédito inteligente. | En el siglo pasado vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. | Así que cremos. | Vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. |

En el siglo pasado vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. Así que creamos una tarjeta de crédito inteligente, vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. En el siglo pasado vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. Así que creamos una tarjeta de crédito inteligente. Vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. Así que creamos una tarjeta de crédito inteligente. Vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas.

Así que creamos una tarjeta de crédito inteligente, vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. En el siglo pasado vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. Así que creamos una tarjeta de crédito inteligente. Vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. Así que creamos una tarjeta de crédito inteligente. Vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. En el siglo pasado vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. Así que creamos una tarjeta de crédito inteligente, vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas.

Vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. En el siglo pasado vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. Así que creamos una tarjeta de crédito inteligente, vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. En el siglo pasado vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. Así que creamos una tarjeta de crédito inteligente. Vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. En el siglo pasado vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. En el siglo pasado vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas.

**TERMINOS Y CONDICIONA**

En el siglo pasado vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. Así que creamos una tarjeta de crédito inteligente, vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. En el siglo pasado vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. Así que creamos una tarjeta de crédito inteligente. Vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas.

Así que creamos una tarjeta de crédito inteligente. Vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. En el siglo pasado vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. Así que creamos una tarjeta de crédito inteligente, vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas.

Vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. En el siglo pasado vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. Así que creamos una tarjeta de crédito inteligente, vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. En el siglo pasado vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas.

Así que creamos una tarjeta de crédito inteligente. Vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. En el siglo pasado vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. Así que creamos una tarjeta de crédito inteligente. Vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas.

En el siglo pasado vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. Así que creamos una tarjeta de crédito inteligente, vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. En el siglo pasado vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. Así que creamos una tarjeta de crédito inteligente. Vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. Así que creamos una tarjeta de crédito inteligente. Vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. En el siglo pasado vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. Así que creamos una tarjeta de crédito inteligente. Vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. Vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. Vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. Vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas.

**NOTIFICACIÓN DE PRE-INVESTIGACIÓN Y EXCLUSIÓN VOLUNTARIA: Esta oferta de [crédito o seguro] está basada en información contenida en su informe de crédito que indica que usted cumple con ciertos criterios [incluyendo la condición de tener propiedades aceptables como colateral]. Si usted no cumple con nuestros criterios, esta oferta no está garantizada. Si usted no desea recibir ofertas de [crédito o seguro] pre-investigadas de ésta y otras compañías, llame a las agencias de información del consumidor [o nombre de la agencia de información del consumidor] sin cargos, [número sin cargo]; o escriba a: [nombre de la agencia de información del consumidor y dirección de correo].**

**En el siglo pasado vimos como:** la tecnología estaba cambiando la manera en que la gente hace las cosas. Así que creamos una tarjeta de crédito inteligente. Vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. Vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. Vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. Vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas.

By direction of the Commission.

**Donald S. Clark,**

*Secretary.*

[FR Doc. 05–1678 Filed 1–28–05; 8:45 am]

**BILLING CODE 6750–01–C**



WILLIAM BLUMENTHAL
General Counsel

THOMAS J. SYTA, Bar # 116286
RAYMOND E. MCKOWN, Bar # 150975
JENNIFER M. BRENNAN, Bar # 225473
Federal Trade Commission
10877 Wilshire Blvd., Ste. 700
Los Angeles, CA 90024
(310) 824-4343 (voice)
(310) 824-4380 (fax)
tsyta@ftc.gov
rmckown@ftc.gov
jmbrennan@ftc.gov

Attorneys for Plaintiff
Federal Trade Commission

EXHIBIT
A-4

LODGED
AUG 15 2005
CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION AT SANTA ANA
BY DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>CONSUMERINFO.COM., INC., a corporation,<br><br>doing business as<br><br>EXPERIAN CONSUMER DIRECT, QSPACE, INC., and IPLACE INC.,<br><br>Defendant. | CV SACV05-801 AHS(MLGx)<br><br>**STIPULATED FINAL JUDGMENT AND ORDER FOR PERMANENT INJUNCTION** |

Plaintiff, Federal Trade Commission ("FTC" or "Commission") is concurrently filing its Complaint, which alleges that Defendant Consumerinfo.com, Inc., doing business as Experian Consumer Direct, Qspace, Inc., and Iplace, Inc.,

has engaged in unfair or deceptive acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45, in connection with the marketing of consumer reports and credit monitoring programs. The parties have agreed to the entry of this Stipulated Final Judgment and Order for Permanent Injunction ("Order") to resolve all matters in dispute in this action without trial or adjudication of any issue of law or fact herein and without Defendant admitting liability for any of the matters alleged in the Complaint. Defendant has waived service of the Summons and Complaint.

**THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** as follows:

## FINDINGS

1. This Court has jurisdiction over the subject matter of this case and over Defendant Consumerinfo.com, Inc. dba Experian Consumer Direct, Qspace, Inc. and Iplace, Inc.

2. Venue in this district is proper under 28 U.S.C. § 1391(b) and (c), and 15 U.S.C. § 53(b).

3. The acts and practices of Defendant are in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

4. The Complaint states claims upon which relief may be granted against Defendant under Sections 5 and 13(b) of the FTC Act, 15 U.S.C. §§ 45 and 53(b).

5. Defendant makes no admissions as to the allegations in the Complaint, other than the jurisdictional facts.

6. Defendant waives: (a) all rights to seek appellate review or otherwise challenge or contest the validity of this Order; (b) any claim Defendant may have

against the Commission, its employees, representatives, or agents that relate to the matter stated herein; (c) all claims under the Equal Access to Justice Act, 28 U.S.C. § 2412, as amended by Pub. L. 104-121, 110 Stat. 847, 863-64 (1996); and (d) any rights to attorneys' fees that may arise under said provision of law.

7. Entry of this Order is in the public interest.

## DEFINITIONS

For purposes of this Order, the following definitions shall apply:

1. "Assisting Others" means knowingly formulating or providing, or arranging for the formulation or provision of, any marketing materials.

2. "Billing Information" means any data that enables any person to access a customer's account, such as a credit card, checking, savings, share or similar account, utility bill, mortgage loan account, or debit card.

3. "Clearly and Conspicuously" means:

a. in print communications, the message shall be in a type size and location sufficiently noticeable for an ordinary consumer to read and comprehend it, in print that contrasts with the background against which it appears;

b. in communications disseminated orally, the message shall be delivered in a volume and cadence sufficient for an ordinary consumer to hear and comprehend it;

c. in communications made through an electronic medium (such as television, video, radio, and interactive media such as the Internet, online services and software), the message shall be presented simultaneously in both the audio and visual portions of the communication. In any communication presented solely through visual or audio means, the message may be made through the same means in which the communication is presented. Any audio message shall be delivered in

a volume and cadence sufficient for an ordinary consumer to hear and comprehend it. Any visual message shall be of a size and shade, with a degree of contrast to the background against which it appears and shall appear on the screen for a duration and in a location, sufficiently noticeable for an ordinary consumer to read and comprehend it; and

d. regardless of the medium used to disseminate it, the message shall be in understandable language and syntax. Nothing contrary to, inconsistent with, or in mitigation of the message shall be used in any communication.

4. In the case of advertisements disseminated by means of an interactive electronic medium such as software, the Internet, or online services, "in close proximity" shall mean on the same webpage, online service page, or other electronic page, and proximate to the triggering representation, and shall not include disclosures accessed or displayed through hyperlinks, pop-ups, interstitials, or other means.

5. "Consumer Report" is synonymous in meaning and equal in scope to the usage of the term as it is defined in Section 603(d) of the Fair Credit Reporting Act, 15 U.S.C. § 1681a(d).

6. "Credit Report" means a consumer report that is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for creditworthiness.

7. "Credit Monitoring Program" means a program that enables a consumer to access information related to substantive changes in his or her credit history as recorded in his or her consumer report.

8. "Defendant" means Consumerinfo.com, Inc. doing business as Experian Consumer Direct, Qspace, Inc., and Iplace, Inc.

9. "Document" is synonymous in meaning and equal in scope to the

usage of the term in Federal Rules of Civil Procedure 34(a), and includes writings, drawings, graphs, charts, photographs, audio, and video recordings, computer records, and other data compilations from which the information can be obtained and translated, if necessary, through detection devices into reasonably usable form. A draft or non-identical copy is a separate document within the meaning of the term.

10. "Free Credit Report/Credit Check Monitoring" (or, "CCM") means a promotion offered by Consumerinfo.com, Inc., regardless of the name under which the promotion was offered, wherein a consumer received a free credit report in conjunction with enrollment on a trial conversion basis in a credit monitoring program.

11. "Full and Complete Refund" means a refund of any unrefunded amount paid for the Free Credit Report/Credit Check Monitoring in the 12-month membership period in which the cancellation took place, or the request for refund or chargeback, or complaint about the charge, was made. No consumer shall receive a refund of more than the unrefunded amount paid in a single twelve-month membership period.

12. “Marketing Partner” means any third party with which Defendant has an agreement under which Defendant agrees to provide order fulfillment services to that third party in conjunction with that third party’s advertising, promotion, offer, or sale of any program in which the consumer receives a free credit report and is enrolled in a credit monitoring program on a trial conversion basis and under which Defendant does not have authority to control such advertising, promotion, offer, or sale.

13. "Material" when used in reference to the sale of goods or services means likely to affect a person's choice of, or conduct regarding, goods or services.

14.     A "Negative Option" offer or agreement is one to sell or provide goods or services under which:  (a) a consumer must take an affirmative step to reject goods or services or cancel the agreement, and (b) the consumer's silence or failure to reject goods or services or to cancel the agreement would ordinarily be interpreted by the seller or provider as acceptance or continuing acceptance of the goods or services.  Negative option offers or agreements include but are not limited to "Trial Conversion" offers, which are characterized by an offer of free products or services or a free trial period of products or services to consumers where, as a result of accepting the free products or services or the free trial period of products or services, consumers would ordinarily be required to contact Defendant to avoid receiving additional products or services and incurring a financial obligation for such additional products or services.

15.     "Short-form advertisement" means any television or radio advertisement of less than sixty (60) seconds duration, Internet banner advertisement, or Internet pop-up advertisement.

## ORDER

## I.     PROHIBITED BUSINESS ACTIVITIES

**IT IS ORDERED** that Defendant and Defendant's successors, assigns, officers, agents, and all other persons or entities within the scope of Fed. R. Civ. P. 65, whether acting directly or through any sole proprietorship, partnership, limited liability company, corporation, subsidiary, branch, division, or other entity, including all other persons or entities in active concert or participation with them, who receive actual notice of this Order by personal service or otherwise, in connection with the advertising, promoting, offering for sale, or sale of consumer reports, credit scores, credit monitoring programs, or any other product, program, or service relating to consumer reports, are hereby permanently restrained and

enjoined from:

A. Misrepresenting, or assisting others in misrepresenting, expressly or by implication, that consumers can obtain a free product, program, or service, a free trial membership, or any such product, program, or service at no cost or obligation.

B. Misrepresenting, or assisting others in misrepresenting, expressly or by implication:

1. the amount of any charge, bill, or fee, including but not limited to, the cost of any consumer report or credit monitoring program;

2. that a consumer will not be charged, billed, or assessed a fee;

3. the timing or manner of any charge, bill, or fee assessment;

4. that a consumer is legally obligated to pay a charge, bill, or fee assessment; or

5. that a consumer will not be charged, billed, or assessed a fee without the consumer's authorization.

C. Failing to make the following disclosures, clearly and conspicuously, in conjunction with the advertising, promotion, or sale of any offer, other than a promotion through a marketing partner, in which the consumer receives a free credit report and is enrolled in a credit monitoring program on a trial conversion basis:

1. At least once in any short-form advertisement, Defendant shall include the following disclosure, or words of similar import, in close proximity to the free credit report representation:

"with enrollment in [name of credit monitoring program]"

2. At least once in any other radio or television advertisement,

Defendant shall include the following disclosures:

> When you order your free report, you will begin your free trial membership in [name of credit monitoring program]. If you don't cancel within the 30 day [or other period] trial period, you will be billed $12 [or other amount] for each month [or other billing period] that you continue your membership.
>
> This offer is not related to the free credit report that you may be entitled to under Federal law. To obtain that free report, you must go to www.annualcreditreport.com.

Provided that, in any radio or television advertisement longer than five (5) minutes in duration, the disclosures required by this Subparagraph I.C.2. shall be made, at Defendant's option, either immediately before each presentation of ordering instructions, or at least once every five (5) minutes.

3. In any other advertisement, and on any website or in any other medium, including but not limited to telephone, email, or direct mail, in which a consumer is able to enroll in the credit monitoring program, Defendant shall include the following disclosures:

a. on the landing page of the website or at the first point of communication:

**IMPORTANT INFORMATION**

> When you order your free report here, you will begin your free trial membership in [name of credit monitoring program]. If you don't cancel your membership within the 30 day [or other period] trial period, you will be billed $12 [or other amount] for each month [or other billing period] that you continue your membership. Under a new Federal law, you may have the right to receive a free copy of your credit report once every 12 months from each of the three nationwide consumer reporting companies. To request your free annual report under that law, you must go to www.annualcreditreport.com. [Name of offering company] is not affiliated with the annual free credit report program.

The reference to www.annualcreditreport.com shall be formatted to appear in a blue color and underscored and shall be an active hyperlink such that a consumer clicking on that hyperlink will be directed to that website. After September 1, 2005, the word "may" shall be deleted from the third sentence of the disclosure required by this Subparagraph I.C.3.a.

The disclosure required by this Subparagraph I.C.3.a. shall be made in a prominent location and in close proximity to the free credit report representation and distinct from other text, such as inside a border; and

b. clearly and conspicuously, and not pursuant to a link, at a

location between the landing page and the location where a consumer submits an order:

"This offer is not related to the free credit report that you may be entitled to under Federal law. To obtain that free report, you must go to www.annualcreditreport.com."

After September 1, 2005, the word "are" shall be substituted for the words "may be" in the first sentence of the disclosure required by this Subparagraph I.C.3.b.; and

c. at the location or time that immediately precedes the point at which the consumer completes the transaction, under the heading **"PAYMENT INFORMATION"** in capital letters and bold print, the following disclosure, or words of similar import:: "When you order your free report here, you will begin your free trial membership in [name of credit monitoring program]. If you don't cancel your membership within the 30 day [or other period] trial period, you will be billed $12 [or other amount] for each month [or other billing period] that you continue your membership."

All written or printed disclosures required by this Subparagraph I.C.3. shall be in a type size that is no smaller than the type size of the principal text on the page, but in no event smaller than 12-point type.

4. On a website or in any other medium in which a consumer is able to enroll in the credit monitoring program, Defendant shall disclose:

a. all material terms and conditions of any cancellation or refund policy, or if Defendant has a policy of not accepting cancellations or making refunds, a statement that this is Defendant's policy. The disclosure required by this Subparagraph I.C.4.a. shall be made in the "**PAYMENT INFORMATION**" section referred to in Subparagraph I.C.3.c.; and

b. any other material terms or conditions of the offer. The disclosure required by this Subparagraph I.C.4.b. shall be made in conformance with Subparagraphs I.D. and I.F.

D. Representing, or assisting others in representing, expressly or by implication, that any such product, program, or service is "free" or is available without cost or obligation, unless Defendant discloses, clearly and conspicuously, and in close proximity to the representation, all fees, costs, obligations or other material terms or conditions associated with the offer, including the material terms of any negative option offer. Provided that, for the purposes of any offer covered by Subparagraph I.C., compliance with that Subparagraph shall be deemed to be compliance with this Subparagraph I.D.

E. In conjunction with a promotion through a marketing partner in which the consumer receives a free credit report and a credit monitoring program on a trial conversion basis, failing to make the following disclosures:

1. the disclosure required under Subparagraph I.C.3.c., or words of similar import, which shall be made, clearly and conspicuously, (a) in the "**Payment Information**" section on the ordering page referred to in

Subparagraph I.C.3.c., and (b) either in the promotional offer made by the marketing partner or at the first point of contact between Defendant and the consumer; and

2. the disclosure required under Subparagraph I.C.3.b., or words of similar import, which shall be made, clearly and conspicuously, either in the promotional offer made by the marketing partner or at the first point of contact between Defendant and the consumer. After September 1, 2005, the word "are" shall be substituted for the words "may be" in the first sentence of this disclosure.

F. Failing to disclose, clearly and conspicuously, before consumers are asked to pay money, reveal billing information, or submit consideration, or before any charge is incurred, all material terms and conditions of a negative option offer, which include but are not limited to the following:

1. the fact that the customer's account will be charged, billed, or assessed a fee unless the customer takes affirmative action to avoid the charge, bill, or fee assessment;

2. when the charge, bill, or fee assessment will be submitted for payment;

3. the specific steps the customer must take to avoid the charge, bill, or fee assessment;

4. all material terms and conditions of a guarantee, refund, or return policy, or if Defendant has a policy of not making refunds or accepting returns, a statement that this is Defendant's policy;

5. the fact that periodic shipments of products or the periodic provision or the continuation of services will occur without further action by consumers;

6. if products are provided in shipments or services provided on a periodic basis, a description of each good or type of good to be included in each shipment or a description of the services that will be performed or continued;

7. if products are shipped or services provided on a periodic basis, the approximate interval between each shipment or service period or the number of shipments or service periods per year;

8. the cost or range of costs for each shipment or service period, including shipping and handling costs; and

9. the minimum number of purchases or minimum service period required by Defendant, if any.

Provided that, for the purposes of any offer covered by Subparagraph I.C., compliance with that Subparagraph shall be deemed to be compliance with this Subparagraph I.F.

G. Causing billing information to be submitted for payment, directly or indirectly, for any such product, program, or service advertised, promoted, offered for sale, or sold as part of an offer or agreement involving a negative option offer, without obtaining the express informed consent of consumers to be charged for any such product, program, or service using an account identified with sufficient specificity for consumers to understand what account will be charged, billed, or assessed a fee. To evidence consumers' express informed consent, Defendant must disclose, clearly and conspicuously, before consumers pay money, reveal billing information, or submit consideration, all material terms and conditions of the offer or agreement (including but not limited to those stated in Subparagraph I.F.), and obtain consumers' express agreement to be charged.

H. Failing to honor a request that Defendant receives to cancel any sale or transaction involving a negative option offer, or to provide a refund in accordance

with Defendant's disclosed policies.

## II. CONSUMER REDRESS

**IT IS FURTHER ORDERED** that:

A. Defendant shall pay an amount sufficient to provide a full and complete refund to any consumer who meets the following qualifications:

1. The consumer was enrolled in the Free Credit Report/Credit Check Monitoring ("CCM") during the period November 1, 2000, through September 15, 2003 and was assessed a charge; and either:

a. within the first three years of the consumer's membership in CCM cancelled such membership and received a pro-rata refund; or

b. prior to entry of this Order, contacted, directly or indirectly, Defendant, the Commission, the Better Business Bureau of the Southland (Colton, California), any credit or debit card issuer, or any other third party to request a refund or chargeback of the charge, or to register a complaint about the charge, for the CCM offer.

2. To identify all consumers who meet the qualifications of this Subparagraph II.A. for receiving a refund, Defendant shall review the following internal customer records as of June 20, 2005: (a) records of pro-rated refunds paid to consumers who cancelled their membership within the first three (3) years of membership; and (b) records that identify consumers in one or more of the following customer service categories: (i) "billing - questioning charge," (ii) "billing - general question," (iii) "possible credit card fraud," or (iv) "possible identity theft." Defendant also shall review any information it has received from

the Commission, the Better Business Bureau of the Southland (Colton, California), any credit or debit card issuer, or any other third party. In addition, Defendant shall provide a full and complete refund to any consumer if such consumer, within two hundred and fifty-five (255) days after entry of this Order, produces documentation sufficient to show that he or she meets the qualifications of this Subparagraph II.A. Defendant shall make such refund within thirty (30) days after receiving the consumer's documentation.

B. Defendant shall make refund payments to consumers who meet the qualifications set forth in Subparagraph II.A. in the following manner:

1. Within sixty (60) days after entry of this Order, Defendant shall attempt to obtain a credit for each such consumer on the consumer's credit or debit card account that was used to enroll in the CCM promotion. Defendant shall send a notice in the form set forth in Attachment A to each consumer for whom it has obtained such a credit. Defendant shall send such notice by email to the consumer's last known email address, or by first class mail to the consumer's last known address. No other information shall be included or added to the notice.

2. In the event that Defendant, despite reasonable efforts, is unable to procure a credit on a consumer's credit or debit card account that was used to enroll in the CCM promotion from the card issuer, Defendant shall deliver by email, within thirty (30) days after the attempt to credit the consumer's account, or ninety (90) days after entry of this Order, whichever is later, a Notice of Refund in the form set forth in Attachment B to the last known email address of the consumer. No other information shall be included or added to the notice. The subject line of the email shall state: "Important: Notice of Refund for Credit Monitoring." Defendant shall procure and utilize software technology sufficient to establish whether the consumer has opened the email notice.

3. In the event that Defendant, despite reasonable efforts: (a) is unable to provide a refund to a consumer as set forth in Subparagraph II.B.1., and (b) is unable to provide an email notice or to demonstrate that the consumer opened the email notice within thirty (30) days of sending the email notice to the consumer, as set forth in Subparagraph II.B.2., Defendant shall mail a Notice of Refund in the form set forth in Attachment C via first-class mail, postage prepaid, to the last known address of the consumer. Defendant shall mail such notice within thirty (30) days of the last date on which a consumer may have opened the email message as provided above, or one hundred and sixty five (165) days, after the entry of this order, whichever is later. The envelope enclosing the Notice of Refund shall be in the form set forth in Attachment D. No other information shall be included or added to the mailing. Defendant shall also retain a National Change of Address System ("NCOA") licensee to update consumers' last known addresses by processing them through the NCOA database. For each mailing returned by the U.S. Postal Service as undeliverable for which Defendant obtains a corrected address, Defendant shall, within fifteen (15) business days after receiving the corrected address, send the Notice of Refund to the corrected address.

4. Defendant shall provide a refund to each consumer who, within two hundred and fifty five (255) days after entry of this Order, or within thirty (30) days of receiving a notice, whichever is sooner, requests a refund in response to a notice provided by the means set forth in Subparagraphs II.B.2. or II.B.3., and who produces documentation sufficient to show that he or she meets the qualifications of Subparagraph II.A. Within fifteen (15) days after receiving a request for refund within the time period provided in the notice, Defendant shall provide refunds by mailing a check via first class mail, postage prepaid, or by crediting the consumer's credit or debit card account, at the consumer's option. Defendant shall enclose

each refund check in an envelope that displays on its front, clearly and conspicuously, the words "REFUND CHECK ENCLOSED." No other information shall be included or added to the mailing, except that Defendant may provide explanatory information relating to the refund.

C. Defendant shall offer the right to cancel membership and receive a pro-rated refund of the current membership period fee to each consumer who was enrolled in the CCM promotion between November 1, 2000 and September 15, 2003, and is still enrolled as of the date of entry of this Order. Defendant shall provide this right in the following manner:

1. Within thirty (30) days after entry of this Order, Defendant shall deliver a Notice of Right to Cancel in the form set forth in Attachment E by email to the last known email address of the consumer. No other information shall be included or added to the notice. The subject line of the email shall state: "Important: Notice of Right to Cancel Credit Monitoring." Defendant shall procure and utilize software technology sufficient to establish whether the consumer has opened the email notice within thirty days.

2. In the event that Defendant, despite reasonable efforts, is unable to provide an email notice or to demonstrate that the consumer opened the email notice within thirty (30) days of sending the email notice to the consumer, as set forth in Subparagraph II.C.1., Defendant shall mail a Notice of Right to Cancel in the form set forth in Attachment F via first-class mail, postage prepaid, to the last known address of the consumer. Defendant shall mail such notice within fifteen (15) days of the last date on which a consumer may have opened the email message as provided above, or one hundred and thirty-five (135) days after the entry of this order, whichever is later. The envelope enclosing the Notice of Right to Cancel shall be in the form set forth in Attachment G. No other information shall be

included or added to the mailing. Defendant shall also retain a National Change of Address System ("NCOA") licensee to update consumers' last known addresses by processing them through the NCOA database. For each mailing returned by the U.S. Postal Service as undeliverable for which Defendant obtain a corrected address, Defendant shall, within fifteen (15) business days after receiving the corrected address, send the Notice of Right to Cancel to the corrected address.

3. Defendant shall cancel the CCM membership, provide a pro-rated refund (calculated on a daily basis) for the cancelled portion of the membership, and refrain from charging any account, billing, or otherwise collecting or attempting to collect any payment, for each consumer who, within one hundred twenty (120) days after entry of this Order, or within thirty (30) days after receiving the Notice of Right to Cancel, whichever is later, requests termination of his or her membership, in any manner, in response to a Notice of Right to Cancel, or who otherwise demonstrates that he or she is eligible to cancel his or her membership. Within fifteen (15) days after receiving a request for refund, Defendant shall provide the refund by mailing a check via first class mail, postage prepaid, or by crediting the consumer's credit or debit card account, at the consumer's option. Defendant shall enclose each refund check in an envelope that displays on its front, clearly and conspicuously, the words "REFUND CHECK ENCLOSED." No other information shall be included or added to the mailing, except that Defendant may provide explanatory information relating to the refund.

D. For a period of two hundred and fifty five (255) days from the date of entry of this Order, Defendant shall provide and adequately staff during ordinary business hours, a toll-free telephone number to answer questions, provide information, and accept requests for termination of membership and/or refunds pursuant to this Order. Defendant shall also provide an email address at which

consumers can ask questions, request information and request termination of membership and/or refunds pursuant to this Order. Defendant shall send an automated reply message to each consumer who sends an email to that email address acknowledging receipt of the email and stating that Defendant will respond to each question and request received at such email address within two (2) business days of receipt. Defendant shall respond to each question and request received at such email address within two (2) business days of receipt.

E. The accounts upon which any refund checks are drawn shall remain open for at least ninety (90) days after Defendant sends such refund checks.

F. Within ten (10) business days after entry of this Order, Defendant shall pay nine hundred and fifty thousand dollars ($950,000) to the Commission. In addition, in the event that any refund checks issued pursuant to this Subparagraph II. remain uncashed ninety (90) days after Defendant sends such refund checks, or two hundred ten (210) days after entry of this Order, whichever is later, Defendant shall pay to the Commission the amount of those uncashed checks. The Commission may apply the funds paid pursuant to this Subparagraph II.F. for such other equitable relief (including additional consumer restitution and consumer information remedies) as it determines to be reasonably related to Defendant's practices as alleged in the Complaint. Any funds not used for such equitable relief will be deposited with the United States Treasury as disgorgement. Defendant shall have no right to challenge the Commission's choice of remedies under this Subparagraph II.F. No portion of any payments under this Order shall be deemed a payment of any fine, penalty, or punitive assessment.

G. Within two hundred and seventy (270) days after entry of this Order, Defendant shall furnish to the Commission the following:

1. the total number of:

a.    consumers whose credit or debit card account was credited pursuant to Subparagraph II.B.1., and the date issued and amount of each credit;

b.    consumers who were sent a Notice of Refund by email pursuant to Subparagraph II.B.2.;

c.    consumers who failed to open the emailed Notice of Refund;

d.    consumers who were sent a Notice of Refund by first-class mail pursuant to Subparagraph II.B.3.;

e.    consumers who were sent a refund check pursuant to Subparagraph II.B.4., and the amount, check number, and mailing date of each check;

f.    consumers who cashed, deposited, or otherwise redeemed their refund checks;

g.    consumers who were sent a Notice of Right to Cancel by email pursuant to Subparagraph II.C.1.;

h.    consumers who failed to open the emailed Notice of Right to Cancel;

i.    consumers who were sent a Notice of Right to Cancel by first-class mail pursuant to Subparagraph II.C.2.;

j.    consumers who requested termination of their membership in the CCM;

k.    consumers whose credit or debit card account was credited with a pro-rated refund pursuant to Subparagraph II.C., and the date issued and amount of each credit;

l.    consumers who were sent a pro-rated refund check

pursuant to Subparagraph II.C., and the amount, check number, and mailing date of each check;

m. consumers who cashed, deposited, or otherwise redeemed their pro-rated refund checks; and

n. "undeliverable" notices mailed to consumers pursuant to this order and returned to Defendant.

2. Defendant shall provide on request from the Commission, within ten (10) business days, in computer readable form and in computer print-out form:

a. the identity of any consumer that is included in Subparagraph II.G.1;

b. all other documents and records evidencing efforts made and actions taken by Defendant to identify, locate, contact, and provide refunds to persons eligible to receive refunds pursuant to Subparagraph II.A. and II.B; and

c. all other documents and records evidencing efforts made and actions taken by Defendant to identify, locate, contact, and provide refunds to persons eligible to cancel their membership pursuant to Subparagraph II.C;

H. Defendant may destroy all records relating to the distribution of this consumer redress six (6) years after the last of the funds are credited, delivered to the Commission, or delivered to the FTC Treasury account, provided that, no records shall be destroyed unless and until a representative of the Commission has received and approved the final accounting report pertaining to Defendant's payment. Records shall be destroyed in accordance with disposal methods and procedures to be specified by the Commission. The Commission may, in its sole discretion, require that such records, in whole or in part, be transferred, in lieu of

destruction, to the Commission.

## III. RELIANCE ON DISCLOSURES

**IT IS FURTHER ORDERED** that:

A. The Commission's agreement to this Order is expressly premised upon the truthfulness, accuracy, and completeness of the consumer complaint, refund, purchase data, and other information provided by Defendant and dated June 24, 2005. Such data constitute material information relied upon by the Commission in negotiating and agreeing to the terms of this Order.

B. If, upon motion by the Commission, this Court finds that Defendant made any material misrepresentation in or omitted material information from the data provided, this matter shall be reopened to allow Plaintiff to show that additional relief, including but not limited to additional equitable monetary relief, consumer restitution, or disgorgement of ill-gotten gains should be entered against Defendant. Plaintiff shall have the right to engage in reasonable discovery for this purpose. Upon a sufficient showing by Plaintiff, the Court shall enter a revised Order against Defendant, which will become immediately due and payable, in addition to such other ancillary relief the Court deems proper.

C. In the event this matter is reopened pursuant to this Paragraph III, Defendant shall have no right to seek modification or abrogation of this Order, and all other Paragraphs of this agreement and Order shall remain in full force and effect unless otherwise ordered by this Court.

D. Any proceedings instituted under this Paragraph III are in addition to, and not in lieu of, any other civil or criminal remedies as may be provided by law, including any other proceedings that the FTC may initiate to enforce this Order.

E. For purposes of this Paragraph III and any subsequent proceedings to

enforce payment, including but not limited to a non-dischargeability complaint filed in a bankruptcy proceeding, Defendant waives any right to contest any of the allegations in the Commission's Complaint.

## IV. COMPLIANCE MONITORING

**IT IS FURTHER ORDERED** that, for the purpose of monitoring and investigating compliance with any provision of this Order,

A. Within fifteen (15) days of receipt of written notice from a representative of the Commission, Defendant shall submit additional written reports, sworn to under penalty of perjury; produce documents for inspection and copying; appear for deposition; and/or provide entry during normal business hours to any business location in Defendant's possession or direct or indirect control, to inspect the business operation.

B. In addition, the Commission is authorized to monitor compliance with this Order by all other lawful means, including but not limited to the following:

1. obtaining discovery from any person, without further leave of Court, using the procedures prescribed by Fed. R. Civ. P. 30, 31, 33, 34, 36, and 45.

2. posing as consumers and suppliers to Defendant, Defendant's employees, or any other entity managed or controlled in whole or in part by Defendant, without the necessity of identification or prior notice.

C. Defendant shall permit representatives of the Commission to interview any employer, consultant, independent contractor, representative, agent, or employee who has agreed to such an interview, relating in any way to any conduct subject to this Order. The person interviewed may have counsel present.

Provided that nothing in this Order shall limit the Commission's lawful use

of compulsory process, pursuant to Sections 9 and 20 of the FTC Act, 15 U.S.C. §§ 49, 57b-1, to obtain any documentary material, tangible things, testimony, or information relevant to unfair or deceptive acts or practices in or affecting commerce (within the meaning of 15 U.S.C. § 45(a)(1)).

## V. COMPLIANCE REPORTING BY DEFENDANT

**IT IS FURTHER ORDERED** that, in order that compliance with the provisions of this Order may be monitored:

A. For a period of three (3) years from the date of entry of this Order, Defendant shall notify the Commission of any changes in corporate structure that may affect compliance obligations arising under this Order, including but not limited to a dissolution, assignment, sale, merger, or other action that would result in the emergence of a successor entity; the creation or dissolution of a subsidiary, parent, or affiliate that engages in any acts or practices that are subject to this Order; the filing of a bankruptcy petition; or a change in the corporate name or address, at least thirty (30) days prior to such change, provided that, with respect to any proposed change in the corporation about which Defendant learns less than thirty (30) days prior to the date such action is to take place, Defendant shall notify the Commission as soon as is practicable after obtaining such knowledge.

B. Three hundred (300) days after the date of entry of this Order, Defendant shall provide a written report to the FTC, sworn to under penalty of perjury, setting forth in detail the manner and form in which it has complied and is complying with this Order. This report shall include, but not be limited to:

1. any changes required to be reported pursuant to Subparagraph V.A.

2. a copy of each acknowledgment of receipt of this Order

obtained pursuant to Paragraph VII.

3. the total amount of consumer restitution paid to Consumerinfo customers under Paragraph II.

C. For the purposes of this Order, Defendant shall, unless otherwise directed by the Commission's authorized representatives, mail all written notifications to the Commission to:

Western Region, Federal Trade Commission
10877 Wilshire Boulevard, Suite 700
Los Angeles, California 90024
RE: FTC v. Consumerinfo.com, Inc.

D. For purposes of the compliance reporting and monitoring required by this Order, the Commission is authorized to communicate directly with Defendant.

## VI. RECORD KEEPING

**IT IS FURTHER ORDERED** that, for a period of six (6) years from the date of entry of this Order, in connection with any business where Defendant is the majority owner of the business or directly or indirectly manages or controls the business, Defendant and its agents, employees, officers, corporations, successors, and assigns, and those persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise, are hereby restrained and enjoined from failing to create and retain the following records:

A. Accounting records that reflect the cost of goods or services sold, revenues generated, and the disbursement of such revenues.

B. Personnel records accurately reflecting: the name, address, and telephone number of each person employed in any capacity by such business; that person's job title or position; the date upon which the person commenced work; and the date and reason for the person's termination, if applicable.

C.  Customer files containing the names, addresses, phone numbers, dollar amounts paid, quantity of items or services purchased, and description of items or services purchased, to the extent such information is obtained in the ordinary course of business.

D.  Complaints and refund requests (whether received directly, indirectly or through any third party) and any responses to those complaints or requests.

E.  Copies of all sales scripts, training materials, advertisements, or other marketing materials.

F.  All records and documents necessary to demonstrate full compliance with each provision of this Order, including but not limited to, copies of acknowledgments of receipt of this Order, required by Paragraphs VII and VIII, and all reports submitted to the FTC pursuant to Paragraphs II and V.

## VII.  DISTRIBUTION OF ORDER BY DEFENDANT

**IT IS FURTHER ORDERED** that, for a period of three (3) years from the date of entry of this Order, Defendant shall deliver copies of this Order as directed below:

A.  Defendant shall deliver a copy of this Order to all of its principals, officers, and directors, and to all managers who have responsibility directly or indirectly for any matters covered by this Order. Defendant also shall deliver an accurate summary of this Order to all of its employees who are engaged in conduct related to the advertising, marketing, sale, or delivery of, or who respond to consumer complaints or inquiries regarding consumer reports, credit scores, or any credit monitoring program. For current personnel, delivery shall be within five (5) days of service of this Order upon Defendant. For new personnel, delivery shall occur prior to them assuming their responsibilities.

B. Defendant must secure a signed and dated statement acknowledging receipt of this Order, within thirty (30) days of delivery, from all persons receiving a copy of the Order pursuant to this Paragraph VII.

## VIII. ACKNOWLEDGMENT OF RECEIPT OF ORDER BY DEFENDANT

IT IS FURTHER ORDERED that Defendant, within five (5) business days of receipt of this Order as entered by the Court, must submit to the Commission a truthful sworn statement acknowledging receipt of this Order, in the form shown on Attachment H.

## IX. RETENTION OF JURISDICTION

**IT IS FURTHER ORDERED** that this Court shall retain jurisdiction of this matter for purposes of construction, modification, and enforcement of this Order.

## X. COSTS AND ATTORNEYS' FEES

**IT IS FURTHER ORDERED** that each party shall bear its own costs and attorneys fees incurred in connection with this action.

## XI. NOTICE OF ENTRY OF ORDER

**IT IS FURTHER ORDERED** that entry in the docket of this Order by the Clerk of Court shall constitute notice to Defendant of the terms and conditions of this Order, and that Defendant waives all rights to contest in any future proceeding whether Defendant was properly served with this Order.

The parties hereby stipulate to the entry of the foregoing Order, which shall constitute a final Order in this action.

**IT IS SO ORDERED:**

Dated this _______ day of __________________, 2005.

United States District Judge

**STIPULATED BY:**

Thomas J. Syta, Esq.
Raymond E. McKown, Esq.
Jennifer M. Brennan, Esq.
Attorneys for Plaintiff
Federal Trade Commission

Consumerinfo.com dba Experian Consumer Direct, Qspace, Inc., and Iplace, Inc.
by: Edward S. Ojdana
Chief Executive Officer

by: Richard Grabowski, Esq.
Attorney for the Defendant
Jones Day
3 Park Plaza, Suite 1100
Irvine, California 92614-8505

by: Anne P. Fortney, Esq.
Attorney for the Defendant
Hudson Cook, LLP
1900 M Street, N.W., Suite 700
Washington, D.C. 20036

**ATTACHMENT A**

**NOTICE OF CREDITING OF ACCOUNT**

Dear [NAME]:

Our records show that you received a free credit report from Consumerinfo.com or Freecreditreport.com sometime between November 1, 2000 and September 15, 2003.

Our free credit report promotion came with a 30-day trial membership in our [name of credit monitoring program] credit monitoring program. After 30 days, unless you cancelled, we automatically enrolled you in the credit monitoring program at an annual fee of $79.95. The Federal Trade Commission (FTC) has alleged that we did not make clear to consumers that they needed to cancel the trial membership to avoid being charged.

According to our records, you either cancelled your credit monitoring program membership or questioned the billing for the credit monitoring program, but didn't receive a full refund. Although we disagree with the FTC's charges, we also want satisfied customers. Therefore, we have reached an agreement with the FTC to pay full refunds to customers like you. We have credited your [credit] [debit] card account in the amount of the annual fee for the applicable year, less any amount you may have already received. Your credit should appear on your card statement shortly.

If you have any questions, please send an e-mail to ______________________________. We will respond within two business days.

Sincerely,

Consumerinfo.com, Inc.

**ATTACHMENT B**

**NOTICE OF REFUND**

Dear [NAME]:

Our records show that you received a free credit report from Consumerinfo.com or Freecreditreport.com sometime between November 1, 2000 and September 15, 2003.

Our free credit report promotion came with a 30-day trial membership in our [name of credit monitoring program] credit monitoring program. After 30 days, unless you cancelled, we automatically enrolled you in the credit monitoring program at an annual fee of $79.95. The Federal Trade Commission (FTC) has alleged that we did not make clear to consumers that they needed to cancel the trial membership to avoid being charged.

According to our records, you either cancelled your credit monitoring program membership or questioned the billing for the credit monitoring program, but didn't receive a full refund. Although we disagree with the FTC's charges, we also want satisfied customers. Therefore, we have reached an agreement with the FTC to pay full refunds to customers like you.

To receive your refund, please do **one** of the following:

- Reply to this email with your full name, address, and daytime telephone number, or write to the address listed below. We will mail a check to the address you give us; **or**

- Call us toll-free at [number] Monday through Friday between 9:00 a.m. and 5:00 p.m. (Pacific time).

Once we receive your information, we will provide your refund within a few weeks. The refund will be in the amount of the annual fee for the applicable year,

less any refund you may have already received. **You must send us your request within _____ days to be eligible for a refund.**

If you have any questions, please send an e-mail to ______________________________. We will respond within two business days.

Sincerely,

Consumerinfo.com, Inc.
[address]

**ATTACHMENT C**

**NOTICE OF REFUND**

Dear [NAME]:

Our records show that you received a free credit report from Consumerinfo.com or Freecreditreport.com sometime between November 1, 2000 and September 15, 2003.

Our free credit report promotion came with a 30-day trial membership in our [name of credit monitoring program] credit monitoring program. After 30 days, unless you cancelled, we automatically enrolled you in the credit monitoring program at an annual fee of $79.95. The Federal Trade Commission (FTC) has alleged that we did not make clear to consumers that they needed to cancel the trial membership to avoid being charged.

According to our records, you either cancelled your credit monitoring program membership or questioned the billing for the credit monitoring program, but didn't receive a full refund. Although we disagree with the FTC's charges, we also want satisfied customers. Therefore, we have reached an agreement with the FTC to pay full refunds to customers like you. To receive your refund, please fill out the enclosed application form and return it to us at the address listed on the form, or call us toll-free at [number] Monday through Friday between 9:00 a.m. and 5:00 p.m. (Pacific Time). Once we receive your information, we will provide your refund within a few weeks. The refund will be in the amount of the annual fee for the applicable year, less any refund you may have already received. **You must send us your request within __________ days to be eligible for a refund.**

If you have any questions, please send an e-mail to ________________________________. We will respond within two business days.

Sincerely,

Consumerinfo.com, Inc.

**APPLICATION FORM**

To request your refund, fill out the information below and return it to the address on this form. **Note: this form must be returned by [date]**

Name: ____________

Address: ____________

City, State and Zip Code: ____________

Daytime phone number: (_)__________

Consumerinfo.com, Inc.

[Return address]

## ATTACHMENT D

Consumerinfo.com
[address]

FORWARDING AND RETURN POSTAGE GUARANTEED

[Address or address window]

**ATTENTION: REFUND INFORMATION ENCLOSED FOR CREDIT MONITORING CUSTOMERS**

# ATTACHMENT E

# NOTICE OF RIGHT TO CANCEL

Dear [NAME]:

Our records show that you received a free credit report from Consumerinfo.com or Freecreditreport.com and are a current customer of our [name of credit monitoring program] credit monitoring program.

Our free credit report promotion came with a 30-day trial membership in our [name of credit monitoring program] credit monitoring program. After 30 days, unless you cancelled, we automatically enrolled you in the credit monitoring program at an annual fee of $79.95. The Federal Trade Commission (FTC) has alleged that we did not make clear to consumers that they needed to cancel the trial membership to avoid being charged.

Although we disagree with the FTC's charges, we also want satisfied customers. Therefore, we have reached an agreement with the FTC to allow customers like you to cancel their credit monitoring program and receive a refund for the unused portion of the membership.

If you would like to continue your membership, you don't need to respond. We will continue to charge your account the annual fee of $79.95. If you would like to cancel your membership and receive a refund, please do one of the following:

- Reply to this email with your full name, address, and daytime telephone number, or write to the address listed below. We will cancel your membership and mail a refund check to the address you give us.
- Call us toll-free at [number] Monday through Friday between 9:00 a.m. and 5:00 p.m. (Pacific time).

Once we receive your information, we will provide your refund within a few weeks. The refund will be in the amount of the unused portion of your current membership term. **You must send us your request within _____ days to be eligible for a refund.**

If you have any questions, please send an e-mail to ________________________________. We will respond within two business days.

Sincerely,

Consumerinfo.com, Inc.
[address]

# ATTACHMENT F

# NOTICE OF RIGHT TO CANCEL

Dear [NAME]:

Our records show that you received a free credit report from Consumerinfo.com or Freecreditreport.com and are a current customer of our [name of credit monitoring program] credit monitoring program.

Our free credit report promotion came with a 30-day trial membership in our [name of credit monitoring program] credit monitoring program. After 30 days, unless you cancelled, we automatically enrolled you in the credit monitoring program at an annual fee of $79.95. The Federal Trade Commission (FTC) has alleged that we did not make clear to consumers that they needed to cancel the trial membership to avoid being charged.

Although we disagree with the FTC's charges, we also want satisfied customers. Therefore, we have reached an agreement with the FTC to allow customers like you to cancel their credit monitoring program and receive a refund for the unused portion of the membership.

If you would like to continue your membership, you don't need to respond. We will continue to charge your account the annual fee of $79.95. If you would like to cancel your membership and receive a refund, please fill out the enclosed application form and return it to us at the address listed on the form, or call us toll-free at [number] Monday through Friday between 9:00 a.m. and 5:00 p.m. (Pacific Time). Once we receive your information, we will provide your refund within a few weeks. The refund will be in the amount of the unused portion of your current

membership term. **You must send us your request within _____ days to be eligible for a refund.**

If you have any questions, please send an e-mail to ______________________________. We will respond within two business days.

Sincerely,

Consumerinfo.com, Inc.

**APPLICATION FORM**

To cancel your credit monitoring program membership and receive a partial refund, fill out the information below and return it to the address on this form. **Note: this form must be returned by [date]**

Name: ____________

Address: ____________

City, State and Zip Code: ____________

Daytime phone number: ( ) ________

Consumerinfo.com, Inc.

[Return address]

**ATTACHMENT G**

Consumerinfo.com

[address]

FORWARDING AND RETURN POSTAGE GUARANTEED

[Address or address window]

**ATTENTION: IMPORTANT NOTICE ABOUT YOUR [name of credit monitoring program] CREDIT MONITORING**

**ATTACHMENT H**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br>Plaintiff,<br>v.<br>CONSUMERINFO.COM., INC., a corporation,<br>doing business as<br>EXPERIAN CONSUMER DIRECT, QSPACE, INC., and IPLACE INC.,<br>Defendant. | CV<br><br>AFFIDAVIT OF DEFENDANT CONSUMERINFO.COM doing business as EXPERIAN CONSUMER DIRECT, QSPACE, INC., and IPLACE, INC. |

[Name of defendant's certifying official], being duly sworn, hereby states and affirms as follows:

1. My name is ______________________. My current residence address is ____________________________________________. I am a citizen of the United States and am over the age of eighteen. I have personal knowledge of the facts set forth in this Affidavit.

2. I am an officer of defendant Consumerinfo.com in *FTC v. Consumerinfo.com* (United States District Court for the Central District of California).

3. On ____________________, I received a copy of the Stipulated Final Judgment and Order for Permanent Injunction, which was signed by the Honorable __________________ and entered by the Court on ____________________. A true and correct copy of the Order I received is appended to this Affidavit.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on ________________, 2005, at __________________________.

____________________________________

By:

State of ________________________, City of __________________________

Subscribed and sworn to before me

this _________ day of ______, 2005.

______________________

Notary Public

My Commission Expires:

______________________

 

EQUIFAX

EXHIBIT
A-5

# Get Your Free Credit Score and Report as of January 18, 2017

14-day trial ends Feb. 1, 2017

Monthly membership of $29.94 automatically charged after trial

For questions or to cancel, just call (800) 720-6627

## SAMPLE SCORE

TransUnion
350 400 450 500 550 600

Experian
350 400 450 500 550 600

Equifax
350 400 450 500 550 600

Delivered in Seconds

## START HERE

First Name

Last Name

Email

ZipCode

☐ Yes, please send special offers from CreditUpdates.com and partners to my email.

YOUR SCORE - NOW!

## BENEFITS

### INSTANTLY

access your credit score from TransUnion

### SECURE

online delivery for your convenience

**CreditUpdates.com Customer Support** to mike 5/19/16

Credit Updates

EXHIBIT A-6

Hi Mike,

## Welcome to Credit Updates!

To help you get the most out of Credit Updates, here is a quick rundown of the features and benefits we have for you.

1. Get your updated credit report and credit score.
2. Review the factors that go into your credit score.
3. Daily monitoring and email alerts of changes to your credit report.
4. **BONUS:** Access thousands of coupons and discounts to local businesses.

**Take Me to My Account**

To Your Financial Health,

**The Credit Updates Team**

(800) 720-6627
Daily from 5am - 9pm PST

Thank you for enrolling in your 7-day trial membership to CreditUpdates.com. After your 7-day trial period you will be charged $29.94 every month until cancelled. If you wish to cancel just call us at (800) 720-6627 to stop your membership.

You are receiving this email based on a recent visit to Credit Updates.

Credit Updates | 340 S. Lemon Ave #8111 | Walnut, CA | 91789

© Copyright 2016 **Credit Updates**. All Rights Reserved.

Case: 1:17-cv-00194 Document #: 32-3 Filed: 02/16/17 Page 87 of 101 PageID #:403

To cancel, call toll-free (800) 934-1938 Member Login

eFreeScore

HOME FEATURES FAQ REVIEWS ABOUT US CONTACT

# Terms and Conditions

EXHIBIT A-7

Revised August 1, 2015

ACCEPTANCE OF TERMS

These Terms and Conditions ("Terms and Conditions" or "Agreement") apply to all: (a) transactions through the eFreeScore.com website and all other websites owned and operated eFreeScore, including, but not limited to, your purchase of the membership based products known as eFreeScore.com (collectively, the "Products"); (b) your access to and use of the websites located at eFreeScore.com (the "Product Website"); and (d) your access to and use of calculators, credit resources, text, pictures, graphics, logos, button items, icons, images, works of authorship and other information and all revisions, modifications, and enhancements thereto (the "Content").

YOUR ORDER OF, USE OF, AND ACCESS TO, THE PRODUCTS, PRODUCT WEBSITES AND CONTENT ARE SUBJECT TO ALL TERMS AND CONDITIONS CONTAINED HEREIN AND ALL APPLICABLE LAWS AND REGULATIONS. PLEASE READ THESE TERMS AND CONDITIONS CAREFULLY. YOUR ORDER OF, ACCEPTANCE OF, USE OF, AND/OR ACCESS TO, THE PRODUCTS, PRODUCT WEBSITES AND/OR CONTENT CONSTITUTES YOUR AGREEMENT TO ABIDE BY EACH OF THE TERMS AND CONDITIONS SET FORTH HEREIN. IF YOU DO NOT AGREE WITH ANY OF THESE TERMS OR CONDITIONS, DO NOT ORDER, USE OR ACCESS ANY PRODUCT, PRODUCT WEBSITE OR CONTENT, OR ANY OF THE INFORMATION WITHIN THE PRODUCT, PRODUCT WEBSITE, OR CONTENT. DISCARD THE PRODUCTS YOU RECEIVED IMMEDIATELY AND CALL CUSTOMER SERVICE AT (800) 934-1938 TO CANCEL YOUR MEMBERSHIP.

This Agreement may be updated from time to time. Online customers should check the Product Websites regularly for updates to these Terms and Conditions. Each time you order, access or use any of the Products, Product Websites, and/or Content, you signify your acceptance and agreement, without limitation or qualification, to be bound by the then current Agreement.

USE OF THE PRODUCTS

In consideration of your order of, access to, and/or use of any Product, Product Website, and/or Content you agree to provide true, accurate, complete and current information about yourself and any minor children you are enrolling, or have enrolled, in any Product, when prompted to do so by the registration and application forms or requested to do so by eFreeScore. By registering, you certify that you are eighteen (18) years of age or older. If any information you provide is untrue, inaccurate or not current, or if eFreeScore has reasonable grounds to suspect that such information is untrue, inaccurate or not current, eFreeScore, at its sole discretion, has the right to suspend or terminate your order of, use of, and/or access to, any Product, Product Website and/or Content, and refuse all current or future orders of, use of, and/or access to, any Product, Product Website and/or Content, or suspend or terminate any portion thereof. Further, you agree that eFreeScore will not be liable to you, your minor children or any third party if eFreeScore suspends or terminates your order of, use of, or access to any Product, Product Websites or Content, or any portion thereof, for any reason.

You understand and agree that by submitting your order you are providing "written instructions" to CSIdentity Corporation ("CSID") and its employees, agents, subsidiaries, affiliates, contractors, third party data sources and suppliers, and all other credit reporting agencies under the Fair Credit Reporting Act (FCRA), as amended, to access your credit files from each national credit reporting agency and to exchange information about you with each such national credit reporting agency in order to verify your identity and to provide the products and/or services to you. You agree and hereby authorize CSID, its agents and employees, to provide your personally identifiable information (or, if applicable, information about your child you have enrolled) to third parties as provided in our Privacy Policy, as may be amended from time to time. You waive any and all claims against CSID and its agents and employees for the acts or omissions of these third parties with regard to the use or disclosure of such information. Your further authorize CSID and its agents and employees to obtain various information and reports about you (or about your child that you have enrolled, if applicable) in order to provide the products and/or services, including, but not limited to, address history reports, name and alias reports, criminal reports or sex offender reports, and to provide monitoring and alerts.

While enrolling for the products and/or services, we will ask you for the following types of information: contact information (such as name, address, phone number, and e-mail address); sensitive information (such as date of birth, driver's license number and social security number); personal information to verify your identity and financial information (such as credit card number). This information is required in order to verify your identity, charge you the agreed upon fees for our products and services, and to fulfill our obligation to provide our products and services to you, including communicating with third parties as necessary to provide such

Case: 1:17-cv-00194 Document #: 11-3 Filed: 01/16/17 Page 85 of 109 PageID #:464

products and services, such as identification verification companies, consumer reporting agencies, payment validation companies, law enforcement agencies, or others

ARBITRATION

YOU UNDERSTAND AND AGREE THAT ALL CLAIMS, DISPUTES OR CONTROVERSIES BETWEEN YOU AND eFreeScore, AND ITS PARENTS, AFFILIATES, SUBSIDIARIES OR RELATED COMPANIES, INCLUDING BUT NOT LIMITED TO TORT AND CONTRACT CLAIMS, CLAIMS BASED UPON ANY FEDERAL, STATE OR LOCAL STATUTE, LAW, ORDER, ORDINANCE OR REGULATION, AND THE ISSUE OF ARBITRABILITY, SHALL BE RESOLVED BY FINAL AND BINDING ARBITRATION AT A LOCATION DETERMINED BY THE ARBITRATOR. ANY CONTROVERSY CONCERNING WHETHER A DISPUTE IS ARBITRABLE SHALL BE DETERMINED BY THE ARBITRATOR AND NOT BY THE COURT. JUDGMENT UPON ANY AWARD RENDERED BY THE ARBITRATOR MAY BE ENTERED BY ANY STATE OR FEDERAL COURT HAVING JURISDICTION THEREOF. THIS ARBITRATION CONTRACT IS MADE PURSUANT TO A TRANSACTION IN INTERSTATE COMMERCE AND ITS INTERPRETATION, APPLICATION, ENFORCEMENT AND PROCEEDINGS HEREUNDER SHALL BE GOVERNED BY THE FEDERAL ARBITRATION ACT ("FAA"). NEITHER YOU (NOR ANY OF YOUR MINOR CHILDREN) NOR eFreeScore SHALL BE ENTITLED TO JOIN OR CONSOLIDATE CLAIMS IN ARBITRATION BY OR AGAINST OTHER CONSUMERS OR ARBITRATE ANY CLAIM AS A REPRESENTATIVE OR MEMBER OF A CLASS OR IN A PRIVATE ATTORNEY GENERAL CAPACITY. THE PARTIES VOLUNTARILY AND KNOWINGLY WAIVE ANY RIGHT THEY HAVE TO A JURY TRIAL.

FCRA DISCLOSURES

The FCRA allows you to obtain a copy of all of the information in your consumer credit file disclosure from any consumer credit reporting company for a reasonable charge. The FCRA also states that individuals are entitled to receive a disclosure directly from the consumer credit reporting company free of charge under the following circumstances:

You have been denied credit, insurance or employment in the past 60 days as a result of your report

1. You certify in writing that you are unemployed and intend to apply for employment in the 60-day period beginning on the day you make the certification
2. You are a recipient of public welfare assistance
3. You have reason to believe that your file at the agency contains inaccurate information due to fraud

The FCRA also permits consumers to dispute inaccurate information in their credit report without charge. Accurate information cannot be changed. You do not have to purchase your credit report or other information from eFreeScore to dispute inaccurate or incomplete information in your Transunion file or to receive a copy of your Transunion consumer disclosure.

The credit report you are requesting from eFreeScore is not intended to constitute the disclosure of Transunion information required by the FCRA or similar state laws. This disclosure report must be obtained directly from a credit bureau such as Transunion by going to https://disclosure.transunion.com/dc/disclosure/disclosure.jsp, or by calling 800-888-4213.

The FCRA allows consumers to get one free comprehensive disclosure of all of the information in their credit file from each of the three national credit reporting companies (Experian, Equifax, and TransUnion) once every 12 months through a central source. Georgia residents can receive two disclosures per year. Although comprehensive, the credit reports from each of the three national credit reporting companies that are available from eFreeScore may not have the same information as a credit report obtained directly from the three national credit reporting companies or through the central source. To request your free annual report under the FCRA, you must go to www.annualcreditreport.com, or call 877-322-8228. eFreeScore's Products are not related to the free FCRA disclosure that you are or may be entitled to.

MODIFICATION OF PRODUCTS

eFreeScore may, at its discretion, modify or discontinue any of the Products, Product Websites or Content, or any portion thereof, with or without notice. You agree that eFreeScore will not be liable to you or any third party for any modification or discontinuance of any of the Products, Product Websites or Content.

NOTICE OF PROSECUTION

For online customers, access to and use of password protected and/or secure areas of the Product Websites are restricted to authorized users only. Unauthorized individuals attempting to access these areas of the Product Websites may be subject to prosecution.

Failure to comply with the FCRA can result in state or federal enforcement actions, as well as private lawsuits. In addition, any person who knowingly and willfully obtains a consumer credit report or disclosure under false pretenses may face criminal prosecution.

SECURITY MEASURES AND AUTHENTICATION

Because eFreeScore uses security measures designed to protect your privacy and to safeguard your information, eFreeScore may not always be able to successfully provide Products to you, including instant online delivery of your credit report for online customers. For example, for certain online Products, when the system is unable to verify your identity, you may be routed through a manual phone authentication process. For other products, eFreeScore cannot offer a manual authentication process and will be unable to fulfill all products in your membership or order if you fail online authentication one or more times.

PERSONAL INFORMATION

eFreeScore may use your personal information to the extent necessary to process your order and/or engage in business maintenance.

REVIEW AND RECEIPT OF PRIVACY NOTICE

By submitting your order, you acknowledge receipt of our Privacy Notice and agree to its terms.

ON-LINE REQUIREMENTS

You must have an email address and a Java-compatible browser such as Netscape Navigator 6.0 or higher, Internet Explorer 5.0 or higher, or AOL 8.0 or higher to receive your Products online. As an online customer, you are agreeing to receive all notifications via email at the email address on file with eFreeScore. To ensure receipt of all notifications, you are obligated to update the email address on file when your email address changes.

NO WARRANTY BY eFreeScore

YOU EXPRESSLY UNDERSTAND AND AGREE THAT YOUR USE OF THE PRODUCTS, PRODUCT WEBSITES AND CONTENT IS AT YOUR SOLE RISK. ALL PRODUCTS, PRODUCT WEBSITES AND CONTENT ARE PROVIDED ON AN "AS IS" OR "AS AVAILABLE" BASIS. eFreeScore AND ITS SUPPLIERS EXPRESSLY DISCLAIM ALL WARRANTIES, GUARANTEES AND CONDITIONS OF ANY KIND WHETHER EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE OR NONINFRINGEMENT. THE INFORMATION CONTAINED IN THE PRODUCTS, PRODUCT WEBSITES, CONTENT OR OTHER MATERIALS YOU MAY RECEIVE FROM eFreeScore DO NOT CONSTITUTE LEGAL, TAX, ACCOUNTING OR OTHER PROFESSIONAL ADVICE. eFreeScore MAKES NO WARRANTY THAT (I) THE PRODUCTS AND CONTENT ARE ACCURATE, TIMELY, UNINTERRUPTED OR ERROR-FREE; AND (II) ANY RESULTS THAT MAY BE OBTAINED FROM THE USE OF THE PRODUCTS OR CONTENT WILL BE RELIABLE.

ACTIVATION CODES

If you are using an activation code to obtain a Product, you are restricted to a one-time use of such activation code. Any subsequent use of the activation code will result in immediate termination of any associated Products without notice and in accordance with the termination provision(s) in the section entitled "Use of the Products," found herein.

Please note that if you improperly obtain a Product with an activation code, any credit card number you may have provided to us will also be charged with the fee for the Product that was obtained improperly.

LIMITATION OF LIABILITY

YOU UNDERSTAND AND AGREE THAT eFreeScore WILL NOT BE LIABLE TO YOU FOR ANY DIRECT, INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL OR EXEMPLARY DAMAGES RESULTING FROM OR IN ANY WAY CONNECTED TO YOUR ACCESS TO, USE, OR INABILITY TO USE THE PRODUCTS, PRODUCT WEBSITES, CONTENT OR MEMBERSHIP BENEFITS, OR FROM YOUR ACCESS TO, USE OF, INABILITY TO USE, OR RELIANCE UPON ANY LINKED WEB SITE (IF APPLICABLE), EVEN IF eFreeScore HAS BEEN ADVISED OF THE POSSIBILITY OF THOSE DAMAGES. SOME JURISDICTIONS EITHER DO NOT ALLOW OR PLACE RESTRICTIONS UPON THE EXCLUSION OR LIMITATION OF DAMAGES IN CERTAIN TYPES OF AGREEMENTS; FOR THESE JURISDICTIONS, THE AFOREMENTIONED LIMITATION ON LIABILITY SHALL BE TO THE MAXIMUM DEGREE PERMITTED BY APPLICABLE LAW. IF, NOTWITHSTANDING THE ABOVE, LIABILITY IS IMPOSED UPON eFreeScore, THEN YOU AGREE THAT eFreeScore'S TOTAL LIABILITY TO YOU FOR ANY OR ALL OF YOUR LOSSES OR INJURIES FROM eFreeScore'S ACTS OR OMISSIONS, REGARDLESS OF THE NATURE OF THE LEGAL OR EQUITABLE CLAIM, SHALL NOT EXCEED THE AMOUNT PAID BY YOU TO eFreeScore FOR THE PRODUCT(S) YOU PURCHASE FROM eFreeScore.

NOT A CREDIT REPAIR ORGANIZATION OR CONTRACT

eFreeScore offers access to your credit report and other credit information. eFreeScore and its affiliates are not credit repair organizations, and are not offering to sell, provide or perform any service to you for the express or implied purpose of either improving your credit record, credit history or credit rating or providing advice or assistance to you with regard to improving your credit record, credit history or credit rating. You acknowledge and agree that you are not seeking to purchase, use, or access any of the Products, Product Websites, and Content in order to do so.

Accurate adverse information on your credit report cannot be changed. If you believe that your credit report contains inaccurate, non-fraudulent information, it is your responsibility to contact the relevant credit reporting company, and follow the appropriate procedures for notifying the credit reporting company that you believe that your credit report contains an inaccuracy. Any information provided to you regarding the procedures followed by the various credit reporting companies related to the removal of inaccurate, non-fraudulent information is provided without charge to you and is available for free. Any such information is not included as part of your credit monitoring product but is provided free of charge to all consumers, regardless of whether they are members of the credit score monitoring product.

CREDIT SCORE

The credit score used on this site is a user-friendly credit score model developed by Transunion to help you see and understand how lenders view your credit worthiness. It is not used by lenders, but it is indicative of your overall credit risk. Higher scores represent a greater likelihood that you'll pay back your debts so you are viewed as being a lower credit risk to lenders. A lower score indicates to lenders that you may be a higher credit risk.

There are three different major credit reporting agencies, Experian, TransUnion, and Equifax that maintain a record of your credit history known as your credit file. Your Credit Score is based on the information in your credit file at the time it is requested. Your credit file information can vary from agency to agency because some lenders report your credit history to only one or two of the agencies. So your credit score can vary if the information they have on file for you is different. And since the information in your file can change over time, your Credit Score may be different from day-to-day.

Lenders and insurers use several different credit scoring models so don't be surprised if your lender gives you a score that's different from the credit score you receive online. Just remember that your associated risk level is generally the same even if the number is not. If the lender's score is lower than your online score, it is possible that this difference can lead to higher interest rates and sometimes credit denial.

REGISTERING FOR ANY PRODUCT

To request a credit report or score, or purchase any Product, you must have an address within the United States, provide a valid Social Security number, address, email address and date of birth and agree to be bound by these Terms and Conditions. In other limited circumstances, you may need to provide a valid telephone number so that eFreeScore can process your order. You must provide valid credit card information. eFreeScore will then evaluate your complete registration information.

In certain jurisdictions sales tax at state and local rates may apply, in which case you may be charged the applicable taxes in addition to the monthly fee and/or the price of the product.

SPOUSE/ADULT CHILDREN NOT INCLUDED

eFreeScore is not able to accept and process joint registration for two or more adults. Neither your spouse nor any other adult will be enrolled in any Product pursuant to your order.

Not all versions of Products include the same features. Please consult the associated Product literature and/or Website for included Product features. If you are already a member, please log in to the Website for your applicable Product features.

CREDIT MONITORING AND IDENTITY ALERTS

Your membership in credit monitoring and/or Identity Alerts(if applicable) is effective for the period covered by your membership fee and continues upon your payment of the monthly/annual renewal fee. Renewal fees for your membership will automatically be charged, at the then current rate, to the credit card or other billing source authorized by you, on the first day of each successive membership term, until you cancel your membership. Should you choose to discontinue your membership for any reason before expiration of the then applicable membership term for which you have paid, you may cancel your membership and terminate further billing by calling the toll-free number listed on this Web Site or calling the number listed by the charge on your bank statement. You may only cancel you membership by calling us or sending us a letter in the mail. Our call center hours of operation are listed in the welcome email and on our website. If you are an annual subscriber and choose to cancel within 180 days of when you were billed, you will be eligible to receive a prorated refund of your current year's membership fee. If you are a monthly subscriber and choose to cancel, your membership and monthly billing will terminate at the end of your monthly billing term and you will not be eligible for a prorated refund of any portion of your paid monthly membership fee. eFreeScore reserves the right to change the membership fee for any renewal term to be effective upon the renewal of your membership.

Please note, there are different processing times across the credit reporting companies, therefore you may not be enrolled in all of them at the same time. Monitoring with Transunion begins within 48 hours of enrollment. Monitoring with Equifax and/or Experian takes approximately 4 days to begin , though in some cases cannot be initiated during the trial period (if a trial period applies). eFreeScore does not control and is not responsible for this enrollment process.

This web site may offer you the opportunity to upgrade your credit monitoring benefit from single-bureau monitoring to two-bureau or three-bureau monitoring. An additional monthly fee may apply. Only if you have previously upgraded your credit monitoring benefit to two-bureau or three-bureau monitoring will you have the opportunity to downgrade the benefit. You may do so by calling Customer Care at the number listed on the Contact Us page. If you upgrade for a fee and opt to downgrade, your monthly membership will be updated in the next billing cycle to reflect the correct benefit and membership fee. You will not be entitled to a refund, pro-rated or otherwise, if you choose to downgrade your monitoring benefit or cancel the product.

When you order a single bureau credit monitoring product from eFreeScore, eFreeScore sends a request to CSID that Transunion enroll you in its credit monitoring program. When you order a credit monitoring product from eFreeScore that monitors credit files at two or three credit bureaus, eFreeScore sends a request to CSID that Experian, Equifax and/or TransUnion enroll you in the credit monitoring program(s).

If your order of any single bureau credit monitoring product thru Transunion is not able to enroll you, then you will not receive alerts or monitoring of changes to your Transunion credit file but you may receive other benefit(s) in your membership (if applicable).

If your order of any two-bureau or three-bureau credit monitoring product (monitoring credit files at two or three credit bureaus) does not result in successful enrollment by any credit bureau in its credit monitoring program, then you will not receive alerts or monitoring of changes to any of your credit files but you may receive other benefit(s) in your membership (if applicable). In the event that only one or two credit bureaus, but not all credit bureaus requested, are able to enroll you in their credit monitoring, credit monitoring will be provided by the bureau or bureaus that were able to enroll you; you will not receive alerts or monitoring of changes to the credit files of the bureau or bureaus that were not able to enroll you in their credit monitoring program.

In the event you order a two-bureau or three-bureau credit monitoring product, by placing your order, you agree that, if fewer than all credit bureaus requested enroll you in their credit monitoring, eFreeScore is authorized to monitor only the credit files at the bureau or bureaus that enrolled you, if any. Any such credit monitoring will be provided at the price agreed upon; you will not be eligible for a price reduction, discount or refund. eFreeScore may not be aware or able to notify you in the event that fewer than all requested credit bureaus enroll you in credit monitoring, if we become aware of such an event you agree we may choose, but are not required, to send you a notification.

Case: 1:17-cv-00194 Document #: 33-3 Filed: 03/10/17 Page 92 of 101 PageID #:487

Credit Monitoring Membership With Trial: You will be asked for valid credit card information when you sign up for the credit monitoring trial. eFreeScore will verify your credit card information before processing your order. An charge in the amount of one dollar, or the amount stated on the credit card page if different, will be performed on your credit card to make sure it is valid and in good standing. However, eFreeScore will not bill you the monthly membership price of $29.94, or the amount stated on the credit card page if different, until the trial period has ended. If you do not cancel your trial membership within 7 days of the date you place your order, your membership will continue automatically and the monthly/annual fee will be billed to the credit card or other billing source provided by you when you enrolled in credit monitoring, on the first day of each successive membership term. Monitoring services may take up to 3 days to become active so this service within your membership may not be available during the whole 7 day trial period; however, other product features and benefits may be available to you during your entire trial period. The 7 day trial period is measured exactly to the minute, for example if you signup at 10:00AM on June 1st your trial will end at 9:59AM on June 8th. If we are unable to provide you a credit report or monitoring because you failed the online identity verification, or any other reason, your trial will still be activated and you may have access to some or all other membership benefits at the price agreed upon; you will not be eligible for a price reduction, discount or refund. If you purchase additional credit reports and/or scores during your trial period, they will be billed to the credit or debit card provided to us during enrollment. In the event that you purchase additional products from eFreeScore using a different credit or debit card, or if you update your payment information with eFreeScore, eFreeScore will charge the latest card provided by you. If we are unable to bill your card for the full membership amount we reserve the right to attempt partial charges up to the total membership amount or we may downgrade your membership to a lower price and attempt to bill you for that lesser amount. Please note, if you have ever been a member and received a trial, eFreeScore may refuse to give you another trial offer. Returning members will be billed the membership fee immediately upon renewal. During your trial period, you are eligible for one report and/or score as dictated by your specific membership terms.

REFUND POLICY

All disputes of any kind, including refund requests may be submitted to eFreeScore in writing no later than 60 days from when the disputed charge was posted to your account. You hereby waive all claims, disputes, or refund requests after the 60 day period. After the 60 day period all charges are deemed to be correct and accurate. When a refund is approved it may take up to 7 business days to be returned to your account. Disputes should be sent to: eFreeScore, 340 S Lemon Ave #8881, Walnut, CA 91789

RESTRICTIONS

TRADEMARKS

You acknowledge and agree that eFreeScore's name, the eFreeScore Logo, Page Headers and other eFreeScore terms, phrases, graphics, logos, and icons are common law or registered trademarks, service marks, and/or trade dress of eFreeScore (collectively "Marks"). You agree you will not use any such Content or Marks for any purpose without the appropriate prior written authorization. eFreeScore Marks may not be used in connection with any product or service that is not eFreeScore's, in any manner that is likely to cause confusion among customers, or in any manner that disparages or discredits eFreeScore. All other trademarks, product names, or logos not owned by eFreeScore that appear on this Product Website are the property of their respective owners.

COPYRIGHTS

All Content included on this Product Website, such as text, graphics, logos, button items, icons, images, data compilation, is the property of eFreeScore or its suppliers and is protected by United States and international copyrights laws. All software used on this site is the property of eFreeScore or its software suppliers and is protected by United States and international copyright laws Reproduction of such content, in whole or in part, is prohibited without prior consent.

ENTIRE AGREEMENT

These Terms and Conditions, the Privacy Policy, and other policies eFreeScore may post constitute the entire Agreement between eFreeScore and you in connection with your use of the Product Websites (if applicable), the Products, and the Content, and supersede any prior versions of the Terms and Conditions, if applicable. If you are accessing this site via a work computer, phone, or other device or are doing so on company time then you are executing this agreement as an agent of that company in addition to your individual capacity. eFreeScore may update these Terms and Conditions from time to time by posting revised Terms and Conditions on the Product Websites, or by mailing an updated copy to the most recent address you have provided to eFreeScore, without notice to you, and your subsequent use of the Products, Product Web Sites, and/or Content is governed by those new Terms and Conditions. The Terms and Conditions are effective until terminated by eFreeScore. In the event of termination, the Intellectual Property, Disclaimers, and Limitations of Liability provisions set forth in these Terms and Conditions will survive. In the event of a conflict between any other notice, policy, disclaimer or other term contained in the Product Websites or otherwise, these Terms and Conditions will control. If any provision is deemed to be unlawful or unenforceable, it will not affect the validity and enforceability of the remaining provisions. The section headings are for convenience only and do not have any force or effect.

TUI Terms and Conditions

You understand that by accepting these Terms and Conditions you are providing "written instructions" to CSIdentity Corporation, TransUnion (with respect to Tri-Bureau services) and their respective affiliates, employees, agents, subsidiaries, affiliates, contractors, third party data providers, and all other credit reporting agencies under the Fair Credit Reporting Act (FCRA), as amended, including, without limitation, Experian, TransUnion, Equifax and affiliated entities, to access your credit files from each national credit reporting agency and to exchange information about you with each such national credit reporting agency in order to verify your identity and to provide the services to you.

TUI Services Agreement

TransUnion Interactive, Inc. Service Agreement For Three Bureau (3B) Products and Services

Important Credit Monitoring Information

Credit Monitoring (including TransUnion Credit Monitoring Basic, TransUnion Credit Monitoring, and other credit monitoring products offered on or through this site) is provided by TransUnion Interactive, Inc. Credit Monitoring monitors one or more of your credit files, depending upon the type of Credit Monitoring you purchase, which are separately owned and/or maintained by each of the applicable credit bureaus: TransUnion LLC, Experian, and Equifax. Credit Monitoring monitors the credit file most closely identified with you based on multiple identifying factors such as first, middle and last names, current and former addresses, Social Security number and date of birth. Credit Monitoring may not advise or alert you if an item of identifying information about you (including your name or address or Social Security number) is contained in the applicable credit bureau's credit file of another person, and will not provide you with any information contained in another individual's credit file. Credit Monitoring does not monitor, compare or cross-reference your credit file(s) with the credit files(s) of any other person.

Please remember that there are different processing times for the commencement of monitoring at each credit reporting bureau, therefore you may not be enrolled in all of them at the same time. Monitoring with TransUnion LLC usually begins within 48 hours of enrollment. Monitoring with Equifax and Experian takes on average approximately 4 days to begin, though in some cases monitoring cannot be initiated during the trial period (if a trial period applies). TransUnion Interactive does not control and is not responsible for the enrollment process.

Your order of any three bureau credit monitoring product is conditioned upon successful enrollment by at least one credit bureau in its credit monitoring product. If no credit bureau is able to enroll you in its credit monitoring program, your order will be cancelled, and you will not receive alerts or monitoring of changes to any of your credit files. In the event that one or two credit bureaus, but not all three bureaus, are able to enroll you in their credit monitoring, credit monitoring will be provided by the bureau or bureaus that were able to enroll you; you will not receive alerts or monitoring of changes to the credit files of the bureau or bureaus that were not able to enroll you in their respective credit monitoring programs.

In the event you order a three-bureau credit monitoring product through this site (the "Site"), by placing your order, you agree that, if fewer than all three credit bureaus enroll you in their credit monitoring, TransUnion Interactive is authorized to monitor only the credit files at the bureau or bureaus that enrolled you. Any such credit monitoring will be provided at the price agreed upon; you will not be eligible for a price reduction, discount or refund. TransUnion Interactive will notify you in the event that fewer than all three credit bureaus enroll you in credit monitoring, but such notification may not occur during your trial period, if any.

General Terms

The images, text, screens, web pages, materials, data, content and other information ("Content") used and displayed on the Site, including but not limited to TransUnion®, TransUnion Interactive®, TrueCredit®, TrueCredit® and Design, and Manage Your Credit Manage Your Life℠ are the property of TransUnion Interactive or its licensors and are protected by copyright, trademark and other laws. In addition to its rights in individual elements of the Content within the Site, TransUnion Interactive owns copyright or patent rights in the selection, coordination, arrangement and enhancement of such Content. You may copy the Content from the Site for your personal or educational use only, provided that each copy includes any copyright, trademark or service mark notice or attribution as they appear on the pages copied. Except as provided in the preceding sentence, none of the Content may be copied, displayed, distributed, downloaded, licensed, modified, published, reposted, reproduced, reused, sold, transmitted, used to create a derivative work or otherwise used for public or commercial purposes without the express written permission of TransUnion Interactive or the owner of the Content.

ALL THREE BUREAU (3B) PRODUCTS AND SERVICES, INCLUDING, WITHOUT LIMITATION, MONITORING, ALERTS, REPORTS AND SCORES, MADE AVAILABLE ON OR ACCESSED THROUGH THIS SITE, ARE PROVIDED TO YOU "AS IS". TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW, NEITHER TRANSUNION INTERACTIVE NOR ITS AFFILIATES OR DATA SUPPLIERS MAKE ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER AS TO THE CONTENT, MEMBERSHIPS, PRODUCTS OR SERVICES AVAILABLE ON OR ACCESSED THROUGH THE SITE, THAT A USER WILL HAVE CONTINUOUS, UNINTERRUPTED OR SECURE ACCESS TO OUR SITE, MEMBERSHIPS, PRODUCTS OR SERVICES OR THAT OUR SITE, MEMBERSHIPS, PRODUCTS OR SERVICES WILL BE ERROR-FREE. IN ADDITION, TRANSUNION INTERACTIVE AND ITS AFFILIATES AND DATA SUPPLIERS DISCLAIM ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING TITLE, MERCHANTABILITY, AND FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT AND INFORMATIONAL CONTENT. THEREFORE, YOU AGREE THAT YOUR ACCESS TO AND USE OF OUR SITE, MEMBERSHIPS, PRODUCTS, SERVICES AND CONTENT ARE AT YOUR OWN RISK. BY USING THIS SITE, YOU ACKNOWLEDGE AND AGREE THAT NEITHER TRANSUNION INTERACTIVE NOR ITS AFFILIATES AND DATA SUPPLIERS HAVE ANY LIABILITY TO YOU (WHETHER BASED IN CONTRACT, TORT, STRICT LIABILITY OR OTHERWISE) FOR ANY DIRECT, INDIRECT, INCIDENTAL, CONSEQUENTIAL OR SPECIAL DAMAGES ARISING OUT OF OR IN ANY WAY CONNECTED WITH YOUR ACCESS TO OR USE OF OUR SITE, CONTENT, MEMBERSHIPS, PRODUCTS OR SERVICES (EVEN IF WE HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES), INCLUDING LIABILITY ASSOCIATED WITH ANY VIRUSES WHICH MAY INFECT YOUR COMPUTER EQUIPMENT.

Registration and Accurate Information

If you decide to register on this Site to purchase three bureau products and services, you may be required to register, provide personal information, and select a user name and password. You agree to provide accurate information in your registration and not to share your password with third parties. You agree not to impersonate another person or to select or use a user name or password of another person. You agree to notify TransUnion Interactive promptly of any unauthorized use of your account and of any loss, theft or disclosure of your password. Failure to comply with these requirements shall constitute a breach of these terms and conditions and shall constitute grounds for immediate termination of your TransUnion Interactive account and your right to use the Site. Online access to consumer credit report information is subject to verification of the identity of the user.

Our Privacy Policy

By using this Site, you agree that TransUnion Interactive and its affiliates may use and share your personal information in accordance with the terms of TransUnion Interactive's Privacy Statement. TransUnion Interactive's privacy statement can be reached at the following link: https://membership.tui.transunion.com/tucm/support.page?panel=privacy.

Fair Credit Reporting Act

The Fair Credit Reporting Act allows you to obtain from each credit reporting agency a disclosure of all the information in your credit file at the time of the request. Full disclosure of information in your file at a credit reporting agency must be obtained directly from such credit reporting agency. The credit reports provided or requested through our Site are not intended to constitute the disclosure of information by a credit reporting agency as required by the Fair Credit Reporting Act or similar laws.

Under the Fair Credit Reporting Act you are entitled to receive an annual free disclosure of your credit report from each of the national credit reporting agencies. For more information visit the credit report section in the Learning Center, available from most pages of the Site.

**You are entitled to receive a free copy of your credit report from a credit reporting agency if:**

- You have been denied or were otherwise notified of an adverse action related to credit, insurance, employment, or a government granted license or other government granted benefit within the past sixty (60) days based on information in a credit report provided by such agency.
- You have been denied house/apartment rental or were required to pay a higher deposit than usually required within the past sixty (60) days based on information in a credit report provided by such agency.You certify in writing that you are unemployed and intend to apply for employment during the sixty (60) day period beginning on the date on which you made such certification.
- You certify in writing that you are a recipient of public welfare assistance.
- You certify in writing that you have reason to believe that your file at such credit reporting agency contains inaccurate information due to fraud.
- In addition, if you reside in the state of Colorado, Maine, Maryland, Massachusetts, New Jersey, or Vermont, you are entitled to receive a free copy of your credit report once a year and if you reside in the state of Georgia, you are entitled to receive a free copy of your credit report twice a year. Otherwise, a consumer reporting agency may impose a reasonable charge for providing you with a copy of your credit report.

The Fair Credit Reporting Act provides that you may dispute inaccurate or incomplete information in your credit report. YOU ARE NOT REQUIRED TO PURCHASE YOUR CREDIT REPORT FROM TRANSUNION INTERACTIVE IN ORDER TO DISPUTE INACCURATE OR INCOMPLETE INFORMATION IN YOUR REPORT OR TO RECEIVE A COPY OF YOUR REPORT FROM EQUIFAX, EXPERIAN OR TRANSUNION, THE THREE NATIONAL CREDIT REPORTING AGENCIES, OR FROM ANY OTHER CREDIT REPORTING AGENCY.

It may be the policies of Equifax, Experian and/or TransUnion to provide a complimentary copy of the consumer credit report under circumstances other than those described above. If you wish to contact Equifax, Experian or TransUnion to obtain a copy of your credit report directly from such agency or if you wish to dispute information contained in an Equifax, Experian or TransUnion credit report file, see the contact information and dispute process description contained in the Learning Center or from the inaccuracies tab on your credit report. The form of credit report and related disclosures provided directly by such agencies to you may differ from those provided by TransUnion Interactive.

TransUnion Interactive's online credit report has been specially designed for consumer ease-of-use. Color illustrations, analysis information and helpful links on TransUnion Interactive's credit report make it easy for you to understand and manage your credit.

Applicable Law

The laws applicable to the interpretation of these terms and conditions shall be the laws of the State of Delaware, USA, and applicable federal law, without regard to any conflict of law provisions. TransUnion Interactive can provide credit reports only for individuals who have established credit in the United States. Those who choose to access three bureau products and services through this Site from outside the United States do so on their own initiative and are responsible for compliance with local laws. You agree that any and all disputes arising under this Agreement or out of TransUnion Interactive's provision of three bureau products and services to you, if submitted to a court of law, shall be submitted to the state and federal courts of New Castle County, Delaware, USA.

Policy Regarding Children

We define children as individuals under the age of 16. The Site is not intended for the use of children and we do not intend to collect information about children through the Site. You must be at least 18 to access any three bureau products and services through this Site.

Home | Features | Member FAQs | Credit FAQs | Reviews | About Us | Contact

Copyright © 2016 eFreeScore.com - X0.0084-1.2.16-i-a389d527 Privacy Policy | Terms & Conditions

  

Case: 1:17-cv-00194 Document #: 11-3 Filed: 01/10/17 Page 94 of 101 PageID #:416

Terms and Conditions - eFreeScore.com Page 8 of 8

https://www.efreescore.com/site/page/terms.html 4/4/2016

McKenney Att. B
Page 16 of 21

BARCLAY DAMON LLP

EXHIBIT
A-8

**Gregory Zini**
*Partner*

January 24, 2017

**VIA ELECTRONIC MAIL**

Guy G. Ward, Esq.
Federal Trade Commission
55 West Monroe Street, Suite 1825
Chicago, IL 60603

Re: FTC v. Credit Bureau Center, et al., Case No. 17-cv-00194 (N.D. Ill.)

Dear Guy:

As you know, we are co-counsel for Defendants Credit Bureau Center, LLC ("CBC") and Michael Brown in the above-referenced matter. We refer to decretal Paragraph V.C of the Temporary Restraining Order entered January 11, 2017 (the "TRO"), which generally provides that Mr. Brown may form a new entity to conduct business provided that he provide the FTC with a written statement disclosing the name of the business entity; the address, telephone number, email address, and website address of the entity; the names of the officers, directors, principals, managers, and employees; and a detailed description of the business's intended activities. We write on his behalf to provide the necessary disclosures.

Mr. Brown's new entity is called Zenfia, LLC, Its address is 340 South Lemon Street, Suite 8881, Walnut, California, 91789. The telephone number is (323) 400-4295. Mr. Brown's email address is mike@zenfia.com. However, we represent Zenfia with respect to the above-referenced matter, as well, and we hereby request that any communications be directed to us.

Mr. Brown is the sole member of Zenfia, LLC; as such, he is the sole principal. As an LLC, there are no officers or directors. Mr. Brown will manage Zenfia. As of this writing, he also is the sole employee of Zenfia; we will notify you immediately if Zenfia hires employees.

Neither CBC nor Mr. Brown will transfer any assets to Zenfia. Zenfia may *use* software code and/or websites owned by CBC or Mr. Brown, but no title will be transferred.

The Avant Building – 200 Delaware Avenue - Buffalo, New York 14202 barclaydamon.com
gzini@barclaydamon.com Direct: 716.858.3750 Fax: 716.768.2750

Zenfia will engage in two lines of business. First, Zenfia will offer credit solutions including white-labeled and co-branded credit reports, scores, and monitoring. In plainer English, this means that Zenfia will either license credit reporting, scoring, and monitoring software to third-party businesses who can then use that software under their own brands; or will license such software under a co-branding agreement to third-party businesses who can then use that software under their own brand jointly with the Zenfia brand.

Second, Zenfia will offer credit reports, scores, and monitoring through the affiliate program that I described during our telephone call yesterday morning. (You may recall that I used DirecTV as an example of one such affiliate.) A brochure explaining the affiliate program is attached to the email transmitting this letter. Zenfia will take great care to ensure that its affiliates are reputable companies offering legitimate products and/or services, and also will take great care to avoid any affiliate engaged in activities such as those alleged by the FTC against co-Defendants Pierce and Lloyd in the Complaint in the above-referenced action. Zenfia also will modify websites and software as necessary to ensure that disclosures required by the FCRA and ROSCA appear prominently not only on personal computer browsers, but on mobile device browsers as well.

It is our opinion that Paragraph V.C permits the conduct described above simply upon transmission of this notice to you as a representative of the FTC. However, because the present state of litigation creates uncertainty, we would like your agreement that the above-described activity would not violate the TRO. We ask that you kindly so signify by countersigning this letter below.

Thank you for your kind attention to these matters.

Very truly yours,

Gregory Zini

AGREED TO this __ day of January 2017:

______________________________
Guy G. Ward, Esq.

12994836.1



●○○○○ AT&T 11:57 PM 51%

Parker McKay Greg Zinni

EXHIBIT A-9

Parker or Greg do you have 5 min now or sometime today? Ling want to do a quick call and confirm we allowed to use the past customer data and bill them (the good ones only)

Will be quick

Greg Zinni Lawfirm Partner Lawyer Parker Fri

GL Yes in a few. But the short answer is I think so.

Ok please be more confident than I think so lol. Call me in a few

Greg Zinni Lawfirm Partner Lawyer Parker Fri

GL I can't be more confident than I think so right at the moment. I need to look at the order again and I'm not in a place where I can do that right now. Want to talk in the am instead?

are hereby restrained and enjoined from:

iMessage

 

11:58 PM 51%

Parker McKay

Greg Zinni

are hereby restrained and enjoined from:

A. Selling, renting, leasing, transferring, or otherwise disclosing the name, address, birth date, telephone number, e-mail address, Social Security number, credit card number, bank account number, or other financial or identifying personal information of any person from whom or about whom any Defendant obtained such information in connection with activities alleged in the FTC's Complaint; and

B. Benefiting from or using the name, address, birth date, telephone number, e-mail address, Social Security number, credit card number, bank account number, or other financial or identifying personal information of any person from whom or about whom any Defendant obtained such information in connection with activities alleged in the FTC's Complaint;

We were relying on page 14 last sentence of paragraph "A". Only limits customer data if obtained by the bad activities alleged in the complaint

If that screenshot is enough to be more confident let's do now. I know parker already said was ok. AM EST is hard for Ling since he pacific time

Greg Zinni Lawfirm Partner Lawyer Parker Fri

GL

Looks good to me. I will upgrade my response to "yes but anything can happen."

Thx Greg



Mike Brown <mikebrownceo@gmail.com>

# Todays Call

5 messages

**Mike Brown** <mikebrownceo@gmail.com> Thu, May 25, 2017 at 1:31 AM
To: Parker MacKay <parker@mackaylawoffice.com>, "Zini, Gregory" <gzini@barclaydamon.com>

Todays call with you felt very odd and was keeping me up tonight. Not just the tone and asking series of questions you already know many of the answers to as if it was your first time hearing it. Also the fact you now retracing and denying what you both previously informed me regarding compliance of the court order. I feel very uneasy about the situation.

We have had multiple calls talking about how I can operate business where we discussed what is allowed and not allowed under the court order. On these calls you specifically stated we are allowed to use the past customer data and bill them provided they are not restricted under the order provided they did not come thru the Pierce/Lloyd scam.

I relied on your expert advice to operate business in good faith and in respect of the courts order. I communicated this plan as complaint and legal to multiple people including Ling.

On March 3rd I text messaged you both to arrange that call with Ling specifically to "*confirm we allowed to use the past customer data and bill them (the good ones only)*". Ling was uneasy and unsure about this plan so Greg and I had a three way call together which eased Lings concerns to where he was comfortable proceeding in compliance with the court order.

So please don't play games retracing or denying it including the attempted cover your ass email 7 days ago where Greg issued a new unprompted opinion.

I would never do anything to violate a court order. I am very confident Ling would not as well. I also think the same for you guys.

Everything on record so far is making me look bad. For example; I don't know why we haven't been taking to the receiver. From the beginning I wanted them to be on our side. Now that I am talking with them directly per Rachels idea they appear to be happier. But now I have permanent court records of non-compliance. I thought you were ignoring them because of settlement talks or something.

I don't know why Greg told the FTC you had never even talked to Ling when you had. He is now being subpoenaed. My credibility is all I have left. Now the FTC thinks I don't even have that left which derailed settlement talks. Please fix this very quickly and fall on the sword and tell the FTC what happened to get my credibility back, preferably private behind the scenes with the FTC and get this settlement done.

This is an email I hope we never need. Please call me around lunch hopefully with some good news.

Thanks,
Mike

---

**Mike Brown** <mikebrownceo@gmail.com> Thu, May 25, 2017 at 10:15 AM
To: Rachel Hirsch <rhirsch@ifrahlaw.com>

[Quoted text hidden]

---

**Zini, Gregory** <gzini@barclaydamon.com> Thu, May 25, 2017 at 2:16 PM
To: Mike Brown <mikebrownceo@gmail.com>, Parker MacKay <parker@mackaylawoffice.com>
Cc: "Rubin, Lawrence C." <lrubin@taftlaw.com>

Mike,

Per our calls this morning, we know you're on a plane right now, so we're responding via email. It's probably best to address your email below, and the issues we discussed yesterday and today, in writing anyway. This message is coming from my account, but it is from both Parker and me.

The FTC declined our offer to negotiate and is seeking some form of relief in court. Guy Ward is out of the office until Tuesday, so we spoke with Sam Levine. He described the relief he is seeking as direction to comply with the existing preliminary injunction and did not use the word "contempt." Nor did any of the FTC personnel use that word yesterday.

To the extent that you want us to interpose a defense stating that there was a misunderstanding of the advice of counsel which resulted in you and/or Daniel Ling billing former customers of CBC under old contracts with CBC, we are willing to do so. We reasonably believe that to be the case. On March 3, you sent to me a screenshot of Paragraph VI of the order, which does not prohibit you from using CBC data obtained from sources other than Pierce and Lloyd, and asked if you could use that data to resume doing business with former CBC customers. We have had several telephone conversations regarding that, as well. Finally, last week, you asked for a written opinion regarding that same paragraph, and I provided you with one. It was not a "cover your ass" email; you specifically requested it.

-

None of our communications indicated to us that you or Ling would be billing old CBC customers under old contracts. Parker and I are in complete agreement upon this point. If you intended to convey that, we did not understand. Again, we are willing to interpose a defense based upon misunderstanding or miscommunication.

However, we will not interpose a defense claiming that either of us in fact advised you that you or Ling could bill old CBC customers under old contracts. Neither of us believe that to be true. Both of us understand receivership law and both of us understand that the old contracts are the property of the receiver. We would not have advised you otherwise and we did not advise you otherwise. To the extent that you want to assert such a defense, you will need to terminate us and engage other counsel to do so. We will understand.

**From:** Mike Brown [mailto:mikebrownceo@gmail.com]
**Sent:** Thursday, May 25, 2017 2:31 AM
**To:** Parker MacKay; Zini, Gregory
**Subject:** Todays Call

[Quoted text hidden]

**Gregory Zini**

Partner

BARCLAY DAMON LLP
The Avant Building • 200 Delaware Avenue • Suite 1200 • Buffalo, NY 14202
D: (716) 858-3750 • F: (716) 768-2750 • C: (716) 536-0933
E: gzini@barclaydamon.com

**barclaydamon.com** • **vCard** • **Profile**

This electronic mail transmission is intended only for the use of the individual or entity to which it is addressed and may contain confidential information belonging to the sender which is protected by the attorney-client privilege. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or the taking of any action in reliance on the contents of this information is strictly prohibited. If you have received this transmission in error, please notify the sender immediately by e-mail and delete the original message.

**Mike Brown** <mikebrownceo@gmail.com>                                    Thu, May 25, 2017 at 2:38 PM
To: Parker MacKay <parker@mackaylawoffice.com>, "Zini, Gregory" <gzini@barclaydamon.com>
Cc: "Rubin, Lawrence C." <lrubin@taftlaw.com>

We know what was said multiple times. We wouldn't do anything against a court order. We spoke about using the past
customer data to BILL them. Using the BILLING data. Can't be more clear than that. The fact you deny it now is crazy.

I obviously dispute facts in your email below.

[Quoted text hidden]

---

**Zini, Gregory** <gzini@barclaydamon.com>                                 Thu, May 25, 2017 at 3:38 PM
To: Mike Brown <mikebrownceo@gmail.com>, Parker MacKay <parker@mackaylawoffice.com>
Cc: "Rubin, Lawrence C." <lrubin@taftlaw.com>

Mike—

Again, please understand that this message comes both from Parker and from me.  Your message below has created a
conflict of interest between you and me (and my law firm) and between you and Parker that prevents us from continuing
as your counsel.  You have alleged that we provided you with incorrect legal advice, an allegation that we deny without
reservation.  You have further advised that in response to any assertion that you violated a court order, that you were
following our advice.  Again, to the extent that you claim that you were following a lawyer's advice, that advice did not
come from Parker or from me.  In these circumstances, the Rules of Professional Conduct prohibit us from continuing as
your counsel.  This is so because it could be claimed by you that we are no longer looking out for your best interests and
are, instead, looking out for our own interests.

You need to obtain new counsel and have that counsel substitute in for our firm by filing a formal Consent to Change
Attorney document.  Your new counsel should contact me directly to arrange for the transfer of the file and the execution
of the Consent to Change Attorney.  Given the present procedural posture of the case, you need to act immediately.  Time
is of the essence.

There is a status conference in the case set for next Thursday, June 1, 2017.  We will attempt to adjourn that conference,
but we cannot say whether my attempt will be successful.  If we can adjourn the conference, we will ask for ten days for
you to find new counsel.  If we cannot, we will need to hear from you by noon Eastern Daylight Time on Tuesday, May 30,
2017 that you have new counsel (and have the aforementioned Consent to Change Attorney executed).  Otherwise, we
will have no choice but to file a motion in the Court for leave to withdraw as your counsel.  That motion will advise the
Court of the existence of a conflict and that we are obligated to withdraw under the Rules of Professional Conduct but will
not publicly disclose the nature of the conflict so that your position is not prejudiced in the eyes of the Court or opposing
counsel.

I regret that this circumstance has occurred, but your claim of wrongdoing on our part has left me without any option.

--Gregory

**From:** Mike Brown [mailto:mikebrownceo@gmail.com]
**Sent:** Thursday, May 25, 2017 3:38 PM
**To:** Parker MacKay; Zini, Gregory
**Cc:** Rubin, Lawrence C.
**Subject:** Re: Todays Call

[Quoted text hidden]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

**EXHIBIT**
**A-11**

© StenoWorks
The Court Reporting Store

**FEDERAL TRADE COMMISSION**,

*Plaintiff*,

-*vs*-

**CREDIT BUREAU CENTER, LLC, *et al.***,

*Defendants*.

Case No. 17-cv-194

**DECLARATION OF GREGORY ZINI**

**GREGORY ZINI**, under penalty of perjury and in accordance with 28 U.S.C. § 1746, states and declares that the following is true and correct:

1. I am a partner in the law firm of Barclay Damon, LLP, co-counsel for Defendants Credit Bureau Center, LLC and Michael Brown in this matter and submit this Declaration in support of the accompanying Motion, pursuant to Local Rule 83.17 and Rule 1.16 of the Illinois Rules of Professional Conduct ("RPC"), for leave to Withdraw as Counsel for Defendants Credit Bureau Corporation ("CBC") and Michael Brown. I am fully familiar with the facts and circumstances of this matter. This Declaration is based upon my personal knowledge. Other co-counsel who have appeared as counsel of record in this matter, and who also are moving to withdraw, are Parker R. MacKay, of the Law Offices of Parker MacKay, and Lawrence C. Rubin, of Taft Stettinus & Hollister LLP.

2. This action was commenced by the Federal Trade Commission with the filing of a Complaint on January 10, 2017. The following day, a Temporary Restraining Order was issued by this Court (Hon. Sharon Johnson Coleman. In connection with that Order, Robb Evans & Associates LLC ("Robb Evans") was appointed Temporary Receiver.

3.      After oral argument and two days of live testimony, and after due deliberation, on February 21, 2017, the Temporary Restraining Order was converted into a Preliminary Injunction (Hon. Matthew F. Kennelly).  That Order provided that Robb Evans would continue as Receiver.

4.      On Friday, May 19, 2017, at approximately 5:50 p.m., I (together with co-counsel identified above) received an electronic mail message from Blair Zanzig, Esq., counsel for Robb Evans, in which Mr. Zanzig informed me of his opinion that CBC and/or Mr. Brown had interfered with receivership assets.

5.      On Wednesday, May 24, 2017, at 12:30 p.m., Mr. MacKay and I had a teleconference with Guy G. Ward and Samuel A.A. Levine, counsel for the FTC, in which Messrs. Ward and Levine informed us of their opinion that CBC and/or Brown had violated the terms of the Preliminary Injunction.  Messrs. Ward and Levine notified us of their intention to bring the alleged violation to the attention of the Court.

6.      During the balance of May 24, 2017 and during nearly the whole day of May 25, 2017, Mr. MacKay and I consulted with our clients, with Mr. Rubin, and with each other regarding a possible defense to whatever application would be brought by the FTC.  Based upon information obtained during these conversations, as well as several follow-up email messages, it has become clear to me that there is a fundamental disagreement between our clients and their lawyers.  In addition, I have become convinced that continuing as counsel to Defendants will contravene my duties and obligations under Rule 1.16 of the Illinois Rules of Professional Conduct and that withdrawal is mandatory under RPC 1.16(a)(1).  Withdrawal in the present circumstances is also supported by RPC 1.16(b)(4) and (7).

Case 1:17-cv-00194 Document #: 86-1 Filed: 06/01/17 Page 3 of 3 PageID #:2164

7. I am aware of various ethics opinions that detail that type and amount of information to support a motion to withdraw due to confidentiality obligations under RPC 1.6. Thus, this Declaration is by design limited in describing the issues that have mandated withdrawal from representation. If the Court requests, I will submit an additional Declaration under seal so that confidential information is not disclosed and no prejudice will result to my clients.

8. Based on the above, it is respectfully submitted that withdrawal by Messrs. MacKay and Rubin and the undersigned is mandated by the Rules of Professional Conduct. We have so notified our clients and have requested that they obtain new counsel. If the motion is granted, we also seek a limited period of time within the action will be stayed in order to allow Defendants to obtain new counsel. Lastly, we seek such additional relief as the Court deems fair and proper.

DATED: Buffalo, New York
June 1, 2017

Respectfully submitted,

/s/ Gregory Zini
Gregory Zini



EXHIBIT
A-12

Subject **RE: Contempt Order**
From Zini, Gregory <gzini@barclaydamon.com>
To Stephen Cochell <srcochell@gmail.com>, Parker MacKay <Parker@mackaylawoffice.com>
Cc Jonathan L. Slotter <jslotter@cochelllawfirm.com>
Date 2017-10-10 13:21

---

Hi Steve,

I think the basic issue here is that we did not tell him to restart the business and use the old customer database. Accordingly, we could not ethically interpose a defense stating otherwise.

Because the issue concerned advice of counsel, which always is privileged, I did not prepare an affidavit concerning my discussions with Mr. Brown.

**From:** Stephen Cochell [mailto:srcochell@gmail.com]
**Sent:** Monday, October 09, 2017 10:17 PM
**To:** Parker MacKay; Zini, Gregory
**Cc:** Jonathan L. Slotter
**Subject:** Contempt Order

Gentlemen:

I had a lengthy discussion with our client today regarding the contempt of court issue. I'm at a loss as to why you took took the position that you took vis a vis the contempt. I assume that you were prepared to explain your position to the Court when you filed your motion to withdraw and that you probably prepared an affidavit.

Mike says you advised him that he could restart the business and use the old customer data base. Regardless of other issues, is that true?

What advice, if any, did you give Michael Brown after it became clear that he wanted to tell the court that you advised him that he could restart the business and use the prohibited customer information. The impact of a contempt order on the defense of this lawsuit is devastating to CBC and reflects adversely on Mike's credibility with the Court.

We are contemplating a motion to set aside the contempt order. Thus, we request that you provide us with a detailed explanation of what you contend happened and your factual and legal basis for your actions. In that vein, we believe that you have a fiduciary to this client to provide this explanation in order to avoid filing this motion if at all possible.

If we do not receive a response from you by or before October 15, 2017, we will take steps to file a motion with the Court to vacate the Order.

--

Stephen R. Cochell

The Cochell Law Firm, P.C.

2616 South Loop West,

Ste 470

Houston

, Texas 77

054

(346)800- 3500 (phone)

(281) 819-2520 (facsimile)

CONFIDENTIALITY NOTICE
This e-mail and any attachments are confidential and may be protected by legal privilege. If you are not the intended recipient, be aware that any disclosure, printing, copying, distribution or use of this e-mail including any attachment is prohibited. If you have received this message in error, please destroy this email and notify the sender by e-mail of the same.

**Gregory Zini**

Partner

The Avant Building • 200 Delaware Avenue • Suite 1200 • Buffalo, NY 14202
D: (716) 858-3750 • F: (716) 768-2750 • C: (716) 536-0933
E: gzini@barclaydamon.com

**barclaydamon.com** • **vCard** • **Profile**

---

This electronic mail transmission is intended only for the use of the individual or entity to which it is addressed and may contain confidential information belonging to the sender which is protected by the attorney-client privilege. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or the taking of any action in reliance on the contents of this information is strictly prohibited. If you have received this transmission in error, please notify the sender immediately by e-mail and delete the original message. ~BD~

---

 

EXHIBIT
A-13

# Get Your Free Credit Score and Report as of January 18, 2017

14-day trial ends Feb. 1, 2017

Monthly membership of $29.94 automatically charged after trial

For questions or to cancel, just call (800) 720-6627

## SAMPLE SCORE

TransUnion
350 400 450 500 550 600

Experian
350 400 450 500 550 600

Equifax
350 400 450 500 550 600

Delivered in **Seconds**

## START HERE

First Name

Last Name

Email

ZipCode

☐ Yes, please send special offers from CreditUpdates.com and partners to my email.

YOUR SCORE - NOW!

## BENEFITS

### INSTANTLY

access your credit score from TransUnion

### SECURE

online delivery for your convenience

 Credit Updates

TransUnion

Your privacy and security are 100% protected.

1 Complete 2 Confirm 3 Verify

## Account Setup

All Fields Required

**First Name:**

**Last Name:**

**Address:**

**Zip Code:**

**State:**

- Select -

**City:**

**Email:**

**Phone Number :** (Optional)

(123) 456-7890

By clicking Submit and Continue I agree by electronic signature to: (1) be contacted by CreditUpdates.com about financial services or credit related offers by a live agent, artificial or prerecorded voice, and SMS text at my residential or cellular number, dialed manually or by autodialer, and by email (consent to be contacted is not a condition to purchase services); and (2) the Privacy Policy and Terms of Use. I understand that consent is not required for purchase and I can forgo providing my phone number.

**Create Your Username:**

**Create Your Password:** (Case sensitive 6-36 characters)

**Verify Your Password:**

Submit & Continue

McAfee SECURE
CLICK TO VERIFY

Norton SECURED
powered by VeriSign

Secure Site
We are committed to protecting your information

### What is a good Credit Score?

Most experts agree that a credit score of 720 or higher is what you should aim for to have an excellent credit score. About 60% of people have a credit score 700 or higher. You can see your percentile rank when you view your credit score.

### Will I find errors on my credit report?

Errors are very commonly found on credit reports due to data input errors, incorrectly reported accounts, or even identity theft. You should review and monitor your TransUnion, Equifax, and Experian credit reports to make sure they are accurate.

## We are Here to Help

Call us toll Free at (800) 720-6627

Phone Hours (Pacific Time)

Everyday: 5 AM - 9 PM





Credit Updates

TransUnion

Your privacy and security are 100% protected.
1 Complete
2 Confirm
3 Verify
Your credit score is ready once we confirm your identity!
TransUnion.
Located Credit File
Verification and Payment Information
Tell us which card you would like to use for your membership
Card Number:
VISA
DISCOVER
CVV:
Expiration Date:
01 - January
2016
Payment Information
When you place your order here you will begin your membership in CreditUpdates.com. You will be billed $29.95 every month you continue your membership. If you wish to cancel just call us at (800) 720-6627 to stop your membership.
Submit & Continue
McAfee SECURE
CLICK TO VERIFY
Norton SECURED
powered by VeriSign

Secure Site
We are committed to protecting your information

### What is a good Credit Score?

Most experts agree that a credit score of 720 or higher is what you should aim for to have an excellent credit score. About 60% of people have a credit score 700 or higher. You can see your percentile rank when you view your credit score.

### Will I find errors on my credit report?

Errors are very commonly found on credit reports due to data input errors, incorrectly reported accounts, or even identity theft. You should review and monitor your TransUnion, Equifax, and Experian credit reports to make sure they are accurate.

## We are Here to Help

Call us toll Free at (800) 720-6627

Phone Hours (Pacific Time)

Everyday: 5 AM - 9 PM

 



Credit Updates

TransUnion

Your privacy and security are 100% protected.
1 Complete
2 Confirm
3 Verify
Verification Information
All Fields Required
All the information you provide is transmitted over a safe and secure connection.
Date of Birth:
Month
Day
Year
Social Security Number:
Submit & Continue

McAfee SECURE
CLICK TO VERIFY

Norton SECURED
powered by VeriSign

Secure Site
We are committed to protecting your information

### What is a good Credit Score?

Most experts agree that a credit score of 720 or higher is what you should aim for to have an excellent credit score. About 60% of people have a credit score 700 or higher. You can see your percentile rank when you view your credit score.

### Will I find errors on my credit report?

Errors are very commonly found on credit reports due to data input errors, incorrectly reported accounts, or even identity theft. You should review and monitor your TransUnion, Equifax, and Experian credit reports to make sure they are accurate.

## We are Here to Help

Call us toll Free at (800) 720-6627

Phone Hours (Pacific Time)

Everyday: 5 AM - 9 PM





All News Shopping Videos Books More Settings Tools

Page 3 of about 9,010,000 results (0.50 seconds)

[Registration - Discover Credit Scorecard](https://www.creditscorecard.com/registration)
https://www.creditscorecard.com/registration
**Free** Credit Scorecard. ... Learn More About Discover Credit Scorecard ... Scorecard is provided by Discover Bank, and includes a FICO® **Credit Score** and other ...

Free Credit Score Check | Cafe Credit
https://www.cafecredit.com/free-credit-score
Check your **free credit score** today! It's fast, easy and secure. Compare best sites and get instant online access to your scores.

Free Credit Report: No Credit Card Needed.
https://www.freecreditreport.com/
View your **free credit** report online now. It's $0 and no **credit** card required. Check yours today from freecreditreport.com®.

Credit Score | SavvyMoney
https://www.savvymoney.com/credit-score
Get savvy about your credit. Get your **free credit score**, compare and find lowest interest rates. ... Get Savvy with Your Credit Score. Check your credit score.

Get Your Truly Free Credit Score | Wise Piggy
https://www.wisepiggy.com/free-credit-score
See your WisePiggy credit report card and **free credit score**. Use our tools to find savings on credit cards, deposits, mortgage, and auto insurance.

Citi® Card Benefits - FICO® Score
https://www.cardbenefits.citi.com/Products/FICO-Score
We think it's important to provide our cardmembers with **free** access to information that will help them understand and stay on top of their **credit** status. That's why ...

Monitor Your Credit With CreditWise | Capital One
https://creditwise.capitalone.com/
Track your **credit** with CreditWise from Capital One. The app that's **free**, whether or not you're a Capital One customer.

100% Free Credit Score, Updated Daily – WalletHub
https://wallethub.com/free-credit-score/
**Free credit scores** from WalletHub are the only **free credit scores** updated DAILY. So check your credit score for free on WalletHub & stay up to date.

6 Things to Know About Free Credit Scores | Banking and Credit | US ...
https://money.usnews.com/...credit/...06.../6-things-to-know-about-free-credit-scores
Jun 15, 2017 - In 2014, the government's Consumer Financial Protection Bureau recommended credit card companies provide **free credit scores** to their ...

Free Credit Score? Not Necessarily. Credit Bureaus Busted for ...
https://www.nbcnews.com/.../free-credit-score-not-necessarily-credit-bureaus-busted-d...
Jan 4, 2017 - A **free credit score** that was neither free, nor really the credit score borrowers were looking for.

Searches related to free credit score

| | |
|---|---|
| free **fico** score | **best way to check** credit score |
| **equifax** free credit **report** | free credit score **check** |
| **is** credit **karma safe** | credit score **range** |
| free credit score **experian** | free credit score **equifax** |

Previous 1 2 3 4 5 6 7 8 9 10 Next

Shadow Creek Ranch, Pearland, TX - From your search history - Use precise location - Learn more

Help    Send feedback    Privacy    Terms