IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, | ) | Docket No. 17 C 194 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| CREDIT BUREAU CENTER, LLC, et al., | ) | Chicago, Illinois |
| | ) | June 28, 2017 |
| Defendants. | ) | 2:30 o'clock p.m. |

TRANSCRIPT OF PROCEEDINGS - MOTION
BEFORE THE HONORABLE MATTHEW F. KENNELLY

APPEARANCES:

For the Plaintiff:    FEDERAL TRADE COMMISSION
                      BY:  MR. GUY G. WARD
                           MR. SAMUEL AARON ABRAHAM LEVINE
                      55 West Monroe Street, Suite 1825
                      Chicago, IL  60603
                      (312) 960-5612


For the Defendant:    BARCLAY DAMON LLP
                      BY:  MR. GREGORY ZINI
                      200 Delaware Avenue
                      The Avant Building, Suite 1200
                      Buffalo, NY  14202
                      (716) 858-3750




Court Reporter:       MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
                      Official Court Reporter
                      219 S. Dearborn Street, Suite 2102
                      Chicago, Illinois  60604
                      (312) 435-5639

EXHIBIT
B

© StenoWorks
The Court Reporting Store

1    APPEARANCES CONTINUED:

2

3                              TAFT STETTINIUS & HOLLISTER LLP
                               BY:  MR. LAWRENCE CHARLES RUBIN
                               111 East Wacker Drive, Suite 2800
4                              Chicago, IL  60601
                               (312) 527-4000
5

6

7    For Danny Pierce:         HINCH NEWMAN LLP
                               BY:  MR. RICHARD BRIAN NEWMAN
                               40 Wall Street, 35th Floor
8                              New York, NY  10005
                               (212) 756-8777
9

10

11   For the Receiver:         HILTZ & ZANZIG LLC
                               BY:  MR. BLAIR ROBERT ZANZIG
                               53 West Jackson Boulevard, Suite 205
12                             Chicago, IL  60602
                               (312) 566-9008
13

14

15

16

17

18

19

20

21

22

23

24

25

3

1     (The following proceedings were had in open court:)

2          THE CLERK:  Case No. 17 C 194, Federal Trade

3     Commission v. Credit Bureau.

4          THE COURT:  Okay.  You don't all have to give your

5     names again.  I have had an opportunity to read this.

6          So going back to the motion to withdraw, one of the

7     things I did, because I wanted to refresh my memory, was to

8     look back at the rough realtime transcript from June 1, which

9     is when you were last here and when the motion to withdraw was

10    first presented.  And, largely, the reason why I said what I

11    did, and Mr. Zini quoted it almost word for word, was that the

12    motion had gotten filed sort of on the eve of that, and I

13    wanted -- I think I said at the beginning I wanted Mr. Brown

14    to have a chance to weigh in on it, and I wasn't sure how the

15    potential withdrawal would affect the briefing on the contempt

16    matter, which, you know, was a matter, I thought, of some

17    importance and urgency.  So that's why I didn't grant it then.

18         I guess maybe I should deal with that first because

19    if I read and also read between the lines of Mr. Zini's

20    motion, he at least contends he's got a problem like starting

21    whenever the motion got filed and continuing through now.

22         MR. ZINI:  Your Honor, we have been in near constant

23    contact, Mr. Brown, Mr. MacKay, even Mr. Rubin, and I, and we

24    may have a pathway forward today that results in not being a

25    conflict.

1          THE COURT:  Okay.

2          MR. ZINI:  We may have a pathway forward today that

3    results in there being a conflict, at which time maybe I'll

4    stand up and ask for a ruling on the motion.

5          THE COURT:  Okay.  Fair enough.  I can go with that.

6    That's fine.

7          All right.  So with regard to the other material you

8    gave me, so I want to go back to what you said right before,

9    Mr. Levine.

10          So the new declaration of Mr. Ling is basically --

11    it's your direct examination of him.

12          MR. LEVINE:  That's correct, your Honor.  Of course,

13    we'd reserve the right to bring him for rebuttal.

14          THE COURT:  Yeah, I understand.

15          So do you want to question Mr. Ling?

16          MR. ZINI:  I have no questions for Mr. Ling, no.

17          THE COURT:  Okay.  So aside from me considering this

18    and all the other stuff I had, does anybody want to present

19    any evidence, testimony -- and I've got Mr. Brown -- Mr. Brown

20    submitted a relatively short declaration, but I have that too,

21    and I reviewed it.

22          MR. ZINI:  I have a brief opening statement, and then

23    some very short questions for either Mr. McKenny or Mr. Kane,

24    depending on who's here today, and those just go to damages.

25          THE COURT:  Got it.  So everybody who is not talking

1  can have a seat.

2         MR. LEVINE:  If I may add, your Honor, the FTC would

3  just want to state that everything we filed today we would

4  like your Honor to consider in ruling on the FTC's motion.

5         THE COURT:  Okay.  When somebody says something that

6  obvious, I have to start thinking -- I am a lawyer, of course.

7  I have to start thinking about, what is he getting at here?

8         Is there something particular you have in mind?

9  Because, obviously, I have read everything.

10        MR. LEVINE:  Nothing in particular, your Honor.  We

11 feel that Mr. Ling's affidavit alone is likely -- is enough to

12 establish by clear and convincing evidence that Mr. Brown

13 should be held --

14        THE COURT:  Oh, you will get a chance to say that in

15 a second.  I get that.

16        MR. LEVINE:  But my -- the only reason I interjected

17 was because if we went first for the defense case, I just want

18 it to be clear that the FTC would be resting on everything we

19 filed --

20        THE COURT:  Oh, fair enough.  I get that.  That's

21 fine.

22        MR. ZINI:  Your Honor's instruction on the first was

23 if you want testimony, bring them in, but we don't object.

24        THE COURT:  Okay.  That's fine.

25        MS. HIRSCH:  And, your Honor, if I may, on behalf of

1   Mr. Ling, as FTC said, we believe we've resolved it to their
2   satisfaction, including all the financial part of it, and we
3   hope -- the FTC has said that, you know, they are not looking
4   to pursue a contempt finding against Mr. Ling.

5           As to your Honor's question regarding evidence, at
6   this time, we don't have any intention of calling anyone, but
7   if the Court were to not agree or consent to our stipulated
8   order, we may reserve the right to call witnesses at that
9   time.

10          THE COURT:  Okay.  So the hedge is in case I don't
11  agree with the stipulated order, which I think I must have
12  left -- I think I left it back there.

13          Wait a second.  Do I have it here?  Do you have
14  another copy?

15          MR. WARD:  I do.

16          THE COURT:  Thanks.  I appreciate it.  Let me just
17  run through it again.

18          So let me ask this question.  So if -- so,
19  essentially, what the stipulated order provides is that
20  Mr. Ling agrees to do a number of things, and the FTC's
21  position is that resolves as to Mr. Ling the contempt motion.

22          So the question I have, and it's not directly
23  addressed by the text of this, is what happens if Mr. Ling, A,
24  doesn't comply with the requirements that are imposed on him
25  by this order, or, B -- and I say this not because of anything

1  involving Mr. Ling but because of other experience in this

2  case -- slow walks compliance or obstructs compliance or says,

3  well, I don't have access to this and, therefore, I can't do

4  it, and the kind of stuff that we have seen -- that I have

5  seen earlier in the case.

6      So if one of those two things happens, am I limited

7  to contempt for violation of the stipulated order, or do we go

8  back to square one, which would be my view as to what ought to

9  happen?

10     MR. LEVINE:  I think our position would be that entry

11  of this order is contingent on his compliance --

12     THE COURT:  I am going to enter the order.  It's not

13  contingent.  Once it's entered, it's not contingent.

14     MR. LEVINE:  And if Mr. Ling did not comply with this

15  order, we would have to proceed against him based on the terms

16  of this order.

17     THE COURT:  Yeah, well, then I am not going to agree

18  to it because the deal is if he doesn't comply with this, this

19  order is vacated, we are back to the petition for contempt,

20  and we are dealing with the violations that occurred up to

21  today, plus whatever he doesn't do in response to this order.

22     If everybody says you're willing to agree to that,

23  then I'm good with it.  Otherwise, not.

24     MS. HIRSCH:  Your Honor, if I could just speak to

25  this without revealing, obviously, what it involves, the

1  monetary payment of it is already being held in our escrow
2  account.
3          THE COURT:  Yeah, I understand that.
4          MS. HIRSCH:  And then the second part, which is a
5  further certification, I think they already have the
6  information.  It was a matter of just timing and logistics of
7  getting it done, but we are ready to do it this afternoon with
8  whatever we have.  There's not really much further to do on
9  that certification part because Mr. Ling doesn't have access
10 to many of the people who he would need to notify about it.
11 So it --
12         THE COURT:  Yeah, and then there's paragraph 6.
13         MS. HIRSCH:  What is paragraph 6?
14         Yes, and that's continuing, and they have that in
15 most of their --
16         THE COURT:  Okay.  So you have my question in mind?
17 Because I am going to get an answer to it one way or another.
18         MS. HIRSCH:  Yeah, I think -- I think that's -- we
19 would like you to enter it if that's the condition upon which
20 your Honor enters it.
21         THE COURT:  Okay.  So the understanding is that if
22 Mr. Ling violates the terms of the stipulated order that I'd
23 be entering today, I am not limited to violations of that
24 order, but we basically go back to where we were before today,
25 status quo ante, as the lingo would go, and I am dealing with

1    the original motion of contempt plus any violations of this

2    order; is that right?

3           MS. HIRSCH:  That's our understanding, correct.

4           THE COURT:  Okay, fine.  So I'm willing to enter it.

5    I will need you, obviously, to get me a -- you know, take the

6    proposed language out of it and get me an electronic version

7    of this, a Word version to the proposed order email address.

8           Okay, then.

9           So in terms of -- in terms of testimony, Mr. Zini,

10   you are not intending to -- you don't want to ask questions to

11   Mr. Ling.  You basically want to argue.

12          MR. ZINI:  I'd like to give a brief opening statement

13   and then ask questions of Mr. McKenney and/or --

14          THE COURT:  Oh, yeah, those -- fine.

15          All right.  Anybody got a problem with that?

16          MR. ZANZIG:  No.  As Mr. Zini alluded to, your Honor,

17   Mr. Burke came from the receiver's office, is here from out of

18   town, so to the extent that we can get his testimony today.

19          THE COURT:  Oh, we are doing it today.

20          MR. ZINI:  And Mr. McKenney I do not see here.  Is he

21   here?

22          MR. McKENNEY:  I'm right here.

23          MR. ZINI:  Oh, great.  Okay.  I'm hoping that

24   Mr. Kane can answer the questions, but if not --

25          THE COURT:  Okay.  Everybody can have a seat except

1    for Mr. Zini.  What's your opening?

2              MR. ZINI:  Thank you.

3              Your Honor, obviously, there are two or three

4    statements and affidavits that relate to Mr. MacKay and to me,

5    and if we were to address them, we would be in direct conflict

6    with our clients, so we are not going to presently address

7    them at this time.

8              THE COURT:  Okay.

9              MR. ZINI:  What we can say, without revealing the

10   contents of any communications and without waiving any

11   privilege, is that we sincerely believe there was a

12   miscommunication between counsel and clients with respect to

13   what could or could not be done pursuant to paragraph 6B of

14   the preliminary injunction which deals with use of customer

15   data.

16             Either counsel misunderstood questions posed by the

17   client or the client misunderstood answers provided by counsel

18   or both.  But it was mistake, not malfeasance, that led to

19   violation of the preliminary injunction.

20             Those violations are remediable.

21             THE COURT:  So I got to stop you.

22             MR. ZINI:  Yes, your Honor.

23             THE COUR:  So you said two things that, to me, cannot

24   exist in the same universe.

25             You started off saying without waiving any

1    privileges, and then you proceeded to talk about there was a
2    miscommunication between counsel and clients.

3           MR. ZINI:  I didn't disclose the communication, your
4    Honor.

5           THE COURT:  I understand, but how can I possibly rely
6    on a lawyer's argument that there was a miscommunication
7    without having any clue what it was?

8           MR. ZINI:  There are going to be some complex issues
9    today, Judge.  That's one of them.

10           THE COURT:  Well, it's not honestly all that complex
11    because if a person advances reliance on privileged
12    communications as a defense to something, they do waive the
13    privilege as to those communications.

14           And so if Mr. Brown's defense on the contempt motion
15    is in any way, shape, or form based on the proposition that
16    there was a misunderstanding that resulted from communications
17    with counsel, the privilege has been waived.

18           MR. ZINI:  That is not in his affidavits, your Honor.
19           THE COURT:  Well, then why are you arguing it?
20           MR. ZINI:  I will withdraw that sentence if it
21    prefers -- if you prefer, your Honor.

22           THE COURT:  It's not a question of what I prefer.
23    It's a question of what the consequences are if that argument
24    is made.

25           Seriously.  Don't -- I mean, don't -- it's not on me.

1    It's on you.  Okay?

2                MR. ZINI:  I understand.

3                THE COURT:  So if the defense is going to be

4    advanced, and if Mr. Brown, who I know is listening here --

5                MR. ZINI:  Yes.

6                THE COURT:  -- wants me to rely on the proposition

7    that there was -- that whatever violations are alleged

8    resulted in some way, shape, or form, in whole or in part,

9    from miscommunications by counsel or misunderstandings between

10   him and counsel, then the privilege is waived.  He's got to

11   make a choice.

12               And so now he can make -- if you want a few minutes

13   to discuss that with him --

14               MR. ZINI:  We're going to need it.

15               THE COURT:  -- make the choice fully understanding

16   the consequences.

17               MR. ZINI:  Thank you.

18               THE COURT:  Let's take a break, and you can talk

19   about it.

20               MR. ZINI:  Thank you.

21     (Short break.)

22               MR. ZINI:  Your Honor, my client has a question for

23   the Court, if he may?

24               THE COURT:  Sure.

25               MR. BROWN:  Good afternoon.

1          I don't fully understand the scope of waiving

2   privilege.  If the Court would entertain to waiving it to the

3   communications that I relied on and my actions, I came here

4   today prepared to discuss that and disclose that.  But I don't

5   understand -- you know, I understand there may be greater

6   consequences that could help me in a contempt motion but harm

7   me in a larger case if it discloses strategy and other

8   information regarding the case.

9          THE COURT:  Let me ponder that for a second.

10         Well, so first of all, I will tell you that, as I say

11  sometimes only half in jest, but I think it's certainly true,

12  the true answer to most legal questions is it depends.

13         So if a person is relying on particular

14  communications as a defense to, in this situation, a contempt,

15  or in other cases, it might be something else, they certainly

16  waive the privilege with regard to those communications and

17  the surrounding circumstances.

18         There are situations in which the privilege can --

19  the waiver can be broader than that, and it's really hard to

20  kind of put it in a bright line fashion, but I think if I can

21  describe it, and I am going to ask if any of the lawyers in

22  the room, or at least the -- FTC's lawyers or Mr. Zini or his

23  co-counsel think I'm wrong, please say so, it would be any

24  other communications that are reasonably related to those.

25         So, for example, I give you a hypothetical.  Let's

1   say that somebody says that on the 2nd of July, my lawyer told

2   me this, X, Y, and Z, and, therefore, I believed that I could

3   do the following things, and then it becomes apparent there

4   was another conversation on July 3rd and another one on

5   July 4th and another one on July 5th that all related to the

6   same subject matter.  You can't say, well, it's just July 2nd

7   because the other communications are reasonably related to

8   those, in this situation, at least, in a way that would be

9   required to put them in context or the -- put them in context

10  I think is the best way of putting it.

11          I can certainly imagine other situations in which,

12  you know, I had one and only one conversation with my lawyer

13  about this.  And if that's the case and there's no other

14  communications that reasonably relate to the subject matter of

15  that, then, yeah, I think the prevailing weight of authority

16  would be that the waiver would then be limited to those

17  communications.

18          I know that's not a definitive answer, but it's

19  pretty much the best I can do.  Does anybody -- particularly

20  on the FTC side, do you think I'm wrong about that?

21          MR. LEVINE:  No.  We agree, your Honor.

22          THE COURT:  Do you think I'm wrong?

23          MR. ZINI:  I think you're right, your Honor.

24          THE COURT:  Okay.  So do you want a couple more

25  minutes to talk?

1           MR. BROWN:  Well, my understanding is that --

2           THE COURT:  If you want a couple -- now that you've

3  heard that, if you want a couple more minutes to confer with

4  Mr. Zini before you make any decisions, I am perfectly

5  comfortable with having you do that.

6           MR. BROWN:  No, I'm fine, your Honor.

7           THE COURT:  Okay.

8           MR. BROWN:  My understanding is the discussion with

9  counsel is a privileged issue, reliance on counsel isn't even

10  a defense.  So I don't want to relate it -- raise it as a

11  defense.  I just want to present it as like a mitigating

12  factor.

13           THE COURT:  Yeah, I'll just be honest with you.

14  Whether it is or isn't a defense, I don't off the top of my

15  head know the answer to that question.  So I am not going to

16  argue with you, but I -- I mean, I suppose it sort of would

17  partly depend on the level of willfulness or intent that's

18  required for contempt, and off the top of my head, I don't

19  recall that.

20           So, I mean, generally speaking, advice of counsel can

21  be a defense when a person is required to act willfully or

22  intentionally in order for whatever consequence is to be

23  imposed, and I don't -- and it's probably addressed in these

24  briefs.  And as I sit here, because there was quite a bit that

25  was filed, I don't recall off the top of my head what, if

1   anything, was said about that.

2   So I hear what you're saying, but as lawyers
3   sometimes say, I don't know that I necessarily -- the fact
4   that I am not, you know, directly responding doesn't mean I
5   agree with you.

6   So the factors -- I'm now looking at the FTC's
7   opening brief which was filed on May the 26th, page 7, it
8   says, In this circuit, a party is in contempt if clear and
9   convincing evidence shows that, number one -- well, and I have
10  to say I am somewhat reticent to suggest that -- this is me
11  talking, not quoting from the brief at this point -- the
12  quote -- part of this quote comes from a district court case
13  which is not controlling authority, but it cites another case.

14  Anyway, let me just read it to you.  I am reading
15  paragraph 20 of the FTC's brief -- or motion.

16  In this circuit, a party is in contempt if clear and
17  convincing evidence shows that, quote, number one, a court
18  order sets forth an unambiguous command; and number two, the
19  alleged contemnor -- that means the person found in contempt
20  -- violates that command; number three, the violation was
21  significant, meaning the alleged contemnor did not
22  substantially comply with the order; and number four, the
23  alleged contemnor failed to make a reasonable and diligent
24  effort to comply.  That's the end of the quote.  That comes
25  from a case that's controlling authority called Securities and

Case: 1:17-cv-00194 Document #: 133-2 Filed: 10/12/17 Page 17 of 56 PageID #:2875

1   Exchange Commission v. Hyatt.  That was decided by the Court
2   of Appeals.

3        The next quote comes from a district court case which
4   is not controlling authority.  It says, "The Court does not
5   have to find that the violation was willful and may find a
6   party in civil contempt if that party has not been reasonably
7   diligent and energetic in attempting to accomplish what was
8   ordered."  That's a quote from a district court decision from
9   the Northern District of Illinois, not me, another judge,
10  called Select Medical Corporation v. Cash Flow Consultants
11  decided in 2010.  It cites a Court of Appeals case.  So let me
12  just -- since it's not that hard for me to pull it, let me see
13  if that quote is lifted from the Court of Appeals.

14        MR. LEVINE:  If I may, your Honor, there was a Court
15  of Appeals case we cited in our reply.

16        THE COURT:  Oh, in the reply?  Okay.

17        MR. LEVINE:  Yeah.  That would be on page 8.  The
18  case is SEC v. McNamee, 481 F.3d --

19        THE COURT:  McNamee?

20        MR. LEVINE:  McNamee.  Thank you.

21        481 F.3d 451.

22        THE COURT:  All right.  So the part from the FTC's
23  reply brief that they just cited -- just a second here.

24        MR. LEVINE:  That would be page 8.

25        THE COURT:  I know.  I got it.  I am going to do my

1  own due diligence here, now that I know that this is a
2  contested issue, which I didn't before.  So bear with me one
3  second.

4       Okay.  So this is a quote from a Seventh Circuit -- a
5  decision by the Court of Appeals, which is binding authority,
6  so this is a more direct answer to the question you asked a
7  few minutes ago.  The case is called Securities and Exchange
8  Commission v. McNamee, M-c-N-a-m-e-e, 481 F.3d 451, and the
9  quote is at pages 455 and 456.

10       It says, First, advice of counsel may show that a
11  person lacked a culpable intent and thus may defeat criminal
12  liability, but scienter -- I will come back to what that means
13  in a second -- is not required in civil contempt proceedings,
14  citing a Supreme Court case.  Reliance on the advice of
15  counsel, accordingly, is not a defense.  That's the end of the
16  quote.

17       So that's the answer to your question.

18       "Scienter" means willfulness or intent.  So,
19  basically, what the Court of Appeals is saying there, that
20  culpable intent or willfulness isn't required in order to show
21  contempt, and, therefore, advice of counsel isn't a defense.

22       Now, to go back to what you were saying, what I think
23  you were saying to me, and you will correct me if I am wrong,
24  was that you are offering what you are going to tell me not as
25  a defense but in mitigation, basically, for something that I

1 would consider in deciding how to deal with contempt if I

2 conclude there is a contempt; is that right?

3             MR. BROWN:  Correct.

4             THE COURT:  And how are you proposing to do this?  Am

5 I going to put you under oath and you are going to tell me?

6             Mr. Zini, can you help me out here?

7             MR. ZINI:  I think at that point, if we do get into

8 advice of counsel issues, I think we need to deal with the

9 withdrawal issue.

10             THE COURT:  Okay.  And which --

11             MR. ZINI:  I have explained that to Mr. Brown.

12             THE COURT:  Yeah, but which -- just a second.  Let me

13 follow the ABA rules.

14             So which of the ABA rules -- Model Rules of

15 Professional Conduct, which is what we follow in our district

16 here, is the one that says that if a client is going to rely

17 on something his lawyer told him, the lawyer needs to

18 withdraw?  Is it the lawyer witness rule?

19             MR. ZINI:  No, it's not the lawyer witness rule.  It

20 is the rule that I cited in my motion --

21             THE COURT:  Remind me.

22             MR. ZINI:  -- which I am presently trying to pull up.

23             THE COURT:  You know what?  I can probably grab it

24 quicker than you can.

25             MR. ZINI:  And I think we would also -- well, there

1    would be another rule as well, but I don't --

2              THE COURT:  It's 1.16 --

3              MR. ZINI:  Thank you.

4              THE COURT:  -- is the one you cited, but 1.16 has

5    about 8 or 10 subparts.  So -- it says, A lawyer shall not

6    represent a client -- or actually shall withdraw if, number

7    one, the representation will violate -- will result in the

8    violation of the rules of professional conduct or other law,

9    and number two, the lawyer's physical or mental condition

10   materially impairs the lawyer's ability to represent the

11   client, or number three, the lawyer is discharged.

12             Is it any of those?

13             MR. ZINI:  It would create a conflict between client

14   and counsel, your Honor, so I think you're looking in the

15   first bucket.

16             THE COURT:  Okay.  So violation of the rules of

17   professional conduct -- or it would result in a violation of

18   another rule of professional conduct --

19             MR. ZINI:  At least one.

20             THE COURT:  -- and the rule that you are saying it

21   would violate would be the conflict rules.  And, you know, I

22   am not going to apologize for walking through this in a sort

23   of deliberate way.

24             In what way?  I mean, I guess my -- you know -- okay.

25             So if lawyer A tells client B, that light is red but

1   you can go ahead and go through it without violating the law,

2   and client B goes through the red light and is in front of the

3   judge at the sentencing on the traffic case that results, the

4   traffic ticket that results -- and I am not going to say it

5   would be a mitigation argument; I am just using it as a

6   hypothetical -- and the client says, well, I need to tell you

7   something my lawyer told me, the judge goes through the whole

8   thing and says, you know, if you do that, you're waiving the

9   privilege, and the client simply repeats verbatim what the

10  lawyer told him and there is no dispute as between the lawyer

11  and the client regarding what's said, then there really isn't

12  a conflict.

13          MR. ZINI:  But there's the difference, your Honor,

14  what you just said.

15          THE COURT:  Okay.

16          MR. BROWN:  If I may add a --

17          MR. ZINI:  I don't think you should.

18          THE COURT:  I wouldn't add at this point.

19          MR. BROWN:  Okay.

20          THE COURT:  I just want to process what Mr. Zini is

21  telling me.

22          So I can word this in sort of the probabilistic as

23  opposed to the sure thing.

24          So the concern, I take it then, Mr. Zini, would be

25  that there is a risk that if Mr. Brown were to testify

1   regarding information or conversations or discussions with his

2   lawyers, that that might obligate one of the lawyers to get up

3   and say, well, it didn't really happen quite that way.

4           MR. ZINI:  Yes, your Honor.

5           THE COURT:  Potentially.  So now I know what we are

6   talking about.  I don't want to guess on these things.  All

7   right, then.

8           Well, does anybody have any brilliant solutions here

9   before I just start winging it?  I am looking over on the

10  plaintiff's side first.

11          MR. LEVINE:  Our position, your Honor, as articulated

12  in the brief, is that advice of counsel is not a defense --

13          THE COURT:  How about this?  How about -- well, let

14  me ask you this, Mr. Zini.  Do you disagree with the

15  proposition that -- we will just call it, broadly speaking,

16  communications with counsel, whether we call it advice or not,

17  communications with counsel, do you disagree with the

18  proposition, at least in this circuit, that's not a defense to

19  a finding of contempt?

20          MR. ZINI:  I agree with the proposition as outlined

21  in the FTC's papers.

22          THE COURT:  All right.  So then -- so my question to

23  you is this.  I mean, it seems to me that it's one thing --

24  exactly how I deal with this might differ depending upon

25  whether what's going on here is there's going to be an

1   argument for reasons other than whatever Mr. Brown might say
2   that he was told or might believe that he understood or
3   whatever from his counsel, that there's going to be an
4   argument that there should not be a finding of contempt for
5   other reasons.  And then if there is a finding of contempt,
6   then you might have to deal with what he understood from
7   counsel as a -- you know, in terms of figuring what, if
8   anything, to do about it.
9           MR. ZINI:  I think that there is --
10          THE COURT:  Let me finish the point because I want to
11  make sure you're getting my drift.
12          Because if that's the case, then it would be -- I can
13  imagine a scenario in which we'd have argument here on, okay,
14  the papers are what they are, the affidavits are what they
15  are, here's what Mr. Brown's -- here's what I as Mr. Brown's
16  lawyer say his position is on whether you should hold him on
17  contempt, I make a finding on that, and then we figure out
18  what happens after that.  I mean, in other words, I can divide
19  it into two parts.
20          MR. ZINI:  Liability and damages.
21          THE COURT:  Yeah.  Right.  Bifurcating it between --
22  you know, between violation and sanction, I guess would
23  probably be the more -- or violation and remedy would be the
24  more --
25          MR. ZINI:  Do you understand what his Honor is

1   saying?

2          THE COURT:  In other words, what I would suggest is

3   that if what Mr. Brown wants to tell me really goes to the

4   question of what remedy should exist, if I make a finding of

5   contempt, my suggestion would be let's hold that for now,

6   let's just deal with the liability aspect, the contempt

7   aspect, first, I mean, I don't know if there's any arguments

8   about that or not, I will rule on those, and then we will at

9   least have accomplished something before we get to the next

10  point.  How does that sound?

11         MR. ZINI:  I think it sounds great, your Honor.

12         THE COURT:  Okay.

13         MR. ZINI:  I think that this should be an --

14         THE COURT:  Do you follow what I'm saying, Mr. Brown?

15         MR. BROWN:  I think Mr. Zini has a proposed solution

16  that might resolve the --

17         THE COURT:  All right.  So you can either stand up or

18  sit down.  That's fine with me.  If you want to sit down,

19  that's fine.  Stay close, though, in case I need to get you

20  back up here.

21         Okay.  Mr. Zini, go ahead.

22         MR. ZINI:  So, in any event, the violations of the

23  court order are remediable.  We have them partly remedied.  We

24  believe that we can get all the way to a complete remedy and

25  return to negotiating a resolution of the underlying case with

 1   the FTC, a resolution that I understand from Mr. MacKay we

 2   were like this close to when we all discovered what happened

 3   here.

 4          But in any event, that's what I've got to say to the

 5   Court.  I'd like to call Mr. Kane.

 6          THE COURT:  Okay.  Remind me where Mr. Kane fits in.

 7          MR. ZINI:  Mr. Kane is the president of the receiver,

 8   Robb Evans & Associates.

 9          THE COURT:  Okay.  Because I have seen that fellow.

10   I haven't seen Mr. Kane that much, or maybe at all.

11          Mr. Kane, come on up.

12     (Witness sworn.)

13          THE COURT:  Mr. Zini, you can go ahead.

14                          - - -

15               BRICK KANE, DIRECT EXAMINATION

16   BY MR. ZINI:

17   Q.  Good morning -- or good afternoon, Mr. Kane.  I'll be

18   brief.

19          Was there a period of time in this case -- by the

20   way, if I use the term "you," I'm referring to Robb Evans &

21   Associates, the company that you were president of, I believe,

22   correct?

23   A.  Yes.

24   Q.  If I use the term "you," can we understand I mean Robb

25   Evans?

1   A.  We can.

2   Q.  Okay.  Was there a period of time in this case when the

3   communication changed --

4               THE COURT:  Actually, give your name for the record.

5               THE WITNESS:  Brick Kane.

6               THE COURT:  Spell the first name.

7               THE WITNESS:  Brick.

8               THE COURT:  Just like it sounds.  And Kane is

9   K-a-n-e?

10              THE WITNESS:  Yes, your Honor.

11              THE COURT:  Thanks.

12              Go ahead, Mr. Zini.

13  BY MR. ZINI:

14  Q.  Was there a time in this case when you would say that the

15  line of communication between you and your client passed

16  thusly:  You to your counsel, to me, to my client, back to me,

17  back to your counsel, back to you maybe during the first

18  couple months of the receivership?

19  A.  Is there a question in there?

20  Q.  Yes, there is.

21  A.  Okay.  Could you repeat it again?

22              THE COURT:  I think what he's asking is whether in

23  the early stages of the receivership when you had to

24  communicate information either with or from the defendants in

25  the case, whether that communication was happening both

1   through your lawyer and through their lawyer going both

2   directions?  Do you follow what I'm saying?

3         THE WITNESS:  Yes, I do.

4         THE COURT:  In other words, the simpler way of

5   putting it would be did your company ever communicate directly

6   with the defendants or did they ever communicate directly with

7   you, or did all of this go through the lawyers, at least in

8   the earlier stages?

9         THE WITNESS:  In the earlier stages, it was between

10  me and Mr. Brown's counsel.

11        THE COURT:  Okay.

12        MR. ZINI:  I'm Mr. Brown's counsel.

13        THE WITNESS:  I know you are.  And I talked to

14  Mr. MacKay --

15  BY MR. ZINI:

16  Q.  Oh, you spoke with Mr. MacKay?

17  A.  We testified about this last time I was here.

18  Q.  Okay.

19  A.  And you and I talked.

20  Q.  Yes.

21  A.  There were no lawyers involved except -- but you.

22  Q.  Was there a point where Mr. Zanzig and I were kind of in

23  the middle of all the communications?

24  A.  There was a point when you and Mr. Zanzig were having

25  communications.

1 Q. Would you agree with me that recently, Mr. Brown and you

2 have been in direct communication?

3 A. We have.

4 Q. And has his -- has your perception of his cooperation with

5 the receiver, you as the receiver, has that improved?

6          THE COURT: You are talking about during this period

7 of direct communication?

8 BY MR. ZINI:

9 Q. The more recent period of direct communication.

10 A. It improved dramatically after the FTC filed their

11 contempt action.

12 Q. What about maybe on or about May 22nd, when there started

13 to be some email traffic between you and Mr. Brown directly,

14 which is before the motion was filed?

15 A. You have to show me the email you're talking about.

16 Q. Okay. Let me see if I have it.

17          MR. ZINI: It's time for me to relearn the ELMO.

18          THE COURT: Oh, I got to turn it on. And you got to

19 pull the thing up. There is a green ring -- there you go.

20 Let me get it flipped on up here.

21          Okay. There you go. It should be coming up on

22 everybody's screens here.

23 BY MR. ZINI:

24 Q. Mr. Kane, if you would please disregard Monica, would you

25 please print this out for us, that's my request of Mr. Rubin's

1   secretary.

2            Beginning here from Mike Brown to Brick Kane on

3   Monday, May 22.  Hello, Brick, nice chatting with you --

4            THE COURT:  Basically, what you're asking is does

5   this refresh his memory that communications started improving

6   around about the time of this email?

7            MR. ZINI:  That is my question.

8            THE WITNESS:  Yes, and I believe that's after the

9   Credit Data Partners' problem popped up.

10           MR. ZINI:  Okay.  And we know, your Honor, what date

11  the contempt motion was brought.  We don't need to address

12  that.  Thank you.

13           THE COURT:  Okay.

14  BY MR. ZINI:

15  Q.  Mr. Kane, in his affidavit, Mr. Ling testifies that

16  through Credit Data Partners they billed consumers

17  $141,522.06.  Do you agree with that figure?

18  A.  Yes.

19  Q.  And do you know if there are any moneys that have been

20  frozen by the receivership out of that figure?

21  A.  Yes.

22  Q.  Do you know the amount of that?

23  A.  I think it's approximately 15,000.

24  Q.  And do you know if there are any moneys that are presently

25  being held by financial institutions, not distributed to the

1    receiver, not distributed to Credit Data Partners?

2            THE COURT:  You are talking about from the same

3    proceeds --

4            MR. ZINI:  From this same pool of 141K.

5            THE WITNESS:  That would have been the amount frozen.

6    BY MR. ZINI:

7    Q.  Do you believe that there are any other moneys out there

8    that have not been returned to consumers, that have not been

9    frozen by the receivership, and that have not been distributed

10   to Credit Data Partners?

11   A.  There may be a small residual reserve account.

12   Q.  Would you know the amount of that reserve account?

13           THE COURT:  When you say "small," what did you mean

14   by small?  Less than what?

15           THE WITNESS:  Less than $5,000, your Honor.

16   BY MR. ZINI:

17   Q.  Do you know what the reserve account is typically used

18   for?

19   A.  Yes.

20   Q.  What is it typically used for?

21   A.  To process chargebacks against.

22   Q.  Is their credit card reserve account typically 10 percent?

23   A.  It depends on the merchant.

24   Q.  It depends on the merchant.  So it could be 10 percent?

25   A.  It could be or it could be higher.

```
 1              THE COURT:  Can I ask a clarifying question?  So the
 2   type of account you're talking about is one where if I as a
 3   merchant have a relationship with a credit card provider, they
 4   require me to keep a reserve account in deposit in case
 5   somebody wants to reverse a charge on their credit card?
 6              THE WITNESS:  That's correct, your Honor.
 7              THE COURT:  All right.  Thanks.  Go ahead.
 8              MR. ZINI:  I have nothing further for Mr. Kane.
 9   Thank you.
10              THE COURT:  Did you want to ask any questions,
11   Mr. Levine or Mr. Ward?
12                            - - -
13              BRICK KANE, CROSS-EXAMINATION
14   BY MR. WARD:
15   Q.  Good afternoon, Mr. Kane.
16   A.  Good afternoon.
17   Q.  In your experience, these reserve accounts, how much time
18   does it take to recover those funds from the merchant?
19   A.  It takes -- in my experience, the merchant will not
20   release funds until after six months of the last charge the
21   merchant processed.
22   Q.  I'm sorry.  I misspoke.  So that's the Merchant Bank.
23   Essentially, they will hold the funds for six months, usually?
24   A.  Usually, yes.
25   Q.  And they also, when they -- when they process any
```

1    chargebacks or during that time period, they sometimes deduct
2    fees from the amount of the reserve which don't go back to
3    consumers.  Those fees then go to the merchant bank, correct?
4    A.  They almost always deduct fees.
5              MR. WARD:  Thank you, Mr. Kane.
6              THE COURT:  Anything further based on that, Mr. Zini?
7              MR. ZINI:  I have nothing further, your Honor.
8              THE COURT:  Thanks, Mr. Kane.  You can step down.
9        (Witness excused.)
10             THE COURT:  The other person you wanted to question
11   was who?
12             Don't worry about that.  It's not worth worrying
13   about.
14             MR. ZINI:  Okay.
15             THE COURT:  You have a nice picture of the cord now.
16             Was there anybody else you wanted to ask questions
17   to?
18             MR. MacKAY:  Are you asking me?
19             THE COURT:  No, I am asking Mr. Zini.
20             MR. ZINI:  We have nothing further, your Honor.
21             THE COURT:  So is that all -- that plus everything
22   else that got submitted, is that all of the testimony that
23   anybody wants to present on the question on what I'll call
24   liability for the contempt?
25             MR. LEVINE:  That's all from the FTC.

1          THE COURT:  Is that it from your end as well,

2     Mr. Zini?

3          MR. ZINI:  Yeah, that's all, your Honor.  We rest.

4          THE COURT:  All right.  So does anybody want to make

5     argument on -- again, confined to the question of liability?

6     You can say, I want to -- I'll stand on the papers.  You can

7     say, I want to make argument.  Either one.  Doesn't matter to

8     me.  However you want to do it.

9          MR. LEVINE:  Your Honor, I think we can make some

10    brief argument.

11         THE COURT:  Okay.

12         MR. LEVINE:  It will be very brief, your Honor.

13         There's been no dispute on the papers or in the

14    hearing today that Mr. Brown orchestrated a scheme in which a

15    new company billed former CBC customers more than $140,000 in

16    clear violation of multiple provision of this Court's

17    preliminary injunction.

18         While Mr. Brown today raised some possibility of

19    advice of counsel, and, of course, we had a lengthy exchange

20    about that, we believe that the issue of whether Mr. Brown

21    should be held in contempt is entirely distinct from the

22    correct remedy for remedying that contempt.  We think the

23    Court should hold Mr. Brown in contempt, and we can proceed

24    with the discussion of the remedy thereafter.

25         THE COURT:  Okay .  Mr. Zini, anything you want to

1  say?

2          MR. ZINI:  Again, it's brief, your Honor.

3          We believe the intent was to comply with the order.
4  I am not going to get into the reasons why.  We sense the
5  Federal Trade Commission -- this is in various papers in this
6  case -- on January 24th, in compliance with the order, notice
7  of intent, Mr. Brown was going to operate his entity called
8  Zenfia, which had existed since at least late 2016.

9          You will find in the statements submitted on behalf
10 of Mr. Ling that there is a little bit of a conflict as to
11 whether the data used by Mr. Ling and Mr. Brown in connection
12 with the conduct alleged in the contempt motion belonged to
13 defendant Credit Bureau Corporation or a company called
14 Zenfia.  The answer is Zenfia.  Our client did not simply
15 steal receivership assets and start using them.

16         We believe that the damages here are low enough that
17 they can be remedied, and they can be remedied in a variety of
18 different ways.  Certainly, we do want consumers to be made
19 whole.  There are ways to do that with reducing the fee
20 application of Mr. MacKay and myself, there are ways to do
21 that with reducing applications for living expenses by
22 Mr. Brown, and if you look at Mr. Brown's testimony, his
23 written testimony, you will see that it clearly evidences a
24 desire to make things whole.

25         Lastly, cooperation with the receiver, I believe, has

1  improved greatly.  I will not speak for Mr. Zanzig, but I will

2  speak on my behalf and say I am far from a computer whiz, and

3  once we got Mr. Kane's team and Mr. Brown speaking directly to

4  one another, things started flowing a lot better.

5         And that's all I have, your Honor.  Thank you.

6         MR. LEVINE:  Your Honor, may I reply briefly?

7         THE COURT:  Sure.

8         MR. LEVINE:  I want to reply to two issues counsel

9  raised, because as your Honor knows, there was no briefing

10  that advanced any of the purported defenses that Mr. Zini just

11  mentioned in his closing argument.

12         As an initial matter with respect to Zenfia, your

13  Honor well knows that we were here for two or three days where

14  the primary -- where the defendant never disputed the

15  Craigslist scheme.  Their entire argument to your Honor was

16  that part of their business was legitimate and that they

17  should be permitted to continue billing people.

18         In rejecting that assertion, your Honor specifically

19  ruled on -- in docket 58, page 14 to 15, that given --

20         THE COURT:  This is the opinion on the preliminary

21  injunction?

22         MR. LEVINE:  Yes, which I know your Honor is familiar

23  with --

24         THE COURT:  No, go ahead.  Go ahead.

25         MR. LEVINE:  -- but your Honor specifically ruled

1   that, Although CBC contends that many of its customers

2   actually want the credit monitoring they signed up for, as of

3   the date of the hearing, it had not provided the receiver with

4   usable content and other information that would enable

5   determination of whether this is true, and if so, how many

6   consumers want to maintain the service.  Given these

7   circumstances, collection of the receivables claimed by CBC

8   would be problematic, as at least a good portion of CBC's

9   receivables, to the extent it has any, are reasonably likely

10  to have resulted from the unlawful practices alleged in the

11  FTC's complaint.

12          Your Honor, that is exactly what happened.  Your

13  Honor's concern in not limiting the scope of the injunction is

14  exactly what was realized when Mr. Brown violated that

15  injunction by billing customers.

16          Mr. Zini now seems to want to re-litigate whether --

17  the scope of the preliminary injunction and whether it should

18  have been issued, but this is not the proper time for that,

19  your Honor.  This was resolved, it was raised by the defense,

20  and your Honor issued an opinion that specifically forbade,

21  specifically forbade, the conduct that is the subject of the

22  FTC's motion.

23          I just want to add briefly with the recent -- the

24  asserted cooperation by Mr. Brown.  The reality is, your

25  Honor, as something I am sure your Honor is also familiar

1  with, that in multiple hearings, the FTC and the receiver came

2  before your Honor and said, we need the CRM, we need the

3  customer database, we need the cooperation of the defendants

4  to get the CRM.  And there was a lot of talk about, well, we

5  are not computer whizzes, we can't make it work, we can't get

6  the information over to the receiver.

7       The reality, your Honor, is that under this Court's

8  nose, under the receiver's nose, under the FTC's nose,

9  Mr. Brown was using that CRM to bill the customers that the

10 Court said he couldn't bill.  The notion that he was unable to

11 cooperate until right before we filed our motion for contempt

12 should not be credited, your Honor.

13      He always had the -- he always had the ability to

14 turn over the CRM.  He had the ability to bill those

15 customers.  He could have turned over that data to the

16 receiver.  The fact that he did so after this latest scheme

17 was exposed should not be factored into your Honor's ruling on

18 our contempt motion.

19      Thank you.

20      MR. ZINI:  Well, your Honor, that reply was certainly

21 longer than my closing statement to which it was directed.

22      Very briefly, I mentioned Zenfia not because I said

23 that what happened with respect to the order was okay but

24 because there is an allegation in the government's papers that

25 my client somehow stole data from the receiver and used it,

1   and that's simply the part that's untrue.

2          If you would like to see communications between me
3   and counsel for the receiver over a period of months, I can
4   certainly submit an affidavit attaching those, but the effort
5   to cooperate certainly was there.  It just simply was not good
6   communication.

7          THE COURT:  So I have a couple of questions I think
8   largely for counsel for the FTC, just so I have a handle on
9   exactly what the terms of the preliminary injunction order are
10  that you're contending were violated and how they were
11  violated.

12         So I'm looking at page 8 of your opening motion.

13         So paragraph 23, you say that there was a
14  violation -- paragraphs 23 and 24, you say that paragraphs 2C
15  and 1C2 were violated.  2C prohibits cashing checks or
16  depositing or processing any payments from customers of
17  defendants, and 1C2 prohibits charging, attempting to charge,
18  or continuing to charge consumers through a negative option
19  feature without having obtained their express informed
20  consent.  That was the first thing.  And that was done by --
21  you're contending by continuing to bill or continuing to
22  charge the former CBC customers for whatever services they had
23  purportedly signed up for prior to the preliminary injunction.
24  Am I right so far?

25         MR. LEVINE:  Correct, your Honor.

1     THE COURT:  Then, secondly, looking now, I am at

2  paragraphs 29 through 32.  31 of the same motion, there is a

3  prohibition on disclosing customer information, prohibits the

4  defendants from disclosing financial or identifying personal

5  information of any person from whom or about whom any

6  defendant obtained information in connection with activities

7  alleged in the complaint and also from benefitting from that

8  kind of information.  So that's paragraphs 6A and B.

9     And secondly, the requirement to turn over all

10  documents and client lists -- including client lists of the

11  receivership defendant, which is paragraph 7B.  Basically,

12  what you're saying is because Mr. Brown was charging clients

13  of CBC, he was necessarily violating those provisions.

14     MR. LEVINE:  If I would just -- that's correct, your

15  Honor.  All I would add is, as detailed in Mr. Ling's

16  declaration, the data was also disclosed to third-party

17  contractors overseas.

18     THE COURT:  All right.  Fair enough.

19     And then -- well, so at this point -- the next -- the

20  third and last thing that I think the motion alleges is a

21  violation was the -- is the failure to turn over customer

22  support emails.  That's kind of behind us at this point,

23  right?  You believe, at least, that you have it all now.

24     MR. LEVINE:  Correct, your Honor.

25     THE COURT:  Okay.  So we are just talking about the

1    other two things.  All right.

2              MR. ZINI:  May I make a statement, your Honor?

3              THE COURT:  Yep.

4              MR. ZINI:  You know, if we look at paragraph 6 of the

5    order and what they can and can't do with customer data, it

6    has to do with customer data obtained in connection with

7    activities alleged in the FTC's complaint, and if your Honor

8    remembers, we spent a couple of days here determining that all

9    of the activities alleged in the FTC's complaint were derived

10   through customers -- or consumers found through an affiliate

11   named Danny Pierce.  That was about 45 percent of my client's

12   operation.  45 percent of the data was data that my client

13   couldn't use.  The other 55 percent doesn't fit into the

14   category of a person about whom any defendant obtained such

15   information in connection with activities alleged in the FTC

16   complaint.

17             We are not disputing, by the way, that it was

18   impermissible to bill these consumers, but the idea that

19   section 6 was violated hasn't been established by the

20   government in any way.

21             THE COURT:  And the reason you're saying that is

22   because section 6 refers back to -- I'm looking at section 6

23   here.  It refers to, quote, activities alleged in the FTC's

24   complaint, and you're saying that the activities alleged in

25   the FTC's complaint only involves customers that were referred

1　in by Mr. Pierce?

2　　　　　MR. ZINI:  That's correct, and that was Mr. Pierce's

3　testimony, and the FTC drafted this order.

4　　　　　THE COURT:  It's a reference to the complaint, so

5　it's really not dependent on Mr. Pierce's testimony.  It would

6　be dependent upon what the complaint says.

7　　　　　MR. ZINI:  In other words, if this were to prohibit

8　defendants from using any customer data, no matter how

9　derived, the FTC, which drafted this order, could easily have

10　drafted it to say that.

11　　　　　THE COURT:  Just a second.  You don't, by chance,

12　have the complaint handy, do you?  I guess I need you to

13　respond to what --

14　　　　　MR. LEVINE:  I can certainly respond, your Honor.

15　　　　　THE COURT:  Yeah, go ahead.  Fine.

16　　　　　MR. ZINI:  If I just might finish up, and then I will

17　allow -- if that's okay with your Honor.

18　　　　　THE COURT:  What's -- go ahead, yeah.

19　　　　　MR. ZINI:  The other issue is -- and, again, there is

20　correspondence to demonstrate this if it is still an issue --

21　all CRM data was turned over to the receiver very early on in

22　the case.  The issue is not whether it was turned over --

23　　　　　THE COURT:  CRM, remind me what that stands for?

24　　　　　MR. ZINI:  Customer relationship management.

25　　　　　THE COURT:  Okay, great.  The database.

1           MR. ZINI:  Yes, the database was turned over early on
2     in the case.  The issue was the receiver's ability to
3     access --
4                THE COURT:  Couldn't read it.
5                MR. ZINI:  Right.
6                THE COURT:  Right.  For a long time.
7                MR. ZINI:  Yes.
8                THE COURT:  Yeah.  Real long time.
9                MR. ZINI:  Yes.
10               THE COURT:  Yeah.  Okay.  I remember that.  All
11    right.
12               So talk to me about this issue regarding the
13    incorporation, I guess, if you will, or the cross-reference to
14    the complaint.
15               MR. LEVINE:  Your Honor, respectfully, what Mr. Zini
16    said completely mischaracterized the nature of the FTC's
17    complaint.
18               It's true that the injunction focused on the
19    Craigslist scheme, but our complaint alleged violations of
20    ROSCA, alleged violation of the free reports rule, which is
21    part of the Fair Credit Reporting Act.  That affects
22    potentially all consumers in the CRM, and, in fact, there was
23    no dispute at the preliminary injunction stage that the Court
24    was likely to find Mr. Brown and his company liable for
25    violations of ROSCA and the free reports rule.

1    Moreover, your Honor, Mr. Zini is assuming a fact

2  that has certainly not been established.  In fact, we

3  presented evidence to the contrary.  Mr. Zini is asserting

4  that only the Craigslist consumers were affected by this

5  latest scheme --

6    THE COURT:  You know what?  If what you are going to

7  tell me is just refer me back to my opinion, I really don't

8  need that.

9    MR. LEVINE:  I actually was not, your Honor.  What I

10  was going to refer you to is our motion where we included a

11  declaration from a consumer who was a victim of the Craigslist

12  scheme, who was revictimized by Mr. Brown through his latest

13  scheme.

14    So the notion that somehow they're off the hook

15  because they didn't bill the Craigslist people is, A, wrong

16  because our complaint was broader than the Craigslist people,

17  and, B, wrong, because at least one Craigslist person was

18  billed.

19    THE COURT:  Thanks.

20    MR. LEVINE:  Thank you, your Honor.

21    MR. ZINI:  May I respond, your Honor?

22    THE COURT:  You know what?  I got to tell you, this

23  is not an episode of Law & Order.  Okay?  If it were an

24  episode of Law & Order, we'd be going back and forth for

25  another 15 minutes until the next commercial.  We are done.  I

1    have heard enough argument from everybody.

2           There is absolutely no doubt whatsoever that the

3    order was violated.  Clear and convincing evidence, there's

4    absolutely that.  It's beyond a reasonable doubt.  It's beyond

5    a shadow of a doubt.

6           Just to walk through the requirements as set forth in

7    the Hyatt case, which I quoted earlier, the provisions of the

8    preliminary injunction order that I referenced a bit ago set

9    forth unambiguous commands.  There is no question, based on

10   the affidavit -- or affidavits that are attached to the FTC's

11   original motion and, in particular, Mr. Ling's affidavit that

12   was submitted today, that Mr. Brown violated those provisions,

13   there is no question that it was significant in the sense that

14   he didn't substantially comply, and there's no question that

15   he didn't make a reasonable and diligent effort to comply.

16          And so for those reasons, I'm finding Mr. Brown in

17   contempt.

18          Now we get to what happens.  And so I want to make

19   sure that I'm understanding.  Before I get into even needing

20   to hear, wanting to hear Mr. Brown's arguments about what he

21   believed, you know, was being communicated to him, I want to

22   make sure I understand what differences there are between what

23   the FTC's asking for and what you understand the defendants to

24   be proposing.

25          So if I'm understanding the motion correctly, if I

1   look at the tail end of it, you're saying that I should enter

2   an order that says -- and I'm looking at paragraph 58 -- Turn

3   over all funds earned through Credit Data Partners L.L.C.

4   within seven days along with a full accounting, provide access

5   to support emails within seven days and a fine for

6   non-compliance -- that may be a moot point -- destroy all

7   copies of any credit scores one, two, three, or CBC customer

8   information and certify to a Court that he's done that.

9         And in the reply, the reply modifies that slightly --

10   well, not -- maybe "slightly" is a wrong word. You are not

11   asking for the turnover all funds, you're asking for me to

12   impose a compensatory sanction of $141,522.06. And I assume

13   that that would be less any credit -- less credit for funds

14   that have been seized that Mr. -- I keep wanting to call him

15   Mr. Brick, but it's Mr. Kane -- Mr. Kane talked about.

16         MR. LEVINE: The only wrinkle with that, the top line

17   figure should be the figure quoted because those funds have

18   not been seized --

19         THE COURT: "Frozen" is the word, not "seized." No,

20   I misspoke. Yeah. I mean, I'm assuming that there is a

21   mechanism for getting that money into the right place.

22         MR. LEVINE: I believe that's right, but I think we

23   need the order with that top line figure to get there.

24         THE COURT: So what you're asking for is destroy all

25   copies of the credit scores one, two, three or CBC customer

1   information and certify that, direct vendors and third parties

2   to do that, certify that within seven days, pay this

3   compensatory sanction in the amount I just described, and,

4   basically, that's what you're asking for at this point, right?

5           MR. LEVINE:  That's right, your Honor.

6           THE COURT:  Okay.  Is what -- what's the proposal --

7   bottom line, once I hear all the arguments, what's the

8   proposal on the defense side as to what I ought to do?

9           MR. ZINI:  I don't think that we have any objection

10  to the amount of monetary relief sought, and I think what

11  we're looking at is there is $141,000 in alleged damages, less

12  75 that's been paid, less an amount that's been seized, less

13  an amount that's been reserved for chargebacks, and we can

14  come up with a way to make payment of that amount.  I think we

15  are looking at about $30,000.

16          THE COURT:  But you are not really contesting the

17  amount.  I mean, you are basically talking about how it gets

18  paid.

19          The reason I'm asking this question, I am sitting

20  here, I am not seeing what the dispute is.  I mean, the

21  dispute may be down the road is like somebody says, we don't

22  think it's getting paid fast enough, and the other side says,

23  we are doing the best we can, and I have to figure that out,

24  but I am not seeing a dispute.

25          MR. ZINI:  Nor do I.

1    MR. LEVINE:  That's right, your Honor.  The figure is
2  what the figure is.
3         THE COURT:  All right.  So, I mean, what we are
4  talking about -- and I don't want to deprive Mr. Brown of the
5  opportunity to say whatever it is he wants to say, but what we
6  are -- so you just made reference to $75,000.  Refresh my
7  memory on what that is.
8         MR. ZINI:  I believe that's what Mr. Ling has paid.
9         THE COURT:  Oh, that's the part that Mr. Ling has
10  paid.
11         And this would be joint and several, obviously.  I
12  mean, it's not double recovery.
13         MR. LEVINE:  That's right, your Honor.
14         THE COURT:  So Mr. Brown, in effect, benefits from
15  that $75,000.
16         MR. LEVINE:  Yes.
17         MR. CALHOUN:  Your Honor, if I may, the order would
18  not be joint and several because of the separate order --
19         THE COURT:  No, no, no, it's joint and several with
20  regard to Mr. Brown's end of it, not your end of it.  I didn't
21  intend to --
22         MR. LEVINE:  We can talk through the mechanics.  I
23  think the figure should still be 141.
24         THE COURT:  No, no, I understand.  So 75 of it would
25  get paid via what Mr. -- what the -- the agreed order that I

1   am entering on Mr. Ling.

2              MR. LEVINE:  Effectively, right.

3              THE COURT:  Is there a mechanism -- and you have more

4   experience with these things than I do.  The 15,000 or

5   whatever it is that's been frozen at the bank account, is

6   there a mechanism by which in some way, shape, or form I can

7   order that to be seized or transferred or whatever?

8              MR. WARD:  Your Honor, we could get you the

9   information about the financial institutions and the accounts,

10  and we could submit that so it could be in the order.  And

11  then the financial institutions, when it's written --

12             THE COURT:  They'd have a chance to object, I

13  suppose, if they wanted to.

14             MR. WARD:  I think they might, but I don't think they

15  would if the order was very specific.

16             THE COURT:  Fine.  Okay.  So that gets us up to 90.

17             I think I understand the deal on the reserve account.

18  Basically, what the bank is saying is the bank is saying, we

19  want to make darn sure that there aren't going to be any more

20  charges coming in before we let go of that money.  And before

21  we let go of it, we are going to deduct our fees.  And that's

22  what banks do, they charge fees, so I get that.  So it's

23  probably not going to end up being $5,000.

24             So that would basically leave us, you know, somewhere

25  in the vicinity of $50,000 south of full compliance, but

1   that's -- I mean, that's going to happen one way or another,

2   right?  I mean, it's going to -- that's either going to get

3   paid or you're going to engage in some other form of remedy

4   seeking in order to get that money, I assume, right?

5           MR. LEVINE:  That's right.

6           THE COURT:  Okay, then.  So I guess -- and, again, I

7   don't want to deprive Mr. Brown of, you know, the opportunity

8   to say whatever it is he wants to say, but I am not -- I mean,

9   if the concern was maybe the judge is going to do something

10  more than this right now and that's why Mr. Brown wanted to

11  talk about what he wanted to talk about, as of right now, I am

12  not.  I mean, I am not precluding the possibility that if I

13  see some additional non-compliance down the road, you know,

14  considering some other type or form of remedy, but at the

15  moment, I don't see it.

16          I mean, just to put the cards on the table, the other

17  things that can happen in a civil contempt situation is you

18  can have a -- what is somewhat incongruously called a remedial

19  fine, or there's lingo like that, there is a remedial fine.  I

20  don't see any reason to do that because if you're going to

21  have trouble getting the $50,000, you'd have even more trouble

22  getting the fine.

23          And then another possibility is if there is -- I

24  mean, if there's assets that you know that the person has that

25  are the proceeds of the unlawful activity, you can make them

1   disgorge that. As we sit here right now, nobody is aware of

2   that. I can always modify it later if you come into the

3   possession of information that leads to that.

4         And then the ultimate thing is if there's something

5   that it's necessary -- that the judge thinks it's necessary to

6   essentially coerce the contemnor to do, you know, you have the

7   authority under appropriate circumstances to jail the person

8   until they comply, but, I mean, as I sit here right now, based

9   on what I have today, I am not really seeing that as something

10   that's on the table. Like I say, I am not going to rule it

11   out into the future, but right now, I don't see that.

12         So, I mean, I'll leave it to Mr. Brown, and if you

13   want to consult with Mr. Zini again, but this has got to be

14   really short, like five minutes.

15         I will leave it to Mr. Brown as to whether you want

16   to talk to me about what you wanted to talk to me about, but

17   my inclination as I sit here right now is to simply say -- I

18   mean, I've already found contempt to, number one, make an

19   order to destroy copies of information and direct vendors and

20   other third parties to destroy it, and I think we might want

21   to be a little bit more specific on the lingo on that, and

22   then number three, order Mr. Brown to pay a compensatory

23   sanction of $141,522.06, and we would put in there that that

24   would -- it's joint and several with Mr. -- well, it's -- I

25   don't remember whether it's joint or several. He gets credit

1   for the -- whatever the lingo is that we need to make clear

2   that he gets credit for whatever Mr. Ling pays, and the

3   assumption is going to be that we're going to get the -- or

4   you're going to get the $15,000 from the frozen account and

5   then eventually going to go after the other stuff.

6          So that's what I am inclined to do.  So do you want

7   to take five minutes -- I'm just going to sit here.  Do you

8   want to take five minutes to talk to him?

9          MR. BROWN:  I just have a quick question, your Honor.

10         THE COURT:  Yes, sir.

11         MR. BROWN:  So I think the main issue on the relief

12  is what we were talking about, and I think we had a couple of

13  proposed options to satisfy that relief, either through

14  waiving --

15         THE COURT:  The thing about the IRA?

16         MR. BROWN:  I am talking about the IRA as one option.

17  Another option is waiving living expenses, which I haven't

18  been paid a dollar since inception of the case for living

19  expenses.  The third option is Parker MacKay and Greg reducing

20  their fee application.

21         THE COURT:  I don't know why we have to worry about

22  that right this second.  I mean, if I impose a sanction -- I

23  mean, I would assume that there's going to be some sort of a

24  time period by which the sanction is to be complied with, and

25  then it seems to me that you will figure out -- and I am going

1   to need to talk to you in a second about the interaction

2   between this and the fee issue, but we will talk about that.

3   But you would then figure out within that period what is going

4   to happen if you do it in -- so in other words, I am not going

5   to say, well, you have to take option 1 rather than option 2,

6   you have to take option 2 rather than option 3.  I am just

7   going to impose a fine.

8           Usually when judges impose fines, it's not really a

9   fine, it's a compensatory sanction, what's called restitution.

10  Usually when a judge imposes restitution, the judge doesn't

11  say, okay, you are going to satisfy it out of this account or

12  this account.  I impose restitution, you satisfy it however

13  you are going to satisfy it, and if the person doesn't comply

14  with that, then I figure out what to do.

15          Do you follow what I'm saying?

16          MR. BROWN:  Yes.  I would seek the Court's approval

17  and permission to execute one of these options --

18          THE COURT:  I mean, what I would want to do is I

19  would want to have you discuss that, and because, you know,

20  the whole asset freeze thing is part of the order, I'd want

21  you to discuss that and then come to me with language about

22  how, this is how we propose to modify the order to permit you

23  to do one or more of those things.

24          But, yeah, I am absolutely open to that.

25          MR. BROWN:  Okay.

1     THE COURT:  So do you want to talk to me about what

2 it was you wanted to talk to me about before or do you want to

3 hold your powder at this point?

4     MR. BROWN:  No, your Honor, I think it's going to be

5 resolved through one of the remedies that we spoke about.

6 Thank you.

7     THE COURT:  Fine.

8     Okay.  So I'm going to deny the motion to withdraw

9 without prejudice.  So let's talk for a second here.  I know I

10 have everything that I'm supposed -- everything that I ordered

11 to be filed on the -- with regard to the amount that's in the

12 trust account of the law firm on the fee issue.

13     I guess my inclination would be, just to kind of

14 throw this out as a possibility, give you all a chance to kind

15 of discuss payment mechanisms, and then you come back to me

16 and say, this is what we're proposing to do insofar as it

17 relates to that particular funds before I start making rulings

18 about it.

19     MR. ZINI:  Your Honor, we had -- and without getting

20 into settlement discussions --

21     THE COURT:  Yes.

22     MR. ZINI:  -- we have floated the idea of, listen, if

23 we need to create a bucket of X dollars in assets to deal with

24 this contempt motion, you know, maybe we create part of that

25 bucket by Gregory Zini saying, you know, I'll take a little

1   bit less, and Parker MacKay saying, I'll take a little bit
2   less, and Mike Brown saying, I'll take a little bit less on
3   living expenses application that we sent on, gosh, in early
4   May, and, you know, maybe some money comes out of an IRA or
5   something like that.  But if we need to create a set -- a fund
6   of assets that way, both Mr. MacKay and I are willing to be
7   flexible on that.

8           THE COURT:  Okay.  The proposal on the table is for
9   me to put off ruling on that to give you a chance to kind of
10  see what you can sort out.  Does anybody have a problem with
11  that?  You just need to tell me if you have a problem is all.
12  If you don't, you don't have to say anything.

13          MR. WARD:  We don't.

14          THE COURT:  Okay.  Fine.  That's what I am going to
15  do then.

16          So what I'd like to get is a -- so I need to get -- I
17  need to get a contempt order from you.  My suggestion is going
18  to be that this thing about directing vendors and third
19  parties to destroy the information, I am just concerned about
20  down the road having something that's clear and specific
21  enough that it will be enforceable, so just -- I would just
22  maybe kind of work that language a little bit.

23          And just so you know my availability, I am here
24  tomorrow, and then I am out Friday, the court is closed on
25  Monday and Tuesday, so I am back on Wednesday.  But, you know,

1    you'll figure out how soon you can get it to me.

2         And then what I'd like to do is give you a status

3    hearing maybe in 30 days, order a status report to be filed,

4    you know, maybe a week ahead of that so I know where you are

5    in terms of what I'll just call compliance with the remedial

6    sanction or the compensatory sanction part of it.

7         So I am going to set it for status on the -- and,

8    Mr. Zini, you can participate by phone, but I'd like -- just

9    in case we have a glitch, if Mr. Rubin could be here, that

10   would be helpful.

11        Could you do August the 2nd at 9:30 for a status?

12   Does that work okay?

13        MR. ZINI:  I believe so, your Honor.  I am just

14   checking my calendar.

15        At 9:30 in the morning, yes, I can.

16        THE COURT:  Okay.  So it's set for status then.  The

17   status report that I referred to will be due on the -- a week

18   before that, which is the 26th of July.  So that basically

19   gives you four weeks.

20        Okay.  Anything else anybody thinks we need to deal

21   with today?

22        MR. ZINI:  Is your Honor's instruction that we should

23   be negotiating the order before we submit it to you?

24        THE COURT:  Well, I think the way to do it is you

25   draft something, and you're going to be reviewing it largely

1    as to form, I think, you know, except for this one part that I

2    suggested that they kind of particularize a little bit more.

3            But, yeah, I want them to run it past you so that --

4            MR. ZINI:  What we call in New York an order on

5    notice.

6            THE COURT:  Yeah, it's the same concept.

7            Okay.  Thanks.

8      (Which were all the proceedings had in the above-entitled

9    cause on the day and date aforesaid.)

10     I certify that the foregoing is a correct transcript from
     the record of proceedings in the above-entitled matter.
11

12   _____          _____
     Carolyn R. Cox                        Date
     Official Court Reporter
13   Northern District of Illinois

14   /s/Carolyn R. Cox, CSR, RPR, CRR, FCRR

15

16

17

18

19

20

21

22

23

24

25