**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **FEDERAL TRADE COMMISSION** | § | **Case No. 17-cv-194** |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | **Judge Kennelly** |
| | § | |
| **CREDIT BUREAU CENTER, LLC,** *et al.,* | § | |
| | § | |
| **Defendants.** | § | **Magistrate Judge Valdez** |

---

# DEFENDANTS' MOTION TO MODIFY PRELIMINARY INJUNCTION

### TABLE OF CONTENTS

Table of Contents ………………………………………………..…………………….. ii

Table of Authorities ………………………………………………………… iv

Argument ……………………………………………………………… 1

        Introduction ………………………………………………… 1

**I.**     The FTC Complaint and Preliminary Injunction ……………………………… 3

**II.**    The Language of the Statute Does Not Grant Authority to the FTC to File Damages Lawsuits …………………………………… 5

    **A.** The FTC Act Provides for Administrative Adjudication of Deceptive Practices ……………………………………… 5

    **B.** Section 13(b) Was Added in 1973 to Aid the FTC by Enjoining Current and Ongoing Future Violations of the Act ………… 5

        **1.** The Court Must Interpret and Apply the Plain Language of the Statute ………………………………… 9

        **2.** Section 19(b) Supports the Context of Section 13(b) …………… 12

        **3.** Section 13(b)'s Legislative History Demonstrates That Disgorgement was Never Contemplated or Authorized by Congress …………………………………..… 14

**III.**   Kokesh Changes the Landscape of FTC Litigation ………………………… 15

    **A.** Kokesh Applies With Equal Force to FTC Proceedings ………………… 17

    **B.** The FTC Uses Disgorgement as a Deterrent for Other Potential Violators ……………………………………………… 18

        **1.** FTC Precedent Shows Disgorgement is Designed to Deter ………… 19

        **2.** The FTC Itself Views Disgorgement as a Deterrent ………………… 20

    **C.** There is No Guarantee that Victims Receive Funds From Disgorgement ………………………………………… 21

**IV.**      **The FTC's Taking Violates the Fourth Amendment**
        **and Fifth Amendment** …………………………………………………… **21**

        **A.**   **The TRO Was Not a Warrant Within the**
           **Meaning of the Fourth Amendment** …………………………………… **22**

**V.**      **Conclusion** ………………………………………………………….. **26**

# TABLE OF AUTHORITIES

*Cases*

*Aaron v. SEC*, 446 U.S. 680, 700 (1980) …………………………………………………………… 9

*Camera v Municipal Court*, 387 U.S. 528, 528-529 (1967) …………………………..... 2, 22, 23

*CFTC v. Co. Petro Marketing Group, Inc* 680 F.2d 573, 583-84 (9th Cir. 1982) ……………… 20

*Davis v. Michigan Dept. of Treasury,* 489 U.S. 803, 809 (1989) ……………………………….. 11

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 214 n.33 (1976) ……………………………….. 9

*FTC v. Amy Travel Serv., Inc.,* 875 F.2d 564, 571–72 (7th Cir.1989) ………………………. 9, 22

*FTC v. Bronson*, 654 F.3d 359, 373 (2d Cir. 2011) ……………………………………… 19, 20

*FTC v. Cantkier,* 767 F.Supp.2d 147, 160 (D.D.C.2011) ………………………………………..9, 22

*FTC v. Evans Prods*. Co., 775 F.2d 1084, 1087 (9th Cir. 1985) ………………………………..… 15

*FTC v. Febre*, 128 F.3d 530, 537 (7th Cir. 1997) …………………………………………………….. 26

*F.T.C. v. Gem Merch. Corp.*, 87 F.3d 466, 469 (11th Cir. 1996) …………………………….. 9, 19

*FTC v. H.N. Singer, Inc*., 668 F.2d 1107 (9th Cir. 1982) …………………………………..… 7. 22

*FTC v. Loan Pointe, LLC*, 525 Fed. Appx. 696 (10th Cir. 2013) ………………………………..… 19

*FTC v. Pantron I Corp.,* 33 F.3d 1088, 1102 (9th Cir.1994) ………………………….………9, 22

*FTC v. Penn State Hershey Med. Center*, No. 1:15-cv-2362 (3d Cir. June 1, 2016) …………… 15

*FTC v. Sec. Rare Coin & Bullion Corp.,* 931 F.2d 1312, 1316 (8th Cir.1991) ……………….. 9, 22

*FTC v. Southwest Sunsites, Inc.,* 665 F.2d 711 (5th Cir.1982) ………………………………….. 9, 22

*FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1024-28 (7th Cir. 1988) …...… 7, 22

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.,* 527 U.S. 308, 326 (1999) … 19

*Kokesh v. S.E.C.,* __U.S., 137 S. Ct. 1635, 156
L.Ed.2d 86 (2017) …………………………………………..… 1, 2, 15 16, 17, 18, 19, 22, 23, 25, 28

*Mateos-Sandoval v. Cty. of Sonoma,* 942 F. Supp. 2d 890, 910 (N.D. Cal. 2013) ……..……… 24

*Meghrig v. KFC Western, Inc.* 516 U.S. 479, 487-488 (1996) …………………………..… 7

*Middlesex County Sewerage Authority v. National Sea Clammers Assn.,*
453 U.S. 1, 14 (1981) ………………………………………………………………… 7

*Mink v. Knox*, 613 F.3d 995, 1010 (10th Cir. 2010) ………………………………………... 25

*Porter v. Warner*, 328 U.S.395, 398 (1946) …………………………………..… 6, 7 22, 25, 27

*Robinson v. Shell Oil Co.,* 519 U.S. 337 (1997) …………………………..…………. 9, 10

*SEC v Cavanagh*, 445 F.3d 105 (2d Cir 2006) ……………………………………..… 19

*SEC v. First City Financial Corp*, 890 F.2d 12 15, 1230 (D.C. Cir. 1989) ……………….. 20

*SEC v. Fischbach Corp.,* 133 F.3d 170, 175 (2d Cir.1997) ……………………………… 19

*See v. City of Seattle*, 387 U.S. 541, 543 (1967) …………………………...… 3, 23

*Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 19 (1979) ………………… 7

*U.S. v. Campos*, 221 F.3d 1143,1147 (10th Cir. 2000) ………………………………… 25

*U.S. v. Carey*, 172 F.3d 1268, 1272 (10th Cir.1999) ……………………………………… 26

*U.S. v. Grimmett*, 439 F.3d 1263, 1271 (10th Cir.2006) ………………………………… 25, 26

*U.S. v. Jacobsen*, 466 U.S. 109, 124 (1984) ……………………………………………… 24

*U.S. v. Otero*, 563 F.3d 1127 (10th Cir.2009) ……………………………………… 26

*U.S. v. Riccardi*, 405 F.3d 852, 863 (10th Cir.2005) ……………………………………… 26

*Wolf v. People of State of Colorado*, 338 U.S. 25, 27 (1949) ………………………… 23

**Constitution and Statutes**

U.S. Const. Amend. IV ..………………………………………………… 21, 22, 23, 25, 26

U.S. Const. Amend VIII …………………………………………………………… 8

12 C.F.R. § 1022 ……………………………………………………………………… 3

15 U.S.C. § 13 ………………………...…… 1, 2, 5, 6, 7, 8, 10, 11, 12, 13, 13, 21, 22, 25, 27

15 U.S.C. § 19 …………………………………………….…...…...... 1, 2, 11, 13, 16

15 U.S.C. § 45 ………………………………………………….……………… 3, 5, 6

15 U.S.C. § 53 ………………………………………………...….……… 5, 6, 10

15 U.S.C. § 56 ………………………………………………………………… 6

15 U.S.C. § 57 …………………………………………………….…... 2, 6, 12, 16

15 U.S.C. § 65 ………………………………………………………………… 25

15 U.S.C. § 1681 ………………………………………………………… 3, 4

15 U.S.C. § 8403 ………………………………………………………… 3, 4

Trans Alaska Pipeline Act, P.L. 93-153 §408, 87 Stat. 592 (1973) ……………………………… 14

**_Miscellaneous_**

J. Howard Beales & Timothy J. Muris, _Striking the Proper Balance: Redress Under_

_Section 13(b) of the FTC Act_, 79 Antitrust L.J. 1, 16-17 (2013) ……………….................... 13

117 Cong. Rec. 39,626 (1973) ………………………………………………………… 14

119 Cong. Rec. 36,609 (1973) …………………………………………………………… 14, 15

**ARGUMENT**

Defendants Credit Bureau Center, LLC and Michael Brown, move to modify the Preliminary Injunction in light of the Supreme Court's *unanimous* decision in *Kokesh v. S.E.C.,* __U.S. __, 137 S. Ct. 1635, 156 L.Ed.2d 86 (2017).

**I.      Introduction**

On June 5, 2017 the Supreme Court handed down its decision in *Kokesh.*  The Supreme Court essentially found that the SEC lacked authority to seek disgorgement and restitution under virtually the same type of statutory provision under which the FTC has brought this action. In *Kokesh*, the Court found that disgorgement and restitution were *penalties* designed to deter potential violators and therefore not authorized under the securities statute.  Although the FTC claims that *Kokesh* is totally "irrelevant" to the FTC Act, the *principles* set out in *Kokesh* inescapably leads to the conclusion that the FTC lacks authority to seek disgorgement and restitution in this lawsuit, and that district courts cannot and should not imply authority for these extraordinarily punitive measures prior to a trial on the merits.  *See Kokesh*, 137 S.Ct at 1644-1645.

In addition to *Kokesh*, the *plain language* of Section 13(b) clearly states that courts are allowed only to enjoin deceptive trade practices while the FTC pursues adjudicative remedies under Section 5 and 19 of the Act.  Moreover, the legislative history underlying Section 13(b) of the FTC Act reveals that Congress *never* intended to authorize the remedies of disgorgement and restitution, and made clear that the FTC cannot seek "exemplary or punitive damages" in FTC proceedings.  15 U.S.C. § 57b.  Section 13(b) of the Act was *intended* to allow the FTC to enjoin

1

ongoing, or threatened future violations of the FTC Act while the Commission pursued monetary or other remedies administratively. Indeed, Section 19 of the Act provides a robust administrative adjudicatory scheme that allows the Commission to grant cease and desist orders and damages. 15 U.S.C. § 19. The construction of Section 13(b) enables the FTC to seek monetary relief for any violation of Section 5, and is so broad that it contradicts and nullifies Section 19, which Congress passed two years after it passed Section 13(b). In sum, Section 13(b) is not a license to file lawsuits for past damages in federal court.

The FTC contends that Kokesh is irrelevant or limited only to the statute of limitations issue raised in that case. Both the decision, as well as the oral argument before the Court, inescapably leads to the conclusion that the principles enunciated in Kokesh apply directly to the facts in the instant case.

In light of *Kokesh* and the FTC's ability to pursue the same or similar relief administratively while enjoining deceptive trade practices, the Court should dissolve the Receivership imposed against CBC, and modify the Preliminary Injunction to "unfreeze" CBC's assets and Michael Brown's personal assets. The Preliminary Injunction would otherwise remain in effect pending administrative proceedings before the FTC.

Defendants also move to suppress evidence illegally seized by the FTC. The TRO obtained by the FTC was non-specific, overly broad and not a warrant within the meaning of the Fourth Amendment. Warrantless searches and seizures are generally unreasonable. The Fourth Amendment did not authorize "equitable searches and seizures" based on "good cause" nor should this Court allow such warrantless searches. Except in certain carefully defined classes of cases, it is axiomatic that a search of private property without proper consent is presumptively unreasonable unless it has been authorized by a valid search warrant. *Camera v Municipal Court*, 387 U.S. 528,

528-529,(1967); *See v. City of Seattle*, 387 U.S. 541, 543 (1967).The Court should therefore order that Defendant's property be returned forthwith, copies of data collected from CBC and Brown be destroyed and that any evidence seized be suppressed and excluded from evidence at trial or further proceedings in this case.

### I.     The FTC Complaint and Preliminary Injunction

The FTC filed a complaint [Dkt. 1] on January 11, 2017 asking the Court to grant temporary, preliminary, and permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' alleged acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. *§* 45(a); and in violation of Section 4 of ROSCA, 15 U.S.C. § 8403; Section 612(g) of the FCRA, 15 U.S.C. § 1681j(g), and the Free Annual File Disclosures Rule, 16 C.F.R. Part 610 ("Free Reports Rule"), recodified at 12 C.F.R. §§ 1022.130-1022.138.

The Court granted an *ex parte* Temporary Restraining Order ("TRO") on January 11, 2017 effectively freezing the assets of all defendants, prohibiting each defendant from transferring, liquidating, selling, concealing dissipating, disbursing, assigning, spending, withdrawing, or otherwise disposing of any funds or real or personal property in their actual or constructive possession.   The TRO appointed a temporary receiver over CBC, the "Receivership Defendant." [Dkt. 2 at 6, 8, 14][1]

A hearing on the FTC's request for preliminary injunction was held on February 13-14, 2017.  The Court filed its a Memorandum and Order [Dkt. 58] on February 21, 2017 finding that there was good cause to believe that CBC had violated Section 5, ROSCA and the Free Reports

---

[1] Notwithstanding the asset freeze provisions, and subject to prior written agreement with the FTC, to be paid from Defendants individual personal funds.

Rule. The Court also found that Michael Brown has some power to control or deactivate Pierce's website[2] and that CBC had authority to modify Pierce and Lloyd's website.[3] Dkt. 58 at 8-9. The Court further referred to texts between Brown and Pierce as suggesting "arguably suggestive of some level of knowledge by Brown of Pierce's deceptive conduct." Dkt. 58 at 10. There was no *direct* evidence that Brown knew that the Rental Listing website created by Pierce or Lloyd contained non-existent real estate listings.

That being said, the Court ultimately found that the evidence supported a conclusion that "the FTC has shown a reasonable likelihood of success on its contention that Brown was aware of, was recklessly indifferent about, or deliberately avoided knowledge of the deceptive activity." [Dkt 58 at 10]. In that vein, the Court was persuaded that the FTC had a likelihood of showing Brown was on actual or constructive knowledge of the fake Craigslist ads due to BBB complaints reviewed by Brown.[4] *Id.* On February 21, 2017, the Court entered its Preliminary Injunction that granted the FTC's request for appointment of a Receiver and further adopted the freeze provisions set out in the TRO.

The combined effect of receivership and freeze orders is to strip any individual or corporate defendant of all rights to transact the Receivership Defendant's business and to prohibit individuals from using their own personal bank accounts. Individuals may ask the FTC to consent to payment of personal expenses, rent, food, gas, car payments, utilities, child care or other expenses to be

---

[2] Strictly speaking, there was no evidence that Mr. Brown could actually turn off Pierce's website, but he could prevent or "deactivate" individuals attempting to access CBC's website.

[3] Defendants respectfully take issue with this finding. Mr. Brown was unaware of Lloyd and dealt solely with Danny Pierce. There is a text from Brown to Pierce requesting that they modify their site to ask customers not to email their credit reports. This was intended to protect the security of credit reports from hackers. There was no contractual right to modify Pierce's website and the text was simply a request.

[4] Defendants respectfully take issue with this preliminary finding, which will be the subject of discovery and trial testimony.

4

paid out of their personal bank accounts. This high level of control over personal conduct is similar to the type of control exercised over criminal defendants before and after trial.

## II. The Language of the Statute Does Not Grant Authority to the FTC to File Damages Lawsuits.

### A. The FTC Act Provides for Administrative Adjudication of Deceptive Practices.

Under Section 5(b) of the FTC Act, the Commission may challenge "unfair or deceptive act[s] or practice[s]" (or violations of other consumer protection statutes) through maintenance of an administrative adjudication. When there is "reason to believe" that a law violation has occurred, the Commission may issue a complaint setting forth its charges. After hearing by an Administrative Law Judge ("ALJ"), the FTC may adopt the findings of the ALJ and enter an order which become final and binding 60 days after it is served unless the order is stayed by the Commission or by a reviewing court. The ALJ may propose a cease and desist order. If a respondent violates a final order, it is liable for a civil penalty for each violation, as set forth in Commission Rule 1.98(c). The penalty is assessed by a district court in a suit brought to enforce the Commission's order. The court may also issue "mandatory injunctions" and "such other and further equitable relief" as is deemed appropriate. (FTC Act, Section 5(l), 15 U.S.C. Sec. 45(l)).

### B. Section 13(b) Was Added in 1973 to Aid the FTC by Enjoining Current and Ongoing Future Violations of the Act.

Section 13(b) of the FTC Act, 15 U.S.C. Sec. 53(b), authorizes the Commission to seek preliminary and permanent injunctions to remedy "any provision of law enforced by the Federal Trade Commission." Section 13(b) was added to the FTC Act as part of amendments to the Trans-Alaska Pipeline Act of 1973. At the time, the provision was expected to be used principally for obtaining preliminary injunctions against corporate acquisitions, pending completion of FTC administrative hearings. Whenever the Commission has "reason to believe" that any party "is

violating, or is about to violate" a provision of law enforced by the Commission, the Commission may ask the district court to enjoin the allegedly unlawful conduct, pending completion of an FTC administrative proceeding to determine whether the conduct is unlawful. Further, under the second proviso of Section 13(b), "in proper cases," the Commission may seek, and the court may grant, a *permanent* injunction.[5]   As set out below, Defendants contend that this clause in the statute applies only to cases where the FTC has

Section 13(b) was not widely used by the Commission to seek damages to consumers for at least a *decade* after passage of Section 13(b) because the Commission understood the limitations of the narrow statutory scope of the provision. In the mid-1980s, the Commission began to make widespread use of the permanent injunction proviso of Section 13(b) in its consumer protection program to challenge cases of basic consumer fraud and deception. The Commission essentially argued that the proviso in Section 13(b) permitting a court to award a "permanent injunction" in "proper cases" was sufficient to allow the FTC to seek remedial monetary relief, or any other form of equitable relief from a district court.  The FTC also argued that, to preserve the possibility of ultimate monetary equitable relief, it should be able to obtain a freeze of assets and imposition of temporary receivers in appropriate cases.

The FTC, relying on *Porter v. Warner*, 328 U.S.395, 398 (1946) for the proposition that Congress, when it gives district court authority to grant  permanent injunction, it also grants authority to grant any ancillary relief necessary to accomplish complete justice because it did not

---

[5] Section 16 of the FTC Act, 15 U.S.C. Sec. 56, specifically authorizes the Commission to represent itself by its own attorneys in five categories of cases: (1) suits for injunctive relief under Section 13 of the FTC Act, 15 U.S.C. Sec. 53; (2) suits for consumer redress under Section 19 of the FTC Act, 15 U.S.C. Sec. 57b; (3) petitions for judicial review of FTC rules or orders or a cease and desist order issued under Section 5 of the FTC Act, 15 U.S.C. Sec. 45; (4) suits to enforce compulsory process under Sections 6 and 9 of the FTC Act, 15 U.S.C. Secs. 46 and 49.3,(5); and (6)and suits to prohibit recipients of compulsory process from disclosing the existence of the process in certain situations, section 21a of the FTC Act, 15 U.S.C. Sec. 57b-2a.

limit that traditional equitable power explicitly or by necessary and inescapable inference. *FTC v. H.N. Singer, Inc*., 668 F.2d 1107 (9th Cir. 1982); *see*, e.g., *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1024-28 (7th Cir. 1988). *Singer* opened the floodgates. The rule enunciated by the Supreme Court in *Porter* was rolled back fifty years later in 1996, in *Meghrig v. KFC Western, Inc*. 516 U.S. 479, 487-488 (1996). Although decided in the context of a RCRA suit, the *Mehrig* court analyzed the viability of the *Porter* decision:

> As we explained in *Middlesex County Sewerage Authority v. National Sea Clammers Assn.,* 453 U.S. 1, 14, 101 S.Ct. 2615, 2623, 69 L.Ed.2d 435 (1981), where Congress has provided "elaborate enforcement provisions" for remedying the violation of a federal statute, as Congress has done with RCRA and CERCLA, "it cannot be assumed that Congress intended to authorize by implication additional judicial remedies for private citizens suing under" the statute. " '[I]t is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it.' " *Id.,* at 14-15, 101 S.Ct., at 2623 (quoting *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 19, 100 S.Ct. 242, 247, 62 L.Ed.2d 146 (1979)).

The FTC has elaborate enforcement provisions in Section 19. Section 13(b) is intended to enjoin misleading or deceptive activity preserving the status quo pending the FTC's filing and resolution of adjudicative remedies. In *Kokesh,* the Supreme Court specifically considered the Porter case holding that:

> When an individual is made to pay a noncompensatory sanction to the Government as a consequence of a legal violation, the payment operates as a penalty. *See Porter v. Warner Holding Co*. 328 U.S. 395, 401 (66 S.Ct 1086, 90 L. Ed. 1332 (1946) (distinguishing between restitution paid to an aggrieved party and penalties paid to the Government).

As set out above, the circuit courts' reliance on *Porter* as authority to impose "equitable" asset freezes, disgorgement and restitution was unsupported and ignored the fact that: (1) disgorgement was used as a deterrent, which is a hallmark of a penalty; and (2) that seizure of funds constituted

penalty because the funds, in large measure, were never paid to victims but were paid to the United States Treasury.

### 3. Section 13(b) Itself Does Not Confer General Equitable Authority in FTC Cases.

It is important to note what Section 13(b) actually provides and does not provide:

> **(b)** TEMPORARY RESTRAINING ORDERS; PRELIMINARY INJUNCTIONS
>
> Whenever the Commission has reason to believe—
>
> **(1)** that any person, partnership, or corporation is <u>violating</u>, or is <u>about to violate</u>, any provision of law enforced by the Federal Trade Commission, and
>
> **(2)** that the enjoining thereof **<u>pending the issuance of a complaint</u>** <u>by the Commission and until such complaint is dismissed by the Commission or set aside by the court on review, or</u> **<u>until the order of the Commission</u>** <u>made thereon has become final, would be in the interest of the public</u>— the Commission by any of its attorneys designated by it **<u>for such purpose</u>** <u>may bring suit in a district court of the United States to enjoin any such act or practice.</u> Upon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest, and after notice to the defendant, a temporary restraining order or a preliminary injunction may be granted without bond: *Provided, however*, That if a complaint is not filed within such period (not exceeding 20 days) as may be specified by the court after issuance of the temporary restraining order or preliminary injunction, the order or injunction shall be dissolved by the court and be of no further force and effect: *Provided further*, <u>That in proper cases the Commission may seek, and after proper proof, the court may issue,</u> **<u>a permanent injunction</u>**. Any suit may be brought where such person, partnership, or corporation resides or transacts business, or wherever venue is proper under section 1391 of title 28. In addition, the court may, if the court determines that the interests of justice require that any other person, partnership, or corporation should be a party in such suit, cause such other person, partnership, or corporation to be added as a party without regard to whether venue is otherwise proper in the district in which the suit is brought. In any suit under this section, process may be served on any person, partnership, or corporation wherever it may be found.

(emphasis supplied). This one (very lengthy) sentence must be interpreted as a whole and harmonized to effect Congressional intent.

### 1.  The Court Must Interpret and Apply the Plain Language of the Statute.

It *appears* that none of the circuit courts interpreting Section 13(b) applied the plain language doctrine in reaching their conclusion that the FTC can file actions for injunctive relief that provide for disgorgement and restitution.[6]

It is axiomatic that the Court must interpret the plain language of a statute to determine its meaning and the intent of Congress. The Court's first step in interpreting a statute is to determine whether language at issue has plain and unambiguous meaning with regard to a particular dispute in the case.  *Robinson v. Shell Oil Co.,* 519 U.S. 337 (1997).  The Court's inquiry must cease if statutory language is unambiguous and "the statutory scheme is coherent and consistent."  *Id.* at 340. The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole. *Id.* at 341.  "In the absence of a conflict between reasonably plain meaning and legislative history, the words of the statute must prevail." *Aaron v. SEC,* 446 U.S. 680, 700 (1980). Moreover, "[s]ince the language and legislative history . . . are dispositive, we have no occasion to address the 'policy' arguments advanced by the parties." *Id.* at 700 n.19 *citing Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 214 n.33 (1976)).

In *Robinson*, the Court found the term "employees" was ambiguous because the Title VII retaliation suit was brought by a <u>former</u> and not a <u>current</u> employee.  Because the statute was ambiguous, the Court then reviewed the broader context of the statute itself.  Other

---

[6] *See  F.T.C. v. Gem Merch. Corp.*, 87 F.3d 466, 469 (11th Cir. 1996); *FTC v. Pantron I Corp.,* 33 F.3d 1088, 1102 (9th Cir.1994); *FTC v. Sec. Rare Coin & Bullion Corp.,* 931 F.2d 1312, 1316 (8th Cir.1991); *FTC v. Amy Travel Serv., Inc.,* 875 F.2d 564, 571–72 (7th Cir.1989); *FTC v. Cantkier,* 767 F.Supp.2d 147, 160 (D.D.C.2011);  *FTC v. Southwest Sunsites, Inc.,* 665 F.2d 711 (5th Cir.1982).

provisions of the statute "plainly contemplate that "*former employees* will make use of the remedial mechanisms of Title VII ... Indeed, § 703(a) expressly includes discriminatory "discharge" as one of the unlawful employment practices against which Title VII is directed. 42 U.S.C. § 2000e–2(a). *Robinson,* 519 U.S. at 345 (emphasis supplied).

The FTC purports to have authority to file this enforcement action under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b). [Dkt 1]. Significantly, Section 13(b) authorizes the FTC to file suit in federal court seeking an "injunction" only when a defendant allegedly "***is violating, or is about to violate***, any provision of law enforced by the Federal Trade Commission." (emphasis added). Under Section 13(b), therefore, the FTC's authority to sue in federal court for injunctive relief is <u>limited</u> to matters involving ***ongoing*** or ***imminent future*** conduct when there is a need for ***<u>prospective</u>*** relief (*i.e.*, where a party is currently violating the FTC Act or is about to do so). There is nothing ambiguous about the words—"violating or is about to violate." Nor do these terms remotely refer to historical conduct or the FTC's standing to seek damages for past conduct.

Section 13(b) further limits the scope of the FTC's authority to seek injunctive relief from a district court by the phrase allowing "the Commission by any of its attorneys designated by it <u>for such **purpose**</u> <u>may bring suit in a district court of the United States to enjoin any such act or practice.</u> This phrase conditions the authority of the Commission or its attorneys to bring an action only to "enjoin any such act or practice." Clearly, there is **<u>nothing</u>** in this provision that authorizes the FTC to "enjoin any such act or practice" into a full fledged damages lawsuit for past allegedly deceptive acts. In sum, the plain language of the statute does <u>not</u> allow the FTC to go any further than seeking an injunction to protect consumers while the Commission pursues adjudicatory proceedings under Section 5.

10

In *Davis v. Michigan Dept. of Treasury,* 489 U.S. 803, 809 (1989) the Court held that: "It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."  A result that frustrates the overall intention of Section 13(b)--to allow injunctive relief pending adjudicatory proceedings before the Commission--clearly runs afoul of the overall meaning and intent of Section 13(b).

Section 13(b) also makes reference to a subsequent clause providing: "*Provided further*, That in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction."  (emphasis supplied).  Proper cases refer to the antecedent clauses which make clear that Section 13(b) authorizes injunctive relief pending filing of a complaint by the Commission under Section 19(a).   As noted above, various circuit courts seized on this part of Section 13(b) to create equitable powers that Congress never intended to grant to district courts.[7]  If Congress wanted to grant broad authority to the FTC to pursue damages, restitution and disgorgement actions, it would have expressly provided for these powers in Section 13(b).[8]

## 2.  Section 19(b) Supports the Context of Section 13(b).

Even though the plain meaning and context of Section 13(b) stands on its own, Section 19 amplifies the context of the statute.

The FTC Act was enacted in 1914, in response to widespread concern about the growth and behavior of monopolies and cartels.  The Act was originally designed to protect the

---

[7] The use of this term is nothing more than a pretext to dramatically expand the scope of the FTC's authority, and manifests an infidelity to the plain language of the statute as well as Congressional Intent.

[8] Simply stated, the expansive approach by the FTC and Courts in the interpretation of Section 13(b) appears to be motivated more by social philosophy than established principles of statutory construction.

marketplace by prohibiting "unfair methods of competition." Congress amended the FTC Act in 1938 to also prohibit "unfair or deceptive acts or practices". The FTC was then tasked with protection of consumers as well as business competition. Under this statutory scheme, if the FTC determines that a company has violated the prohibitions against unfair methods of competition or unfair or deceptive acts or practices, it "shall issue ... an order requiring such person, partnership, or corporation to cease and desist from using such method of competition or such act or practice."

In 1975, two years after adopting Section 13(b), Congress adopted Section 57(a), which authorizes "Suits by Commission Against Persons, Partnerships, or Corporations; Jurisdiction Relief for Dishonest or Fraudulent Acts." This provision provides that the Commission pursue *adjudicatory* proceedings and also specifically provides for remedies that may be <u>enforced</u> by the district courts upon final resolution of the case. Section 19 of the FTC Act, 15 U.S.C. § 57(b) provides:

> The court in an action under subsection [19] (a) shall have jurisdiction to grant such relief as the court finds necessary to redress injury to consumers or other persons, partnerships, and corporations resulting from the rule violation or the unfair or deceptive act or practice, as the case may be. Such relief may include, <u>but shall not be limited to</u>, *rescission or reformation of contracts, the refund of money or return of property, the payment of damages, and public notification respecting the rule violation or the unfair or deceptive act or practice, as the case may be*; <u>except that nothing in this subsection is intended to authorize the imposition of any exemplary or punitive damages.</u> (emphasis supplied).

Section 57(c), in turn allows the FTC to file a civil action to enforce a cease and desist order. In an article, two commentators thoroughly analyzed the legislative history of Section 13(b) and Section 19:

> Just two years after the enactment of Section 13(b), Congress enacted two new provisions that authorized the FTC to seek monetary relief--<u>but only under specified circumstances</u>. As noted above, Section 19

authorized consumer redress following issuance of a cease-and-desist order when a reasonable man would have known the conduct was "dishonest or fraudulent," and Section 5(m)(1)(B) authorized issuance of civil penalties following a litigated Commission determination that a practice was unfair or deceptive if the defendant had "actual knowledge" of that finding. The enactment of these provisions by those in Congress responsible for FTC oversight-- again, just two years after the enactment of Section 13(b)--is illuminating because it suggests that no one at the time understood Section 13(b) to authorize an award of consumer redress in all cases. (emphasis supplied)

J. Howard Beales & Timothy J. Muris, Striking the Proper Balance: Redress Under Section 13(b) of the FTC Act, 79 Antitrust L.J. 1, 16-17 (2013).

Congress did not authorize the FTC to authorize punitive actions against FTC violators; yet, the FTC has persuaded district courts to impose draconian measures that were never even considered by Congress. While FTC administrators and trial judges may feel that disgorgement and restitution provide the best remedy for consumers, district courts must interpret and apply the law as Congress intended, and not based on their own notions of equity or social justice.

Congress did not intend that the FTC extract punishment under the guise of an equitable remedy. Although prior appellate decisions have allowed disgorgement, these pre-*Kokesh* decisions simply reached the wrong conclusion. The FTC's motion for receivership and asset freeze for all CBC's and Michael Brown's personal assets is wholly unsupported by authority. Accordingly, the receivership should be dissolved, the bank accounts and assets belonging to CBC and Michael Brown must be returned. The injunctive relief imposed by this Court would be unaffected by this part of the Defendants' motion.

13

### 3. Section 13(b)'s Legislative History Demonstrates That Disgorgement was Never Contemplated or Authorized by Congress.

The FTC has ample authority to obtain injunctive relief and pursue penalties through the administrative process. The FTC decided to do an end-run around its own procedures by invoking Section 13(b) of the FTC Act. However, there is overwhelming evidence that Section 13(b) of the FTC Act was added to the FTC Act to protect consumers from deceptive trade practices during potentially protracted administrative proceedings. This provision was not intended, nor did Section 13(b) authorize disgorgement and restitution proceedings in federal courts.

In debating amendments to the FTC Act, there were continuing concerns about the FTC seeking monetary relief on the basis of vaguely defined prohibitions. *See id.* at 8 (2013) (citing 117 Cong. Rec. at H39,626).

Section 13(b) was added to the FTC Act in 1973 as part of the Trans-Alaska Pipeline Act, P.L. 93-153, § 408, 87 Stat. 592 (1973). A Senate Report for an earlier proposal to give the FTC injunctive authority noted the concern that the agency needed a means "to bring an immediate halt to unfair or deceptive acts or practices where to do so would be in the public interest" because, at the time, "such practices might continue for several years until agency action is completed." S. Rep. No. 93-151, at 30-31 (1973). The debates over Section 13(b) are replete with statements emphasizing the importance of empowering the FTC to stop ongoing violations of law through forward-looking injunctive relief. See 119 Cong. Rec. 36,609 (1973) ("Without this injunction power consumers have no protection at all during the pendency of the suit and competitors must have sufficient resources to survive or to finance the complex litigation necessary to assert their rights.") (statement of Rep. Smith); *id.* at 36,610 ("[I]t is essential that the Commission have authority to prevent the aggregation of serious public harm during the period required for the Commission to complete cease and desist order proceedings and attendant appeals.") (statement

14

of Rep. Johnson); id. at 36,612 ("What does this bill really do to the powers of the Federal Trade Commission? It will permit the FTC to go to court and ask for injunctions to restrain violations of "ongoing or future violations" of the FTC Act). *FTC v. Evans Prods.* Co., 775 F.2d 1084, 1087 (9th Cir. 1985).

In *Evans Products*, the Ninth Circuit recognized that: "[t]he sparse legislative history [of Section 13(b)] also indicates that Congress only contemplated ongoing or future violations which required the 'quick handling' that an injunction could provide." Id. In sum, the FTC's authority to seek injunctive relief in federal court was intended as a limited tool, to be used only in situations requiring immediate action to prevent ongoing or threatened consumer harm, and not as an alternative to replace administrative proceedings that the FTC utilized for *five decades*. This is perhaps best demonstrated by the FTC's practice in merger cases, where it simultaneously commences proceedings in both the federal and administrative courts. The FTC asks the federal court for a preliminary injunction (preventing the parties from consummating their merger to preserve the status quo under Section 13(b), but simultaneously reserves the adjudication of the merits of the FTC's case against that merger for the administrative proceedings.[9]

### III.    *Kokesh* Changes the Landscape of FTC Litigation

In *Kokesh,* the Court *unanimously* held that disgorgement was a penalty designed to punish violations of the securities laws.  "Disgorgement, as it is applied to SEC proceedings, operates as

---

[9] See e.g. *FTC v. Penn State Hershey Med. Center*, No. 1:15-cv-2362 (3d Cir. June 1, 2016), available at https://www.ftc.gov/system/files/documents/cases/160601pinnacleappealbrief.pdf ("In the meantime, the FTC and the Commonwealth of Pennsylvania asked the district court below to issue a preliminary injunction preventing the merger from closing before the administrative adjudication is complete. Recognizing the need to protect consumers from competitive harm until the adjudication is finished and to preserve the FTC's ability to secure effective relief if the merger is held unlawful, Congress authorized district courts to grant preliminary injunctions temporarily barring mergers in this type of case. 15 U.S.C. § 53(b)."); Complaint at 2, FTC v. Penn State Hershey Med. Center, No. 1:15-cv- 2362 (M.D. Pa. Dec. 9, 2015), available at https://www.ftc.gov/system/files/documents/cases/160408pinnacleamendcmplt.pdf

a penalty under § 2462." *Kokesh,* 137 S.Ct. at 1645 (emphasis supplied). The *Kokesh* Court was deeply concerned about the lack of explicit statutory authority for the SEC to impose disgorgement and restitution. The FTC Act similarly does not provide for express statutory authority to seek disgorgement or restitution nor does it specifically authorize damages. As previously stated, under the FTC's adjudicatory process, the courts may not impose any punitive damages sought by the FTC during the enforcement process. Indeed, the FTC Act specifically prohibits the FTC from seeking any punitive damages (or penalties) in district court proceedings.[10] 15 U.S.C. §57b. Like the SEC, the Federal Trade Commission has a full panoply of enforcement tools: It may promulgate rules, investigate violations of those rules and the [unfair trade practices] laws generally, and seek damages or injunctive relief for those violations. *Kokesh*, 137 S. Ct. at 1641; Section 19, FTC Act.

Like the SEC, the FTC Act authorized *only* injunctive relief but that power has been misused by the SEC to seek court-ordered disgorgement and restitution. *Id.* at 1640. The *Kokesh* Court further found that the disgorgement remedy was a penalty and form of punishment because when "the SEC seeks disgorgement, it acts in the public interest to remedy harm to the public at large rather than standing in the shoes of particular injured parties." *Id.* at 1653. Moreover, the Court held that SEC disgorgement is not compensatory as courts "have required disgorgement 'regardless of whether the disgorged funds will be paid to such investors as restitution.'" *Id.*at 1645. "Some disgorged funds are paid to victims; other funds are disbursed to the United States Treasury." Id. at 1644.

Even though district courts may distribute the funds to the victims <u>they have not identified any statutory command that they do so.</u> **When an individual is made to**

---

[10] Regardless of whether disgorgement is called a penalty, punitive damages, exemplary damages or "redress," the unauthorized taking of funds which are not required to be paid directly to victims is a penalty. *Kokesh*, 137 S.Ct. at 1645.

**pay a non-compensatory sanction to the Government as a consequence of a legal violation, the payment operates as a penalty.**

SEC disgorgement thus bears all the hallmarks of a penalty:  It is imposed as a consequence of violating a public law and it is intended to deter, not to compensate.

(emphasis supplied).   Thus, the *Kokesh* court  held that: "Deterrence…has traditionally been viewed as a goal of punishment." Id. at 1643.  Similarly, the Court held that even if disgorgement served a dual compensatory as well as a punitive or deterrent purpose, use of disgorgement would still represent a form of punishment or penalty. Id. at 1645.[11]

## A. *Kokesh* Applies With Equal Force to FTC Proceedings.

Disgorgement requires that the defendant give up "those gains…properly attributable to the defendant's interference with the claimant's legally protected right." *Kokesh*, at 1640. However, disgorgement did not return defendant back to the place he would have occupied had he not violated the law, because disgorgement often exceeds the profits obtained by the defendant and is often imposed without considering "defendant's expenses that reduced the amount of illegal profit." *Id.* at 1644.  In other words, rather than restoring the status quo ante, disgorgement in the SEC context left the defendant worse off." *Id*. at 1645.   Disgorgement in FTC proceedings similarly does not allow for reduction of expenses.

Use of disgorgement is a powerful tool to extract one-sided settlements from alleged violators and has become a profit center for the United States treasury.  Reports issued by the FTC highlighting its performance collected by the amounts paid to consumers averaged only 38% over a three-year period.

2014- $185 Million Disgorged-$38 Million Paid to Consumers-20%, **Exhibit 1**

---

[11] The Court specifically referred to the Eighth Amendment's prohibition against excessive fines as part of its analysis in *Kokesh*.

2015- $204 Million Disgorged-$49 Million Paid to Consumers-24%, **Exhibit 2**

2016-$309 Million Disgorged-$176 Million Paid to Consumers-56%, **Exhibit 3**

The FTC did not actively seek disgorgement in FTC cases until 2012. Since that time, the FTC's use of disgorgement as a remedy dramatically increased in 2015-2016. **Exhibit 2 and 3.**

Most individuals in FTC actions *immediately* lose all access to their funds to defend themselves unless they have businesses or accounting that separates out tainted versus untainted funds. This sets up a scenario that an individual must consent to a government agency's proposed "consent" order because they cannot pay their personal bills and lose everything they own. The Government essentially gains control over everything a defendant owns---from their business, homes, cars and personal bank accounts, and the FTC, Receiver or a Court dictates how much money can be spent on food, clothing, and rent until the case is resolved**. Exhibit 4;** Declaration of Michael Brown Regarding Motion to Modify Preliminary Injunction.

At the same time, the FTC then urges alleged violators to settle their case to avoid losing everything they have and/or face an industrywide bar on related FTC matters.

### B. The FTC Uses Disgorgement as a Deterrent for Other Potential Violators.

One of the factors considered by the Supreme Court in determining that disgorgement was a penalty was the intended use of the remedy by the SEC. Sanctions as a result of violating public laws are inherently punitive because "deterrence [is] not [a] legitimate governmental objective. *Kokesh* 137 S.Ct. at 1643. Deterrence…has traditionally been viewed as a goal of punishment." *Id.* at 1644. Specifically, the fact that the SEC used disgorgement, and the threat of disgorgement as a deterrent to potential violators demonstrated that use of the penalty was to punish Defendants and not to compensate alleged victims. *Id.* at 1643.

1. <u>FTC Precedent Shows Disgorgement is Designed to Deter.</u>

In *FTC v. Bronson*, 654 F.3d 359, 373 (2d Cir. 2011), the Court held that where disgorgement is sought, it is the government, not the victim of the wrongdoing, who seeks to recover the defendant's unlawful gains.

> It is well established that "courts of equity will go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved." *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.,* 527 U.S. 308, 326, 119 S.Ct. 1961, 144 L.Ed.2d 319 (1999) (internal quotation marks omitted). In light of this fact, and **because "the primary purpose of disgorgement orders is to deter violations of the [ ] laws by depriving violators of their ill-gotten gains,"** *SEC v. Fischbach Corp.,* 133 F.3d 170, 175 (2d Cir.1997), a regulatory agency seeking disgorgement need <u>not</u> identify specific victims to whom payment is due "in good conscience," as it would be required to do if seeking to impose a constructive trust. *See Knudson,* 534 U.S. at 213, 122 S.Ct. 708. Indeed, in some securities enforcement cases, the nature of the harm is so diffuse that the specific identities of the victims would be nearly impossible to ascertain and the quantum of their individual entitlements too minimal to compute.
>
> <u>Nor, having obtained  disgorgement award are public entities required to make any particular effort to compensate the victims that they *can* identify.</u> *See Fischbach,* 133 F.3d at 176;…. (emphasis supplied).

The *Bronson* Court nevertheless did not require the FTC to satisfy the tracing rules and the defendant in a disgorgement action is not entitled to deduct cost associated with committing their illegal acts. *Id.* at 374 *citing SEC v Cavanagh*, 445 F.3d 105 (2d Cir 2006).

In *FTC v. Loan Pointe, LLC*, 525 Fed. Appx. 696 (10th Cir. 2013) also found that disgorgement "is a distinctly public-regarding remedy, available only to government entities seeking to enforce explicit statutory provisions…Its primary purpose 'is to deter violations of the laws by depriving violators of their ill-gotten gains.'"  *Id.* at 698 *citing Bronson*654 F.3d at 374. The Court, in *Gem Merchandising* 87 F.3d at 470 held that: "disgorgement, the purpose of which 'is not to compensate the victims of fraud, but to deprive the wrongdoer of his ill-gotten gain, is

appropriate." *Citing SEC v. First City Financial Corp*, 890 F.2d 12 15, 1230 (D.C. Cir. 1989) (permitting disgorgement and observing that "disgorgement is an equitable remedy designed to deprive a wrongdoer of his unjust enrichment and to deter others from violating the securities laws); *CFTC v. Co. Petro Marketing Group, Inc* 68 F.3d 573, 583-84 (9th Cir. 1982) (permitting disgorgement and recognizing it deterrent effect).

2.    The FTC Itself Views Disgorgement as a Deterrent.

Similarly, the FTC has recently and historically made clear, unequivocal statements that they view deterrence as a primary reason for disgorgement.    In an April 17, 2015 statement by the FTC on settlement of an anti-trust case, the FTC emphasized that:

> This case therefore presents precisely the type of situation in which we appropriately "start from the premise that an injunction against future violations is not adequate to protect the public interest." **Exhibit 5** at 3.

> The imposition of injunctive relief alone would fail to adequately remedy the harm caused by Cardinal's past conduct and would have **insufficient deterrent effect**."  **Exhibit 5** at 5.

> Disgorgement deters subsequent conduct simply by sending a message that **wrongdoers**, if caught, will not be able to profit from their wrongdoing." (emphasis supplied). **Exhibit 5** at 6.

In a separate document, David Fitzgerald, a former Assistant Director for Litigation in the Commission's Bureau of Consumer Protection from 1982 to 1990 stated:

> Don't overlook the value of basic research. **Neither the text of Section 13(b) nor its legislative history disclosed a basis to argue for broad equitable relief.** Instead of stopping there, however, research into the case law interpreting statutes conferring similar injunctive authority on other agencies led to the *Porter* line of cases, providing critical support for a broad interpretation of Section 13(b).

**Exhibit 6**, Fitzgerald, Unpublished Paper, The Genesis of Consumer Protection Remedies Under Section 13(B) Of The FTC Act. (emphasis supplied).

On July 31, 2003, the Commission issued a policy statement that extolled deterrence as one of the primary policies to be achieved in disgorgement actions: "In such cases, the use of

disgorgement will serve an appropriate deterrence goal. One key purpose of the disgorgement remedy is to remove the incentive to commit violations by demonstrating to the potential violator that unlawful conduct will not be profitable. This purpose can best be served when the violator can determine in advance that its conduct would probably be considered illegal."[12]   Based on the above court decisions, FTC statements and commentators, it is clear that the disgorgement and restitutionary remedies sought by the FTC are designed to deter potential violators and is therefore designed as a penalty.

### C. There is No Guarantee that Victims Receive Funds From Disgorgement.

There is no guarantee that disgorgement and restitution actually results in payment to alleged victims.  Amounts collected but not paid out to alleged victims are paid to the United States Treasury.  Justice Gorsuch expressed concern that there was no statute governing the disposition of disgorged funds:  "Well, here we don't know, because there's no statute governing it. We're just making it up."  **Exhibit 7** Supreme Court Transcript of Oral Argument at 52.  Moreover, the FTC issues no guidelines to their staff on how to pursue disgorgement/restitution penalties.[13]   Justices Kennedy, Sotomayor and Alito asked the Solicitor General for any authority supporting their argument.  **Exhibit 7** at 7-8, 9, 13.

### IV.    The FTC's Taking Violates the Fourth Amendment and Fifth Amendment.

The Fourth Amendment provides that:

The right of the people to be secure in their persons, houses, papers, and effects, against <u>unreasonable searches and seizures</u>, shall not be violated, and no warrants

---

[12] Policy Statement On Monetary Equitable Remedies -- Including in Particular Disgorgement and Restitution – In Federal Trade Commission Competition Cases Addressing Violations of the FTC Act, the Clayton Act, or the Hart Scott-Rodino Act (July 31, 2003), available at https://www ftc.gov/public-statements/2003/07/policy-statement-monetaryequitable-remedies-including-particular.

[13] *Supra* note 12. *See also* Dollars, Doctrine, and Damage Control: How Disgorgement Affects the FTC's Antitrust Mission Maureen K. Ohlhausen, Commissioner, Federal Trade Commission.  Ms. Ohlhausen is now Acting Commissioner of the FTC, **Exhibit 8**.

> shall issue, but upon <u>probable cause</u>, supported by oath or affirmation, and <u>particularly describing the place to be searched</u>, and the persons or things to be seized. (emphasis supplied).

The seizure and subsequent search of CBC's and Michael Brown's assets violated the Fourth Amendment because the search and seizure was based solely on the proposition that the FTC can obtain assets and records for disgorgement and restitution. See *H.N. Singer, Inc*., at 1111-1112; *World Travel Vacation* 861 F.2d at 1024-28.[14]  In *Kokesh*, the Solicitor General specifically invoked the Court's decision in *Porter* as supporting its authority in SEC proceedings,[15] and the *Kokesh* court unanimously found that *Porter* supported its conclusion that a requiring an individual to pay a non-compensatory sanction operates as a penalty. *Kokesh,* 137 S. Ct. at 1644.

### A.  The TRO Was Not a Warrant Within the Meaning of the Fourth Amendment.

The TRO was not a warrant within the meaning of the Fourth Amendment.  The TRO was not authorized by statute, and did not particularly state the specific offenses committed, the location of the evidence and a factual basis for why there was probable cause to seize the evidence at the time of issuing the TRO.   The TRO was nothing more than a *general warrant* similar to the warrants that were a recurring point of contention in the Colonies immediately preceding the Revolution.   *See e.g.* Dickerson, Writs of Assistance as a Cause of the Revolution in the Era of the American Revolution 40 (R. Morris ed. 1939).  As a result, the Framers placed precise limits on the issuance of warrants. *Camera v Municipal Court*, 387 U.S. at 528-529 (warrant clause applies to inspections for compliance with regulatory statutes); *City of Seattle*, 287 U.S at 543 (same).

---

[14] Other circuits relying on *Porter* as authority to enlarge Section 13(b)'s equitable powers to include disgorgement and restitution in FTC proceedings include:  *Gem Merch. Corp.*, 87 F.3d at 469 ; *Pantron*  33 F.3d at 1102; *Rare Coin & Bullion Corp.,* 931 F.2d at 1316;  *Amy Travel Serv., Inc.,* 875 F.2d at 571–72; . *Cantkier,* 767 F.Supp.2d at 160;  *Southwest Sunsites, Inc.,* 665 F.2d at 711.

[15] *See* Respondent's Brief at 18, 26-27, 41, Appellant's Brief, Kokesh v. SEC, No. 16-529.

The Fourth Amendment provides that, 'The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and <u>particularly describing the place to be searched, and the persons or things to be seized</u>.' **The basic purpose of this Amendment, as recognized in countless decisions of this Court, is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials.** The Fourth Amendment thus gives concrete expression to a right of the people which 'is basic to a free society.' *Wolf v. People of State of Colorado*, 338 U.S. 25, 27, 69 S.Ct. 1359, 1361, 93 L.Ed. 1782.

Though there has been general agreement as to the fundamental purpose of the Fourth Amendment, translation of the abstract prohibition against 'unreasonable searches and seizures' into workable guidelines for the decision of particular cases is a difficult task which has for many years divided the members of this Court. Nevertheless, one governing principle, justified by history and by current experience, has consistently been followed: except in certain carefully defined classes of cases, a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant. [citations omitted]. (emphasis supplied)

*Camera* 387 U.S. at 528-529. The FTC stated that its application for TRO was based on good cause. Good cause is not synonymous with particularized probable cause under the Fourth Amendment. The TRO simply stated that the allegations in the Complaint provided "good cause" to seize all CBC and Michael Brown's assets. The search was overly broad.

Simply stated, the FTC's quest for evidence was motivated by a desire to collect evidence that could have been used for either civil or criminal proceedings and was certainly intended to obtain evidence supporting penalties of disgorgement. The FTC was searching for evidence relating to non-existent real estate ads used on Craig's List. The seizure and subsequent search required the FTC to obtain a warrant under the Fourth Amendment. Use of "equitable authority" does not pass muster for warrantless searches under the Fourth Amendment.

It is well established that a seizure lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes possessory interests, for example, retaining property for an unreasonably long time. *Mateos-Sandoval v. Cty. of Sonoma,*

23

942 F. Supp. 2d 890, 910 (N.D. Cal. 2013), *aff'd sub nom. Sandoval v. Cty. of Sonoma,* 591 F. App'x 638 (9th Cir. 2015), *opinion amended and superseded on denial of reh'g,* 599 F. App'x 673 (9th Cir. 2015), *and aff'd sub nom. Sandoval v. Cty. of Sonoma*, 599 F. App'x 673 (9th Cir. 2015); *United States v. Jacobsen*, 466 U.S. 109, 124 & n. 25, 104 S.Ct. 1652, 80 L. Ed.2d 85 (1984).

Other than the FTC's bald allegations that an Ex Parte Motion was necessary, there was no sworn testimony or affidavit setting out probable cause for the seizure nor was there an emergency or any evidence *at the time* of seeking imposition of a receivership (and turnover of the documents and assets) that CBC or Brown would flee the jurisdiction or transfer assets to avoid FTC conduct. The FTC's "*Ex Parte* Temporary Restraining Order, with Asset Freeze, Appointment of a Receiver, Other Equitable Relief, and Order to Show Cause Why a Preliminary Injunction Should Not Issue" [Dkt. 16] fails to articulate the basis for ex parte injunctive relief under F. R. Civ. P. 65 and fails to apply for seizure of assets based on probable cause; instead, asserting it had "good cause," whatever that is.

Counsel recognizes that the FTC may invoke the good faith exception to the exclusionary rule. However, the good faith exception requires adherence to rules that bound the FTC to satisfy Rule 65(b) and the Fourth Amendment. Similarly, the Supreme Court's *unanimous* ruling in *Kokesh* was predictable given its peremptory rejection of the Government's reliance on *Porter* to justify the *extraordinary* expansion of equitable powers under Rule 13(b).

Rule 65(b)(2) provides, in pertinent part, that "Every temporary restraining order issue without notice must …describe the injury and state why it is irreparable; state why the order was issued without notice…." There was neither an allegation in the TRO or the Complaint setting out why *ex parte* relief was necessary. There was no factual basis, *prior to seizure*, setting forth evidence that information would be destroyed or that assets would be secreted or taken outside the

jurisdiction of the Court.  Even *assuming* that the FTC was not aware of the pending decision in *Kokesh*, it disregarded Rule 65(b)(2).[16]  The evidence seized from CBC and Michael Brown should be excluded from evidence at trial.

Moreover, the seizure was overly broad including all domain names, personal bank accounts, bank account records, and assets owned by CBC and Brown.  <u>The FTC purportedly started investigating this case in March 2016 and could have prevented nine months of alleged consumer injury if they had simply picked up the phone or sent a cease and desist "demand" letter followed by legal action if necessary.</u>  **Exhibit 4**, Brown Declaration ¶ 4d.  Instead, the FTC's goal was to shut the business down, strip CBC and Michael Brown of all assets and then talk about settling the case.  As a government agency, the FTC is charged with knowledge of Supreme Court cases that limit their authority.  It appears that the FTC forged ahead with seizure of everything owned by CBC and Brown notwithstanding the Supreme Court's decision in *Kokesh*.  Simply stated, this course of action was unreasonable.

The Fourth Amendment requires that a search warrant be narrow in scope and cannot be overly broad. *Mink v. Knox*, 613 F.3d 995, 1010 (10th Cir. 2010). A warrant is overly broad if it does not contain sufficiently particularized language that creates a nexus between the suspected crime and the items to be seized. *See Campos*, 221 F.3d 1143, 1147 (10th Cir. 2010); *United States v. Grimmett*, 439 F.3d 1263, 1271 (10th Cir.2006). In *United States v. Otero*, 563 F.3d 1127 (10th Cir.2009), the Court recognized that [t]he modern development of the personal computer and its ability to store and intermingle a huge array of one's personal papers in a single place increases

---

[16] Counsel recognizes that the FTC may invoke the good faith exception to the exclusionary rule. However, good faith requires adherence to rules that bound the FTC to satisfy Rule 65(b) and the Fourth Amendment.  Similarly, the Supreme Court's unanimous ruling in *Kokesh* was predictable given its peremptory rejection of the Government's reliance on *Porter* to justify the extraordinary expansion of equitable powers under Rule 13(b).

law enforcement's ability to conduct a wide-ranging search into a person's private affairs, and accordingly makes the particularity requirement that much more important. *See, e.g. United States v. Riccardi*, 405 F.3d 852, 863 (10th Cir.2005) (warrant authorizing general search of computer invalid as it permitted officers to search anything "from child pornography to tax returns to private correspondence"); *U.S. v. Carey*, 172 F.3d 1268, 1272 (10th Cir.1999) (computer search for files pertaining to distribution of controlled substances uncovered child pornography). *Id*. at 1132. We therefore held that "warrants for computer searches must affirmatively limit the search to evidence of specific ... crimes...." *Id*. (*quoting Riccardi*, 405 F.3d at 863 (emphasis added)).

## V.    Conclusion

Because a large percentage of funds seized by the FTC is not paid to victims and goes to the United States Treasury, the FTC's disgorgement remedy is a penalty and must be stricken from their complaint.[17]  Similarly, the FTC uses disgorgement as a deterrent and therefore a penalty.

In the instant case, the FTC's claim for disgorgement and asset freeze reflects a disturbing trend in government agencies suing for relief, immediately freezing all of Defendant's assets and aggressively limiting the individual's ability to assets and access to critical information to defend themselves in an FTC action.  The FTC has an extensive enforcement scheme that has been undermined by Section 13(b) actions seeking equitable disgorgement, restitution, and asset freezes.  While there are, no doubt, well intended agency officials and jurists who believe that use of disgorgement and restitution is the right social policy, the decision to grant this type of relief rests with Congress---not with the FTC or the district courts.

---

[17] In *FTC v. Febre*, 128 F.3d 530, 537 (7th Cir. 1997), the Seventh Circuit held that disgorgement did not amount to a penalty under Section 13(b) of the FTCA.  The *Febre* court also held that disgorgement is designed to be remedial and not punitive.  *Id.* Quite simply, *Febre* is overruled by *Kokesh*.

The seizure of CBC and all of Michael Brown's assets violated the Fourth Amendment. The *Kokesh* decision was predictable in light of the plain language of the Section 13(b) and the obvious language in *Porter* that distinguished between restitution paid to an aggrieved party and penalties paid to the Government. The *Kokesh* decision merely held that *Porter* did not provide support for imposing penalties against parties sued by the FTC. At that point, the FTC should have, but failed to release CBC and Michael Brown's assets. The Fourth Amendment protects citizens from such oppressive conduct. Accordingly, to deter the FTC and other government agencies, the Court should order return of all assets to CBC and Michael Brown forthwith and to suppress all such evidence, and the fruits of such evidence at trial.

Defendants request this Court take judicial notice of official records and/or statements of FTC officials, or articles that are widely disseminated on the internet. See Fed. R. Evid. 201. This includes Exhibits 1-3 and 5-8 which are attached for the Court's convenience.

WHEREFORE, Defendants CBC and Michael Brown request this Honorable Court dissolve the Receivership and modify the Preliminary Injunction to strike all provisions that limit or restrict CBC or Michael Brown from their access and use to all assets seized by the FTC.

By: /s/ Stephen R. Cochell

Stephen R. Cochell
Texas Bar No.: 24044255
2616 South Loop West, Ste 470
Houston, Texas 77054
Telephone: (346) 800-3500
Facsimile: (281) 783-6800

**Attorney for Defendants Credit Bureau Center, LLC and Michael Brown**

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing instrument has been served upon all counsel of record pursuant to the Court's ECF system.

/s/ Stephen R. Cochell
Stephen R. Cochell