**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **FEDERAL TRADE COMMISSION** | § | **Case No. 17-cv-194** |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | **Judge Kennelly** |
| | § | |
| **CREDIT BUREAU CENTER, LLC,** *et al.,* | § | |
| | § | |
| **Defendants.** | § | **Magistrate Judge Valdez** |

### DECLARATION OF MIKE BROWN IN SUPPORT OF DEFENDANTS MOTION FOR SUMMARY JUDGMENT

**MICHAEL BROWN**, under penalty to perjury and in accordance with 28 U.S.C. §1746, states and declares that the following is true and correct:

1. As a non-lawyer, I view this case as having two issues that are separate: (1) Did I know about Pierce and Lloyd's scheme and if not, did I recklessly disregard the facts and therefore cause injury to consumers as a result; and (2) Were there any compliance problems with CBC's website?

2. I am currently age 33. My educational background includes getting a GED. I took a few courses in community college related to computer science, however I am mostly self-taught as a programmer.

3. Because of my knowledge in computer programming, I developed a program that made the customer service department at Experian more efficient. Because of this, I was moved to the software development department. After approximately six years of working at Experian, I started my own business. CBC was created in August, 2011.



EXHIBIT
A

1

4. While working at Experian, Experian (FreeCreditReport.com) was involved in a lawsuit with the FTC, which was settled in 2005. Because of this, I became aware of the procedures necessary to ensure compliance with FTC regulations regarding negative options, ROSCA, and the free credit report rule.

5. My websites, eFreeScore.com and CreditUpdates.com were designed around the template used by Freescore360.com (owned by OneTechnologies) because OneTechnologies was recently forced to modify its website in order to comply with a FTC consent order. **Exhibit 1** https://www.ftc.gov/system/files/documents/cases/141121onetechstip.pdf.. I relied on this consent order to ensure that I would comply with all FTC rules and regulations.

6. In addition to the consent order, I made compliance measures based off various FTC publications. For example, one consent order mandated that the payment information be no smaller than 12-point font. **Exhibit 2** at 5027 (Page 10 - https://www.ftc.gov/sites/default/files/documents/cases/2005/08/050816stipfnl0223263.pdf ).

7. I have attached true and correct copies of the Landing page and webpages for both eFreeScore.com and CreditUpdates.com that were activated on or about December 1, 2015 and which were operational until the Court entered a Temporary Restraining Order on January 10th 2016. **Exhibit 3.** I will refer to these two sites as the "**Subject Websites**." The FTC's lawsuit does not allege that either of these sites violate FTC laws. We provided variations of these sites to our White Label partners under different names and url's.

8. We developed two different lines of business. One line was the White Label/Co-Branding and Direct Solicitations. The White Label/Co-Branding line of business basically allowed a business to offer the credit monitoring services we provided under their name or "white

label." The websites also generated credit monitoring services directly from consumers attracted to our websites. The other line of business was with affiliates who were compensated by CBC for referral of consumers to CBC's websites to obtain credit scores and credit monitoring.

9. I designed CBC's Landing pages and websites using the Freescore360.com and OneTechnologies sites as a guide. The goal was to make the Landing Page simple, direct and clear without cluttering the page with ads or unnecessary information that might confuse consumers. We were successful in growing the business increasing sales and revenues each year.

10. We had contracts with our white label "partners." The contracts all provided that the white label partner were independent contractors and had an independent responsibility to comply with " all applicable Laws, including, by way of illustration but not limitation, the Fair Credit Reporting Act (FCRA), the Gramm-Leach-Bliley Act (GLBA) and the rules and regulations promulgated by the Federal Trade Commission (FTC)."

11. Contracts for affiliates specifically provided that the affiliate "comply fully with all Federal Trade Commission regulations related to advertising" and defined that they are an independent contractor.

12. Revable, a company owned by Danny Pierce, (sometimes referred to as "Pierce") became an affiliate in 2013. A true and accurate copy of Pierce's electronic affiliate agreement is attached hereto as **Exhibit 4**. The Agreement provides, in pertinent part, that:

> It is the intent of MyScore to treat our customers fairly and to comply fully with all Federal Trade Commission regulations related to advertising. <u>As such, **we require our affiliates to comply with these regulations**. This includes, but is not limited to,</u> Federal Trade Commission 16 CFR Part 255: Guides Concerning the Use of Endorsements and Testimonials in

Advertising, which requires, among other criteria, that material connections between advertisers and endorsers be disclosed. (emphasis supplied).

13. Before agreeing to the affiliate agreement Pierce initially worked through Roger Furgeson, who was an established white label partner and Revable's Affiliate Manager per his LinkedIn profile. **Exhibit 5,** Furgeson Profile. The following facts are relevant to this case.

a. Although we now know that Pierce had a relationship with Andrew Lloyd ("Lloyd"), I did not know Lloyd and never met or talked to Lloyd.

b. Like most start-up businesses, I was intimately involved with all facets of the business, including customer service. I trained and worked with the customer service agents and drafted many of the scripts used as a guide in addressing customer service issues. As the business grew, I delegated customer service responsibility to supervisors and a manager.

c. Pierce and I started talking about Revable's business in 2013. Pierce told me about his real estate and Rent to Own approach for marketing rental homes, and wanted to refer his customers to CBC for credit scores and credit monitoring services. Pierce in 2103 represented to me that his company did over ten thousand in profit per day and in 2016 he generated about $32,000 profit a day and showed me a screenshot that showed his cash flow. Pierce was already working with Roger Furgeson, Revable's Affiliate Manager, on a white label website and reached out to me to work directly with CBC.

d. Pierce told me that he wanted to have CBC operate a web site that would accommodate his customers. Pierce had his web design team at Revable create some design concepts and landing page that was sent to CBC and ultimately activated a landing page eFreeScore and Creditupdates.com that was separate and distinct from CBC's pre-existing websites. The websites were activated on or about December 1, 2015.

e. I did not know that Pierce or Lloyd were providing false information to consumers about the availability of the rental homes advertised on their website. If I had known, I would have immediately terminated my relationship with them.

f. The MLS and Rent to Own model used by Pierce offered a legitimate service and could have been easily replicated by simply paying for the MLS data (about $699 per month) and investing the time and resources to connect landlords with potential renters which is frequently done in an automated fashion. Pierce had an impressive MLS website powered by RentFind that offered thousands of listings daily including contact information for the properties. A copy of the site is attached as **Exhibit 6.**

4

g.  As previously stated, Pierce made it clear he had the financial resources at his disposal although it is now clear that was a lie.

h.  I understand that the FTC sued me because they thought that I was part of a conspiracy with Pierce and Lloyd.  However, they did not investigate or attempt to determine any facts about my knowledge of their activities.  The FTC assumed that all my business was illegitimate. However, over 52% of the business is from White Label/Co-Brand/Direct Solicitations.   The growth of the affiliate side of the business was substantial after Revable became an affiliate.  That side of the business accounted for about 48% of the business.

i.  The funds generated by this line of business is totally unrelated to the Subject Websites.

j.  If the FTC had called me and asked me to modify my website, I would have modified it the next day.  Similarly, if the FTC had asked me about Pierce or about customer complaints, I would readily shared any requested information with them to resolve any problems.  The seizure of my business destroyed years of business development, loss of intellectual property as well as revenues that were steadily increasing year over year before Pierce became an affiliate.

14. The websites that are the subject of this lawsuit (the "Subject Websites") are attached hereto as **Exhibit 7**.  Exhibit 7 is Pierce's creditupdates.com website, which is identical (except for name) to Pierce's eFreeScore.com site.  The version of the Subject Websites attached to the *Complaint* in this case were manipulated, reduced in size, and did not accurately depict the size of the lettering and layout of the Subject  Websites.  Although the FTC claims that various parts of the website are in "fine print", the FTC itself endorsed 12-point font as being sufficient in a consent decree in ConsumerInfo (Experian) my previous employer. **Exhibit 1**.  It was not my goal to confuse or distract customers by loading up the sites with other ads, testimonials or loading up with facts about credit issues (all of which are addressed in FAQ's or other hyperlinks).

15.   The primary goal for renters was to get a credit score to give to landlords, so we focused on offering a free credit score.  I understood from talking to Pierce that his customers the

credit score to demonstrate good credit to potential landlords and to help them screen out renters with a poor credit score (by their standards).

16. The FTC claims that the Subject Websites are misleading and deceptive under Section 5 and violate the Free Credit Report rule because of the "banner" on the Landing page. The banner, however, does not state "Free Credit Report." **Exhibit 7.** As the Court can see, the term "Free Credit Score" has a distinctively different color than the word "Report" on a *separate* line. *Id.* The distinctive coloring alerts the customer that they can get a free credit score and is designed to get them to read the entire offer.

## Get Your Free Credit Score
## and Report as of May 19, 2016

17. To the extent that the "banner" may confuse a consumer, the Landing Page also locates a button that allows the consumer to go to the next page makes it clear that: "YOUR SCORE – NOW." *Id.* This statement is in the same distinctive color as FREE CREDIT SCORE. *Id.*

18. On the "confirm" page, the headline reads "YOUR CREDIT SCORE IS READY ONCE WE CONFIRM YOUR IDENTITY!" (emphasis supplied). This headline is in bold blue lettering prominently located directly above the form where the consumer enters their payment information. *Id.*

19. Below that statement, on the Verification and Payment Information, CBC asks the consumer: "Tell us which card you would like to use for your $1.00 refundable processing fees and membership." Lastly, the declarations provided by the customers prove that they were aware the Reports might not be totally free, as they were aware that they cost a $1.00 refundable processing fee unless they cancelled within the trial period, our policy was any customer who requested a refund received a refund of their processing fee. *Id.*

20. The negative option disclosure, including the statement of a 7-day trial period, price and cancellation procedure on the Landing page, the Payment Page as well as the Welcome email, make it abundantly clear to consumers that they pay a refundable processing fee and a membership fee. The Welcome email is attached as **Exhibit 8** and is separately sent to the member's email almost instantaneously after the member finishes the payment screen. At the same time, the member automatically sees a list of all his or her benefits. **Exhibit 9.**

21. The overall design of the website makes it <u>difficult</u> for a customer to overlook or ignore the plain language of the offer on the first page of 7-day trial, $29.95 Membership & Cancel Phone Number and the button to push "YOUR SCORE NOW", followed by a box asking: "Why do I need to check my Credit Score?" The Payment Page starts with a headline, in bold: "**Your credit <u>score</u> is ready when we confirm your identity!**" which is then followed by the negative option feature. (emphasis supplied). *Id.* Furthermore, it is impossible for a consumer to purchase the membership without hitting "submit."

22. The FTC also claims that Defendants violated the Free Credit Report Rule. We deny that claim.

   a. I don't pretend that I am an expert on legal issues, but I did try to stay abreast of developments by monitoring FTC consent decrees.

   b. The FCRA created a website where consumers can get a free annual credit report, *without a credit score*, at AnnualCreditReport.com. Many companies, including landlords and employers, need to have a credit score that analyzes the credit report rather than review pages of past history of credit reporting, which can be tedious and challenging.

   c. This "free credit report" is defined as at 12 CFR 1022.138 (a)(2) as a " **<u>file disclosure</u>** prepared by or obtained from, directly or indirectly, a nationwide consumer reporting agency (as defined in section 603(p) of the FCRA)".

    1. A "file disclosure" is defined at 12 CFR § 1022.130 as "a disclosure by a consumer reporting agency pursuant to section 609 of the FCRA, 15 U.S.C. 1681g."

    2. The Free Credit Score and a report offered by CBC is not a "file disclosure" or "free credit report" offered by the bureaus under U.S.C. 1681g.

    d. I had previously read in industry literature and posts that you can't simply offer a free credit <u>report</u> without telling consumers that they can obtain a free annual credit report from the Government at AnnualFreeCreditReport.gov. I also read that the FTC considered whether a free credit score should be included in their rule, but that <u>the Commission decided that it would be confusing for customers to be referred to the government site when they could not get a free credit score at the Government site.</u> I concluded that I could legitimately tell consumers that they could get a "Free Credit Score and Report." My lawyers located the Notice of Proposed Rule Making dated March 3, 2010, which confirmed my understanding. The Commission modified a proposed rule about offering free credit reports before it was final so it would <u>not</u> apply to sites offering a Free Credit Score. The rule is "<u>limited</u> <u>in</u> <u>scope</u> to reports of the <u>type</u> disseminated through the centralized source[.]; " i.e. a report without a score. (emphasis supplied).

    e. If CBC had issued a disclosure for AnnualCreditReport.com on a website advertising Free Credit Score<u>, I believe it would have been unfair and misleading to consumers because they cannot get a free credit score at the Government's site.</u> That is not my opinion. It is the statement by the FTC itself.

    f. This is why all the competitors in my industry do not have the AnnualCreditReport.com disclosure on websites that offer a Free Credit Score and a report.

23. The FTC has also brought a ROSCA claim and asks the Court to enter an order permanently barring me for engaging in any business offering a negative option feature. This effectively deprives me of the opportunity to work in the credit monitoring industry, which is where I've devoted my professional career. Regardless, the negative option feature used in the Subject Websites do not violate ROSCA. In fact, the Subject Websites exceeded the minimum protections mandated in ROSCA.

a. CBC did not violate ROSCA because CBC put the ROSCA disclosures in the required location (before submitting payment information) in twelve point font. The negative option statement is not required anywhere else but must be provided before "obtaining the consumer's billing information.

b. The negative option feature in the Subject Websites are identical to the negative option feature used in the Pre-Existing Websites. The FTC has not alleged, nor have they brought an action alleging a violation of the negative option features nor has the FTC produced any evidence that any customers in the White Label Line of business ever complained that they did not see the negative option feature prominently displayed on the payment page of the Pre-Existing Websites.

c. The full negative option is set out below, illustrating that there is nothing that prevents a reasonably prudent consumer from reading and understanding the clear and conspicuous negative option before they press Submit. By pressing Submit, the consumer gave their informed consent.



# Verification and Payment Information

Tell us which card you would like to use for your $1.00 refundable processing fee and membership

**Credit Card Number:**

**CVV Code:**

**Expiration Date:**

01 - Janua       2017

Payment Information
When you place your order here you will begin your membership in CreditUpdates.com. You will be billed $1.00 today and start your trial membership. After your 7-day trial period you will be charged $29.95 every month. If you wish to cancel just call us at (800) 720-6627 to stop your membership.



24. On <u>three</u> (3) occasions, CBC stressed to consumers that they would be paying a membership fee for services which could be cancelled after a trial period:

    (a) The first negative option feature appears right below the banner on the Landing Page and states, in 12 point font, that: "7-day ends Dec. 28, 2016" --"Monthly membership of $29.94 automatically charged after trial period"—For questions or to cancel, just call (800)934-1938 with phone numbers for questions or to cancel;

    (b) The second negative option feature advises: "Payment information. When you place your order here you will begin your membership in eFreeScore.com. You will be billed $1.00 today and start your trial membership. After your 7-day trial period you will be charged $29.94 every month. If you wish to cancel just call us at (800)934-1936 to stop your membership." After filling out their credit card information, the customer then submits and verifies their social security information.

    (c) The third negative option statement is sent electronically literally within minutes telling customers about the services they will receive and further states: "If you need anything at all please don't hesitate to contact us and we hope you enjoy your trial membership After your trial you will be billed $29.94 every month you continue your membership If you wish to cancel simply call us to stop your membership."

23.    Negative Option Features are not a new method of merchant-consumer payment arrangements, but have been since I was a teenager (about 15-19 years). It is difficult to find someone who has not agreed to a negative option feature on the internet or in person. Some large national companies such as Zillow.com and Trulia.com do post the address and required the interested party reach out to Zillow/Trulia in order to contact the owner and general rental leads. Zillow/Trulia also markets credit report offers with negative options to these prospective renters. My point is that everyone knows that they have to cancel the service within the trial period to cancel the service and to avoid incurring either a limited charge or a full charge for the services received. Everyone also knows that if the merchant provides the service, you cannot expect to call and get a full refund or any refund depending on the merchant or the service or product provided.

24.     Having worked in the industry for approximately 14 years, I am well aware that customers engage in what is commonly known in the credit industry as "friendly fraud" by consumers.  The term is widely used and is documented in the merchant charge card processing industry.  I have attached an internet article about "friendly fraud" that describe what the term means.  **See Exhibit 10**, "When Customers Lie-How to Fight Friendly Fraud."  There are many other internet articles available.  The author reports a number of reasons for friendly fraud.  Most importantly, however, the author reports:

> Friendly fraud is becoming an increasingly larger portion of chargebacks. A whopping **86% of chargebacks are deemed fraudulent**. Worse, 40% of customers who file one fraudulent chargeback will file another within 90 days.
>
> The losses due to friendly fraud are significant. According to Visa, the financial impact of friendly fraud reached **$11.8 billion in 2012** and is growing 41% annually.

25.     Friendly fraud in this industry refers to customers who:

(a) claim that they did not read the negative option in the hope of getting a full or partial refund;

(b) claim that the overall ad was misleading and deceptive and threaten to complain to the FTC;

(d) complain that they did not sign up for the service;

(d) claim that the service was never received; and

(e) claim that they called and cancelled but that we kept charging them.

(f)  Friendly fraud occurs in both fully compliant and non-compliant websites.

26.     CBC had a liberal refund policy through its 7-day trial period and was also liberal in granting refunds after the trial period ended.  Many customers simply wanted a free credit score and we expected at least half would cancel the service after they got the score and the immediate need to get their score ended with renting a property.  We paid for the credit scores and reports at

a loss for consumers to evaluate our membership. We asked for a processing fee to cover our expenses for the overhead associated with giving out free credit scores, to also have a mechanism for the negative option if the customer decided to keep the service, and to have no confusion we are not the free no credit card required AnnualCreditReport.com site. Customers were told three times that they could cancel the service and they would get back their refundable processing fee. We had, at times, twenty one (21) customer service representatives or more and the phone lines were open 7 days a week, 16 hours per day that went straight to a live customer service agent with no phone prompts. The general policy was:

(a)     All refunds requested within the 7-day trial period were to be honored and paid. To my knowledge, this policy was strictly followed.

(b)     If customers called and asked for a refund after the trial period, we would give them a refund for one month. If the customer was not satisfied with this refund, I authorized Customer Service to grant up to two months refund. The goal was to amicably extend a courtesy and compromise with an unsatisfied customer.

(c)     Of the 50,394 members requesting a refund between 2014-2017, CBC refunds were granted 96% of the entire time. **Exhibit 12**. **CBC/BRO 367, 379 and 397**

(g)     As in any system populated by human beings, customer service representatives periodically made mistakes or misapplied the policy, resulting in a complaint, but the rate of refunds was very high.

(h)     The FTC has submitted a number of recordings and transcripts relating to difficulty in obtaining refunds. These were the exception and not the norm. The lawyers have listened to a number of customer calls and will submit a number of customer service calls and emails under seal that show customers had an easy time obtaining refunds.

27.     Every customer reasonably knew or reasonably should have known that CBC's services would be free if they cancelled the membership within 7-day trial period. In fact, every consumer was aware they could get their $1.00 processing refunded if they cancelled within the 7-day trial period. Under these circumstances, it is neither unfair nor inequitable to expect that a consumer would read and be aware of these statements. The Welcome email clearly and definitively tells

13

consumers they need to cancel within the trial period or incur a charge. Otherwise, charges for the services provided were fully refundable.

32.     Although I personally do not have access to CBC's raw data base, this data was collected in CBC's computer system at or near the time that consumers signed up for trial periods, membership, cancelled their memberships, sought refunds or obtained services from CBC and such entries were made by someone with knowledge, e.g. customer service representative or the EVO of its business. I have provided my lawyers, specifically Jonathan Slotter, an associate with the Cochell Law Firm, with formulae to run in the data base to generate facts about CBC's business operations. These formulae, and the results were provided to the FTC so they could replicate the results. **Exhibits 11 - 16** shows the following:

   a.  The White Label and direct business represents 52% of the business whereas the affiliate line of business came to about 48%, primarily from Pierce. **Exhibit 12** at **CBC/BRO 367-368**

   b.  Members who cancelled during the trial period were about 43% of all memberships. *Id.* at **CBC/BRO 406-407.**

   c.  Ninety six (96)% of the Members who continued after the trial period and later asked to cancel were paid refunds. *Id.* at **CBC/BRO 367, 379 and 397. Exhibit 11.**

   d.  Thirty seven (37%) of Pierce customers who initially wanted to cancel only wanting the free score were retained after calling customer service. Most of the time this was because customers wanted a more affordable service *Id.* at **CBC/BRO 2205-2206** and **Exhibit 13** at line 21.

   e.  The Pierce customers who were retained generated $835,785.35, and $591,835.68 in 2016 alone. **Exhibit 14.**

   f.  The amount spent by the 4% of people who were not refunded as to our policy was $45,183.45. **Exhibit 15.**

   g.  Each chargeback resulted in a charge of atleast $25 to CBC. **Exhibit 16.** CBC lost $412,200 in chargeback fees to Pierce referrals.

33.     There is also a question about whether I recklessly disregarded evidence that Danny Pierce or his company Revable was running a scam.  First of all, I regret that I did not recognize that the scam existed and terminated Revable as an affiliate.   I am not a trained fraud investigator and most of my information about the industry comes from industry blogs and review of some consent decrees identified in blogs.  There were some well known Craigslist scams that I had seen personally while at Experian and operating my business.  At the time, however, I was not aware of any articles or blogs that identified use of phony Craigslist ads warning that phony ads would be used to obtain referral fees from credit monitoring services.   The FTC raised an issue about an anonymous complaint about a fake ad for a <u>room</u> to rent that they seem to claim should have alerted me to Pierce's scheme.  Pierce did not rent rooms and this complaint was <u>not</u> something that would have alerted me to fraud on the scale undertaken by Pierce.

34.     I got over a hundred (and sometimes a lot more) emails, phone calls, and messages per day raising different issues about the business.  Starting in or about 2012, we contracted with Virtual Post Mail to open and scan all mail and direct it to the appropriate parties.   The initial review and handling of customer complaints.   The Customer Service Department would address all customer service issues and complaints and determine if any matters would be referred to higher management.   All financial matters, such as bank statements, merchant processing and matters involving fraud would be escalated to me.

   a.  In mid-September 2017, one of the customer service representatives sent me an email from "Mike Super" making extremely profane remarks directed to CBC.  The representative asked how to deal with this type of complaint.

   b.  Dating back to my days at Experian, customer service representatives within the industry rarely respond to abusive emails from someone who is not a customer and who may be unbalanced.

   c.  The name "Mike Super" is similar to names used by "trolls" ("SuperMan") who try to create problems on the internet.

15

a. I included Tom Fragala, a business development contractor who was assisting me in structuring projects for CBC that addressed customer issues and concerns. Tom was always concerned about protecting consumers, so I valued his opinion and ideas on problem solving.

e. We talked about this message (Josh, Tom and others) and could not investigate the claims because "Mr. Super" he provided no details or information about the property that was supposedly an issue, and did not tell us how he concluded that the ads were false.

35. I asked Josh Margulies, an independent copyrighter to write a template to address these sorts of communications.

a. I had discussions with both Josh and Tom about their impressions about the complaint. We discussed Craig's List scams and how to address the problem by immediately escalating the problem to me on <u>known</u> Craig's List problems so I could take immediate action. As to Craig's List issues that were not known scams, these would continue to be handled by Customer Service subject to the general rule that they escalate all fraud issues to their management.

b. Customer Service Representatives were supposed to determine if there was evidence of fraud and escalate the issues to their supervisor and/or manager (or both). This system has worked in identifying fraud for me in the past on multiple occasions where I quickly terminated the fraud and refunded customers.

c. After completing this process, neither Tom nor Josh thought the complaint was serious or suggested that there was a problem with Pierce's ads. Again, Pierce's RentFind website, a very sophisticated robust website, had shown evidence of substantial revenues per month and Pierce represented himself to be a reasonable business man who followed the law. Also, I never dreamed that he would run a scam based on phony MLS ads when he could have made a lot of money by doing it legally.

36. Starting in or about 2012, we contracted with ex Post Mail to open and scan all mail and direct it to the appropriate parties. The initial review and handling of customer complaints.

a. The Customer Service Department would address all customer service issues and complaints and determine if any matters would be referred to higher management.

b. All financial matters, such as bank statements, merchant processing and matters involving fraud would be escalated to me.

c. When I contacted BBB and the Business Consumer Alliance regarding their ratings of CBC, I asked Customer Service to let me know of any

16

communications with these ratings organizations. This was to keep me up to date what the ratings issues were, and what steps needed to be taken and by who so that we could move the process forward.

d.  With respect to Craig's List, there were some well known fraud schemes that were to be automatically escalated to me. Other matters relating to real estate would be reviewed, evaluated and referred to me if the Customer Supervisor or Manager thought there was a fraud on a customer.

e.  From my days of working as a Customer Service Representative for Experian, we became very familiar with customers who called to try and cancel their agreements with Experian.

37. On or about May 16, 2016, I reached out to the Business Consumer Alliance to improve our rating with them and they forwarded five (5) complaints they received that needed to be responded to in order to improve our rating. Consistent with our procedures, I had the customer service department process them with instructions to respond to the claims and make this a positive experience for the consumer. It was important to me that consumers have a positive experience with CBC.

37. On or about May 19th, I reached out to the BBB to take our A+ rating with them to the next level by seeking BBB accreditation.

38. On or after June 2, 2016 received a letter from BBB generally suggesting that consumers were misled into signing up for a credit reporting service instead of applying for housing. However, there were no specifics provided in the BBB letter and the BBB provided no specifics.

39. In early July, 2016, I had previously applied for accreditation from the BBB because CBC had an A+ rating from the BBB. **Exhibit 17.** Customer Service was instructed to send me all correspondence from BBB. On or about July 6, 2016, the BBB sent me three complaints.

a.  CBC had an A+ rating with BBB at the time. However, during July, 2016, I took steps to investigate the issues raised by Ms. Savage, and had googled real estate ads, and tried to determine if the ads were real. I took screen shots of the MLS website that appeared on RentFind on July 23, 2016 and also located googled and

found the property on the MLS. Exhibit 5. I also talked to Pierce and asked about whether the ads were genuine because we had received complaints that the ads were false. He assured me that the ads were genuine and the complaints were wrong. This persuaded me that the ads were real and that RentFind's ads were legitimate. It was impossible to track down landlords to talk about a property.

b. The biggest problem with investigating the RentFind ads is that they the ad has been removed by the time we got the complaint.

c. The FTC claims I got a letter dated July 15, 2016 regarding denial of accreditation but I did not receive it. The BBB is composed of 106 independently operated branches. The FTC cites a letter from the branch that includes Los Angeles and Silicon Valley. Moreover, the letter itself mistakenly characterizes that consumers thought they were applying for housing. In fact, the consumers were looking for houses from Pierce's RentFind advertised on Craigslist.

40. Chargebacks are not an indicator of fraud. The FTC goes to great lengths to suggest that chargebacks somehow support their fraud allegations. As set out earlier, however, the issue of chargebacks is directly related to the very high incidence of "friendly fraud" by consumers. The FTC's discussion of excessive chargebacks as being a cause for cancellation is only partially true.

a. Each company that offers merchant services has its own level of acceptable risk tolerance. In this industry, merchant processors routinely grant a chargeback regardless of the validity of the customer's complaint, and do so without investigation or any information about the customer, their contract with CBC and the benefit and services received by the customer.

b. Each merchant account is offered by a different company that has different policies based on their financial strength. We had multiple merchant service accounts whose rates were different depending on the company and our willingness to pay a higher rate. With the increase in volume, we had to find new merchant account processors that were comfortable with our volume and business model. Merchant processors were routinely changing their credit policies and accepted business models.

c. CBC maintained chargeback rates around 0.8% at the time the TRO was filed and was in compliance. **Exhibit 18.**

41. PowerPay was acquired by EVO a bank with a completely different risk profile for merchant processing. EVO then conducted a "Negative Option Review" to remove negative option accounts from its portfolio which they now considered as prohibited per their credit policy. EVO provided CBC notice of this with 30 days to find a new provider.

42. Similarly, the FTC produced an email (PSMF 67) that talks about CBC's termination by Humboldt and looking to Visa EU. This reference is uninformed and takes the communication out of context. CBC was reaching out to a sales agent to obtain a merchant account. In this situation, this agent only had two domestic relationship options one had already been applied for and recommended Visa EU where it is knows they are more comfortable with the risk.

43. DSMF 68 refers to opinions expressed by an agent who had a relationship with only one bank. Deluca's opinion as a sales agent was puffery or based on a very limited network of contacts. CBC did obtain another merchant processor shortly after this discussion.

44. DSMF 69 refer to an MID mischaracterizing normal business activity in cultivating an MID. CBC has never had a merchant account closed by Visa or Mastercard for non-compliance or chargebacks. It was closed because this particular bank has their own distinct policy about management of its portfolio. If an account is not in compliance, it is Visa and MasterCard's policy to send us a formal notice and offer a 6 month program where they work with a merchant to reduce chargebacks. If the merchant is not able to come within acceptable limits, then they terminate the relationship. Brown has never had a single merchant processing relationship terminated by Visa or MasterCard for chargebacks or any reason.

45. DFSM 79 refers to a text that the FTC claims shows that I controlled Revable's website. That is not true. I received a comment from Customer Service that a customer was concerned about the security ("phishing") of their credit report information. This was an example of customer

service escalating customer concerns and bringing any issues to my attention. As a responsible business owner concerned about customers security, he asked Pierce to "please change" the template to recommend consumers not email their credit report but instead print it out. Email is not a secure method for transmitting a credit report to a landlord. This was not a directive but a request and recommendation made to Revable to protect security of customer information.

46. I was concerned with fraud generally. I periodically assigned Diego Munoz to go through all the chargebacks for a particular time period and review each chargeback to determine the true reason for the chargebacks. See **Exhibit 19** (March 2016); **Exhibit 20**(March 2016);**Exhibit 21** (June 21, 2016). Many individuals did not call CBC about their account. In some cases, the customer talked to Customer Service, agreed to discounted pricing without expressing dissatisfaction but still later decided to charge back. Although the rate of chargebacks fluctuated, CBC was maintaining chargeback rates at 0.8% at the time the lawsuit was filed.

    a. The dashboard simply gave CBC the ability to review the volume and number of sign-ups per hour and per day and was simply a tool to review daily business activity.

47. I worked closely and intensively with Tom Fragala about CBC's compliance issues as we grew the business. Tom had superior writing and analytical skills that we were using to assure that affiliates complied with the FTC Act and other statutes or rules. **Fragala Depo. Ex. 2, 3, 6, 7, 8, 9, 15, and 16.**

48. The FTC contends that I knew about the fraud or recklessly disregarded information that would have alerted me to the harm to consumers. I am very frustrated that the Customer Service Department did not escalate the complaints to me. Clearly, Diego Munoz, Customer Service Supervisor, and David Rojas, Customer Service Manager, failed to follow the policies that I

had adopted and followed since establishing CBC. Fraud, particularly fraud that appears to be part of a pattern has to be addressed to protect consumers.

49.    I took steps to ensure that affiliates complied with the FTC and other regulations. I terminated and rejected affiliates who were unwilling to comply with the FTC act or other laws. CBC's affiliates were required to "comply fully with all Federal Trade Commission regulations related to advertising" and white label agreements required compliance with "all applicable Laws, including, by way of illustration but not limitation, the Fair Credit Reporting Act (FCRA), the Gramm-Leach-Bliley Act (GLBA) and the rules and regulations promulgated by the Federal Trade Commission (FTC)."

50.    I testified at deposition (at pages 41-44, 51-53) about specific instances where I terminated affiliates or refused to enter into an affiliate agreement because the company refused to comply with the law.

   a.    Before even launching my business in 2011 I paid for a lawyer to review my website and received an FTC compliance letter from a lawyer. From observing the compliance issue that Experian had, compliance with the FTCA was very important to me. I forwarded this compliance letter to my merchant processor **Fragala Depo., Ex. 10.**

   b.    I created, processed and procedures for onboarding new customers including checklists for compliance for FTC, FACTA, and FCRA Compliance that was initially handled by myself and then delegated to project managers and contractors. **Fragala Depo., Ex 3.**

   c.    I frequently educated CBC's project managers on compliance to ensure they are following my processes and procedure and prevented potential issued with FCRA compliance when customers websites mentioned "free credit report" **Exhibit 22.**

   d.    Early in my business in 2012 preventing affiliate fraud was extremely important to me. I reached out to my Affiliate Tracking Company (Offerit) and asked the best way to prevent fraud. I implemented third party services to prevent fraud and developed our own internal fraud prevention features. **Exhibit 23**

e. The processes and procedures I implemented in customer service worked on numerous occasions to prevent fraud and protect customers. Diego, the customer service supervisor, escalated brought to our attention a lady that had over 76 fraud accounts. I immediately instructed Diego to cancel and refund all 76 accounts and additionally instructed Tom Fragala to reach out to the partner about this fraud. **Exhibit 24.**

f. Before we start working with a new customer I probe them to ensure they comply with all laws and decline to work with them if they are not compliant. In 2014 in this example I rejected working with an affiliate that was violating the TCPA and didn't have the proper disclosures. **Fragala Depo. Ex. 10.**

g. I have a history of terminating and affiliates that engage in fraud. When fraud alerts or chargebacks are received they are investigated. The first approximately 2 years I did these investigations, but later delegated to others. This 2013 fraud alerts was suspected of fraud and I reached out to the affiliate network to immediately stop all their sales and conducted a phone call to identify and prevent the fraud **Exhibit 25.**

h. CBC constantly battled "friendly fraud" where most our customers would incorrectly claim transactions are "unauthorized" in order to obtain refund. In 2016 we announced integrations with a few major banks that allowed us to share our mutual customers order information and product usage information to help refresh customers memories of the transaction. **Exhibit 26.**

i. In some cases, my sales agent would incorrectly receiver a customer service phone call. This sales agent, Tom Fragala, would prompt users as to why they didn't recall signing up and specifically prompted users on if they signed up from a CraigsList scam which was not the case. We were always on the lookout for scams. **Fragala Depo. Ex. 21**

j. Security was important to me and I maintained a policy that all customer service agents should leave accurate notes on a customer account as to what they wanted if an account was accessed. This policy was enforced by myself and delegated to customer service managers and supervisors. **Fragala Depo. Ex. 22 and 23.**

k. With respect to tracking complaints in the CRM, the CRM did not provide the company or partner name to customer service. The customer service agents saw a number but did not necessarily appreciate that this was a number for a source of traffic nor did they know the identity of the company from the number.

51.    The FTC has raised an issue about a project called SimpleRefund to reduce chargebacks. DFSM 89. The project was never activated. The project was designed to help customers get answers to questions. There was already a high rate of refunds and we wanted to encourage customers to call us because we would rather have customers resolve any issue with us, as opposed to getting charged $25 for each chargeback from each of the merchant processors.

52.    DFSM 90 tries to make a distinction between publicly accessible websites. All of the Subject Websites and PreExisting Websites were publicly accessible. As to the failure to remove the Transunion logo, this was an oversight as CBC had dozens of websites that it managed

53.    The damages alleged against me are subject to defenses set out by my lawyer. However, it is important to note that 52% of CBC's revenues had absolutely nothing to do with Pierce and the Subject Websites. Pierce started as an affiliate sometime in 2013 but the volumes did not noticeably change until 2014. The Subject Websites were not activated until December 1, 2015. Although I do not think that I should be held legally responsible for Pierce's unauthorized acts, I have been asked to help calculated alleged damages to assure that the court has accurate information.

54.    I am informed that the remedy of restitution requires that a specific fund that can be traced from payment by the customer to CBC and kept as proceeds identifiable to each transaction. All funds paid by customers were paid into CBCs general operating account from which vendors, employees and independent contractors were paid. In other words, all funds were commingled and nothing can be traced. This includes all funds from White Label/Co-Branding and Direct Solicitations. As of the date of entry of the TRO on January 11, 2017, 52% of the proceeds were legitimate funds amounting to $338,000. This amount should be returned to CBC or to me.

55.     I am also informed that the Court could order disgorgement, which requires a calculation of net profits.  As set out above, any calculation should start as of December 1, 2015, when the Subject Websites were activated.  In addition, about 37% of Pierce's referrals to CBC called in to CBC's Customer Service Department and asked to cancel their service, but then again affirmatively decided to continue with the services after obtaining a discounted membership price or reminding them of all the benifits.  Defendants should get credit, and not be required to pay consumers who were satisfied with CBC's services and yet again affirmatively continued with the membership. Similarly, CSID provided the actual credit scores, reports, monitoring, insurance, and some other benefits and should counted as an expense.  The following calculations are submitted for three scenarios.

<p style="text-align:center">(a) <strong><u>If liability starts on December 1, 2015 Until Imposition of the Receivership:</u></strong></p>

| Total Revenue from Pierce | $4,083,309.15 |
|---|---|
| Revable Commissions | $1,363,785[1] |
| Pierce Refund Amount | $308,351.08 |
| Pierce Chargebacks | $230,577.02 |
| Chargeback fees | $228,150[2] |
| Merchant Fees | $22441.10 |
| Revenue from Pierce Retainees | $591,835.68 |
| Pierce/Lloyd Settlement | ~381,000.00[3] |
| CSID Payment | $707,241.71[4] |
| Web Technology & Hosting | $198,067.00[5] |

---

[1] Payment to Pierce from XERO Software affiliate expenses spreadsheet.

[2] **Exhibit 16.**

[3] This number has been halved in order to represent that the Pierce and Lloyd settlement was for the entirety of their work from 2014 onward, and thus halving seems appropriate since these specific damages would have started in December 2015.

[4] Number is calculated off of percentage of Pierce's revenue from Dec. 2015 into CBC's total revenue then multiplied into CSID expense amount.

[5] **Exhibit 27 -** Income Statements

Customer Service Staff & Op.  -  $28,799.00[6]_____
Total Liability:                          $0

(b) **If Liability Starts On June 30, 2016 As A Date Where Notice Or Knowledge Is Imputed To Brown**.

The Receiver found that I received about $659,159 from 2014 until the receivership was imposed.  Docket 36 at 8.  The revenue generated by Pierce from June 30, 2016 through imposition of the receivership was $220,278.87.  The amount paid to Brown should be reduced to $105,733.85 or 48% attributable to the Pierce websites.

(c) **If Liability is Imposed From 2014 Until Imposition of the Receivership**.

| | |
|---|---|
| Total Revenue from Pierce | $6,832,435.81 |
| Revable Commissions | $2,370,000.00 |
| Pierce Refund Amount | $472,751.56 |
| Pierce chargebacks | $394,903.68 |
| Pierce Chargeback fees | $228,150.00 |
| Merchant Fees | $69,230.01 |
| Revenue from Pierce retainees | $835,785.35 |
| Pierce/Lloyd Settlement | ~762,000.00 |
| CSID Payment | $1,175,621.76[8] |
| Web Technology & Hosting | $432,003.00[7] |
| Customer Service Staff & Op.  - | $270,361.00_____ |
| Total Liability: | $0 |

56.  We have also claimed set off for the damages inflicted as a result of the FTC imposing a receivership over CBC's entire business.  As previously stated, the White Label/Co-Branding/Direct Solicitation business had grown each year of CBC's business and was unrelated to Pierce's websites.  Therefore, we request a set off of 52% of $1,950,000 net

---

[6] *Id.*

[8] I took the total amount paid to CSID and calculated 48% of the payments attributable to Pierce.

[7] Dkt. 36, Receiver Report, pp. 7

revenues or $1,042,000 based on a full year in 2016 as a measure of damages. **Exhibit 27, Income Statement.**

57. I understand that if the Court imposes liability, there are a broad ranges of sanctions that can be imposed. The following information is presented for the Court's consideration. I am currently 33 years old.

    d. While I had success prior to having the misfortune of allowing Mr. Pierce to become an affiliate, I do recognize, in hindsight, that CBC grew very quickly and that I could have done a better job of protecting myself from rogue affiliates such as Pierce.

    e. I had just hired Darcy Bardwell in Orange County, California to become an Affiliate Manager and to work with Pierce and other affiliates on compliance issues. We did not have the opportunity to allow Ms. Bardwell to work closely with Pierce or other affiliates on compliance.

    f. I would also hire an outside counsel to routinely review customer service complaints and make recommendations about how to investigate all complaints involving fraud.

    g. In addition, the deposition of Tom Fragala demonstrates that we were spending ever-increasing amounts of money to build out procedures and checklists for assuring that affiliates complied with the FTC Act. Fragala did not hesitate to ask about compliance issues. **Fragala Depo. Ex. 2, 3, 6, 7, 8, 9, 15, and 16.**

    h. The experience with my prior attorneys left me wondering about the system because their advice did get me into trouble. The lawyers who were supposed to be giving me advice on the TRO immediately told me to transfer funds to pay them. This violated the TRO. The issues are more fully discussed in Docket No 136.

    i. I realize that the contempt issue left a bad impression with the Court. Our legal challenges regarding Section 13(b) of the Act are, in no way, any indication of disrespect for this Court or to the FTC.

    j. If I am allowed to continue in the credit monitoring services industry, I would want to re-start my business because my options in other businesses are limited. I have reasonably good technical skills (a bit dated at this point) and (I hate to admit it) weak writing skills.

    k. I respectfully submit that lifetime prohibition against working in the credit monitoring industry is disproportionately severe to the alleged violations. It is akin to a thirty year-plus fine that cannot be paid. Pierce and Lloyd set this scheme in

motion. While the Court may ultimately disagree with the positions taken in this lawsuit, the alleged violations of Section 5, ROSCA and the Free Credit Report rule do not reveal evil intent on my part. In fact, the fact that the Pre-Existing websites complied with the FTC shows that I can and will comply with a court order. Ultimately, I realize that I cannot simply rely on lawyers and must understand each sentence of an injunction.

l.   With respect to certain provisions of the FTC's proposed Final Injunction, the period of supervision should be no greater than that imposed on Pierce and Lloyd, who created and operated RentFind.

1.   With respect to Section III (B) of the Proposed Final Injunction, this section requires me to provide a copy of the Final Injunction to any potential affiliate or white label partner and requires them to sign a receipt certifying that they received the order. This provision will only guarantee that I will not be able to do business in the credit monitoring business (or any online business for that matter). The provision is also unlimited as to time period or industry and is therefore overly broad as well.

2.   With respect to Section V (A) of the Proposed Final Injunction, the FTC asks the court to require that I make the ROSCA disclosure in **any** representation such as a banner, google ad or email. All of my Landing Pages, including the Prior Websites, have the same wording and same 12-point font. This disclosure complies with other consent orders. I have attached a google ad, which illustrates that the proposed provision is impractical as well as overly broad and disproportionately severe to limit legitimate legal forms of online advertising.

3.   With respect to Section VII of the Proposed Final Injunction, the FTC's "easy mechanism" for cancellation is overly broad and will deprive my business of any opportunity to retain customers who may be wanting to cancel the service based on an impulse or without fully considering the services being delivered. CBC had an easy mechanism to cancel, through email or by phone. Thousands of customers successfully cancelled by email and by phone.

58. This is a summary of my testimony. I reserve the right to supplement or clarify my testimony if called as a witness at hearing or trial.

--------------------------------------- SIGNATURE ON NEXT PAGE -----------------------------------

27

Executed on March 23, 2018.

_Michael Brown_

Michael Brown

1   SARAH E. SCHROEDER, Calif. Bar No. 221528
    KENNETH H. ABBE, Calif. Bar No. 172416
2   EVAN ROSE, Calif. Bar No. 253478
    YAN FANG, Calif. Bar No. 279737
3   901 Market Street, Suite 570, San Francisco, CA 94103
    415-848-5100 (T); 415-848-5184 (F); sschroeder@ftc.gov
4   Attorneys for Plaintiff FEDERAL TRADE COMMISSION

5   LISA MADIGAN, Attorney General
    PAUL A. ISAAC, Ill. Bar No. 6300087
6   500 South Second Street, Springfield, IL 62706
    217-782-4436 (T); 217-782-1097 (F); pisaac@atg.state.il.us
7   Attorney for Plaintiff STATE OF ILLINOIS

8   MIKE DEWINE, Attorney General
    JEFFREY R. LOESER, Ohio Bar No. 0082144
9   30 E. Broad Street, 14th Floor, Columbus, OH 43215
    614-728-1172 (T); 877-650-4712 (F); jeff.loeser@ohioattorneygeneral.gov
10  Attorney for Plaintiff STATE OF OHIO

                        **EXHIBIT
                           1**

                        © StenoWorks
                        The Court Reporting Store

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>STATE OF ILLINOIS, and<br><br>STATE OF OHIO,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>ONE TECHNOLOGIES, LP, a limited partnership, also d/b/a SCORESENSE, ONE TECHNOLOGIES, INC., and MYCREDITHEALTH,<br><br>ONE TECHNOLOGIES MANAGEMENT, LLC, a limited liability company, individually and as general partner of ONE TECHNOLOGIES, LP, and<br><br>ONE TECHNOLOGIES CAPITAL, LLP, a limited liability partnership, individually and as a limited partner of ONE TECHNOLOGIES, LP,<br><br>　　　　　Defendants. | CASE NO. 3:14-CV-05066-JSC<br><br>[~~PROPOSED~~]<br>**STIPULATED ORDER FOR PERMANENT INJUNCTION & MONETARY JUDGMENT** |

Plaintiffs, the Federal Trade Commission ("Commission" or "FTC"), the State of Illinois, and the State of Ohio, filed their Complaint for Permanent Injunction and Other Equitable Relief in this matter, pursuant to Sections 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b), 57b, Sections 5 and 6 of the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. §§ 8404–05, the Ohio Consumer Sales Practices Act, O.R.C. §§ 1345.01 *et seq.*, and Section 7(a) of the Illinois Consumer Fraud and Deceptive Business

Practices Act ("Illinois Consumer Fraud Act"), 815 ILCS § 505/7(a).  Plaintiffs and Defendants stipulate to the entry of this Stipulated Order for Permanent Injunction and Monetary Judgment to resolve all matters in dispute in this action between them.

THEREFORE, IT IS ORDERED as follows:

## FINDINGS

1.     This Court has jurisdiction over this matter.

2.     The Complaint charges that Defendants participated in deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), Section 4 of ROSCA, 15 U.S.C. § 8403, the Ohio Consumer Sales Practices Act, O.R.C. §§ 1345.01 *et seq.*, and Section 2 of the Illinois Consumer Fraud Act, 815 ILCS § 505/2, in the marketing of their credit monitoring programs.

3.     Defendants neither admit nor deny any of the allegations in the Complaint, except as specifically stated in this Order.  Only for purposes of this action, Defendants admit the facts necessary to establish jurisdiction.

4.     Defendants waive any claim that they may have under the Equal Access to Justice Act, 28 U.S.C. § 2412, concerning the prosecution of this action through the date of this Order, and agree to bear their own costs and attorney fees.

5.     Defendants waive all rights to appeal or otherwise challenge or contest the validity of this Order.

## DEFINITIONS

For the purpose of this Order, the following definitions apply:

A.     **"Advertisement"** means a commercial message in any medium that directly or indirectly promotes a consumer transaction.

B.     **"Charge"** or **"charging"** means causing billing information to be submitted for payment, including against a consumer's credit card, debit card, bank account, phone bill, or other account, or otherwise attempting to collect money or other consideration.

///

///

STIPULATED FINAL ORDER                                                    Page 2 of 15

C. **"Clear and conspicuous"** or **"clearly and conspicuously"** means as follows:

    1. In print communications, the disclosure shall be presented in a manner that stands out from the accompanying text so that it is sufficiently prominent, because of its type size, contrast, location, or other characteristics, for an ordinary consumer to notice, read, and comprehend it;

    2. In communications made through an electronic medium (such as television, video, radio, and interactive media such as the Internet, online services, and software), the disclosure shall be presented simultaneously in both the audio and visual portions of the communication. In any communication presented solely through visual or audio means, the disclosure shall be made through the same means through which the communication is presented. In any communication disseminated by means of an interactive electronic medium such as software, the Internet, or online services, the disclosure must be unavoidable. Any audio disclosure shall be delivered in a volume and cadence sufficient for an ordinary consumer to hear and comprehend it. Any visual disclosure shall be presented in a manner that stands out in the context in which it is presented so that it is sufficiently prominent, due to its size and shade, contrast to the background against which it appears, the length of time it appears on the screen, and its location, for an ordinary consumer to notice, read, and comprehend it; and

    3. Regardless of the medium used to disseminate it, the disclosure shall be in understandable language and syntax. Nothing contrary to, inconsistent with, or in mitigation of the disclosure shall be used in any communication.

D. **"Defendants"** means One Technologies, LP, One Technologies Management, LLC, One Technologies Capital, LLP, and their successors and assigns, individually, collectively, or in any combination.

E. **"Material"** means likely to affect a person's choice of, or conduct regarding, goods or services.

F. **"Negative Option Feature"** means, in an offer or agreement to sell or provide any good or service, a provision under which the consumer's silence or failure to take affirmative action to

reject a good or service or to cancel the agreement is interpreted by the seller or provider as acceptance or continuing acceptance of the offer.

## I. PROHIBITION AGAINST MISREPRESENTATIONS

IT IS ORDERED that Defendants, Defendants' officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with any of them who receive actual notice of this Order, whether acting directly or indirectly, in connection with the advertising, marketing, promoting, or sale of any good or service with a Negative Option Feature, are permanently restrained and enjoined from misrepresenting, expressly or by implication, any material fact, including but not limited to:

A.     The cost or price of a good or service;

B.     That a good or service is free, a bonus, a gift, without cost, or without obligation;

C.     That consumers can obtain a good or service for a minimal processing, service, or administrative fee with no further obligation;

D.     The purpose for which a consumer's payment information will be used;

E.     The timing or manner of any charge or bill (including but not limited to the date of the charge and whether it will be a credit card charge or checking account debit);

F.     The length of any trial period before the consumer is charged or billed; or

G.     That a transaction has been authorized by a consumer.

## II. REQUIRED DISCLOSURES

IT IS FURTHER ORDERED that Defendants, Defendants' officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with any of them who receive actual notice of this Order, whether acting directly or indirectly, in connection with the advertising, marketing, promoting, or sale of any good or service with a Negative Option Feature, are permanently restrained and enjoined from:

A.     Before a customer consents to pay for such good or service, failing to disclose, clearly and conspicuously:

1.     The name of the seller or provider of the good or service or the name of the good or service as it appears in billing statements;

2. A description of the good or service, including but not limited to its

duration;

3. The cost or price of the good or service;

4. The length of any trial period; and

5. The mechanism to stop any recurring charges.

B. For any transaction involving a sale of a service to a consumer, within 10 days after the date of the sale, failing to send the consumer written confirmation of the transaction, either by email or first class mail, clearly and conspicuously identified as such in the email subject line or on the outside of the envelope. Such written confirmation shall include clear and conspicuous disclosure of all the information required by Subsection A of this Section and of the procedures by which consumers can cancel or request a refund.

### III. EXPRESS INFORMED CONSENT

IT IS FURTHER ORDERED that Defendants, Defendants' officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with any of them who receive actual notice of this Order, whether acting directly or indirectly, in connection with the advertising, marketing, promoting, or sale of any good or service with a Negative Option Feature, are permanently restrained and enjoined from using billing information to obtain payment from a consumer, unless, prior to using such billing information to obtain payment, Defendants obtain the express informed consent of the consumer. Express informed consent shall consist of:

A. For all written offers (including over the Internet or other web-based applications or services): a check box, signature space or line, or another substantially similar method by which consumers must affirmatively select to accept the Negative Option Feature. Immediately adjacent to an affirmative selection method, Defendants shall disclose the information identified in Subsection A of the Section entitled "Required Disclosures." This disclosure shall contain no additional information and shall be clear and conspicuous in relation to any other information provided on the page relating to costs, risks, or obligations associated with the Negative Option Feature, including any terms referring to "free," "trial," and "processing fee."

B.     For all oral offers: the consumer's express, informed agreement to the Negative Option Feature, as evidenced by:

    1.     The consumer's authorization of payment for the good or service described;

    2.     The consumer's name and the date of the authorization;

    3.     The consumer's understanding of what account will be charged; and

    4.     The consumer's receipt of the disclosures required by this Order in Subsection A of the Section entitled "Required Disclosures."

Defendants shall maintain for each such transaction a voice recording of the entire transaction, including the sales representations. Each recording must be retrievable by the consumer's name, telephone number, or billing information and must be provided upon request to the consumer, the consumer's bank, or any law enforcement entity.

## IV. PROHIBITIONS CONCERNING REFUNDS & CANCELLATIONS

IT IS FURTHER ORDERED that Defendants, Defendants' officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with any of them who receive actual notice of this Order, whether acting directly or indirectly, in connection with the advertising, marketing, promoting, or sale of any good or service, are permanently restrained and enjoined from:

A.     Misrepresenting, expressly or by implication, any material term of any refund or cancellation policy or practice;

B.     Failing to disclose, clearly and conspicuously, before a consumer consents to pay for such good or service through a Negative Option Feature, all material terms, limitations, and conditions of any cancellation or refund policy, including but not limited to prohibitions against cancellations or refunds;

C.     Failing to honor a cancellation or refund request that complies with any policy to make refunds or allow cancellations; and

D.     Failing to provide and disclose, clearly and conspicuously, a simple mechanism for a consumer to immediately stop any recurring charge for such good or service. Such

STIPULATED FINAL ORDER          Page 6 of 15

mechanism must not be difficult, costly, confusing, or time consuming, and it must be at least as simple as the mechanism the consumer used to initiate the recurring charge. For the purposes of this Subsection, a toll-free telephone call is a sufficiently simple cancellation mechanism so long as:

        1.    Defendants disclose, clearly and conspicuously, the toll-free telephone number on all websites and direct customer communications relating to the recurring charge and the underlying good or service;

        2.    Defendants include the toll-free telephone number in billing descriptors for the recurring charge;

        3.    Defendants maintain a call center that is open from 9:00 a.m. to 9:00 p.m. (Eastern Time) Monday through Friday, 9:00 a.m. to 6:00 p.m. (Eastern Time) Saturday, and 1:00 p.m. to 6:00 p.m. (Eastern Time) Sunday;

        4.    Defendants immediately accept a consumer's cancellation request, provided, however, that Defendants may then attempt to retain the consumer. If at any time during the retention efforts the consumer expresses a desire that Defendants cease their retention efforts, Defendants shall immediately cease their retention efforts; and

        5.    The mechanism is not otherwise difficult, costly, confusing, or time consuming.

## V. PROHIBITION ON VIOLATING THE
## RESTORE ONLINE SHOPPERS' CONFIDENCE ACT

IT IS FURTHER ORDERED that Defendants, Defendants' officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with any of them who receive actual notice of this Order, whether acting directly or indirectly, in connection with the advertising, marketing, promoting, or sale of any good or service, are permanently restrained and enjoined from violating the Restore Online Shoppers' Confidence Act, 15 U.S.C. §§ 8401–05, a copy of which is attached.

///

///

STIPULATED FINAL ORDER               Page 7 of 15

# VI. MONETARY JUDGMENT

IT IS FURTHER ORDERED that:

A.        Judgment in the amount of twenty-two million dollars ($22,000,000) is entered in favor of Plaintiffs against Defendants, jointly and severally, as equitable monetary relief.  All money paid to Plaintiffs pursuant to this Order is compensatory and not punitive in nature.  Such money is not intended as nor shall it be treated or construed as a penalty or fine of any kind.

B.        Defendants are ordered to pay to Plaintiffs, by making payment to the Commission, twenty-two million dollars ($22,000,000).  Defendants stipulate that such funds will be held in escrow by a third party pursuant to a written escrow agreement, which provides for payment to Plaintiffs within 7 days of entry of this Order by electronic fund transfer in accordance with instructions previously provided by a representative of the Commission, should this Order be entered by on or before the end of February 2015.

# VII. ADDITIONAL MONETARY PROVISIONS

IT IS FURTHER ORDERED that:

A.        Defendants relinquish dominion and all legal and equitable right, title, and interest in all assets transferred pursuant to this Order and may not seek the return of any assets.

B.        The facts alleged in the Complaint will be taken as true, without further proof, in any subsequent civil litigation by or on behalf of any Plaintiff, including in a proceeding to enforce its rights to any payment or monetary judgment pursuant to this Order, such as a nondischargeability complaint in any bankruptcy case.

C.        The facts alleged in the Complaint establish all elements necessary to sustain an action by any Plaintiff pursuant to Section 523(a)(2)(A) of the Bankruptcy Code, 11 U.S.C. § 523(a)(2)(A), and this Order will have collateral estoppel effect for such purposes.

D.        Defendants acknowledge that their Taxpayer Identification Numbers (Social Security numbers or Employer Identification Numbers), which Defendants must submit to the Commission, may be used for collecting and reporting on any delinquent amount arising out of this Order, in accordance with 31 U.S.C. § 7701.

///

STIPULATED FINAL ORDER                                                                Page 8 of 15

E.     All money paid to Plaintiffs pursuant to this Order shall be deposited into a fund administered by the Commission or its designee to be used for equitable relief, including consumer redress and any attendant expenses for the administration of any redress fund.

F.     If a representative of the Commission, in consultation with the States of Illinois, Ohio, and Texas, decides that direct redress to consumers is wholly or partially impracticable or money remains after redress is completed, such funds shall be divided among Plaintiffs as follows: fifty-thousand dollars ($50,000) to the State of Illinois; fifty-thousand dollars ($50,000) to the State of Ohio Consumer Protection Enforcement Fund established by O.R.C 1345.51; and the remainder to the Commission.  The amount paid to the State of Illinois shall be deposited into the Attorney General Court Ordered and Voluntary Compliance Payment Projects Fund for subsequent expenditure as authorized by the Attorney General.  The Commission may apply any remaining money for such other equitable relief (including consumer information remedies) as it determines to be reasonably related to Defendants' practices alleged in the Complaint.  Any money not used for such equitable relief by the Commission shall be deposited to the United States Treasury as disgorgement.  Any funds paid to the State of Illinois or the State of Ohio not used for equitable relief may be used by the State to the full extent authorized by the State's laws, including but not limited to as payment for the State's costs of investigating and litigating the instant case.  Defendants have no right to challenge any actions any Plaintiff may take pursuant to this Subsection.

## VIII. CUSTOMER INFORMATION

IT IS FURTHER ORDERED that Defendants, Defendants' officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with any of them who receive actual notice of this Order, whether acting directly or indirectly, in connection with the advertising, marketing, promoting, or sale of any good or service, must provide sufficient customer information to enable any Plaintiff to efficiently administer consumer redress.  If a representative of any Plaintiff requests in writing any information related to redress, Defendants must provide it, in the form prescribed by the Plaintiff, within 14 days.

///

# IX. ORDER ACKNOWLEDGMENTS

IT IS FURTHER ORDERED that Defendants obtain acknowledgments of receipt of this Order:

A.     Each Defendant, within 7 days of entry of this Order, must submit to each Plaintiff an acknowledgment of receipt of this Order sworn under penalty of perjury.

B.     For 5 years after entry of this Order, each Defendant must deliver a copy of this Order to:

      1.     All principals, officers, directors, and LLC managers and members;

      2.     All employees, agents, and representatives who participate in conduct related to the subject matter of the Order; and

      3.     Any business entity resulting from any change in structure as set forth in the Section titled Compliance Reporting.  Delivery must occur within 7 days of entry of this Order for current personnel.  For all others, delivery must occur before they assume their responsibilities.

C.     From each individual or entity to which a Defendant delivered a copy of this Order, that Defendant must obtain, within 30 days, a signed and dated acknowledgment of receipt of this Order.

# X. COMPLIANCE REPORTING

IT IS FURTHER ORDERED that Defendants make timely submissions to Plaintiffs:

A.     One year after entry of this Order, each Defendant must submit a compliance report, sworn under penalty of perjury.  Each Defendant must:

      1.     Identify the primary physical, postal, and email address and telephone number, as designated points of contact, which representatives of any Plaintiff may use to communicate with the Defendant;

      2.     Identify all of that Defendant's businesses by all of their names, telephone numbers, and physical, postal, email, and Internet addresses;

STIPULATED FINAL ORDER

3.      Describe the activities of each business, including the goods and services offered, the means of advertising, marketing, and sales, and the involvement of any other Defendant;

4.      Describe in detail whether and how that Defendant is in compliance with each Section of this Order; and

5.      Provide a copy of each Order Acknowledgment obtained pursuant to this Order, unless previously submitted to all Plaintiffs.

B.      For 20 years after entry of this Order, each Defendant must submit a compliance notice, sworn under penalty of perjury, within 14 days of any change in the following:

1.      Any designated point of contact; or

2.      The structure of any Defendant or any entity that Defendant has any ownership interest in or controls directly or indirectly that may affect compliance obligations arising under this Order, including: creation, merger, sale, or dissolution of the entity or any subsidiary, parent, or affiliate that engages in any acts or practices subject to this Order.

C.      Each Defendant must submit to Plaintiffs notice of the filing of any bankruptcy petition, insolvency proceeding, or similar proceeding by or against such Defendant within 14 days of its filing.

D.      Any submission to Plaintiffs required by this Order to be sworn under penalty of perjury must be true and accurate and comply with 28 U.S.C. § 1746, such as by concluding: "I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on: _____" [and supplying the date, signatory's full name, title (if applicable), and signature].

E.      Unless otherwise directed by a Commission representative in writing, all submissions to the Commission pursuant to this Order must be emailed to DEbrief@ftc.gov or sent by overnight courier (not the U.S. Postal Service) to: Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW,

STIPULATED FINAL ORDER                                                    Page 11 of 15

Washington, DC 20580. The subject line must begin: FTC v. One Technologies, LP, matter number 1323021.

F.     All submissions to Plaintiff State of Illinois must be emailed to pisaac@atg.state.il.us or sent by overnight courier (not the U.S. Postal Service) to: Assistant Attorney General Paul Isaac, Illinois Attorney General's Office, 500 South Second Street, Springfield, IL 62706, (217) 782-4436 (P). (Or other contact as provided to Defendants by the Illinois Attorney General's Office).

G.     All submissions to Plaintiff State of Ohio must be emailed to jeff.loeser@ohioattorneygeneral.gov or sent by overnight courier (not the U.S. Postal Service) to: Assistant Attorney General Jeffrey Loeser, Consumer Protection Section, Ohio Attorney General's Office, 30 East Broad Street, 14th Floor, Columbus, Ohio 43215. (Or other contact as provided to Defendants by the Ohio Attorney General's Office).

## XI. RECORDKEEPING

IT IS FURTHER ORDERED that Defendants must create certain records for 10 years after entry of the Order, and retain each such record for 5 years. Specifically, Defendants, in connection with the sale of any good or service with a Negative Option Feature, must create and retain the following records:

A.     Accounting records showing the revenues from all goods or services sold;

B.     Personnel records showing, for each person providing services, whether as an employee or otherwise, that person's: name; address(es); telephone number(s); job title or position; dates of service; and (if applicable) the reason for termination;

C.     Records of all consumer complaints and refund requests, whether received directly or indirectly, such as through a third party, and any response; and

D.     All records necessary to demonstrate full compliance with each provision of this Order, including all submissions to Plaintiffs.

## XII. COMPLIANCE MONITORING

IT IS FURTHER ORDERED that, for the purpose of monitoring Defendants' compliance with this Order, including any failure to transfer any assets as required by this Order:

STIPULATED FINAL ORDER                                             Page 12 of 15

1       A.     Within 14 days of receipt of a written request from a representative of any

2  Plaintiff, each Defendant must: submit additional compliance reports or other requested

3  information, which must be sworn under penalty of perjury; appear for depositions; and produce

4  documents for inspection and copying. Any Plaintiff is also authorized to obtain discovery,

5  without further leave of court, using any of the procedures prescribed by Federal Rules of Civil

6  Procedure 29, 30 (including telephonic depositions), 31, 33, 34, 36, 45, and 69.

7       B.     For matters concerning this Order, any Plaintiff is authorized to communicate

8  directly with any Defendant. Defendants must permit representatives of any Plaintiff to

9  interview any employee or other person affiliated with any Defendant who has agreed to such an

10  interview. The person interviewed may have counsel present.

11       C.     Plaintiffs may use all other lawful means, including posing, through its

12  representatives, as consumers, suppliers, or other individuals or entities, to Defendants or any

13  individual or entity affiliated with Defendants, without the necessity of identification or prior

14  notice. Nothing in this Order limits the Commission's lawful use of compulsory process,

15  pursuant to Sections 9 and 20 of the FTC Act, 15 U.S.C. §§ 49, 57b-1.

16              **XIII. RETENTION OF JURISDICTION**

17       IT IS FURTHER ORDERED that this Court retains jurisdiction of this matter for

18  purposes of construction, modification, and enforcement of this Order.

19       **PURSUANT TO STIPULATION, IT IS SO ORDERED.**

20

21

22  Dated:  November 21, 2014                             JUDGE

23



24

25

26

27

28

1 | **SO STIPULATED AND AGREED:**

2 | **FOR PLAINTIFFS:**

3 | JONATHAN E. NUECHTERLEIN
4 | General Counsel

5 |

6 | SARAH E. SCHROEDER
7 | KENNETH H. ABBE
   | EVAN ROSE
8 | YAN FANG
   | Attorneys for Plaintiff
9 | FEDERAL TRADE COMMISSION

10 |

11 | LISA MADIGAN
12 | Attorney General
   | State of Illinois

13 |

14 |

15 | PAUL A. ISAAC
   | Attorney for Plaintiff
16 | STATE OF ILLINOIS

17 |

18 | MIKE DEWINE
19 | Attorney General
   | State of Ohio

20 |

21 |

22 | JEFFREY R. LOESER
   | Attorney for Plaintiff
23 | STATE OF OHIO

24 |

25 |

26 |

27 |

28 |

STIPULATED FINAL ORDER                    Page 14 of 15

1  SO STIPULATED AND AGREED:

2  FOR PLAINTIFFS:

3  JONATHAN E. NUECHTERLEIN
4  General Counsel

5

6  SARAH E. SCHROEDER
   KENNETH H. ABBE
7  EVAN ROSE
   YAN FANG
8  Attorneys for Plaintiff
9  FEDERAL TRADE COMMISSION

10

11 LISA MADIGAN
12 Attorney General
   State of Illinois
13

14

15 PAUL A. ISAAC
   Attorney for Plaintiff
16 STATE OF ILLINOIS

17

18 MIKE DEWINE
19 Attorney General
   State of Ohio
20

21

22 JEFFREY R. LOESER
   Attorney for Plaintiff
23 STATE OF OHIO

24

25

26

27

28

STIPULATED FINAL ORDER                                    Page 14 of 15

1  **FOR DEFENDANTS:**

2

3  JEFFREY KNOWLES, ESQ.
   ROGER COLAIZZI, ESQ.
4  AMY R. MUDGE, ESQ.
   MATTHEW FARLEY, ESQ.
5  Venable LLP
   575 7th St. NW
6  Washington, DC 20004
   Telephone: 202-344-4860
7  Fax: 202-344-8300
   Email: jknowles@venable.com
8
   Attorneys for Defendants ONE TECHNOLOGIES, LP; ONE TECHNOLOGIES
9  MANAGEMENT, LLC; ONE TECHNOLOGIES CAPITAL, LLP

10

11 **DEFENDANTS: One Technologies, LP; One Technologies Management, LLC; One**
   **Technologies Capital, LLP**
12

13     One Technologies, LP

14
       By: _____
15

16

17     One Technologies Management, LLC

18
       By: _____
19

20

21     One Technologies Management Capital, LLP

22
       By: _____
23

24

25

26

27

28

   STIPULATED FINAL ORDER                                    Page 15 of 15

S. 3386

# One Hundred Eleventh Congress
## of the
## United States of America

### AT THE SECOND SESSION

*Begun and held at the City of Washington on Tuesday,*
*the fifth day of January, two thousand and ten*

## An Act

To protect consumers from certain aggressive sales tactics on the Internet.

*Be it enacted by the Senate and House of Representatives of*
*the United States of America in Congress assembled,*

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "Restore Online Shoppers' Confidence Act".

**SEC. 2. FINDINGS; DECLARATION OF POLICY.**

The Congress finds the following:

(1) The Internet has become an important channel of commerce in the United States, accounting for billions of dollars in retail sales every year. Over half of all American adults have now either made an online purchase or an online travel reservation.

(2) Consumer confidence is essential to the growth of online commerce. To continue its development as a marketplace, the Internet must provide consumers with clear, accurate information and give sellers an opportunity to fairly compete with one another for consumers' business.

(3) An investigation by the Senate Committee on Commerce, Science, and Transportation found abundant evidence that the aggressive sales tactics many companies use against their online customers have undermined consumer confidence in the Internet and thereby harmed the American economy.

(4) The Committee showed that, in exchange for "bounties" and other payments, hundreds of reputable online retailers and websites shared their customers' billing information, including credit card and debit card numbers, with third party sellers through a process known as "data pass". These third party sellers in turn used aggressive, misleading sales tactics to charge millions of American consumers for membership clubs the consumers did not want.

(5) Third party sellers offered membership clubs to consumers as they were in the process of completing their initial transactions on hundreds of websites. These third party "post-transaction" offers were designed to make consumers think the offers were part of the initial purchase, rather than a new transaction with a new seller.

(6) Third party sellers charged millions of consumers for membership clubs without ever obtaining consumers' billing information, including their credit or debit card information, directly from the consumers. Because third party sellers

S. 3386—2

acquired consumers' billing information from the initial merchant through "data pass", millions of consumers were unaware they had been enrolled in membership clubs.

(7) The use of a "data pass" process defied consumers' expectations that they could only be charged for a good or a service if they submitted their billing information, including their complete credit or debit card numbers.

(8) Third party sellers used a free trial period to enroll members, after which they periodically charged consumers until consumers affirmatively canceled the memberships. This use of "free-to-pay conversion" and "negative option" sales took advantage of consumers' expectations that they would have an opportunity to accept or reject the membership club offer at the end of the trial period.

## SEC. 3. PROHIBITIONS AGAINST CERTAIN UNFAIR AND DECEPTIVE INTERNET SALES PRACTICES.

(a) REQUIREMENTS FOR CERTAIN INTERNET-BASED SALES.—It shall be unlawful for any post-transaction third party seller to charge or attempt to charge any consumer's credit card, debit card, bank account, or other financial account for any good or service sold in a transaction effected on the Internet, unless—

(1) before obtaining the consumer's billing information, the post-transaction third party seller has clearly and conspicuously disclosed to the consumer all material terms of the transaction, including—

(A) a description of the goods or services being offered;

(B) the fact that the post-transaction third party seller is not affiliated with the initial merchant, which may include disclosure of the name of the post-transaction third party in a manner that clearly differentiates the post-transaction third party seller from the initial merchant; and

(C) the cost of such goods or services; and

(2) the post-transaction third party seller has received the express informed consent for the charge from the consumer whose credit card, debit card, bank account, or other financial account will be charged by—

(A) obtaining from the consumer—

(i) the full account number of the account to be charged; and

(ii) the consumer's name and address and a means to contact the consumer; and

(B) requiring the consumer to perform an additional affirmative action, such as clicking on a confirmation button or checking a box that indicates the consumer's consent to be charged the amount disclosed.

(b) PROHIBITION ON DATA-PASS USED TO FACILITATE CERTAIN DECEPTIVE INTERNET SALES TRANSACTIONS.—It shall be unlawful for an initial merchant to disclose a credit card, debit card, bank account, or other financial account number, or to disclose other billing information that is used to charge a customer of the initial merchant, to any post-transaction third party seller for use in an Internet-based sale of any goods or services from that post-transaction third party seller.

S. 3386—3

(c) APPLICATION WITH OTHER LAW.—Nothing in this Act shall
be construed to supersede, modify, or otherwise affect the require-
ments of the Electronic Funds Transfer Act (15 U.S.C. 1693 et
seq.) or any regulation promulgated thereunder.

(d) DEFINITIONS.—In this section:

(1) INITIAL MERCHANT.—The term "initial merchant" means
a person that has obtained a consumer's billing information
directly from the consumer through an Internet transaction
initiated by the consumer.

(2) POST-TRANSACTION THIRD PARTY SELLER.—The term
"post-transaction third party seller" means a person that—

(A) sells, or offers for sale, any good or service on
the Internet;

(B) solicits the purchase of such goods or services on
the Internet through an initial merchant after the con-
sumer has initiated a transaction with the initial merchant;
and

(C) is not—

(i) the initial merchant;

(ii) a subsidiary or corporate affiliate of the initial
merchant; or

(iii) a successor of an entity described in clause
(i) or (ii).

## SEC. 4. NEGATIVE OPTION MARKETING ON THE INTERNET.

It shall be unlawful for any person to charge or attempt to
charge any consumer for any goods or services sold in a transaction
effected on the Internet through a negative option feature (as
defined in the Federal Trade Commission's Telemarketing Sales
Rule in part 310 of title 16, Code of Federal Regulations), unless
the person—

(1) provides text that clearly and conspicuously discloses
all material terms of the transaction before obtaining the con-
sumer's billing information;

(2) obtains a consumer's express informed consent before
charging the consumer's credit card, debit card, bank account,
or other financial account for products or services through
such transaction; and

(3) provides simple mechanisms for a consumer to stop
recurring charges from being placed on the consumer's credit
card, debit card, bank account, or other financial account.

## SEC. 5. ENFORCEMENT BY FEDERAL TRADE COMMISSION.

(a) IN GENERAL.—Violation of this Act or any regulation pre-
scribed under this Act shall be treated as a violation of a rule
under section 18 of the Federal Trade Commission Act (15 U.S.C.
57a) regarding unfair or deceptive acts or practices. The Federal
Trade Commission shall enforce this Act in the same manner,
by the same means, and with the same jurisdiction, powers, and
duties as though all applicable terms and provisions of the Federal
Trade Commission Act (15 U.S.C. 41 et seq.) were incorporated
into and made a part of this Act.

(b) PENALTIES.—Any person who violates this Act or any regula-
tion prescribed under this Act shall be subject to the penalties
and entitled to the privileges and immunities provided in the Fed-
eral Trade Commission Act as though all applicable terms and
provisions of the Federal Trade Commission Act were incorporated
in and made part of this Act.

S. 3386—4

(c) AUTHORITY PRESERVED.—Nothing in this section shall be construed to limit the authority of the Commission under any other provision of law.

**SEC. 6. ENFORCEMENT BY STATE ATTORNEYS GENERAL.**

(a) RIGHT OF ACTION.—Except as provided in subsection (e), the attorney general of a State, or other authorized State officer, alleging a violation of this Act or any regulation issued under this Act that affects or may affect such State or its residents may bring an action on behalf of the residents of the State in any United States district court for the district in which the defendant is found, resides, or transacts business, or wherever venue is proper under section 1391 of title 28, United States Code, to obtain appropriate injunctive relief.

(b) NOTICE TO COMMISSION REQUIRED.—A State shall provide prior written notice to the Federal Trade Commission of any civil action under subsection (a) together with a copy of its complaint, except that if it is not feasible for the State to provide such prior notice, the State shall provide such notice immediately upon instituting such action.

(c) INTERVENTION BY THE COMMISSION.—The Commission may intervene in such civil action and upon intervening—

(1) be heard on all matters arising in such civil action; and

(2) file petitions for appeal of a decision in such civil action.

(d) CONSTRUCTION.—Nothing in this section shall be construed—

(1) to prevent the attorney general of a State, or other authorized State officer, from exercising the powers conferred on the attorney general, or other authorized State officer, by the laws of such State; or

(2) to prohibit the attorney general of a State, or other authorized State officer, from proceeding in State or Federal court on the basis of an alleged violation of any civil or criminal statute of that State.

(e) LIMITATION.—No separate suit shall be brought under this section if, at the time the suit is brought, the same alleged violation is the subject of a pending action by the Federal Trade Commission or the United States under this Act.

*Speaker of the House of Representatives.*

*Vice President of the United States and*
*President of the Senate.*



**Monday,
January 31, 2005**

Part VIII

# Federal Trade
# Commission

16 CFR Parts 642 and 698
Prescreen Opt-Out Disclosure; Final Rule

EXHIBIT
2

© StenoWorks
The Court Reporting Store

## FEDERAL TRADE COMMISSION

### 16 CFR Parts 642 and 698

**[RIN 3084–AA94]**

### Prescreen Opt-Out Disclosure

**AGENCY:** Federal Trade Commission.

**ACTION:** Final rule.

**SUMMARY:** The Fair and Accurate Credit Transactions Act of 2003 (''FACT Act'' or ''Act'') directs the Federal Trade Commission (''FTC'' or ''Commission''), in consultation with the Federal banking agencies and the National Credit Union Administration, to adopt a rule to improve the required notice to consumers regarding their right to opt out of prescreened solicitations for credit or insurance. This final rule implements this requirement.

**EFFECTIVE DATE:** This rule is effective on August 1, 2005.

**FOR FURTHER INFORMATION CONTACT:** Jeanne-Marie Burke or Kellie Cosgrove Riley, Attorneys, (202) 326–3224, Division of Financial Practices, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue, NW., Washington, DC 20580.

**SUPPLEMENTARY INFORMATION:**

### Statement of Basis and Purpose

### I. Background

Section 615(d) of the Fair Credit Reporting Act (''FCRA'') requires that any person who uses a consumer report in order to make an unsolicited firm offer of credit or insurance to the consumer (''prescreened offer'' or ''prescreened solicitation''), shall provide with each written solicitation a clear and conspicuous statement that: (A) Information contained in the consumer's consumer report was used in connection with the transaction; (B) the consumer received the offer of credit or insurance because the consumer satisfied the criteria for credit worthiness or insurability under which the consumer was selected for the offer; (C) if applicable, the credit or insurance may not be extended if, after the consumer responds to the offer, the consumer does not meet the criteria used to select the consumer for the offer or any applicable criteria bearing on credit worthiness or insurability or does not furnish any required collateral; (D) the consumer has a right to prohibit information contained in the consumer's file with any consumer reporting agency from being used in connection with any credit or insurance transaction that is not initiated by the consumer; and (E) the consumer may exercise the right referred to in

subparagraph (D) by notifying a notification system established under section 604(e) [of the FCRA].

Section 615(d)(1) of the FCRA [15 U.S.C. 1681m(d)(1)][1]

The Fair and Accurate Credit Transactions Act of 2003, Public Law 108–159, 117 Stat. 1952 (FACT Act or the Act) was signed into law on December 4, 2003. Section 213(a) of the FACT Act amends FCRA section 615(d) to require that the statement mandated by section 615(d) ''be presented in such format and in such type size and manner as to be simple and easy to understand, as established by the Commission, by rule, in consultation with the Federal banking agencies and the National Credit Union Administration.''

On September 27, 2004, the Commission issued, and sought comment on, a proposed Rule implementing the requirements of section 213(a) of the FACT Act (''the proposed Rule'').[2] In response to the proposed Rule, the Commission received approximately 60 comments from a variety of trade associations, creditors, insurers, consumer advocacy groups, and individual consumers. After carefully considering the comments received, the Commission adopts the proposed Rule with some modifications.

The final Rule carries out the Commission's mandate to improve the prescreen notice so that it is simple and easy to understand. The FACT Act specifies that ''simple and easy to understand'' is to be achieved by establishing a format, type size, and manner for the presentation of the notice. These three factors indicate that ''simple and easy to understand'' is meant to include both (1) the content, such as language and syntax, of the notice so that it effectively conveys the intended message to readers, and (2) the presentation and format of the notice such that it calls attention to the notice and enhances its understandability. Thus, the final Rule establishes certain baseline requirements for these two components to ensure that the notices

meet the statutory mandate. As stated in the proposed Rule, the determination of whether a notice meets the ''simple and easy to understand'' standard is based on the totality of the disclosure and the manner and format in which it is presented, not on any single factor. Modifications have been made to the final Rule to make it clearer that the ''simple and easy to understand'' standard is a flexible one.

The final Rule: (1) Sets forth the purpose and scope of the Rule; (2) defines ''simple and easy to understand''; (3) requires a notice that consists of an initial statement that provides basic opt-out information (''short notice''), and a separate longer explanation that offers further information (''long notice''); (4) adds a definition for ''principal promotional document,'' the document in which the short notice must appear; (5) establishes the effective date for the Rule; and (6) proposes model notices that may be used for compliance.

Therefore, having consulted with the Office of the Comptroller of the Currency, Board of Governors of the Federal Reserve System, Federal Deposit Insurance Corporation, Office of Thrift Supervision, and National Credit Union Administration, the FTC issues the following Rule.

### II. Overview of Comments Received

The Commission received approximately 60 comments concerning the proposed Rule.[3] The vast majority of these comments were from industry trade organizations[4] and the business community.[5] Individual consumers, five

---

[1] Section 604(e) of the FCRA requires that any consumer reporting agency that provides prescreened lists to marketers shall maintain a notification system through which consumers may choose to have their names and addresses excluded from such lists. That section also requires that consumer reporting agencies that compile and maintain files on consumers on a nationwide basis establish a joint notification system. The nationwide consumer reporting agencies have done so, and the current telephone number for the joint notification system is 1–888–5–OPT–OUT (1–888–567–8688).

[2] The notice of proposed rulemaking and proposed Rule were published in the **Federal Register** on October 1, 2004. 69 FR 58861.

[3] The public comments relating to this rulemaking may be viewed at *http://www.ftc.gov/os/comments/prescreenedoptout/index.htm.* Citations to comments filed in this proceeding are made to the name of the organization (if any) or the last name of the commenter, and the comment number of record.

[4] These included the Consumer Data Industry Association (''CDIA'') (the trade association that represents the nationwide consumer reporting agencies and a variety of other consumer reporting agencies), America's Community Bankers, American Bankers Association, American Council of Life Insurers, American Financial Services Association, the Coalition to Implement the FACT Act (representing trade associations and companies that furnish, use, collect, and disclose consumer information), Consumer Bankers Association, Credit Union National Association, Florida Association of Mortgage Brokers, Independent Community Bankers of America, Michigan Credit Union League, Mortgage Bankers Association, National Association of Federal Credit Unions, National Independent Automobile Dealers Association, National Retail Federation, Pennsylvania Credit Union Association, and Property Casualty Insurers Association of America.

[5] These included financial institutions, such as Bank of America Corporation, Countrywide Home Loans, MasterCard International Incorporated, MBNA America Bank, N.A., Navy Federal Credit Union, Union Federal Bank, and Visa U.S.A. Inc.;

members of Congress,[6] and consumer advocacy groups[7] also submitted comments on the proposed Rule. In addition to considering the comments received, the Commission reviewed and considered the Board of Governors of the Federal Reserve System's Report to the Congress on "Further Restrictions on Unsolicited Written Offers of Credit or Insurance ("FRB Prescreen Report").[8]

The Commission received comments on nearly all of the provisions contained in the proposed Rule. Most commenters, including consumers, businesses, trade associations, and consumer groups, expressed general support for a Rule requiring an improved and more understandable prescreen notice. However, commenters disagreed on what manner and format would best accomplish the goals of the FACT Act and what information should be contained in the notices.

The majority of industry commenters opposed the layered notice approach, asserting that a layered notice exceeds the FTC's statutory authority, would overshadow other important notices, and would lead consumers to make uninformed decisions about whether to opt out.[9] Some industry members, as well as consumer advocacy groups, supported the layered notice as an appropriate means of effecting the statutory directive of providing a simple and easy format for disclosing the required information.[10] Commenters also disagreed on whether the type-size requirements should be larger[11] or smaller[12] than proposed, and whether the notice should include additional information, such as the benefits of prescreened offers,[13] or prohibit any additional information from being included in the notice.[14]

In general, commenters also approved of the definition of "simple and easy to understand," but some expressed concern that the proposed Rule's list of factors to be considered in determining whether a notice met this definition might be considered a "checklist" rather than examples.[15] In addition, commenters generally agreed that the Rule should also include a definition for "principal promotional document."[16]

Although commenters generally supported the proposed Rule's inclusion of model notices,[17] some commenters suggested changes or additions to the language of those notices to achieve various goals, including using more "neutral" language for the short notice,[18] adding language regarding collateral requirements,[19] and adding language regarding the benefits of prescreened offers.[20]

All of these comments, as well as others, are discussed more fully below.

## III. Section-By-Section Analysis

### A. Section 642.1: Purpose and Scope

Proposed section 642.1(a) set forth the purpose of the proposed Rule, which was to implement section 213(a) of the FACT Act. Section 213(a) requires the FTC to establish the format, type size, and manner in which the notices to consumers regarding the right to opt out of prescreened solicitations are to be presented. The Commission received no comments regarding this section and it is adopted as proposed.

Proposed section 642.1(b) set forth the scope of the proposed Rule. The Rule applies to any person who uses a consumer report on any consumer in connection with any credit or insurance transaction that is not initiated by the consumer, pursuant to section 604(c)(1)(B) of the FCRA. The Commission received no comments regarding this section and it is adopted as proposed.

### B. Section 642.2: Definitions

#### 1. "Simple and Easy to Understand"

The proposed Rule contained one definition in section 642.2. "Simple and easy to understand" was defined to mean "plain language designed to be understood by ordinary consumers." Proposed section 642.2 also listed eight factors that would be considered in determining whether a statement is "simple and easy to understand."[21]

The Commission received several comments concerning this definition. Some commenters noted that they supported the definition, did not suggest any changes, and encouraged the Commission to retain it in the final Rule.[22] Other commenters suggested that the Commission eliminate the eight factors from the definition. These commenters expressed various concerns about the factors, including that they unduly complicate an otherwise uncomplicated definition and could be interpreted as a checklist of requirements that must each be present in order to meet the definition.[23]

As the Commission noted in the notice of proposed rulemaking ("NPRM") accompanying the proposed Rule, the eight factors are intended to provide guidance to companies in

---

insurers, such as Progressive; and credit reporting agencies, such as Equifax Information Services LLC, Experian Information Solutions, Inc., and TransUnion LLC.

[6] Congressman Spencer Bachus, Chair of the Subcommittee on Financial Institutions and Consumer Credit, of the House Financial Services Committee (R–AL); Congressman Paul Kanjorski (D–PA); Congressman John Sweeney (R–NY); Senator George Allen (R–VA); and Senator Jim Bunning (R–KY).

[7] These included the Consumer Action, National Consumers League, Consumer Federation of America, and Privacy Rights Clearinghouse.

[8] See *http://www.federalreserve.gov/boarddocs/rptcongress/*.

[9] See, e.g., Comment, America's Community Bankers #OL–100013; Comment, Discover Bank #OL–100016; Comment, Financial Services Roundtable #EREG–000004; Comment, Juniper Financial Corp., #000009; Comment, MasterCard International Incorporated #000012; Comment, Visa U.S.A. Inc. #000005; Comment, Wells Fargo & Company #000007; Comment, Wilmer Cutler Pickering Hale and Dorr LLP #OL–100045.

[10] See, e.g., Comment, Boeing Employees' Credit Union #000020; Comment, Commerce Bancshares, Inc. #OL–100045; Comment, National Consumers League, et al. #OL–100011; Comment, Pennsylvania Credit Union Association #OL–100024; Comment, Privacy Rights Clearinghouse #OL–100015.

[11] See, e.g., Comment, National Consumers League, et al. #OL–100011; Comment, Privacy Rights Clearinghouse #OL–10015.

[12] See, e.g., Comment, Commerce Bancshares, Inc. #OL–100045; Comment, Mortgage Bankers Association #OL–100036; Comment, National Independent Automobile Dealers Association #OL–100021; Comment, Union Federal Bank #OL–100044.

[13] See, e.g., Comment, Discover Bank #OL–100016; Comment, Financial Services Roundtable #EREG–000004; Comment, MBNA America Bank #OL–100031.

[14] See, e.g., Comment, Connors #OL–100014; Comment, National Consumers League, et al. #OL–100011; Comment, Privacy Rights Clearinghouse #OL–100015.

[15] See, e.g., Comment, Coalition to Implement the FACT Act #OL–100042; Comment, Juniper Financial Corp. #000009; Comment, MasterCard International Incorporated #000012.

[16] See, e.g., Comment, Commerce Bancshares, Inc. #OL–100045; Comment, Credit Union National Association #000003; Comment, Mortgage Bankers Association #OL–100036; Comment, National Association of Federal Credit Unions #OL–100020; Comment, National Consumers League, et al. #OL–100011; Comment, Privacy Rights Clearinghouse #OL–100015.

[17] See, e.g., Comment, Countrywide #000010; Comment, Visa U.S.A. Inc. #000005.

[18] See, e.g., Comment, Juniper Financial Corp. #000009; Comment, MasterCard International Incorporated #000012; Comment, Visa U.S.A. Inc. #000005; Comment, Wells Fargo & Company #000007.

[19] See, e.g., Comment, Mortgage Bankers Association #OL–100036.

[20] See, e.g., Comment, JPMorgan Chase Bank #OL–100019; Comment, Juniper Financial Corp. #000009.

[21] The eight factors to be considered in determining whether a statement is "simple and easy to understand" were: (1) Use of clear and concise sentences, paragraphs, and sections; (2) use of short explanatory sentences; (3) use of definite, concrete, everyday words; (4) use of active voice; (5) avoidance of multiple negatives; (6) avoidance of legal and technical business terminology; (7) avoidance of explanations that are imprecise and reasonably subject to different interpretations; and (8) use of language that is not misleading.

[22] See, e.g., Comment, Discover Bank #OL–100016; Comment, Wells Fargo & Company #000007.

[23] See, e.g., Comment, Coalition to Implement the FACT Act #OL–100042; Comment, Equifax Information Services LLC #OL–100023; Comment, Juniper Financial Corp. #000009; Comment, MasterCard International Incorporated #000012.

complying with the Rule, while allowing them to maintain flexibility to determine how best to meet the definition.

The Commission has revised the Rule to clarify that use of clear and concise sentences, paragraphs, and sections is a mandatory part of the definition, but the remaining seven factors are simply examples to be considered in meeting the "simple and easy to understand" definition. These factors should neither be considered to be mandatory, nor to constitute an exhaustive list.

In addition, the Commission has determined to specify in the final Rule that the layered notice is a required component of the "simple and easy to understand" definition. The Commission has determined that the layered format makes the prescreen disclosures simpler and easier to understand, and it is appropriate that it specifically be incorporated into the definition.[24]

## 2. "Principal Promotional Document"

Proposed section 642.3(a)(2) required that the short form of the layered notice be placed on the first page of the principal promotional document. The Commission noted in the NPRM that the question of what constitutes the "principal promotional document" is fact specific, but that, in general, the Commission would consider the cover letter or the document that is designed to be seen first by the consumer to be the "principal promotional document." The proposed Rule did not define "principal promotional document," however, and the Commission requested comment on whether such a definition was necessary.

The Commission received several comments requesting that the Commission provide a definition for "principal promotional document."[25]

Some commenters suggested specific definitions for the term, such as the document intended to be seen first by the consumer, the document that addresses the consumer directly with the offer, the cover letter or other document used to introduce the offer, or the cover letter or other document that the consumer sees first when opening the solicitation. At least one commenter asserted that the proper location for the disclosure is in the application or the offer of credit.[26] Another commenter suggested that factors to be considered in determining whether a document is the principal promotional document should include (1) whether the document is the first page of a letter to a consumer, or (2) whether the document contains the credit terms being offered.[27]

In addition, some commenters expressed concern that the concept of a principal promotional document would not translate well to an electronic prescreened offer. Specifically, these commenters were concerned that a pop-up advertisement that appeared on the consumer's computer screen would have to contain the short notice.[28] These commenters suggested that pop-up advertisements should be considered similar to envelopes, and therefore not considered the principal promotional document.

The Commission agrees with the commenters that a definition would help companies to comply with the Rule and has considered all of the suggested definitions. The final Rule defines principal promotional document as the document that is designed to be seen first by the consumer, such as the cover letter. Requiring that the disclosure appear early in the solicitation enhances the noticeability of the disclosure, thereby aiding in making the disclosure simple and easy to understand. The final Rule does not link the definition to the credit terms or the application, because many different documents within the solicitation may contain some or all of the credit terms, and those consumers who are interested in opting out of receiving solicitations for future offers may not be likely to review the terms and conditions of the offer at hand. Therefore, linking the definition

to credit terms would not provide guidance to businesses, nor would it ensure that those interested in opting out could easily locate the notice.

In addition, the Commission has considered the concerns expressed by the commenters regarding the application of the definition to electronic offers. The Commission is in agreement with those commenters who equated a pop-up promotional screen with an envelope. Therefore, the Commission will consider the principal promotional document in those circumstances to be the page designed to be seen first by the consumer who clicks on the pop-up promotional screen.

## C. Section 642.3: Prescreen Opt-Out Notices

The proposed Rule required a "layered" notice—that is, a notice that includes both an initial short portion and a longer portion contained later in the solicitation. The short portion of the notice informed consumers about the right to opt out of receiving prescreened solicitations and specified a toll-free number for consumers to call to exercise that right. No additional information could be included in the short notice. The long portion of the notice provided consumers with all of the additional information required by section 615(d) of the FCRA. The long notice could contain additional information that did not interfere with, detract from, contradict, or otherwise undermine the purpose of the opt-out notice. The proposed Rule set forth certain baseline requirements for the type size of the notice, as well as the presentation of the notice.

Most of the comments the Commission received focused on various aspects of this section of the proposed Rule. Commenters addressed several topics pertaining to this section, including the Commission's statutory authority to prescribe a layered notice, the Commission's statutory authority to require the notice to appear in electronic solicitations, the content of the notice, the type size of the notice, and the format and manner in which the notice is presented, including within electronic solicitations. Each of these is addressed in turn below.

## 1. Statutory Authority for the Layered Notice

Several commenters questioned whether the Commission had exceeded its statutory authority by mandating a layered notice.[29] Many of these

---

[24] The Commission also notes that, in addition to meeting the "simple and easy to understand" definition set forth by the Rule, prescreen opt-out notices must continue to meet the "clear and conspicuous" standard required by the FCRA. One recent case from the Court of Appeals for the Seventh Circuit noted that, in determining whether a prescreen notice is "clear and conspicuous," factors to be considered are: "the location of the notice within the document, the type size used within the notice as well as the type size in comparison to the rest of the document * * * whether the notice is set off in any other way— spacing, font style, all capitals, etc." *Cole* v. *U.S. Capital, Inc.*, 389 F.3d 719, 731 (7th Cir. 2004). The court concluded, "In short, there must be something about the way the notice is presented in the document such that the consumer's attention will be drawn to it." *Id.* Thus, the "simple and easy to understand" standard overlaps to some extent with the "clear and conspicuous" standard.

[25] See, e.g., Comment, Commerce Bancshares, Inc. #OL–100045; Comment, Credit Union National Association #000003; Comment, Mortgage Bankers

Association #OL–100036; Comment, National Association of Federal Credit Unions #OL–100020; Comment, National Consumers League, *et al.* #OL–100011; Comment, Privacy Rights Clearinghouse #OL–100015.

[26] Comment, Michigan Credit Union League #OL–100030.

[27] Comment, Mortgage Bankers Association #OL–100036.

[28] See, e.g., Comment, Financial Services Roundtable #EREG–000004; Comment, GE Consumer Finance-Americas #OL–100018.

[29] See, e.g., Comment, Consumer Bankers Association #OL–100028; Comment, HSBC North

commenters stated that the Commission was improperly specifying a definition of the clear and conspicuous standard contained in section 615(d) of the FCRA, including imposing a prominence requirement.[30] These commenters argued that Congress did not intend this disclosure to be more prominent than other disclosures required by law, such as the so-called "Schumer box,"[31] or that any one element of the disclosure be more prominent than another. One commenter opined that the layered notice was actually two notices and therefore was contrary to the language in section 615(d) of the FCRA requiring "a clear and conspicuous statement."[32]

The Commission has considered these comments and has decided to retain the layered notice approach in the final Rule. The FACT Act requires that the notice be "*presented* in a *format* and in such *type size* and *manner* as to be simple and easy to understand, as established by the Commission." (Emphasis added.) Thus, the plain language of the statute provides that "simple and easy to understand" encompasses presentation of the notice. The Commission has concluded that the layered notice is an appropriate and effective means of achieving this goal, and that nothing in the FACT Act or the FCRA prohibits the use of a layered notice approach.

Under section 615(d) of the FCRA, the prescreen disclosure must be clear and conspicuous. Section 213(a) of the FACT Act imposed the *additional requirement that the disclosure be "simple and easy to understand." Therefore, the statutory scheme establishes a different standard for the prescreen disclosure than it imposes on other disclosures that must only be clear and conspicuous. There is no evidence in the record that the layered notice required by this Rule will compromise the communication of other required disclosures in prescreened solicitations.*

Some commenters stated that, even if the Commission has authority to require a layered notice, it was improper for the Commission to rely upon the consumer survey that the Commission undertook as part of developing the proposed Rule as support for the layered notice

requirement. These commenters criticized the methodology of the survey as unrepresentative of consumer reactions in a real-world setting.[33] The Commission recognizes the limitations of any survey testing methodology because of the artificial setting of the test environment, but maintains that the study approximated real-world conditions to the extent feasible.[34] The Commission believes that the survey provides probative evidence of the comparative effectiveness of the three versions of notices it tested ("current," "improved," and "layered").[35] The survey found that the layered notice better communicated the central messages—consumers' right to opt out and how to exercise the right—than did the current version.[36]

A layered notice is particularly useful in cases such as this, where the information that must be disclosed consists of a relatively simple central proposition accompanied by a larger quantity of explanatory or ancillary information. The layered approach allows for clear communication of the central message with a clear reference to the additional required information.

Those consumers interested in the additional information have the opportunity to view that information in another location.[37]

**2. Statutory Authority To Require Notice in Electronic Solicitations**

Several commenters suggested that the FCRA does not apply to solicitations that are transmitted electronically because such documents are not "written," as that term is used in the FCRA.[38] The Commission believes that "written" refers to information that is capable of being preserved in a tangible form and read, as opposed to an oral statement that is intangible and transitory. As with information presented on paper, consumers using electronic media can read the information and preserve it for possible later review either by printing it on paper, saving it on disk, or by some other means. The Commission believes that the purpose of section 213(a) of the FACT Act was to enhance consumers' awareness of opt-out rights, under section 615(d) of the FCRA, whenever they receive a written solicitation in any form, regardless of the means of transmission. Therefore, the Commission has determined that the Rule should apply to all written solicitations, even if they are transmitted electronically.

**3. Content of the Notice**

Commenters expressed two primary concerns with the content of the short portion of the notice: (1) Whether it is appropriate to include a statement of the opt-out right and the telephone number of the opt-out system in the short portion of the notice; and (2) whether companies should be permitted to include additional information, beyond

---

American Holdings #000004; Comment, Juniper Financial Corp. #000009; Comment, MasterCard International #000012; Comment, Visa U.S.A. Inc. #000005; Comment, Wachovia Corporation #OL–100017.

[30] See, *e.g.*, Comment, Juniper Financial Corp. #000009; Comment, MasterCard International #000012; Comment, Wachovia Corporation #OL–100017.

[31] See 12 CFR 226.5a.

[32] Comment, Visa U.S.A. Inc. #000005.

[33] *See, e.g.*, Comment, Wilmer Cutler Pickering Hale and Dorr LLP #OL–100046. (For a discussion of the consumer survey, *see* 69 FR 58861, 58864.)

[34] The study used standard consumer testing methodology and consisted of an *initial exposure*, in which the test instrument was presented to the consumer and then removed from view, and a *forced exposure*, in which the consumer's attention was focused on specific information in the test instrument. *See* Manoj Hastak, Ph.D., *The Effectiveness of "Opt-Out" Disclosures in Pre-Screened Credit Card Offers*, at 3–4, located at *http://www.ftc.gov/reports/prescreen/040927optoutdiscprecreenrpt.pdf*. In the view of the Commission's consumer research expert consultant, the initial exposure was designed to simulate "fairly natural viewing conditions." *Id.* at 4. The FRB Prescreen Report indicates that, for most of those consumers who actually open and review prescreened solicitations, this approach may indeed approximate real-world conditions. In a nationwide survey of consumers, the FRB found that 56% of consumers throw prescreened solicitations away without opening them, 34% merely "glance" at them, and the remaining 10% read them closely. *See* FRB Prescreen Report at 32. The initial exposure may have simulated the experience of consumers who glance at prescreened solicitations but do not examine them closely, that is, the experience of most consumers who actually open prescreened solicitations.

[35] The Commission has long recognized that methodological perfection is not required before a consumer survey can be probative and reliable; rather, imperfections in methodology affect the weight that is given to the survey. See, *e.g.*, *In re Stouffer Foods Corp.*, 118 F.T.C. 746, 799 (1994); *In re Bristol-Meyers Co.*, 85 F.T.C. 688, 743–44 (1975).

[36] *See* 69 FR 58861, 58864. In addition, although there was not a statistical difference between the improved and layered versions in the communication of the opt-out right, the layered version was more effective in the initial "natural" exposure (as compared to the second "forced" exposure) at communicating how to exercise that right.

[37] The results reported in the FRB Prescreen Report indicate that a layered notice may be a very effective means to ensure that consumers who open prescreened solicitations will see the prescreen disclosure. As noted, *supra* note 34, the FRB Prescreen Report found that 56% of consumers throw prescreened solicitations away without opening them, 10% of consumers open the solicitations and examine them, and the remainder (34%) open the solicitations and "glance" at them. *Id.* Those consumers who immediately throw the solicitation away are not likely to see the notice wherever it is located; those who examine the solicitation closely might see any disclosure, even one on the back of the page or in fine print; but those consumers who "glance" at the solicitation may be more likely to see a prescreen disclosure located on the first page of the principal promotional document that is printed in a noticeable type size and set apart from other text on the page. Thus, a layered notice seems more likely to be seen by the majority of consumers who open prescreened solicitations.

[38] *See, e.g.*, Comment, American Financial Services Association #OL–100038; Comment, Discover Bank #OL–100016.

that mandated by the statute, in any part of the layered notice.

*Inclusion of opt-out right and telephone number in the short notice.*

Several commenters suggested that it was improper for the Commission in the proposed Rule to require presentation of the opt-out right and the telephone number to opt out for placement in the short portion of the notice, while relegating other statutorily-required information to the long portion of the notice.[39] Some of these commenters stated that the Commission did not have the authority to make certain elements of the disclosure (in particular, the telephone number) more prominent than others by placing them in the short portion of the notice. Some were concerned that consumers would not read the long portion of the notice if they could obtain all of the information necessary to opt out from the short portion, which might lead them to make decisions about opting out without the benefit of all pertinent information.[40] Other commenters expressed concern that consumers may mistakenly assume they can use the opt-out telephone number to reply to the offer itself, leading to frustration and confusion.[41]

As stated above, Congress has directed the Commission to prescribe the presentation of the notice, including its manner and format. In exercising that authority, the Commission has determined to include the opt-out right and telephone number in the short notice in the final Rule.[42] Nothing in the statute prohibits the Commission from exercising its authority in this manner, and, in fact, the only legislative history specifically discussing the content of the required notice supports this result

and indicates Congress' interest in highlighting the opt-out right.[43]

The FRB Prescreen Report seems to confirm Congress' concern that the existing notice under FCRA section 615(d)(2) has not been especially effective at communicating to consumers that they have a right to opt out of prescreened solicitations. The FRB conducted a nationwide survey of consumers and found that only 20% of consumers were aware of the opt-out right, and that less than half of those had learned of it through the section 615(d) notice.[44] The Report cites the pending ''review of the presentation and the placement of the notice in written prescreened solicitations' mandated by the FACT Act (that is, the Commission's rulemaking proceeding), as one basis for its recommendation that further legislative changes are not necessary at this time.

The Commission has concluded that the statute's purpose is best accomplished by requiring that the short notice include the essential information that consumers need if they choose to opt out. Those consumers who are seeking more information about prescreened offers and their options are invited by the short notice to obtain further information from the long notice.

Finally, the Commission is not persuaded that consumers will be confused about the purpose of the telephone number, given that the short notice will explicitly state that the number is to be used for opting out of future prescreened offers.

*Additional information in the notices.*
The proposed Rule prohibited senders of prescreened solicitations from including information in the short portion of the notice other than that specified by the Rule—that is, consumers' right to opt out and how to

exercise it. The proposed Rule contained no such restriction on the content of the long portion of the notice, so long as any additional content did not interfere with, detract from, contradict, or otherwise undermine the purpose of the notice.

Some commenters supported the proposed Rule's prohibition on additional information being included in the short notice, and encouraged the Commission to prohibit additional information in the long notice as well. These commenters argued that allowing additional information in the notices would be contrary to the Commission's statutory mandate, confuse consumers, and allow marketers to discourage consumers from opting out.[45] Other commenters, however, advocated allowing additional information, such as the benefits of prescreened offers and the consequences of opting out, in both the short and long notices in order to provide consumers with sufficient information to make an informed decision about whether to opt out.[46] Some of these commenters cited to an exchange between Representatives Bachus and Kanjorski during the House of Representatives' consideration of the bill, in which the Congressmen stated that consumers should be aware ''not only of the right to opt out of receiving prescreened solicitations, but also of the benefits and consequences of opting out.''[47] Representatives Bachus and Kanjorski submitted a comment to the Commission expressing the importance of consumer awareness of the benefits and consequences of opting out.

The Commission recognizes that prescreened offers may confer many benefits on consumers. As discussed in several of the comments, such offers may be an easy and efficient means for consumers to learn of competing credit or insurance offers and to identify those that best suit their needs. The Commission also acknowledges, as stated in certain of the comments, that the growth in prescreened offers has coincided with a general trend towards lower initial interest rates and certain other more favorable terms, and that a substantial percentage of credit card enrollments result from prescreened offers. Moreover, the Commission recognizes that if prescreened offers

---

[39] *See, e.g.,* Comment, Coalition to Implement the FACT Act #OL–100040; Comment, Direct Marketing Association #OL–100035; Comment, TransUnion LLC #000022; Comment, Wachovia Corporation #OL–100017.

[40] *See, e.g.,* Comment, American Bankers Association #OL–100040; Comment, Capital One Financial Corporation #OL–100033.

[41] *See, e.g.,* Comment, American Financial Services Association #OL–100038; Comment, Capital One Financial Corporation #OL–100033.

[42] Although the FCRA specifically mentions both the address and telephone number for the notification system, the Commission has determined that it is appropriate to require only the telephone number in the short notice because: (1) the Commission understands that space is at a premium in prescreened solicitations, particularly on the first page of the principal promotional document, and therefore does not want to require more information than necessary in the short notice; and (2) the communication of the central message is likely to be more effective with less verbiage in the short notice. The telephone number requires less space and less verbiage than the address.

[43] For example, FACTA section 213(a), amending FCRA section 615(d)(2), is entitled, ''Enhanced Disclosure of the Means Available to Opt Out of Prescreened Lists.'' Although the title of a statutory section cannot limit that section, it may assist in explaining what was intended by that section. *See also, e.g.,* 149 Cong. Rec. S13851–52 (daily ed. Nov. 4, 2003) (statement of Sen. Sarbanes) (noting that the amendments to the FCRA ''will require a summary of consumers' rights to opt out of prescreened offers.''); 149 Cong. Rec. S13855 (daily ed. Nov. 4, 2003) (statement of Sen. Johnson) (noting that the amendments to the FCRA ''take[] important new steps to empower consumers to reduce unwanted credit solicitations.''); 149 Cong. Rec. S15806–07 (daily ed. Nov. 24, 2003) (statement of Sen. Sarbanes) (noting that the amendments to the FCRA will ''help ensure that consumers are aware of how to opt out of the prescreening process * * *. The FTC * * * will be required to write rules on the size and prominence of the disclosure of the opt-out telephone number that is included with offers of credit to consumers.'')

[44] FRB Prescreen Report at 32.

[45] *See, e.g.,* Comment, Connors #OL–100014; Comment, National Consumers League, *et al.* #OL–100011; Comment, Privacy Rights Clearinghouse #OL100015.

[46] *See, e.g.,* Comment, CDIA #OL–100026; Comment, Direct Marketing Association #OL–100035; Comment, Wilmer Cutler Pickering Hale and Dorr LLP #OL–100046.

[47] Congressional Record, November 21, 2003, page H12219. *See also infra* note 51.

Case: 1:17-cv-00194 Document #: 136 Filed: 10/17/17 Page 40 of 120 PageID #:2962

became less viable, marketers may switch to direct mail solicitations, which may be more costly and carry less favorable terms.[48] At the same time, the Commission notes the concerns raised by certain commenters about the alleged costs of prescreening, such as the privacy implications for those consumers who do not wish to have their personal financial information shared or used to make unsolicited credit and insurance offers.[49]

Regardless of the costs and benefits of prescreening, the FCRA provides that consumers may opt out of prescreened offers, and simply directs the Commission to determine how best to inform consumers of this right and how to exercise it. Moreover, the FCRA does not require that marketers notify consumers of the consequences of opting out, nor does it direct the Commission to require such a disclosure. The final Rule, therefore, requires only the statutorily-mandated messages, but permits additional information where appropriate.

The Commission has concluded that permitting additional information in the short notice could significantly diminish the communication of the statutorily-mandated message.[50] The final Rule, like the proposed Rule, does allow additional information, including information about the benefits of prescreening, in the long notice, if that information does not interfere with, detract from, contradict, or undermine the purpose of the prescreen notices. The Commission believes this approach allows marketers to provide consumers with information that may be useful to them in making their decisions, while at the same time not interfering with the statutory mandate to make the notices simple and easy to understand. The Commission also notes that marketers are free to include information about prescreening elsewhere in their solicitations. Finally, section 213(d) of the FACT Act requires the Commission to undertake a public awareness campaign to alert consumers to the availability of the opt-out right. The Commission intends to use this campaign to educate consumers about the benefits and consequences of opting out.[51]

4. Type Size of the Notice

The proposed Rule required the short portion of the notice to be in a type size that is larger than the principal text on the same page, but in no event smaller than 12-point type, and the long portion of the notice to be in a type size that is no smaller than the type size of the principal text on the same page, but in no event smaller than 8-point type.

Some commenters asserted that the type size prescribed for the short notice was adequate, but that the type size for the long notice was too small.[52] Others found the type size required for the long notice to be appropriate, but opined that the type size for the short notice was too large.[53] Still others proposed that the Commission adopt the approach used in the commentary to the Truth in Lending Act's implementing Regulation Z, which deems disclosures in 12-point type to be readily noticeable, but permits smaller type size to be used.[54] A few commenters suggested that the Commission not impose a type-size requirement at all,[55] or that the requirement only be relative to surrounding text rather than specifying an absolute size.[56]

The Commission has considered these comments, but has determined not to change the type-size requirements for written prescreened solicitations. The FACT Act directs the Commission to prescribe a rule that establishes, among other things, a type size that is sufficient to render the notice simple and easy to understand. It is important that the notices be large enough to be noticed and readable by ordinary consumers. At the same time, the Commission understands that space is at a premium in prescreened solicitations. Requiring the short portion of the notice to be in a type size that is larger than the principal text on the same page, combined with a minimum 12-point type-size requirement, is sufficient to ensure that it is noticeable and readable without imposing unnecessary expense on marketers.

The long notice, which contains additional information, presents a somewhat different calculus. Consumers who see the short notice and are interested in learning further information are directed by the short notice to the long notice. Accordingly, the Commission believes that the long notice should be in a type size that is sufficiently large to be readable, but that there is less need for the long notice to be readily noticeable. Balancing these interests, the Commission concludes that the long notice should be no smaller than 8-point type and no smaller than the principal text on the same page.

Some commenters also expressed concerns about complying with the type-size requirements in electronic solicitations. Several commenters pointed out that because the settings of the computer on which a solicitation is viewed can alter a solicitation's format, meeting a specific minimum point requirement would be burdensome.[57] These commenters suggested that the Commission instead impose a standard of relative prominence for electronic solicitations, which would require, for example, that the short notice be larger than the principal text.[58] The Commission agrees that, for electronic solicitations, a standard of relative prominence is an appropriate means by which to accommodate the vast range of electronic devices that may be used to view the offer. Thus, the final Rule provides that, for electronic solicitations, marketers must take reasonable steps to ensure that the short notice is in a type size that is larger than the principal text on the same page. The long notice must be in a type size no smaller than the principal text on the same page.

---

[48] *See also* FRB Prescreen Report at 28–36 (discussing the benefits of receiving prescreened offers).

[49] *See also* FRB Prescreen Report at 37–46 (discussing the costs of receiving prescreened offers).

[50] *See, e.g.*, Funkhouser, *An Empirical Study of Consumers' Sensitivity to the Wording of Affirmative Disclosure Messages,* 3 J. Pub. Pol. & Mktg. at 31, 33 (finding that *"information must be presented simply and straightforwardly,"* and "affirmative disclosures should say *exactly* what they are intended to mean.") (Emphasis in the original).

[51] The colloquy between Representatives Bachus and Kanjorski cited by some commenters refers to this public awareness campaign as a vehicle for informing consumers of the benefits and consequences of opting out. *See* 149 Cong. Rec. H12,218–19 (daily ed. Nov. 21, 2003) ("Mr. KANJORSKI. Mr. Speaker, does the gentleman share with me the understanding that the FTC's public awareness campaign is to be designed to increase public awareness, not only of the right to opt out of receiving prescreened solicitations, but also of the benefits and consequences of opting out? Mr. BACHUS. Mr. Speaker, yes, I share that understanding.").

[52] *See, e.g.*, Comment, National Consumers League, *et al.* #OL–100011. *See also* Comment, Privacy Rights Clearinghouse #OL–100015 (commenting that the long notice type size requirement was too small).

[53] *See, e.g.*, Comment, Boeing Employees' Credit Union #000020; Comment, Michigan Credit Union League #OL–100030; Comment, Mortgage Bankers Association #OL–100036; Comment, National Independent Automobile Dealers Association #OL–100021; Comment, Union Federal Bank #OL–100044.

[54] *See, e.g.*, Comment, Credit Union National Association #000003; Comment, Navy Federal Credit Union #000006.

[55] *See, e.g.*, Comment, Coalition to Implement the FACT Act #OL–100042; Comment, Consumer Bankers Association #OL–100028; Comment, TransUnion LLC #000022.

[56] *See, e.g.*, Comment, Countrywide #000010.

[57] *See, e.g.*, Comment, Credit Union National Association #000003; Comment, Countrywide #000010; Comment, Progressive #OL–100010.

[58] *See, e.g.*, Comment, Countrywide #000010; Comment, National Independent Automobile Dealers Association #OL–100021; Comment, Progressive #OL–100010.

5. Form of the Notice

The proposed Rule set forth certain baseline requirements for the form of both the long and the short portions of the notice. The proposed Rule required the short notice to be on the front side of the first page of the principal promotional document in the solicitation, or, if provided electronically, on the first screen; located on the page and in a format so that it is distinct from other text; and in a type style that is distinct from other type styles used on the same page. The proposed Rule required the long notice to begin with a heading identifying it as the "*OPT-OUT NOTICE*"; be in a type style that is distinct from other type styles used on the same page; and be set apart from other text on the page. The Commission received several comments concerning these requirements generally, as well as specific comments regarding the required location, type style, and heading requirements. These are addressed in turn below.

*General comments.*

Some commenters asserted that the requirements regarding form did not provide companies with enough flexibility to determine the best method for making the notices clear and conspicuous, as well as simple and easy to understand.[59] Conversely, other commenters were concerned that the requirements were not specific enough to ensure that the notices would meet the statutory standards.[60] These commenters suggested, for example, that the Rule require businesses to use bolded type style, rather than allowing them the flexibility to determine how to comply with the distinct type style requirement.

The Commission has considered these comments and declines to alter the baseline requirements in the final Rule. The requirements are not overly restrictive and allow companies flexibility to determine how best to use the basic formatting tools set forth in the Rule to make a statement noticeable and understandable. At the same time, the requirements provide sufficient specificity to ensure that the notices are simple and easy to understand.

*Location of notices in one-page solicitations.*

Several commenters noted that certain prescreened solicitations may consist of only a single page, and recommended that the final Rule not require a layered

format in that circumstance.[61] Others requested that the Commission clarify that the short and long portions of the notice could both appear on the first page of the principal promotional document.[62] Others stated that, because prescreened offers of insurance usually consist of a single page or a fold-out self mailer, the final Rule should not apply to prescreened offers of insurance.[63]

Section 615(d) of the FCRA clearly covers prescreened offers of insurance, and the Commission declines to establish an exemption for such offers from the final Rule. The Commission also declines to provide an exception from the layered notice requirement for one-page solicitations. Even in a one-page solicitation, the layered format contributes to making the notice simple and easy to understand. The Commission agrees that both the short and long portions of the notice may appear on the first page of the principal promotional document. As in the proposed Rule, the final Rule allows businesses to place the long notice in any location within the solicitation so long as that location is referenced in the short notice.

*Location of notices in electronic solicitations.*

Because the settings of the device on which an electronic solicitation is viewed can alter a solicitation's format, some commenters objected to the requirement that the short-form notice appear on the first screen of an electronic solicitation.[64] Some commenters proposed that the short portion of the notice simply be required to appear on the first page of an electronic solicitation,[65] or "reasonably proximate to, or included in, the main marketing message," [66] in order to accommodate variations among viewing devices. By contrast, other commenters supported requiring the short notice to appear on the first screen of the offer.[67]

The Commission has determined that, for the reasons stated in the comments, it is not practicable to require that the short portion of the notice always appear on the first page or first screen of electronic solicitations. Thus, the

final Rule requires that, for electronic solicitations, the short notice be included on the same page and in close proximity to the principal marketing message. This standard ensures that consumers viewing the solicitation will be reasonably likely to see the short notice.

*Distinct type style requirement.*

Some commenters requested that the Commission modify the proposed Rule to clarify that the type style of the notice must contrast only with the *principal* type style used on the same page, rather than with all type styles on the page.[68] The Commission agrees that this clarification should be made. Companies should not be precluded, for example, from presenting the notices in bolded type style simply because a small portion of the text on the page is in bold.[69] Therefore, the final Rule specifies that both the short and long portions of the notice must be in a type style that is distinct from the type style of the principal text on the same page.

*Long notice heading.*

The proposed Rule required that the long portion of the notice include the heading "*OPT-OUT NOTICE*." Some commenters suggested that this heading should reflect the totality of information in the long notice, rather than focusing on the opt-out information in the notice.[70] These commenters suggested a variety of new headings, such as "*PRESCREEN DISCLOSURES*."

The Commission has considered these comments and agrees that the long notice heading should be modified to reflect the totality of the information contained in that portion of the notice. Therefore, the final Rule requires that the long notice begin with a heading identifying it as the "*PRESCREEN & OPT-OUT NOTICE*."

*D. Section 682.4: Effective Date*

The Commission initially proposed to make the Prescreen Opt-Out Disclosure Rule effective 60 days after publication of the final Rule. Many industry commenters requested a longer effective date in order to allow covered entities to implement changes to their prescreened solicitations. These commenters explained that prescreened solicitations are generally prepared several months in advance, and

---

[59] *See, e.g.,* Comment, Property Casualty Insurers Association of America #000008.

[60] *See, e.g.,* Comment, National Consumers League, *et al.* #OL–100011; Comment, Privacy Rights Clearinghouse #OL–100015.

[61] *See, e.g.,* Comment, Coalition to Implement the FACT Act #OL–100042.

[62] *See, e.g.,* Comment, National Independent Automobile Dealers Association #OL–100021.

[63] *See, e.g.,* Comment, American Council of Life Insurers #OL–100027.

[64] *See, e.g.,* Comment, Credit Union National Association #000003.

[65] *See, e.g.,* Comment, Credit Union National Association #000003.

[66] *See, e.g.,* Comment, Wachovia Corporation #OL–100017.

[67] *See, e.g.,* Comment, Financial Services Roundtable #EREG–000004; Comment, MasterCard International Incorporated #0000012.

[68] *See, e.g.,* Comment, MasterCard International Incorporated #0000012.

[69] For example, 12 CFR part 226, appendix G, requires that the headings in certain Truth-in-Lending disclosures be in bolded type style. This would not preclude companies from also placing the prescreen disclosure in bolded type style.

[70] *See, e.g.,* Comment, Consumer Bankers Association #OL–100028; Comment, Juniper Financial Corp. #000009; Comment, MasterCard International Incorporated #100012.

therefore they need more time to comply with the final Rule in order to exhaust existing inventories of solicitations and to prepare and disseminate new compliant solicitations.[71] These commenters suggested time periods ranging from 90 days to 1 year after publication of the final Rule. After considering the comments, the Commission has extended the effective date to August 1, 2005. The Commission believes that this time period will provide businesses with sufficient time to implement the new requirements, while ensuring that the benefits to consumers of the improved opt-out notice occur as soon as reasonably practicable.

*E. Appendix A to Part 698: Model Prescreen Opt-Out Notices*

In the proposed Rule, the Commission set forth model notices, including both a short and long portion, in both English and Spanish. These notices included model language and also illustrated proper placement and display of the language.

Several commenters suggested changes to the language in the model notices, including specifying more "neutral" language for the short notice, adding information to the long notice, providing model language for collateral requirements, and clarifying that the telephone number is for the consumer reporting agencies, not the prescreen marketer. The Commission agrees that some changes to the proposed model notices are appropriate, and is making the modifications described below. Otherwise, the proposed notices are retained.

These model notices adopted in the final Rule may be used for purposes of complying with the Rule.[72]

1. Model Language in the Short Notice

The proposed Rule's model short notice stated, "To stop receiving 'prescreened' offers of [credit or insurance] from this and other companies, call toll-free, [toll free number]. See *OPT-OUT NOTICE* on other side [or other location] for details." According to several

commenters, this language implies that prescreened offers are undesirable and encourages consumers to opt-out.[73] These commenters requested that the Commission revise the model short notice to use less negative language.

The Commission has determined to revise the short notice language to remove any possible negative characterization of prescreened solicitations. The first sentence of the short notice in the final Rule states, "You can choose to stop receiving 'prescreened' offers of [credit or insurance] from this and other companies by calling toll-free [toll-free number]." The Commission believes that this language does not imply a recommendation of any course of action, but rather simply informs consumers of their statutory right.

In addition, for the same reasons that commenters suggested that the long notice heading should be modified, the Commission has determined that the model short notice's reference to the long notice should be modified to reflect to totality of the information in the long notice. Therefore, the second sentence of the model short notice in the final Rule states, "See *PRESCREEN & OPT-OUT NOTICE* on other side [or other location] for more information about prescreened offers."

2. Additional Information in Long Notices

Several commenters suggested that the model long notice should contain additional information, including information about the benefits and drawbacks of prescreening,[74] that opting out will not stop all offers of credit and insurance, or that consumers may be asked to provide their Social Security numbers when exercising the opt-out right.[75] The Commission believes that

each of these messages can be useful to consumers, and notes that it tested the communication of each of these messages as part of its consumer survey.[76]

The Commission has considered these comments, but has determined not to include information beyond that required by the statute in the model notice. The model notice contains plain language statements of the statutorily-required information. Rather than single out other particular messages for inclusion in the model, and thereby imply that certain information is required or that other information is prohibited, the final Rule allows companies flexibility to determine what, if any, additional information should be included (so long as the additional information does not interfere with, detract from, contradict, or undermine the purpose of the opt-out notices).[77]

3. Collateral Requirement

The proposed Rule's model long notice contained a plain-language summary of the information required by section 615(d) of the FCRA to be included in prescreened offers. At least one commenter noted that, among other things, it must be disclosed when a prescreened offer is contingent upon the consumer providing adequate collateral. This commenter stated that the model notice did not specifically include this information, and requested that the Commission revise the model notices to include it.[78]

The Commission has considered this argument and agrees that the model long notice should contain additional language regarding the collateral requirement for use by creditors and insurers in appropriate circumstances. Therefore, the final Rule modifies the second sentence of the model long notice to state, "This offer is not guaranteed if you do not meet our criteria [including providing acceptable property as collateral]."

4. Telephone Number

Some commenters recommended that the Commission make clear in the

---

[71] *See, e.g.,* Comment, American Council of Life Insurers #OL–100027; Comment, Boeing Employees' Federal Credit Union #000020; Comment, Wachovia Corporation #OL–100017; Comment, Wells Fargo & Company #000007.

[72] Some commenters suggested that the final Rule require marketers to use notices that substantially conform with the model notices. *See, e.g.,* Comment, National Consumers League, *et al.* #OL–100011. However, the Commission believes that there are sufficient requirements in the Rule to make the notices effective, and therefore it is not necessary to require that marketers' notices substantially conform with the model notices.

[73] *See, e.g.,* Comment, Direct Marketing Association #OL–100035; Comment, Discover Bank #OL–100016; Comment, Juniper Financial Corp. #000009; Comment, MasterCard International Incorporated #000012; Comment, Visa U.S.A. Inc. #000005; Comment, Wells Fargo & Company #000007.

[74] *See supra* text accompanying notes 48 and 49 discussing the benefits and drawbacks of prescreening that were raised by the commenters.

[75] *See, e.g.,* Comment, Coalition to Implement the FACT Act #OL–100042; Comment, Consumer Bankers Association #OL–100028; Comment, Wachovia Corporation #OL–100017. The potential benefits of prescreening were described above in Section III.C.3. In addition, as discussed in the NPRM, not all credit card or insurance offers consumers receive are prescreened offers. For example, some such offers are mass-mailed to consumers and do not derive from prescreened lists. Therefore, opting out of precreened offers will not end all mail solicitations. Finally, as explained in the NPRM, the opt-out system operated by the nationwide consumer reporting agencies requires a Social Security number for verification; including

the need to provide a Social Security number in the notice might alleviate consumers' concerns about revealing this sensitive information.

[76] The survey found that the tested language used to convey these ancillary messages did not communicate well to consumers; at the same time, it does not appear that the tested language, at least under the conditions of the study, detracted from the primary message that consumers could choose to opt out. *See* 69 FR 58861, 58864.

[77] The Commission also notes that appropriate additional information might be a website address where consumers can obtain additional information about prescreening and the opt-out right.

[78] *See, e.g.,* Comment, Mortgage Bankers Association #OL–100036.

**5030** **Federal Register**/Vol. 70, No. 19/Monday, January 31, 2005/Rules and Regulations

model notice that consumers would be calling the consumer reporting agencies that operate the toll-free number for opting out, and not the creditor or insurer, when exercising their opt-out right.[79]

The Commission has considered these comments and agrees that language should be added to the model long notice to clarify that the telephone number is that of the consumer reporting agencies, not the creditor or insurer. Therefore, the final Rule modifies the third sentence of the model long notice to state, ''If you do not want to receive prescreened offers of [credit or insurance] from this and other companies, call the consumer reporting agencies [or name of consumer reporting agency] toll free, [toll free number]; or write: [consumer reporting agency name and address].''

**IV. Paperwork Reduction Act**

In accordance with the Paperwork Reduction Act, as amended, 44 U.S.C. 3501, *et seq.*, the Commission submitted the proposed Rule to the Office of Management and Budget (''OMB'') for review. The OMB approved the Rule's information collection requirements through November 30, 2007, and assigned OMB control number 3084–0132. In response to comments received, the Commission has revised its estimate of the burden for companies that issue many different prescreened solicitations and therefore will be required to revise multiple solicitations in order to comply with the Rule. On December 8, 2004, the OMB approved the new burden estimate.

As set forth in the NPRM, the Rule imposes certain disclosure requirements on makers of prescreened credit solicitations, as required by the FACT Act. Specifically, such solicitations must include a statement containing a short-form and a long-form notice, which provides consumers with information concerning prescreened solicitations and how to opt out of receiving such solicitations in the future. In addition, the Rule contains a model disclosure that companies may use to comply with the Rule's requirements.

The NPRM estimated the time to revise and re-format an existing solicitation to be about 8 hours per firm. At the same time, the NPRM estimated that between 500 and 750 entities would be affected, so that the total annual burden to the industry would be between 4000 and 6000 hours and the

estimated total annual cost would be between $110,000 and $167,000.[80] Numerous commenters stated that the NPRM underestimated the costs of revising solicitations by failing to calculate the additional costs to be borne by larger companies that issue multiple solicitations.[81]

At the outset, the Commission notes that any new disclosure format, as required by the FACT Act's mandate to improve the existing opt-out disclosure, requires affected firms to revise their prescreened solicitations. Moreover, the Commission does not believe that the layered notice format of the final Rule appreciably increases the burdens on affected entities. Nevertheless, the Commission recognizes that companies that offer multiple solicitations will incur added costs to revise these notices. Thus, the Commission now estimates that the total annual burden to the industry will be between 43,600 and 45,600 hours. This figure reflects the Commission's estimate that approximately 100 entities will need additional time to revise multiple notices as follows: for each of these 100 entities, an additional four hours each for an estimated 99 solicitations not accounted for in the NPRM. Based on the time needed to bring these additional solicitations into compliance, the Commission now estimates that the total cost to the industry will be between $1,157,894 and $1,213,329. This figure reflects the 39,600 additional hours of skilled technical labor (at $26.44 per hour) that the Commission estimates will be required to revise the multiple solicitations.[82]

Although some commenters also estimated that more time would be needed to format and develop a disclosure than the eight hours estimated by the NPRM,[83] or that the labor costs to revise each notice would be higher than estimated,[84] the Commission has concluded that it is

feasible to design a solicitation according to its original estimates. Nevertheless, in order to permit companies to implement such changes in a more cost-effective manner, the Commission has extended the time to comply with the rule to August 1, 2005.

**V. Final Regulatory Flexibility Analysis**

The Regulatory Flexibility Act (''RFA''), 5 U.S.C. 601–612, requires that the Commission provide an Initial Regulatory Flexibility Analysis (''IRFA'') with a proposed Rule and a Final Regulatory Flexibility Analysis (''FRFA''), with the final Rule, unless the Commission certifies that the Rule will not have a significant economic impact on a substantial number of small business entities.

The Commission hereby certifies that the final Rule will not have a significant economic impact on a substantial number of small business entities. The FCRA previously mandated the prescreen disclosure. The FACT Act requires the Commission to adopt a rule to make the required disclosure simple and easy to understand. The proposed Rule applies to any entity that makes prescreened offers of credit or insurance. The Commission has been unable to determine the number of small entities that purchase prescreened lists from consumer reporting agencies. However, the Commission believes that only a small number of small entities make prescreened offers. The Commission did not receive any comments to the IRFA that would allow it to determine the precise number of small entities that will be affected. Although there may be some small entities among the entities making prescreened offers, the economic impact of the final Rule is not likely to be significant on a particular entity, nor is the final Rule likely to have a significant economic impact on a substantial number of small entities. The minimal impact on creditors and insurers would likely consist of revising disclosures that they already give in order to make the disclosures simple and easy to understand.

The Commission requested comment on the IRFA and the proposed Rule's impact on small businesses. The Commission received a few comments in response. These comments, which are discussed in more detail below, requested more time to comply with the Rule [85] and suggested that the layered

---

[79] *See, e.g.,* Comment, Bank of America Corporation #OL–100032; Comment, Mortgage Bankers Association #OL–100036.

[80] This estimate was based on Bureau of Labor Statistics data (as of July, 2002), as follows: 2 hours of managerial/professional time at $31.55 per hour; plus 6 hours of skilled technical labor at $26.44 per hour; multiplied by 500 and 750 companies, for a total of $110,870 and $166,305, respectively.

[81] *See, e.g.,* Comment, Bank of America Corporation #OL–100032; Comment, JPMorgan Chase Bank #OL–100019; Comment, MasterCard International Incorporated #000012; Comment, Wachovia Corporation #OL–100017; Comment, Wells Fargo & Company #000007; Comment, Wilmer Cutler Pickering Hale and Dorr LLP #OL–100046.

[82] As in the NPRM, the hourly rate is based on Bureau of Labor Statistics data, as of July, 2002.

[83] *See, e.g.,* Comment, Countrywide #000010; Comment, JPMorgan Chase Bank #OL–100019; Wachovia Corporation #OL–100017.

[84] *See, e.g.,* Comment, American Bankers Association #OL–100040; Comment, Capitol One Financial Corporation #OL–100033.

[85] *See, e.g.,* Comment, Credit Union National Association #000003; Comment, National Independent Automobile Dealers Association #OL–100021.

notice requirement may be difficult for some small businesses.[86]

The Commission continues to believe that a precise estimate of the number of small entities that fall under the Rule is not currently feasible. However, based on the comments received and the Commission's own experience and knowledge of industry practices, the Commission also continues to believe that the cost and burden to small business entities of complying with the Rule is minimal and that the final Rule will not have a significant impact on a substantial number of small entities. Accordingly, this document serves as notice to the Small Business Administration of the agency's certification of no effect. Nonetheless, the Commission has decided to publish a Final Regulatory Flexibility Analysis with this final Rule. Therefore, the Commission has prepared the following analysis:

*A. Need for and Objectives of the Rule*

Section 213 of the FACT Act directs the FTC to adopt a rule to improve the required notice to consumers regarding their right to opt out of prescreened solicitations for credit or insurance. In this action, the FTC promulgates a final Rule that would implement this requirement of the FACT Act. The Rule is authorized by and based upon section 213 of the FACT Act.

*B. Significant Issues Received by Public Comment*

The Commission received a few comments in response to its IRFA. Some commenters, in particular, trade associations representing small businesses, were primarily concerned about the time allowed for compliance with the Rule. These commenters asserted that small businesses, which have more limited resources than larger marketers, needed more than the proposed 60 days to comply with the Rule. The commenters suggested an effective date ranging from 120 days to 6 months from the date the final Rule is issued.[87] The final Rule changes the effective date to August 1, 2005. Therefore, small businesses, as well as other entities, should have sufficient time to comply.

Other commenters suggested that the layered notice requirement may be

difficult for some small entities.[88] Some of these comments noted that small entities often have one-page solicitations, and that the layered notice would likely require them to increase the length of their marketing materials, at great expense. As an alternative, these commenters suggested that a one-part notice, rather than the layered notice, should be permitted. The Commission has considered these comments, but does not believe that the layered notice requirement is overly burdensome for small businesses. The Commission has clarified in the statement of basis and purpose that accompanies the final Rule that both parts of the layered notice may appear in a single page solicitation, obviating the need for an additional page or document. Even on a single page solicitation, the layered format contributes to a notice that is simple and easy to understand. The Rule also allows companies flexibility as to the precise formatting and language of the notices. The Commission considers this flexibility sufficient to allow all entities, including small entities, to determine an appropriate means of complying with the Rule within the framework of their own solicitations.

*C. Small Entities To Which the Rule Will Apply*

As described above, the Rule applies to any entity, including small entities, that makes prescreened offers of credit or insurance. The Commission has been unable to ascertain a precise estimate of the number of small entities that are creditors or insurers, and received no specific comments to the IRFA that allow it to determine the precise number of small entities that will be affected. Entities potentially covered by the Rule include any entity that extends credit or insurance, including insurance companies, retailers, department stores, and banking institutions, if they are engaging in prescreened offers of credit. For these kinds of entities, the Small Business Administration defines small business to include, in general, a business whose annual receipts do not exceed $6 million in total receipts for insurance companies and retailers, and $23 million in total receipts for department stores. For banking institutions, the Small Business Administration defines small business to include entities whose total assets do not exceed $150 million.[89]

However, not all businesses that extend credit or insurance are required to comply with the Rule. Rather, only such entities that make prescreened solicitations will be subject to the Rule's requirements. Although the number of small businesses that offer credit or insurance is large, the Commission believes that only a small number of those businesses engage in prescreened solicitations. The Commission believes that many small businesses find it more cost effective to engage in other forms of solicitation, including point-of-sale solicitations and/or solicitations of existing customers.

*D. Projected Reporting, Recordkeeping, and Other Compliance Requirements*

Under the final Rule, any entity making a prescreened offer of credit or insurance will be required to provide recipients of the offer with a disclosure regarding their right to opt out of such offers. (There are no filing or recordkeeping requirements in the Rule.) These disclosures are to be in a form that is simple and easy to understand. As noted in the Paperwork Reduction Act analysis above, the estimated time to revise the notice and re-format solicitations is approximately 8 hours (one business day), and the total cost for all entities to comply with this Rule is between $1,157,894 and $1,213,329.

*E. Steps Taken To Minimize Significant Economic Impact of the Rule on Small Entities*

The Commission considered whether any significant alternatives, consistent with the purposes of the FACT Act, could further minimize the Rule's impact on small entities. The FTC asked for comment on this issue. Some commenters suggested that the layered notice requirement may be difficult for small businesses, and that a single notice would be more appropriate.[90] However, as discussed above, the Commission has determined that the layered format is the best way to ensure that the disclosures are simple and easy to understand and does not find that the layered notice approach poses a particular burden to small entities. The Rule allows small entities flexibility in determining how best to present the layered notice within the framework of their solicitations, and therefore does not impose a substantial burden.

The Commission also requested comment on the need to adopt a delayed

---

[86] *See, e.g.,* Comment, ChoicePoint Precision Marketing, Inc. #OL–100025; Comment, Wilmer Cutler Pickering Hale and Dorr LLP #OL–100046.

[87] *See, e.g.,* Comment, Credit Union National Association #000003; Comment, National Independent Automobile Dealers Association #OL–100021.

[88] *See, e.g.,* Comment, ChoicePoint Precision Marketing, Inc. #OL–100025; Comment, Wilmer Cutler Pickering Hale and Dorr LLP #OL–100046.

[89] These numbers represent size standards for most entities in the industries mentioned above. A list of the SBA's size standards for all industries can

be found at *http://www.sba.gov/size/indextableofsize.html.*

[90] *See, e.g.,* Comment, ChoicePoint Precision Marketing, Inc. #OL–100025; Comment, Wilmer Cutler Pickering Hale and Dorr LLP #OL–100046.

effective date for small entities in order to provide them with additional time to come into compliance. The Commission received some comments on this issue;[91] the Commission has decided to extend the effective date for all entities subject to the Rule to August 1, 2005. This additional time will allow small entities to assess their compliance obligations and make cost-sensitive decisions concerning how best to comply with the Rule.

## VI. Final Rule

### List of Subjects

*16 CFR Part 642*

Consumer reporting agencies, Consumer reports, Credit, Fair Credit Reporting Act, Trade practices.

*16 CFR Part 698*

Consumer reporting agencies, Consumer reports, Credit, Fair Credit Reporting Act, Trade practices.

■ The Federal Trade Commission amends chapter I, title 16, Code of Federal Regulations, as follows:

■ 1. Add new part 642 to read as follows:

## PART 642—PRESCREEN OPT-OUT NOTICE

Sec.
642.1  Purpose and scope.
642.2  Definitions.
642.3  Prescreen opt-out notice.
642.4  Effective date.

**Authority:** Pub. L. 108–159, sec. 213(a); 15 U.S.C. 1681m(d).

### § 642.1  Purpose and scope.

(a) *Purpose.* This part implements section 213(a) of the Fair and Accurate Credit Transactions Act of 2003, which requires the Federal Trade Commission to establish the format, type size, and manner of the notices to consumers, required by section 615(d) of the Fair Credit Reporting Act (''FCRA''), regarding the right to prohibit (''opt out'') of) the use of information in a consumer report to send them solicitations of credit or insurance.

(b) *Scope.* This part applies to any person who uses a consumer report on any consumer in connection with any credit or insurance transaction that is not initiated by the consumer, and that is provided to that person under section 604(c)(1)(B) of the FCRA (15 U.S.C. 1681b(c)(1)(B)).

### § 642.2  Definitions.

As used in this part:

[91] *See, e.g.,* Comment, Credit Union National Association #000003; Comment, National Independent Automobile Dealers Association #OL–100021.

(a) *Simple and easy to understand* means:

(1) A layered format as described in § 642.3 of this part;

(2) Plain language designed to be understood by ordinary consumers; and

(3) Use of clear and concise sentences, paragraphs, and sections.

(i) *Examples.* For purposes of this part, examples of factors to be considered in determining whether a statement is in plain language and uses clear and concise sentences, paragraphs, and sections include:

(A) Use of short explanatory sentences;

(B) Use of definite, concrete, everyday words;

(C) Use of active voice;

(D) Avoidance of multiple negatives;

(E) Avoidance of legal and technical business terminology;

(F) Avoidance of explanations that are imprecise and reasonably subject to different interpretations; and

(G) Use of language that is not misleading.

(ii) [Reserved]

(b) *Principal promotional document* means the document designed to be seen first by the consumer, such as the cover letter.

### § 642.3  Prescreen opt-out notice.

Any person who uses a consumer report on any consumer in connection with any credit or insurance transaction that is not initiated by the consumer, and that is provided to that person under section 604(c)(1)(B) of the FCRA (15 U.S.C. 1681b(c)(1)(B)), shall, with each written solicitation made to the consumer about the transaction, provide the consumer with the following statement, consisting of a short portion and a long portion, which shall be in the same language as the offer of credit or insurance:

(a) *Short notice.* The short notice shall be a clear and conspicuous, and simple and easy to understand statement as follows:

(1) *Content.* The short notice shall state that the consumer has the right to opt out of receiving prescreened solicitations, and shall provide the toll-free number the consumer can call to exercise that right. The short notice also shall direct the consumer to the existence and location of the long notice, and shall state the heading for the long notice. The short notice shall not contain any other information.

(2) *Form.* The short notice shall be:

(i) In a type size that is larger than the type size of the principal text on the same page, but in no event smaller than 12-point type, or if provided by electronic means, then reasonable steps

shall be taken to ensure that the type size is larger than the type size of the principal text on the same page;

(ii) On the front side of the first page of the principal promotional document in the solicitation, or, if provided electronically, on the same page and in close proximity to the principal marketing message;

(iii) Located on the page and in a format so that the statement is distinct from other text, such as inside a border; and

(iv) In a type style that is distinct from the principal type style used on the same page, such as bolded, italicized, underlined, and/or in a color that contrasts with the color of the principal text on the page, if the solicitation is in more than one color.

(b) *Long notice.* The long notice shall be a clear and conspicuous, and simple and easy to understand statement as follows:

(1) *Content.* The long notice shall state the information required by section 615(d) of the Fair Credit Reporting Act (15 U.S.C. 1681m(d)). The long notice shall not include any other information that interferes with, detracts from, contradicts, or otherwise undermines the purpose of the notice.

(2) *Form.* The long notice shall:

(i) Appear in the solicitation;

(ii) Be in a type size that is no smaller than the type size of the principal text on the same page, and, for solicitations provided other than by electronic means, the type size shall in no event be smaller than 8-point type;

(iii) Begin with a heading in capital letters and underlined, and identifying the long notice as the ''PRESCREEN & OPT-OUT NOTICE'';

(iv) Be in a type style that is distinct from the principal type style used on the same page, such as bolded, italicized, underlined, and/or in a color that contrasts with the color of the principal text on the page, if the solicitation is in more than one color; and

(v) Be set apart from other text on the page, such as by including a blank line above and below the statement, and by indenting both the left and right margins from other text on the page.

### § 642.4  Effective date.

This part is effective on August 1, 2005.

## PART 698—[AMENDED]

■ 2. Amend § 698.1 by revising paragraph (b) to read as follows:

### § 698.1  Authority and purpose.

\*     \*     \*     \*     \*

(b) *Purpose.* The purpose of this part is to comply with sections 607(d), 609(c), 609(d), 612(a), and 615(d) of the Fair Credit Reporting Act, as amended by the Fair and Accurate Credit Transactions Act of 2003, and Section 211 of the Fair and Accurate Credit Transactions Act of 2003.

■ 3. Add Appendix A to Part 698 as follows:

## Appendix A to Part 698—Model Prescreen Opt-Out Notices

In order to comply with part 642 of this title, the following model notices may be used:

**BILLING CODE 6750–01–P**

(a) *English language model notice.* (1) *Short notice.*



# Here's a Line About Credit

J.S. Name
12345 Friendly Street
City, ST 12345

Dear Ms. Name,

Back in the last century, we saw how technology was changing the way people do things. So we set out to create a the last century, we saw how technology was changing the way people do things. Back in the last century, we saw how technology was changing the way people do things. So we set out to create a the last century, we saw how technology was changing the way people do things.

Back in the last century, we saw how technology was changing the way people do things. So we set out to create a smart kind of credit card. Back in the last century, we saw how technology was changing the way. Back in the last century, we saw how technology was changing the way people do things. So we set out to create a the last century, we saw how technology was changing the way people do things.

Back in the last century, we saw how technology was changing the way people do things. So we set out to create a smart kind of credit card. Back in the last century, we saw how technology was changing the way peop. So we set out to create a smart kind of credit card. Back in the last century, we saw how technology was changing the way people do things. So we set out to create a smart kind of credit a smart kind of credit card.

So we set out to create a smart kind of credit card. Back in the last century, we saw how technology was changing the way people. Back in the last century, we saw how technology was changing the way people do things. So we set out to create a smart kind of credit card.

We saw how technology was changing the way people do things. So we set out to create a smart kind of credit card. Back in the last century, we saw how technology.

Sincerely,

John W. Doe
President, Credit Card Company

PFOR 00 MON
FIXED ABC

BALANCE TR
FOR 00 MONTHS

NO MONTHS FEE

INTERNET SECURITY
SECURITY

ONLINE FRAUD PRO
GUARANTEE

YOUR BALANCE
PAY YOUR BILL

FEE-FREE REWARDS
PROGRAM

---

**You can choose to stop receiving "prescreened" offers of [credit or insurance] from this and other companies by calling toll-free [toll-free number]. See <u>PRESCREEN & OPT-OUT NOTICE</u> on other side [or other location] for more information about prescreened offers.**

(2) *Long notice.*

Back in the last century, we saw how technology was changing the way people do things. So we set out to create a smart kind of credit card. Back in the last century, we saw how technology was changing the way. Back in the last century, we saw how technology was changing the way people do things. So we set out to create a last century, we saw how technology was changing the way people do things.

HEADER

| Percent Rate for | Other ABCs | Variable info material | Grace or repases Are placed here | Computing the balast | Annual Fee | Usual Place Finance Charge |
|---|---|---|---|---|---|---|
| Back in the last century, we saw how technology was changing the way people do things. So we set out to create a smart kind of credit card. | Back in the last century, we saw how technology was changing the way people do things. So we set out to create a smart kind of credit card. Back in the last century, we saw how technology was changing the way. | Back in the last century, we saw how technology was changing the way people do things. So we set out to create a smart kind of credit card. | Back in the last century, we saw how technology was changing. | Back in the last century, we saw how technology was changing the way people do things. So we set out to create a smart kind of credit card. | Back long ago. | Back in the last century, we saw how technology. |

Back in the last century, we saw how technology was changing the way people do things. So we set out to create a smart kind of credit card. Back in the last century, we saw how technology was changing the way. Back in the last century, we saw how technology was changing the way people do things. So we set out to create a smart kind of credit card. Back in the last century, we saw how technology was changing the way people do things. So we set out to create a smart kind of credit card. Back in the last century, we saw how technology was changing the way.

Back in the last century, we saw how technology was changing the way people do things. So we set out to create a smart kind of credit card. Back in the last century, we saw how technology was changing the way people do things. So we set out to create a smart kind of credit card. Back in the last century, we saw how technology was changing the way. Back in the last century, we saw how technology was changing the way people do things. So we set out to create a smart kind of credit card. Back in the last century, we saw how technology was changing the way. Back in the last century, we saw how technology was changing the way people do things. So we set out to create a smart kind of credit card. Back in the last century, we saw how technology was changing the way people do things. So we set out to create a smart kind of credit card. Back in the last century, we saw how technology was changing the way.

Back in the last century, we saw how technology was changing the way people do things. So we set out to create a smart kind of credit card. Back in the last century, we saw how technology was changing the way.

Back in the last century, we saw how technology was changing the way people do things. So we set out to create a smart kind of credit card. Back in the last century, we saw how technology was changing the way.

**TERMS AND CONDITIONS**

Back in the last century, we saw how technology was changing the way people do things. So we set out to create a smart kind of credit card. Back in the last century, we saw how technology was changing the way. Back in the last century, we saw how technology was changing the way people do things. So we set out to create a smart kind of credit card. Back in the last century, we saw how technology was changing the way people do things. So we set out to create a smart kind of credit card. Back in the last century, we saw how technology was changing the way people do things. So we set out to create a smart kind of credit card. Back in the last century, we saw how technology was changing the way. Back in the last century, we saw how technology was changing the way people do things. So we set out to create a smart kind of credit card. Back in the last century, we saw how technology was changing the way. Back in the last century, we saw how technology was changing the way people do things. So we set out to create a smart kind of credit card. Back in the last century, we saw how technology was changing the way people do things. So we set out to create a smart kind of credit card. Back in the last century, we saw how technology was changing the way people do things. So we set out to create a smart kind of credit card. Back in the last century, we saw how technology was changing the way. Back in the last century, we saw how technology was changing the way people do things. So we set out to create a smart kind of credit card. Back in the last century, we saw how technology was changing the way people do things. So we set out to create a smart kind of credit card. Back in the last century, we saw how technology was changing the way people do things. So we set out to create a smart kind of credit card. Back in the last century, we saw how technology was changing the way people do things. So we set out to create a smart kind of credit card. Back in the last century, we saw how technology was changing the way. Back in the last century, we saw how technology was changing the way people do things. Back in the last century, we saw how technology was changing the way. Back in the last century, we saw how technology was changing the way people do things. Back in the last century, we saw y, we saw how technology was changing the way. Back in the last century, we saw how technology was changing the way people do things.

Act Notice: the a smart kind of credit card. Back in the last century, we saw how technology was changing the way people do things. So we set out to create a smart kind of credit card. Back in the last century, we saw how technology was changing the way. Back in the last century, we saw.

**PRESCREEN & OPT-OUT NOTICE**: This "prescreened" offer of [credit or insurance] is based on information in your credit report indicating that you meet certain criteria. This offer is not guaranteed if you do not meet our criteria [including providing acceptable property as collateral]. If you do not want to receive prescreened offers of [credit or insurance] from this and other companies, call the consumer reporting agencies [or name of consumer reporting agency] toll-free, [toll-free number]; or write: [consumer reporting agency name and mailing address].

**Notice to Some Residents:** te a smart kind of credit card. Back in the last century, we saw how technology was changing the way. Back in the last century, we saw how technology was changing the way people do things. So we set out to create a smart kind of credit card. Back in the last century, we saw how technology was changing the way. Back in the last century. So we set out to create a smart kind of credit card. Back in the last century, we saw how technology was changing the way.

(b) *Spanish language model notice.*
(1) *Short notice.*



# Aquí están líneas crédito

J.S. Nombre
1234 Calle Amistosa
Ciudad, ST 12345

PFOR 00 MON FIJO ABC

Estimada Señora Nombre:

En el siglo pasado vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. Así que creamos una tarjeta de crédito inteligente, vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. En el siglo pasado vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. Así que creamos una tarjeta de crédito inteligente. Vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas.

Así que creamos una tarjeta de crédito inteligente. Vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. En el siglo pasado vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. Así que creamos una tarjeta de crédito inteligente, vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas.

Vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. En el siglo pasado vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. Así que creamos una tarjeta de crédito inteligente, vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. En el siglo pasado vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas.

Así que creamos una tarjeta de crédito inteligente. Vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. En el siglo pasado vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. Así que creamos una tarjeta de crédito inteligente. Vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas.

Sinceramente,

John W. Doe
Presidente, Compañía

TRANSFERENCIA DE BALANCE POR MESES

SIN CUOTA MENSUAL

PAGO ELECTRÓNICO SEGURO

PROTECCIÓN CONTRA FRAUDE EN LÍNEA GARANTIZADO

SU BALANCE PAGA SU CUENTA

PROGRAMA DE RECOMPENSAS SIN CUENTA

**Usted puede elegir no recibir más "ofertas de [crédito o seguro] pre-investigadas" de esta y otras compañías llamando sin cargos al [número sin cargo]. Ver la NOTIFICACIÓN DE PRE-INVESTIGACIÓN Y EXCLUSIÓN VOLUNTARIA al otro lado de esta página [o en otro lugar] para más información sobre ofertas pre-investigadas.**

(2) *Long notice.*

En el siglo pasado vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. Así que creamos una tarjeta de crédito inteligente, vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. En el siglo pasado vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. Así que creamos una tarjeta de crédito inteligente.

AQUÍ ESTÁN

| Protección Contra Fraude | Programa de Recompensas | Su Balance Paga | Sin Cuota Mensual | Protección Contra Fraude | Recompensas Sin Cuenta | Sin Cuota Mensual |
|---|---|---|---|---|---|---|
| En el siglo pasado vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. | Vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. Vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. | En el siglo pasado vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. En el siglo pasado vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. Así que cremos. | Así que creamos una tarjeta de crédito inteligente. | En el siglo pasado vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. | Así que cremos. | Vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. |

En el siglo pasado vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. Así que creamos una tarjeta de crédito inteligente, vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. En el siglo pasado vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. Así que creamos una tarjeta de crédito inteligente. Vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. Así que creamos una tarjeta de crédito inteligente. Vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas.

Así que creamos una tarjeta de crédito inteligente, vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. En el siglo pasado vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. Así que creamos una tarjeta de crédito inteligente. Vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. Así que creamos una tarjeta de crédito inteligente. Vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. En el siglo pasado vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. Así que creamos una tarjeta de crédito inteligente, vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas.

Vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. En el siglo pasado vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. Así que creamos una tarjeta de crédito inteligente, vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. En el siglo pasado vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. Así que creamos una tarjeta de crédito inteligente. Vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. En el siglo pasado vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas.

TERMINOS Y CONDICIONA

En el siglo pasado vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. Así que creamos una tarjeta de crédito inteligente, vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. En el siglo pasado vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. Así que creamos una tarjeta de crédito inteligente. Vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas.

Así que creamos una tarjeta de crédito inteligente. Vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. En el siglo pasado vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. Así que creamos una tarjeta de crédito inteligente, vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas.

Vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. En el siglo pasado vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. Así que creamos una tarjeta de crédito inteligente, vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. En el siglo pasado vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas.

Así que creamos una tarjeta de crédito inteligente. Vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. Así que creamos una tarjeta de crédito inteligente. Vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas.

En el siglo pasado vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. Así que creamos una tarjeta de crédito inteligente, vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. En el siglo pasado vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. Así que creamos una tarjeta de crédito inteligente. Vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. Así que creamos una tarjeta de crédito inteligente. Vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. En el siglo pasado vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. Vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. Vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. Vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas.

<u>NOTIFICACIÓN DE PRE-INVESTIGACIÓN Y EXCLUSIÓN VOLUNTARIA</u>: Esta oferta de [crédito o seguro] está basada en información contenida en su informe de crédito que indica que usted cumple con ciertos criterios [incluyendo la condición de tener propiedades aceptables como colateral]. Si usted no cumple con nuestros criterios, esta oferta no está garantizada. Si usted no desea recibir ofertas de [crédito o seguro] pre-investigadas de ésta y otras compañías, llame a las agencias de información del consumidor [o nombre de la agencia de información del consumidor] sin cargos, [número sin cargo]; o escriba a: [nombre de la agencia de información del consumidor y dirección de correo].

**En el siglo pasado vimos como:** la tecnología estaba cambiando la manera en que la gente hace las cosas. Así que creamos una tarjeta de crédito inteligente, vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. Vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. Vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas. Vimos como la tecnología estaba cambiando la manera en que la gente hace las cosas.

By direction of the Commission.

**Donald S. Clark,**

*Secretary.*

[FR Doc. 05–1678 Filed 1–28–05; 8:45 am]

**BILLING CODE 6750–01–C**



# Get All 3 Credit Scores Instantly See Your Credit Scores Online Today!

**This offer Includes scores with data form**
**TransUnion® , Experian® , and Equifax®**

With successful enrollment in
ZoomCreditScore.



## Access your Credit Scores Now

Many sites will try to offer you a free credit report and not give you your credit scores. We know the credit score is what your really interested in seeing and thats why we give you all three credit scores for free. Checking your credit report and score here will NOT lower your credit score so what are you waiting for? Get your **free credit score** right now!

## Key Features Include:

- ✓ Your 3 Credit Scores
- ✓ Summary of what factors are affecting your scores
- ✓ Monitoring for important changes to your credit
- ✓ Receive email alerts for certain changes to your credit reports
- ✓ $25K identity theft insurance* (with no deductible)
- ✓ Identity theft restoration service.



### Do you know your credit scores?

Get your credit score now!

### ⊕ My Credit Dashboard:

- ✓ View all 3 credit reports and credit scores
- ✓ View monitoring alerts & messages
- ✓ See what's affecting your score

### Important Information

Once you complete your free order here you will start your 7-day free trial membership for ZoomCreditScore.com. After the free trial period you will be billed $29.95 every month for your membership. You may call (888) 200-4147 to cancel within your trial period anytime at no cost. Click here for full terms and conditions.



## Get Started Now!



## What's included in your instant credit report?

Your credit report contains a bunch of important information about you and your ability to pay your bills including;

- ✓ Personal information such as name, current and previous address, employers
- ✓ Who has checked your credit
- ✓ Your account history such as credit cards, auto loans, mortgages and other credit accounts
- ✓ Public records such as judgments, liens, bankruptcies, and more

EXHIBIT
3

**Disclaimer**: 1) Lenders use many different scoring models to calculate your credit score. We use the TransRisk credit score model and even though its based on the same credit report data your score will be different across different models. Please use this credit score for educational purposes only. 2) Credit monitoring could take up to 3 days to become active and this may not be available your whole trial period.

# Zoom**CreditScore**.com

**1** SIGN UP   **2** SUBMIT ORDER   **3** VERIFY IDENTITY



## Profile

First Name:

Middle Initial:

Last Name:

Suffix:

None

Phone Number:

Email Address:

☐ Yes please email me important special offers. Privacy Policy

## Address

Street Address:

Apt, Unit, Bldg: (optional)

City:                          State:

AK

Zip Code:

Have You lived at this address 6 Months or more?

◯ Yes ◯ No

**Submit to Continue**



### We're Here to Help

Our customer service team is available 7 days a week to help answer any questions.

Call us toll free at **(888) 200-4147**

Everyday: 5 AM to 9 PM PST



### This is a Secure Page

We are dedicated to protecting information you entrust to us.

Your Privacy and security are protected. We take many steps in securing all your personal information.

---

Home | About Us | Contact Us | Privacy Policy | Terms & Conditions

Copyright © 2018 ZoomCreditScore.com - X0.0736-1.1.1-

# Zoom**CreditScore**.com



**Profile**    Needed to retrieve your Credit Report            All Fields Required

## Date of Birth:

| Month | Day | Year |

## Sign-In Details

### Username: (alpha numeric only, no special characters)

### Password: (Case Sensitive 6-36 characters)

### Confirm Password:

## Credit/Debit Card    Your card will not charged the membership fee during the Trial.

### Card Number:        CVV Code:

### Expiration:

| 01 - January | 2014 |

**Payment Information**
When you order your free credit score(s) here you will begin your trial membership in ZoomCreditScore.com. If you don't cancel your membership within the 7-day trial period you will be billed $29.95 for every month to continue your membership. If you wish to cancel just call us at (888) 200-4147 to stop your membership

**Press the "Submit Secure Order" button below to accept our Terms & Conditions and Privacy Policy. You also give permission to obtain your credit score(s) and report(s) as described in the Terms and Conditions.**

**Submit Secure Order**



### We're Here to Help

Our customer service team is available 7 days a week to help answer any questions.

Call us toll free at **(888) 200-4147**

Everyday: 5 AM to 9 PM PST



### This is a Secure Page

We are dedicated to protecting information you entrust to us.

Your Privacy and security are protected. We take many steps in securing all your personal information.

---

Home | About Us | Contact Us | Privacy Policy | Terms & Conditions

Copyright © 2018 ZoomCreditScore.com - X0.0708-1.1.1-

CRITICAL

 **ZoomCreditScore**.com

① **SIGN UP** ② **SUBMIT ORDER** ③ **VERIFY IDENTITY**

The credit bureau requires your social security number to securely identify you and retrieve your credit report

## Social Security Number:



**Continue**

### We're Here to Help 

Our customer service team is available 7 days a week to help answer any questions.

Call us toll free at **(888) 200-4147**

Everyday: 5 AM to 9 PM PST

### This is a Secure Page 

We are dedicated to protecting information you entrust to us.

Your Privacy and security are protected. We take many steps in securing all your personal information.

Home | About Us | Contact Us | Privacy Policy | Terms & Conditions

Copyright © 2018 ZoomCreditScore.com - X0.0908-1.1.1-

CBCBR0000765

# eFreeScore.com

🔒 Member Sign in



The average credit score is 675
## What's your credit score?
## Get 3 FREE credit scores

### Start Your Trial Here

First Name

Last Name

Email

**Checking your credit won't affect your score!**

### Get Your FREE Trial & FREE Credit Score!

  

**Important Information:**

Once you complete your order here you will start your trial membership for eFreescore.com. You will be billed $1.00 today to start your 7-day trial and then $29.94 every month for your membership. You may call (800) 934-1938 to cancel within your trial period anytime at no cost. Click here for full terms and conditions

Try it now for FREE! Membership get you access to your credit score and inform you of important changes.

### 3 Free Credit Scores
Some websites only let you check one score! We let you check all three of your credit scores from Experian, Equifax, and Transunion with your membership. Enjoy peace of mind knowing that you can view your score from all 3 major credit reporting agencies.

### Credit Change Notifications
Your credit report will be monitored daily for important changes. We will send you an email or SMS alert when your credit report contains a new credit inquiry, new account, or change of address to help you monitor for identity theft.

### Explanation of Your Score
In plain English we tell you what are the major factors affecting your score. We make it so you don't need to be a professional banker or financial advisor to understand your credit scores.



**eFreeScore.com**
+ All 3 Credit Scores
+ View Scores Instantly
+ Explanation of Your Scores

**Other Sites**
- Only 1 Credit Score
- Not 100% Online
- No Explanation of Your Score



**What is Considered a Good Score?**

"About 60% of people have a 700 credit score or higher. Many say that 720 or higher is really the number you should aim for to have an excellent credit score."

Financial Advisor
Ray Martin

**Disclaimer:** Monitoring services may take up to 3 days to become active so this service within your membership may not be available during the whole 7 day trial period. The credit scores we offer may not be the same scoring model used by a lender or other credit score sites so view this score only for educational purposes. Experian, Equifax, and Transunion trademarks remain property of their respective holders, and are only used to directly describe the products and the source of the credit data being provided.

Home of the 3 Free Credit Scores | About Us | Contact Us | Privacy Policy | Terms & Conditions | Like Us On Facebook | Follow Us On Twitter

Copyright © 2018 eFreeScore.com - X0.0416-1.2.121



# You're Just a few steps away from seeing your 3 FREE Credit Scores!

**Step 1**

**Step 2**

**Step 3**

**View Scores**



## Step 1. Tell Us About Yourself

First Name:

Last Name:

Address:

City:

State:

Zip Code:

Email:

Phone Number:

☑ Yes, i authorize you and/or third party marketers to contact me via email.

**Continue**

### Secure Site

We are dedicated to protecting information you entrust to us.

Your Privacy and security are protected. We take many steps in securing all your personal information.

**Contact Us**

Our customer service team is available 7 days a week to help answer any questions.

**(800) 934-1938**

Mon - Fri: 6 AM to 5 PM PST
Weekends: 9 AM to 2 PM PST

Copyright © 2018 eFreeScore.com - X0.0495-1.2.121

# eFreeScore.com

## You're Just a few steps away from seeing your 3 FREE Credit Scores!



**Step 1**

**Step 2**

**Step 3**

**View Scores**

### Step 2. Tell Us Your Identity

Date of Birth:

| Month | Day | Year |

## Sign-In Details

Username:

Password: (Case sensitive 6-36 characters)

Confirm Password:

**Credit/Debit Card** \*your credit card will not be charged during the free trial period. however, valid credit card information is required to establish your account.

Card Number:          CVV Code:

Expiration:

01 - January          2019

Payment Information

When you place your order here you will begin your membership in eFreeScore.com. You will be billed $1.00 today and start your trial membership. After your 7-day trial period you will be charged $29.94 every month. If you wish to cancel just call us at (800) 934-1938 to stop your membership.

**Continue**



## Shopping Cart

| 3 FREE Credit Scores | $0.00 |
| Factors Affecting Credit Scores | $0.00 |
| Credit Monitoring (7-Day Trial) | $0.00 |
| Online Delivery | $0.00 |
| 24/7 Online Access to Your Scores (30 days) | $0.00 |
| All 3 Credit Reports | $0.00 |
| TOTAL | $0.00 |

 Secure Site

We are dedicated to protecting information you entrust to us.

Your Privacy and security are protected. We take many steps in securing all your personal information.

### Contact Us

Our customer service team is available 7 days a week to help answer any questions.

**(800) 934-1938**

Mon - Fri: 6 AM to 5 PM PST
Weekends: 9 AM to 2 PM PST

---

Home | About Us | Contact Us | Privacy Policy | Terms & Conditions | Like Us On Facebook | Follow Us On Twitter

Copyright © 2018 eFreeScore.com - X0.0680-1.2.121

 eFreeScore.com

# You're Just a few steps away from seeing your 3 FREE Credit Scores!

 Step 1

Step 2

**Step 3**

View Scores

 **Contact Us**

Our customer service team is available 7 days a week to help answer any questions.

**(800) 934-1938**

Mon - Fri: 6 AM to 5 PM PST
Weekends: 9 AM to 2 PM PST

## Step 3. Social Security Number



Social Security Number:



 

 Secure Site

We are dedicated to protecting information you entrust to us.

Your Privacy and security are protected. We take many steps in securing all your personal information.

Home | About Us | Contact Us | Privacy Policy | Terms & Conditions | Like Us On Facebook | Follow Us On Twitter

Copyright © 2018 eFreeScore.com - X0.0476-1.2.121

CSCRR0001169

 **JiffyFreeScore**

  

Member Sign In



# Free Credit Scores & Report!

Take control of your credit now and know where you stand. Did you know checking your own credit will NOT lower your score? See your free scores and reports now!

- ✓ Your 3 Free Credit Scores
- ✓ View Factors Affecting Your Scores
- ✓ Detailed View of Your Credit Reports

**Get Yours Free!**

    

## See What Factors Affect Your Scores



In plain English we tell you what are the major factors affecting your credit scores. We make it so you don't need to be a professional banker or financial advisor to understand your credit scores.

## View Your Scores In Your Dashboard



Includes a one-of-a-kind credit dashboard to keep you informed about your credit report, scores, and alerts.

## How Does Your Credit Stack Up?



The average credit score is 675. What's your credit score? See where your credit score ranks today.

### Important Information:

Once you complete your free order here you will start your 7-day free trial membership for JiffyFreeScore.com. After the free trial period you will be billed $29.95 every month for your membership. You may call (877) 840-5417 to cancel within your trial period anytime at no cost. <u>Click here</u> for full terms and conditions.

<u>Contact Us</u>  <u>Terms and Conditions</u>  <u>Privacy Policy</u>

Copyright © 2018 JiffyFreeScore.com - X0.0467-3.26.48-

CBC/BRC001770



🔒 Member Sign in



The average credit score is 675
## What's your credit score?
## Get 3 FREE credit scores

### Start Your Trial Here

First Name

Last Name

Email

**Checking your credit won't affect your score!**

**Get Your FREE Trial & FREE Credit Score!**

 Experian  EQUIFAX  TransUnion.

**Important Information:**

Once you complete your order here you will start your membership for GSFCreditcare.com. You will be billed $19.95 every month for your membership You may call (877) 852-0820 to cancel within your trial period anytime at no cost. Click here for full terms and conditions.

Try it now for FREE! Membership gets you access to your credit score and alerts you to important credit changes.

 **3 Free Credit Scores**
Some websites only let you check one score! We let you check all three of your credit scores from Experian, Equifax, and Transunion with your membership. Enjoy peace of mind knowing that you can view your score from all 3 major credit reporting agencies.

**Credit Change Notifications**
Your credit report will be monitored daily for important changes. We will send you an email or SMS alert when your credit report contains a new credit inquiry, new account, or change of address to help you monitor for identity theft.

**Explanation of Your Score**
In plain English we tell you what are the major factors affecting your score. We make it so you don't need to be a professional banker or financial advisor to understand your credit scores.

 **GSFCreditCare.com**
+ All 3 Credit Scores
+ View Scores Instantly
+ Explanation of Your Scores

**Other Sites**
- Only 1 Credit Score
- Not 100% Online
- No Explanation of Your Score 

**What is Considered a Good Score?**

 About 60% of people have a 700 credit score or higher. Many say that 720 or higher is really the number you should aim for to have an excellent credit score.

Financial Advisor
Ray Martin

**Disclaimer:** Monitoring services may take up to 3 days to become active so this service within your membership may not be available during those days. The credit scores we offer may not be the same scoring model used by a lender or other credit score sites so view this score only for educational purposes. Experian, Equifax, and Transunion trademarks remain property of their respective holders, and are only used to directly describe the products and the source of the credit data being provided.

Home | About Us | Contact Us | Privacy Policy | Terms & Conditions

Copyright © 2018 GSFCreditCare.com - X0.0508-3.51.96-

 

1 **SIGN UP** | 2 **SUBMIT ORDER** | 3 **VERIFY IDENTITY**

 

## Profile

**First Name:**

**Middle Initial:**

**Last Name:**

**Suffix:**

None

**Phone Number:**

**Email Address:**

☐ Yes please email me important special offers. Privacy Policy

## Address

**Street Address:**

**Apt, Unit, Bldg: (optional)**

**City:**

**State:**

AK

**Zip Code:**

Have You lived at this address 6 Months or more?

○ Yes ○ No

**Submit to Continue**

### We're Here to Help



Our customer service team is available 7 days a week to help answer any questions.

Call us toll free at **(877) 852-0820**

Everyday: 5 AM to 9 PM PST

### This is a Secure Page



We are dedicated to protecting information you entrust to us.

Your Privacy and security are protected. We take many steps in securing all your personal information.

Home | About Us | Contact Us | Privacy Policy | Terms & Conditions

Copyright © 2018 GSFCreditCare.com - X0.0671-3.51.96-



**1** SIGN UP     **2** SUBMIT ORDER     **3** VERIFY IDENTITY

## Profile
Needed to retrieve your Credit Report     All Fields Required

### Date of Birth:
Month   Day   Year 🔒

### Sign-In Details

**Username:** (alpha numeric only, no special characters)

**Password:** (Case Sensitive 6-36 characters)

**Confirm Password:**

### Promotion Code

[ use code ]

**Payment Information**
When you place your order here you will begin your membership in GSFCreditCare.com. You will be billed $19.95 every month to continue your membership. If you wish to cancel just call us at (877) 852-0820 to stop your membership.

**Press the "Submit Secure Order" button below to accept our Terms & Conditions and Privacy Policy. You also give permission to obtain your credit score and report as described in the Terms and Conditions.**

**Submit Secure Order**

---



**We're Here to Help**

Our customer service team is available 7 days a week to help answer any questions.

Call us toll free at **(877) 852-0820**

Everyday: 5 AM to 9 PM PST

**This is a Secure Page**



We are dedicated to protecting information you entrust to us.

Your Privacy and security are protected. We take many steps in securing all your personal information.

---

Home | About Us | Contact Us | Privacy Policy | Terms & Conditions

Copyright © 2018 GSFCreditCare.com - X0.0964-3.51.96-

 

**1** SIGN UP → **2** SUBMIT ORDER → **3** VERIFY IDENTITY 

The credit bureau requires your social security number to securely identify you and retrieve your credit report

## Social Security Number:

[        ] [        ] [        ] 🔒



### We're Here to Help 

Our customer service team is available 7 days a week to help answer any questions.

Call us toll free at **(877) 852-0820**

Everyday: 5 AM to 9 PM PST

### This is a Secure Page 

We are dedicated to protecting information you entrust to us.

Your Privacy and security are protected. We take many steps in securing all your personal information.

Home | About Us | Contact Us | Privacy Policy | Terms & Conditions

Copyright © 2018 GSFCreditCare.com - X0.0689-3.51.96-

CBCBRO001174

# MYSCORE AFFILIATE AGREEMENT

This Affiliate Agreement ("Agreement"), dated _____, 20_____ by and between MyScore LLC, a California limited liability company, and _____,

a _____,

contains the complete terms and conditions regarding the application to participate as an affiliate of MyScore and the establishment of links from your website to our website(s).

1. Definitions. The following definitions are used in this Agreement:

   a. "We", "Our", "Us", - MyScore LLC.

   b. "You", "Your" and "Affiliate(s)" - the business, individual or entity applying for participation in the MyScore Affiliate Program, or that displays Our products, services and/or promotions on its website and/or through offline representation through the affiliate tracking code in exchange for receiving remuneration from MyScore for sales resulting from such display.

   c. "Affiliate Site" - the Affiliate's Internet site which displays MyScore Products and Services and/or promotions.

   d. "MyScore Products and Services" - Credit Monitoring Memberships that are available for purchase through MyScore's website(s).

   e. "Commission Fees" or "Commissions" - Under the Affiliate Program, subject to the terms hereof, you will be paid a Commission Fee for each Qualified Purchase by a Referred Customer that you refer to MyScore under and in accordance with this Agreement.

   f. "Qualified Purchase" - a new successful customer signup of MyScore Products and Services by MyScore to a Referred Customer which meets the criteria set forth in Section 6 hereof.

   g. "Referred Customer" - each new and unique customer referred from Affiliate through a Link (defined in Section 3 below) provided by or approved by Us, which meets the criteria set forth in Section 6 hereof.

   h. "Registration Form" - any and all order forms, Registration Forms, or other signup or acceptance form (whether online, paper, fax, or otherwise) submitted by You or, as applicable, the Referred Customer to make a Qualified Purchase.

2. Promotion of Our Affiliate Relationship.

   a. We may make available to You a variety of graphic and textual links (each of these links sometimes being referred to herein as "Links" or, individually, as a "Link"), which are subject to the terms and conditions hereof. The Links will serve to identify Your site as part of the Affiliate Program and will establish a Link from Your site or e-mail to Ours. The Links may connect to any area of Our site (although commissions will only be issued on Qualified Purchases). In utilizing the Links, You agree that You will cooperate fully with Us in order to establish and maintain such Links.



EXHIBIT
4

b. You also agree that You will display on Your site only those graphic or textual images (indicating a Link) provided by Us or text messages expressly approved in advanced in writing by MyScore. All Affiliate Sites shall display such graphic and/or textual images prominently in relevant sections of their site. Furthermore, you agree not to use cookie stuffing techniques that set the affiliate tracking cookie without the Referred Customer's knowledge. (example: iframe). Any information with respect to Us that is going to be displayed on Your site must be provided by Us and expressly approved by Us in writing in advance of any display.

c. EXCEPT AS PERMITTED ABOVE OR IN SECTION 14 BELOW, YOU SHALL NOT AND ARE NOT AUTHORIZED TO (i) USE THE MYSCORE TRADEMARK, NAME OR ANY OF OUR OTHER INTELLECTUAL PROPERTY (OR ANY VARIATIONS OR MISSPELLINGS THEREOF OR OTHER TERM OR TERMS CONFUSINGLY SIMILAR TO ANY OF THE FOREGOING) (ALL OF THE FOREGOING, INCLUDING WITHOUT LIMITATION, THE "LINKS" AND THE "LICENSED MATERIALS" (DEFINED BELOW), ARE REFERRED TO HEREIN AS "OUR IP"), WITHOUT OUR EXPRESS PRIOR WRITTEN PERMISSION; (ii) USE OUR IP IN A DOMAIN OR WEBSITE NAME, IN ANY BIDS FOR KEYWORDS OR GOOGLE ADWORDS (OR SIMILAR PROGRAMS AT OTHER SEARCH ENGINES), IN ANY SEARCH ENGINE ADVERTISING (PAID OR OTHERWISE), IN ANY METATAGS, GOOGLE ADWORDS (OR SIMILAR PROGRAMS AT OTHER SEARCH ENGINES), KEY WORDS, ADVERTISING, SEARCH TERMS, CODE, OR OTHERWISE; (iii) CAUSE OR CREATE OR ACT IN ANY WAY THAT CAUSES OR CREATES OR COULD CAUSE OR CREATE ANY "INITIAL INTEREST CONFUSION" OVER THE USE OF OUR IP ON THE INTERNET OR IN ANY SEARCH ENGINE ADVERTISING. YOUR USE OF OUR IP IN ANY MANNER, OTHER THAN AS EXPRESSLY PERMITTED HEREUNDER (IN ADDITION TO BEING A BREACH OF THIS AGREEMENT) SHALL CONTITUTE UNLAWFUL INFRINGEMENT OF OUR TRADEMARKS, COPYRIGHTS OR OTHER INTELLECTUAL PROPERTY RIGHTS, AND MAY SUBJECT YOU TO CLAIMS FOR DAMAGES (INCLUDING WITHOUT LIMITATION, TREBLE DAMAGES FOR KNOWING OR WILFUL INFRINGEMENT), AND THE OBLIGATION TO PAY OUR LEGAL FEES AND COSTS IN CONNECTION WITH ANY ACTION OR PROCEEDING IN WHICH WE SEEK TO ENFORCE OUR RIGHTS UNDER THIS AGREEMENT OR WITH REGARD TO ANY OF OUR INTELLECTUAL PROPERTY RIGHTS.

d. All Links may be modified and/or expanded from time to time throughout the term of this Agreement pursuant to the mutual agreement of the parties hereto. You are not allowed to post any refunds, credits or discounts, or other content concerning MyScore, unless We have given You prior written permission in each instance. Affiliates may only use coupons and discounts that are provided exclusively through the Affiliate Program using banners and links. Each Link connecting users of Your site to the pertinent area of Our site will in no way alter the look, feel, or functionality of Our site. Any violations of the terms surrounding links, coupons, refunds, credits or discounts shall constitute a material breach of this Agreement, and may result in Your termination from the program or withholding of Commissions.

3. <u>FTC Endorsement Compliance</u>.

   a. It is the intent of MyScore to treat our customers fairly and to comply fully with all Federal Trade Commission regulations related to advertising. As such, we require our affiliates to comply with these regulations. This includes, but is not limited to, <u>Federal Trade Commission 16 CFR Part 255: Guides Concerning the Use of Endorsements and Testimonials in Advertising,</u> which requires, among other criteria, that material connections between advertisers and endorsers be disclosed. This means that directories, review/rating sites, blogs and other websites, email or collateral that purport to provide an endorsement or assessment of an advertiser (in this case MyScore) must prominently disclose the fact financial or in-kind compensation is provided from the advertiser. You are advised to seek and obtain your own legal advice on how these rules apply to your website or other promotional activities for which you receive compensation.

   b. MyScore reserves the right to withhold commission fees and cancel the affiliate relationship with you should we determine, at our discretion, that you are not in compliance with the previously mentioned guide or other FTC regulations/guides we deem relevant.

4. <u>Order Processing</u>. We will process orders placed by Referred Customer who follow the Links from your website to MyScore's website(s). We reserve the right, in our sole discretion, to reject orders that do not comply with certain requirements that we may establish from time to time. All aspects of order processing and fulfillment, including MyScore service, cancellation, processing, refunds and payment processing will be our responsibility. We will track the Qualified Purchases generated by your website. To permit accurate tracking, reporting, and Commission accrual, you must ensure that the Links between your website and our website are properly formatted.

5. <u>Commission Determination</u>. Under the Affiliate Program, you will be paid a Commission Fee for each Qualified Purchase by a Referred Customer that you refer to MyScore under and in accordance with the terms of this Agreement. Each Referred Customer and each Qualified Purchase must meet the following criteria (the "Criteria"):

   a. Each Referred Customer must be a new and unique visitor to MyScore and must register by completing and submitting the Registration Form using a valid and unique account and billing information and result in a new successful membership.

   b. Commission may not be paid for a Referred Customer that has transferred from any of our partners or subsidiaries.

   c. Each Referred Customer must make a Qualified Purchase, and provide a valid payment for the purchased MyScore Products or Services. To generate a Commission Fee for you, each Referred Customer must be an active, qualified customer of MyScore and must be up-to-date in all payments at the time the Commission Fees are processed and not have been subject to a refund, credit, cancellation, suspension or chargeback.

d. Each Referred Customer must sign up in a manner, which in our sole judgment, definitively establishes that the Referred Customer was referred directly from you to MyScore under this Agreement.

e. Each Referred Customer must remain in compliance with our Terms of Service, Acceptable Use Policy and other policies that are active at the time the Commission Fees are processed.

f. Commission Fees may not be paid for the Qualified Purchase if the Referred Customer has been offered or received coupons, refunds, credits or discounts from the Affiliate or if the Referred Customer has joined a business-opportunity program (as determined by MyScore in its sole discretion) that is managed or participated in by the Affiliate, unless MyScore has provided its prior written permission.

g. If a Referred Customer has received a popup with a discounted offer, while leaving our site during their purchase, we will NOT pay commissions on purchase.

h. MyScore reserves the right to withhold initial Commissions Fees for Affiliates who are new to the Affiliate program, or who have commissions that are potentially fraudulent as determined by MyScore in its sole discretion, to determine the legitimacy and cancellation rates of Referred Customers.

i. MyScore reserves the right to suspend payment of Commission Fees at any time and indefinitely, if it suspects fraud or other improper activity or a potential breach of any of the terms in this Agreement by the Affiliate or a Referred Customer(s). MyScore reserves the right to deduct from Affiliate's current and future Commission Fees any and all Commission Fees corresponding to any fraudulent, questionable, and cancelled MyScore purchases. Where no subsequent Commission Fee is due and owing, MyScore will send Affiliate a bill for the balance of such refunded purchase upon termination of the program or termination of the Referred Customer.

j. MyScore, in its sole discretion, reserves the right to withhold indefinitely any Commission Fee, and/or to reverse, deny or reject any Commission Fee, for:

   i. Any account/sale which has not been in an approved status in good standing as an account of MyScore for a period of at least thirty (30) days.

   ii. All commissions generated for accounts that may be fraudulent, including but not limited to the use of software that generates real and fictitious information.

   iii. If we deem orders to be fraudulent or see a pattern of potentially fraudulent activity, including, without limitation, where there are multiple accounts from the same customer, or referral of accounts which do not comply with this Agreement. We review account information (including site content) to assess referrals.

   iv. Altering Our Links in any way.

   v. Referred Customers that have been offered or received coupons, refunds, credits or discounts from the Affiliate or for Referred Customers who have joined a business opportunity program that is managed or participated in by the Affiliate, unless MyScore has provided written permission.

   vi. Customers engaging in "Domain Speculation," which is determined by the identification of two (2) web hosting accounts with the same Referred

Customer's name, email address, or other identifying characteristic as determined by MyScore and/or the identification of two (2) or more web hosting accounts that have no content on their websites or have similar content, templates or formatting, as determined by MyScore.

vii. Affiliates whom we believe may be artificially submitting Referred Customers, engaging in the advertisement of business-opportunity sites (as determined by MyScore in its sole discretion), using marketing practices that we deem to be unethical or likely to attract fraudulent signups and/or signups with a very low likelihood of renewal.

viii. Any Qualified Transactions exceeding any caps or limits MyScore has placed on the Affiliate. MyScore may email Affiliate telling them they are capped/limited to a certain number of leads per day, week, year, or in total.

k. MyScore reserves the right to immediately cancel or withhold for later review any Commission Fee based on the foregoing or that otherwise fails to meet the Criteria. It is the responsibility of the Affiliate to monitor the payment, denial and withholding of Commission Fees; MyScore is not obligated to actively notify Affiliates of the status of Commission Fees. If an Affiliate has a question about a Commission Fee that has been cancelled or withheld, that Affiliate has 30 days from the day the payment was due to contact MyScore to discuss or reclaim the Commission Fee. Any changes to decisions about cancelled or withheld Commission Fees are strictly at MyScore's discretion.

l. Commissions for any Referred Customer who is associated with any MyScore reseller, referral or other program may be removed from your payment. In other words, You may not receive double commissions or compensation.

m. In the event that the Referred Customers that are referred to MyScore by a specific Affiliate are determined to have an excessive cancellation rate (as determined by MyScore in its sole discretion), MyScore reserves the right to withhold or decline pending and future Commission Fees for the Affiliate.

n. Any of the following actions constitutes immediate grounds for MyScore to terminate this Agreement and will result in forfeiture of any Commission Fees due to you:

i. Any attempt by an Affiliate to manipulate, falsify or inflate Referred Customers, Qualified Purchases or Commission Fees.

ii. Violation of any of the terms of this Agreement.

6. Commission Fees and Payments.

a. Subject to the terms of this Agreement, we will pay a Commission Fee equal to the specified percentage or dollar amount set forth in the Commission Report on a Qualified Purchase by a Referred Customer which occurs during the month or other period for which such Commission Fee is being calculated.

b. The Commission Fee may be changed any time for any reason by MyScore by email notice. The Commission Fee will be communicated to Affiliate by email and may be a different Commission Fee per site, tracking link, traffic source or other factors that will also be communicated by email. If Affiliate does not agree with the

Commission Fees or any changes to Commission Fees then they must immediately stop sending Referred Customers.

c. Commission Fees will be paid on a net 30 day basis after the end of the month in which a Qualified Purchase was properly completed. MyScore will not reimburse nor compensate You for any commission or other consideration other than for Qualified Purchases by a Referred Customer made in accordance with the terms hereof.

d. There is a $50 minimum threshold for payment of Commission Fees. If You do not meet this minimum threshold, the commission payment for the month in question will be added to the commission payments due in future months until the minimum threshold is reached. In the event that this Agreement terminates, any accumulated but unpaid commission payment will be paid regardless of amount.

e. Check payments will only be reissued within 120 days of original issue date in the case of a lost check or stop-payment request. After 120 days, the payment will be voided. Check cancellation fees may be applied.

f. PayPal payments will only be reissued within 120 days of original issue date in the case of incorrect PayPal address or refusal from PayPal to accept payment.

g. You are responsible for informing MyScore about changes to postal and e-mail addresses, as well as any changes to your name, email address, contact information, tax identification number, or other personal information that will impact MyScore's ability to issue a valid Commission payment. Failure to provide the correct addresses may result in the forfeiture of any Commissions due to you. Commission Fees that are returned for invalid or insufficient address information or for other reasons may be forfeited as well.

7. <u>Payment Forms/Types</u>.

a. Commission Fees shall be paid based on the current information in Your Affiliate profile. We must be notified of any change in address or bank account information. Failure to do so may result in delay or loss of your Commission Fee.

b. You are responsible for informing MyScore of Your desired payment form/type:

    i. A check, if You are located in the United States.

    ii. An electronic funds transfer or wire transfer to Your bank. If this form of payment is chosen, you must be able to supply the following:

        (1) Account number

        (2) Type of account (checking or savings)

        (3) Federal Reserve Bank routing number.

        (4) If Your bank is not located in the United States, a SWIFT number.

    iii. When available, PayPal payment. Please refer to PayPal's policy to ensure You are eligible to receive payment if You are not located in the United States.

b. MyScore is not responsible for any third-party fees charged by PayPal, bank or other financial institute used to receive Affiliate Commission Fees.

c. You can update or change desired payment form at any time by updating your Affiliate profile by emailing us. Changes to desired payment form may take up to two payout cycles to take effect.

d. MyScore, in its sole discretion, reserves the right to modify the terms of this Commission payment method or schedule at any time. Such changes shall take effect when posted.

e. <u>Disputes</u>. Affiliate specifically agrees to file any tracking or commission disputes as well as any other disputes and discrepancies within 45 days after the end of the month in which the sale or event that is disputed occurred. Disputes filed after 45 days of the date on which the Qualified Purchase occurred may not be accepted by MyScore; if the dispute is not accepted, Affiliate forfeits forever any rights to a potential claim.

8. <u>Tax Information and Address Changes</u>.

a. It is Your responsibility to provide MyScore with the tax and payment information required to issue a Commission Fee to You. If MyScore does not receive the necessary tax or payment information within 90 days of a Commission Fee being earned, MyScore will consider that Commission Fee to be forfeited by the Affiliate, and no payment will be issued.

b. Each Affiliate is required to submit a W8/W9 tax form before MyScore will issue any Commission Fees.

c. You are responsible for the payment of all taxes related to the commissions you earn under this Agreement. In compliance with tax laws, MyScore will issue a Form 1099 to Affiliates whose earnings meet or exceed the applicable amount warranting the Form 1099.

d. Any address changes must be made in the Affiliate profile by emailing us at least fifteen (15) business days prior to the end of the calendar quarter in order for Commissions for that quarter to be sent to the revised address.

9. <u>Reports of Qualified Purchases</u>. Monthly reports will be issued to Affiliate or Affiliate will be provided a login to an affiliate tracking system of MyScore's choice. The potential Qualified Purchases shown in this report have not been reviewed to confirm they meet all criteria for Qualified Purchases. As such, Commission Fees may not be issued on all Referred Customers that appear in the report or affiliate tracking system.

10. <u>Obligations Regarding Your Site</u>.

a. You will be solely responsible for the development, operation, and maintenance of Your site and for all materials that appear on Your site. Such responsibilities include, but are not limited to, the technical operation of Your site and all related equipment; creating and posting product reviews, descriptions, and references on Your site and linking those descriptions to Our website; the accuracy and propriety of materials posted on Your site (including, but not limited to, all materials related to MyScore Products and Services); ensuring that materials posted on Your site do not violate or infringe upon the rights of any third party and are not libelous or otherwise illegal. We disclaim all liability and responsibility for such matters.

b. We have the right in Our sole discretion to monitor signups through Your site at any time and from time to time to determine if You are in compliance with the terms of this Agreement. If You are not in compliance We may terminate this Agreement immediately.

11. MyScore Responsibilities. We will be responsible for providing all information necessary to allow You to make appropriate Links from Your site to Our site. MyScore will solely be responsible for order processing for orders/Qualified Purchases placed by a Referred Customer following a Link from Your site, for tracking the volume and amount of Qualified Purchases generated by Your site, and for providing information to Affiliates regarding Qualified Purchases statistics. MyScore will be solely responsible for all order processing, including but not limited to payment processing, cancellations, refunds and related MyScore service. Any determination made by MyScore regarding the foregoing shall be binding absent manifest error.

12. Policies and Pricing. Referred Customers who buy MyScore Products and Services through the Affiliate network will be deemed to be Our Customers. Accordingly, all of Our rules, policies, and operating procedures concerning MyScore orders, MyScore service, and MyScore Products and Services sales will apply to those Customers. We may change Our policies and operating procedures at any time. For example, We will determine the prices to be charged for MyScore Products and Services sold under the Affiliate Network in accordance with Our own pricing policies. Prices and availability of MyScore Products and Services may vary from time to time, from affiliate to affiliate, and from region to region. Because price changes may affect products that You have listed on Your site, You may or may not be able to include price information in Your product descriptions. We will use commercially reasonable efforts to present accurate information, but We cannot guarantee the availability or price of any particular product or service. Please note that by signing up to be an Affiliate, You agree to both this Agreement and Our Terms of Service.

13. Emails and Publicity. You shall not create, publish, transmit or distribute, under any circumstances, any bulk electronic mail messages (also known as "SPAM") without prior written consent from MyScore for each and every day when any bulk mailing will occur. MyScore, in its sole discretion, reserves the right to reject each and every e-mail mailing. Additionally, You may only send e-mails containing a MyScore affiliate link and or a message regarding MyScore or MyScore's Affiliate Program to person(s) who have been previously contacted and whom consented to the fact that the You will be sending an e-mail containing MyScore information or information about the MyScore affiliate program. Failure by You to abide by this section, CAN-SPAM Act of 2003 or our Anti-Spam Policy, in any manner, will be deemed a material breach of this Agreement by You and foreclose any and all rights you may have to any commissions. If your account has excessive clicks in a very short period of time as determined by MyScore in its sole discretion, the Affiliate relationship may be terminated.

14. Licenses and Use of the MyScore.com Logos and Trademarks.

a. Subject to the limitations set forth in Section 3 above and otherwise in this Agreement, we grant you a non-exclusive, non-transferable, revocable license to

(i) access our site through the links solely in accordance with the terms of this agreement and (ii) solely in connection with such links, to use the MyScore.com trademark and logo and similar identifying material relating to us (but only in the form(s) that they are provided by us) (collectively, the "Licensed Materials"), for the sole purpose of selling MyScore Products and Services on your site and as approved in advance by us. You may not alter, modify, or change the Licensed Materials in any way. You are only entitled to use the Licensed Materials to the extent that You are a member in good standing of the MyScore Affiliate Program.

b. You shall not make any specific use of any Licensed Materials for purposes other than selling MyScore Products and Services, without first submitting a sample to Us and obtaining the express prior written consent of Your MyScore account executive, which consent shall not be unreasonably withheld. You agree not to use the Licensed Materials in any manner that is disparaging or that otherwise portrays MyScore, any hosted member of MyScore or any MyScore employee or representative in a negative light. We reserve all of Our rights in the Licensed Materials and of Our other proprietary rights. We may revoke Your license at any time, by giving You written notice. If not revoked, this license shall terminate upon expiration or termination of this Agreement.

c. You grant to Us a non-exclusive license to utilize Your names, titles, and logos, as the same may be amended from time to time (the "Affiliate Trademarks"), to advertise, market, promote, and publicize in any manner Our rights hereunder; provided, however, that We shall not be required to so advertise, market, promote, or publicize the Affiliate Trademarks. This license shall terminate upon the expiration or termination of this Agreement.

15. Term of the Agreement.

a. The term of this Agreement will begin upon Our acceptance of Your Affiliate Program application and will end when terminated by either party. Either You or We may terminate this Agreement at any time, with or without cause. You are only eligible to earn Commission Fees on Qualified Purchases occurring during the term, and Commission Fees earned through the date of termination will remain payable only if the orders for the related MyScore Products and Services are not cancelled and comply with all Terms laid out in this Agreement. We may withhold Your final payment of Commission Fees for a reasonable time to ensure that all Qualified Purchases are valid and payment from Referred Customers are legitimate as determined by MyScore in its sole discretion.

b. Any Affiliate who violates either this Agreement or MyScore's Terms and Conditions will immediately forfeit any right to any and all accrued Commissions Fees and will be removed from the MyScore Affiliate Program.

c. MyScore reserves the right to remove an Affiliate from the Affiliate Program, and to terminate or suspend this Agreement, at any time for any reason, in MyScore's sole discretion.

d. Without limitation, Affiliate's participation in the Program, and this Agreement, shall be deemed automatically terminated immediately and all

commissions forfeited upon Affiliate's violation of any of the terms of this Agreement or of any applicable law or regulation having the force of law.

16. <u>Modification</u>. We may modify any of the terms and conditions contained in this Agreement at any time in Our sole discretion. Such modifications shall take effect when posted on Our site. MyScore, in its sole discretion, reserves the right to notify You by e-mail and further reserves the right to withhold notification of any changes made to this Agreement. Modifications may include, but are not limited to, changes in the scope of available Commissions, Commission amounts/percentages, payment procedures, Commission Fee payment schedules, and Affiliate Program rules. If any modification is unacceptable to You, Your only recourse is to terminate this agreement. Your continued participation in the Affiliate Program following Our posting of a change notice or new agreement on Our site will constitute binding acceptance of the change.

17. <u>Disclaimers</u>. We make no express or implied warranties or representations with respect to the Affiliate Program or any MyScore Products and Services sold through the Affiliate Program (including, without limitation, WARRANTIES OF FITNESS, MERCHANTABILITY, NON-INFRINGEMENT, OR ANY IMPLIED WARRANTIES ARISING OUT OF COURSE OF PERFORMANCE, DEALING, OR TRADE USAGE). In addition, We make no representation that the operation of Our site will be uninterrupted or error free, and We will not be liable for the consequences of any interruptions or errors, including the tracking of information about Referred Customers during the period of interruption.

18. <u>Relationship of Parties</u>. You and MyScore are independent contractors, and nothing in this Agreement will create any partnership, joint venture, agency, franchise, sales representative, or employment relationship between the parties. You will have no authority to make or accept any offers or representations on Our behalf. You will not make any statement, whether on Your site or otherwise, that reasonably would contradict anything in this Section.

19. <u>Representations and Warranties</u>. You hereby represent and warrant to us as follows:

a. This Agreement has been duly and validly executed and delivered by You and constitutes Your legal, valid, and binding obligation, enforceable against You in accordance with its terms.

b. The execution, delivery, and performance by You of this Agreement and the consummation by You of the transactions contemplated hereby will not, with or without the giving of notice, the lapse of time, or both, conflict with or violate (i) any provision of law, rule, or regulation to which You are subject, (ii) any order, judgment, or decree applicable to You or binding upon Your assets or properties, (iii) any provision of Your by-laws or certificate of incorporation, or (iv) any agreement or other instrument applicable to You or binding upon Your assets or properties.

c. You are the sole and exclusive owner of the Affiliate Trademarks and have the right and power to grant to Us the license to use Your trademarks in the manner contemplated herein, and such grant does not and will not (i) breach, conflict with, or constitute a default under any agreement or other instrument applicable to You or binding upon Your assets or properties, or (ii) infringe upon

- 10 -

any trademark, trade name, service mark, copyright, or other proprietary right of any other person or entity.

d. No consent, approval, or authorization of, or exemption by, or filing with, any governmental authority or any third party is required to be obtained or made by You in connection with the execution, delivery, and performance of this Agreement or the taking by You of any other action contemplated hereby.

e. There is no pending or, to the best of Your knowledge, threatened claim, action, or proceeding against You, or any Affiliate of Yours, with respect to the execution, delivery, or consummation of this Agreement, or with respect to Your trademarks, and, to the best of Your knowledge, there is no basis for any such claim, action, or proceeding.

f. During the term of the Agreement, You will not include in Your site content that is, in Our opinion, unlawful, harmful, threatening, defamatory, obscene, harassing, racially, ethically, or otherwise objectionable or are in violation of Our Terms of Service or Acceptable Use Policy.

g. You are at least eighteen (18) years of age.

h. Each Referred Customer and each Qualified Purchase referred or submitted by You to Us, is valid, genuine, unique and not fraudulent and meets each of the Criteria for generating a Commission Fee as provided in this Agreement.

20. Limitation of Liability. WE WILL NOT BE LIABLE FOR INDIRECT, SPECIAL, INCIDENTAL, OR CONSEQUENTIAL DAMAGES, OR ANY LOSS OF REVENUE, PROFITS, OR DATA, ARISING IN CONNECTION WITH THIS AGREEMENT OR THE AFFILIATE PROGRAM, EVEN IF WE HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. FURTHER, OUR AGGREGATE LIABILITY ARISING WITH RESPECT TO THIS AGREEMENT AND THE AFFILIATE PROGRAM WILL NOT EXCEED THE TOTAL COMMISSIONS PAID OR PAYABLE TO YOU UNDER THIS AGREEMENT DURING THE 3-MONTH PERIOD IMMEDIATELY PRECEDING THE EVENT GIVING RISE TO SUCH LIABILITY.

21. Indemnification. You hereby agree to indemnify and hold harmless Us and Our subsidiaries and affiliates, and their directors, officers, employees, agents, shareholders, partners, members, and other owners, against any and all claims, actions, demands, liabilities, losses, damages, judgments, settlements, costs, and expenses (including reasonable attorneys' fees) (any or all of the foregoing hereinafter referred to as "Losses") insofar as such Losses (or actions in respect thereof) arise out of or are based on (i) any claim that Our use of the Affiliate Trademarks infringes on any trademark, trade name, service mark, copyright, license, intellectual property, or other proprietary right of any third party, (ii) any misrepresentation of a representation or warranty or breach of a covenant and agreement made by You herein, or (iii) any claim related to Your site, including, without limitation, its development, operation, maintenance and content therein not attributable to Us.

22. Confidentiality. Each of the parties here to agrees that all information including, without limitation, the terms of this Agreement, business and financial information, MyScore and vendor lists, and pricing and sales information, shall remain strictly confidential and shall not be utilized for any purpose outside the

- 11 -

terms of this Agreement except and solely to the extent that any such information is (a) already lawfully known to or independently developed by the receiving party, (b) disclosed in published materials, (c) generally known to the public, or (d) lawfully obtained from any third party any obligation of confidentiality to the discloser hereunder. Notwithstanding the foregoing, each party is hereby authorized to deliver the copy of any such information (a) to any person pursuant to a valid subpoena or order issued by any court or administrative agency of competent jurisdiction, (b) to its accountants, attorneys, or other agents on a confidential basis, and (c) otherwise as required by applicable law, rule, regulation, or legal process including, without limitation, the Securities Exchange Act of 1933, as amended, and the rules and regulations promulgated thereunder, and the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

23. <u>Independent Investigation</u>. Your application submission acknowledges that you have read this agreement and agree to be bound by all its terms and conditions. You understand that we may at any time (directly or indirectly) solicit MyScore relationships on terms that may differ from those contained in this agreement. We may also solicit MyScore relationships with entities that operate websites that are similar to or compete with your website. You have independently evaluated the desirability of participating in the MyScore Affiliate Program and are not relying on any representation, guarantee, or statement other than as set forth in this agreement.

24. <u>Governing Law</u>. The laws of the United States and the State of California will govern this Agreement, without reference to rules governing choice of laws. Any action relating to this Agreement must be brought in the federal or state courts located in Orange County, California and You irrevocably consent to the jurisdiction of such courts. You may not assign this Agreement, by operation of law or otherwise, without Our prior written consent. Subject to that restriction, this Agreement will be binding on, inure to the benefit of, and be enforceable against the parties and their respective successors and assigns. Our failure to enforce Your strict performance of any provision of this Agreement will not constitute a waiver of Our right to subsequently enforce such a provision or any other provision of this Agreement.

- - 0 - -

I INDICATE MY APPROVAL OF THIS AGREEMENT AND DESIRE TO BECOME AN AFFILIATE UNDER THESE TERMS AND CONDITIONS BY COMPLETING AND SUBMITTING THE AFFILIATE PROGRAM SIGNUP FORM, BY SUBMITTING PROPOSED REFERRED CUSTOMERS OR QUALIFIED PURCHASES TO US UNDER OUR AFFILIATE PROGRAM AND/OR BY COLLECTING AND COMMISSION FEES FROM US.

**IN WITNESS WHEREOF,** the parties hereby execute this Agreement as of the date first written above.

**MY SCORE LLC**                    _____

By: _____        By: _____

Printed name: _____        Printed name: _____

Its: _____        Its: _____

Email: _____        Email: _____

- 13 -

# Roger Ferguson

Marketing and Advertising Professional

## Experience

**Owner  at  FatCat Ent**

February 2013  -  Present  (4 years 2 months)

> Manage a full time staff of media buyers and email marketing services

**Affilate Manager  at  Revable**

January 2012  -  January 2013  (1 year 1 month)

> Manage affiliates to make sure campaigns are optimized 100%

## Skills & Expertise

**Online Advertising**
**Lead Generation**
**Direct Marketing**
**Media Strategy**
**Affiliate Marketing**
**Media Buying**
**Advertising**
**Media Planning**
**Digital Marketing**
**Web Marketing**
**Online Marketing**
**Social Media Marketing**
**Web Analytics**
**Online Lead Generation**
**Email Marketing**
**Google Adwords**
**PPC**
**SEO**
**Mobile Marketing**
**SEM**

## Education

**dojo**



EXHIBIT
5

# Roger Ferguson

Marketing and Advertising Professional

---



Contact Roger on LinkedIn



powered by
# RentFind

**My Rent**      **Search**      **Moving Center**      **List a Property**      **Site Feedback**

# FREE Houses For Rent Search

When you're looking for rentals, it helps to know where to start. You're in luck. We have the rentals you're looking for and all the tools you need to find them. Search for your next apartments, condo, or house on this site and get moving.

**Overview**

**Houses for Rent -- An Easy Search Online**

### Renter Resources



**Rented Single-Family Homes on the Rise**



**Renting a House: Renters Changing the Face of Neighborhoods**



**How to Find a Good Roommate**

## Search Houses for Rent

| City, State or ZIP | Search |

- Join over a million renters who found a home with us -- it's FREE!
- We are #1 in renter traffic and features tens of thousands of rentals - with more added daily!
- Detailed listings of condo rentals include amenities, photos, floor plans, contact information, and more!

## Houses For Rent in Your City

Atlanta Houses For Rent

Austin Houses For Rent

Baltimore Houses For Rent

Boston Houses For Rent

Charlotte Houses For Rent

Chicago Houses For Rent

Cincinnati Houses For Rent

Cleveland Houses For Rent

Nashville Houses For Rent

Orlando Houses For Rent

Philadelphia Houses For Rent

Phoenix Houses For Rent

Portland Houses For Rent

Sacramento Houses For Rent

Salt Lake City Houses For Rent

San Antonio Houses For Rent

EXHIBIT
6

Albuquerque Houses For Rent          Boulder Houses For Rent

Fort Worth Houses For Rent          Saint Paul Houses For Rent

Los Angeles Houses For Rent

## How we help you

We are a free rental site that offers a large selection of trusted apartments and houses for rent. Our large selection of listings and helpful tools will make it easy for you to find an affordable apartment quickly.

There are a number of convenient qualities that make us the best choice for a property rental search. For example, our services are free, and for anybody who wants to navigate our site for houses for rent, there is never any membership fee. We have a huge database of available homes that is constantly growing, and each property you search for includes photos, location details, and layout information. With such valuable resources at your fingertips, there is no longer any need to rely on the three-line descriptions that you usually find in a newspaper.

With several user-friendly search functions, we make finding rental properties easier than ever. To find a suitable home or apartment, our powerful apartment search tool ensures that all of your important needs are accounted for. Users just have to fill in the search parameters with the location of choice, along with the state and city. To better focus your search, users can specify a budget range in terms of minimum and maximum cost, and can also determine the exact size of the desired houses for rent. Whether you want a studio apartment or an entire home for your family, the search instantly displays results that can be further filtered to meet your specific needs. With us there's no need to delay a search for rental properties, just turn on your computer, and get started today!

**Our Company**

About Us

Media Contact

Careers

Privacy Policy

Terms of Use

**Popular Searches**

Popular City

US State

Rental Type

College and University

Military Base

**Let Us Help**

Help for Renters

Rental Safety

List a Property

Contact Support

About Our Listings

© 2016 RentFind, LLC. All photos, videos, text, and other content are the property of RentFind, LLC.

and the Logo are registered trademarks of RentFind, LLC. All rights reserved.

powered by

# FRE

When yo... next ap...

Over...

Hou...
Onlin...

## Sign up to see the best available rentals.

Get access to all of our rentals. It's 100% free!

Email

example@example.com

Phone

xxx-xxx-xxxx

Name

Jane Doe

**SIGN UP!**

- Join over a million renters who found a home with us -- it's FREE!
- We are #1 in renter traffic and features tens of thousands of rentals - with more added daily!
- Detailed listings of condo rentals include amenities, photos, floor plans, contact information, and more!

## Renter Resources



Rented Single-Family Homes on the Rise



Renting a House: Renters Changing the Face of Neighborhoods



How to Find a Good Roommate

## Houses For Rent in Your City

Atlanta Houses For Rent

Austin Houses For Rent

Baltimore Houses For Rent

Boston Houses For Rent

Charlotte Houses For Rent

Chicago Houses For Rent

Nashville Houses For Rent

Orlando Houses For Rent

Philadelphia Houses For Rent

Phoenix Houses For Rent

Portland Houses For Rent

Sacramento Houses For Rent

 

# Get Your **Free Credit Score** and Report as of January 18, 2017



EXHIBIT
7

| 14-day trial ends Feb. 1, 2017 | Monthly membership of $29.94 automatically charged after trial | For questions or to cancel, just call (800) 720-6627 |
|---|---|---|

## SAMPLE SCORE

TransUnion
350 400 450 500 550 600

Experian
350 400 450 500 550 600

Equifax
350 400 450 500 550 600

Delivered in
**Seconds**

## START HERE

First Name

Last Name

Email

ZipCode

☐ Yes, please send special offers from CreditUpdates.com and partners to my email.

**YOUR SCORE - NOW!**

## BENEFITS

### INSTANTLY

access your credit score from TransUnion

### SECURE

online delivery for your convenience

 **Credit Updates**



🔒 Your privacy and security are 100% protected.

**①  Complete**    **②  Confirm**    **③  Verify**

# Account Setup

All Fields Required

**First Name:**

**Last Name:**

**Address:**

**Zip Code:**

**State:**

- Select -

**City:**

**Email:**

**Phone Number :** (Optional)

(123) 456-7890

By clicking Submit and Continue I agree by electronic signature to: (1) be contacted by CreditUpdates.com about financial services or credit related offers by a live agent, artificial or prerecorded voice, and SMS text at my residential or cellular number, dialed manually or by autodialer, and by email (consent to be contacted is not a condition to purchase services); and (2) the Privacy Policy and Terms of Use. I understand that consent is not required for purchase and I can forgo providing my phone number.

**Create Your Username:**

**Create Your Password:** (Case sensitive 6-36 characters)

**Verify Your Password:**

 **Submit & Continue**

 **McAfee SECURE** CLICK TO VERIFY

 **Norton SECURED** powered by VeriSign

## Secure Site

We are committed to protecting your information

### What is a good Credit Score?

Most experts agree that a credit score of 720 or higher is what you should aim for to have an excellent credit score. About 60% of people have a credit score 700 or higher. You can see your percentile rank when you view your credit score.

### Will I find errors on my credit report?

Errors are very commonly found on credit reports due to data input errors, incorrectly reported accounts, or even identity theft. You should review and monitor your TransUnion, Equifax, and Experian credit reports to make sure they are accurate.

## We are Here to Help

Call us toll Free at (800) 720-6627

 Phone Hours (Pacific Time)
Everyday: 5 AM - 9 PM

 

🔒 Your privacy and security are 100% protected.

**1 Complete** ▶ **2 Confirm** ▶ **3 Verify**

## Your credit score is ready once we confirm your identity!

TransUnion.  ✔ **Located Credit File**

---

### Verification and Payment Information

Tell us which card you would like to use for your membership

**Card Number:**

[                                        ]    VISA  MasterCard  AMERICAN EXPRESS  DISCOVER

**CVV:**

[                    ]    

**Expiration Date:**

[ 01 - January ⇕ ]  [ 2016 ⇕ ]

Payment Information
When you place your order here you will begin your membership in CreditUpdates.com. You will be billed $29.95 every month you continue your membership. If you wish to cancel just call us at (800) 720-6627 to stop your membership.

**Submit & Continue**    McAfee SECURE™ CLICK TO VERIFY    Norton SECURED powered by VeriSign


### Secure Site
We are committed to protecting your information

#### What is a good Credit Score?

Most experts agree that a credit score of 720 or higher is what you should aim for to have an excellent credit score. About 60% of people have a credit score 700 or higher. You can see your percentile rank when you view your credit score.

#### Will I find errors on my credit report?

Errors are very commonly found on credit reports due to data input errors, incorrectly reported accounts, or even identity theft. You should review and monitor your TransUnion, Equifax, and Experian credit reports to make sure they are accurate.

---

## We are Here to Help

Call us toll Free at (800) 720-6627

📞 Phone Hours (Pacific Time)
**Everyday: 5 AM - 9 PM**



 **Credit Updates**

 TransUnion

🔒 Your privacy and security are 100% protected.

| ① Complete | ② Confirm | ③ Verify |
| --- | --- | --- |

 **Secure Site**
We are committed to protecting your information

# Verification Information

All Fields Required



**All the information you provide is transmitted over a safe and secure connection.**

**Date of Birth:**

| Month ⇕ | Day ⇕ | Year ⇕ |

**Social Security Number:**

🔒

### What is a good Credit Score?

Most experts agree that a credit score of 720 or higher is what you should aim for to have an excellent credit score. About 60% of people have a credit score 700 or higher. You can see your percentile rank when you view your credit score.

### Will I find errors on my credit report?

Errors are very commonly found on credit reports due to data input errors, incorrectly reported accounts, or even identity theft. You should review and monitor your TransUnion, Equifax, and Experian credit reports to make sure they are accurate.

**Submit & Continue**

 McAfee SECURE — CLICK TO VERIFY

 Norton SECURED — powered by VeriSign

## We are Here to Help

Call us toll Free at (800) 720-6627

 Phone Hours (Pacific Time)
**Everyday: 5 AM - 9 PM**

**Hi Monica,**



EXHIBIT
8

# Welcome to Credit Updates!

To help you get the most out of Credit Updates, here is a quick rundown of the features and benefits we have for you.



**1.** Get your updated credit report and credit score.



**2.** Review the factors that go into your credit score.



**3.** Daily monitoring and email alerts of changes to your credit report.



**4. BONUS:** Access thousands of coupons and discounts to local businesses.

Button

If you need anything at all, please don't hesitate to contact us and we hope you enjoy your trial membership. After your trial, you will be billed $29.94 every month you continue your membership. If you wish to cancel, simply call us to stop your membership.
We have live representatives available to assist you 7 days a week at (800) 720-6627, or if outside the US call +1 925 298 6179.

To Your Financial Health,
**Alissa Davis**
**SVP of Customer Satisfaction**
**Toll-free customer care: (800) 720-6627**
**Outside the US call: +1 925 298 6179**
**Hours: Everyday: 5 AM to 9 PM PST**

 **Credit Updates**

| Home | Alerts & Reports | Rewards Total | Manage Account | Contact Us |

EXHIBIT
9

## Welcome To Your Dashboard

🔔 **ALERT CENTER**

### You have NO alerts at this time

No alerts means there have been no important changes to your credit report or score since you signed up. You can relax knowing your credit is in good hands. In the meantime, please click here to see a sample and get a feel for what they look like.

☰ **MY BENEFITS**

### All 3 Credit Reports and Scores

Get a complete view of your credit with our 3 Bureau credit report and score. See where you rank plus find and correct any inaccurate information. **View your report**

[ Active ]

### Credit Monitoring

We monitor your credit report every day and report back to you crucial changes which you can view in your \"Alert Center\". **View your alerts**

[ Active ]

### Monthly Updated Credit Score

Every month we automatically get your updated credit score and we graph your score changes on a graph and see how your score changes over time. **View Score Statement**

[ Active ]

### $1 Million ID Theft Insurance

Our identity theft insurance offers a zero deductible and reimburses you for out of pocket expenses up to $1 Million. Plus, we retain lawyers, investigators and case managers on your behalf. **View insurance policy**

[ Active ]

### Lost Wallet Assistance

We know how much of a burden it can be when you lose your wallet and we make it easy to cancel all your cards. Just make one call to us and we contact all the your banks and credit cards to report the lost cards and get you replacements.

[ Active ]

### Fraud Resolution

If you are ever a victim of identity theft we help you cut thru the red tape and restore your good name.

[ Active ]

### RewardsTotal

As part of your membership, you get coupons and discounts on movies, shopping, restaurants, entertainment, amusement parks, and health & beauty products. **See your free rewards discounts**

[ Active ]

**CONTACT US**

Phone: (800) 720-6627
Email:
Support@CreditBureauCenter.com



Subscribe:        Email        RSS

« **Back**

Oct 25, 2017



By By Sarah Elizabeth Zilenovski

Tweet        Share        Like 0        Share        G+



**When Customers Lie: How to Fight Friendly Fraud**

EXHIBIT
10



Sometimes, a customer's order doesn't go as planned. But sometimes, the customer plans for things to go wrong. Either situation may result in a chargeback – but only one of these situations is fraud.

Legitimate chargebacks can occur when a customer honestly never receives their order. Or, maybe the product was defective, or the order wasn't canceled as requested. The customer may try to resolve the issue with the merchant, but if that doesn't work, the customer may decide file a transaction dispute with their credit card company.

But **friendly fraud** isn't honest at all. It happens when a customer places a legitimate order, receives the merchandise and then files a dispute with their bank or credit card issuer with the dishonest intention of receiving an undeserved refund.

Because friendly fraud starts off as a legitimate purchase, it's often difficult to prevent. But that shouldn't stop merchants from recognizing friendly fraud as a serious threat and acting to minimize its effects on their business.

# Why Do Customers File False Chargebacks?

Case: 1:17-cv-00194 Document #: 206-1 Filed: 03/24/18 Page 105 of 188 PageID #:4994

While chargebacks were initially developed by card issuers to protect consumers, the chargeback process has become so easy that thieves are able to easily game the system. Friendly fraud can take place in a variety of ways, including when the customer:

› Places an order with the explicit intent to get free products

› Experiences buyer's remorse and regrets a high-priced purchase

› Hides a purchase from a spouse or joint account holder

› Forgets to cancel a recurring purchase

› Misses the window to return a product

› Tries to lower their credit card balance

Some instances of friendly fraud also occur when consumers have a legitimate complaint but opt to not speak to the merchant first and instead take their complaint directly to the card issuer. Unfortunately, these customers don't realize — or simply don't care about — that this hurts the merchant.

# The Staggering Cost of Friendly Fraud

Friendly fraud is becoming an increasingly larger portion of chargebacks. A whopping **86% of chargebacks are deemed fraudulent**. Worse, 40% of customers who file one fraudulent chargeback will file another within 90 days.

The losses due to friendly fraud are significant. According to Visa, the financial impact of friendly fraud reached **$11.8 billion in 2012** and is growing 41% annually. That cost reflects more than just the purchase price of the goods; merchant losses can include:

› Chargeback and processing fees

› Shipping fees

› Penalties

› Lost personnel time spent gathering documentation and researching claims

And the damage doesn't stop there. If merchants accrue too many chargebacks, they risk losing their credit card merchant account, needing to pay for a **high-risk account**, or going out of business entirely.

All of this hits merchants hard — especially small businesses who don't have the time, money or personnel to **defend themselves against fraudulent claims**.

# 8 Steps for Preventing Friendly Fraud

Not only is defending against chargebacks tedious and expensive, it's also rarely successful: Reports estimate that merchants prevail only **20% to 30%** of the time. Even if merchants do win a dispute, they are still required to pay fees and penalties.

That's why it's critical for merchants to take steps like these to **prevent friendly fraud** from happening in the first place:

› Maintain good customer relationships. Encourage customers to call merchants before filing chargebacks. This contact gives merchants the opportunity to make the transaction right.

› Send order confirmations. Each customer should receive an email confirmation for their purchases that includes the terms of the purchase and return policy.

› Require card verification values (CVV). These three- or four-digit codes increase the likelihood that the customer has the physical card in hand, not just the number.

› Require signatures at delivery. Merchants should require recipients to sign for deliveries, especially high-value orders, making it harder for a customer to deny receipt.

› Make getting in touch easy. Merchants should offer multiple ways for customers to get in touch with them — phone numbers, email addresses, social media pages — and train their customer service team to handle complaints efficiently.

› Ensure clarity on credit card statements. Consider the business name that displays on a customer's credit card statement. Ensure the description won't confuse customers; at the very least, let customers know what name they should expect to see on statements.

› Keep customers informed. From the time the order is placed to when customers receive satisfaction surveys, merchants should stay in contact. Send order updates with shipping and tracking information so a customer knows where their merchandise is every step of the way.

› Communicate clearly. Ensure that cancellation and return policies are clearly stated on the website, receipts and emails.

Even merchants who closely follow these guidelines may still find themselves the victim of friendly fraud. That's why merchants must implement a comprehensive solution that can protect against the rising threat of card-not-present and friendly fraud.

**Contact a ClearSale analyst today** to learn how our guaranteed protection covers your business 100% against any fraudulent transaction that results in a chargeback.









**Sarah Elizabeth Zilenovski**

Sarah is a Marketing Manager at Clearsale and has been with the company since 2012. During that time, she has developed deep knowledge about fraud prevention. She brings extensive expertise in planning, marketing, go-to-market strategy and sales experience, thanks to a background that spans financial planning, controlling and analysis. She previously spent 5 years with Proctor & Gamble, and she holds bachelor and master degrees in Business with great distinction from a top Brazilian business school.

> ALL FROM THIS AUTHOR

## You may also like

Case: 1:17-cv-00194 Document #: 206-1 Filed: 03/24/18 Page 108 of 188 PageID #:4997



🏷 Fraud Prevention

## Optimizing Your PayPal Chargeback Protection



By Sarah Elizabeth Zilenovski

Mar 12, 2018



Case: 1:17-cv-00194 Document #: 206-1 Filed: 03/24/18 Page 109 of 188 PageID #:4998

🏷 Fraud Prevention

## How Well Can Artificial Intelligence Tell Celebrities Apart?



By Paulo Azevedo                                                 Mar 4, 2018



#PCIComplianceExpenses            clearsale

🏷 Fraud Prevention, 🏷 E-commerce

## Is Your e-Commerce Business PCI Compliant?



By Sarah Elizabeth Zilenovski                                  Mar 1, 2018

Case: 1:17-cv-00194 Document #: 206-1 Filed: 03/24/18 Page 110 of 188 PageID #:4999



🏷 **Fraud Prevention**

## Bitcoin and Chargebacks: How It Works



By Sarah Elizabeth Zilenovski                 Feb 26, 2018



clearsale

🏷 Fraud Prevention, 🏷 E-commerce

## Balancing Robust Fraud Prevention With Seamless Online Shopping



By Sarah Elizabeth Zilenovski                                          Feb 21, 2018



#IndustryFocus

🏷 Fraud Prevention, 🏷 industry focus

## Protecting Your Hotel Business From Chargebacks



By Sarah Elizabeth Zilenovski                                          Feb 18, 2018

🔍  Search

type your search

## Categories

Fraud Prevention (125)   News (59)   E-commerce (58)   featured (15)   Entrepreneurship (13)

Trade Shows (12)   Awards (5)   False Declines (5)   industry focus (5)   chargebacks (3)   ebook (3)

cases (2)   holidays (2)   sales (2)   101 (1)   blockchain (1)   guest posts (1)   infographic (1)   shopify (1)

small businesses (1)

## Top Authors



**Bernardo Lustosa**
COO At Clearsale

**Sarah Elizabeth Zilenovski**
Marketing Manager At Clearsale

**Bruno Farinelli**
Fraud Analytics Manager At Clearsale

**Pedro Chiamulera**
CEO At Clearsale

**Rafael Lourenco**
Vice President At Clearsale

Knock out fraud and chargebacks before they happen. Empower your business with world-class Total Guaranteed Fraud Protection Solution .

🔒 Merchant Login

**Fraud Protection Solution**

How it works

What Kind of solution we offer

Benefits

Guaranteed Chargeback Insurance

Our Application Guide

Case: 1:17-cv-00194 Document #: 206-1 Filed: 03/24/18 Page 113 of 188 PageID #:5002

Pricing

**Our Culture**

About Us

Our People

**Clients**

Featured Clients

Success Stories

**Resources**

Blog

FAQ

Merchant guide for fraud protection

Videos

Ebooks

Infographics

**Developers**

Overview

Clearsale API

Magento

  BigCommerce

  Shopify

  Prestashop

  Woocommerce

Zoey

Volusion

**Contact**

Get Started

Press Info

Referral Program

Copyright 2018 ClearSale LLC. - All rights reserved







## INDEX

CBC Total Revenue ..................................................................................................................... 3

Total Pierce Revenue .................................................................................................................. 4

CBC Revenue from January 2015 .............................................................................................. 5

CBC Revenue from Pierce from January 2015 ......................................................................... 6

Revenue from Pierce December 2015 ........................................................................................ 7

Revenue from Non-Pierce December 2015 ............................................................................... 8

CBC Revenue from July 7, 2016 ............................................................................................... 9

CBC Revenue from Pierce from July 7, 2016 ......................................................................... 10

Number of Non-Pierce Customers From January 2015 – Present ........................................... 11

Number of Pierce Customers from January 2015 – Present .................................................... 12

Amount of Refunds from Pierce .............................................................................................. 16

Refunds from Pierce from December 2015 - Present ............................................................... 17

Refunds from Dec. 2015 – Present .......................................................................................... 18

Amount of Chargebacks – Pierce ............................................................................................ 20

Number of Chargebacks - Pierce ............................................................................................. 21

Number of Non-Pierce Chargebacks from January 2015 – Present ........................................ 22

Number of Pierce Chargebacks January 2015 – Present ......................................................... 23

Number of Non-Pierce Chargebacks December 2015 – Present ............................................. 24

Number of Chargebacks from Dec 2015-present – Pierce ...................................................... 25

Amount of Non-Pierce Chargebacks from January 2015 – Present ........................................ 26

Amount of Pierce Chargebacks from January 2015 – Present ................................................ 27

CBC/BRO000365

Amount of Non-Pierce Chargebacks from December 2015 – Present ................................................................. 27

Amount of Chargebacks from Dec 2015-present - Pierce ................................................................................ 29

Database Call Notes re Scam and Fraud ........................................................................................................... 30

Database Notes re Retain .................................................................................................................................. 31

Number of Mobile Users ................................................................................................................................... 32

Notes re No Refund ........................................................................................................................................... 33

CBC/BRO000366

**CBC Total Revenue**



CBC/BRO000367

**Total Pierce Revenue**



CBC/BRO000368

## CBC Revenue from January 2015



CBC/BRO000369

## CBC Revenue from Pierce from January 2015



CBC/BRO000370

**Revenue from Pierce December 2015**



CBC/BRO000371

**Revenue from Non-Pierce December 2015**



CBC/BRO000372

**CBC Revenue from July 6, 2016 - Present**



CBC/BRO000373

**CBC Revenue from Pierce from July 6, 2016 - Present**



CBC/BRO000374

**Number of Non-Pierce Customers From January 2015 – Present**



CBC/BRO000375

**Number of Pierce Customers from January 2015 – Present**



CBC/BRO000376

**Number of Non-Pierce Customers from December 2015 to Present**



CBC/BRO000377

**Number of Pierce Customers from December 2015 – Present**



CBC/BRO000378

**Amount and Number of Refunds**



CBC/BRO000379

**Amount of Refunds from Pierce**



CBC/BRO000380

**Refunds from Pierce from December 2015 - Present**



CBC/BRO000381

**Refunds from Dec. 2015 – Present**



CBC/BRO000382

**Amount and Number of Chargebacks**



CBC/BRO000383

**Amount of Chargebacks – Pierce**



CBC/BRO000384

## Number of Chargebacks - Pierce



CBC/BRO000385

**Number of Non-Pierce Chargebacks from January 2015 – Present**



CBC/BRO000386

**Number of Pierce Chargebacks January 2015 – Present**



CBC/BRO000387

**Number of Non-Pierce Chargebacks December 2015 – Present**



CBC/BRO000388

**Number of Chargebacks from Dec 2015-present – Pierce**



CBC/BRO000389

**Amount of Non-Pierce Chargebacks from January 2015 – Present**



CBC/BRO000390

**Amount of Pierce Chargebacks from January 2015 – Present**



CBC/BRO000391

**Amount of Non-Pierce Chargebacks from December 2015 – Present**



CBC/BRO000392

**Amount of Chargebacks from Dec 2015-present - Pierce**



CBC/BRO000393

**Database Call Notes re Scam and Fraud**



CBC/BRO000394

**Database Notes re Retain**



CBC/BRO000395

**Number of Mobile Users**



CBC/BRO000396

**Notes re No Refund**



CBC/BRO000397

**Number of Active CBC Customers at Time of Filing of Lawsuit**



**Total Number of Members of CBC**



**Total Number of Users Billed**



**Total Number of Customers Who Received Refund**



CBC/BRO000408



```
1    -- Users retained Pierce 2016
2  • select count(1) from
3    ⊟(
4    select distinct  account_id from activities a
5    join user_profiles up on up.user_id=a.account_id
6    where a.user_id != 999 and up.source_code="35"
7    ⊟and (activity like '%Membership price was change%'
8    or activity  like '%Membership next renewal date extended to%'
9    or activity  like '%retained%'
10   ⌐)
11   and year(created)  = 2015
12   ⌐)
13   a;
14
15
16
```

| count(1) |
| --- |
| 4269 |

CBC/BRO002205

**Table: chargeback**

**Columns:**

| | |
| --- | --- |
| chargeback_id | int(11) AI PK |
| user_id | int(11) |
| billing_history_id | int(11) |
| card_type | varchar(18) |
| credit_card_first_six | varchar(7) |
| credit_card_last_four | varchar(5) |
| amount_in_cents | int(11) |



```sql
1    -- Users retained Pierce 2016
2 •  select count(1) from
3    ┌ (
4      select distinct  account_id from activities a
5      join user_profiles up on up.user_id=a.account_id
6      where a.user_id != 999 and up.source_code="35"
7    ┌ and (activity like '%Membership price was change%'
8      or activity  like '%Membership next renewal date extended to%'
9      or activity  like '%retained%'
10   └ )
11     and year(created)  = 2016
12   └ )
13     a ;
14
```

Result Grid | Filter Rows: | Export: | Wrap Cell Content: |

| count(1) |
|----------|
| 9131 |

CBC/BRO002206



```
 4    where a.user_id != 999
 5    and a.activity like '%no refund%'
 6    and a.activity not like '%no refund requested%'
 7    and a.module = 'notes' order by 1 desc ;
 8
 9
10
11 •  select action, sum(amount_in_cents) from activities a
12    join billing_history b on a.account_id = b.account_code
13    where a.user_id != 999
14    and b.status = 'success'
15    and a.activity like '%no refund%'
16    and a.activity not like '%no refund requested%'
17    and a.module = 'notes'
18    and b.action != 'verify'
19    group by action
20    order by 1 desc ;
```

Result Grid

| action | sum(amount_in_cents) |
|--------|----------------------|
| verify | 1500 |
| refund | 462191 |
| purchase | 7380801 |

CBC/BRO 2207

CONFIDENTIAL

# All Sites

| | |
|---|---|
| All Membership Order Count | 297,818 |
| Last 12 Months Membership Order Count | 136,684 |
| Source Code 35 Membership Order Count | 152,064 |
| Source Code 35 Last 12 Months Membership Order Count | 75,764 |
| All Order Count | 342,764 |
| Last 12 Months Order Count | 161,750 |
| Source Code 35 Order Count | 153,319 |
| Source Code 35 Last 12 Months Order Count | 76,470 |
| All Billing Charge Count | 849,256 |
| Last 12 Months Billing Charge Count | 421,607 |
| All Billing Charge Amount | $14,008,663.41 |
| Last 12 Months Billing Charge Amount | $6,817,466.73 |
| Source Code 35 Billing Charge Count | $6,818,069.13 |
| Source Code 35 Last 12 Months Billing Charge Count | $3,663,331.51 |
| Source Code 35 Billing Charge Amount | $6,818,069.13 |
| Source Code 35 Last 12 Months Billing Charge Amount | $3,663,331.51 |
| All Refund Count | 462,389 |
| Last 12 Months Refund Count | 21,335 |
| All Refund Amount | $884,602.29 |
| Last 12 Months Refund Amount | $472,751.76 |
| Source Code 35 Refund Count | 21,816 |
| Source Code 35 Last 12 Months Refund Count | 21,816 |
| Source Code 35 Refund Amount | $471,097.23 |
| Source Code 35 Last 12 Months Refund Amount | $267,669.49 |
| All Charge Back Count | 21,451 |
| Last 12 Months Charge Back Count | 10,204 |
| All Charge Back Amount | $533,205.70 |
| Last 12 Months Charge Back Amount | $240,736.00 |
| Source Code 35 Charge Back Count | 16,488 |
| Source Code 35 Last 12 Months Charge Back Count | 9,126 |
| Source Code 35 Charge Back Amount | $394,903.68 |
| Source Code 35 Last 12 Months Charge Back Amount | $210,572.77 |

**EXHIBIT 13**

© StenoWorks
The Court Reporting Store

CONFIDENTIAL

CBC/BRO 000296



EXHIBIT 14

© StenoWorks
The Court Reporting Store

```
20      └ )
21      a;
22
23
24 ●    select sum(b.amount_in_cents) from
25   ┌ (
26      select distinct account_id from activities a
27      join user_profiles up on up.user_id = a.account_id
28      where a.user_id != 999 and up.source_code = '35'
29   ┌ and (activity like '%Membership price was change%'
30      or activity like '%Membership next renewal date extended to%'
31      or activity like '%retained%'
32   ┌ ) and year(created)=2016
33   └ )
34      a
35      join billing_history b on b.account_code = a.account_id
36      where  b.status = 'success';
```

Result Grid | Filter Rows: | Export: | Wrap Cell Content: 🔠

| sum(b.amount_in_cents) |
|---|
| 59183568 |

Result 3 ×                                                                 ❶ Read Only

Output

Action Output

| # | Time | Action | Message | Duration / Fetch |
|---|---|---|---|---|
| ✓ | 1 19:07:27 | select count(1) from ( select distinct account_i... | 1 row(s) returned | 34.000 sec / 0.000 sec |
| ✓ | 2 19:08:54 | select count(1) from ( select distinct account_i... | 1 row(s) returned | 36.500 sec / 0.000 sec |
| ✓ | 3 19:10:16 | select sum(b.amount_in_cents) from ( select di... | 1 row(s) returned | 249.453 sec / 0.000 sec |

**Table: billing_history**

**Columns:**
| | |
|---|---|
| billing_history_id | int(11) AI PK |
| account_code | int(11) |
| credit_card_id | varchar(255) |
| username | varchar(45) |
| email | varchar(100) |
| external_id | varchar(45) |
| billing_provider_id | int(11) |







**PowerPay**
A Company of **EV** PAYMENTS INTERNATIONAL

## Payment Processing Statement

| | |
|---|---|
| **Merchant Name:** EFREESCORE | |
| **Address:** 340 S LEMON AV, UNIT #8881, WALNUT, CA 91789 | |
| **Merchant ID:** 00002715XXXX3026 | **Month:** July 2015 |

02715001001000

320 Cumberland Ave | Portland ME, 04101 | **Technical and Customer Support:** 1-888-888-4009 | **Chargebacks:** 1-800-999-8674

# CHARGEBACKS

| Date Posted | Chargeback Date | Reference Number | Tickets | Amount | Adjustments | Non-Settlement | Discount | Settled Amount |
|---|---|---|---|---|---|---|---|---|
| 07/01 | 07/01 | 18201715 | 1 | 29.94 | 0.00 | 0.00 | 0.00 | 29.94 |
| 07/01 | 07/01 | 18202134 | 1 | 29.94 | 0.00 | 0.00 | 0.00 | 29.94 |
| 07/02 | 07/02 | 18101848 | 1 | 29.94 | 0.00 | 0.00 | 0.00 | 29.94 |
| 07/02 | 07/02 | 18201811 | 1 | 29.94 | 0.00 | 0.00 | 0.00 | 29.94 |
| 07/02 | 07/02 | 18201836 | 1 | 29.94 | 0.00 | 0.00 | 0.00 | 29.94 |
| 07/02 | 07/02 | 18203609 | 1 | 29.94 | 0.00 | 0.00 | 0.00 | 29.94 |
| 07/06 | 07/06 | 18600403 | 1 | 29.94 | 0.00 | 0.00 | 0.00 | 29.94 |
| 07/06 | 07/06 | 18601260 | 1 | 29.94 | 0.00 | 0.00 | 0.00 | 29.94 |
| 07/06 | 07/06 | 18601522 | 1 | 29.94 | 0.00 | 0.00 | 0.00 | 29.94 |
| 07/07 | 07/07 | 11000203 | 1 | 29.94 | 0.00 | 0.00 | 0.00 | 29.94 |
| 07/08 | 07/08 | 18900702 | 1 | 29.94 | 0.00 | 0.00 | 0.00 | 29.94 |
| 07/08 | 07/08 | 18901440 | 1 | 29.94 | 0.00 | 0.00 | 0.00 | 29.94 |
| 07/08 | 07/08 | 18901598 | 1 | 29.94 | 0.00 | 0.00 | 0.00 | 29.94 |
| 07/09 | 07/09 | 15400042 | 1 | 29.94 | 0.00 | 0.00 | 0.00 | 29.94 |
| 07/09 | 07/09 | 15400142 | 1 | 29.94 | 0.00 | 0.00 | 0.00 | 29.94 |
| 07/09 | 07/09 | 19001792 | 1 | 29.94 | 0.00 | 0.00 | 0.00 | 29.94 |
| 07/09 | 07/09 | 19002055 | 1 | 29.94 | 0.00 | 0.00 | 0.00 | 29.94 |
| 07/09 | 07/09 | 19003609 | 1 | 29.94 | 0.00 | 0.00 | 0.00 | 29.94 |
| 07/10 | 07/10 | 19103454 | 1 | 29.94 | 0.00 | 0.00 | 0.00 | 29.94 |
| 07/13 | 07/13 | 15500099 | 1 | 29.94 | 0.00 | 0.00 | 0.00 | 29.94 |
| 07/13 | 07/13 | 19300706 | 1 | 29.94 | 0.00 | 0.00 | 0.00 | 29.94 |
| 07/13 | 07/13 | 19302407 | 1 | 29.94 | 0.00 | 0.00 | 0.00 | 29.94 |
| 07/14 | 07/14 | 19100856 | 1 | 29.94 | 0.00 | 0.00 | 0.00 | 29.94 |
| 07/14 | 07/14 | 19000920 | 1 | 29.94 | 0.00 | 0.00 | 0.00 | 29.94 |
| 07/14 | 07/14 | 19000947 | 1 | 29.94 | 0.00 | 0.00 | 0.00 | 29.94 |
| 07/22 | 07/22 | 20200554 | 1 | 29.94 | 0.00 | 0.00 | 0.00 | 29.94 |
| 07/23 | 07/23 | 20302106 | 1 | 29.94 | 0.00 | 0.00 | 0.00 | 29.94 |
| 07/23 | 07/23 | 20303017 | 1 | 29.94 | 0.00 | 0.00 | 0.00 | 29.94 |
| 07/24 | 07/24 | 11402898 | 1 | 29.94 | 0.00 | 0.00 | 0.00 | 29.94 |
| 07/24 | 07/24 | 20401645 | 1 | 1.00 | 0.00 | 0.00 | 0.00 | 1.00 |
| 07/24 | 07/24 | 20401646 | 1 | 29.94 | 0.00 | 0.00 | 0.00 | 29.94 |
| 07/29 | 07/29 | 21000561 | 1 | 29.94 | 0.00 | 0.00 | 0.00 | 29.94 |
| 07/29 | 07/29 | 21000717 | 1 | 29.94 | 0.00 | 0.00 | 0.00 | 29.94 |
| 07/29 | 07/29 | 20900538 | 1 | 29.94 | 0.00 | 0.00 | 0.00 | 29.94 |
| **TOTAL** | | | 34 | 989.02 | 0.00 | 0.00 | 0.00 | 989.02 |

**YOUR ACCOUNT at a glance . . . .**

**Transaction Summary**

Sales...........................$0.00

Transactions..........................0

Credits...........................$0.00

Credits Issued.......................0

Total...........................$0.00

**Card Summary Totals**

MasterCard.....................$0.00

Visa............................$0.00

Discover........................$0.00

Amex............................$0.00

Others..........................$0.00

**Other Fees**

Total...........................$850.00

**American Express Settlement/Discount**

Total.....................................$0

**American Express Pass Through**

Total.....................................$0

**American Express Other Fees**

Total.....................................$0

**GIFT CARD ACTIVITY** available for viewing on or about the 8th of the month

# OTHER FEES

| Card | Charge | Description | Number | Rate | Fees |
|---|---|---|---|---|---|
| | 3007 | ONLINE DATA ENTRY | 34 | 0.0000 | 0.00 |
| | 6930 | INCOMING CHARGEBACKS | 34 | 25.0000 | 850.00 |
| **TOTAL** | | | | | 850.00 |

EXHIBIT 16



**Payment Processing Statement**

| | |
|---|---|
| **Merchant Name:** EFREESCORE | |
| **Address:** 340 S LEMON AV, UNIT #8881, WALNUT, CA 91789 | |
| **Merchant ID:** 00002715XXXX3026 | **Month:** July 2015 |

02715001001000

320 Cumberland Ave | Portland ME, 04101 | **Technical and Customer Support:** 1-888-888-4009 | **Chargebacks:** 1-800-999-8674

**YOUR ACCOUNT HAS BEEN DEBITED**................................................**$850.00**

Reputation Update

**Mike Brown** to Jeff                                                          5/19/16

FYI: After the feedback from your CFO we been making great progress improving our online reputation. We now have an **A+ rating**
**with the BBB**.

http://www.bbb.org/losangelessiliconvalley/business-reviews/credit-reporting-agencies/credit-bureau-center-ltd-in-walnut-ca-413377

Just wanted to share that we take your feedback seriously and using it to improve as a company.

Thanks,
Mike



EXHIBIT
17



EXHIBIT
Mc Kenney
30
12/14/17  st



```sql
select count(1) from chargeback
where chargeback_date > '2016-06-10 00:00:00'
and chargeback_reason not like 'Verifi%'
and chargeback_reason not like 'Ehhoca%'
order by 1 desc;


select count(1) from billing_history
where date > '2016-06-10 00:00:00'
```

| count(1) |
| --- |
| 650151 |

**Subject:** Chargeback Update– Similarities
**From:** Diego Munoz <diegomunoz001@gmail.com>
**Date:** 3/16/16, 8:55 PM
**To:** David Rojas <darb714@gmail.com>, Mike Brown <M.Brown@myscore360.com>

Hello Mike, David.

Here are some updates on the chargebacks receiving. Im sure the trial ending email,m will help lower the amount of Chargacks form members that never called.

2406840 – to old to pull call. Client was billed the day he cancelled. We are now
 issuing a refund in these cases.
2341572– never received a call
2401245– never received a call
2368169– had issue with refunds in these days. agent handled call ok, offered a
 refund
2322341– never received a call
2324688– agent should have offered a refund since caller was not happy about charges.
 did not. will speak to agent
2379851– never received a call
2363012– never received a call
2180881– never received a call
2277982– agent handled call ok. Client did not request a refund
2392662– never received a call
2332278– never received a call
2406467– never received a call
2411860– never received a call to cancel.Call to old to pull. called with general
 questions when member started trial. Never called back to cancel
2402999– agent did all retentions. no refund was requested
2271476– helpdesk–no refund requested
2326616– call to old to pull – called with bank and was issued 2 refunds back in
December
2435763– Client was issued a courtesy refund and retained. then chargeback came in
2400354– Never received a call
1856410– never received a call
2404618– client was issued courtesy refunds and was aware of them, but still issued       a
chargeback
2129727– never received a call
2397454– never received a call
2303115– Never received cancellation call. only called to get scores. needed to reprocess
it.

EXHIBIT
19

Case: 1:17-cv-00194 Document #: 206-1 Filed: 03/24/18 Page 166 of 188 PageID #:5055

**Subject:** Chargeback- Similarities- Call reviews
**From:** Diego Munoz <diegomunoz001@gmail.com>
**Date:** 3/7/16, 7:56 PM
**To:** David Rojas <darb714@gmail.com>, Mike Brown <M.Brown@myscore360.com>

Hello Mike,

I went back over the last 20 select Chargebacks to see what they have in common and I notice most of these , we never received a call for. Another similarity on some of these is that they are bad account without SSN/DOB. one of these the agent offered 2 refunds only issued 1.

My guess is that the chargebacks that we did not receive a call about, will go down since we are now sending an email when the trial starts and also noticed they are now getting emails when the trial is going to expire. This should help with those type of chargebacks.

I will continue checking similarities in the chargebacks daily and will be sure to let you know of any patterns.

| USER ID | What happened on Call | What could have been done differently |
|---|---|---|
| 2428543 | Received 3 calls where agent greeted and seemed to be hung up on . Agent called back, no answer | Not sure what could have been done differently |
| 2390222 | Never received a call from this CB | |
| 2314557 | Never received a call from this CB | |
| 2411930 | Client said she was not expecting to be billed, but did NOT ask for a refund. | Could have offered a refund since she said she wasnt aware. But client said she just wanted to cancel. No refund was requested. |
| 2333037 | Never received a call from this CB | |
| 2376163 | Call past 30 days–unable to pull. –Client called 1–2 hours after being billed | could have offered a refund, since she was recently billed. |
| 2258858 | Agent failed to do the second refund as she said she would | Should have issued both refunds. Only issued 1 |
| 2415453 | Bad account–No DOB or SSN– Never received a call from this CB | Could not maybe charge accounts with no DOB, SSN |
| 2311905 | Never received a call from this CB | |
| 2397027 | Never received a call from this CB | |
| 2285778 | Never received a call from this CB | |
| 2414666 | Never received a call from this CB | |
| 2393252 | Never received a call from this CB | |
| 2398740 | NO DOB/SSN–Never received a call from this CB | perhaps, not  charge accounts with no DOB, SSN |
| 2392503 | Helpdesk cancellation– issued 2 courtesy refunds | Could have maybe offered more refunds, but instructions tell us to issue up to 2 |
| 2426494 | Never received a call from this CB | |
| 2408346 | Never received a call from this CB | |
| 2394069 | Never received a call from this CB | |

EXHIBIT
20

© StencilWorks
The Court Reporting Store

**Subject:** Requested chargeback info
**From:** Diego M <diego@myscore360.com>
**Date:** 6/21/16, 4:54 PM
**To:** drojas@myscore360.com, Mike Brown <M.Brown@myscore360.com>

Hello Mike,

Here is the Chargeback count you requested. I created a column labeled "Results", where i put what happened in the call. There were many with active accounts and soon to be billed. i went ahead and cancelled all the ones that were not cancelled .

Out of the 80 CBs, 32 called in .

─Attachments:──────────────────────────────────

   Chargeback Count 6.21.2016.xlsx                               17.2 KB



EXHIBIT
21

| | |
|---|---|
| **From:** | Jens Sorensen <jens@myscore360.com> |
| **Sent:** | Tuesday, April 14, 2015 5:29 PM |
| **To:** | Mike Brown <mike@myscore360.com> |
| **Cc:** | Tom Fragala <tom@mytruston.com> |
| **Subject:** | Re: main home page of creditumbrella |

Lol - I saw that answer coming :)

Thanks.

Jens Sorensen
Project Manager
MyScore LLC

**From:** Mike Brown <mike@myscore360.com>
**Sent:** April 14, 2015 10:26:31 AM PDT
**To:** Jens Sorensen <jens@myscore360.com>
**Cc:** Tom Fragala <tom@mytruston.com>
**Subject:** Re: main home page of creditumbrella

Both

On Tuesday, April 14, 2015, Jens Sorensen <jens@myscore360.com> wrote:
> Mike,
>
> Is that part of the FCRA or a bureau requirement?
> Jens Sorensen
> Project Manager
> MyScore LLC
>
>
>
> **From:** Jens Sorensen <jens@myscore360.com>
> **Sent:** April 14, 2015 10:21:36 AM PDT
> **To:** Mike Brown <mike@myscore360.com>, Tom Fragala <tom@mytruston.com>
> **Subject:** Re: main home page of creditumbrella
>
> Ok. I will let him know.
>
> I^d guess that Art may sometimes give his employees instructions using the wrong site name.
>
> When Art first tried signing up a test account on creditupdates.com he encountered an issue because he already had an account on creditreportnation.com.
>
> The names are pretty similar and generic enough.

EXHIBIT
22

Jens Sorensen
Project Manager
MyScore LLC

---

**From:** Mike Brown <mike@myscore360.com>
**Sent:** April 14, 2015 10:16:48 AM PDT
**To:** Tom Fragala <tom@mytruston.com>
**Cc:** Jens Sorensen <jens@myscore360.com>
**Subject:** Re: main home page of creditumbrella

Looks like they hosting the CRN html on their end and linking it to CU. Thats ok just make sure the offer text is congruent. Also I see they mention "free credit report" which is a no no. Have them replace with "free credit scores"

On Tue, Apr 14, 2015 at 10:13 AM, Tom Fragala <tom@mytruston.com> wrote:
  i'm sure mike will know what's going on :-)

  On Tue, Apr 14, 2015 at 10:13 AM, Jens Sorensen <jens@myscore360.com> wrote:
    The image appears to be from CreditReportNation.com. However the link used is to
    creditupdates and does include the correct site version for us to credit them for sany sign ups.
    Jens Sorensen
    Project Manager
    MyScore LLC

    ---

    **From:** Tom Fragala <tom@mytruston.com>
    **Sent:** April 14, 2015 10:06:12 AM PDT
    **To:** Mike Brown <mike@myscore360.com>
    **Cc:** Jens Sorensen <jens@myscore360.com>
    **Subject:** Re: main home page of creditumbrella

    ah, you noticed that too. i'll let you guys follow up and ask why. they aren't going to get credit
    for those signups at the home page if they don't and they really should -- if they're happy, we'll
    all be happy.

    On Tue, Apr 14, 2015 at 10:04 AM, Mike Brown <mike@myscore360.com> wrote:
      They not using the CU theme?

      On Tue, Apr 14, 2015 at 9:55 AM, Tom Fragala <tom@mytruston.com> wrote:
        you probably have seen this already...they added a new menu item right at the top home
        page level, called "credit reports"...

Inline image 1

--

Tom Fragala | TRUSTON | www.mytruston.com
340 S Lemon Ave #2688  Walnut CA 91789
tel 800.960.5512 x710 | fax 800.960.4199

--

Tom Fragala | TRUSTON | www.mytruston.com
340 S Lemon Ave #2688  Walnut CA 91789
tel 800.960.5512 x710 | fax 800.960.4199

--

Tom Fragala | TRUSTON | www.mytruston.com
340 S Lemon Ave #2688  Walnut CA 91789

Case: 1:17-cv-00194 Document #: 206-1 Filed: 03/24/18 Page 171 of 188 PageID #:5060

tel 800.960.5512 x710  |  fax 800.960.4199

```
                 3 - Talk about Anti Fraud Systems - 022812
Delivered-To: rob.lawrence@toomuchmedia.com
Received: by 10.27.7.145 with SMTP id 139csp2119924wlh;
        Tue, 24 Feb 2015 11:29:33 -0800 (PST)
X-Received: by 10.50.85.18 with SMTP id d18mr17572470igz.3.1424802500688;
        Tue, 24 Feb 2015 10:28:20 -0800 (PST)
X-Mozilla-Keys:

Return-Path: <vlad.zamelukhin@toomuchmedia.com>
X-Original-To: rob@toomuchmedia.com
Delivered-To: rob.lawrence@toomuchmedia.com
Received: from vlad-zamelukhins-mac-pro.local (unknown [75.99.182.234])
        by roxy.isprime.com (Postfix) with ESMTPA id D02C57C4BA2
        for <rob@toomuchmedia.com>; Tue, 28 Feb 2012 11:10:00 -0500 (EST)
Message-ID: <4F4CFC5C.1000407@toomuchmedia.com>
Date: Tue, 28 Feb 2012 11:10:04 -0500
From: Vlad Zamelukhin <vlad.zamelukhin@toomuchmedia.com>
User-Agent: Thunderbird 2.0.0.19 (Macintosh/20081209)
MIME-Version: 1.0
To: rob@toomuchmedia.com
Subject: [Fwd: Re: Promo Code]
Content-Type: text/plain; charset=ISO-8859-1; format=flowed
Content-Transfer-Encoding: 7bit


-------- Original Message --------
Subject:     Re: Promo Code
Date:    Tue, 14 Feb 2012 00:25:21 -0800
From:    Mike Brown <m.brown@zoomcreditscore.com>
To:      Vlad Zamelukhin <vlad.zamelukhin@toomuchmedia.com>
References:      <4F1F2DE2.6030900@toomuchmedia.com>
<615AAF1D-9783-49E5-A196-A25503EAE4E1@zoomcreditscore.com>
<4F218C2A.50804@toomuchmedia.com>
<B1E9DFCC-A9A0-4720-A3CC-D9DF0CC82F25@zoomcreditscore.com>
<4F317090.1020706@toomuchmedia.com>


Do you guys have any integration with anti fraud services like scrubkit? Or any
other service? Whats the best way to prevent fraud using your platform?

Thanks,
Mike

On Feb 7, 2012, at 10:42 AM, Vlad Zamelukhin wrote:

> Hi Mike,
>
> Just wanted to get in touch with you to see how everything is going. Please let me
know if you have any questions.
>
> Thanks and I look forward to your response!
>
> Best regards,
> --
>
> Vlad Zamelukhin
>
> Too Much Media
>
> http://toomuchmedia.com
>
> 732-385-1536 XT 1123
```

EXHIBIT
23

EXHIBIT
Mc Kenna-1
20
12/14/17

Page 1

```
                      3 - Talk about Anti Fraud Systems - 022812
>
> ICQ - 452583619
>
> AIM - TMMVlad
>
> Skype - TMMVlad
>
>
>
> Mike Brown wrote:
>> Hey Vlad,
>>
>> I will get around to signing online and working on some of the integration more
probably on Monday. Thanks again for all your help.
>>
>> Mike
>>
>> On Jan 26, 2012, at 9:23 AM, Vlad Zamelukhin wrote:
>>
>>
>>> Hey Mike,
>>>
>>> Just checking in with you to see if you needed any more info from myself or our
developers.
>>>
>>> Thanks again and I look forward to your reply!
>>>
>>> Best regards,
>>> --
>>>
>>> Vlad Zamelukhin
>>>
>>> Too Much Media
>>>
>>> http://toomuchmedia.com
>>>
>>> 732-385-1536 XT 1123
>>>
>>> ICQ - 452583619
>>>
>>> AIM - TMMVlad
>>>
>>> Skype - TMMVlad
>>>
>>>
>>>
>>> Mike Brown wrote:
>>>
>>>> Thanks!
>>>>
>>>> On Jan 24, 2012, at 2:17 PM, Vlad Zamelukhin wrote:
>>>>
>>>>
>>>>> Mike,
>>>>>
>>>>> Was able to get you the 3 month free code approved. :)
>>>>>
>>>>> Go to https://secure.offerit.com/account.html and create a new account. The
2nd page will ask you for a code, enter: QJB9XIF2
>>>>>
>>>>> Please let me know if you have any questions.
>>>>>
>>>>> Thanks and look forward to working with you!
```

Page 2

                    3 - Talk about Anti Fraud Systems - 022812
>>>>>
>>>>> Best regards,
>>>>> --
>>>>>
>>>>> Vlad Zamelukhin
>>>>>
>>>>> Too Much Media
>>>>>
>>>>> http://toomuchmedia.com
>>>>>
>>>>> 732-385-1536 XT 1123
>>>>>
>>>>> ICQ - 452583619
>>>>>
>>>>> AIM - TMMVlad
>>>>>
>>>>> Skype - TMMVlad
>>>>>
>>>>>
>>>>
>>
>>


--

Vlad Zamelukhin

Too Much Media

http://toomuchmedia.com

732-385-1536 XT 1123

ICQ - 452583619

AIM - TMMVlad

Skype - TMMVlad

1 - Dealing with Affiliate Fraud - Fragalia00000503

From: Mike Brown <mike@myscore360.com>
Sent: Friday, March 25, 2016 11:10 PM
To: Diego M <diego@myscore360.com>
Cc: David Rojas <darb714@gmail.com>; Mike Brown <M.Brown@myscore360.com>; Tom Fragala <tom@myscore360.com>
Subject: Re: Client Charged 76 times-Fraud- important

Diego, Please cancel all and refund.

Tom, reach out to Sv 235 Complete credit plus over this fraud. Partners blocked from signing up with same card more than twice now so this happened before this change

On Friday, March 25, 2016, Diego M <diego@myscore360.com> wrote:

> Hello Mike,
>
> This account holder claims we are charging her and there is no reason for
> it, since its not a business card.
> Full Name Ariel McCullough
> Credit Card 4342-56 XX-XXXX-7000
> <https://admin.myscore360.com/admin/search/credit_card/434256-7000>
> (Visa)
> exp. 3/2019
> Address 162 Howard Ave
> Denver , CO 80236
> US
>
> Agent:
> This cust has over 76 accounts linked to her card, she claims she is not a
> business and has no idea why she keeps getting billed from us.
>
> Billing Info
>
> <https://admin.myscore360.com/admin/account/update_billing_info/2354176>
>
> Full Name Ariel McCullough
> Credit Card 4342-56 XX-XXXX-7000
> <https://admin.myscore360.com/admin/search/credit_card/434256-7000>
> (Visa)
> exp. 3/2019
> Address 162 Howard Ave
> Denver , CO 80236
> US
> Phone
> This is the card that has several accounts linked.
>





Page 1

Re: Suspicious activity.

**Subject:** Re: Suspicious activity.
**From:** Brent Brague <brent@boostnetworks.com>
**Date:** 8/27/13, 10:38 AM
**To:** Mike Brown <mike@myscore360.com>

Let's have a call later today to review everything. Then I will go to the pubs and correct any issues and sources of Fraud.

Brent Brague

Office –801-252-5017
Skype - MojoBrent
Email – brent@boostnetworks.com
http://www.linkedin.com/in/brentbrague

Sign up link : http://boost.affiliate-reporting.com

**From:** Mike Brown <mike@myscore360.com>
**Date:** Monday, August 26, 2013 10:50 PM
**To:** Brent Brague <brent@boostnetworks.com>
**Subject:** Re: Suspicious activity.

Same fraudster just ordered on 279423

On Mon, Aug 26, 2013 at 5:33 PM, Mike Brown <mike@myscore360.com> wrote:
Sorry I mean only sales on or after 8/22. The 3 before that date for 277790 are legit

On Mon, Aug 26, 2013 at 5:14 PM, Mike Brown <mike@myscore360.com> wrote:
Can we reach out to 280015 and 277790 to find out how they are doing sales? Lets stop all their sales and this is my notice now to charge them back.

I just got two fraud alerts (real time fraud chargeback alert) from this affiliate and after further inspection I can say with very high confidence these are all stolen credit cards.

After seeing the fraud alerts I then see some sales thru known proxies and all credit card AVS mis-match plus the caps. Both these affiliates appear to be the same exact type and maybe even the same person trying to hide under subid's

Thanks,
Mike



EXHIBIT
25

—B460E796-BE77-443F-B23E-82365D16579A[235].png—



EXHIBIT
McWhinney
23
12/14/17

Re: Suspicious activity.

# BOOSTNETWORKS

Attachments:

B460E796-BE77-443F-B23E-82365D16579A[235].png                    4.8 KB

**Subject:** New integration going live
**From:** Mike Brown <mike@myscore360.com>
**Date:** 4/7/16, 2:21 AM
**To:** Diego Munoz <diego@myscore360.com>, David Rojas <darb714@gmail.com>

We are excited to announce we have a new integration going live next week with a select few major banks. Now when a customer calls their bank to question or dispute a charge the supporting banks can see the users account detail in CST to confirm the customers charge is valid and not "friendly fraud". This works both ways and allows banks to easily and correctly identify actual true fraud.

Please note we will be sharing with the bank all the account details going forward including CST notes so please make sure our notes are professional. Agents should be aware their the notes can be reviewed by other companies and we want to make sure our company always always looks positive. Following correct process and procedures and always helping the customers.

As always we never want to prevent customers from calling their banks so de-escalating and resolving the call is a priority even if the customer may not beable to get the result they want.

We will frequently be adjusting the refund procedures and chargeback processing procedures the next few months as we optimize these new integrations so appreciate the teams ability to quickly adapt to new polices! Keep up the great work you guys are doing a great job

Thanks
Mike





12/11/17, 12:48 PM

# Income Statement

## MyScore LLC
## 1 January 2014 to 31 December 2014

| | 31 Dec 14 |
|---|---|
| **Revenue** | |
| Consulting Services | 18,992 |
| Returns & Adjustments | (2,210) |
| Revenue | 1,696,136 |
| **Total Revenue** | **1,712,917** |
| **Less Cost of Sales** | |
| Advertising - UA | 52,076 |
| Affiliate Commissions | 180,905 |
| Customer Service - Operations | 10,685 |
| Customer Service - Staff | 68,918 |
| Data Cost | 450,585 |
| Merchant Fee | 46,789 |
| UA Cost - Consultants | 250 |
| Web Technology & Hosting | 71,863 |
| **Total Cost of Sales** | **882,072** |
| **Gross Profit** | **830,846** |
| **Operating Expenses** | |
| Accounting | 41,821 |
| Advertising-General | 3,761 |
| Bank Service Charges | 3,742 |
| Consulting | 432 |
| Conventions & Meetings | 549 |
| Employee Communications | 80 |
| Entertainment | 1,736 |
| Expendable Computer Equipment | 606 |
| Expendable Office Equipment | 608 |
| Expendable Software | 2,615 |
| Insurance - Property | 952 |
| Legal | 20,986 |
| Marketing Expense | 331,795 |
| Meals | 317 |
| Miscellaneous Expense | 157 |
| Office Expenses | 413 |
| Office Rent | 27,283 |
| Outside Services | 134,800 |
| Owner Car Expense | 8,286 |
| Owner Health Insurance | 5,467 |
| Postage & Delivery | 2,113 |

EXHIBIT
27

© StencilWorks
The Court Reporting Store

# Income Statement

| | 31 Dec 14 |
|---|---:|
| Printing & Stationery | 64 |
| Provision for Doubtful Accounts | 10,197 |
| Sales Commissions | 15,527 |
| Taxes | 1,961 |
| Telephone | 2,611 |
| Travel | 3,583 |
| Web Development | 77,986 |
| **Total Operating Expenses** | **700,447** |
| **Net Income / (Loss) before Tax** | **130,399** |
| **Net Income** | **130,399** |
| **Total Comprehensive Income** | **130,399** |

# Income Statement

**MyScore LLC**
**1 January 2015 to 31 December 2015**

| | 31 Dec 15 |
|---|---|
| **Revenue** | |
| Consulting Services | 16,888 |
| Returns & Adjustments | (4,500) |
| Revenue | 2,632,290 |
| **Total Revenue** | **2,644,678** |
| **Less Cost of Sales** | |
| Advertising - UA | 10,527 |
| Affiliate Commissions | 775,949 |
| Customer Service - Operations | 11,936 |
| Customer Service - Staff | 80,016 |
| Data Cost | 785,301 |
| Merchant Fee | 22,270 |
| Web Technology & Hosting | 119,099 |
| **Total Cost of Sales** | **1,805,098** |
| **Gross Profit** | **839,580** |
| **Operating Expenses** | |
| Accounting | 21,210 |
| Advertising-General | 4,065 |
| Automobile Expenses | 1,487 |
| Bank Service Charges | 7,953 |
| Consulting | 42,544 |
| Entertainment | 5,799 |
| Expendable Computer Equipment | 994 |
| Expendable Software | 1,570 |
| Insurance - Property | 939 |
| Legal | 33,796 |
| Marketing Expense | 104,209 |
| Miscellaneous Expense | 1,262 |
| Office Expenses | 426 |
| Office Rent | 71,679 |
| Outside Services | 71,490 |
| Owner Car Expense | 427 |
| Owner Health Insurance | (20) |
| Postage & Delivery | 3,660 |
| Provision for Doubtful Accounts | 41,583 |
| Sales Commissions | 28,324 |
| Sales Expense | 4,965 |
| Telephone | 4,241 |

# Income Statement

|  | 31 Dec 15 |
|---|---|
| Travel | 7,893 |
| Utilities | 1,543 |
| Web Development | 82,183 |
| **Total Operating Expenses** | **544,221** |
| **Net Income / (Loss) before Tax** | **295,359** |
| **Net Income** | **295,359** |
| **Total Comprehensive Income** | **295,359** |

# Income Statement

## MyScore LLC
## 1 January 2013 to 31 December 2013

|  | 31 Dec 13 |
|---|---|
| **Revenue** | |
| Revenue | 568,994 |
| **Total Revenue** | **568,994** |
| **Less Cost of Sales** | |
| Advertising - UA | 12,733 |
| Customer Service - Operations | 16,316 |
| Customer Service - Staff | 39,711 |
| Data Cost | 182,358 |
| Merchant Fee | 22,418 |
| Web Technology & Hosting | 23,467 |
| **Total Cost of Sales** | **297,002** |
| **Gross Profit** | **271,993** |
| **Operating Expenses** | |
| Accounting | 16,896 |
| Advertising-General | 25,367 |
| Bank Service Charges | 1,230 |
| Dues & Subscriptions | 481 |
| Entertainment | 78 |
| Equipment Rentals | 97 |
| Expendable Computer Equipment | 1,316 |
| Expendable Software | 2,153 |
| Insurance - Casualty | 585 |
| Insurance - Property | 875 |
| Legal | 275 |
| Meals | 186 |
| Miscellaneous Expense | 329 |
| Office Expenses | 2,161 |
| Office Rent | 13,189 |
| Outside Services | 295 |
| Postage & Delivery | 740 |
| Provision for Doubtful Accounts | 34,149 |
| Sales Commissions | 6,492 |
| Telephone | 901 |
| Travel | 512 |
| Web Development | 83,830 |
| **Total Operating Expenses** | **192,139** |
| **Net Income / (Loss) before Tax** | **79,854** |
| **Net Income** | **79,854** |

# Income Statement

| | 31 Dec 13 |
|---|---|
| **Total Comprehensive Income** | **79,854** |

# Income Statement

## MyScore LLC
## 1 January 2012 to 31 December 2012

|  | 31 Dec 12 |
|---|---:|
| **Revenue** | |
| Revenue | 172,202 |
| **Total Revenue** | **172,202** |
| **Less Cost of Sales** | |
| Advertising - UA | 2,526 |
| Customer Service - Operations | 3,699 |
| Customer Service - Staff | 9,741 |
| Data Cost | 55,346 |
| Merchant Fee | 12,375 |
| UA Cost - Consultants | 8,540 |
| Web Technology & Hosting | 12,789 |
| **Total Cost of Sales** | **105,015** |
| **Gross Profit** | **67,187** |
| **Operating Expenses** | |
| Accounting | 2,608 |
| Advertising-General | 2,412 |
| Bank Service Charges | 13 |
| Dues & Subscriptions | 298 |
| Entertainment | 13 |
| Insurance - Property | 1,631 |
| Office Expenses | 212 |
| Office Rent | 6,690 |
| Outside Services | 670 |
| Postage & Delivery | 467 |
| Sales Commissions | 450 |
| Telephone | 563 |
| Web Development | 15,581 |
| **Total Operating Expenses** | **31,608** |
| **Operating Income / (Loss)** | **35,579** |
| **Other Income and Expense** | |
| Ask my accountant | (22) |
| Provision for State Income Tax | (800) |
| **Total Other Income and Expense** | **(822)** |
| **Net Income / (Loss) before Tax** | **34,757** |
| **Net Income** | **34,757** |
| **Total Comprehensive Income** | **34,757** |

# Income Statement

<div align="center">

## MyScore LLC
## 1 January 2011 to 31 December 2011

</div>

| | 31 Dec 11 |
|---|---:|
| **Revenue** | |
| Revenue | 1,770 |
| **Total Revenue** | **1,770** |
| **Gross Profit** | **1,770** |
| **Operating Expenses** | |
| Insurance - Property | 164 |
| Legal | 1,120 |
| Postage & Delivery | 10 |
| **Total Operating Expenses** | **1,294** |
| **Net Income / (Loss) before Tax** | **476** |
| **Net Income** | **476** |
| **Total Comprehensive Income** | **476** |

# Income Statement

## MyScore LLC
## 1 January 2016 to 31 December 2016

|  | 31 Dec 16 |
|---|---:|
| **Revenue** | |
| Consulting Services | 6,310 |
| Revenue | 4,930,353 |
| **Total Revenue** | **4,936,663** |
| **Less Cost of Sales** | |
| Advertising - UA | 189,259 |
| Affiliate Commissions | 1,245,479 |
| Customer Service - Operations | 23,659 |
| Customer Service - Staff | 5,140 |
| Data Cost | 1,290,921 |
| Merchant Fee | 171 |
| UA Cost - Consultants | 1,450 |
| Web Technology & Hosting | 198,067 |
| **Total Cost of Sales** | **2,954,144** |
| **Gross Profit** | **1,982,518** |
| **Operating Expenses** | |
| Accounting | (2,526) |
| Advertising-General | 2,513 |
| Automobile Expenses | 679 |
| Bank Service Charges | 8,651 |
| Consulting | 5,661 |
| Entertainment | 208 |
| Expendable Computer Equipment | 99 |
| Expendable Software | 1,297 |
| Legal | 61,227 |
| Marketing Expense | 529,960 |
| Meals | 335 |
| Miscellaneous Expense | 574 |
| Office Expenses | 2,543 |
| Office Rent | 6,355 |
| Outside Services | 126,032 |
| Postage & Delivery | 3,551 |
| Sales Commissions | 3,091 |
| Sales Expense | 1,650 |
| Telephone | 4,539 |
| Travel | 8,964 |
| Utilities | 225 |
| Web Development | 167,775 |

# Income Statement

|  | 31 Dec 16 |
|---|---:|
| **Total Operating Expenses** | **933,404** |
| **Operating Income / (Loss)** | **1,049,115** |
| **Other Income and Expense** |  |
| Interest Expense | (61) |
| **Total Other Income and Expense** | **(61)** |
| **Net Income / (Loss) before Tax** | **1,049,053** |
| **Net Income** | **1,049,053** |
| **Total Comprehensive Income** | **1,049,053** |