# In the Matter of:

# FTC v. Credit Bureau Center, et al.

*December 13, 2017*
*Michael Brown*

**Condensed Transcript with Word Index**



For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555



EXHIBIT
B

FTC v. Credit Bureau Center, et al.                                    12/13/2017

---

**1**

```
1              IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
2                       EASTERN DIVISION
3
    FEDERAL TRADE COMMISSION,        )
4                                    )
            Plaintiff,               )
5                                    )    Case No.
            vs.                      )    17-cv-194
6                                    )
    CREDIT BUREAU CENTER, LLC, et    )    Judge Kennelly
7   al.,                             )
                                     )
8           Defendants.              )
9
10          The deposition of MICHAEL BROWN, called for
11  examination pursuant to the Rules of Civil
12  Procedure for the United States District Courts
13  pertaining to the taking of depositions, taken
14  before Layli Phillips, Certified Shorthand
15  Reporter of the State of Illinois, at 230 South
16  Dearborn Street, Room 3030, Chicago, Illinois, on
17  December 13, 2017, at 9:02 a.m.
18
19
20  Reported by:  Layli Phillips, CSR, RPR, CRR
21  License No.:   084.003900
22
23
24
25
```

**2**

```
1   APPEARANCES:
2   For the Plaintiff:
         UNITED STATES FEDERAL TRADE COMMISSION
3        MR. SAMUEL A.A. LEVINE
         MR. GUY G. WARD
4        MR. DOUG MCKENNEY
         230 South Dearborn Street, Room 3030
5        Chicago, Illinois  60604
         (312) 960-5612
6        slevinel@ftc.gov
7
    For the Defendants:
8        COCHELL LAW FIRM
         MR. STEPHEN R. COCHELL
9        2616 South Loop West
         Houston, Texas  77054
10       (346) 800-3500
         SRCochell@CochellLawFirm.com
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**3**

```
1                       I N D E X
2
3   Examinations                                  Page
4
5   By Mr. Levine                                    6
6
7                     E X H I B I T S
8
9   Number          Description                   Page
10
11  Exhibit 1    Notice of Depositions              11
12  Exhibit 2    Email Mr. Cochell Sent to the      41
13               FTC on Tuesday, December 12th
14  Exhibit 3    Declaration, Docket 50-1           68
15  Exhibit 4    Excerpted Portion of PI            72
16               Hearing Transcript
17  Exhibit 5    Email From Danny to Witness in     91
18               the End of 2014
19  Exhibit 6    Email                             103
20  Exhibit 7    Email From CSID                   105
21  Exhibit 8    Email                             107
22  Exhibit 9    Email                             110
23  Exhibit 10   Email Between Witness and CS      112
24               Identity
```

**4**

```
1   Exhibit 11   Email Between Witness and CSID    115
2   Exhibit 12   Email Between Witness and an      123
3                Underwriter At a Credit Card
4                Processer
5   Exhibit 13   Email Between Witness and Sara    132
6                Best
7   Exhibit 14   Email Between Witness and         141
8                Larry At Service First
9                Financial
10  Exhibit 15   Email                             144
11  Exhibit 16   Email From Tom to Witness         158
12  Exhibit 17   Email Between Witness and Tom     162
13  Exhibit 18   Text Messages                     170
14  Exhibit 19   Skype Conversation Between        183
15               Danny and the Witness
16  Exhibit 20   The Report on All the Revenue     202
17               Orders, Refunds, and
18               Chargebacks
19  Exhibit 21   Chat on Slack                     225
20  Exhibit 22   Email From Tom to Witness         263
21  Exhibit 23   Communication From Tom Fragala    272
22               Sent to the Copywriter, Josh
23               Margulies
24
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Brown

FTC v. Credit Bureau Center, et al.                                    12/13/2017

---

5

1    Exhibit 24   Email Between Heather With    285
2              CSID and Witness
3    Exhibit 25   Email Between Witness and    291
4              Diego, Customer Service
5              Supervisor
6    Exhibit 26   Big Packet of What Was Filed    298
7              in Connection With the FTC's
8              Complaint
9    Exhibit 27   Email                        320
10   Exhibit 28   Email                        323
11   Exhibit 29   Declaration Witness Filed in    346
12             November
13   Exhibit 30   Complaint in the Lawsuit     350
14   Exhibit 31   A Website Called SimpleRefund   353
15   Exhibit 32   Email Between Witness and a    357
16             Copywriter, Josh Margulies
17
18
19
20
21
22
23
24

---

6

1                    MICHAEL BROWN
2         the deponent herein, called as a
3    witness, after having been first duly sworn, was
4    examined and testified as follows:
5                    EXAMINATION
6    BY MR. LEVINE:
7         Q.   Okay.  Mr. Brown, this is a deposition
8    in the matter of FTC v. Credit Bureau Center,
9    17-cv-194.
10             My name is Samuel Levine.  I'm an
11   attorney with the FTC.  I'll be conducting this
12   deposition.
13             I thought we'd start by going around and
14   identifying ourselves for the record.
15        MR. WARD:  Guy Ward for the Federal
16   Trade Commission.
17        MR. MCKENNEY:  Doug McKenney for the
18   Federal Trade Commission.
19        MR. COCHELL:  Steve Cochell for Michael
20   Brown and CBC.
21        A.   I'm Michael Brown.
22        Q.   And Mr. Brown, you understand that
23   you're being deposed today?
24        A.   Correct.
25        Q.   I want to start off on an exhibit.

---

7

1              Let's hold off on that.  Let me first
2    ask you if you have been deposed before.
3         A.   Yes.
4         Q.   And when was that?
5         A.   I don't recall the specific dates, but I
6    want to say probably around ten years ago.
7         Q.   Okay.  And what matter was that in
8    connection with?
9         A.   That was Mike Brown v. Experian.
10        Q.   And what was the nature of that lawsuit?
11        A.   Two main points.  One was an invention
12   disclosure agreement where I owned some
13   technology, wanted to be compensated for it.
14             The second one was a wage an hour
15   dispute.
16        Q.   And with respect to the first, the
17   invention disclosure agreement, what was, in
18   layman's terms, the invention?
19        A.   It was a ticketing software for the
20   customer service department.
21        Q.   And how did that software work?
22        A.   It worked by enabling customer service
23   agents to enter in tickets that require further --
24   further work by another person.
25        Q.   So the tickets sort of triggered

---

8

1    something within the system that led to another
2    person being assigned a task?
3         A.   Yeah, you could say that, yeah.
4         Q.   And what was the outcome of that
5    lawsuit?
6         A.   That was a confidential settlement.
7         Q.   I want to go over some rules to insure
8    that we get a good transcript and that we -- this
9    is done as efficiently as possible.
10             The first is that you understand that
11   you're under oath and that even though this isn't
12   a courtroom, you're still under oath; and it has
13   the same effect as if you're testifying in a
14   courtroom.
15        A.   Correct.
16        Q.   You're subject to the same penalty of
17   perjury as if you were testifying in court; you
18   understand that?
19        A.   Yes.
20        Q.   So the reporter's job is to take down
21   everything that's said by either you or counsel or
22   any visitors while we are on the record, so you
23   can assume you're on the record unless everyone
24   agrees to go off the record; does that make sense?
25        A.   Yes.

---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Brown

FTC v. Credit Bureau Center, et al.                                    12/13/2017

---

9

1    Q.   I'm going to ask you a few routine
2    questions about your ability to answer questions
3    today.  Do not take them personally.
4         Are you suffering from any illness that
5    would affect your ability to testify today?
6    A.   No.
7    Q.   Are you under the effects of any drug
8    that would affect your ability to testify today?
9    A.   No.
10   Q.   Are you under the effects of any
11   medication that would affect your ability to
12   testify today?
13   A.   No.
14   Q.   Any -- under the effect of alcohol that
15   would affect your ability to testify --
16   A.   No.
17   Q.   -- today?
18        So one of the rules that I fear you may
19   have just broken, not a big one, but please wait
20   until the end of my question, even if you know
21   what the answer is going to be, before you -- even
22   if you know what the question is going to be
23   before you answer so that the reporter can create
24   a clear record; does that make sense?
25   A.   Yes.

---

10

1    Q.   Okay.  I'm going to try to make my
2    questions clear.  But if I ask a question and you
3    don't understand it, I'm going to expect that you
4    tell me you don't understand it, and I'll try to
5    rephrase it; does that make sense?
6    A.   Yes.
7    Q.   The next rule I just went over is that
8    we don't speak over each other; you understood
9    that?
10   A.   Yes.
11   Q.   Another rule is that you have to answer
12   audibly and in complete words, so nodding the head
13   won't do it; does that make sense?
14   A.   Yes.
15   Q.   For the benefit of the reporter.
16        If you're -- if you're answering a
17   question and you think of some documents that may
18   assist you in remembering the answer, let me know,
19   and I may be able to retrieve them for you; does
20   that make sense?
21   A.   Yes.
22   Q.   Sometimes it occurs to people that a
23   previous answer they gave is not completely
24   accurate.  If that occurs, please let me know, and
25   so that you can make any corrections to your

---

11

1    answer; does that make sense?
2    A.   Yes.
3    Q.   If at any time you need to take a break
4    or get some fresh air, just let me know.  If
5    there's a question pending, I'll ask you to answer
6    the question.  But I'm happy to give you a break
7    after that.  Okay?
8    A.   Okay.
9    Q.   All right.  Now to the exhibit.  I'm
10   going to show you what's been marked for
11   identification as Exhibit 1.
12        And we give the reporter the stamped
13   copy, and I'll give you a copy.
14             (Whereupon Deposition Exhibit
15              No. 1 was marked for
16              identification by the court
17              reporter.)
18   BY MR. LEVINE:
19   Q.   And, Mr. Brown, do you recognize the
20   document that's been marked for identification as
21   Exhibit 1?
22   A.   I believe so.
23   Q.   Do you -- do you recognize this as a
24   notice of depositions?
25   A.   Yes.

---

12

1    Q.   And you understand that your counsel was
2    served with this notice?
3    A.   I believe so.
4    Q.   One thing I want to be sure we're on the
5    same page about is that this -- this is actually a
6    notice of two depositions.  One deposition is of
7    you in your individual capacity as Michael Brown,
8    and the other is in your capacity as what's called
9    a 30(b)(6) representative of Credit Bureau Center
10   Corporation; does that make sense?
11   A.   Yes.  And I would, you know, love if you
12   could clarify when you're asking me questions
13   what capacity you would like me to answer.
14   Q.   Well, that's what I was getting at.  I
15   was going to assume as I asked my questions that
16   you would be speaking in both your individual
17   capacity and your capacity as a corporation.
18        If we don't do it that way, we
19   essentially have to take the -- conventionally
20   take two depositions, one of the individual and
21   one of you on behalf of the corporation.
22        So the way I would like to proceed today
23   is to have you answer questions; and if you're
24   speaking just individually or just in your
25   corporate capacity to let me know, and we can

---

3 (Pages 9 to 12)

Brown

FTC v. Credit Bureau Center, et al.                              12/13/2017

---

13

1  adjust accordingly.  Is that fair?
2          MR. COCHELL:  Well, it may be or may not
3  be.  What -- what I think that -- I mean, look, I
4  mean, typically, what I've done in the past is
5  take the individual dep if he's the sole owner of
6  the company.  Pretty much if -- if it's about the
7  corporation, you know, we're probably going to
8  affirm anything like that, or the judge will
9  likely just take that as a corporate answer as
10 well because he is essentially the company.
11         You know, but if it's something unusual,
12 we may -- I'll make a note of it, and we'll try
13 and clarify it; but I don't know that he can make
14 those distinctions on the spot.
15         MR. LEVINE:  Well, Mr. Cochell, if you
16 think there's a question I'm asking that would
17 lead to some divergence between the corporation
18 and Mr. Brown, I would ask that you alert me to
19 that, and we'll figure something out.
20         MR. COCHELL:  I'll say, objection,
21 divergence.
22         MR. LEVINE:  I think I'll be able to
23 recognize that.
24         MR. COCHELL:  Okay.  All right.
25 BY MR. LEVINE:

---

14

1      Q.   Mr. Brown, does that make sense to you,
2  what your attorney and I just discussed?
3      A.   I believe so.
4          MR. COCHELL:  So if you think there's a
5  different answer for you individually versus the
6  company, if it occurs to you at the time, then
7  just clarify it.  Okay?
8          THE WITNESS:  Okay.
9          MR. LEVINE:  I'm just trying to save
10 time here, and hopefully it won't be an issue.
11 But if it is, let's talk about it.
12         MR. COCHELL:  Yeah.  We want to
13 corporate.  We don't want to drag this thing out.
14         MR. LEVINE:  Understood.
15 BY MR. LEVINE:
16     Q.   Okay.  All right.  Mr. Brown, you
17 understand that you're here pursuant to a lawsuit
18 brought by the FTC against you, Credit Bureau
19 Center, and two other individuals?
20     A.   Yes.
21     Q.   Did you review any documents in
22 preparation for this deposition?
23     A.   Yes.
24     Q.   What generally did you review?
25     A.   Too many specifically to recall; but, I

---

15

1  believe, the complaint, PI transcripts, a lot of
2  the filings, text messages.
3      Q.   When you say PI, was there a comma
4  between PI and transcripts?  Do you mean the
5  transcripts from the hearing?
6      A.   Yes.
7      Q.   Did you speak to anyone other than your
8  attorney in preparation for the deposition?
9      A.   No.
10     Q.   All right.  I want to start by learning
11 a little bit about your background.
12         Now, when this case was filed, you were
13 the CEO of Credit Bureau Center Corporation,
14 correct?
15     A.   I'm the managing director.
16     Q.   Is there a CEO of Credit Bureau Center
17 Corporation?
18     A.   They are very similar.  I would consider
19 the managing director the CEO.
20     Q.   So there's no separate CEO?
21     A.   No.
22     Q.   Now, Credit Bureau Center Corporation
23 was previously known as MyScore, correct?
24     A.   Correct.
25     Q.   And were you in the same capacity as

---

16

1  managing director as MyScore?
2      A.   Yes.
3      Q.   And you are the sole owner of -- and by
4  the way, I'm going to refer to Credit Bureau
5  Center Corporation and MyScore simply as CBC; does
6  that make sense?
7      A.   Yes.
8      Q.   And once again, if there's a
9  distinction, you can let me know.
10     A.   Okay.
11     Q.   So you are the managing director, you
12 are -- excuse me.
13         You are the sole owner of CBC, correct?
14     A.   Correct.
15     Q.   And you were of MyScore as well.
16     A.   Correct.
17     Q.   I just broke my own rule.
18         What were you doing before founding --
19 and you were the founder of CBC too?
20     A.   Correct.
21     Q.   And when did you found CBC?
22     A.   I believe it was in or around 2011.
23     Q.   Okay.  What were you doing before that?
24     A.   Before that, I think it was around 2009
25 or so, and beyond that, I had worked for Experian.

---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Brown

FTC v. Credit Bureau Center, et al.                                    12/13/2017

---

17

1    Q.   Starting in 2009?
2    A.   No, ending in 2009.
3    Q.   Oh.  What did you do between 2009 and --
4    what did you do between 2009 and when you founded
5    MyScore, CBC?
6    A.   Some of the prep work and creating the
7    CBC and also, you know, looking for work.
8    Q.   Before 2009, you were at Experian.  When
9    did you start there?
10   A.   I don't recall the -- the year, but I
11   was there approximately seven years.
12   Q.   Okay.  And what was the position there
13   when -- what position did you hold at the time you
14   left Experian?
15   A.   Senior software engineer.
16   Q.   And how long were you in that position?
17   A.   I don't recall exactly.  I want to say
18   maybe approximately half or more of the time I was
19   there.
20   Q.   Three or four years?
21   A.   Approximately.
22   Q.   What did you do before -- before that?
23   A.   Before that, I held a position that was,
24   I would say, a cross between a software engineer
25   and a customer service rep.

---

18

1    Q.   Could you describe that for me?
2    A.   Yeah.  So this might help if I give you
3    a little bit of the history of my work there.
4         So I started out as a customer service
5    agent, and they slowly learned that I was capable
6    of assisting them in ways beyond the customer
7    service job.  I have a knowledge of programming
8    and developing websites.
9         And for some period of time, they kept
10   me kind of in the customer service department
11   doing tasks for them kind of part-time with
12   customer service duties.
13        Eventually I got noticed in the software
14   development department or software engineering
15   department, and they snatched me up.
16   Q.   And was part of the reason that you were
17   noticed by the engineering department that you had
18   developed this software related to customer
19   service?
20   A.   That's one of the reasons, yes.
21   Q.   So how many years were you doing
22   customer service?
23   A.   I don't recall specifically.  It was
24   about a little less than half.
25   Q.   And what kind of customers were these?

---

19

1    A.   These were customers who were calling up
2    wanting to mainly cancel their membership for
3    FreeCreditScore and FreeCreditReport.com.
4    Q.   So these were distinguishing -- I'm
5    going to distinguish between business consumers
6    and consumer consumers.  These were individual
7    consumers?
8    A.   Well, for clarity sake, if we can refer
9    to a business consumer as a partner because that's
10   the term I'm used to using; and consumers we will
11   refer to as consumers, customers, consumers, yeah.
12   Q.   And you were talking to consumers?
13   A.   Correct.
14   Q.   Do you remember what kind of reasons you
15   were getting from the consumers for why they were
16   cancelling or trying to cancel?
17   A.   Yeah.  A lot of people were cancelling
18   because they wanted to solely enjoy the benefits
19   of the free trial.  A lot of consumers were
20   cancelling because they were alleging this was
21   fraud or a scam.  A lot of consumers were
22   cancelling because they didn't recognize the
23   charge.  A lot of the people were calling in to
24   cancel because they wanted a lower price.
25   Q.   So, I'm sorry, you said that the

---

20

1    consumer-facing business that you were doing
2    customer service with is called Free Score, say
3    that again?
4    A.   There's a couple, at least a couple
5    different websites.  One is FreeCreditScore.com.
6    The other is FreeCreditReport.com.
7    Q.   And these websites offered credit
8    monitoring, it sounds like?
9    A.   They offered credit monitoring as a
10   benefit.  They also offered free credit reports
11   and/or free credit scores.
12   Q.   So, of course, we'll get to this later;
13   but it was a similar -- the business model of
14   FreeCreditScore.com and FreeCreditReport.com was a
15   similar business model to eFreeScore.com and
16   CreditUpdates.com?
17   A.   Yes.  I took my knowledge and experience
18   at Experian and decided to do a similar business
19   for myself.
20   Q.   In your role, let's start as a senior
21   software engineer, did you manage other employees?
22   A.   For a short period of time, yes.
23   Q.   And how many employees?
24   A.   Just one.
25   Q.   And what kind of employee was he or she?

---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Brown

FTC v. Credit Bureau Center, et al.                                    12/13/2017

---

21

1     A.   Software engineer.  Mainly my
2  replacement.
3     Q.   Did you manage any employees as a
4  customer service, slash, software engineer in your
5  first half?
6     A.   No.
7     Q.   Did you deal with any legal issues in
8  any of your time at Experian?
9     A.   Can you define legal issue?
10    Q.   Yeah.  Did you ever deal with FCR -- are
11 you familiar with FCRA?
12    A.   Yes.
13    Q.   Fair Credit Reporting Act, I think.
14    A.   I'm pretty familiar with -- with that,
15 yeah.
16    Q.   Did you ever deal with the FCRA?
17    A.   I -- on a few different occasions, I had
18 worked with people at Experian regarding
19 compliance with FCRA and other rules.
20    Q.   Do you remember the particular FCRA
21 compliance issues you dealt with?
22    A.   Yeah.  Namely, there was the compliance
23 with a lawsuit from the FTC on at least one
24 occasion.
25         And we were modifying the landing pages

---

22

1  and copy or text on the websites to insure
2  compliance with the FCRA Free Credit Report Rule,
3  and I think it was Section 13(b) or Section 5 of
4  the FTC Act as well.
5     Q.   And among the allegations brought by the
6  FTC were that the advertisement of free reports
7  was deceptive?
8     A.   To the best of my recollection, I think
9  it was nearly identical to this complaint that it
10 was deceptive, I believe so.
11    Q.   And when you say "this complaint,"
12 you're referring to the complaint brought in the
13 matter about which we're --
14    A.   The reason we're here today.
15    Q.   In the matter FTC v. CBC, 17-cv-194?
16    A.   Correct.
17    Q.   Thank you.
18         Do you remember what year that lawsuit
19 was brought?
20    A.   At this time, no.
21    Q.   Are you familiar with the term affiliate
22 marketing?
23    A.   Yes.
24    Q.   And how would you define that?
25    A.   I think affiliate marketing is a term to

---

23

1  describe the activity of compensating someone
2  known as an affiliate in order to drive orders or
3  customers to your site.
4     Q.   Did you deal with any affiliate
5  marketing while at Experian?
6     A.   That's a difficult answer or difficult
7  question to answer yes or no.  You know, I dealt
8  with a lot of different types of marketing at
9  Experian which may encompass affiliate marketing.
10         There's affinity marketing, partnership
11 marketing, working with companies such as American
12 Express, ChoicePoint, USAA, compensated in a
13 number of different ways or maybe not at all.
14 There's a lot of marketing involved.
15    Q.   But to the best of your recollection,
16 Experian did use affiliate marketers?
17    A.   Correct.
18    Q.   And do you recall if some of the
19 consumers you talked to on the phone in your
20 customer service capacity had been routed to the
21 Experian websites through affiliate marketers?
22    A.   The customers were routed to the
23 websites any number of ways.
24    Q.   Did you ever -- I know you talked about
25 software engineering on the customer service side.

---

24

1  Did you engineer any software related to the
2  affiliate marketing side while at Experian?
3     A.   I worked on Experian's entire platform,
4  which encompasses just about any major portion of
5  the business you can imagine.
6     Q.   What about specifically affiliate
7  marketing?
8     A.   It was so long ago, it's hard to recall
9  exact specifics; but I do recall working on the
10 entire system.
11    Q.   And do you recall if Experian's system
12 included a way to track affiliates?
13    A.   I don't recall.
14    Q.   Okay.  So returning to the lawsuit
15 brought by the FTC against Experian -- by the way,
16 was that lawsuit against -- was the defendant
17 Experian Consumer Direct, aka ConsumerInfo.com?
18    A.   I believe so.
19    Q.   Did that affect your work at all?
20         MR. COCHELL:  Objection, form of the
21 question.
22 BY MR. LEVINE:
23    Q.   You mentioned earlier that you engaged
24 in conversations with -- after the lawsuit, you
25 engaged conversations with management about

---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Brown

FTC v. Credit Bureau Center, et al.                                    12/13/2017

---

25

1    compliance; is that accurate?
2        A.   Yes.
3        Q.   Were there any other ways in which the
4    lawsuit affected what you did at Experian?
5        A.   What I did at Experian?  I don't
6    specifically recall.  It was a while ago.
7        Q.   When -- I'm sorry.
8             You left Experian in 2009, correct,
9    approximately?
10       A.   Around there, yes.
11       Q.   And why did you leave?
12       A.   I was laid off.
13       Q.   So that was not for cause?
14       A.   No.
15       Q.   Now, we talked about over the next two
16   years, you sort of laid the groundwork for CBC; is
17   that fair to say?
18       A.   No.
19       Q.   No.  Okay.
20            Tell me -- tell me what would be fair to
21   say what you were doing during those two years.
22       A.   So after that period of time, I was
23   actively seeking employment.  I believe, I think I
24   recall that was a difficult time to find
25   employment, and eventually came to the conclusion

---

26

1    that I would start CBC.
2        Q.   Was that in maybe 2010 you came to that
3    conclusion?
4        A.   I can't give you an exact date.
5        Q.   You started CBC on your own, correct?
6        A.   When you say started CBC on my own, can
7    you clarify that?
8        Q.   I'll be more specific.  You already
9    testified that you have always been the sole owner
10   of CBC, correct?
11       A.   Yes.
12       Q.   Have you always been -- were you the
13   sole employee of CBC at the time this lawsuit was
14   filed, at the time the lawsuit about which we're
15   discuss -- that we're discussing was filed?
16       A.   The sole employee, yes.
17       Q.   And have you always been the sole
18   employee of CBC?
19       A.   I believe so.
20       Q.   CBC did use contractors and vendors,
21   correct?
22       A.   Yes.
23       Q.   And these contractors would have
24   received 1099s instead of W-2s, correct?
25       A.   I believe so, yes.

---

27

1        Q.   Did you select the contractors?
2        A.   Yes.
3        Q.   Did you supervise --
4        A.   In most cases.
5        Q.   In which cases did you not select the
6    contractors?
7        A.   I specifically recall one incident where
8    I -- I did select the contractor in the end, but I
9    placed a great deal of weight in David Ling's
10   recommendation to select a contractor.
11       Q.   And this is the same David Ling who was
12   involved in the contempt proceeding in this
13   matter?
14       A.   Correct.
15       Q.   Which contractor was it that David Ling
16   weighed in on?
17       A.   Darcy Bardwell.
18       Q.   And who was that?
19       A.   She was an affiliate manager.
20       Q.   Do you remember what year that was that
21   you retained -- is Darcy a man or a woman?
22       A.   She's a woman.
23       Q.   Do you remember what year it is that you
24   retained Darcy?
25       A.   I think it was like a month before the

---

28

1    lawsuit or maybe even the same week that we were
2    growing pretty quick, and we wanted someone to pay
3    more attention to and manage the affiliates; so we
4    hired someone specifically for this position.
5        Q.   Could you spell the name of that
6    individual for the reporter and for me?
7        A.   I believe the first name is D-a-r-c-y,
8    and the last name is B-a-r-d-w-e-l-l.  Not a
9    hundred percent confident in that spelling, but
10   that is close.
11       Q.   Darcy was to be an affiliate manager,
12   you said?
13       A.   Correct.
14       Q.   And was that to manage all the
15   affiliates you had at the time?
16       A.   I'm not sure.
17       Q.   You're not sure because you don't
18   remember, or because you didn't make a
19   determination at the time?
20       A.   She was so new, I believe she was still
21   in the training phase.  I don't think we got to
22   that point yet.
23       Q.   And what did you envision her
24   responsibility to be?
25       A.   I wanted her to oversee all the

---

7 (Pages 25 to 28)

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Brown

FTC v. Credit Bureau Center, et al.                                    12/13/2017

---

29

1    affiliates.
2        Q.   And what does overseeing them involve?
3        A.   Monitoring them, similar to an account
4    management job.
5            Someone is -- has an increase or
6    decrease in traffic, they will reach out to them,
7    try to get the affiliates to grow more business or
8    send more business.
9            Also monitoring them for compliance.
10       Q.   Prior to the -- prior to retaining
11   Ms. Bardwell, it sounds like you didn't quite get
12   to the point of retaining her, but up to the point
13   of retaining Ms. Bardwell, were the
14   responsibilities you just described handled by
15   you?
16           MR. COCHELL:  Objection, form of the
17   question.
18           Go ahead.
19       A.   So I believe we did get to the point
20   retaining Bardwell.  I remember signing an
21   agreement with her, so I just wanted to correct
22   that.
23           But before that, you know, I -- I wore
24   that hat and many others.
25       Q.   So I'm going to take your lawyer's

---

30

1    advice and ask you a follow-up question to
2    clarify.
3            You -- you recall signing an agreement
4    with Ms. Bardwell.  Do you remember when that was,
5    more precisely?
6        A.   It was very close to the filing of the
7    lawsuit.  It might have been a month or the same
8    week, around there.
9        Q.   2017?
10       A.   Around there.  The lawsuit was
11   January 10th.  It was within a month or a week of
12   the lawsuit.
13       Q.   Did you have the authority -- I would
14   say to fire contractors, but I realize they are
15   not employees.
16           So what I'll say is:  Did you have the
17   authority to terminate contractors?  That sounds
18   like killing them.  Let me rephrase that again.
19           Did you have the authority to terminate
20   relationships with contractors?
21       A.   Yeah.  I'm free to do anything in my
22   business.
23       Q.   So some of these -- I just want to list
24   some of the people I know to be contractors, and
25   you can tell me I'm right or wrong.

---

31

1            So David Ling was a contractor?
2        A.   Correct.
3        Q.   CSID you had a contract with, correct?
4        A.   They are also, I believe, a contractor.
5        Q.   And they provided the -- we'll get to
6    this later, but they provided the credit
7    monitoring service?
8        A.   That's one of the pieces they provide,
9    yes.
10       Q.   Were there any other entities similar to
11   CSID that provided credit monitoring?
12       A.   Can you specify a time period?
13       Q.   At any time during the existence of CBC.
14       A.   During the existence of CBC, no.
15       Q.   Mr. Fragala?
16       A.   I would like to ask a question on that.
17   So you say during the existence of CBC.  Is that
18   assuming it doesn't exist on the day the lawsuit
19   was filed, or are you assuming it exists now?
20       Q.   Tell me what you -- tell me what your
21   concern is, and I'll see if I should rephrase the
22   question.
23       A.   So there was a -- another third-party
24   company called ID and Credit Services, I believe
25   you are aware of, that we had reached out to to

---

32

1    get services from that is similar to CSID.  That
2    was after the lawsuit was filed.
3        Q.   ID and Credit Services contracted
4    with -- strike that.
5            Did ID and Credit Services actually
6    provide credit monitoring?
7        A.   Yes.
8        Q.   To whom?
9        A.   You would have to ask them.
10       Q.   So you don't know who they provided
11   credit monitoring services to?
12       A.   Are you asking who their customers are?
13       Q.   No.
14           Tell me your -- tell me what you hired
15   ID and Credit Monitoring Services to do.
16           I'm sorry.  Say the name of the company
17   again.
18       A.   I believe it's ID and Credit Services.
19       Q.   Okay.  What was the nature of your
20   relationship with ID and Credit Services?
21       A.   He was a contact.
22       Q.   Who is "he"?
23       A.   Matthew Connelly.
24       Q.   And you contacted him?
25       A.   I've been in contact with him over some

---

8 (Pages 29 to 32)

Brown

FTC v. Credit Bureau Center, et al.                                                     12/13/2017

---

33

1   period of time.
2       Q.   Did you contact him after the filing of
3   the lawsuit, at this lawsuit?
4       A.   I had been in contact with him after the
5   lawsuit, yes.
6       Q.   And what had you been in contact with
7   him about after this lawsuit?
8       A.   I don't specifically recall all the
9   conversations; but at least one of them, I had
10  introduced him to David Ling.
11      Q.   For what purpose did you introduce him
12  to David Ling?
13      A.   David Ling's company needed a credit
14  data provider.
15      Q.   And which company was that?
16      A.   What was that?
17      Q.   Which company was that?
18      A.   ID and Credit Services.
19      Q.   I'm sorry.  So David Ling's company was
20  called ID and Credit Services?
21      A.   No.  David Ling -- sorry.  David Ling's
22  company was the -- I'm drawing a blank as to the
23  company name, but it was named in the -- some of
24  the court documents.
25      Q.   Did David Ling's company do business as

---

34

1   CS123.com?
2       A.   Yes.
3       Q.   Okay.  So David Ling's company needed
4   an, I think you said, credit data feed, correct?
5       A.   Correct.
6       Q.   What is a credit data feed?
7       A.   So I would consider that to encompass
8   different credit products, right?
9            So part of servicing customers is
10  there's an authentication piece.  Customers have
11  to go through an identity verification process in
12  order to be able to access some benefits like
13  monitoring.  There's the ability to pull reports
14  and scores, maybe identity theft insurance, and
15  other credit related benefits.
16      Q.   Do you know whether CS123 contracted
17  with ID and Credit Services?
18      A.   Yes.
19      Q.   And did -- they did contract with ID and
20  Credit Services?
21      A.   Yes.
22      Q.   Do you know did ID -- strike that.
23           Did CS123 have customers?
24      A.   At what point in time?
25      Q.   Any point in time.

---

35

1       A.   Yes.
2       Q.   And what point in time was that?
3       A.   I don't recall the date specifically;
4   but it was around March, April, May.
5       Q.   Of 2017?
6       A.   Yes.
7       Q.   Were these the customers who had also
8   been customers of CBC?
9       A.   These were customers that were owned by
10  Zenfia.
11      Q.   And what's your basis for saying they
12  were owned by Zenfia?
13      A.   So around the end of 2016, Zenfia was
14  recently formed.  December 8th, 2016, Zenfia
15  became a service provider to CBC and executed a
16  white label agreement similar to the white label
17  agreement that was executed by most white label
18  partners.
19           In the white label agreements, Zenfia
20  has sole ownership of all the customer data,
21  including billing data on the platform; so the
22  customers are Zenfia's.
23      Q.   And what service did CBC -- excuse me.
24           You said Zenfia was a service provider.
25  What service did Zenfia provide to CBC?

---

36

1       A.   They provided the white label platform
2   on which CBC operates the websites.
3       Q.   But CBC already had a white label
4   platform, correct?
5       A.   It was transferred to Zenfia.
6       Q.   So what -- are you familiar with the
7   term consideration?  Probably not, right?
8       A.   I'm sure you'll define it for me.
9       Q.   Fair enough.
10           Zenfia, as you describe it, was given
11  ownership of CBC's customer base; is that
12  accurate?
13      A.   As a service provider, it has the
14  exclusive ownership of the data.
15      Q.   And it was given that ownership by CBC,
16  correct?
17      A.   I would need to refer to the specific
18  agreement.
19      Q.   In December 2016, did Zenfia provide
20  anything to CBC in exchange for that ownership,
21  whatever the nature of that ownership was?
22           MR. COCHELL:  Objection; form,
23  foundation.
24  BY MR. LEVINE:
25      Q.   You can answer it.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Brown

FTC v. Credit Bureau Center, et al.                                    12/13/2017



37

1    A.   I would need to reference the agreement
2  that you're referring to or we're referring to.
3        I know that Zenfia additionally had a
4  management services agreement with CBC.  And there
5  were management services being provided under that
6  agreement as well.
7    Q.   What were the management services?
8    A.   I would need to reference that
9  management services agreement.
10   Q.   Did Zenfia have any employees?
11   A.   No.
12   Q.   You were the sole owner of Zenfia?
13   A.   Yes.
14   Q.   Did Zenfia have any income?
15   A.   Yes.
16   Q.   What was that income?
17   A.   I would need to reference the bank
18  statements maybe, financial statements.  But I
19  know at a minimum, there was a management services
20  fee that was paid from CBC to Zenfia.
21   Q.   Do you recall Zenfia's accounts being
22  frozen as part of this lawsuit?
23   A.   At what period of time?  Or I'll say,
24  yes, I think it was around February, shortly after
25  the lawsuit, you had frozen them.

38

1    Q.   Were there any bank accounts of Zenfia
2  that were not frozen by the lawsuit?  Let me
3  rephrase that.
4        Were there any bank accounts owned by
5  Zenfia -- no.  I'll stick with how I phrased it.
6        Were there any bank accounts owned by
7  Zenfia that were not frozen by the lawsuit?
8    A.   No.
9    Q.   And would all the Zenfia's income have
10  been reflected in the bank accounts that were
11  frozen by the lawsuit?
12   A.   Yes.
13   Q.   And would all of Zenfia's income been
14  reflected in the tax returns filed by Zenfia in
15  2016?
16   A.   I did not file any tax returns in 2016.
17   Q.   I should --
18   A.   Actually, I want to correct that.  I
19  don't recall if I filed tax returns for 2016.  I
20  did file something.  I don't know if that included
21  Zenfia.  It's a little unclear to me if I have to
22  file one or not for that.
23   Q.   Do you recall if you filed 2016 tax
24  returns for Zenfia in 2017?
25   A.   I filed something regarding taxes.  I

39

1  don't remember if it was just for me personally or
2  for Zenfia.  Because of the receivership aspect of
3  it, I'm a little unclear as to my responsibilities
4  regarding that.
5    Q.   Okay.
6    A.   And if I can also add, part of the
7  confusion as to why it's unclear is Zenfia is not
8  included in the preliminary injunction as a CBC
9  defendant.  So it's very unclear if that is in the
10  receivership or not.
11   Q.   The court didn't agree with you, but
12  this isn't the forum to have a discussion about
13  that.  But I appreciate the comment.
14       Is it your position today that Zenfia --
15  well, I guess you just stated your position,
16  correct?
17   A.   Can you repeat the question?
18   Q.   No.  Never mind.
19       I want to go back to a list of your
20  contractors.  So we just had a discussion about
21  CSID.  Another one was Tom Fragala, F-r-a-g-a-l-a;
22  is that correct?
23   A.   Correct.
24   Q.   Another one whose name I've seen, but
25  it's not -- I don't think it's his real name, is

40

1  Steve Score?
2    A.   Correct.
3    Q.   Do you remember his real name?
4    A.   The name I recall may not be his real
5  name because he's -- I assume he's got a Chinese
6  name I can't pronounce, but I also know him as
7  Gordon Yang.
8    Q.   Y-a-n-g?
9    A.   I believe so.
10   Q.   Is he located overseas?
11   A.   Yes.
12   Q.   In China?
13   A.   Yes.
14   Q.   Was he a programmer?
15   A.   Yes.
16   Q.   What was Fragala's responsibility or
17  responsibilities?
18   A.   He's had numerous responsibilities over
19  the years, everything from sales, marketing,
20  partnership developing, business developing,
21  website design, compliance, scripting.  He wore
22  many hats like me at times.
23   Q.   Affiliate marketers were contractors,
24  right?
25   A.   Correct.

10 (Pages 37 to 40)

Brown

FTC v. Credit Bureau Center, et al.                                    12/13/2017



41

1     Q.  So you had the ability to terminate
2  them?
3     A.  Correct.
4     Q.  I want to -- I'm now showing you a
5  document that I have marked for identification as
6  Exhibit 2.
7         (Whereupon Deposition Exhibit
8           No. 2 was marked for
9           identification by the court
10          reporter.)
11  BY MR. LEVINE:
12     Q.  Do you recognize this document?
13     A.  No.
14     Q.  Okay.  Take a minute and look at -- I'll
15  represent to you that this is an email Mr. Cochell
16  sent to the FTC on Tuesday, December 12th.
17         Take a look at the text of the document,
18  and tell me if you're familiar with it.
19         MR. COCHELL:  Is there an exhibit number
20  on this?
21         MR. LEVINE:  This is 2.
22         MR. COCHELL:  Okay.
23     A.  I read it.
24     Q.  Do you see at the top of the email, it
25  says, "The defense now reads, colon"?

42

1     A.  Yes.
2     Q.  And there's a paragraph that follows
3  ending in the term "legal obligations," correct?
4     A.  Yes.
5     Q.  Are you familiar with that paragraph?
6     A.  I just read it now, yes.
7     Q.  Have you ever seen it before?
8     A.  I believe it looks similar to one that's
9  in the amended answer.
10     Q.  If you go -- let me back up.
11         Did you -- never mind.
12         If you go six lines from the bottom, it
13  says, "Mr. Brown terminated other affiliates who
14  engaged in deceptive and/or fraudulent conduct and
15  declined working with various companies for
16  noncompliance."
17         Do you see that?
18     A.  Yes.
19     Q.  Do you recall which affiliates you
20  terminated?
21     A.  It's hard to recall the names
22  specifically without the document in front of me.
23  But I can describe the affiliates.
24     Q.  Sure.
25     A.  There's a few instances.  There was one

43

1  who had engaged in some sort of fraud.  And we had
2  disabled the affiliate and terminated the
3  agreement with the affiliate.
4         There was another we declined to work
5  with because he wanted to engage in activities
6  that were not lawful and did not comply with the
7  TCPA, which is known as the Telephone
8  Communications Privacy Act.
9         We declined to work with affiliates who
10  don't follow the rules and regulations, and we
11  take that very seriously.
12         There was another affiliate we
13  terminated for fraud; and I specifically recall in
14  addition to terminating them, we canceled all the
15  customers' memberships and refunded all the
16  customers because we don't want customers who are
17  unhappy or signed up fraudulently on our website.
18     Q.  Okay.  The first affiliate you mentioned
19  you said was a he or a she?
20     A.  First one, I believe, was a he.
21     Q.  So you said he was -- the first
22  affiliate you mentioned, you said he was
23  terminated for some sort of fraud, correct?
24     A.  Yes.  And I actually recall there was
25  another.  There was another case that was

44

1  terminated for fraud as well.
2     Q.  Another affiliate?
3     A.  Yeah.
4     Q.  Okay.  I want to go one by one.  So
5  let's talk about that first one.  Okay?
6     A.  Mm-hmm.
7     Q.  What kind of fraud was he terminated
8  for?
9     A.  It's hard to say all the exact instances
10  of the fraud; but to the best of my recollection,
11  he was deceiving customers, promising them a gift
12  card or incentive in exchange for completing an
13  offer.
14         For example, I will give you a hundred
15  dollar Walmart gift card in exchange for getting
16  your credit report from CBC.
17     Q.  And what time period was that?
18     A.  I don't recall specifically.  I would
19  need to see the email.
20     Q.  What email?
21     A.  It's in the 44,000-plus emails we turned
22  over to you.
23     Q.  What email are you referring to though?
24     A.  The email where I'm terminating the
25  affiliate or investigating the fraud, something

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Brown

FTC v. Credit Bureau Center, et al.                                    12/13/2017

---

45

1    along those lines.
2        Q.   How did you learn that this affiliate
3    was promising Walmart gift cards, et cetera?
4        A.   I would need to reference that specific
5    email to refresh my memory.
6        Q.   So you don't recall presently how you
7    learned of the fraud?
8        A.   No.
9        Q.   Do you remember the name of the
10   affiliate?
11       A.   No.
12       Q.   Did the affiliate have a company?
13       A.   I believe so.
14       Q.   Do you remember the name of the company?
15       A.   No.
16       Q.   Do you remember any words in the email
17   that would help us identify it?
18       A.   I believe the word fraud was definitely
19   in the email.
20       Q.   This may be more directed to Mr. Cochell
21   than to you.  But since the emails have been --
22   since the CBC emails have been produced, if you
23   want to produce that email to us, we'd love to see
24   it.
25           MR. COCHELL:  It's already been

---

46

1    produced.  I mean, if -- as part of our
2    preparation, we may identify that email.  And if
3    we do identify it, we'll give it to you --
4            MR. LEVINE:  Fair enough.
5            MR. COCHELL:  -- happily.  Okay?
6    BY MR. LEVINE:
7        Q.   Okay.  Another affiliate you said you
8    declined to work with because he or she or it
9    wanted to violate the TCPA, so let's start with
10   the pronouns.  Is it a he, a she, or an it?
11       A.   I don't know.
12       Q.   You don't remember?
13       A.   No.  I don't know because this was
14   specifically a chat conversation.
15           MR. WARD:  Maybe we should take just a
16   short break.  Is that okay with everyone?
17           THE WITNESS:  Sure.  That sounds good.
18           (Whereupon, a short break was
19           taken.)
20   BY MR. LEVINE:
21       Q.   Don't tell me what you said, Mr. Brown.
22   But you spoke with your attorney during the break?
23       A.   Correct.
24       Q.   You understand you're still under oath?
25       A.   Correct.

---

47

1        Q.   Okay.  I want to return to the
2    affiliates you terminated.
3            Now, the first one we already discussed.
4            And by the way, when I say first, I'm
5    not referring necessarily chronologically.  I'm
6    referring how you explained it to me.
7            So the first one we discussed.
8            Another affiliate you said you declined
9    to work with because they were going to violate
10   the TCPA; is that accurate?
11       A.   Correct.
12       Q.   Do you remember the name of that
13   affiliate?
14       A.   I don't remember.  I remember it started
15   with an M.  And it was in a Skype chat, and it was
16   copy and pasted into an email by Tom Fragala to
17   me.
18       Q.   Okay.  Do you remember the time period?
19       A.   I do not.
20       Q.   Another affiliate you said you
21   terminated for fraud and then canceled all the
22   memberships of everyone they had driven to your
23   company; is that right?
24       A.   Uh-huh.
25       Q.   Is that a yes?

---

48

1        A.   Yes.
2        Q.   Do you remember the name of that
3    affiliate?
4        A.   No.
5        Q.   Individual or company?
6        A.   I believe it was a company.  I would
7    need to see the email to refresh my memory.
8        Q.   So there would have been -- there would
9    be an email reflecting the fact that you
10   terminated this individual?
11       A.   Yes.
12           MR. COCHELL:  That one I can tell you I
13   can produce to you.  I've seen that one.  I
14   remember seeing it.  So I'll get that to you.
15           MR. LEVINE:  Okay.  Thank you.
16           MR. COCHELL:  Uh-huh.
17   BY MR. LEVINE:
18       Q.   You also -- you also stated that you
19   canceled all the memberships of everyone who had
20   been signed up through that affiliate, correct?
21       A.   Correct, and refunded those customers.
22       Q.   And would those cancellations be
23   reflected -- let me strike that.
24           You're familiar with the term CRM?
25       A.   Yes.

---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Brown

FTC v. Credit Bureau Center, et al.                                    12/13/2017

---

49

1      Q.   This is the database --
2      A.   Customer relationship management
3   database system.
4      Q.   And you used a CRM?
5      A.   Yes.
6      Q.   And the CRM tracked affiliates?
7      A.   Some, some CRMs track affiliates.
8      Q.   Your CRM had a record of affiliates?
9      A.   Not exactly.  I would love to clarify
10  that for you if you would like.
11     Q.   I do want you to clarify it.  Let's hold
12  off on that for now.
13         But when I say CRM, I'm going to be
14  talking about the CRM that you used through your
15  company, CBC; does that make sense?
16     A.   We used multiple.  But I understand,
17  yes.
18     Q.   How about the one on AWS?
19     A.   Yes.
20     Q.   There was only one, correct?
21     A.   Correct.
22     Q.   So we're going to talk about that CRM.
23  Okay?
24     A.   Okay.
25     Q.   By the way, AWS is Amazon Web Services,

---

50

1   right?
2      A.   Correct.
3      Q.   That's kind of a big cloud platform
4   owned by Amazon --
5      A.   Yes.
6      Q.   -- sort of.  Okay.
7         Okay.  So getting back to that affiliate
8   terminated for fraud, the memberships you
9   canceled, would those cancellations be reflected
10  in the CRM?
11     A.   Yes.  And additionally, the refunds
12  would be reflected there as well.
13     Q.   Okay.  Okay.  And I think there was one
14  more affiliate you said you terminated -- oh, I'm
15  sorry.
16         How did you -- how did you find out --
17  what -- excuse me.
18         What kind of fraud was that terminate --
19  affiliate we just discussed engaged in?
20     A.   It's hard to say without seeing the
21  specific email.  I don't recall specifically what
22  it was.  I need to see the email.
23     Q.   But the way you learned about the fraud
24  was from an email.
25     A.   I don't recall how I learned about the

---

51

1   fraud; but I sent an email either investigating
2   it, terminating the affiliate, something to that
3   effect, and probably multiple emails.
4      Q.   Okay.  There was one more affiliate, I
5   think, you referenced as you remember terminating
6   for fraud, correct?
7         Your counselor is shaking his head.
8         MR. COCHELL:  No.  I've been taking
9   pretty copious notes.  There were four
10  terminations.  I think you just covered the last
11  one.
12         MR. LEVINE:  No.  I think I only covered
13  three.
14         MR. COCHELL:  Oh, really?  Then I stand
15  corrected, or I sit corrected.
16  BY MR. LEVINE:
17     Q.   Can you remember another affiliate you
18  terminated for fraud?
19     A.   I believe I recall four.  But since
20  we're just going through them in the random order,
21  I'm getting a little lost in the questions you're
22  asking.  So I believe there's four that I can
23  recall.
24     Q.   For any of the affiliates you terminated
25  for fraud at any time, do you remember how you

---

52

1   learned about the fraud?
2      A.   In one particular case, I now recall it
3   got escalated from the call center to me.
4      Q.   This is the call center in Colombia?
5      A.   Correct.
6      Q.   Do you recall which -- what type of
7   fraud that involved?
8      A.   It's hard for me to say exactly without
9   refreshing my memory without the email.  But I
10  believe it had something to do with credit card
11  fraud, using the same credit card multiple times,
12  someone trying to -- yeah.  It's hard for me to
13  say without specifically seeing the email.
14     Q.   Now, that sounds like the kind of fraud
15  that's a fraud on you by the affiliate; am I
16  misunderstanding?
17     A.   All fraud is a fraud on me if they are
18  an affiliate of mine.
19     Q.   Okay.  But you -- the customer service
20  escalated that issue to you via email?
21     A.   I don't recall the form, but they
22  escalated it to me; but that was the general
23  policy.
24         We had a policy of, you know, these are
25  the known scams.  If you see these scams in

---

13 (Pages 49 to 52)

Brown

FTC v. Credit Bureau Center, et al.                                      12/13/2017

---

53

1    particular, escalate them to me to deal with it.
2           And above and beyond that, it's kind of
3    like a see something, say something policy. If
4    you see something suspicious, which this was
5    outside of that policy, if you see something
6    suspicious, escalate it to me, and we will
7    investigate it.
8           And like we did in this case, we
9    terminated the affiliate because they were doing
10   fraud; and we canceled and refunded the customers
11   because this is not something that we stand for.
12      **Q.  Okay.  You can put that exhibit to the**
13   **side.  I may return to it.**
14      **CBC had -- I'm just going to go back to**
15   **talking about CBC.  Okay?**
16      A.   Mm-hmm, yes.
17      **Q.  And the way the company was organized.**
18   **Okay?**
19      A.   Okay.
20      **Q.  CBC had bank accounts, correct?**
21      A.   Yes.
22      **Q.  You opened those bank accounts?**
23      A.   Yes.
24      **Q.  You were the only signatory on those**
25   **bank accounts?**

54

1      A.   Yes.
2      **Q.  You controlled the funds in those bank**
3    **accounts?**
4      A.   Yes.
5      **Q.  CBC had a customer service department,**
6    **correct?**
7      A.   CBC had a customer service company it
8    contracts with.
9      **Q.  Fair.  Was that the same company**
10   **throughout the time you ran CBC?**
11     A.   Mostly.
12     **Q.  Let's start, what was the name of the**
13   **company?**
14     A.   Virtual Teleservices.
15     **Q.  And you said mostly.  During what**
16   **periods -- let me rephrase that.**
17          **Were there periods during which you had**
18   **multiple customer service departments -- by the**
19   **way, when I say departments, I realize they were**
20   **not part of the company, that they were**
21   **contractors; but I'm going to use the term**
22   **departments.  Okay?**
23     A.   Okay.
24     **Q.  All right.  So was there a time during**
25   **which CBC had multiple customer service**

55

1    **departments?**
2      A.   There was some period of time where I
3    engaged someone directly as a contractor, wasn't a
4    company to my knowledge, to help out in a
5    supervisory QA type role outside of the Colombia
6    company.
7      **Q.  And that's the country, C-o-l-o,**
8    **correct?**
9      A.   Correct.
10     **Q.  What was the name of the supervisor?**
11     A.   Name was Stephanie G.
12     **Q.  You don't know her last name?**
13     A.   I would butcher it if I tried to say it,
14   so...
15     **Q.  Do you remember what time period that**
16   **was?**
17     A.   No.
18     **Q.  Okay.  Let's go back to talking about**
19   **Virtual Teleservices.**
20     A.   Mm-hmm.
21     **Q.  Do the names David Rojas and Diego M.,**
22   **as in Mary, ring a bell?**
23     A.   Yes.
24     **Q.  Those were the managers of Virtual**
25   **Teleservices?**

56

1      A.   One is a manager, one is a supervisor.
2      **Q.  And which is which?**
3      A.   David Rojas was the manager.  Diego is
4    the supervisor.  Sometimes the manager will play a
5    supervisory role, kind of wears multiple hats.
6      **Q.  When you say supervising, that's**
7    **supervising the sort of line customer service**
8    **folks?**
9      A.   The lying customer?
10     **Q.  No, the line, l-i-n-e.**
11     A.   Okay.
12          MR. COCHELL:  It's that Chicago accent.
13          MR. LEVINE:  Right, right.
14          MR. COCHELL:  You all talk funny here.
15          MR. LEVINE:  I'll just rephrase it.
16   BY MR. LEVINE:
17     **Q.  The supervisors supervised the customer**
18   **service staff, correct?**
19     A.   Correct.
20     **Q.  Did you have any contacts at the -- were**
21   **you in contact with Mr. Rojas and Diego M.?**
22     A.   Yes.
23     **Q.  Were you in contact with anyone else at**
24   **that -- at Virtual Teleservices?**
25          MR. COCHELL:  Objection, form of the

14 (Pages 53 to 56)

Brown

FTC v. Credit Bureau Center, et al.                                    12/13/2017

---

57

1    question.
2    BY MR. LEVINE:
3        Q.   You can --
4            MR. COCHELL:  You can answer if you can.
5        A.   Not that I specifically recall.  But I
6    remember in the early years of the business, I was
7    very intimately involved in the training,
8    monitoring and QA, and developing processes and
9    procedures.
10           I believe I recall getting on some sort
11   of conference call or training calls and helping
12   in those early years to develop sound processes
13   and procedures.
14       Q.   When you say "early years," the company
15   wasn't around for a whole -- hasn't been a whole
16   lot of years.  How many years are we talking
17   about?
18       A.   The company has been around for, I
19   think, over six years; and I believe it was the
20   first one or two that I was more intimately
21   involved and developed good processes and
22   procedures to where the customer service can
23   follow those processes and procedures.
24       Q.   And there were times during which you
25   actually trained the customer service employees

---

58

1    directly?
2        A.   There were times when, you know, I was
3    involved in what you would call coaching, right?
4            So we would do calls together, we would
5    take calls, they would listen to them, they would
6    take calls, I would listen to them, and we would
7    do role playing with phone calls and come up with
8    good procedures and practices and guidelines.
9        Q.   Did you ever visit the nation of
10   Colombia?
11       A.   Yes.
12       Q.   And was that to visit the customer
13   service operations?
14       A.   Not specifically to visit the customer
15   service operations.
16       Q.   How many occasions during the time that
17   you ran CBC, how many times did you go to
18   Colombia?
19       A.   One.
20       Q.   And do you remember when that was?
21       A.   It was about a week or two before this
22   lawsuit.
23       Q.   And what took place during that meeting?
24   Let me back up.  Strike that.
25           How long were you in Colombia a week

---

59

1    before this lawsuit?
2        A.   I don't recall specifically, but it was
3    maybe about a week.
4        Q.   And how long did you spend at Virtual
5    Teleservices?
6        A.   I did not go to Virtual Teleservices.
7        Q.   Did you have any interaction with the
8    customer service folks while you were down there?
9        A.   Yes.  I met with Diego and David in
10   Cartagena.
11       Q.   But you met with them essentially off
12   site, correct?
13       A.   They are all work-at-home agents, so --
14       Q.   Oh, okay.  The customer service people
15   work at home?
16       A.   (Nodding head.)
17       Q.   What was the nature of your discussion
18   with Diego and David?
19       A.   It was mostly personal conversations.  I
20   don't specifically recall any business
21   conversations.
22       Q.   Backing up a little bit, did Virtual --
23   did your customer service department operate email
24   addresses?
25       A.   Do you mean did they use an email

---

60

1    address?
2        Q.   Sure.
3        A.   Yes.
4        Q.   Among those email addresses they used
5    was support@eFreeScore.com?
6        A.   Correct.
7        Q.   Did you set that email address up?
8        A.   I set one of them up at some point in
9    time, but I don't know if I set up the one that
10   you know today as the support email.
11       Q.   There's also a
12   support@CreditUpdates.com, correct?
13       A.   Yeah.  And they're -- they're not known
14   as separate emails.  They are more of like an
15   alias to one mailbox.
16       Q.   Do you remember what that mailbox was
17   that they fed into?
18       A.   It was the Google account that we turned
19   over.
20       Q.   So you had access to the -- to those
21   email accounts?  I guess I should rephrase that.
22           You had access to the email account to
23   which those addresses fed emails?
24       A.   I don't know if I -- I don't think I
25   specifically had access to that because I had to

---

15 (Pages 57 to 60)

Brown

FTC v. Credit Bureau Center, et al.                                    12/13/2017

---

61

1  reset the password forcefully in order to gain
2  access to these emails to produce them.
3         So this is something that the customer
4  service department had access to.
5     Q.   Were you aware of whether customer
6  service recorded calls from consumers?
7     A.   Yes. I set up the customer service call
8  recording feature and paid extra for this in order
9  to have good practices and procedures and make
10  sure calls can be QA'ed. That stands --
11     Q.   That's quality --
12     A.   -- for quality assurance.
13     Q.   Thanks.
14         You had access to those recordings?
15     A.   Yes.
16     Q.   What did your quality assurance process
17  involve?
18     A.   Quality assurance process is quite a
19  lengthy process. I believe it was about two or
20  three pages of questions that we go through to
21  insure good quality assurance.
22         It's everything from greeting the
23  customer correctly to not having dead air to
24  addressing customers' concerns to having a
25  first-call resolution, which means that if you're

---

62

1  able to satisfactorily identify and resolve the
2  customer's concern without additional follow-up
3  phone calls.
4         It's about overall just having a good
5  impression on the customer. At the end of the
6  call, you want the customer to be happy, feel
7  resolved, and to be a good, happy customer.
8     Q.   Did you ever check in and check the
9  recordings to see if the customer service staff
10  was following the procedures?
11     A.   I think the --
12     MR. COCHELL:  Objection as to lack of
13  time frame.
14  BY MR. LEVINE:
15     Q.   Did you ever?
16     A.   Yeah. So the first couple years, first
17  year or two, I should clarify, I was very
18  intimately involved in the customer service
19  operations.
20         I monitored many calls, developed good
21  QA processes and procedures that eventually were
22  used by the customer service supervisors and
23  managers and customer service agents.
24         Eventually, that was delegated to them
25  to follow these processes and procedures and

---

63

1  escalate any known scams, any known issues, tech
2  issues, customer issues, website issues, any sort
3  of issue to us so at that point, you know, there
4  were -- the customer service supervisors were
5  primarily monitoring the phone calls.
6         But there are instances, you know, going
7  back to this affiliate fraud situation where we
8  terminated this affiliate and refunded all the
9  customers, situations like that, I do get in there
10  and actively listen to the phone calls and try to
11  trace down the source of the fraud, what was said,
12  how it's being done, and try to block the fraud.
13     Q.   And speaking of tracing the source of
14  the fraud, we'll get into this later, but CBC
15  assigned IDs to each affiliate; is that a fair
16  description?
17     A.   You know, there is an identifier to
18  tracking an affiliate, yes.
19     Q.   And that's a number.
20     A.   It can be. It's some unique identifier.
21  It could be alphanumeric.
22     Q.   What -- sorry, what did you call that,
23  an identifier?
24     A.   Yes, alphanumeric.
25     Q.   Alphanumeric identifier?

---

64

1     A.   Yeah.
2     Q.   Customer service -- are you familiar
3  with the BBB?
4     A.   Yes.
5     Q.   Better Business Bureau?
6         Did customer service review BBB
7  complaints?
8     A.   Yes.
9     Q.   Is that throughout the six years of CBC?
10     A.   So just like the call process, right,
11  the first year or two, I was intimately involved
12  in BBB complaints; and I personally handled the
13  BBB complaints and developed sound processes and
14  procedures to handle them successfully.
15         And eventually at some point in time,
16  the customer service department took over that
17  responsibility to successfully handle the BBB
18  complaints.
19     Q.   And you said with respect to calls that
20  customer service was instructed to escalate
21  complaints of known scams; is that accurate?
22     A.   Correct.
23     Q.   Did the same go for BBB complaints?
24     A.   That was the policy across any channel
25  of communication.

---

16 (Pages 61 to 64)

Brown
FTC v. Credit Bureau Center, et al.                                    12/13/2017



65

1       Q.   Did customer service personnel have
2  access to the CRM?
3       A.   Yes.  And by CRM, I assume you're
4  talking about the AWS.
5       Q.   Yeah.  Thank you for clarifying that.
6  Let's just assume going forward, if I say CRM,
7  that's what I mean.  And I'll try to be precise if
8  I mean something else.
9       A.   Okay.
10      Q.   So the identifier that you just
11 explained to me, could customer service see the
12 identifier for the affiliate marketer that brought
13 in the customer they were speaking with?
14      A.   In some cases.
15      Q.   When would they not have been able to
16 see the identifier?
17      A.   So I would need to -- it's not a simple
18 question, but I would need to give you a little
19 bit of history about the CRM.
20      So there's a couple different concepts
21 or a few different concepts in the CRM, you know.
22 And I think we went over this in the PI hearing.
23      But a customer can be a white label
24 website or an affiliate or a partner.  It can be a
25 white label website, a cobranded website, an

66

1  affiliate on our website; so there's different
2  levels of tracking.
3       So some details are visible to all
4  customer service agents, and some details are not.
5       For example, if a customer calls in and
6  they want to see what website did this customer
7  call up on, if it's an eFreeScore.com customer or
8  CreditUpdates.com customer or whatever other white
9  label website we have, they can see that
10 information because they need to know what website
11 the customer is on.
12      If it's a specific affiliate ID, they
13 may not have that level of detail because it's not
14 necessarily relevant to the task that they are
15 performing.
16      Q.   But within the CRM, affiliate IDs
17 were -- each customer was -- let me strike that.
18      Each customer who came in through an
19 affiliate, the affiliate ID for that customer was
20 recorded, correct?
21      A.   So, again, there's essentially these
22 three different types of affiliates or partners.
23 So at each level, there's some sort of recording
24 to mark, you know, and associate this customer
25 with that source.

67

1       Q.   Okay.  Okay.  Now, you just explained
2  what I was going to ask you about next, just kind
3  of the business model for CBC; but I have another
4  question about it.
5       You said in the declaration, which I do
6  have somewhere, but I think we can just talk about
7  it, you said in the declaration that essentially
8  CBC's business model was required scale because
9  purchasing credit monitoring service is expensive,
10 and you need a scaleable solution to deliver that
11 to individual consumers.
12      Does that sound right to you?
13      A.   Can you refresh my memory with this
14 document?
15      Q.   Sure.  Let's see if I have it.
16      I'm not going to introduce this as an
17 exhibit yet.  Let's just see if we can talk about
18 it.
19      But you wrote in it's Docket 50-1,
20 Page 3, "The simple reason companies like CBC
21 exist is to implement scaleable solutions for the
22 end user.  A direct credit data service API feed
23 for a single consumer or company is cost
24 prohibitive."
25      Do you recall that?

68

1       A.   Can I see the document and get some
2  context?
3       Q.   Sure, certainly.
4       Why don't we mark this as Exhibit 3.
5          (Whereupon Deposition Exhibit
6           No. 3 was marked for
7           identification by the court
8           reporter.)
9  BY MR. LEVINE:
10      Q.   And I'll ask you to please turn to
11 Page 3.  So you're looking at Exhibit 3, Docket
12 50-1, Page 3, Paragraph 10.  It's right at the
13 bottom of Page 3.
14      A.   Yes, I recall.
15      Q.   And do you agree with what you wrote in
16 the declaration?
17      A.   Of course.
18      Q.   And the way I interpret this, and you
19 can tell me if I'm wrong, is that you need a
20 company that can achieve some scale in order to
21 cover the cost of the CSID's services; is that
22 accurate?
23      A.   No.
24      Q.   Okay.  Tell me -- tell me where I went
25 wrong.

17 (Pages 65 to 68)

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Brown

FTC v. Credit Bureau Center, et al.                                    12/13/2017

---

69

1      A.   So what this is saying is that if you
2   are a small business and you have a hundred
3   customers a month you are signing up, you cannot
4   go to CSID, Experian, TransUnion, or any of the
5   credit bureaus and say, I want to pull credit
6   reports from you via API because, first of all,
7   you're going to have very expensive setup fees.
8         Second of all, they are not going to
9   want to waste their time on someone that small;
10  and it's just cost prohibitive.
11        You have certain minimum obligations you
12  have to satisfy with the bureaus to achieve
13  competitive pricing additionally.
14        There's a lot of reasons why a smaller
15  business cannot interact directly with the
16  bureaus.
17     **Q.   That makes sense to me.  I just want to**
18  **quickly go through some of the things you said.**
19        **So you said a small business with a**
20  **hundred customers, so basically you need a lot of**
21  **the customers in order to make -- among other**
22  **things you described, you need a lot of the**
23  **customers to cover those fixed costs you**
24  **described; is that accurate?**
25     A.   I mean, there is a lot of reasons why a

---

70

1   bureau wouldn't want to work with a small company.
2   You know, not having a lot of customers could be
3   one of them.
4      **Q.   Another thing you said was that there**
5   **were high fixed costs to getting a data feed; is**
6   **that accurate?**
7      A.   I said there is a high setup fee --
8      **Q.   That's right.**
9      A.   -- and there's a -- potentially monthly
10  minimums you need to hit.
11     **Q.   Monthly minimums of what?**
12     A.   Of revenue.
13     **Q.   Okay.**
14     A.   Or data costs.
15     **Q.   Okay.  We may return to this exhibit,**
16  **but we're done with it for now.  Thank you.**
17        **Now, you already said that -- we've**
18  **already discussed that CBC used some affiliate**
19  **marketers, correct?**
20     A.   Correct.
21     **Q.   I just want to go over some terms.  You**
22  **already defined affiliate marketing.  Are you**
23  **familiar with the term traffic?**
24     A.   Yes.
25     **Q.   And what does that mean?**

---

71

1      A.   Traffic involves the act of someone
2   directing a visitor to a site.
3      **Q.   And is that site sometimes called the**
4   **offer?**
5      A.   Yes.
6      **Q.   Another term I've seen, out -- another**
7   **term I've seen is data feed.  And I've seen it in**
8   **two ways.  I'm just going to ask you to clarify**
9   **this for me.  Okay?**
10     A.   Mm-hmm.
11     **Q.   So I've seen data feed mean what we just**
12  **described, which is the service CSID provides.  Is**
13  **that called a data feed?**
14     A.   It can be.
15     **Q.   The other way I've seen data feed is the**
16  **source of the traffic.  Is that -- is the source**
17  **of the traffic referred to as a data feed?**
18     A.   No.  Just to clarify, so a data feed is
19  literally exactly what it sounds like, a feed of
20  data.
21        You know, so if you're getting a feed of
22  credit reports or you're getting a feed of, you
23  know, leads, if you're getting a feed of anything,
24  you can get a data feed of it.
25     **Q.   And by leads, you mean consumers who may**

---

72

1   **become customers, right?**
2      A.   It could be a feed of prospective
3   customers, yes.
4      **Q.   Okay.  Well, some of this might be**
5   **redundant; but I do want to make sure I get a good**
6   **understanding of the CRM.**
7         **So this is going to be a -- this is**
8   **going to be Exhibit 4.**
9            **(Whereupon Deposition Exhibit**
10              **No. 4 was marked for**
11              **identification by the court**
12              **reporter.)**
13  BY MR. LEVINE:
14     **Q.   Now, Mr. Brown, I'm showing you a**
15  **document that's been marked for identification**
16  **Exhibit 4.**
17        **You testified earlier that you reviewed**
18  **the transcript of the PI hearing in advance of**
19  **this deposition, correct?**
20     A.   Yes.
21     **Q.   I will represent to you that this is an**
22  **excerpted portion of that transcript that includes**
23  **only your examination at that hearing.  Okay?**
24     A.   Okay.
25     **Q.   So, you know, we'll refer to this -- we**

---

18 (Pages 69 to 72)

Brown

FTC v. Credit Bureau Center, et al.                                    12/13/2017

---

73

1    may refer to this later; but for now, I just want
2    to zero in on the issue about the CRM.
3            So I'm going to ask you to please turn
4    to docket page -- I better back up here.
5            So there are two types of page numbers
6    that appear on this document.  There's the page
7    number in the upper right-hand corner.  And then
8    if you look at the file stamp from the court,
9    there's the ECF page number that says X out of
10   190; do you see that?
11       A.   Yes.
12       Q.   So I'm not going to promise to be
13   consistent throughout this deposition.  But right
14   now, what I'm referring to is docket Page 101,
15   okay, which is Page 201 on the sheet.
16       A.   So near the end?
17       Q.   Near the end.  That's it.
18           And actually, there's a page I -- it
19   starts with, "Yeah.  It looks like they might have
20   gone to a print page of report."
21           Do you see that?
22       A.   Yes.
23       Q.   Okay.  And you recall testifying in this
24   hearing?
25       A.   Yes.

---

74

1        Q.   Okay.  So the court here, I'll represent
2    to you, but I'm sure you know, is the judge; and
3    the witness is you.  Does that make sense?
4        A.   Yes.
5        Q.   Okay.  So the court says, "So it sounded
6    like you have three affiliate tracking systems.
7    This is the Offerit one."
8            THE REPORTER:  The what?
9            MR. LEVINE:  Offerit, one word,
10   O-f-f-e-r-i-t.
11   BY MR. LEVINE:
12       Q.   "There was the other one called, dash, I
13   want to say landscape, but that's the wrong -- "
14           And you say, "LinkTrust."
15           And then the court says, " -- LinkTrust,
16   and then the third one was the internal one."
17           Do you see that?
18       A.   Yes.
19       Q.   And then you say, "I believe there might
20   have been more."
21       A.   Yes.
22       Q.   Okay.  So now that we've established I
23   know how to read, when you refer to the internal
24   one -- well, let's start one by one.
25           So Offerit, is that an affiliate

---

75

1    tracking platform?
2        A.   Yes.
3        Q.   LinkTrust, affiliate tracking platform?
4        A.   Yes.  And some of these companies do
5    multiple things, but it is an affiliate tracking
6    platform.
7        Q.   And the internal one is the CRM on AWS?
8        A.   Correct.
9        Q.   Okay.  Do you remember when LinkTrust
10   was put in place?
11       A.   No.
12       Q.   Okay.  Okay.  We're actually done for
13   now with that exhibit, Exhibit 3.
14           MR. COCHELL:  That's 4.
15           MR. LEVINE:  Thank you.  We're done for
16   now with Exhibit 4.
17           Now I'm going to attempt to pull some
18   things up on the computer, and just bear with me
19   one moment.  We can stay on the record.
20           Guy, can you hand me my outline?
21           MR. WARD:  I'm sorry.  What did you
22   want?
23           MR. LEVINE:  The outline right there
24   (indicating).
25           So what we're going to do now, I hope,

---

76

1    is have you help explain the CRM to me.
2            MR. COCHELL:  Could you maybe put that
3    between the two of us --
4            MR. LEVINE:  Yeah, sure.
5            MR. COCHELL:  -- so I could see it?  Guy
6    could come around or Doug if you want to.
7            MR. LEVINE:  I'm not going to introduce
8    this as an exhibit for the complications that
9    Mr. Cochell is probably familiar with.
10           But I'm opening a document that has been
11   exported from the CRM.  The file name is
12   userprofiles.XLSX.
13           It's been produced to defendants
14   attorneys' eyes only, but we're going to review it
15   for the purposes of this deposition.
16   BY MR. LEVINE:
17       Q.   I just want you to go through,
18   Mr. Brown, and I'm going to ask you what the
19   columns mean.  And if you know, I would like you
20   to tell me what each column means.  Okay?
21       A.   I can do that, except I'm not familiar
22   with what you're presenting to me.  It's not in
23   the original format that we provided it to you, so
24   some columns may mean different things in
25   different tables.

---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Brown

FTC v. Credit Bureau Center, et al.                                    12/13/2017

---

77

1       So I just want to give you that
2  disclaimer.
3       Q.  Fair enough.  Okay.  Let's try it all
4  the same.
5           I see the first column, profile,
6  underscore, ID.  Could you tell me what that
7  refers to?
8       A.  And where is this data from again?
9       Q.  The CRM.
10      A.  What part of the CRM?
11          MR. WARD:  This is called user profiles.
12      A.  User profiles.  Okay.
13          So profile ID would be an identifier for
14  the user profile table, I would assume, or file.
15      Q.  Okay.  User ID?
16      A.  That would be an ID for the user.
17      Q.  And that -- would that be the consumer
18  or the --
19      A.  That would be the user in the CRM which
20  may or may not be consumer.
21      Q.  So this would be you or one of the
22  customer service people?
23      A.  Customer service agent, could be a
24  consumer, anyone, a user.
25      Q.  A lead ID?

---

78

1       A.  I don't know in this case.
2       Q.  Okay.  Would it help if I showed you
3  what -- if I did a little drop-down so you could
4  see all --
5           MR. LEVINE:  There's a mouse over there.
6  Could you grab the mouse?
7           MR. MCKENNEY:  Yeah.
8  BY MR. LEVINE:
9       Q.  Let's see.  If you don't know, you don't
10  know.  But just tell me if this would help.
11          I apologize for the delay.  This is not
12  my strong suit.
13          MR. COCHELL:  I have frequently tried to
14  do presentations on big screens from my computer
15  and have not succeeded.
16          MR. WARD:  We'll just take a break, a
17  little short conference off the record.
18          MR. COCHELL:  Okay.
19          (Whereupon, a short break was
20          taken.)
21  BY MR. LEVINE:
22      Q.  All right.  So let's back up before we
23  go through the specifics.
24          Now, in the CRM as it existed while the
25  company was in operation, what kind of information

---

79

1  would have been recorded for each customer of CBC
2  that you can recall now?
3       A.  What information is recorded on a
4  customer?
5       Q.  Mm-hmm.
6       A.  All the information we collect.
7       Q.  And which -- what information do you
8  collect?
9       A.  So depending on the type of customer and
10  the type of site and the type of product, it may
11  vary.
12          For someone who signs up on
13  CreditUpdates looking to check their credit
14  report, you know, at a minimum, we collect their
15  first name, last name, email, phone, address,
16  social security number, date of birth, credit
17  card.
18      Q.  And if a customer comes in at 1:00
19  o'clock, and then another customer comes in at
20  1:01 -- by the way, when I say come in, I'm going
21  to refer to conversions.  Okay?  That's a term
22  you're familiar with?
23          THE REPORTER:  Refer to what?
24          MR. LEVINE:  Conversions.
25  BY MR. LEVINE:

---

80

1       Q.  Is that a term you're familiar with?
2       A.  Mm-hmm.
3       Q.  Yes?
4       A.  Yes.
5       Q.  And you track when there's a conversion,
6  correct?
7       A.  Yes, conversions are tracked.
8       Q.  Is the time that the consumer converted
9  recorded in the CRM?
10      A.  So there's some translation or
11  translating of terms that happen when you define a
12  conversion.  You know, a conversion in one system
13  is not the same in another.
14          And what I mean by that is there's
15  multiple events that take place, right?  Customer
16  signs up, and we save their information on Page 1.
17  Sign up on Page 2, their credit card is
18  authorized.  They go through an ID verification
19  process with questions.
20          So, you know, there's multiple steps to
21  happen along the way, if that helps.
22      Q.  And there's sort of a time stamp for
23  each step?
24      A.  There can be.
25          MR. LEVINE:  Okay.  I think I'm going to

---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Brown

FTC v. Credit Bureau Center, et al.                                    12/13/2017

---

81

1    skip around here. So if you don't want me to,
2    come over here.
3         MR. WARD: No. Go ahead. I've looked
4    at it.
5         MR. LEVINE: Okay.
6    BY MR. LEVINE:
7    Q.   Okay. Now, do you recall -- I think I
8    already asked you this, so I apologize.
9         Do you recall what the user ID refers
10   to?
11   A.   I believe it's the ID of the user.
12   Q.   Okay. And is that generated
13   automatically, or does the user enter that
14   manually?
15   A.   Generated as an auto incrementing field.
16   Q.   What about the lead ID?
17   A.   I believe that's an auto incrementing
18   field as well, but I'm not sure in this particular
19   view.
20   Q.   And do you know what the -- that would
21   signify?
22   A.   No.
23   Q.   Okay. First and last name of the --
24   this is the first, middle, and last name of the
25   customer, right?

---

82

1    A.   Yes.
2    Q.   Okay. Looking at Column H, the company,
3    would that be -- there's some codes here. Do you
4    remember what the company refers to?
5    A.   I would assume it's -- I would assume
6    it's the company.
7         I mean, I see a lot of real estate
8    companies in here; Century 21, Coldwell Banker,
9    FMC Lending, Frontgate Properties, Vision One
10   Realty, a lot of real estate and lenders.
11        So I would assume that's the company of
12   the user.
13   Q.   I'm not going to ask you what a phone
14   number is.
15        What about entity ID, do you know what
16   that refers to?
17   A.   Yes. So entity ID is similar to a type
18   of system. It's to provide some separation
19   between different types of business processes or
20   logic.
21        For example, something involving credit
22   reports could be on one entity. Something
23   involving credit restoration could be on another
24   entity because they involve different code,
25   different logic.

---

83

1    Q.   Okay. What about site ID? This is
2    Column S.
3    A.   Site ID would be the ID of the site.
4    Q.   These are CBC's sites?
5    A.   They can be.
6    Q.   What other -- or white label or --
7    A.   It's literally any -- any type of sites
8    that's using the CRM.
9         So going back to the other examples,
10   you're right, it could be white label, it could be
11   cobranding, it could be our own site.
12   Q.   It's the site to which the customer is
13   directed?
14   A.   Yes, or not always to where they are
15   directed, but it is a site that they may have come
16   through or are going to at some point in time.
17   Q.   Fair enough.
18        And is that automatically generated,
19   that input?
20   A.   No.
21   Q.   Someone manually puts the site ID in for
22   each user?
23   A.   No. The site ID is recorded based on
24   where they're -- where they came from or where
25   they are going to.

---

84

1    Q.   But it's recorded automatically?
2    A.   Yes.
3    Q.   Okay. That's what I meant. Okay.
4    Let's move over to column -- oh, I'm
5    sorry.
6         Column T is site version ID. Tell me
7    what that refers to.
8    A.   So it's a -- the version of the sites.
9    It's an ID.
10   Q.   Now, how is that different than site ID?
11   A.   So each sites may have multiple
12   versions; and a version of the site, the site
13   version ID would identify the version of that
14   site.
15   Q.   Okay. Thank you.
16        Now I'm looking at Column U, source
17   code. What does that refer to?
18   A.   So source code is a code that designates
19   the source of whatever record this is, which in
20   this case is a user profile; so this user profile
21   came from this source code.
22   Q.   So earlier, we talked about identifiers.
23   Would the identifiers be the same as the source
24   code?
25   A.   I don't understand the question.

---

21 (Pages 81 to 84)

Brown

FTC v. Credit Bureau Center, et al.                                                              12/13/2017

---

85

1       Q.   Fair enough.
2           Would a given affiliate's identifier be
3   the same as a given affiliate's source code?
4       A.   Not always.
5           If I can maybe help provide some
6   clarification, I can see in this list, Source Code
7   35, I know that this is Pierce and Lloyd, if that
8   helps understand this column.
9       Q.   It does.
10          Sub ID, Column V.
11      A.   Sub ID is another identifier used for
12  multiple purposes whenever additional identifiers
13  may be needed.
14      Q.   So is an example of when that would be
15  used when a -- when an affiliate has
16  subaffiliates?
17      A.   No.  Typically that would be a
18  subaffiliate ID.
19      Q.   Oh, okay.  So this would -- Column V is
20  not subaffiliate ID?
21      A.   I don't believe so.
22      Q.   Okay.  That might be it for the CRM.
23  Yeah.
24          Referral source, is that the IP address?
25      A.   No.  That may be in some cases, a

---

86

1   customer's browser may pass a source.
2       Q.   Okay.  And that was Column Z.
3           Do you remember what refer keyword is in
4   Column AA?
5       A.   Yeah.  There used to be a point in time
6   where search engines such as Google would pass in
7   the keyword the customer searched in order to land
8   on their website.
9           So looking at this, for a keyword, you
10  notice there's a lot of customers who came in
11  searching for one dollar credit report, one dollar
12  credit score, all three credit scores, all three
13  credit scores free, credit report, three free,
14  right?
15          So this would designate at some point in
16  time when they were still passing the keyword what
17  the keyword was the customer used to land on our
18  website.
19      Q.   Okay.  I think we're done with the CRM.
20  I'm waiting for a signal from Guy if I'm wrong,
21  but I think that's all from that for now.  Okay?
22          We're not going to save.
23          Now I want to show you a spreadsheet
24  that's been extracted from the Offerit platform.
25  Its file name, it's been produced, is

---

87

1   MyScoreDB-MemberTables.XLSX.
2           Mr. Brown, I'll first ask you, feel free
3   to scroll around the spreadsheet, and tell me if
4   you're familiar with it.
5       A.   I'm definitely not familiar with this
6   data or even this view, and the reason for that is
7   is I use an interface on a website to interact
8   with Offerit as a company; and I assume this to be
9   some sort of database back end access that I would
10  never see and our customer of Offerit would never
11  see.
12      Q.   Is it fair to say that any information
13  that would be in this database you would have also
14  had access to?
15      A.   Not necessarily.
16      Q.   Would there be some data in Offerit that
17  you did not have access to?
18      A.   Definitely.
19      Q.   Which data would that be?
20      A.   We would have to ask Offerit.
21      Q.   Are you aware of any data that you did
22  not have access to that's at Offerit?
23      A.   In general, with any CRM or tracking
24  platform, there's almost always data that's not
25  visible to a user of the application.

---

88

1           Just like in our CRM, you know, a user
2   may not know, for example, a user ID.  But we have
3   a user ID.  That would be one example.
4       Q.   Okay.  So I'm going to go faster through
5   this, but I'm going to do the same thing we did
6   with the CRM and ask you about some of these
7   columns.
8           So I want to first ask you about Column
9   C, which is the log-in ID.  In our last exchange,
10  you sort of predicted my question, but I'm going
11  to ask you what the log-in ID means.
12      A.   I cannot tell you what any of these
13  columns mean in someone else's CRM database
14  without guessing.
15      Q.   And by CRM database, you mean the
16  Offerit database?
17      A.   I assume that's what this is, yes.
18      Q.   Are you familiar -- in your -- in
19  whatever interface you had access to Offerit
20  through, was the term log-in ID used in that
21  interface?
22      A.   Not that I recall.
23      Q.   Do you recall any -- do you recall what
24  the field was to identify the source of the
25  traffic?

---

22 (Pages 85 to 88)

Brown

FTC v. Credit Bureau Center, et al.                                    12/13/2017

---

89

1   A.  I don't recall.
2   Q.  Okay.  Do you -- are you familiar with
3  Column F, converted joined?  Is that a field that
4  you would have used in your Offerit interface?
5   A.  That's not something I recognize.
6   Q.  Okay.  Okay.  I think we're done with
7  the spreadsheet.  Thank you.
8       Well, I'm really happy to put the
9  computer away.
10      Let's talk about Danny Pierce.  You said
11 his name when we were talking about the CRM.  You
12 said he was Source Code 35 was my recollection,
13 correct?
14  A.  Yes.
15  Q.  Okay.  Now, who is Danny Pierce?
16  A.  Danny Pierce was an affiliate of CRM.
17  Q.  Now, are you aware that he also operated
18 a company called Revable?
19  A.  Yes.
20  Q.  When I refer to Danny Pierce, I'm also
21 going to be referring to Revable; is that fair?
22  A.  Yes.
23  Q.  If there's an instance where there's any
24 divergence, counselor can make the divergence
25 objection.

---

90

1       MR. COCHELL:  Objection, divergence.
2       MR. LEVINE:  Yeah.
3       MR. COCHELL:  Just like the movie.
4       MR. LEVINE:  Right.
5  BY MR. LEVINE:
6   Q.  How did you first come into contact with
7  Danny Pierce?
8   A.  So Danny Pierce emailed me a while ago,
9  reached out to me via email.
10  Q.  Do you remember approximately when that
11 was?
12  A.  I think it was, you know, beginning of
13 2015 or end of 2014, somewhere around there.
14  Q.  All right.  Let's quickly do -- I think
15 this is Exhibit 5.
16      (Whereupon Deposition Exhibit
17       No. 5 was marked for
18       identification by the court
19       reporter.)
20      MR. COCHELL:  Thank you.
21 BY MR. LEVINE:
22  Q.  All right.  Mr. Brown, I'm showing you a
23 document that's been marked for identification as
24 Exhibit 5.  Do you recognize it?
25  A.  I believe so.

---

91

1   Q.  What is it?
2   A.  It looks like an email from Danny to me
3  in the end of 2014.
4   Q.  Okay.  Does this refresh your
5  recollection as to when Danny Pierce reached out
6  to you?
7   A.  Yeah.
8   Q.  And that would have been September 2014?
9   A.  Correct.
10  Q.  That's it for this exhibit.
11      And let me back up on the exhibit.  The
12 email address Mike@MyScore360.com is your email?
13  A.  Was my email, yes.
14  Q.  When did it cease being your email?
15  A.  Somewhere around when the lawsuit was
16 filed.
17      MR. COCHELL:  I'm sorry.  I didn't hear
18 that.
19  A.  Somewhere around when the lawsuit was
20 filed.
21      MR. COCHELL:  Okay.
22 BY MR. LEVINE:
23  Q.  So access to it was turned over in
24 connection with the lawsuit?
25  A.  Yeah.

---

92

1   Q.  And do you recognize
2  DannyDPierce@gmail.com as Danny's email address?
3   A.  I don't.
4   Q.  What about Danny@Revable.com?
5   A.  I'm familiar with that one.
6   Q.  Do you recognize this phone number as
7  Danny Pierce's phone number?
8   A.  No.
9   Q.  But you had Danny Pierce's phone number?
10  A.  Yes.
11  Q.  Who is Roger?
12  A.  Roger was someone that sat in between a
13 company called -- I can't recall the company, but
14 there was a company that we provided a white label
15 website to; and they did business, I believe,
16 through Roger who I found out in September did
17 business with Pierce.
18  Q.  Do you know what Roger's line of
19 business was?
20  A.  I don't know.
21  Q.  Well, what did you find out about his
22 business with Pierce?
23  A.  I don't understand.
24  Q.  Well, first of all, do you know Roger's
25 last name?

---

23 (Pages 89 to 92)

Brown

FTC v. Credit Bureau Center, et al.                                        12/13/2017

---

93

1    A.  I think it's Ferguson.
2    Q.  Okay.  So Danny says -- Danny Pierce
3  says in his email, "No longer dealing with Roger.
4  He's a child."
5        You respond, "Thanks for reaching out.
6  What happened?"
7        And then you say you'll talk soon.
8        Did you ever have the conversation with
9  Danny Pierce in which you talked about Roger?
10    A.  Yes.
11    Q.  Was that conversation shortly after this
12  email was sent?
13    A.  I don't recall, but I assume so.
14    Q.  And what, if anything, did you learn
15  about Roger Ferguson?
16    A.  I don't recall the specific
17  conversation, but the general topic of Roger was
18  that -- something to the effect of he's not
19  working with him anymore or was difficult to work
20  with.
21    Q.  But you didn't talk about what kind of
22  work Roger did?
23    A.  I don't recall.
24    Q.  You don't recall what he did, or you
25  don't recall whether you talked about it?

---

94

1        MR. WARD:  Go off the record.
2        (Whereupon, a short break was
3        taken.)
4  BY MR. LEVINE:
5    Q.  So I want to understand better this
6  Roger.  So you said Roger's last name is Roger
7  Ferguson.
8    A.  I believe so.
9    Q.  At the time Danny Pierce emailed you in
10  September 2014, he simply said Roger.
11    A.  Mm-hmm.
12    Q.  That suggests, doesn't it, that you knew
13  who he was at the time?
14    A.  You know, I think I have talked to him
15  or at least heard of him.  No.  I've definitely
16  talked with him before, yeah.
17    Q.  When did you talk to him?
18    A.  Sometime before 2014.
19    Q.  Do you remember what you talked about?
20    A.  No.
21    Q.  Does the name Fat Cat Enterprises mean
22  anything to you?
23    A.  Yes.
24    Q.  What is it?
25    A.  I believe that's one of Roger's

---

95

1  companies.
2    Q.  And do you remember what that company
3  does?
4    A.  I think it does some sort of marketing.
5    Q.  You said "one of Roger's companies," so
6  you're aware of Roger having multiple companies?
7    A.  I'm not aware of him having multiple
8  companies, but I know that he was working with
9  another company I did business with; but I can't
10  recall the name right now, but I'm sure it will
11  come to me in a little bit.
12        But I don't understand the relationship
13  between the two of them, but I don't know if he
14  was working for both or just one; but I'm not
15  aware of any other companies besides the one
16  that's -- I can't recall the second.
17    Q.  So there were two companies you recall
18  Roger running?
19    A.  I don't know if he ran the other one;
20  but I know that when I interacted with them, they
21  talked about Roger, so he was somehow involved
22  with the second company.
23    Q.  Fat Cat Enterprises, you said, was a
24  marketing company, correct?
25    A.  I believe so.

---

96

1    Q.  What kind of marketing did it do?
2    A.  I assume affiliate marketing.
3    Q.  Why do you assume that?
4    A.  Because it's my understanding that he
5  was in some way an affiliate.
6    Q.  So you understood that Roger was an
7  affiliate marketer?
8    A.  Mm-hmm.
9    Q.  Roger Ferguson.
10    A.  Yes, yes.
11    Q.  And what was the basis for your
12  understanding that Roger Ferguson was an affiliate
13  marketer?
14    A.  So it will help to give some context to
15  this to answer that question.
16        So, you know, Danny essentially came or
17  Pierce essentially came from a long line of
18  referrals.
19        So at one point in time, a referral
20  partner, Tom Fragala, referred a company to do
21  business with me as a white label website.  They
22  had a white label website and, I believe, used
23  Roger who in turn used Danny who in turn used
24  Lloyd.
25        At some point in time, Roger came to me

---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Brown

FTC v. Credit Bureau Center, et al.                                12/13/2017

---

97

1    directly to be an affiliate cutting out the one
2    link in the chain.
3        And then on this date, Danny came to me
4    directly cutting out --
5        Q.   And Danny is coming to you after Roger
6    had already been an affiliate for you?
7        A.   Mm-hmm, yes.
8        Q.   And after Danny had already been an
9    affiliate for Roger?
10       A.   I -- I assume he's an affiliate for
11   Roger.  I don't know for sure; but I believe so,
12   yeah.
13       Q.   Well, you said you knew that Roger --
14   you said you knew that Lloyd was doing affiliate
15   marketing for Andrew -- excuse me, for Danny and
16   that Danny was doing affiliate marketing for Roger
17   and that Roger was doing affiliate marketing for
18   you.
19       A.   I just want to clarify though, I did not
20   know at this time Lloyd works with Danny.  I know
21   that now as I sit here today.
22       Q.   What's your basis for believing Lloyd
23   worked with Roger?
24       A.   No, that Lloyd -- I did not know that
25   Lloyd worked with Danny.  I don't have any

---

98

1    knowledge either way to whether Lloyd worked with
2    Roger.
3        Q.   Lloyd is defendant Andrew Lloyd,
4    correct?
5        A.   Correct.
6        Q.   You said that there were this chain of
7    affiliate marketers, and they were trying to
8    leapfrog each other to work directly with you; is
9    that more or less accurate?
10           MR. COCHELL:  Objection, form of the
11   question.
12   BY MR. LEVINE:
13       Q.   You can answer it.
14       A.   I don't understand the question.  Can
15   you rephrase it?
16       Q.   Okay.  You said that Roger was doing
17   affiliate marketing for you, Danny Pierce was
18   doing affiliate marketing for Roger, and Andrew
19   Lloyd was doing affiliate marketing for Danny.
20           And I'm wondering what your basis for
21   that understanding is.
22       A.   So what I said is that a referral
23   partner or salesperson named Tom referred a
24   company --
25       Q.   This is Tom Fragala.  You know his name.

---

99

1        A.   Tom Fragala.  Tom Fragala referred a
2    company to work with me, and I set them up with a
3    white label website.
4        Q.   What's the company?
5        A.   I don't remember the company name, but I
6    recall one of the principals.
7        Q.   Who is that?
8        A.   Colt Moody.
9        Q.   Okay.  Go on.  I'm sorry.
10       A.   Colt Moody and his partner, whose name I
11   don't recall, operated this white label website
12   hosted by CBC.  They used I don't know how many
13   affiliates or what forms of traffic, but they
14   generated sales for their white label website.
15       Q.   How did you know that Andrew Lloyd was
16   involved with those sales?
17       A.   I have no idea if Andrew Lloyd was
18   involved in those sales.
19       Q.   You mentioned him.  I didn't even ask.
20           MR. COCHELL:  Objection, misstates the
21   evidence.
22   BY MR. LEVINE:
23       Q.   Why did you mention Andrew Lloyd?
24           MR. COCHELL:  Same objection.
25       A.   I don't understand.

---

100

1        Q.   You said the words Andrew Lloyd.
2    We'll -- we can read -- go back over the
3    transcript.  Can you --
4        A.   I mean, it's possible I could be naming
5    the wrong names.  I'm trying to establish a
6    history of multiple people involved.  But I'm
7    telling you right now the link in the relationship
8    as I understand them.
9            So --
10       Q.   What is --
11       A.    -- we have Fragala, a referral partner
12   salesperson who referred a company to me to set up
13   a white label website.
14           I know one of the principals to be Colt
15   Moody.  Colt Moody is out there operating his
16   white label website doing whatever he can to grow
17   his site hosted by CBC.
18           At some point in time, he decided, I
19   don't want to do this anymore, for who knows what
20   reason.
21           At that point in time, Roger reached out
22   to me and said, "Hey, I was sending traffic or
23   referrals to Colt Moody's site; and I would like
24   to keep doing that through you."
25           And he came through a trusted line of

---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Brown

FTC v. Credit Bureau Center, et al.                                        12/13/2017

---

101

1    referrals, again, from Tom, through Colt, have a
2    good history, so I worked with him directly.
3          At this point in time, I have no
4    knowledge of Pierce, let alone Lloyd. All right?
5          Sometime after that, you know, Pierce
6    reaches out to me directly and says -- you know,
7    you presented this email -- says he's not working
8    with him anymore.
9          So it appears that Pierce is now working
10   with me directly, so I set up a relationship with
11   Pierce. At this point, I have no idea who Lloyd
12   is.
13         That's how we got to this email.
14     Q.   Now, at the time this email was sent,
15   you had apparently known Pierce long -- excuse me.
16         At the time this email had -- was sent,
17   you knew Roger Ferguson for a longer period than
18   you knew Danny Pierce, correct?
19     A.   Yeah. When this -- when I received this
20   email, this was my first time hearing Danny's name
21   or knowing who he is.
22     Q.   So when you testified earlier you didn't
23   know who Roger was, that wasn't true.
24     A.   I don't think I testified I don't know
25   who Roger is.

---

102

1      Q.   Well, you remembered who Danny Pierce
2    was, right?
3      A.   Can you play back the transcript?
4      Q.   Can't play it back.
5      A.   Read it back?
6      Q.   But you -- we don't have to read it
7    back.
8          You knew who Roger was when you received
9    this email, didn't you?
10     A.   Of course. He was an affiliate of mine.
11     Q.   Okay. CBC struggled to pay its bills,
12   didn't it?
13     A.   There were --
14         MR. COCHELL: Objection, form of the
15   question.
16     A.   There were periods of time when cash
17   flow was an issue.
18         Do you mind if we break for the restroom
19   again?
20         MR. LEVINE: Sure.
21         THE WITNESS: Thanks.
22         (Whereupon, a short break was
23         taken.)
24   BY MR. LEVINE:
25     Q.   Okay. So we were talking about paying

---

103

1    bills. CBC had to pay CSID for its credit data
2    services, correct?
3      A.   Correct.
4      Q.   Now showing you -- I'm about to show you
5    a document that's been marked for identification
6    as Exhibit 6.
7          (Whereupon Deposition Exhibit
8          No. 6 was marked for
9          identification by the court
10         reporter.)
11   BY MR. LEVINE:
12     Q.   Do you recognize this document?
13     A.   I believe so, yeah.
14     Q.   MBrown@ZoomCreditScore.com is your email
15   address?
16     A.   It was.
17     Q.   Dominic Mastronunzio, do you recognize
18   that name as someone from CSID?
19     A.   I do.
20     Q.   The subject line is "past due invoices,"
21   and it appears that you were extremely past due;
22   do you see that?
23     A.   Yes.
24     Q.   And that your company owed 46,000-plus
25   dollars, correct?

---

104

1      A.   Correct.
2      Q.   And that was in January of 2014,
3    correct?
4      A.   Yes.
5      Q.   Okay.
6      A.   The reason for this is that I believe
7    this was at the time when we had a merchant
8    account close, purportedly due to chargebacks; but
9    it was because of the bank Power Pay who had new
10   credit policies issued by EVO and instructed Power
11   Pay, the credit card processer, that free trial
12   merchants or negative option merchants are now on
13   the prohibited list.
14         And so they had gone through and
15   terminated contracts with merchants. And so at
16   that time, we were unable to process recurring
17   transactions for customers.
18         So we had a cash flow crunch until we
19   were able to find new credit card processing
20   because nothing changed with our business. It was
21   the credit policy of the bank who decided to no
22   longer work with free trial merchants for one
23   reason or another.
24     Q.   When did the cash crunch end?
25     A.   I don't recall.

---

26 (Pages 101 to 104)

Brown

FTC v. Credit Bureau Center, et al.                                    12/13/2017

---

105

1     Q.   Do you recognize Jerry Jensen, Fabian
2  Garcia, Tina Tripoli, and Juhee Lindley as CSID
3  employees?
4     A.   I believe I recognize all of them except
5  Juhee perhaps, but yes.
6           (Whereupon Deposition Exhibit
7            No. 7 was marked for
8            identification by the court
9            reporter.)
10  BY MR. LEVINE:
11     Q.   I'm now showing you a document that's
12  been marked for identification as Exhibit 7.
13     A.   Mm-hmm.
14     Q.   This is -- well, let's go through it.
15        Do you recognize this as another email
16  from CSID?
17     A.   Yes.
18     Q.   This one is to both your email
19  addresses, Mike@MyScore360.com and
20  MBrown@MyScore360.com; do you see that?
21     A.   Yes.
22     Q.   Do you recognize Jan Abasolo as an
23  account manager from CSID?
24     A.   Yes.
25     Q.   And we already talked about those names

---

106

1  on the cc.
2        This looks like your unpaid balance had
3  actually grown to $107,000; do you see that?
4     A.   Yes.
5     Q.   And do you recall owing $107,000 to CSID
6  in May 2014?
7     A.   Yes.
8        MR. LEVINE:  Okay?
9        MR. WARD:  (Nodding head.)
10  BY MR. LEVINE:
11     Q.   This is going to be Exhibit 8.
12        (Whereupon Deposition Exhibit
13          No. 8 was marked for
14          identification by the court
15          reporter.)
16  BY MR. LEVINE:
17     Q.   Mr. Brown, I'm showing you a document
18  that's been marked for identification as
19  Exhibit 8.
20        Do you know who Heather Havins is?
21     A.   Yes.
22     Q.   Who is she?
23     A.   She is someone who works for CSID --
24     Q.   And Tina --
25     A.   -- also known as Experian.

---

107

1     Q.   And Tina Tripoli we already talked
2  about, right?
3     A.   Mm-hmm.
4     Q.   Yes, yes?
5     A.   Yes.
6     Q.   At the bottom of Exhibit 8, do you see
7  that you wrote an email to Heather Havins and Tina
8  Tripoli?
9     A.   Yes.
10     Q.   And this was in July 2014?
11     A.   Yes.
12     Q.   Do you recall this email?
13     A.   Yes.
14     Q.   What prompted this email?  What prompted
15  you to send this email?
16     A.   I don't specifically recall, but it
17  appears to be an email about growth.
18     Q.   The last sentence, you say you want to
19  stick with our proposed payment schedule; do you
20  see that?
21     A.   Yes.
22     Q.   Is that an indication that you -- that
23  you were behind on payments with CSID?
24     A.   It's an indication that we came to an
25  agreement on an agreed payment schedule; and we

---

108

1  were -- you know, planned on honoring that agreed
2  schedule.
3     Q.   The first sentence, you say, "To confirm
4  our conversation, we started focusing on
5  developing our affiliate channel around November
6  and December of last year.  We are seeing great
7  growth with this channel."
8        Do you see that?
9     A.   Yes.
10     Q.   So was part of your plan to make good
11  with CSID to grow your affiliate traffic?
12        MR. COCHELL:  Objection, form of the
13  question.
14     A.   I don't read what you're reading here,
15  but can you rephrase the question?
16     Q.   No.  You can reread it.
17     A.   I don't understand your question.
18     Q.   Okay.  That's all right.
19        You're saying, "We are seeing great
20  growth with this channel.  Over the last six
21  months, we have gone from 4,000 active members to
22  now 12,000 active members and adding an increasing
23  3 to 5,000 new members per month."
24        Do you see that?
25     A.   Yes.

---

27 (Pages 105 to 108)

Brown

FTC v. Credit Bureau Center, et al.                                      12/13/2017

---

109

1    Q.   And you described this email as a growth
2  plan, right?
3    A.   Well, the subject of it is MyScore
4  growth, so we're definitely talking about growth.
5    Q.   And the growth you're referring to is
6  growing your traffic, right?
7    A.   Growing our business, yes.
8    Q.   And one of the ways you want to grow
9  that business is through an -- your affiliate
10  channel, correct?
11    A.   Correct.
12    Q.   And in the second paragraph, second to
13  last sentence, you say your goal in 12 months is
14  to be doing at least 1,000 new orders a day; do
15  you see that?
16    A.   Correct.
17    Q.   Okay.  So those are 1,000 -- strike
18  that.
19         Okay.  Okay.  This is going to be 9,
20  Exhibit 9.
21             (Whereupon Deposition Exhibit
22              No. 9 was marked for
23              identification by the court
24              reporter.)
25

---

110

1  BY MR. LEVINE:
2    Q.   Okay.  I'm showing you a document that's
3  been marked -- no, I'm not.
4         MR. COCHELL:  I personally have never
5  done that.
6  BY MR. LEVINE:
7    Q.   Mr. Brown, I'm showing you a document
8  that's been marked for identification as
9  Exhibit 9.
10         I believe you've already identified Tina
11  Tripoli and Heather Havins, the CSID folks,
12  correct?
13    A.   Yes.
14    Q.   And Mike@MyScore360.com is you, correct?
15    A.   Yes.
16    Q.   This appears to be an email indicating
17  that your company now owes a balance of $117,000;
18  do you see that?
19    A.   Correct.
20    Q.   So your balance had actually grown since
21  your cash crunch in January; is that accurate?
22    A.   Yeah.  We were essentially using CSID,
23  who appears to be very flexible in their payment
24  terms, to support cash flow.
25    Q.   Okay.

---

111

1    A.   And I want to also add that, you know, I
2  don't -- I wouldn't take this email as an
3  inability to pay as we didn't have that much money
4  in the bank account.
5         Typically I like to have balances that
6  are not zero or near zero in the bank account in
7  order to support any sort of cash flow need, so we
8  may have had greater than this in the bank account
9  at that time.
10    Q.   Okay.  I'm showing you a document that's
11  marked for identification as Exhibit 10.
12             (Whereupon Deposition Exhibit
13              No. 10 was marked for
14              identification by the court
15              reporter.)
16  BY MR. LEVINE:
17    Q.   Do you recognize it?
18    A.   Yes.
19         MR. COCHELL:  Do you have a copy for me?
20         MR. LEVINE:  Sorry.  I'm going too fast.
21         MR. COCHELL:  Thank you.
22         MR. LEVINE:  I got it.
23         MR. WARD:  Oh.
24  BY MR. LEVINE:
25    Q.   I'm sorry.  Do you recognize that?

---

112

1    A.   Yes.
2    Q.   What is the document?
3    A.   The document is email between myself and
4  CS Identity.
5    Q.   Kind of an email chain, right?
6    A.   Yes.
7    Q.   If you go to the second to last page at
8  the bottom, it's July 9th, 2015, do you see that,
9  second to last page?
10    A.   Okay.  Yes.  It says, "Hi Mike."
11    Q.   So this is almost a year after
12  Exhibit 9, correct?  This email was sent almost a
13  year after Exhibit 9 was sent, correct?
14    A.   Yes.
15    Q.   And Heather Havins in her email, which
16  is on if you look at the Bates Stamp 6274, says,
17  "You have outstanding balances and open invoices."
18         Do you see that?
19    A.   Yes.
20    Q.   So it's true that you continued to owe a
21  balance to CSID as of July 2015, correct?
22    A.   Yeah.  I mean, there's frequently times
23  where, you know, we may pay a bill late, have more
24  cash in the bank, especially given how flexible
25  CSID is.  We have net 30 payment terms; and we've

---

28 (Pages 109 to 112)

Brown

FTC v. Credit Bureau Center, et al.                                    12/13/2017

---

113

1    gone net 60, net 90, and it's been okay.
2         It's about managing a business and
3    managing cash flow.
4         Q.   Well, if you look at the second page of
5    Exhibit 10, it's an email from Heather Havins on
6    August 4th, 2015.  She says she's looking for
7    "consistent communication, in addition to the
8    payment.  I've continued to be an advocate for
9    your business, but going dark doesn't help my
10   case.  Please send payment and a proposed payment
11   schedule ASAP."
12        Do you see that?
13        A.   Yeah.  And I also see above that in that
14   email talks about, again, some sort of merchants
15   processing issue where we're unable to bill
16   existing merchants.
17        Again, I would assume by the bank that
18   purported to close an account due to chargebacks,
19   but it's in almost every case I've encountered, a
20   bank suddenly changes their risk profile with the
21   wind of the day that they no longer like free
22   trial businesses, and this is one of those
23   scenarios.
24        Q.   It certainly doesn't seem from these
25   emails that CSID was okay with your not paying

---

114

1    your bills on time, does it?
2         MR. COCHELL:  Objection; form of the
3    question, argumentative.
4         A.   CSID definitely has the ability to turn
5    off your credit data feed any they'd like.
6         I know we were a good profitable
7    customer for them, and I know they continued to
8    work with us through different payment terms over
9    the course of many years.
10        Q.   They were emailing you repeatedly to try
11   to get you to just respond, right?
12        MR. COCHELL:  Objection, misstates the
13   evidence.
14        A.   I don't think it says exactly that.
15        I mean, there's periods of time where I
16   may not be completely responsive, you know, I
17   might take a few days or more to respond; but, you
18   know, partners like having good communication.
19        Q.   And they wanted to get paid on time,
20   didn't they?
21        A.   Sure.  And they also love my business.
22        Q.   Okay.
23
24
25

---

115

1         (Whereupon Deposition Exhibit
2         No. 11 was marked for
3         identification by the court
4         reporter.)
5    BY MR. LEVINE:
6         Q.   Mr. Brown, I'm now showing you an
7    exhibit marked for identification as Exhibit 11.
8    Do you recognize the document?
9         A.   Yes.
10        Q.   What is it?
11        A.   It's an email between myself and CSID.
12        Q.   Between Trina Pirtle being a
13   representative of CSID?
14        A.   Yes.
15        Q.   CSID appears to be telling you that you
16   owe $50,000 approximately for July and another
17   hundred thousand dollar plus for August; do you
18   see that?
19        A.   The hundred thousand dollars is not due
20   yet.  It says it will be due on Friday.  The only
21   amount that's due in this email is $53,000.
22        Q.   And Trina also says, "We really need to
23   receive payments on time to keep your account
24   current."
25        Do you see that?

---

116

1         A.   That would make sense.
2         Q.   So this is the fourth or fifth email
3    where CSID was emailing you to pay your bills,
4    correct?
5         A.   Like I said, we frequently used CSID to
6    maintain high balances in our bank account; and we
7    like having five- and six-figure balances in the
8    bank account at all times, even if that means
9    paying an invoice a little late.
10        Q.   Well, you paid it late enough that CSID
11   forced you to agree to a payment schedule, didn't
12   they?
13        MR. COCHELL:  Objection, form of the
14   question.
15        A.   I don't think anybody forced us to do
16   anything.  I think we came to an agreement on us
17   being allowed to pay late.
18        Q.   If you turn to the second page of
19   Exhibit 11, that's the agreement you're referring
20   to?
21        A.   Yes, one of them.
22        Q.   If you turn to the -- "one of them"?
23   There were multiple agreement -- there were
24   multiple payment schedules you had to reach with
25   CSID?

---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Brown

FTC v. Credit Bureau Center, et al.                                    12/13/2017

117

1      A.   Sure.  We just went through a few emails
2  where we're talking about payment schedules, so
3  definitely.
4      Q.   Is that your signature on Page 435?
5      A.   Yes.
6      Q.   All right.  I think we're done with
7  Exhibit 11.
8           MR. LEVINE:  Go off the record for a
9  minute.
10           (Whereupon, discussion was held
11            off the record.)
12           MR. LEVINE:  Back on.
13  BY MR. LEVINE:
14      Q.   We just spent some time talking about
15  CBC's financials, correct?
16      A.   No.  I think we spent some time talking
17  about some payments to CSID.
18      Q.   Okay.  Are you familiar with the term
19  chargeback?
20      A.   Yes.
21      Q.   And what is a chargeback?
22      A.   Chargeback is when a bank -- I'm sorry.
23           A chargeback is when a consumer decides
24  not to contact the company or the merchant, so CBC
25  in this scenario, to ask for a refund; and instead

118

1  they contact the bank.
2      Q.   And ask for a refund because they are
3  dissatisfied for some reason?
4      A.   Could be any number of reasons they want
5  a refund.
6      Q.   And a chargeback is not good for a
7  merchant, right?
8      A.   I mean, besides having to refund that
9  customer in a chargeback scenario, we also get
10  charged a fee for a chargeback; so it's definitely
11  preferable for us to refund a customer.
12      Q.   And merchant processors, you're familiar
13  with that term?
14      A.   Yes.
15      Q.   Merchant processors track the chargeback
16  rate for any given merchant ID, correct?
17      A.   I would assume so, yeah.
18      Q.   You would assume, or do you know?
19      A.   You would have to check with the
20  merchant processors what they track; but I know
21  chargeback rates are recorded, right.
22      Q.   And the merchant processors you worked
23  with tracked chargebacks, correct?
24      A.   Yes.
25      Q.   Are you familiar with if chargeback

119

1  rates go high enough, are merchant processors, in
2  your experience, is it possible that they will
3  stop processing for a merchant?
4      A.   So the way a merchant processer works is
5  when you apply for a merchant account, it's
6  essentially a loan.  If I go to them and I say, I
7  need to process a hundred thousand dollars a month
8  in credit card transactions, the bank says, hey, a
9  consumer can call their bank and ask for a refund
10  six months after the first charge.
11           So the credit card processer looks at
12  every dollar you process through a merchant
13  account as a loan because you may get a dollar
14  today from a consumer, and they may change their
15  mind in six months.
16           So it's up to them to determine what
17  sort of risk they are comfortable with and how
18  much they let you process, what refund rates you
19  have, what chargeback rates you have in order for
20  them to have a compliant and profitable account.
21      Q.   And the way these merchant processors
22  view the merchant is through the concept of a
23  merchant ID; is that right?
24      A.   There is an identifier for each merchant
25  account, yes.

120

1      Q.   It's called a MID or merchant ID.
2      A.   Correct.
3      Q.   And can one merchant have multiple MIDs,
4  M-I-D-s?
5      A.   Sure.
6      Q.   Are you familiar with the term load
7  balancing?
8      A.   Yes.
9      Q.   And what is load balancing?
10      A.   Load balancing would be balancing the
11  load.
12      Q.   You got --
13      A.   In what --
14      Q.   -- to be more specific.
15      A.   -- context are you referring to load
16  balancing?
17      Q.   That's fair.  Load balancing in the
18  context of -- load balancing in the context of
19  chargebacks among multiple MIDs.
20      A.   I mean, I don't think -- I mean, you can
21  load balance transactions.  You can't pick where a
22  chargeback goes unfortunately.
23      Q.   And why would you load balance
24  transactions?
25      A.   Because different banks have different

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Brown

FTC v. Credit Bureau Center, et al.                                    12/13/2017



121

1    risk profiles. And like we pointed out in the
2    previous example, some banks may change credit
3    policies with the wind. They may love a free
4    trial negative option merchant one month; next
5    month, they may not.
6         So it's always a good idea and a good
7    business practice to at least have two merchant
8    accounts per site so not only the descriptor can
9    accurately match on the consumers' billing
10   statement, but you have some sort of redundancy
11   for your business.
12        Q.   And if the chargeback rate for one MID
13   gets too high, can you then balance it by
14   rerouting sales to the other MID?
15        A.   What do you mean by "too high"?
16        Q.   Well, there's a point at -- you said the
17   different merchant processors have different risk
18   tolerance, correct?
19        A.   Correct.
20        Q.   And how do they measure -- at some
21   point, a merchant becomes too risky; and they
22   won't do business with them, right?
23        A.   You have to ask the merchants how they
24   come to those decisions, but there are numerous
25   factors they take into consideration in an

122

1    account. It could be their credit policy, credit
2    of the individual, such as myself, to open up the
3    merchant account. It could be the type of offer
4    that it is.
5         Q.   What about the chargeback rate?
6         A.   Could be how many chargebacks you have
7    on the account. Could be the refund rate. Could
8    be the percent of charges that go through
9    successfully. Could be the address verification
10   rate, the CVV verification rate.
11        There's a number of -- a high number of
12   factors that go into analyzing an account.
13        Q.   Did you testify earlier that you started
14   doing business with Danny Pierce in around
15   September 2014?
16        A.   I think it was around then, yeah.
17        Q.   And he was an affiliate marketer for
18   you?
19        A.   Yes.
20        Q.   And about that time, chargebacks became
21   a problem for CBC, didn't they?
22        A.   I don't agree with that statement.
23        Q.   Okay.
24        A.   And the reason I don't agree with this
25   is because there are set rules by Visa and

123

1    Mastercard which describes when chargebacks
2    require further looking into.
3         Q.   Okay.
4              (Whereupon Deposition Exhibit
5              No. 12 was marked for
6              identification by the court
7              reporter.)
8    BY MR. LEVINE:
9         Q.   All right, Mr. Brown. I'm showing you a
10   document I marked for identification as
11   Exhibit 12. Do you recognize it?
12        A.   I believe so.
13        Q.   And what is it?
14        A.   It's an email between myself and an
15   underwriter at a credit card processer.
16        Q.   Which is like a merchant processer like
17   we were just talking about, right?
18        A.   Correct.
19        Q.   So you recognize
20   Underwriting@VantagePayments.com as being the
21   email of a representative of a merchant processer?
22        A.   Yes.
23        Q.   Same with Dustin@VantagePayments.com and
24   KenMusante@VantagePayments -- @EurekaPayments.com?
25        A.   I know the name Ken. I don't know who

124

1    Dustin is.
2         So, I mean, in this email, just like the
3    interaction with almost every merchant account
4    provider, they may change credit policies with the
5    wind; and instead of telling you, hey, we as a
6    bank changed our policy on who we work with, they
7    say, we have an issue with chargebacks.
8         Now, the reason they say that is because
9    now they have an excuse to hold onto your reserve.
10   A lot of these companies hold six-figure reserves,
11   sometimes more, sometimes less, right?
12        And if they tell you, we changed our
13   credit policy, then you're going to want those
14   reserves back because it's not because of us, it's
15   because of them.
16        All right. If they say that suddenly
17   your account is having a chargeback issue, and I
18   say that in air quotes, then now they can hold
19   onto your reserve for 6, 9, maybe even 12 months
20   (indicating).
21        Q.   You put chargeback in air quotes. Is it
22   your contention that Vantage Payments wasn't
23   accurately counting your chargebacks?
24        A.   No. What I'm stating is Visa and
25   Mastercard has chargeback guidelines that we were

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Brown
FTC v. Credit Bureau Center, et al.                                      12/13/2017

125

1   in compliant with -- in compliance with, and we
2   did not exceed those chargeback guidelines working
3   with Vantage.
4        But Vantage above and beyond those
5   guidelines decided they wanted to close the
6   account due to purportedly chargebacks.
7   **Q.   Well, Vantage literally said you did**
8   **exceed their chargebacks.  They said you had**
9   **excessive chargebacks; and he had terminated your**
10  **merchant account, didn't they?**
11       A.   No.  So the way it works is Visa and
12  Mastercard have certain rules that they follow
13  regarding chargebacks.  And I'll break it down how
14  it works.
15       So they have different programs.  You
16  have the normal Visa merchants.  If you go above a
17  certain threshold, you go into a chargeback
18  monitoring program, which gives you a certain
19  number of months --
20  **Q.   Certain threshold of what?**
21       A.   Chargeback-to-sale ratio.
22       So if you go above a certain ratio, they
23  give you, I think it's about three months,
24  sometimes six, depends, to work out your ratio to
25  get to a lower ratio.

126

1        After that, if you don't successfully do
2   that, you may go on to the next chargeback
3   program, which is a little bit more strict.  It's
4   called the High-Risk Chargeback Monitoring
5   Program.  And they give you an additional workout
6   period to come into compliance.
7        So we did not even get into the
8   chargeback monitoring program as defined by Visa.
9   In fact, we were not even on Visa's radar.
10       But suddenly we get hit with this
11  undefined term of excessive chargebacks that our
12  account is closed, so we did not even go through a
13  chargeback monitoring program at any point in time
14  with Vantage.
15  **Q.   When you responded to Vantage, you said,**
16  **"I will not throw any new customers at it," or you**
17  **suggest that that is an option for keeping it**
18  **open.**
19       **Do you see that?**
20       A.   Correct.
21  **Q.   Was that kind of an example of**
22  **balancing, what we were talking about earlier?**
23       A.   This is an example of helping Vantage
24  understand that there's other ways they can
25  mitigate their risk.  It's not necessarily an on

127

1   or off switch with an account.  A lot of it has to
2   do with volume, right?
3        So if they may be uncomfortable, for
4   example, with the amount of volume we put on the
5   account, if we put a hundred thousand dollars on
6   the account, maybe we're only approved for $75,000
7   a month, they may close it due to chargebacks.
8        But in reality, it may not -- have
9   nothing to do with it.  They are just
10  uncomfortable with the volume.  So that's kind of
11  the go-to answer.
12       So I'm pointing out that we can lower
13  the volume, which would probably lower the
14  chargebacks as well --
15  **Q.   You said no new volume.**
16       A.   Lower the volume, decrease it.  It says
17  right here, "Volume will decrease every month," so
18  decrease the volume on the accounts, which should
19  decrease the volume of chargebacks as well.
20  **Q.   And you say you wanted to work on**
21  **reducing chargebacks; do you see that?**
22       A.   Correct.
23  **Q.   Did you want to work on reducing**
24  **chargebacks, or were you just saying that?**
25       A.   No.  We've always worked on reducing

128

1   chargebacks.
2   **Q.   So when you put them in air quotes, you**
3   **do care about chargebacks, don't you?**
4        A.   Definitely.
5   **Q.   So they hit your bottom line --**
6        A.   Cost us money, yes.
7        THE REPORTER:  You have got to speak a
8   little slower and one at a time, please.
9        MR. LEVINE:  I apologize.
10  BY MR. LEVINE:
11  **Q.   And if you had too many chargebacks, you**
12  **can lose a merchant account, right?**
13       A.   It's up to the merchant processer to
14  determine what risk they want to have on an
15  account.
16       And I will say, we have never gone
17  through a chargeback monitoring program, not
18  coming into compliance with it, causing a merchant
19  account to be closed by the card issuers, never.
20       MR. COCHELL:  Can you mark the question
21  about not wanting to -- reducing -- that they
22  wanted to reduce chargebacks?  I want to come back
23  to that.
24  BY MR. LEVINE:
25  **Q.   You said, "Volume will decrease every**

32 (Pages 125 to 128)

Brown

FTC v. Credit Bureau Center, et al.                                    12/13/2017

---

129

1    month till the existing membership base runs out."
2         What did you mean by that?
3         A.   Meaning the credit card processer has an
4    opportunity to keep the relationship, keep the
5    account open, while accomplishing their supposed
6    goal of excessive chargebacks.
7         So if you reduce your volume and the
8    chargebacks go down, then they would no longer be
9    excessive.
10        So if we stopped sending new business to
11   this credit card processer and let old business
12   continue to process, customers cancel every month;
13   so it's going to be a forever decreasing curve of
14   lower volume and lower chargebacks.
15        So if the credit card processer was
16   truly interested in excessive chargebacks, then
17   they would quickly become nonexcessive had we
18   stopped sending new traffic to it.
19        That's another reason I don't believe
20   they are being fully honest and transparent on
21   what the true reason is.
22        Q.   Okay.  Now, when you say new business or
23   new traffic, your plan here wasn't to cut off new
24   traffic.  It was to send it to a different
25   merchant ID, correct?

---

130

1         A.   Correct, through a merchant that's
2    comfortable accepting new orders and comfortable
3    with our growth.
4         Q.   Did you have any reason to believe that
5    your new traffic would have a higher chargeback
6    rate than your current traffic?
7         A.   I don't understand the question.
8         Q.   Well, you say that your goal is to
9    reduce chargebacks.  You say in the email,
10   Exhibit 12, the goal is to reduce chargebacks and
11   that you'll do it by keeping the existing
12   membership base with Vantage but moving new
13   traffic to another MID; is that accurate?
14        MR. COCHELL:  Objection, objection,
15   misstates his testimony.
16        MR. LEVINE:  I'm not quoting his
17   testimony.  I'm quoting the email, so --
18        MR. COCHELL:  You're not quoting the
19   email.  There's nothing in there that says that
20   his goal was to reduce excessive chargebacks.
21   BY MR. LEVINE:
22        Q.   Well, you say -- you say, Mr. Brown,
23   don't you, that you will work on reducing
24   chargebacks, right?
25        MR. COCHELL:  Where?  That's not --

---

131

1    you're referring to Exhibit 12.  It doesn't appear
2    on Exhibit 12.
3         MR. LEVINE:  Do you have an objection,
4    Steve?
5         MR. COCHELL:  I do.
6         MR. LEVINE:  What is it?
7         MR. COCHELL:  You're misstating the
8    evidence.
9    BY MR. LEVINE:
10        Q.   You said you want to work on reducing
11   chargebacks; do you see that?
12        A.   Are you talking about in the email?
13        Q.   Yes.
14        MR. COCHELL:  I stand corrected.  I'm
15   sorry.  It's on the third sentence.  I didn't see
16   that, "reducing CB's."  Okay.
17        A.   Yeah.  As a general policy, like I said,
18   we always want to reduce chargebacks because it's
19   more profitable to us to interact with the
20   customer and issue a refund.
21        Q.   I understood.
22        And for future reference, CB, can we use
23   that as meaning chargeback, fair?
24        MR. COCHELL:  Yeah.  It's my mistake.
25   BY MR. LEVINE:

---

132

1         Q.   Okay.  We're all on the same page?
2         A.   Yes.
3         Q.   Okay.  No problem.
4         MR. COCHELL:  There's a lot of acronyms
5    here.
6         MR. LEVINE:  I know it.
7         This is going to be 13.
8             (Whereupon Deposition Exhibit
9              No. 13 was marked for
10             identification by the court
11             reporter.)
12   BY MR. LEVINE:
13        Q.   Okay.  Mr. Brown, I'm showing you a
14   document that's been marked for identification as
15   Exhibit 13.  Do you recognize it?
16        A.   Yes.
17        Q.   What is it?
18        A.   Sorry.  I don't recognize this email in
19   particular, but I recognize it as an email.
20        So it looks like it's an email between
21   myself and Sara Best, who I don't recall who she
22   is.  But it looks like she's a -- someone who
23   assists in obtaining a merchant account.
24        Q.   What about Maria Luisa, Maria Luisa
25   De Luca; do you recognize that name?

---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Brown

FTC v. Credit Bureau Center, et al.                                      12/13/2017

---

133

1      A.   I don't recall her name.
2      Q.   Do you recognize her email address?
3      A.   No.
4      Q.   Do you remember you used the email
5   address -- excuse me.
6           Mike@MyScore360.com is your email
7   address though, correct?
8      A.   Yes.
9      Q.   And you were the only one with access to
10  that email, correct?
11     A.   Yes.
12     Q.   Okay.  So let's turn to the second page
13  of Exhibit 13.  So this is February 25th --
14  February, actually, 18th, 2015.  It's the same day
15  that you got the email.  It's the same day that
16  you sent the email we discussed on Exhibit 12.  Do
17  you see that?
18     A.   Yes.
19     Q.   Okay.  And you write on February 18th,
20  2015, at 2:57 p.m., "We had an account closed with
21  Humboldt, so EMB would be the only option.  I need
22  a replacement account fast.  Chargebacks are
23  high."
24          Do you see that?
25     A.   Yes.

---

134

1      Q.   So your chargeback rate as of February
2   2015 was high.
3      A.   I mean, I also go to say that it's
4   always below the limit.  So we're constantly
5   within the limit to comply with the Visa and
6   Mastercard limitations.
7           And like I said before, we have never
8   ever had an account close by Visa or Mastercard
9   after exceeding a chargeback monitoring program.
10     Q.   And the limit is a hundred?
11     A.   Limit is a hundred or a percentage.
12     Q.   Let's go to the first page of
13  Exhibit 13.  It looks like you sent Maria Luisa
14  De Luca some statements on February 18 at 3:11
15  p.m.  Do you see that?
16     A.   Correct.
17     Q.   And she responds, "You had 128
18  chargebacks in January and 134 in December."
19          Do you see that?
20     A.   Sorry.  What page are we on?
21     Q.   First page of Exhibit 13.
22     A.   Okay.
23     Q.   Do you see that?
24     A.   Yes.
25     Q.   Were the statements you sent accurate?

---

135

1      A.   If they were from the bank, I would
2   assume so.
3      Q.   So you actually blew way past the limit
4   of a hundred chargebacks, didn't you?
5      A.   She's not specifying.  There's no limit
6   on a hundred chargebacks total.  There's a limit
7   of a hundred chargebacks per Visa.
8      Q.   Per month, right?
9      A.   Per month.
10     Q.   It says --
11     A.   I don't know how many of these are from
12  Visa, and that's not a hard limit.
13     Q.   Well, Maria De Luca says, "I doubt any
14  processer would want to touch the account."
15          And you went to her to open up a
16  merchant ID, right?
17     A.   Correct.
18     Q.   So you were relying on her to navigate
19  this process of obtaining a MID, correct?
20     A.   Yeah.  The way the process works is --
21     Q.   I'm just asking you if you relied on her
22  to manage the MID, and then I'll let you say
23  whatever you want.
24     A.   Sorry.  I don't think I can answer that
25  as a yes or no question.

---

136

1           So I'm going to say that these people
2   work as an agent or contractor with multiple
3   banks.  So a person like Maria will have contacts
4   with certain banks, and they may be different than
5   the next person who has contacts with different
6   banks.
7           So while it's true that Maria may not
8   have a home for this type of business with this
9   type of statements, I can tell you with certainty
10  we found a bank who is comfortable with our risk
11  and who will happily take our business.
12     Q.   Well, who is "we"?
13     A.   I'm saying myself and CBC when I say
14  "we".
15     Q.   But you go ahead and tell her the next
16  day, midnight, that you're going to set up a whole
17  new corporation with a whole new signer so you can
18  start up a MID, right?
19     A.   That's what I wrote in the email, yep.
20     Q.   And do you remember doing that?
21     A.   I need to see an email that reflects or
22  refresh my memory.  But 2015, I think -- I think
23  we did that with Tom.
24     Q.   Tom Fragala?
25     A.   Tom Fragala, yeah.

---

34 (Pages 133 to 136)

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Brown

FTC v. Credit Bureau Center, et al.                                    12/13/2017

137

1      Q.  So you say that your corporation could
2  have set up a bank account -- a merchant account
3  elsewhere, but you felt at the time that you
4  needed to set up a whole new company just so
5  merchants would process your traffic -- excuse me,
6  process your transactions, right?
7      A.  I think that when you have a company
8  that has -- is fresh, you may be -- may be better
9  off than existing company.
10     Q.  What I said correct then, isn't it?
11     A.  Can you repeat that?
12         MR. LEVINE:  Can you repeat it, please?
13             (Whereupon, record was read as
14             requested.)
15     A.  I think that completely misstates what's
16  happening here.
17         So CBC has, and always has had for quite
18  a period of time, multiple relationships with
19  multiple merchants.
20         So it just so happens that Nick with
21  underwriting@Vantage decided to not process this
22  account, and I wanted to find a new home for this
23  particular account.
24         So we have the option of moving this
25  traffic to any of our existing relationships or

138

1  establishing a new one.
2         So that completely mischaracterizes this
3  email.
4      Q.  But Luisa says you need a new signer, a
5  new corp, a new URL, a new name, a new address,
6  and a new phone number.
7         Do you see that?
8      A.  Yeah.  This would be an option, right.
9  We have --
10     Q.  Why would you -- I'm sorry.  Go ahead.
11     A.  Again, like I said, we always have had
12  multiple relationships with merchant banks.  We
13  have the option to move this volume anywhere.
14     Q.  So if it were so easy to move the volume
15  anywhere, why would you go through the trouble of
16  setting up a new URL, a new name, a new address,
17  and a new phone number with a new signer?
18     A.  Because like I mentioned earlier, a lot
19  of these banks limit -- a lot of these banks view
20  credit card processing almost as a loan.
21         Think of it as a credit line where I may
22  be approved only up to a hundred thousand dollars
23  a month on one account.  And while I may be able
24  to go over that, it's a soft limit, there are
25  risks in doing that.

139

1         So it's --
2      Q.  But you said it would be easy for CBC to
3  get a merchant account under its own name.  That's
4  not true, is it?
5      A.  We -- we haven't had any significant
6  problems getting accounts.
7      Q.  Well, there --
8      A.  There has been periods --
9         THE REPORTER:  One at a time, please.
10     A.  There has been periods of time where
11  there has been tightening in the credit card
12  processing market, largely in part due to FTC
13  actions and different things out there in the
14  industry.
15         People change their view on our type of
16  business, for example, not wanting to do business
17  with negative option, which is kind of frequent.
18         So EVO might love us one day, Power Pay
19  might love us the other, Humboldt might love us
20  the next day.  It's a constant shifting scenario
21  where we're constantly wanting to work with a
22  business who values our traffic.
23     Q.  When you say "our" though, you actually
24  had to set up a new company to get anyone's
25  business, didn't you?

140

1      A.  No, because CBC always had credit card
2  processing.
3      Q.  You had Tom Fragala set up his own
4  processing, correct?
5      A.  Tom Fragala helped with credit card
6  processing, but CBC always had credit card
7  processing.
8      Q.  But you had him create a new corporation
9  just to sign up a merchant processer, correct?
10     A.  He offered to help with credit card
11  processing.
12     Q.  And you decided to go through those
13  steps rather than seek a merchant processer on
14  your own, correct?
15     A.  We were doing both in parallel.
16     Q.  Okay.  I think I'm done with 13.
17             (Whereupon Deposition Exhibit
18             No. 14 was marked for
19             identification by the court
20             reporter.)
21  BY MR. LEVINE:
22     Q.  Okay.  Mr. Brown, I'm showing you a
23  document that's been marked for identification as
24  Exhibit 14.  Do you recognize the document?
25     A.  Yes.

35 (Pages 137 to 140)

Brown

FTC v. Credit Bureau Center, et al.                                12/13/2017

---

141

1      Q.   What is it?
2      A.   It's an email between myself and Larry
3   at Service First Financial.
4      Q.   So that's ServiceFirst@earthlink.net,
5   that's Larry?
6      A.   Yeah, Larry Cohn.
7      Q.   So you know who he is?
8      A.   Yes.
9      Q.   Who is he?
10     A.   He is a representative or a sales rep
11  for multiple banks or merchant account providers.
12     Q.   Kind of like the lady Maria Luisa in
13  Exhibit 13, right?
14     A.   Yeah, in one way or another.
15     Q.   And actually this was the -- Exhibit 14
16  was the same day you had received an email from
17  Maria Luisa De Luca in Exhibit 13, correct?
18     A.   I'm sorry.  Can you repeat that?
19     Q.   The email you sent on the second page of
20  Exhibit 13 -- excuse me, of Exhibit 14 was sent on
21  the same day as the email Maria Luisa sent on the
22  first page of Exhibit 13; do you see that?
23     A.   Yes.
24     Q.   Okay.  And after Maria Luisa told you
25  that no processer would touch the account, you

---

142

1   asked Larry whether he had any good offshore
2   options.  What did you mean?
3      A.   So I mean that Maria obviously didn't
4   have a sufficient Rolodex of companies who would
5   appreciate this type of business, so I reached out
6   to someone who might have different contacts and
7   different relationships with banks that will
8   accept this risk.
9          So in this email, he looks to talk about
10  a credit card processer called Synovus; and we're
11  talking about offshore credit card processing
12  options because, you know, Visa EU has different
13  chargeback rules and regulations to where banks
14  may be more comfortable with the risk.
15     Q.   But you weren't -- he could not identify
16  any domestic merchant processer who would work
17  with you, correct?
18     A.   I don't -- does it say that somewhere?
19     Q.   Well, on Page 2 of Exhibit 14, he says,
20  "I don't have another place domestically."
21     A.   Yeah.  According to this email, he says
22  he doesn't have a place domestically for credit
23  monitoring, not anything to do with our
24  chargebacks, just the credit monitoring business
25  in general.

---

143

1          If you'll notice at the end of
2   Exhibit 14, it says, do you have any -- asking
3   about the credit monitoring model, he says, "I
4   don't have a place domestically."
5      Q.   Well, he says that after he says, "You
6   were terminated at Humboldt and flagged by Visa."
7          So he was talking about you, correct?
8      A.   I take this to believe that his only
9   relationship for the credit monitoring model is
10  Humboldt, whom we had a relationship with
11  previously; so that was not an option.
12     Q.   So it was your understanding that Larry
13  Cohn had no domestic options for MID -- no
14  domestic MIDs for any credit monitoring business?
15     A.   According to this email, I said, Do you
16  have any options for the credit monitoring model?
17  Larry replies, I see you're with
18  Humboldt.  "I don't have another place
19  domestically."
20     Q.   He doesn't say, I see you're with
21  Humboldt.  He says they terminated you --
22     A.   Yeah --
23     Q.   -- and we know --
24     A.   -- "terminated at Humboldt, and I don't
25  have another place domestically."

---

144

1          So this leads me to believe this was the
2   only option for the credit monitoring model that
3   he had domestically.
4      Q.   Okay.
5      A.   Which is an example of a tightening that
6   I was referring to in the credit card processing
7   space.
8      Q.   Okay.
9      A.   It's not a good situation where there's
10  only one bank in the U.S. apparently who will take
11  this type of model.
12     Q.   All right.  I'm now showing a document
13  that's been marked for identification as
14  Exhibit 15.  Take a look at it.  Tell me if you
15  recognize it, please.
16          (Whereupon Deposition Exhibit
17           No. 15 was marked for
18           identification by the court
19           reporter.)
20     A.   Yep.
21     Q.   You do recognize that?
22     A.   Yes.
23     Q.   Okay.  And I see a number of names on
24  this.  I see your name and email; do you see that?
25     A.   Mm-hmm.

---

36 (Pages 141 to 144)

Brown

FTC v. Credit Bureau Center, et al.                                    12/13/2017

---

145

1      Q.   Yes?
2      A.   Yes.
3      Q.   You see Tom Fragala, who we talked about
4  earlier, right?
5      A.   Yes.
6      Q.   That's his email, Tom@mytruston.com?
7      A.   Yes.
8      Q.   You also see Nick Qualman, Vantage
9  Payments.  We saw him earlier, right?
10     A.   On the email below, yes.
11     Q.   That's the same Nick Qualman who
12  appeared on Exhibit 12 from @VantagePayments,
13  right?
14     A.   Yes.
15     Q.   Who had terminated your -- or who had
16  notified you that your MID was terminated, right?
17     A.   Yes.
18     Q.   So it looks like Nick from Vantage is
19  now working directly with Tom Fragala; is that
20  right?
21     A.   Yes.
22     Q.   Do you recall that?
23     A.   Yes.
24     Q.   And was this the situation in which you
25  asked Tom Fragala to set up a new company and

---

146

1  apply for a MID?
2      A.   At the time, I believe I reached out to
3  him to ask if he had any contacts regarding credit
4  card processing.
5           And I'm not a hundred percent confident,
6  but I think that might be who this Maria girl was
7  because I don't remember her.  I think she might
8  have been referred by Tom.
9           And when she was unable to help, I think
10  this is when Tom offered to help.
11     Q.   Help by applying for a MID on his own?
12     A.   Correct.
13     Q.   With a new corporation?
14     A.   Correct.
15     Q.   Let's turn to the second page of
16  Exhibit 15, please.  Was that new corporation
17  ScoreOutlook.com?
18     A.   No.
19     Q.   What was the new corporation?
20     A.   I believe it was called Online Credit
21  Systems.
22     Q.   And the d/b/a was ScoreOutlook.com?
23     A.   Yes.
24     Q.   That table you see with the number under
25  merchant, is that the merchant ID number?

---

147

1      A.   Yes.
2      Q.   But this was your business ultimately,
3  right?
4      A.   No.
5      Q.   Tell me what you mean.
6      A.   Tom was set up as a white label
7  customer.  He had a white label agreement with
8  CBC.  He had his own company, Online Credit
9  Systems, and his own domain that he purchased and
10  had, ScoreOutlook.com.
11          And now I was unable to grow my business
12  further under my personal credit, and he offered
13  to help and became a white label customer.
14     Q.   But your personal business in part, not
15  completely, but in part, relied on this merchant
16  ID referenced in Exhibit 15, correct?
17     A.   I don't understand what you're saying.
18  I think you're misstating what this says.  So --
19     Q.   Okay.  Let's go through it --
20     A.   -- as a sole owner of CBC, there's
21  certain limits on how I can grow on my own
22  personal credit.
23          Tom offered to jump in and help with the
24  growth and did that in the form of a white label
25  website.

---

148

1      Q.   You see at March 16th, 2015, at 2:13
2  p.m., Tom forwarded his exchange with Nick
3  Vantage, right -- Nick from Vantage?
4      A.   Yes.
5      Q.   And you tell Tom Fragala how to reply.
6      A.   Yeah.  I was giving him feedback.  I
7  believe this was a new process to him, interacting
8  with merchant account providers; so I was
9  definitely there to help him along the way.
10     Q.   Well, this isn't feedback.  This is
11  you're ghostwriting an email, right?
12     A.   I think you're mischaracterize it.
13     Q.   You said, "Reply with this, colon."
14          And then you write some things down.
15          Is it your testimony that you were not
16  telling Tom Fragala to reply with a text that
17  follows the phrase, "Reply with this"?
18     A.   I see what you're talking about on the
19  first page, so, yeah.  I was definitely giving him
20  information on how to reply.
21     Q.   And why would you have had this
22  information if this was Tom's business?
23     A.   Because Tom has his own separate
24  business, and we are directing -- directing
25  traffic to that business.  So if he's looking for

---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Brown

FTC v. Credit Bureau Center, et al.                                    12/13/2017

---

149

1    guidance on forecasting, that's something I would
2    be able to provide him.
3        Q.   Which traffic?
4        A.   The traffic on ScoreOutlook.com.
5        Q.   Would that include traffic generated by
6    Danny Pierce?
7        A.   I would need to see the database to tell
8    you specifically what traffic that was.
9        Q.   So when you tell him to say, "I stopped
10   all new orders to the site to prevent it from
11   going to a hundred," what was your basis for
12   telling him to say that?
13       A.   It appears to be immediately below from
14   Nick, he said, Hey, do you think you can "stay
15   under a hundred through the rest of the month?"
16           And so the basis was in order to comply
17   with the requests, that's how we did it.
18       Q.   Were you stopping orders, or was Tom
19   Fragala stopping orders?
20       A.   We were working with him to work within
21   the parameters of his merchant account.
22       Q.   Can you clarify that?
23       A.   I was working with Tom to work within
24   the parameters of his merchant account for that
25   white label website.

---

150

1        Q.   What do you mean, "work within the
2    parameters"?  Do you mean get --
3        A.   In other words, his merchant processing
4    company made a request to stay within a certain
5    limit; and I worked with Tom to honor that request
6    to stay within that limit.
7        Q.   And how -- what were you going to do to
8    help honor that request?
9        A.   It has to do with volume of traffic and
10   orders.
11       Q.   So you controlled the volume of traffic
12   that went to Tom's white label site?
13       A.   Definitely I don't think I -- that's an
14   accurate characterization of this.
15           So I worked with Tom to determine what's
16   acceptable for his site.
17           Again, going back to my site, every site
18   and processer has certain predefined limits, just
19   as Tom's site, ScoreOutlook.com.
20           So, again, we want to work with the
21   banks in good faith hand in hand and work within
22   those limits, which is what we're doing in this
23   email.
24       Q.   Where was Tom Fragala getting traffic
25   for ScoreOutlook.com?

---

151

1        A.   Again, we would need to see the
2    database.
3        Q.   But you would have had access to the
4    database as of March 2015, correct?
5        A.   Correct.  Both myself and Tom would have
6    had access.
7        Q.   And you would have been able to see the
8    source of the traffic that was going to white
9    label -- that was going to ScoreOutlook.com,
10   correct?
11       A.   I mean, everything is recorded in the
12   database; so --
13       Q.   So the answer is yes?
14       A.   Would we be able to see?  You're asking
15   me if I can see the data or if it's there?  I
16   don't understand.  Can you clarify?
17       Q.   Would you have been able to see the
18   source of the data?
19           You said that everything was in the
20   database, right?
21       A.   Everything is in the database, correct,
22   yes.
23       Q.   Go to the second page of Exhibit 15.
24   Tom tells Nick, "It must be a rogue traffic source
25   from a CPA network."

---

152

1            Do you know what he meant by that?
2        A.   No.
3        Q.   But you would have been able to identify
4    that traffic source in the CRM, right?
5        A.   I don't know what rogue traffic source
6    he's referring to.
7        Q.   Well, I know that; but you could have
8    determined it, right?
9        A.   This is not an email to me.
10       Q.   That's right.  But I'm asking you if you
11   would have been able to determine the traffic
12   source.
13       A.   If there's a customer I can relate to an
14   affiliate, then, yes, I can determine this
15   customer came from this affiliate.
16       Q.   After receiving this email, did you
17   undertake any effort to identify what Tom Fragala
18   called a rogue traffic source?
19       A.   This wasn't in an email to me.  And this
20   is on his white label website.  So I got no
21   instructions from Tom to investigate what he's so
22   calling a rogue traffic source.
23       Q.   That didn't give you some concern that
24   there was a reference to a rogue traffic source?
25       A.   This is on his website in his merchant

---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Brown

FTC v. Credit Bureau Center, et al.                    12/13/2017

---

153

1    account, on his white label website.
2        Q.   Yeah.  But you're telling him what to
3    say and how to manage the traffic.  You had
4    control over it, didn't you?
5        A.   What I'm doing is I'm working with Tom
6    to follow the guidelines issued by the merchant
7    bank.
8        Q.   Okay.  So you're working to follow the
9    guidelines; and one of those guidelines involved
10   chargebacks, right?
11       A.   One of the guidelines involved what type
12   of volume they wanted to see on the account for
13   the rest of the month.
14       Q.   And one of the -- answer my question
15   now.
16            One of the guidelines involved
17   chargebacks, right?
18       A.   One of the guidelines for what?
19       Q.   One of the guidelines that you just
20   referred to that the merchant processer had in
21   place involved keeping the chargebacks under a
22   certain figure, correct?
23       A.   That was the request from Vantage,
24   correct.
25       Q.   And you were working with Tom, you just

---

154

1    testified, to bring him into compliance, right?
2        A.   It's not that he was out of compliance.
3        Q.   I'm not asking that.  I'm just asking,
4    that's what you were trying to do.
5        A.   You said to bring him in compliance as
6    if he wasn't in compliance.
7             This is a request from the bank.  They
8    only want to see a certain amount of volume.  I
9    helped Tom craft a response to deal with this
10   process.
11       Q.   So Tom says -- so Nick wrote, "Your
12   account is trending to break a hundred
13   chargebacks."
14            And Tom says that "must be a rogue
15   traffic source," as in a traffic source that's
16   generating -- whose customers are generating a lot
17   of chargebacks.
18            That's how that would be interpreted,
19   right?
20       A.   You would have to ask Tom.
21       Q.   But having read this email, you didn't
22   do anything to investigate the possibility of a
23   rogue traffic source, did you?
24       A.   Again, this wasn't an email that was
25   directed to me.  I think you're misinterpreting

---

155

1    this.
2        Q.   But you told Tom how to reply, so you
3    must have read it.
4        A.   I told --
5            MR. COCHELL:  Objection; form of the
6    question, argumentative.
7        A.   If you'll read my reply, my reply was in
8    response to the email from Nick, "Can you stay
9    under a hundred for the rest of the month?"
10           That's what my reply is helping him
11   with.
12       Q.   Tom was your business partner, right?
13           MR. COCHELL:  Objection, form of the
14   question.
15   BY MR. LEVINE:
16       Q.   You worked with Tom, right?
17       A.   I worked with Tom.
18       Q.   You were trying to help Tom stay in
19   compliance, right?
20           MR. COCHELL:  Objection, form of the
21   question.
22       A.   I was helping Tom with a request from a
23   merchant bank.
24       Q.   Did you speak to Tom regularly?
25       A.   Yes.

---

156

1        Q.   On the phone?
2        A.   Yes.
3        Q.   In text?
4        A.   Yes.
5        Q.   In email?
6        A.   Yes.
7        Q.   Did Tom ever say, I think I have a rogue
8    traffic source and that's why we're having all
9    these problems?
10           MR. COCHELL:  Objection, form of the
11   question.
12       A.   I don't recall him saying that he's ever
13   had a rogue traffic source; but, I mean, there are
14   scenarios where he has been concerned about
15   different types of traffic.
16       Q.   So he's on the verge of losing a
17   merchant processer, tells that processer it's due
18   to a rogue traffic source, and he never mentions
19   that to you, the guy who is trying to help him
20   stay in compliance?
21       A.   You're completely mischaracterizing this
22   email.  This has no indication that he is at risk
23   of losing the merchant account --
24       Q.   It literally says that.
25       A.   This is literally a request that says,

---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Brown

FTC v. Credit Bureau Center, et al.                                    12/13/2017

---

157

1    Can you stay below a hundred for the rest of the
2    month?
3        Q.   "If your account does that, it runs the
4    risk of being terminated."
5        A.   Okay.  So on the third email or third
6    page.
7            MR. WARD:  We should break for lunch.
8    What do you think?
9            MR. LEVINE:  Let's do one more.  One
10   more exhibit, then we'll do lunch?
11           THE WITNESS:  Sure.
12           MR. COCHELL:  I don't want to interrupt
13   you when you're on a roll.
14           MR. LEVINE:  I think I have to do two
15   more exhibits.  So, okay.  They are tied together.
16   All right.  So that was Exhibit 15.
17           (Whereupon Deposition Exhibit
18            No. 16 was marked for
19            identification by the court
20            reporter.)
21   BY MR. LEVINE:
22       Q.   Okay.  I'm now showing you a document
23   that's been marked for identification -- did I
24   give you two copies, Mike?
25       A.   No.

---

158

1        Q.   I'm now showing you a document that's
2    been marked for identification as Exhibit 16.  Do
3    you recognize this document?
4        A.   Yes.
5        Q.   Put it side by side, if you will, with
6    Exhibit 15, please.
7            Now, what is Exhibit 16?
8        A.   It's an email from Tom to myself.
9        Q.   And this is Tom Fragala?
10       A.   Correct.
11       Q.   And Tom's forwarding an email from Nick
12   Qualman from Vantage Payments, right?
13       A.   Correct.
14       Q.   This is the same individual -- the same
15   individuals we saw in Exhibit 15, correct?
16       A.   Correct.
17       Q.   Except this email is being sent a little
18   less than a month after the exchange in
19   Exhibit 15; do you see that?
20       A.   Correct.
21       Q.   Okay.  And Nick says, "Here's your
22   report for the end of the month.  It looks like
23   you broke a hundred chargebacks."
24           Do you see that?
25       A.   Correct.

---

159

1        Q.   And Tom immediately asks you how to
2    respond.  I shouldn't say immediately.  Let me
3    rephrase the question.
4            Tom then asks you how to respond; do you
5    see that?
6        A.   No.  I think you're mischaracterizing
7    this email.  It clearly says, "Mike, please
8    review.  Went over a hundred chargebacks."
9        Q.   This merchant account referenced in
10   Exhibit 16 is the same one that we saw in
11   Exhibit 15, correct?
12       A.   Yes.
13       Q.   And this was used --
14       A.   This --
15       Q.   This merchant account involved CBC's
16   traffic, correct?
17       A.   This is traffic on ScoreOutlook.com,
18   which is a white label website owned by Online
19   Credit Systems.
20           And now, I mean, looking at these two
21   emails, it already says on Number 15 that he says,
22   "You're trending to break a hundred."
23           So when you get an email in the next
24   month saying you broke a hundred, I mean, that
25   seems it was already stated.

---

160

1        Q.   Well, you wrote in Exhibit 15 that you
2    expected chargebacks to go down dramatically.
3    What was your basis for that in Exhibit 15 if you
4    had no control over the traffic?
5        A.   Because we worked with Tom to adjust the
6    traffic to his site to insure he's honoring the
7    requests from the merchant processer.
8        Q.   So you did control the traffic to Tom's
9    website?
10       A.   I worked with Tom to help him with his
11   white label website to adjust traffic to his
12   website to be in compliance with the merchant
13   processer.
14       Q.   And how did you adjust -- how did you
15   work with Tom to adjust traffic to his website?
16       A.   It was very simple.  He emailed me and
17   said he was going over, and we talked and
18   discussed appropriate changes to make sure we
19   don't go over the limit.
20       Q.   And what were the changes with respect
21   to traffic?
22       A.   I don't specifically recall, but I
23   believe it was -- involved the volume of the
24   traffic.  He was capable of only accepting a
25   certain amount of volume.

---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Brown

FTC v. Credit Bureau Center, et al.                                    12/13/2017

161

1      Q.   And this was traffic generated by
2   affiliates?
3      A.   I would need to see the database to
4   answer that.
5      Q.   At the time, you would have known who
6   was generating the traffic, correct?
7      A.   I mean, everything is in the database,
8   yes.
9           And I should also point out again that
10  this isn't a rule or a compliance where we're
11  over.  This is a number that the merchant bank
12  picks that they are comfortable with this type of
13  risk.
14          So think of it as a credit card with a
15  credit limit.  If you have a hundred dollar credit
16  limit, you go over that, they are not comfortable
17  with that risk.  They may decline those
18  transactions.
19          So this is not something where you go
20  over and then you're not compliant.  This has to
21  do with the risk tolerance that they are willing
22  to take.
23          So I just want to point out that
24  distinction.
25      Q.   One last exhibit.  This time I promise.

162

1   And then we'll do lunch.
2           MR. COCHELL:  Okay.  Is that a
3   contractual promise or just a lawyer promise?
4           MR. LEVINE:  It's a contractual promise.
5           MR. COCHELL:  Lawyer time.
6           (Whereupon Deposition Exhibit
7            No. 17 was marked for
8            identification by the court
9            reporter.)
10  BY MR. LEVINE:
11      Q.   Okay, Mr. Brown.  I'm showing you a
12  document marked for identification as Exhibit 17.
13  Do you recognize it?
14      A.   Yes.
15      Q.   What is it?
16      A.   It's an email between myself and Tom.
17      Q.   This is a different email address for
18  Tom, I think; but this is the same Tom Fragala,
19  right?
20      A.   Correct.
21      Q.   And this Exhibit 17, that email that --
22  the emails on Exhibit 17 were sent about two
23  months after the emails on Exhibit 16; do you see
24  that?
25      A.   Correct.

163

1      Q.   Tom's initial email is a quote.  Do you
2   see that?
3      A.   Yes.
4      Q.   Do you know who he's quoting?
5      A.   It doesn't say in the email.  I'm not
6   sure.
7      Q.   Probably a merchant processer, right?
8      A.   It looks like they are talking about a
9   merchant account, yes, I would assume so.
10      Q.   Tom asked if you have any ideas.  You
11  respond, "Unfortunately not."
12          Do you see that?
13      A.   Yes.
14      Q.   And then you follow up, and you say,
15  "Actually guarantee them you will be under 1
16  percent chargebacks within 60 days."
17      A.   Correct.  He asked me for any ideas.  I
18  provided him an idea.
19      Q.   And then he followed up, "Any ideas on
20  what I would use as the guarantee?"
21          And you say, "Remind them that the
22  number of chargebacks is going down."
23          Do you see that?
24      A.   Yeah.  He seemed a little confused as to
25  what a guarantee is.  It's not a guarantee as if

164

1   you're pledging an asset.  It's a guarantee as in
2   I'm going to reach this metric.
3      Q.   So you were committed to working with
4   Tom to reach that metric, right?
5      A.   I committed to Tom to reach that metric,
6   is that what you're asking me?
7      Q.   To work with Tom to reach that metric.
8      A.   So Tom is a white label customer.  I
9   committed to Tom when we executed the white label
10  agreement, so I'm definitely working with Tom.
11          I'm not committing to him on anything
12  regarding merchants' accounts.
13      Q.   Well, you testified earlier that you
14  worked with Tom to help him stay within compliance
15  of the merchant account guidelines.
16          I know you don't like the word
17  compliance, but within -- you testified earlier
18  that you worked with Tom to stay within the
19  merchant account guidelines, correct?
20          MR. COCHELL:  Objection, form of the
21  question.
22          MR. LEVINE:  Yeah.  Let me restate the
23  question.
24  BY MR. LEVINE:
25      Q.   You worked with Tom -- you testified

Brown

FTC v. Credit Bureau Center, et al.                                    12/13/2017

---

165

1   earlier that you worked with Tom to insure that
2   you stayed within the merchant account guidelines,
3   correct?
4       A.   I mean, I think my testimony reflects
5   what I clearly said.
6       Q.   Okay. So you told Tom to guarantee a
7   merchant processer that you'll be under 1 percent
8   chargebacks within 60 days.
9       A.   And that's actually what happens on a
10  merchant account when the traffic stops, so --
11      Q.   And you had control over that traffic.
12      A.   No. The account was closed.
13      Q.   It was closed?
14      A.   According to this email.
15      Q.   It says, "We're at great risk."
16           Oh, yes. That's --
17      A.   It says, "We are unable to reopen."
18      Q.   That's true. That's true.
19           So this account was actually closed
20  because the chargebacks were so high, correct?
21      A.   It says, It's above what they are
22  "allowed in our portfolio."
23           So this is a -- again, not a compliance
24  thing. We are always in compliance with the Visa
25  and Mastercard regulations on chargebacks.

---

166

1        This is a business decision this
2   particular credit card processer made on what is
3   allowed in their portfolio.
4       Q.   Your prediction two months earlier that
5   chargebacks would go down dramatically turned out
6   not to be realized, correct?
7       A.   I think you're completely misstating
8   what this email says. There is no figure in here
9   as to what the chargeback percentage is now as
10  opposed to two months ago.
11      Q.   Well, it was high enough that you were
12  terminated, right -- that ScoreOutlook was
13  terminated, right?
14      A.   The merchant processer appears to say it
15  was above what is allowed in their portfolio.
16      Q.   And that's kind of the death penalty in
17  this world, isn't it?
18           MR. COCHELL: Objection, form of the
19  question.
20      A.   I don't understand the question.
21      Q.   Well, you lose all merchant processing,
22  that's kind of the death penalty, right?
23           You talked about all these remedial
24  steps; monitoring, supervision, whatever. When
25  you cut off --

---

167

1       A.   Yeah, that's --
2       Q.   -- processing, that's the final step,
3   right?
4       A.   No. That's -- you're completely --
5   you're not understanding the process at all.
6           So this account, like the others, is
7   within the guidelines --
8       Q.   No, it wasn't.
9       A.   -- programs -- listen.
10          This account is within the guidelines
11  and the procedures within Visa and Mastercard.
12          I'm going to explain the process again
13  really quick so we all understand.
14          So a merchant account has to stay within
15  certain limits, and it's the transaction-to-sale
16  ratio.
17          If you go above those limits, you have a
18  three- to six-month workout period where you're in
19  a monitoring program.
20          So Visa doesn't just terminate your
21  relationship. They want to work with you. They
22  want businesses to accept Visa. That's how it
23  works.
24          If you don't work out the ratios within
25  that three- to six-month period, you go into an

---

168

1   additional monitoring program. So in total, you
2   may have up to a year to work out any issue.
3           So according to this email, Tom did not
4   get into this monitoring program. He was not
5   afforded the opportunity to work out any issues
6   with chargebacks, and -- and was -- in a very
7   preliminary stage, they didn't even get to that
8   point. It's simply the bank decided, we're not
9   going to allow this in our portfolio.
10          And like I said, these banks change what
11  they allow with the winds. It could be due to
12  chargebacks. It could be due to something else.
13  We don't know.
14      Q.   Well, they told you chargebacks.
15      A.   They always tell us chargebacks.
16      Q.   Okay. No further questions for this
17  portion of the deposition.
18          MR. COCHELL: All right. Sure. Of
19  course.
20          MR. WARD: Off the record.
21          (Whereupon, a lunch break was
22          taken.)
23  BY MR. LEVINE:
24      Q.   Okay. Mr. Brown, we just came back from
25  lunch. You understand you're still under oath?

---

42 (Pages 165 to 168)

Brown

FTC v. Credit Bureau Center, et al.                                        12/13/2017

---

169

1    A.   Yeah.
2         Can we also check if that water is
3    refilled?
4    Q.   I just filled it.
5    A.   Okay.
6         MR. COCHELL:  Yeah.  Michael remembered
7    the name of a company that you had asked him about
8    earlier.
9         MR. LEVINE:  Oh, great.
10        MR. COCHELL:  So you might want to start
11   off with that and follow up if you need to.
12        MR. LEVINE:  Yeah.  Let's start with
13   that.
14   A.   The company I referred to when I
15   referred to one of the owners of -- the principal
16   as being Colt Moody, the name of the company is JC
17   Media.
18   Q.   Any other information you recall over
19   lunch?
20   A.   I remember another principal of that
21   company, I believe, named Jamie.  That might be
22   the reason for the J and the C in the JC Media,
23   Jamie, Colt.
24   Q.   Okay.  Anything else?
25   A.   No.

---

170

1    Q.   CBC's largest affiliate was Danny
2    Pierce, correct?
3    A.   Yes.
4    Q.   And that was Source Code 35 in the CRM?
5    A.   Correct.
6    Q.   Okay.
7         (Whereupon Deposition Exhibit
8          No. 18 was marked for
9          identification by the court
10         reporter.)
11   BY MR. LEVINE:
12   Q.   Okay.  I'm showing you a document that's
13   been marked for identification as Exhibit 18.  Do
14   you recognize the document?
15   A.   I believe this looks like -- it doesn't
16   have the name here anywhere; but I think this is
17   text messages with me, and can you refresh my
18   memory who this is with?  Is this Pierce?
19   Q.   I'll represent that this was produced by
20   Pierce.
21   A.   Okay.
22   Q.   And I think another version of it, some
23   variances, was also produced by you.
24   A.   Okay.
25   Q.   And your phone number is (714) 906-9949?

---

171

1    A.   That was my phone number, yes.
2    Q.   And you described this document as text
3    messages.
4    A.   Mm-hmm.
5    Q.   Yes?
6    A.   Yes.
7    Q.   And you recall that you texted -- it's
8    fair to say that you texted regularly with Danny
9    Pierce?
10   A.   You know, fairly, fairly regularly.
11   Q.   Okay.
12   A.   Yes.
13   Q.   Okay.
14   A.   There's times where there's more, and
15   there's times where there's less; but it's just...
16   Q.   Okay.  I want to start on Page 1.  Do
17   you know who the gray is and who the blue is in
18   the document?
19   A.   I believe the blue is Pierce, and the
20   gray is myself.
21   Q.   Okay.  And the gray is on the left, and
22   the blue is on the right.
23   A.   Correct.
24   Q.   Okay.  Let's go down to 10-14-14 at
25   6:21 p.m.  You write, "Let me know if I can do

---

172

1    anything to get this back over a hundred a day."
2         Do you see that?
3    A.   Correct.
4    Q.   And then a couple weeks later, you
5    write, "Traffic looked bad today.  What happened?"
6         Do you see that?
7    A.   Yeah.
8    Q.   So you monitored Pierce's traffic pretty
9    carefully, right?
10   A.   We're always monitoring the volume of
11   traffic from our affiliates.
12   Q.   Turn to Page 4.  This is in
13   February 19th, 2015.  Go to the -- I'm sorry.
14        If you could turn to Page 4 and look at
15   February 11th, 2015, you say, "Look like -- looks
16   like traffic broken.  Please check."
17        Do you see that?
18   A.   Yep.
19   Q.   And at the bottom, you say, "Traffic was
20   strong on the 16th.  Was that just because" -- and
21   now I'm going on to Page 5 -- "of a backlog, or
22   are we going to see that as the new normal?"
23        Do you see that?
24   A.   Yeah.
25   Q.   So you were continuing to monitor Danny

---

43 (Pages 169 to 172)

Brown

FTC v. Credit Bureau Center, et al.                                    12/13/2017

173

1    Pierce's traffic?
2        A.   Yeah.  I mean, we want all of our
3    affiliates to send more traffic.  We can make
4    more -- make more revenue.
5        Q.   Okay.  Could you turn, please, to
6    Page 29 under October 1st, 2015?
7        A.   Mm-hmm.
8        Q.   You write, "Traffic been going down.
9    Any issues?  Did we get all those domains
10   updated?"
11       A.   Yeah.
12       Q.   And this is just more monitoring, right,
13   of the -- of the --
14       A.   This is normal dialogue with the
15   affiliate checking in, seeing how things are
16   going, see if there's anything we can do to get
17   traffic up.
18       Q.   When you were monitoring, or whatever
19   word you want to use, this traffic, which program
20   did you generally use to monitor Pierce's traffic?
21       A.   So I had a dashboard that had some
22   graphs that shows the -- in a graphical format
23   kind of the volume of the traffic per month, per
24   day, and per hour.
25           So occasionally, I would see dips in

174

1    traffic and say, "Well, why did that happen?"
2           And I'll go in there and see what the
3    dip was from.
4        Q.   And was that -- did you describe it as a
5    dashboard, right?
6        A.   Yeah.
7        Q.   Was that dashboard connected to the CRM?
8        A.   Yeah.
9        Q.   And did the dashboard reflect which
10   traffic source was rising or falling?
11       A.   No.  But I had a way to filter different
12   things in there so I could get an idea.
13       Q.   Such that you could tell Danny Pierce,
14   your traffic is up, or your traffic is down?
15       A.   Yeah.  Specifically for him, I could
16   literally click on Source Code 35 and see sign-ups
17   per hour and per day.  And if it went down, then I
18   can ask what the issue is.
19       Q.   Okay.  One final point on this.  If you
20   turn to Page 59, toward the bottom, this is
21   January 9th, 2017, you say, "When you -- when you
22   resuming traffic?  Still see zero coming," I
23   assume you meant through.
24           Do you see that?
25       A.   Yeah.

175

1        Q.   So you were continue -- you were able to
2    monitor the traffic all the way up until the
3    filing of the lawsuit, correct?
4        A.   Yeah.  I'm definitely able to see the
5    volume of the traffic, and I'm definitely asking
6    him to resume the traffic.  We wanted more
7    traffic.
8        Q.   And you were able to control how much
9    traffic Pierce generated, correct?
10       A.   No, definitely not.
11           You know, we can control to accept his
12   traffic or not.  I can control if I'm going to pay
13   Pierce or not.  I can't control what Pierce does,
14   how much he sends.
15           I can make requests.  And just like this
16   request right here, can you resume today, that's
17   what I'm doing, requesting Pierce.
18       Q.   Okay.  So if you turn -- I'm sorry to do
19   this.
20           If you turn back to Page 13, please,
21   we're looking now toward the bottom at July 1st,
22   2015.  And Pierce in the blue says, "By the way,
23   traffic will be increasing by like 30 percent next
24   week."
25           And you write, "Please hold off on

176

1    increase."
2        Q.   Do you see that?
3        A.   Yeah.
4        Q.   So you were able to tell Pierce when to
5    slow down traffic, correct?
6        A.   I'm able to tell Pierce and set limits
7    on how much I want to accept.  It's my business,
8    my website.  And, yeah, that's it.
9        Q.   And that was true throughout your time
10   working with Danny Pierce?
11       A.   Yeah.  I mean, that's true with any --
12   any website.  They can control what they choose to
13   accept.
14       Q.   Okay.  We talked earlier about -- very
15   briefly about a subaffiliate; do you recall that
16   discussion?
17       A.   Today?
18       Q.   Yes.
19       A.   Yes.
20       Q.   So some affiliates have affiliates of
21   their own, correct?
22       A.   Yes.
23       Q.   Were you aware whether Pierce had
24   subaffiliates?
25           MR. COCHELL:  Objection; form of the

44 (Pages 173 to 176)

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Brown

FTC v. Credit Bureau Center, et al.                                      12/13/2017

---

177

1    question, lack of time frame.
2    BY MR. LEVINE:
3        Q.   Are you aware today that Pierce had
4    subaffiliates or sub --
5        A.   I am aware he did today because of the
6    existence of Lloyd, whom I didn't know previously.
7        Q.   Were you aware before the lawsuit that
8    Pierce had a subaffiliate or subaffiliates?
9        A.   I had no idea how many he had or if he
10   had one.  I did know in general he is an affiliate
11   network, which does imply he subcontracts out to
12   affiliates and manages other affiliates.
13       Q.   Okay.  Same document.  We were looking
14   at Exhibit --
15           MR. WARD:  18.
16           MR. LEVINE:  Thank you.
17   BY MR. LEVINE:
18       Q.   Exhibit 18.  If you turn please to
19   Page 25, toward the bottom, this is -- the date on
20   this is September 2nd, 2015.  And Pierce writes,
21   "My partner wants to continue scaling, and our ROI
22   is so damn low."
23           Do you see that?
24       A.   I'm sorry.  Where did you get this date
25   from?

---

178

1        Q.   Page -- okay.  Good.  That would be
2    Page 21.
3        A.   And what date was it?  Okay.
4        Q.   I see September 2nd, 2015, on 21.
5        A.   Okay.
6        Q.   And then no other dates prior to
7    Page 25; do you see that?
8        A.   Okay.  Now, what section am I looking on
9    on Page 25?
10       Q.   Okay.  Bottom of Page 25, Pierce writes,
11   "My partner wants to continue scaling, and our ROI
12   is so damn low."
13           Do you see that?
14           MR. COCHELL:  This is Page 21?
15           MR. LEVINE:  Page 25.
16           MR. COCHELL:  Oh, Page 25.  I'm sorry.
17       A.   Can you point me where is this on at
18   that again?
19       Q.   I can point it to you (indicating).
20       A.   Okay.
21       Q.   So at this time, you knew that Pierce
22   had a partner, didn't you?
23       A.   Appears so, yeah.
24       Q.   He didn't say partners.
25       A.   I have no idea how many he has or if he

---

179

1    has only one --
2        Q.   Okay.  Turn to page --
3        A.   -- or if his partner is even his
4    affiliate.
5        Q.   Okay.  Let's turn to Page 34.  I'm
6    looking at July 22, 2016.  And this is a text from
7    you.  And you say, "Well, I'm trying to get up
8    ASAP so you have more to offer your guy to keep
9    him happy and the CR running."
10           Do you see that?
11       A.   Yeah.
12       Q.   So, once again, you're -- this time,
13   it's you referring to one person who works with
14   Danny Pierce; do you see that?
15       A.   I mean, I think he just said he has at
16   least a partner.  I don't know.  You know, are we
17   talking about his affiliates, his partner?  I
18   don't know.  Whoever is helping him manage this.
19       Q.   What did you mean by "your guy"?
20       A.   He has referred to in -- somewhere in
21   these text messages, I believe, he's referred to a
22   guy who helps him run this.
23       Q.   Did he ever refer to multiple people?
24       A.   I don't know.  I would need to read
25   these chats and refresh my memory.  Not that I

---

180

1    recall.
2        Q.   Do you recall -- what you wrote is, "I'm
3    trying get up ASAP so you have more to offer your
4    guy and keep him happy and the CR running."
5           Do you see that?
6        A.   Yeah.
7        Q.   CR refers to the credit report offer,
8    right?
9        A.   Yeah.
10       Q.   So this single guy who worked with
11   Pierce seems to be important enough that you
12   thought keeping him happy was necessary to keep
13   the operation running, right?
14       A.   You know, it's a constant, I would say,
15   negotiation dealing with an affiliate.
16           And I say it's a negotiation because
17   they are always wanting more, right?  So they are
18   going to say, I'm not happy with the payout, I'm
19   not happy with the conversions, you know.
20           Sometimes there's one or more guys,
21   sometimes it's just one guy, sometimes they sound
22   like they are a big company, sometimes they are an
23   individual.  They'll say, I'm not happy.
24           And so it's a constant negotiation.
25   We're doing things to keep our partners happy.

---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Brown

FTC v. Credit Bureau Center, et al.                                    12/13/2017

---

181

1    Q.   You already testified you don't remember
2  Pierce ever talking about other guys other than
3  this one guy, correct?
4    A.   Yeah.  I don't recall him talking about
5  any -- any other guys.
6    Q.   Okay.
7    A.   I do know that, you know, having looked
8  at Revable online, there are multiple guys that
9  represent to be from Revable, specifically, you
10 know, multiple affiliate managers.
11       So I don't know how many of these guys
12 he worked with, if he worked with just one of the
13 guys or he has a guy who is a partner, an
14 affiliate.
15       But, you know, obviously I want to keep
16 Revable happy and get more traffic from them at
17 this point in time.
18   Q.   You said "keep him happy," as in the
19 guy.
20   A.   Keep -- keep Revable happy.
21   Q.   Okay.  Let's go to 49.  Now we're in
22 November 19th, 2016.  And Pierce in the middle of
23 the page says, "Anyway, my boy is starting to get
24 really pissy and wants to push all the traffic to
25 the other CR," the other offer.

---

182

1        Do you see that?
2    A.   Yeah.
3    Q.   So this is now a third instance where
4  either you or Mr. Pierce is referring to a single
5  partner; isn't that right?
6    A.   He's referring to a guy, you're right.
7        Like I said, this is a constant
8  negotiation.  He's saying he's not happy, his guy
9  is not happy.  All right.  They want to send their
10 traffic to another offer, and they do that to
11 negotiate payouts.
12       And was I the only credit report offer
13 that they sent this fraudulent traffic to?
14   Q.   So you're saying "they".  So you knew
15 there were at least two guys, right?
16       MR. COCHELL:  Objection,
17 mischaracterizes the testimony.
18 BY MR. LEVINE:
19   Q.   No.  I'm asking a question.
20   A.   Come on.  I mean, we're sitting here
21 today with the knowledge we have here today.  I
22 know there to be at least two guys.
23       And you know what, to this day, I think
24 there might be more.  If you look at Revable
25 online, there's other affiliate managers out

---

183

1  there.  And are these fake profiles?  Do these
2  people exist?  What do they do?  I don't know.
3        And if they are working with other
4  credit report offers, I mean, I -- this -- this is
5  very interesting.
6        MR. WARD:  Off the record.
7            (Whereupon, discussion was held
8             off the record.)
9        MR. LEVINE:  Let's go back on the
10 record.  I might just be slower.
11       Actually, let's go off.
12           (Whereupon, discussion was held
13            off the record.)
14       MR. LEVINE:  Back on.  I apologize for
15 the delay.
16           (Whereupon Deposition Exhibit
17            No. 19 was marked for
18            identification by the court
19            reporter.)
20 BY MR. LEVINE:
21   Q.   Okay.  Mr. Brown, I'm showing you a
22 document that's been marked for identification as
23 Exhibit 19.  Do you recognize this document?
24   A.   It appears to be a conversation between
25 Danny and myself.

---

184

1    Q.   Okay.  Do you know the medium?
2    A.   I believe this is Skype.
3    Q.   Okay.  Danny is Danny Pierce?
4    A.   Correct.
5    Q.   So let's go to Page 12, and now I'm
6  looking at the pages noted at the bottom of the
7  document.
8    A.   Okay.
9    Q.   So looking at Page 12 of Exhibit 19.
10 And if you look at December 11th, 2015, at
11 9:41 a.m., Danny Pierce says, "My partner and I
12 are going over different strategies to increase
13 profits while sending to your offer and don't want
14 to step on your toes."
15       Do you see that?
16   A.   Yeah.
17   Q.   So this is another instance where
18 Mr. Pierce is referring to only one partner,
19 right?
20   A.   Are you asking if his partner is his
21 affiliate, is that what you're getting at --
22   Q.   No.
23   A.   -- or no?
24   Q.   This is another instance where he's --
25 where Mr. Pierce is referring to only one partner,

---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Brown

FTC v. Credit Bureau Center, et al.                                    12/13/2017

---

185

1    correct?
2        A.   Yeah, it appears so.
3        Q.   And you responded to that, right?
4        A.   Yeah.
5        Q.   Okay.  Let's turn to Page 17.  Now I
6    want to go on February 5th, 2016, at 6:16 p.m.
7    Okay?
8        A.   Mm-hmm.
9        Q.   Danny says, "My guy over here wants to
10   do something else, and I'm starting to feel like a
11   slave owner.  LMAO."
12           You respond two minutes later, "If he
13   bounced, is he the only one to keep the lights on?
14   Would hate to see it die after all the work we all
15   putting into it.  Thought you said was getting to
16   be less work on your end with your new IP source."
17           Do you see that?
18       A.   Yeah.
19       Q.   And Danny responds, "He's the one that
20   runs all the apps, scripts, and does the legwork,"
21   right?
22       A.   Yep.
23       Q.   So you knew what Danny's partner was
24   doing, didn't you?
25       A.   I mean, there's moments in time -- we've

---

186

1    gone over, you know, I think, about a year plus of
2    text message histories or chat histories.  There's
3    times where he says partner, times where he says
4    guy --
5        Q.   Well --
6        A.   -- times where he says different things.
7            But, I mean, I can agree it seems that
8    there is one person, maybe more, I don't know; but
9    there is one person that is managing this offer
10   for him.
11           That could be an affiliate manager
12   managing the traffic.  It could be one affiliate.
13   But it -- you know --
14       Q.   You say you don't know what he was
15   doing, but you asked that if this partner bounced,
16   was he the only one to keep the lights on.
17           So you were at least concerned that if
18   this partner left, the whole source would be cut
19   off, weren't you?
20       MR. COCHELL:  Objection; form of the
21   question, lack of foundation.
22       A.   So like any good business that's
23   managing partners and affiliates, right, we want
24   the traffic to continue.  I don't want Pierce's
25   traffic to go away.

---

187

1            I don't care if he has 1 guy or 50 guys
2    running it.  We want their traffic to increase.
3    We want more business.  We want to keep growing
4    together.
5        Q.   But if you believed he had 50 guys
6    running it, why would you be concerned if only 1
7    of those 50 guys bounced?
8        MR. COCHELL:  Objection, form of the
9    question.
10   BY MR. LEVINE:
11       Q.   You can answer.
12       MR. COCHELL:  You can answer.
13       A.   Can you repeat the question?
14       MR. LEVINE:  Could the reporter, please?
15           (Whereupon, record was read as
16           requested.)
17       MR. COCHELL:  Objection, form of the
18   question.
19           Go ahead.
20       A.   So I don't have a lot of insight into
21   Danny's organization other than what he's
22   disclosed to me and other than what's available
23   publicly online.
24           So publicly online, I can see he has
25   multiple affiliate managers.  He has a network

---

188

1    that's listed in multiple affiliate network
2    directories representing to promote many affiliate
3    offers, one of them being mine.  All right.
4            So I don't know if he has one partner
5    even at this point in time that's dedicated to
6    managing this offer, managing multiple affiliates,
7    or if this is the affiliate himself.
8            So, yes, he sheds a little bit of
9    insight into saying, my guy here, my partner
10   there.  But the reality is it's his business; and,
11   you know, he's free to run it however he wants.
12           And whether he has 1 guy, 2 guys, or 50
13   guys honestly doesn't really matter too much.
14       Q.   It's true though that we've now gone
15   through five examples in which either you or
16   Mr. Pierce refer to one partner of Mr. Pierce's,
17   correct?
18       A.   Correct.
19       Q.   And we haven't gone through any examples
20   where either you or Mr. Pierce refers to multiple
21   partners of Mr. Pierce, correct?
22       A.   Correct.  But is this guy an affiliate
23   network?  Is this guy an affiliate?
24       Q.   I'll ask -- thank you.
25           And on two instances, you asked that if

---

47 (Pages 185 to 188)

Brown

FTC v. Credit Bureau Center, et al.                                    12/13/2017

---

189

1    this one guy left, would the whole source shut
2    down, didn't you?
3        A.   And I don't -- I don't know if you
4    understand our industry very well.
5        Q.   I'm not asking about the industry.  I'm
6    asking about the text messages and Skype messages
7    that are before you and before me.
8        A.   Yeah.  There's some guy that Pierce uses
9    for traffic.
10       Now, if that guy is an affiliate
11   manager, an affiliate -- or an affiliate network,
12   I don't have insight into that.  And frankly, from
13   my position, it doesn't matter a whole lot.
14       Q.   Okay.  Let's stick to 42-2, which is the
15   Skype conversation, Exhibit 19.  Please turn to
16   Page 4 of Exhibit 19.
17       If you look at November 24th, 2015, at
18   1:52 p.m., you write, "Never have this issue with
19   other pubs though.  Probably because you the only
20   one we have to load balance with."
21       And feel free to read the text around
22   it.
23       What I'm going to ask you is:  What did
24   you mean by load balance?
25       A.   Can you point me to the page?  Is it

---

190

1    near the bottom?
2        I see it now.
3        Q.   You're on -- yeah.
4        MR. COCHELL:  What part of it?
5        MR. LEVINE:  This is 11-24-15.
6        MR. COCHELL:  It's like six lines from
7    the bottom?
8        MR. LEVINE:  Yeah.
9        MR. COCHELL:  Okay.  All right.  Thanks.
10       A.   You know, it means exactly what it says.
11   He's essentially a large affiliate.
12       I say pubs.  Publishers is also a term
13   used interchangeably as affiliate.
14       He's -- he's my biggest customer, and so
15   big that I had to put the traffic on multiple
16   sites.  So we have certain processing limits for
17   different sites.
18       Q.   And that had to do with chargebacks,
19   didn't it?
20       A.   This has to do with the volume that
21   we're approved for at the merchant processing
22   banks.
23       Q.   But Danny Pierce is charged -- let me
24   strike that.
25       The chargeback rate on Danny Pierce's

---

191

1    traffic was much higher than any of your other
2    sources, wasn't it?
3        A.   That's incorrect.
4        Q.   Okay.  Let's turn to Page 8.  Now I'm
5    looking 12-2-15 at 2:54 p.m.
6        A.   Mm-hmm.
7        Q.   You write -- actually, let's look at
8    12-2-15 at 2:50 p.m.  Danny writes, "Is the offer
9    on those new MIDs you mentioned the other day?"
10       And you respond, "They ready to go as
11   soon as we can throw some more volume at it.
12   Can't just move the existing volume over.  Have to
13   manage chargebacks."
14       Do you see that?
15       A.   Yep.
16       Q.   So this is another example -- well, tell
17   me what you meant by this.
18       MR. COCHELL:  I'm sorry.  What was the
19   question?
20   BY MR. LEVINE:
21       Q.   What did you mean by "have to manage
22   chargebacks"?
23       A.   I mean exactly what I said.  You know,
24   there's -- different banks have different limits
25   on what they can accept, including chargebacks.

---

192

1        And I think we went through some
2    different examples where a bank will say, I only
3    want to get this many chargebacks.  Other banks
4    will say, I only want to process this amount of
5    dollar volume.
6        So it means exactly that.  We have to
7    manage the volume and the guidelines that were
8    provided in order to keep our accounts.
9        Q.   But "the existing volume," you refer to
10   the existing volume.  That evidently had
11   chargebacks that were too high to go through the
12   new MIDs, correct?
13       A.   I don't see this stated anywhere.  I
14   think you're reading something into this that's
15   not here.
16       Q.   Well, you said, We need to "throw some
17   more volume at it.  Can't just move the existing
18   volume over.  Have to manage chargebacks."
19       A.   I don't understand your question.
20       Q.   So the existing volume had a chargeback
21   rate that was too high to send through the new
22   MIDs, correct?
23       A.   It doesn't say that existing volume is
24   higher or lower.  I don't know where you're
25   getting that.

---

48 (Pages 189 to 192)

Brown

FTC v. Credit Bureau Center, et al.                                         12/13/2017

---

193

1      But this is talk about how we manage our
2   volume to stay within the guidelines of the bank.
3      **Q.   And the existing volume wasn't good
4   enough because you said, "Can't just move the
5   existing volume over."**
6      A.   And there's lots of reasons why you may
7   not want to move volume over.
8      **Q.   But you say the reason:  "Have to manage
9   chargebacks."**
10     A.   That may be one factor.
11     **Q.   Okay.  Let's move on.**
12         **Let's go to Page 20, very last message
13  on Page 20 of Exhibit 42-2, which is Deposition
14  Exhibit 19.  2-25-16, 11:54 p.m., Mike Brown.
15  "These chargebacks on this traffic killing me.
16  Had to drop the price of the offer to just keep it
17  running.  A hundred percent losing money right
18  now."**
19     A.   Okay.
20     **Q.   Why was Danny Pierce's traffic -- why
21  was the chargeback on Danny Pierce's traffic
22  killing you?**
23     A.   So this goes back to what I was saying
24  previously that it's a constant negotiation with
25  an affiliate.  They say, We're not happy.  We want

---

194

1   to get paid more.
2          I say, I'm not happy.  Their traffic
3   stinks.
4          It's a constant negotiation that
5   continues on for a long time.
6      **Q.   And the traffic stunk because the
7   chargeback rate was so high.**
8      A.   No.  This is something we say to
9   negotiate.
10     **Q.   So is this another instance in which you
11  refer to high chargebacks, but you didn't actually
12  mean it?**
13     A.   I think the data regarding the
14  chargebacks will speak for themselves once we have
15  access to the database.
16     **Q.   But you had access to that during the
17  operation of the business, did you not?**
18     A.   Of course I had access to the database.
19     **Q.   And you would even be able to break down
20  the chargeback rate by affiliate source, correct?**
21     A.   Of course.
22     **Q.   Let's turn to page -- let's turn to the
23  next page, 2-25-16, 11:59 p.m.  Danny:  "How many
24  chargebacks are you getting?"**
25         **Brown:  "Traffic looks like it's half**

---

195

1   **what it was yesterday.  Chargebacks always been a
2   shit ton over five percent."**
3      **Q.   Do you see that?**
4      A.   Yeah, I do.
5      **Q.   And you were talking about Danny
6   Pierce's traffic, right?**
7      A.   Yeah.  This is a perfect example,
8   another example of how it's a constant
9   negotiation, me saying, Your traffic is not good
10  enough, I want to pay you less, or he's saying, My
11  traffic is so amazing, I want to be paid more.
12         So there's no way Pierce was over five
13  percent.  And, in fact, I know our chargeback rate
14  to be much lower, especially at the time before
15  the lawsuit.  So this is inaccurate but used for
16  Danny to get better deals and to make him feel
17  like he has no reason to negotiate for higher
18  payout.
19     **Q.   These are your words though.**
20     A.   Correct.
21     **Q.   So what you're saying is that you were
22  just not telling the truth to Danny.**
23     A.   Correct.  It's a constant negotiation.
24     **Q.   And by "negotiation," you mean no need
25  to tell the truth?**

---

196

1      A.   Well, by negotiation, I mean he'll
2   constantly say in your face, I'm going to send
3   this traffic to a different credit report offer.
4      **Q.   That's not what we're talking about.
5          You said his chargeback rate was over
6   five percent.  Was that true or was it not?**
7      A.   It's not true.  I think the stats for
8   the chargebacks will speak for themselves.
9      **Q.   Danny says, "How do you keep processing?
10  Is your customer service not working?"**
11         **You say, "Able to blend it with my other
12  volume."**
13         **"Blend it," that's the load balancing we
14  talked about earlier, right?**
15     A.   Of course.  He is mixed in with other
16  people whose traffic, like -- like business with
17  multiple sources of traffic.
18     **Q.   And that's what you were helping Tom
19  Fragala with, right?**
20     A.   Tom Fragala was a white label partner
21  that owned the website ScoreOutlook.com.
22     **Q.   Yes.  You've said that.
23         But you were helping Tom Fragala manage
24  chargebacks, correct?**
25     A.   I think that's an inaccurate statement.

---

49 (Pages 193 to 196)

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Brown

FTC v. Credit Bureau Center, et al.                                    12/13/2017

---

197

1    Q.   Okay.  Did Danny Pierce do affiliate
2  marketing for Tom Fragala?
3    A.   You would have to ask him.
4    Q.   Okay.  Danny says, "Over five percent is
5  death.  Over 100 is death."
6        And you respond, "Rest of the volume is
7  good less than 1 percent, like .2 to .3 percent."
8        Do you see that?
9    A.   Yeah.
10   Q.   Was this also not true?
11   A.   Correct.
12   Q.   So when you told Danny Pierce that his
13  chargeback rate was like a hundred and 50 times
14  the rest of your traffic, that wasn't true?
15   A.   It's not true.
16   Q.   Okay.
17   A.   I think, like I said, the chargeback
18  stats from the database will speak for themselves.
19   Q.   Okay.  Let's go to Page 32, July 12th,
20  2016, at 12:54 p.m.  It's the very top.
21        Danny says, "What's the current" -- I'm
22  sorry.  Are you there?
23   A.   Yeah.
24   Q.   Danny says --
25        MR. COCHELL:  What's the page number

---

198

1  again?
2        MR. LEVINE:  Page 32.
3        MR. COCHELL:  32.  What date?  I'm
4  sorry.
5        MR. LEVINE:  7-12-16.
6        MR. COCHELL:  Thank you.
7  BY MR. LEVINE:
8    Q.   Danny says, "What's the current
9  chargeback percentage?"
10        You respond, "I normally don't get into
11  these details, only doing with you to be
12  transparent to keep it running.  It's close to
13  five percent if by itself, always runs hot."
14        Do you see that?
15   A.   Yeah.
16   Q.   That wasn't true either?
17   A.   No.  I mean, just like I said, I don't
18  normally go into these details.  These are the
19  private inner workings of my business.  If an
20  affiliate wants to ask stats on the chargebacks or
21  revenue or any other proprietary information, I
22  may give them an inaccurate number.
23   Q.   And your testimony is that five percent
24  is inaccurate?
25   A.   Correct.

---

199

1    Q.   If you go down to 1:31 p.m., July 12th,
2  2016, you talk about blending traffic.  And you
3  say, "No bank would take five percent one one let
4  alone a ton of MIDs."
5        Do you see that?
6    A.   Yeah.
7    Q.   And your testimony is, once again --
8  well, I'll ask you.
9    A.   I don't understand the question.
10   Q.   What you're telling Danny Pierce here
11  was not true either?
12   A.   What part of the question is not sure
13  because there's multiple sentences here, and I
14  want to be specific.
15   Q.   You say that you needed to blend Danny's
16  traffic with other traffic because no bank would
17  take five percent.  Do you see that?
18   A.   Yeah.  I want -- I want Danny or Pierce
19  to feel like, you know, he can't take his traffic
20  somewhere else.
21   Q.   So you were not telling the truth to
22  him?
23   A.   Correct.  It's none of his business what
24  my stats are.
25   Q.   You didn't say, none of your business.

---

200

1  You lied.
2    A.   Yeah.
3    Q.   And this is the fourth time you lied to
4  him about your chargeback rate?
5    A.   Yeah.  He has no reason to know that.
6    Q.   Okay.
7        MR. WARD:  Off the record for a second.
8        (Whereupon, discussion was held
9         off the record.)
10  BY MR. LEVINE:
11   Q.   You testified earlier that Danny
12  Pierce's chargeback rate wasn't higher than any of
13  your other affiliates, right?
14   A.   That's not what I said.
15   Q.   What did you say?
16   A.   I said it wasn't, I think you said, 150
17  times higher.
18   Q.   No.  Earlier than that, I asked you, we
19  can go back if we have to, about Danny's
20  chargeback versus other chargebacks.  And you said
21  it was the same.  You don't remember that?
22   A.   Can you read back from the record?
23        (Whereupon, discussion was held
24         off the record.)
25

---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Brown

FTC v. Credit Bureau Center, et al.                                    12/13/2017

---

201

1                (Whereupon, record was read as
2                requested.)
3    BY MR. LEVINE:
4        Q.   Is it your testimony that the chargeback
5    rate on Danny Pierce's traffic was the same as the
6    chargeback rate on the other traffic going to your
7    websites?
8        A.   You know, every -- every traffic source
9    has differences in chargeback rates, definitely.
10       Q.   Was Danny's -- I'm sorry.
11       A.   There's no doubt about it.  And I think
12   the data, once we have access to the database, I
13   think it will speak for themselves.
14       Q.   Well, you do have access to the
15   database.  But Danny --
16       A.   No, we don't have access to the database
17   from my understanding.  We have yet to turn that
18   over.
19            MR. COCHELL:  Well, no.  It's been
20   turned over, but we can't decipher it just yet.
21       A.   It's in a weird format or something.
22       Q.   Danny Pierce's traffic, was it
23   consistently higher than the rest of your traffic?
24       A.   I would need to see the data in the
25   database.

---

202

1        Q.   You don't remember currently?
2        A.   I would need to see the data in the
3    database.
4        Q.   That wasn't my question.
5            You don't remember currently, yes or no?
6        A.   I don't remember currently if Pierce's
7    traffic was higher than the thousands or hundreds
8    of other people that had this traffic.
9        Q.   He was your largest affiliate by far.
10       A.   Correct.
11       Q.   Okay.  Showing you a document that's
12   going to be Exhibit 20.
13            (Whereupon Deposition Exhibit
14            No. 20 was marked for
15            identification by the court
16            reporter.)
17   BY MR. LEVINE:
18       Q.   Do you recognize this document?  Do you
19   recognize this document?
20       A.   Oh, yes.
21       Q.   What is it?
22       A.   This is the report on all the revenue
23   orders, refunds, and chargebacks.
24       Q.   And how is this generated?
25       A.   This was generated at my direction to my

---

203

1    China worker, Steve.  I asked him to create this
2    report.
3        Q.   When was it generated?
4        A.   I think it was the beginning to
5    middle -- I'm sorry.
6            Sometime after the lawsuit in January, I
7    believe.
8        Q.   And what data did Steve -- did Steve
9    rely on the CRM to generate this report?
10       A.   Yes.
11       Q.   So Steve Score, that's Gordon Yang,
12   right?
13       A.   Yes.
14       Q.   Gordon Yang had access to the CRM after
15   the filing of this lawsuit?
16       A.   Yes.
17       Q.   Does he have access as we speak today to
18   the CRM?
19       A.   No.
20       Q.   At what point did he lose access?
21       A.   So immediately after the lawsuit, we
22   prepared this type of report.
23            And then thinking at the time we were
24   complying with the PI, we cleared out all the
25   Source Code 35 data.  And that resided still with

---

204

1    Zenfia.
2            So Steve would have had access to that
3    partial data until my declaration that we
4    certified we destroyed all the data.
5        Q.   Was this report generated in preparation
6    for the preliminary injunction hearing?
7        A.   I believe I wanted to use it then, yeah.
8        Q.   So at the time of the preliminary
9    injunction hearing, Steve Score had access to the
10   CRM, correct?
11       A.   That's not what I said.  I said it was
12   around right after this lawsuit was filed in
13   January, this report was generated.
14       Q.   Well, there's a chronology.  The PI
15   hearing was in February.  So he had access to the
16   CRM in January, correct?
17       A.   No.  I said that we had removed the
18   Source Code 35 data believing at the time we were
19   complying with the order.
20       Q.   So you don't read data from the CRM prior
21   to producing it to the FTC?
22       A.   No.  We made a copy of it.
23       Q.   And where did the copy go?
24       A.   That was in Zenfia's account.
25       Q.   Where is the copy currently?

---

51 (Pages 201 to 204)

Brown

FTC v. Credit Bureau Center, et al.                                    12/13/2017

---

205

1       A.   There are no copies of the database.
2       Q.   **Steve Score had a copy of the entire**
3  **database, didn't he?**
4       A.   No.
5       Q.   **Well, how was he able to generate data**
6  **on Source Code 35 if you had removed Source Code**
7  **35 from the database?**
8       A.   So this is -- we talked about Amazon,
9  right?  Amazon is a cloud provider.  He was able
10 to run these reports in the cloud provider.  It
11 doesn't mean he has a copy of the database.  He
12 had access to run a query on the database.
13      And what we specifically deleted were
14 not the records.  It was the personal identifiable
15 information.  So we replaced the name, like let's
16 say a record has Mike Brown, it was M, star, star,
17 star, B, star, star, star, and everything else was
18 starred out.
19      That's what we did to insure compliance
20 with the order, what we thought was complying with
21 the order at the time through my previous counsel,
22 which I now know to not be completely accurate.
23      Q.   **So when you told Judge Kennelly you**
24 **didn't have access to the CRM, that wasn't true,**
25 **was it?**

---

206

1            MR. COCHELL:  At what time?
2            MR. LEVINE:  During the preliminary
3  injunction hearing.
4       A.   Can you refresh my memory?
5       Q.   **Well, did you have access to the CRM**
6  **during the preliminary injunction hearing?**
7       A.   Can you refresh my memory?
8       Q.   **No.  I'm asking you if you remember**
9  **whether you had access to the preliminary**
10 **injunction during the -- excuse me --**
11           MR. COCHELL:  He's asked for -- you said
12 you would give him documents to refresh his
13 memory.
14           MR. LEVINE:  I'm not going to give him a
15 document at this time.  I'm asking him if he
16 remembers.
17 BY MR. LEVINE:
18      Q.   **And if -- you haven't answered.  If you**
19 **don't remember, I'll give you the document.**
20      **Let's start with seeing if you remember.**
21 **See if that can be answered.**
22      A.   I'd have to look at --
23      Q.   **Do you -- let me ask the question.  Let**
24 **me ask the question.**
25      **Did you have access to the CRM during**

---

207

1  **the preliminary injunction hearing?**
2       A.   So the receiver --
3       Q.   **It's a yes or no question, Mr. Brown.**
4       A.   I can't answer it as a yes or no --
5            MR. COCHELL:  Do you recall one way or
6  the other?
7       A.   I can't answer it as a yes or no
8  question.
9            But what I can tell you is the
10 receivership took ownership, took control --
11      Q.   **I know that.**
12      **Answer my question:  Did you have access**
13 **to the CRM, yes or no?**
14      A.   I don't recall, unless you have
15 something else to refresh my memory.
16      Q.   **I have your testimony.  I don't know if**
17 **it's true.**
18      **I'm asking you:  Did you have access --**
19 **Steve Score worked for you, right?**
20      A.   Correct.
21           MR. COCHELL:  Okay.  Look, he asked for
22 you to refresh his memory.  Show him the
23 testimony.  Refresh his memory.
24           MR. LEVINE:  His testimony wouldn't
25 refresh his recollection as to what he had access

---

208

1  to, only what he testified to.
2            We'll get to the testimony later.  I'm
3  asking about access, a point on which the
4  testimony has nothing to say.
5            I'll ask the question unless you have an
6  objection.
7  BY MR. LEVINE:
8       Q.   **Did you have access to the CRM during**
9  **the preliminary injunction hearing?**
10      A.   You know, I need to refresh my memory as
11 to what time the receiver took over the AWS
12 account.
13      Q.   **Well, let's back it up.**
14      **Did you lose access to the CRM at the**
15 **time the receiver took over the AWS account?**
16      A.   I don't recall when --
17      Q.   **Well, we know you didn't because you**
18 **started a new business.**
19           MR. COCHELL:  You've got to let him
20 finish.
21           MR. LEVINE:  Okay.
22      A.   So --
23      Q.   **Let me ask a new question.  Okay?**
24      A.   Mm-hmm.
25      Q.   **You didn't lose access to the database**

---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Brown

FTC v. Credit Bureau Center, et al.                                    12/13/2017

---

209

1    until the contempt hearing, correct?
2       A.   I know at the contempt hearing, we
3    certified that we had deleted the data.
4           I mean, I can't recall specifically when
5    we -- before that, you know, when the receiver
6    took ownership of it, or I can't recall
7    specifically --
8       Q.   You can't recall when you relinquished
9    control of the CRM; is that your testimony?
10      A.   Correct.  But I know there's documents
11   and email that can refresh my memory.  I would be
12   happy to --
13      Q.   There's not.
14      A.   -- review them.
15      Q.   There's not.
16          MR. COCHELL:  We're going to move that
17   strike that sidebar.
18   BY MR. LEVINE:
19      Q.   What you know is that Steve Score was
20   one of your contractors, right?
21      A.   Yeah.
22      Q.   He created Exhibit 20 at your direction,
23   right?
24      A.   Yes.
25      Q.   And you already testified that you

---

210

1    directed him to create this in preparation for the
2    preliminary injunction hearing, right?
3       A.   I think it was used around then.
4       Q.   So if he had access to the -- so Steve
5    Score had access to the CRM prior to the
6    preliminary injunction hearing, correct?
7       A.   At some point, yeah.
8       Q.   At some point prior to the preliminary
9    injunction hearing.
10      A.   Yeah.
11      Q.   And if Steve Score had access, then you
12   had access too, didn't you?
13      A.   At some point before the PI, yes.
14      Q.   Okay.  Did you lose it at some point
15   before the PI?
16      A.   That's the part I don't recall.  I don't
17   recall it exactly when the receiver, you know,
18   locked us out.
19      Q.   But we know you were still using the
20   data in March and April.  David Ling filed a
21   declaration that said that.  Was Ling lying in his
22   declaration?
23      A.   I think you're confusing the tainted
24   data with the good data.
25      Q.   No.  I'm talking about a database which

---

211

1    has both tainted and what you call non-tainted
2    data; am I clear?
3       A.   I understand.
4       Q.   The CRM had both types of data, didn't
5    it?
6       A.   Yeah.
7       Q.   So there's no confusion.
8           David Ling testified at the contempt
9    hearing that you had access to the CRM data.  Was
10   he lying?
11      A.   No.
12      Q.   So you did have access to the CRM data.
13   Thank you.
14          Now I want to go back to Exhibit 4,
15   Page 201, which is docket Page 101.
16          MR. COCHELL:  Exhibit 4, what?
17          MR. LEVINE:  Exhibit 4, Page 201, which
18   is docket Page 101.
19          MR. COCHELL:  Okay.
20   BY MR. LEVINE:
21      Q.   Now, you already testified today that
22   when you said -- when the court said, "And then
23   the third one -- the third one was the internal
24   one," you understood the court to be referring to
25   the CRM.  You already testified that, you

---

212

1    remember?
2       A.   What line are we talking about here?
3       Q.   Line l1 on Page 201 -- I'm sorry, Line 9
4    to 10 on Page 201.
5       A.   It says, "LinkTrust, and then the third
6    one was the internal one."
7       Q.   And you already testified that that was
8    the CRM, right?
9       A.   By CRM, you're talking about the AWS
10   one?
11      Q.   Yeah.
12      A.   Yeah.
13      Q.   So if you go to Page 202, Line 16
14   through 19, Judge Kennelly says, "So the internal
15   one -- I want to make sure I'm tying everything
16   together in my head.  You don't have access to the
17   internal one right now because it's been taken
18   over by the receiver?"
19          And you answer, "Correct."
20          And that wasn't true, was it?
21      A.   That's not what I'm saying.  I'm saying
22   that, you know, there's obviously a good amount of
23   prep work and things that were done to set up that
24   new business credit data partners.
25          So if this is where I testify we didn't

---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Brown

FTC v. Credit Bureau Center, et al.                                    12/13/2017

213

1   have access, then I did not have access at this
2   point in time.
3       Q.   So you had access in January, you lost
4   it at the hearing, you gained it back in March?
5   What's going on?
6       A.   I mean, this is a complex --
7       Q.   No, it's not.  You had access or you
8   didn't.
9            MR. COCHELL:  Objection --
10      A.   Excuse me.
11           MR. COCHELL:  -- form of the question,
12  argumentative.  Please just ask questions without
13  arguing.
14  BY MR. LEVINE:
15      Q.   What's complicated about it?
16      A.   This is a complicated CRM, as you've
17  noticed.  I think there's probably 140-plus tables
18  in the database, and it's a sizable database.
19  It's not something you just set up instantly, you
20  have access to or you don't have access to.
21           So at this point in time, we did not
22  have access to it because this is my testimony.
23  There's no confusion about that --
24      Q.   What if it was just for negotiation?
25           MR. COCHELL:  Well, let him finish,

214

1   Counsel.
2            Go ahead.
3       A.   What's your question?
4       Q.   Steve Score had access to the CRM before
5   the preliminary injunction, and so did you, you
6   already testified to that, right?
7       A.   Correct.
8       Q.   So your testimony is on the eve of the
9   preliminary injunction, you relinquished control
10  of the CRM?
11      A.   So let me walk through some dates real
12  quick.  So the PI hearing is on February 23rd.
13  All right.  The lawsuit was filed on January 10th.
14  And Steve Score --
15           MR. WARD:  Sorry.  It was on the 14th
16  and the 13th, the PI hearing, and on the 8th of
17  February of 2017.  I thought I would just put that
18  out there.
19           MR. COCHELL:  Thank you.  That's good.
20  Thank you.
21           THE WITNESS:  I'm confused.  Can you
22  repeat that again?
23           MR. WARD:  The PI hearing was on the 8th
24  of February and the 13th and 14th of February,
25  2017.

215

1            MR. COCHELL:  Yeah.  This is simply when
2   it was filed.
3            THE WITNESS:  Oh, this is when filed.
4            MR. COCHELL:  That's all.
5            THE WITNESS:  Okay.
6            MR. WARD:  Okay.  So go ahead.
7       A.   So the PI hearing was in early February,
8   and the complaint was filed January 10th.
9            So my -- one of the early reactions was
10  to find out the scope of the damage by Pierce.  I
11  instructed Steve to create this report so I can
12  understand the scope and the revenues from Pierce.
13           So at the PI hearing, somewhere before
14  that, I believe we had conversations with the
15  receiver to turn over access to the database.
16           Now, I would need to refresh my memory
17  as to what date that was; but when I testified to
18  this fact, we did not have access to the CRM.
19           And it's a complicated system.  It's not
20  like you just take the CRM and set it up
21  overnight.  It's a process.
22      Q.   Well, it's complicated to set up.  But
23  accessing it simply requires credentials, correct?
24      A.   No.  I mean, just like you gave us the
25  CRM data now and we can't access this format --

216

1       Q.   Steve Score --
2       A.   -- and how long did it take you to
3   access the CRM data?
4       Q.   Well, you testified earlier that it was
5   in a more useable format before the lawsuit.
6       A.   Right.  It's running on a web server,
7   and the web servers were seized.  The web servers
8   were shut down.  The DNS pointing to these
9   websites were killed.
10      Q.   Your --
11      A.   So this is very different than the raw
12  data exports that you're referring to.  The CRM is
13  referred to as the websites, what you interact
14  with, what I see every day.
15      Q.   I appreciate your description of the
16  CRM, but that's really not what I'm talking about.
17  I'm talking about access to the CRM.
18  We've already established that Gordon Yang in
19  China had access to the CRM before the injunction
20  hearing.  So it wasn't so complicated that you
21  couldn't get it to China, was it, accessing those
22  CRM?
23      A.   I think you're mischaracterizing the
24  testimony and the facts.
25      Q.   How so?

54 (Pages 213 to 216)

Brown

FTC v. Credit Bureau Center, et al.                                    12/13/2017

---

217

1    A.   I think you're not understanding the
2  difference between the CRM and the underlying
3  database of the CRM, right?
4        So, for example, you turned over the
5  underlying database of the CRM in a highly
6  unusable format that neither of us can access
7  right now as we speak to you today.
8        So would I have the ability with this
9  information to recreate these stats and create
10 this report today without the infrastructure
11 behind the CRM to power it?  No.
12   Q.   Well, let's turn back to Exhibit 20
13 then.  This was prepared before the preliminary
14 injunction hearing; and it's pretty clean data,
15 isn't it?
16       It perfectly captures the membership
17 order count, the last 12-month membership order
18 count, the Source 35 membership order count; you
19 see all that?
20   A.   Yeah.
21   Q.   So your affiliate in China was able to
22 use the CRM to generate very precise data on CBC's
23 business operations, wasn't he?
24   A.   So like I said, this was done in
25 January, like right after the lawsuit was filed,

---

218

1  to understand the scope of the lawsuit.
2        So what does that have to do with my
3  testimony weeks later saying I don't have access
4  anymore?  I'm not following you.
5    Q.   Is it your testimony that you
6  relinquished access prior to the CRM, prior to the
7  preliminary injunction hearing?
8    A.   I'm saying there was a window where the
9  lawsuit was filed and the receiver did not take
10 action to kill our websites and to kill our CRM.
11       That window, I believe, was
12 approximately a week.  This report was run in that
13 week.
14       Then the receiver killed all the
15 websites, killed the DNS.  You're unable to log
16 into the back end of the CRM.
17       If you recall, I gave them a URL to
18 access the CRM of admin.MyScore360.com; and
19 magically they are not able to access it because
20 they killed the websites.
21   Q.   Who is --
22   A.   That is different than the data.
23   Q.   Who is Irving Popovetsky?
24   A.   He is a contractor.
25   Q.   And you transferred your CRM to him on

---

219

1  January 31st of 2017, didn't you?
2    A.   I did not transfer the CRM to him.  He
3  assisted in transferring the CRM.
4    Q.   From whom to whom?
5    A.   To a new Amazon account.
6    Q.   From you to a new Amazon account?
7    A.   Correct, to a new Amazon account.
8    Q.   So you copied the CRM into a new Amazon
9  account right before the preliminary injunction
10 hearing --
11   A.   He did a --
12   Q.   -- and then told the judge you didn't
13 have access.
14   A.   No, no.  You're completely
15 mischaracterizing what I said.
16       Like I said, a CRM consisted of multiple
17 components.  You have the whole front end
18 infrastructure and UI that powers the CRM; and you
19 have the raw data behind it in a highly unusable
20 form, like kind of like what we have today.
21       So when he did a backup and we purged
22 all the irrelevant data, we don't have the CRM
23 sitting in front of it to power it.
24   Q.   What data --
25   A.   We don't have the CRM in front of it to

---

220

1  access it.
2        So when I say it can't be accessed, it's
3  because there's no websites and there's nothing
4  pointing to it.
5        This was made off of a website
6  (indicating).  What I'm holding in my hand as
7  Exhibit 20, this was loaded through a web browser
8  on a website.
9    Q.   How do you know?
10   A.   Because I accessed it to print it out.
11   Q.   Accessed the website?
12   A.   Correct.
13   Q.   What website was it?
14   A.   Something on admin.MyScore360.com.
15   Q.   Which you had access to at the time of
16 the preliminary injunction hearing.
17   A.   No.  This was within approximately the
18 first week before the receiver killed all of the
19 domain names and all of the websites, there was a
20 small window of time from when the lawsuit was
21 filed to when the receiver killed everything.
22 This is when that was generated.
23   Q.   The Irving -- did the -- did Irving
24 Popovetsky destroy what you called irrelevant data
25 at your direction?

---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Brown

FTC v. Credit Bureau Center, et al.                                    12/13/2017

---

221

1    A.   Irving didn't destroy anything.
2    Q.   You said that he got rid of irrelevant
3    data. You said he "purged irrelevant data". What
4    does "purged" mean?
5    A.   If I said that, then I was mistaken.
6    What I -- what did happen was he copied
7    it over, and I believe it was Steve who helped
8    purge the irrelevant data or the data we believed
9    we were not supposed to have.
10   Q.   And Steve -- Steve deleted the data at
11   your direction?
12   A.   Correct.
13   Q.   And that was before the preliminary
14   injunction hearing?
15   A.   I don't recall the exact date.
16   Q.   So if he purged the irrelevant data, it
17   follows that he also had the relevant data, right?
18   A.   There's -- there's data there.
19   Q.   And what data did you deem irrelevant
20   such that you directed him to delete it?
21   A.   So at the time, it seemed very clear
22   that we were not supposed to have the Pierce and
23   Lloyd data. So at some point in time, we removed
24   that data --
25   Q.   While allowing --

---

222

1    A.   -- believing we were complying with the
2    court order.
3    Q.   While allowing Mr. Yang, known as Steve
4    Score, and Mr. Popovetsky to maintain a copy of
5    the rest of the data, correct?
6    A.   That's completely inaccurate.
7    The data sits in Amazon. People may --
8    people are not -- let's see. The database is
9    large. It's not something you can just click and
10   download a file like an Excel file. It's a long
11   time-consuming process.
12   It's not something that someone in China
13   over a very slow Internet connection is just going
14   to be able to do.
15   Q.   It takes about five and a half hours,
16   right?
17   A.   It would depend on your Internet
18   connection. It could take days or months.
19   Q.   To transfer it to Irving Popovetsky, it
20   took about five and a half hours, right?
21   A.   I don't know. There's a chat
22   conversation which would tell us.
23   Q.   But you did copy the entire database to
24   Irving Popovetsky, correct?
25   A.   I didn't copy the database to anyone.

---

223

1    Irving copied it.
2    Q.   At your direction.
3    A.   Correct.
4    MR. WARD: The entire database?
5    THE WITNESS: You can only make an
6    option -- or operation on the entire database, so
7    it's a two-step process.
8    MR. WARD: So that -- so you're saying
9    I'm correct, that he copied the entire CRM --
10   MR. COCHELL: One questioner --
11   MR. WARD: -- at your direction.
12   MR. COCHELL: -- at a time.
13   MR. LEVINE: No. I'm allowing him to
14   ask questions.
15   MR. COCHELL: No.
16   MR. WARD: I'll take that as an
17   objection.
18   MR. COCHELL: I'm going to direct the
19   witness not to answer.
20   MR. LEVINE: I'll answer it.
21   MR. COCHELL: There's no tag teaming in
22   depositions.
23   MR. LEVINE: Find me --
24   MR. COCHELL: I've never heard of that.
25   MR. LEVINE: Find me a Rule of Civil

---

224

1    Procedure that prohibits it.
2    MR. COCHELL: Find me a rule that allows
3    two or three lawyers to ask one witness a
4    question. I've never seen it done --
5    MR. LEVINE: Well, too bad.
6    MR. COCHELL: -- and I've never allowed
7    it, and I'm not going to start today.
8    MR. LEVINE: I'll ask the question.
9    BY MR. LEVINE:
10   Q.   You transferred the whole database to
11   Popovetsky.
12   A.   I'd have to see the chat --
13   Q.   No, you don't.
14   A.   -- to refresh my --
15   Q.   You already answered Guy.
16   A.   -- memory.
17   Q.   You said you can't transfer parts of the
18   data; you transfer the whole thing.
19   A.   I am drawing a blank as to if we purged
20   it before or after the transfer.
21   But I know our chat transcripts, which
22   you're heading at over there, will gladly refresh
23   my memory.
24   Q.   This is on a Slack, right?
25   A.   Yeah.

---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Brown

FTC v. Credit Bureau Center, et al.                                    12/13/2017

225

1          (Whereupon Deposition Exhibit
2          No. 21 was marked for
3          identification by the court
4          reporter.)
5      MR. LEVINE: This is going to be
6  Exhibit 21.
7      Okay. I'm showing you -- I'm sorry.
8      MR. COCHELL: Thank you.
9      MR. LEVINE: We have got to share.
10 BY MR. LEVINE:
11     **Q.  I'm showing you, Mr. Brown, a document**
12 **that's been marked for identification as**
13 **Exhibit 21.**
14         **Is this the chat that you said would**
15 **refresh your recollection?**
16     A.  I believe so.
17     **Q.  Okay.  And this is a chat on Slack**
18 **between you, Irving Popovetsky, and Steve Score,**
19 **correct?**
20     A.  Do I have two copies of this?
21     **Q.  Oh, thank you.**
22     A.  I believe so, yes.
23     **Q.  Okay.  And David Ling is on this chat**
24 **too, correct?**
25     A.  I don't know.  I don't see his name on

226

1  here.
2      **Q.   Okay.  All right.  So if you look at the**
3  **bottom of Page 21 -- excuse me, Exhibit 21, first**
4  **page, Popovetsky says on January 31st, "The**
5  **database transfer is underway."  Expect to**
6  **complete it "in about five hours."**
7         **Do you see that?**
8      A.  Oh, yes.  I remember this.
9      **Q.   So that refreshes your recollection?**
10     A.  Yeah.
11     **Q.   And this is January -- excuse me.**
12 **This is January 31st, 2017, right?**
13     A.  Correct.
14     **Q.   So when you told the judge you didn't**
15 **have access to the CRM, that just wasn't true, was**
16 **it?**
17     A.  That's completely not understanding
18 the -- what I'm saying.
19     **Q.   Did you have access or didn't you have**
20 **access during the preliminary injunction hearing?**
21     A.  Listen to what I'm saying very clearly.
22     MR. COCHELL: Objection, form of the
23 question.
24     A.  A CRM is a content management system.
25 It's not a CM database.  It's a content management

227

1  system which encompasses a database, right?
2      So in this action, he's making a copy of
3  the database, and we're complying with the court
4  order after this and removing the irrelevant data.
5  And this was done in preparation because the
6  receiver wanted the Amazon account.
7      And if you recall, on the phone call
8  with the receiver and the FTC, I specifically
9  stated that this was Zenfia data.
10     And you stated you wanted the whole
11 Amazon accounts and proceeded to give me some mini
12 lecture.
13     And so we complied with that by giving
14 the Amazon account and made a copy of the data and
15 complied with the order.  And now the database is
16 a piece of the CRM.
17     So just because you have a copy of the
18 database like we do today, you purportedly sent us
19 a copy of the database, I don't have the CRM
20 infrastructure to view this data and access it in
21 an easy way.  This is a piece of this
22 (indicating).
23     So when I say I didn't have access to
24 the CRM, that is accurate.
25     **Q.   But you have access to the data within**

228

1  **the CRM.**
2      A.  There's a copy of the CRM that was moved
3  somewhere without being set up, I guess you could
4  call it.
5      **Q.   But I'll ask the question again.**
6         **But at the time of the preliminary**
7  **injunction hearing, you had access to the data**
8  **within the CRM, correct?**
9      A.  In some format.
10     **Q.   Okay.  Okay.  Let's move on.**
11     MR. COCHELL: No.  Let's spend another
12 20 minutes on that.
13 BY MR. LEVINE:
14     **Q.   Actually, I do have to ask you**
15 **something.**
16         **Did Irving -- are you aware whether**
17 **Irving Popovetsky destroyed his copy of the data**
18 **after the contempt hearing?**
19     A.  Like I said, Irving never had a copy of
20 the data.
21     **Q.   Okay.  What about Steve Score, are you**
22 **aware whether Steve Score destroyed his copy of**
23 **the data after the contempt hearing?**
24     A.  Like I said, Steve Score never had a
25 copy of the data.

Brown

FTC v. Credit Bureau Center, et al.                                    12/13/2017

---

229

1    Q.   So whom were you transferring it to?
2    A.   A new Amazon account.
3    Q.   And who had access to that new Amazon
4    account?
5    A.   Me.
6    Q.   Okay.  Thank you.
7         All right.  Let's go back to Exhibit 20,
8    please.  You have that in front of you?
9    A.   Yep.
10   Q.   Now that we've dealt with the provenance
11   of this data, let's talk about it.
12        We were talking about Danny Pierce's
13   chargeback, right; do you recall that?
14   A.   Yeah.
15   Q.   If you look at the bottom of this table,
16   I want to draw your attention to two rows.  Okay?
17   One row says, "last 12 months chargeback count."
18        It's at six or seven from the bottom.
19        And then the third row from the bottom
20   says, "Source Code 35 last 12 month chargeback
21   count."
22        Do you see that?
23   A.   Give me a moment, please.
24   Q.   Sure.  Just tell me when you're ready.
25   A.   Yes, I see it.

---

230

1    Q.   Now, this is the 12 months before
2    whenever Gordon Yang created this database, right,
3    or created this document, right?
4    A.   Can you repeat the question?
5    Q.   When it says "last 12 months," is that
6    referring to 12 months prior to the time that this
7    report was created?
8    A.   Yes.
9    Q.   And it was created sometime in
10   January 2017, correct?
11   A.   Correct.
12   Q.   Okay.  So if you look at the last
13   12-month chargeback count, there were 10,204
14   chargebacks.
15        Source 35 is Danny Pierce, you testified
16   earlier, correct?
17   A.   Correct.
18   Q.   And if you look at his chargeback count
19   in the last 12 months, 9,126, right?
20   A.   The Source Code 35 says, "last
21   12 months, 9,126," yep.
22   Q.   And last 12 months overall is 10,204,
23   correct; do you see that?
24   A.   Which line are you looking at?
25   Q.   Seven from the bottom, "Last 12 months

---

231

1    chargeback count, 10,204."
2         Do you see that?
3    A.   Yeah.
4    Q.   Okay.  You have a calculator out, I
5    think, on your phone.  Could you divide 9,126 by
6    10,204 for me, please?
7    A.   Divide what?
8    Q.   9,126 by 10,204.
9    A.   Hold on one second.  So you're going to
10   compare the Source Code 35 chargebacks with which
11   ones?
12   Q.   Do you mind if I take the exhibit, and I
13   can highlight them for you?
14   A.   Yeah.
15   Q.   I'm going to take the last 12-month
16   chargeback count as the denominator.
17   A.   Mm-hmm.
18   Q.   And the Source 35 last 12-month
19   chargeback count as the numerator.  Got it?
20   A.   Yeah.  This isn't accurate.
21   Q.   What's not accurate?
22   A.   The chargebacks were not ten times
23   larger as this shows.
24   Q.   What do you mean?
25   A.   Let me review this real quick.  One

---

232

1    moment.
2         Okay.
3    Q.   You were saying --
4    A.   Okay.  What number do you want me to
5    divide?
6    Q.   Let's do the math, 9,126 divided by
7    10,204.
8    A.   What number are you trying to reach?
9    Q.   That's what the calculator will tell us.
10   A.   I want to know your -- your --
11        MR. COCHELL:  He wants to know what the
12   percentage of chargebacks are for --
13   BY MR. LEVINE:
14   Q.   Is it accurate?
15        MR. COCHELL:  -- Danny Pierce of the
16   whole thing.
17   BY MR. LEVINE:
18   Q.   Is it accurate, and you can check it on
19   your calculator, that 89.4 of your chargebacks in
20   the 12 months before January 2017 were
21   attributable to Danny Pierce?
22   A.   I don't believe that to be so, no.
23   Q.   So Exhibit 20, the -- but you agree with
24   the math, right?
25   A.   I agree your -- your math of dividing

---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Brown

FTC v. Credit Bureau Center, et al.                                    12/13/2017

---

233

1    one number by another --
2        Q.   Did I choose the right numerator and the
3    right denominator?
4        A.   You know, I think the data will speak
5    for itself in the database.  I mean, it's entirely
6    possible someone could have made an error in
7    generating this report.
8        Q.   You produced this report to us.
9        A.   I didn't produce this report.  Steve
10   Score produced this report.
11       Q.   Your attorney produced this report.
12   That's why it says at the bottom, CBC, slash,
13   Brown 296.
14       A.   I talked about who developed this
15   report, right?  Someone wrote a query to arrive at
16   this number.  Obviously the query is incorrect.
17       Q.   Why is it obviously incorrect?
18       A.   Because I know that Pierce wasn't 80 or
19   90 percent of the chargebacks for a fact.
20       Q.   Even though you told Pierce over and
21   over his chargeback rates were five times higher,
22   that was all a lie, so is Exhibit 20; is that your
23   testimony?
24       A.   So the data in the database will show us
25   the accurate chargeback count; and if there was a

---

234

1    mistake in how this is calculated, then I would --
2    I would love to see the real data.
3        Q.   Well, you generated -- Steve Score
4    generated this data at your direction based on the
5    database that he had access to.  Where is the
6    error from?
7        A.   Sometimes developers make mistakes.
8        Q.   But you don't have any specific basis
9    for rejecting the data in Exhibit 20, do you?
10           MR. COCHELL:  Objection; form of the
11   question, misstates the witness's testimony.
12           MR. LEVINE:  Okay.  I'll ask.
13           MR. COCHELL:  He disagrees with it.
14   You've asked him for the basis of his
15   disagreement.  He's told you.
16           MR. LEVINE:  I'm going to ask a new
17   question.
18   BY MR. LEVINE:
19       Q.   You've already agreed that my math is
20   right based on Exhibit 20.
21           What I'm asking you is:  Are you aware
22   of any specific error in the math behind
23   Exhibit 20 that would have led to what you call a
24   mistake?
25           MR. COCHELL:  Objection, form of the

---

235

1    question.
2    BY MR. LEVINE:
3        Q.   Why is there -- just answer the question
4    I asked.
5        A.   I'm sorry.  Can you repeat the question?
6        Q.   I'll rephrase it.
7            What is your basis for saying that the
8    data reflected in Exhibit 20 is mistaken?
9            MR. COCHELL:  Objection; form of the
10   question, asked and answered.
11           Go ahead and answer it again.
12       A.   So according to this document, it says
13   last 12 months, chargebacks are 10,000, right?
14           And then it says last 12 months for
15   Source Code 35, 9,000.
16           So this would lead me to believe that
17   the chargebacks were only 1,000 higher to
18   encompass all of the chargebacks, which I don't
19   think to be true.
20       Q.   But you don't have any specific
21   mathematical error that you can point to that
22   would have generated this purported error, do you?
23       A.   Well, see, this is where the data and
24   the database is going to tell us because realize,
25   a human being created a report and wrote a sequel

---

236

1    query to generate this; and it's entirely possible
2    that the total could be inaccurate.
3            I would love to go in there and generate
4    an accurate total.  And the data in the database
5    doesn't lie.  It's in the database.
6        Q.   Apparently this data did, which it comes
7    from the database.
8            MR. COCHELL:  Objection, argumentative.
9    BY MR. LEVINE:
10       Q.   You relied on this data in battling the
11   preliminary injunction, didn't you?
12       A.   I don't know if we presented this at the
13   preliminary injunction.
14           MR. COCHELL:  It wasn't marked as an
15   exhibit.
16           MR. LEVINE:  That's true.
17   BY MR. LEVINE:
18       Q.   But you said in your first declaration
19   that Pierce generated about $6.8 million in
20   revenue for CBC; do you remember that?
21       A.   Yeah.
22       Q.   And look at that, 6.8 million, and
23   that's just for the last 12 months for Source Code
24   35; do you see that?
25       A.   No.  That's for all time.

---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Brown

FTC v. Credit Bureau Center, et al.                                              12/13/2017

---

237

1    Q.   Oh, okay.  I'm sorry.  Right, you're
2    right.
3          And that's exactly what you wrote in
4    your opposition.  That's exactly what was
5    reflected in your opposition to the preliminary
6    injunction, correct?
7    A.   Yes.
8    Q.   So you relied on this data in opposing
9    the preliminary injunction, correct?
10   A.   On this particular line item, the
11   6.8 million, yes.
12   Q.   So that line item is right, and you're
13   certain that's right?
14   A.   Well, you know what, this calls me to
15   question the accuracy of all the numbers here.  If
16   one is correct, I think we should validate them
17   all.
18   Q.   Okay.  Okay.  Actually, I do have some
19   further questions about Exhibit 20.
20         Did -- how did you -- how did you obtain
21   Exhibit 20?
22   A.   I asked Steve to generate this.
23   Q.   And that was before the preliminary
24   injunction hearing.
25   A.   This was sometime in early January.

---

238

1    Q.   Right.  Did you look at it?
2    A.   Of course.
3    Q.   Did you go back to him and say, this
4    can't be right, 90 percent of my chargebacks are
5    from Danny Pierce?
6    A.   I don't recall saying that.
7    Q.   You were really -- I think it's fair to
8    say you were really determined to modify the
9    temporary restraining order such that you could
10   continue to operate a portion of your business,
11   correct?
12   A.   Correct.
13   Q.   That was what your attorneys were
14   seeking at the preliminary injunction hearing,
15   correct?
16   A.   Correct.
17   Q.   And one of the things you kept arguing
18   in the preliminary injunction hearing is that the
19   data would show a lot of your business was
20   untainted, right?
21   A.   Correct.
22   Q.   And you had your affiliate -- you had
23   your contractor, Steve Score, generate this report
24   about data from the business, correct?
25   A.   Correct.

---

239

1    Q.   And you decided not to use this data at
2    the preliminary injunction as evidence?
3          MR. COCHELL:  Objection, form of the
4    question.
5          Go ahead.
6    A.   So I think it's no secret that my
7    previous counsel was not good.  There's a lot I
8    would have preferred to do differently.
9          And I think you might be proving our
10   point, you know, whether this number is right or
11   wrong.
12         If you think it's right, then this just
13   goes to show that the rest of our business was
14   that much more good and untainted, right?
15         If it's not right, like I think it is,
16   then I think it will show that the chargeback rate
17   is not that much different; so --
18   Q.   So you want to use this data in whatever
19   way best serves your case or not use it?
20         MR. COCHELL:  Objection, argumentative.
21   BY MR. LEVINE:
22   Q.   Isn't that what you just said?
23         MR. COCHELL:  No.  That's not what he
24   said.  Object --
25   A.   No, that's not what I said.

---

240

1          MR. LEVINE:  Please have your client
2    answer the question.
3    A.   That's not what I said.  I think you're
4    mischaracterizing this.
5          And, you know, frankly, I don't think we
6    subtracted the refunds and chargebacks from the
7    6.8 million number.  I think now that that could
8    be another error.  The numbers might -- the
9    damages might be lower from Pierce and Lloyd.
10   Q.   You don't know --
11   A.   I think we should revisit that.  It
12   looks like the -- the refunds for Pierce was
13   nearly half a million dollars.  And the
14   chargebacks, which also count as refunds, look
15   like they total about $400,000.  So I think the
16   damages might be closer to 6 million.
17   Q.   So that data you trust.
18   A.   Well, we would have to go through and
19   verify it, like I previously said.  If there's a
20   problem with one of these fields, like I suspect
21   there is, I think we should go through it and
22   recreate this.
23         You have the data.  He supposedly has
24   the data.  I think this would be a great
25   opportunity to go through and analyze it.

---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Brown

FTC v. Credit Bureau Center, et al.                                    12/13/2017

241

1    Q.   In January, you had the data, and you
2    did have someone analyze it.  And this is what he
3    generated, isn't it?
4        A.   Well, sometimes people make mistakes.  I
5    asked a software engineer to create these stats.
6    And with software comes mistakes.
7        Q.   You blame your attorney for not using it
8    at the preliminary injunction hearing; but Steve
9    Score sent it to you, right?  He didn't send it to
10   Gregory Zini.
11       MR. COCHELL:  Objection.  Direct the
12   witness not to answer.
13   BY MR. LEVINE:
14       Q.   Let me rephrase that.
15       Steve Score sent this database to you,
16   correct?
17       A.   Steve Score did not send the database to
18   me.
19       Q.   I'm sorry.  Steve Score, aka Gordon
20   Yang, sent Exhibit 20 to you, correct?
21       A.   I got this from Steve.  He provided a
22   link or this in some way to me, yes (indicating).
23       Q.   And you didn't say to -- never mind.
24       MR. COCHELL:  Is this time for a break?
25       MR. LEVINE:  Yeah, sure.

242

1        MR. COCHELL:  Because I need to go down
2    the hall.
3        MR. LEVINE:  Yeah, that's fine.
4        (Whereupon, a short break was
5        taken.)
6        A.   So if I may, upon further review of this
7    document you presented --
8        Q.   And that's Exhibit 20?
9        A.   -- Exhibit 20, you know, I see multiple
10   errors in here.
11       Q.   What else?
12       A.   Just to show you a blaringly obvious
13   one, look where it says, "Source Code 35 refund
14   counts."
15       Q.   Mm-hmm.
16       A.   It says 21,816.
17       Q.   Yeah.
18       A.   One line below that, "Last 12 months
19   refund counts" for Source Code 35, 21,816.
20   Obviously all the refunds did not occur in the
21   last 12 months.  This is another blaring example
22   of this being inaccurate.
23       Now, what I can tell you to back up what
24   I'm saying is that the refund amounts and the
25   chargeback amount is generally near hand in hand.

243

1        So if you want to look for the Source
2    Code 35 refund amounts, $471,000, versus all
3    refund amount, $884,000, that will go to show you
4    as a percentage how different or similar the
5    traffic was.
6        This looks more in line with what I
7    would be expecting the chargeback count to reflect
8    because the chargeback count and refund counts are
9    very similar.
10       Q.   Okay.
11       A.   And that's what the data will reflect.
12       Q.   Any other errors you spotted in this,
13   errors or things you believe are accurate on
14   Exhibit 20 during the break?
15       A.   You know, I think analyzing the full
16   database, you know, might come across more; but
17   there's none that I can see in this moment.
18       Q.   Okay.  Let's go -- let's talk.
19       Okay.  We're moving -- you can put that
20   exhibit aside.
21       Now, you understood that Danny Pierce
22   was using Craigslist to generate traffic, correct?
23       A.   Yeah.
24       Q.   And --
25       A.   Sorry.  What number was the -- off the

244

1    record, I guess.
2        (Whereupon, discussion was held
3        off the record.)
4    BY MR. LEVINE:
5        Q.   You knew that Danny Pierce was using
6    Craigslist to generate traffic, correct?
7        A.   Of course.
8        Q.   And you knew that the whole time he was
9    your affiliate?
10       A.   Yes.
11       Q.   And you knew it was traffic for people
12   seeking rental properties?
13       A.   Yes.
14       Q.   And you knew this traffic involved
15   sending emails?
16       A.   Yes.
17       Q.   And you knew that these emails had a
18   template?
19       A.   Yes.
20       Q.   Okay.  Let's go back to Exhibit 18,
21   which is the iMessage conversation with Danny
22   Pierce.  I'll ask you to please turn to Page 36.
23       A.   Sorry.  What exhibit again?
24       Q.   Exhibit 18, Page 36.
25       A.   36?

61 (Pages 241 to 244)

Brown

FTC v. Credit Bureau Center, et al.                                    12/13/2017

---

245

1    Q.   Yeah.
2         Okay.  So I'm looking at 7-24-16.  And
3    the gray is you, right?
4    A.   Mm-hmm.
5    Q.   Yes?
6    A.   Yeah.
7    Q.   Okay.  Let's actually first look at the
8    blue, at the -- right under 7-24-16, 5:44 p.m.
9    Pierce says, "How much do you think running this
10   costs?"
11        Do you see that?
12   A.   Yes.
13   Q.   You respond, "Your costs all break down
14   to the number of sales per post, and then
15   calculate the resource costs to make that post.  I
16   estimate about $1 per post plus the guy to oversee
17   it.  Look, I'm not here to beat you up over
18   profits, but understand I know what they are and
19   how this works."
20        Do you see that?
21   A.   Yes.
22   Q.   So I want to go through and -- that text
23   and try to -- you can help me understand what you
24   meant.
25        So how did you know -- what was your

---

246

1    basis for saying that "your costs all break down
2    to the number of sales proposed"?
3    A.   Because this point in time, you know, I
4    do know that Pierce is posting ads on Craigslist,
5    right?  He's posting ads for apartments on
6    Craigslist, and he gets a certain number of people
7    who reply to these ads; and he'll send an email to
8    these customers.
9         And it costs money to post at that scale
10   on Craigslist.  And at the end of the day, people
11   are trying to calculate their earnings per click
12   or their earnings for the day, right?
13        So everything comes down to the cost per
14   post and how much they make per click.
15   Q.   And --
16   A.   So basically in one way or another, I'm
17   saying, look -- he's complaining about profit,
18   complaining that he gets zero transparency because
19   he's not entitled to any in my business.
20        And I'm saying, look, you're being
21   greedy.  I know you're making a lot of money
22   because you're probably paying a dollar per post.
23   Q.   You say you knew "how this works."
24        You meant you knew what his costs were
25   approximately?

---

247

1    A.   I mean, I know the process of posting an
2    ad on Craigslist.  I know the process of getting
3    rental data.  I know the process of sending an
4    email.  I have a good understanding of that.
5    Q.   Getting rental data can cost a lot,
6    right?
7    A.   No.
8    Q.   Didn't you say in a declaration that it
9    costed a minimum $699 a month to --
10   A.   No.  I'm sorry.  I didn't think that
11   that was a lot.
12   Q.   Well, I'm in government.
13        So you don't list that as a cost here,
14   do you?
15   A.   To me, that's a negligible cost when
16   he's getting -- he made a lot more than that per
17   day.
18   Q.   Okay.  You say, "I estimate about $1
19   per -- $1 per post plus the guy to oversee it."
20   A.   Mm-hmm.
21   Q.   Here's another reference to one guy,
22   right?
23   A.   Yeah.
24   Q.   What did you mean "the guy to oversee
25   it"?

---

248

1    A.   I'm sure he has a campaign manager, an
2    affiliate, a technical guy, someone to oversee
3    this.
4    Q.   What does overseeing it involve, as you
5    understood it then?
6    A.   I mean, I would understand this to make
7    sure that's, you know, your ads are being posted
8    successfully, that the emails are going out to
9    consumers, the consumers are clicking on the
10   emails.
11   Q.   And these emails contain links, right?
12   A.   Yeah.
13   Q.   And those links would go to your
14   website.
15   A.   Correct.
16   Q.   And those links included tracking links
17   within them that allowed Pierce to track how many
18   people were clicking, right?
19   A.   So there's multiple tracking systems
20   involved, right?
21        So Pierce, I believe, had his own.  He
22   would redirect to my tracking link, and I would
23   redirect to my website.
24   Q.   So the link that appeared in the email
25   to consumers, it wasn't just eFreeScore.com, was

---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Brown

FTC v. Credit Bureau Center, et al.                                    12/13/2017

---

249

1    it?
2        A.   No.
3        Q.   It was a link that included -- it was a
4    link that included a tracking -- tracking link
5    within it?
6        A.   It was Pierce's tracking link for his
7    affiliate link, yes.
8        Q.   And if he had subaffiliates, there might
9    be an additional tracking link within that link?
10       A.   I don't understand your question.
11       Q.   Strike that.
12            Did Pierce show you those links before
13   putting them in emails?
14       A.   He didn't show me that particular link.
15   You know, I have -- I have seen them.
16       Q.   And where have you seen them?
17       A.   I've seen them online a few places
18   posted.  I've seen them in -- as a referring URL
19   in Offerit.  That's all that I can recall.
20       Q.   Where did you see them posted online?
21       A.   Various websites.  I think there might
22   have been some on like Quora.  I think there's one
23   on Quora.com.
24       Q.   And were the links alone, or were they
25   in the full email?

---

250

1        A.   I don't recall specifically, but I
2    believe it was probably the email.
3        Q.   So you recall seeing the emails Pierce
4    sent online?
5        A.   Yes.
6        Q.   At what point did you see them?
7        A.   I don't recall specifically.  I have
8    seen different emails over the course of our
9    relationship with him.
10       Q.   And you know now those emails were for
11   phony properties, right?
12       A.   See, that's the part I'm a little
13   confused about to this day; and I would love to
14   find out the answer to this.
15            But I don't know if he was advertising
16   phony nonexistence properties for rent or if he
17   was advertising legitimate properties for rent but
18   then failing to send the email to the prospective
19   renter to the landlord.
20            I think, you know, looking at these
21   properties, they seem to be legitimate properties
22   that he's advertising for rent.
23            And I think the fraud took place when
24   Pierce failed to match up this prospective renter
25   with the landlord, credit report in hand.  That's

---

251

1    where I think the failure or the fraud was.
2        Q.   You remember these emails.  They say --
3    well, let's talk about that later.  Okay.  We'll
4    go back to that.
5            Let's turn to Page 37.  So we're still
6    in July 24th, 2016.  You asked, "How many posts
7    per day are you doing?"
8            You're referring to Craigslist posts,
9    right?
10       A.   Yeah.
11       Q.   Pierce, Pierce responds, "4 to 5,000."
12            Do you see that?
13       A.   Yeah.
14       Q.   That's a lot of -- that would be a lot
15   of properties, wouldn't it?
16       A.   Yep.
17       Q.   You thought Pierce was handling rentals
18   for 4 to 5,000 properties?
19       A.   I think that Pierce had access to an MLS
20   database of at least 4 to 5,000 rental properties.
21            Now, I don't think he was a property
22   manager of that many.  That would be ridiculous.
23            But going back to my previous comment,
24   and I think it was in my declaration, you can buy
25   access to the MLS database for about $700 a month.

---

252

1    And this would be many more than 4 to 5,000
2    properties.
3        Q.   So your understanding was that Pierce
4    bought -- your understanding, let's break it down,
5    was that Pierce posted 4 to 5,000 property ads per
6    day.
7        A.   More or less.
8        Q.   In markets all over the country,
9    correct?
10       A.   Correct.
11       Q.   And didn't you say in your declaration
12   that the 699 per month was just MLS in one market?
13       A.   No, I don't believe so.
14            And to clarify, I mean, he did say 4 to
15   5,000 per day.  But, you know, sometimes you take
16   what affiliates say with a grain of salt.  Could
17   be more, could be less.  But he has said some
18   different things.
19       Q.   Okay.  And you asked, "How many replies
20   per ad?"
21            Do you see that?
22       A.   No.
23       Q.   You don't see where you say, "How many
24   replies per ad," toward the top of Page 37?
25       A.   Yes.

---

63 (Pages 249 to 252)

Brown

FTC v. Credit Bureau Center, et al.                                      12/13/2017

---

253

1    Q.   You say, "4 to 5,000 per day is too much
2    for the" average "number of sales.  How many
3    replies per ad you average?  80?"
4         Do you see that?
5    A.   Yes.
6    Q.   So you estimated that there would be 80
7    replies to 4 to 5,000 ads every day?
8    A.   No.  What I'm getting at is I'm reverse
9    calculating his costs, right?
10        So if we know that for every X number of
11   visitors he sends to the website, X number are
12   going to enroll, right, then we take it a step
13   further and say, okay, how many ads does he have
14   to post to get X number of visitors to the
15   website?  And then, okay, how many replies is that
16   on average per ad?  That's what we're getting at
17   here.
18        So I'm saying there's no way it's
19   possible he would get one customer to enroll by
20   posting ten properties for rent.  I would have to
21   imagine there's a lot more prospective renters
22   than that.
23   Q.   Right, because you thought there would
24   actually be 80 replies based on the volume of 4 to
25   5,000 ads, correct?

---

254

1    A.   Yeah.
2    Q.   So we're talking over 300,000 emails.
3    A.   I'm -- I mean, I'm obviously doubting
4    what he's saying.  I said, "4 to 5,000 a day is
5    too much for the number of sales."
6         I'm not necessarily believing what he
7    says.  Like I said, I'm taking it with a grain of
8    salt.
9    Q.   But you --
10   A.   He says, "4 to 5,000" per day.
11        And I said right here, "4 to 5,000 per
12   day is too much for the number of sales."
13   Q.   But you did think there would be 80
14   replies for every ad.
15   A.   That would be my guess, yeah.
16   Q.   And you thought Pierce was personally
17   responding to all of these replies?
18   A.   No.  I think he had an automated system
19   in place, a template that was customizing the
20   template for the property.
21   Q.   Okay.
22   A.   Now, I'll give you an example of this.
23   I'll see one template online that says something
24   to the effect of, We had a recently remodeled
25   kitchen.

---

255

1         Then I'll see another email that says,
2    We're pet friendly, right?
3         So all these emails are different, and
4    they are unique.  And the way it was explained to
5    me is that he's doing what's called a spinning or
6    a text spinning, syntax spinning to customize the
7    email to the property.
8         So if I see an email that says, Okay,
9    great, you have a recently remodeled kitchen, and
10   the next one, it says a pet friendly, it seems
11   like it's custom to property.
12   Q.   So you saw multiple landlord emails.
13   A.   Yes.
14   Q.   And when I say landlord emails, you
15   understand I'm referring to what later turned out
16   to be fake landlord emails, right?
17   A.   I think that's mischaracterizing the
18   email.
19        I think the -- again, I think if Pierce
20   had matched up that prospective renter with the
21   property owner, I think there would be nothing
22   wrong with this email.
23   Q.   So the FTC alleged in its complaint that
24   Pierce sent ads, emailed -- let me back up.
25        The FTC alleged in its complaint that

---

256

1    Pierce posted ads for properties that he didn't
2    own or have any authority to rent to own; are you
3    aware of that allegation?
4    A.   I believe that's in your complaint.
5    Q.   But you believe he actually had access
6    to these properties?
7    A.   I believed he had access to the MLS
8    database, and he has represented to me on numerous
9    occasions he does for other websites.
10        Now, there's one in particular that
11   comes to mind called RTO database, which is a
12   rent-to-own property.
13        And now, you know, I feel bad because I
14   saw these emails.  I saw the properties.  I have
15   gone through, and I've seen some of the
16   properties.  And they look real.  The ads look
17   real.
18        And, you know, the responses don't
19   mention free credit report.  They don't mention
20   free credit score.  And, you know, he pulled a
21   fast one on us.
22        I feel like the difference between
23   compliance and noncompliance with this type of
24   campaign is a small difference of matching up the
25   renter with the landlord.  And had he have spent

---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Brown

FTC v. Credit Bureau Center, et al.                                    12/13/2017

---

257

1    the extra $700 to do this, we would not be in this
2    situation.
3          And you know what, if I had any
4    indication at all that he was posting fraudulent,
5    nonexistent properties or doing any sort of fraud,
6    it's not worth the headache. I would have
7    immediately cut ties with him.
8    Q.    When you say you saw the ads and the
9    emails and they looked real, that was before the
10   lawsuit was filed, right?
11   A.    Correct.
12   Q.    You mentioned RTO. That is rent to own?
13   A.    Correct.
14   Q.    And I believe it was your understanding
15   that Pierce was -- his particular niche in the
16   rental market was RTO?
17   A.    I understood that was one of the offers
18   that he represented that he owned or drove traffic
19   to.
20   Q.    What about -- but you -- he drove
21   traffic to your offer, right?
22   A.    But he also had a rent-to-own offer. I
23   don't know if it's true or not, but he told me
24   that he did.
25   Q.    Let's leave that aside. We're talking

---

258

1    about your offer, Credit Bureau Center. Okay?
2    A.    Okay.
3    Q.    Did you believe that that traffic that
4    he generated for CBC was RTO traffic?
5    A.    I believed it was rental traffic.
6    Q.    You didn't know whether it was RTO or --
7    A.    No. I mean, RTO would be specifically
8    for people looking for rent to own. That type of
9    traffic is for showing people a listing.
10         But I do know that he on these websites
11   that he provided, I believe, did provide a search
12   engine to access rent-to-own traffic.
13         So I don't know if you recall some of
14   these emails from the landlords. But on the
15   emails from the landlords, if you go to that
16   website, it's a rental listing website, which
17   looks like it includes all type of rental
18   listings. Could be rent to own, could be a
19   property search, could be anything.
20         So I don't know what type of properties
21   he had access to. Maybe he was fabricating this
22   the whole time.
23         But if we had known this, we would have
24   declined to work with him, like we've done with
25   all the other affiliates that committed fraud.

---

259

1    Q.    But you were quite familiar with those
2    emails.
3    A.    Yes.
4    Q.    Okay. So you didn't know whether your
5    traffic was RTO or not. You -- let me back up.
6          I think I might have misheard what you
7    said. Did you testify that you believed the
8    traffic going to your offer was rental,
9    traditional rental, not RTO?
10   A.    Can you repeat the question?
11   Q.    The traffic Pierce generated that went
12   to your offer, was it RTO?
13   A.    So RTO is rent to own. So I don't know
14   if you're familiar with rent-to-own traffic. So
15   rent-to-own traffic can be operated a few
16   different ways, right?
17         So one way is you're advertising a
18   property and then selling access to listings. So
19   CBC was not at this point in time selling access
20   to listings.
21         We didn't have at this point in time the
22   MLS listings to do that. But this was a business
23   that we were definitely interested in.
24   Q.    That's not what I meant.
25   A.    So I don't think you're -- you're asking

---

260

1    like, you know --
2    Q.    I'll rephrase.
3    A.    Okay.
4    Q.    You said that you saw some of Pierce's
5    ads on Craigslist, right?
6    A.    Yes.
7    Q.    You also saw some of the emails, right?
8    A.    Yes.
9    Q.    And you knew that those ads and emails
10   linked to your offer, right?
11   A.    Yes.
12   Q.    Did you know that -- did you believe
13   that those ads and emails were for RTO
14   opportunities?
15   A.    So the email itself is not for an RTO
16   opportunity, but he represented he had an RTO
17   offer.
18         And if you recall from the text message
19   history, he was going to monetize these customers
20   other ways and didn't want to step on our toes.
21         One of these ways involved enrolling
22   customers in a rent-to-own program, which he
23   purported to have, one of them specifically being
24   rent-to-own database.
25         So he may direct a customer to our

---

65 (Pages 257 to 260)

Brown

FTC v. Credit Bureau Center, et al.                                    12/13/2017

261

1   website, at the same time market to that customer
2   and saying, Hey, do you have poor credit?  Would
3   you like to get a rent-to-own home?  Sign up for
4   rent-to-own database.  And guess what?  As in
5   rent-to-own database, we need a copy of your
6   credit report.
7          So this could be RTO traffic too.  So
8   they kind of complement each other in how they
9   work that way.  So it can be RTO traffic; but it
10  can be to an RTO offer or credit report offer, if
11  that makes sense.
12      Q.   Yes.
13          You said that you -- did you have an RTO
14  offer?
15      A.   We had an RTO offer at one point in
16  time.
17      Q.   Did it -- was there any traffic to that
18  RTO offer?
19      A.   We were just about to launch it before
20  the lawsuit got filed.
21      Q.   So there was no traffic to the RTO
22  offer?
23      A.   No.
24      Q.   Now, you said that you were familiar
25  with Pierce's ads and emails before the lawsuit,

262

1   correct?
2       A.   Yes.
3       Q.   How many of the -- let's start with the
4   emails.
5       A.   Mm-hmm.
6          Excuse me.  Do you mind if I go off the
7   record and heat up my coffee?
8       Q.   Yeah.
9          (Whereupon, a short break was
10             taken.)
11          MR. LEVINE:  Okay.  Let's go back on the
12  record whenever everyone is ready.
13  BY MR. LEVINE:
14      Q.   You're aware that the fraud in this --
15  discussed in this case involves fake Craigslist
16  ads -- excuse me, involves Craigslist ads for fake
17  properties and fake landlord emails, that's the
18  allegation; do you understand that?
19      A.   No.  I don't understand that to be true.
20  I understand what you're saying though.
21      Q.   Are you aware of fraud of the nature
22  that I described?
23      A.   Yeah.  I think there's some clarity.
24  Maybe I'm not the one to provide this, and maybe
25  you're not either, but there's a difference

263

1   between advertising a fake, nonexistent,
2   fraudulent property that doesn't exist, and
3   there's a difference between advertising a real
4   property that does exist.
5          Sitting here today, I don't know which
6   one is true because I see some properties that
7   look real and pop up to a real MLS listing.  And
8   then I see some complaints where they say it
9   doesn't exist.  So I don't know.
10      Q.   Okay.  I'm showing you a document that's
11  been marked for identification as Exhibit 22.
12          (Whereupon Deposition Exhibit
13             No. 22 was marked for
14             identification by the court
15             reporter.)
16  BY MR. LEVINE:
17      Q.   Do you recognize it?
18      A.   Yes.
19      Q.   What is it?
20      A.   It's an email from Tom to myself.
21      Q.   Do you see it's Tom Fragala?
22      A.   Yes.
23      Q.   April 2015?
24      A.   Mm-hmm.
25      Q.   Yes?

264

1       A.   Yes.
2       Q.   He says, "You were the one that taught
3   me about these type of scams, and I know you've
4   been burned by them.  I happened to notice this
5   fake ad for apartment to get credit report from
6   March."
7          Do you see that?
8       A.   Yes.
9       Q.   Had you told Tom Fragala about scams
10  with fake ads for apartments?
11      A.   No.  I told him about scams for fake job
12  applications.  People post a job that doesn't
13  exist, and they get an applicant to apply for a
14  job and tell them to get a credit report.
15      Q.   So Tom was mistaken that you had told
16  him about rental scams?
17      A.   No.  I think he is not mistaken.  I
18  think what he says speaks for himself:  "You
19  taught me about these types of scams."
20          So he's obviously not referring to this
21  specific scam but a type of scam in general.
22      Q.   And his next sentence, doesn't he refer
23  to "fake ads for apartments to get credit report"?
24      A.   He said, "I happened to notice this fake
25  ad" for an apartment to get a credit report.

66 (Pages 261 to 264)

Brown

FTC v. Credit Bureau Center, et al.                                    12/13/2017

---

265

1    Q.   Did you click on that link?
2    A.   I did.
3    Q.   Do you remember what it says?
4    A.   I saw something regarding a landlord
5    that didn't get a response to their email.
6    Q.   Did it have to do with a fake ad?
7    A.   I didn't read that complaint as having
8    to do with a fake ad.
9        Hindsight is 20/20. Looking back at
10   this now, maybe I'll say we should have launched a
11   full-on fraud investigation.
12       But we're in the complaint business. We
13   get customers that complain about things all the
14   time.
15       For someone to say -- you know, I've
16   heard things like, Your Google ads are fake, your
17   website is fake, your email is fake. You get
18   these type of things all the time.
19       So when I clicked on this link, I see a
20   complaint that a landlord didn't reply, it doesn't
21   seem alarming to me because I know people are
22   posting ads on Craigslist.
23       And it's not just Danny. We're
24   marketing to real estate agents. We're marketing
25   to lenders. We're marketing to all sorts of

---

266

1    people. And there's nothing in here that would
2    tie this ad to Pierce, let alone an ad, let alone
3    a fake ad.
4        So if someone says, This ad is fake --
5    or, I'm sorry, if someone says, The landlord
6    didn't reply, that happens. Landlords don't reply
7    for any number of reasons.
8    Q.   It says "fake ad" right in the
9    hyperlink, doesn't it?
10   A.   Yeah. Like I said, customers say weird
11   things all the time. I've heard our websites are
12   fake. I've heard the emails are fake, our people
13   are fake. People say crazy things.
14   Q.   You say these are very hard to track.
15   You're referring to these scams?
16   A.   No. I'm referring to the ad. I have
17   zero visibility into Pierce and what ad goes
18   where.
19       So let's say that, A, I click on this
20   link. First of all, I click on this link, there's
21   a customer's first name and first name only. I
22   can't track down this customer to Pierce. I can't
23   track down this customer to an ad.
24       Even if I could track it to a customer,
25   I can only track it to Pierce. I can't track this

---

267

1    to a landlord ad. So I can't go down, chase the
2    ad, chase the landlord, and say, hey, landlord,
3    why didn't you reply to Customer A?
4    Q.   But if you --
5    A.   Do they have poor credit? Did you not
6    like their reply? What was the reason?
7    Q.   If you got a fake ad -- if you got a
8    fake ad complaint that was linked to Pierce, you
9    could have asked Pierce about it, right?
10   A.   So we talked about his campaign a lot.
11   Like I said, hindsight may be 20/20.
12       But it's expected if you're posting any
13   type of volume on Craigslist, any sort of rental
14   property, legitimate or not, customers are going
15   to say, This is fake.
16   Q.   Did you ever ask Pierce if he had been
17   posting fake ads?
18   A.   Pierce represented to me he had access
19   to MLS database.
20   Q.   Not my question.
21   A.   He never represented to me he was
22   posting fake ads.
23   Q.   That wasn't my question either.
24       Did you ever ask Pierce if he was
25   fake -- if he was posting fake ads?

---

268

1    A.   No, because Pierce represented to me he
2    was posting real ads.
3    Q.   Okay. When did he represent that to
4    you?
5    A.   I don't recall specifically. But it's
6    been multiple times throughout the course of us
7    working together. And it all comes back to a long
8    line of trust that was abused and to me believing
9    him too.
10       Don't forget, he came from Tom Fragala
11   who referred JC Media. JC Media referred Roger.
12   Roger referred Pierce.
13       All right. So these are people that I
14   trusted. This is someone who represented -- he
15   didn't just send traffic to me. He sent traffic
16   to other credit report offers. He has his own
17   rent-to-own offer.
18       He sent me fake screenshots of how big
19   he was as an affiliate to hype himself up.
20   Q.   Did Pierce ever tell you in writing he
21   was posting real ads?
22   A.   You would need to reference the chats,
23   but --
24   Q.   Do you remember him -- I'm not asking
25   you to reference the chats.

---

67 (Pages 265 to 268)

Brown

FTC v. Credit Bureau Center, et al.                                    12/13/2017

269

1       I'm asking you:  Sitting here currently,
2  do you remember any time Pierce told you in
3  writing that he was posting real ads?
4       A.   I can't recall without referencing the
5  chats.
6       But I know for sure, he referenced the
7  rent-to-own MLS database that he had, which would
8  include real legitimate properties, unless, of
9  course, he was lying about that too.
10      Q.   Which he said he was sending to his own
11 offer, didn't he?
12      A.   Correct.
13      Q.   He knew it wasn't going to you --
14      A.   Which means he has MLS data.  I think
15 you're missing the point.
16      If you have a rent-to-own offer, you
17 have MLS properties.  You have a database.  In
18 fact, the site is called rent-to-own database.
19 This means he has MLS data.
20      Why would I suspect someone with an MLS
21 database would market a fraudulent property?
22      Q.   Well, let's talk about --
23      A.   Fraudulent property, we don't know.
24      Q.   Let's talk about some of the reasons you
25 might suspect it.

270

1       A.   You know, and if I can add.
2       Q.   Yeah.
3       A.   I just did a project for FEMA.  I helped
4  FEMA recruit people for the Puerto Rico disaster
5  that happened.
6       We got 12,000 people who applied for
7  this FEMA job.  I had tons of complaints about
8  people saying this was a fake website, this was a
9  fake ad, this was fraud.  And you know what, a few
10 people were saying -- they were complaining to the
11 FTC about it.
12      This is us helping out the people of
13 Puerto Rico who were ravaged by a hurricane doing
14 legitimate marketing, and even this type of
15 business has fraud complaints and scam complaints.
16      Q.   Okay.
17      A.   And you know what?  I know the website
18 wasn't fake and that was fraud, but does that stop a
19 consumer from saying that it is?
20      Q.   Okay.
21      A.   We had the Department of Homeland
22 Security call us --
23      Q.   I'm not asking about Puerto Rico, and
24 I'm not --
25      A.   -- within days.  I had ICE call us in

271

1  days.  I had the local police department.
2       Q.   Okay.
3       MR. COCHELL:  I think he gets your
4  point.
5  BY MR. LEVINE:
6       Q.   You got a lot of complaints about fake
7  ads to CBC, didn't you?
8       A.   I disagree with that statement.
9       Q.   Well, you got enough complaints that you
10 actually hired a copywriter to draft an email
11 template when you got such complaints, didn't you?
12      A.   See, this is an example --
13      Q.   Answer my question.  Didn't you?
14      A.   We have copywriters create templates --
15      Q.   No.  That wasn't my question.  And I'm
16 not asking about FEMA.
17      Isn't it true that you hired a
18 copywriter to draft a template for when customers
19 complained about ads on Craigslist?
20      A.   That's not true.
21      Q.   Isn't it?
22      A.   No.
23      Q.   Do you know the name Josh Margulies?
24      A.   I know that name.
25      Q.   And what did you hire him to do?

272

1       A.   He's a copywriter.
2       Q.   Okay.  This will be Exhibit 23.
3            (Whereupon Deposition Exhibit
4             No. 23 was marked for
5             identification by the court
6             reporter.)
7       A.   So does --
8       Q.   Let's let me ask the questions.
9       A.   Okay.
10      Q.   Unless you have a correction to your
11 previous testimony.
12      A.   No.
13      Q.   Okay.  I'm just trying to move this
14 along.
15      Okay.  I'm showing you a document that's
16 been marked for identification as Exhibit 23.  Do
17 you recognize the document?
18      A.   Yes.
19      Q.   What is it?
20      A.   It is a communication from Tom Fragala
21 sent to the copywriter, Josh Margulies; customer
22 service supervisor; myself; Jens Sorenson, the
23 project manager.
24      Q.   Turn to Page 3.  And the date of this
25 email is September 20th, 2015, correct, this most

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Brown

FTC v. Credit Bureau Center, et al.                                                12/13/2017

---

273

1    recent email?
2         MR. COCHELL:  Page 3?
3    BY MR. LEVINE:
4    Q.   I'm sorry.  Page 1, the date of the
5    email is September 20th, 2015, right?
6    A.   Yeah.
7    Q.   Okay.  Let's turn to Page 3 of
8    Exhibit 23.  Mike Super writes, "I am the person
9    responsible for flagging for removal vast number
10   of fake ads your people are putting on Craigslist
11   in the St. George, Utah, area."
12        Do you see that?
13   A.   I sure do.
14   Q.   And it says, "You're using it to bait --
15   as bait to entice people to come to
16   CreditUpdates.com and eFreeCreditReport.com."
17   A.   Correct.
18   Q.   And you saw this email, didn't you?
19   A.   Correct.
20   Q.   And Diego M. was your customer service
21   guy, right?
22   A.   Yes.
23   Q.   And he writes to Josh Margulies on
24   September 17th, 2015, that's the bottom of Page 2
25   going on to the top of Page 3, "Can we possibly

---

274

1    create a response for upset clients who we don't
2    have an account for and are sending messages and
3    are clearly upset about the way they brought to
4    the program.  Some people are upset about the
5    Craigslist posting."
6         Do you see that?
7    A.   Yeah.
8    Q.   Tom emails you on September 8th, 2015,
9    and says, "Aren't all or most of these ads done by
10   essentially fraudulent affiliates who are playing
11   the game of pumping in as many clients to get the
12   payouts by 'advertising' phony themes like get a
13   credit check in order to qualify for a job, that
14   doesn't exist?"
15        Do you see that?
16   A.   Yes.
17   Q.   Okay.  You respond, "If ever a
18   Craigslist related complaint" -- you respond
19   September 21st, 2015, "if ever a Craigslist
20   related complaint related to a job application,
21   application of food stamps, government aid, or $40
22   gift card, please escalate to me."
23        Do you see that?
24   A.   Yes.
25   Q.   And you say, "Anything related to real

---

275

1    estate, sales/rentals, rent-to-own programs,
2    please work with Josh to make an appropriate
3    template that would deescalate the customer."
4         Do you see that?
5    A.   Yes.
6    Q.   Why were you only escalating food
7    stamps, government aid, and gift card complaints?
8    A.   These were the known scams at the time.
9    We give processes and procedures to the customer
10   service department on the known scams.
11        So the known scams are job applications,
12   application for food stamps, government aid,
13   unemployment, something like that, gift cards,
14   escalate these to me.
15        You know, this wasn't on our radar.  It
16   wasn't.
17   Q.   But Tom Fragala had emailed you five
18   months earlier to tell you about rental scams with
19   fake ads.  We just went over that.  It was
20   exhibit --
21   A.   Yeah, so --
22   Q.   Let me finish.  It was Exhibit 22.
23   A.   So first of all, I want to go back to
24   this email on Page 3.
25   Q.   Are we talking about Exhibit 23?

---

276

1    A.   The one you handed me latest, the latest
2    one.
3    Q.   Yeah.  Okay.
4    A.   So this customer is clearly being
5    abusive to our customer service people making wild
6    claims.
7         So first they say, I flagged your fake
8    ad, and then I contacted some legitimate ones.
9         I don't know what he's saying.  First of
10   all, there's no email address.  There's no ad.
11   There's no nothing.  It's just someone that's
12   being abusive to our customer service department.
13        And we created a template for this
14   person.  And if you'll notice, the key sentence is
15   "create a response for clients who we don't have
16   an account for."
17        We did not have an account for this
18   user, so we cannot track this user.  I don't know
19   where they came from.  Was it Pierce?  Was it
20   Lloyd?  Maybe not.  Was it a legitimate landlord?
21   I don't know.
22        But I can tell you it doesn't make
23   sense, what the customer is saying, and --
24   Q.   You say the claims are wild, but you did
25   nothing to investigate whether they were wild, did

---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Brown

FTC v. Credit Bureau Center, et al.                                    12/13/2017

277

1    you?
2        A.    This was not a customer of ours.
3    There's nothing I can do to investigate this.  And
4    like --
5        Q.    Nothing you can do to investigate it?
6    You couldn't have asked Danny Pierce about it,
7    your largest affiliate?
8        A.    I would have no reason to believe this
9    is from Pierce.
10           You have to put this in context.  At the
11   time, we're scaling up our offer targeting real
12   estate agents.  We have thousands of real estate
13   agents and loan officers and people in the real
14   estate space, many people posting on Craigslist.
15          I have no reason to believe this has
16   anything to do with did Danny, let alone Danny's
17   properties.  And this is not a customer of ours.
18          And let me also add, we're trying to run
19   a good customer service department.  And we're
20   working with outside people like Josh, the
21   copywriter, to better our customer service
22   department.  We're saying, these are the known
23   scams, and escalate these.
24          And this got past us.  And I am not
25   happy about it.

278

1        Q.    But Josh Margulies told you about a scam
2    with fake ads.  Five months later, you have --
3        A.    Josh --
4        Q.    Let me finish my question.
5            Josh Margulies told you about a scam in
6    April 2015 involving five months -- let me
7    restart.
8            Josh Margulies told you about an ad in
9    April 2015 --
10          MR. WARD:  Tom Fragala.
11          MR. LEVINE:  Thank you.  I just need
12   some caffeine.
13          MR. COCHELL:  Tom, Josh, it's all the
14   same.
15          MR. LEVINE:  I'm going to start over
16   again.
17   BY MR. LEVINE:
18       Q.    Tom Fragala told you about a fake ad
19   scam in April 2015.  Five months later, you're
20   told about the same type of scam; and you don't do
21   anything about it, do you?
22          MR. COCHELL:  Objection; asked and
23   answered, form of the question, argumentative.
24       A.    Okay.  So what I'll say is:  People say
25   wild things all the time --

279

1        Q.    What was your basis for saying it's
2    wild?
3        A.    I have worked at Experian.  I've worked
4    for FreeCreditReport.com.  I've listened to phone
5    calls in customer service.  It's not uncommon for
6    customers to say, scam, fraud, not legitimate,
7    this ad was fake, your website is fake.
8        Q.    He said, "Vast number of fake ads."
9            You just didn't believe him?
10           I'm sorry.  Mike Super on September 7th,
11   2015, said, "Vast number of fake ads."
12           You didn't believe him?
13       A.    Why would I believe there's a fake ad?
14   This seems like someone who wants a refund.
15   Hindsight is 20/20.
16       Q.    He wasn't a customer, you said.
17       A.    You're right.  I'm sorry.  I misspoke on
18   that.  He's not a customer.
19       Q.    So --
20       A.    We don't have an account.  I don't know.
21   I can't track this to a fake ad.  I don't see a
22   phone number for this customer.  And we can't
23   launch a full-on fraud investigation for every
24   single customer who says, your website is fake.
25       Q.    Mike Super is not a customer; and you

280

1    had his email, correct?
2        A.    Correct.
3        Q.    You could have emailed him, right?
4        A.    This is why we're working with the
5    copywriter is to come up with an email to email
6    these customers.
7        Q.    But Mike Super is not a customer.  Why
8    didn't you just --
9        A.    So this is what we're -- we're coming up
10   with an email template to email these people.
11       Q.    Mike Super tells you there's a vast
12   number of fake ads sending traffic to
13   eFreeScore.com; and you don't contact him to see
14   whether this is indeed a wild charge, do you?
15       A.    So we are in the complaint business.
16   People complain.  All right?  People say, I don't
17   recognize this charge.
18          But we know they did it.  We have their
19   IP address.  We have --
20       Q.    He's not a customer.
21       A.    You're right.  I'm not talking about him
22   this second.
23       Q.    So let's talk about him because that was
24   my question.  You didn't contact him, did you?
25       A.    So this guy --

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Brown

FTC v. Credit Bureau Center, et al.                                    12/13/2017

281

1    Q.   Just answer my question.  You didn't
2  contact Mike Super, did you?
3    A.   Let me say why --
4    Q.   I've asked you a number of times -- no.
5  You have to answer the question first.
6    A.   And I can't answer that a yes or no
7  question --
8    Q.   Did you contact him or not?
9    A.   No.  And let me tell you why.
10   Q.   Okay.
11   A.   This guy is being abusive to our
12 customer service --
13   Q.   Okay.
14   A.   -- department saying, "You assholes."
15 "Keep wasting your time."  "Fucking ads."  "Fake
16 adds."  I'm "flagging them."
17      This is not someone want our customer
18 service department to interact with.
19   Q.   What about you --
20   A.   This is an abusive person that is making
21 wild accusations that are contradictory that we
22 can't trace to an affiliate.
23      Now, you may sit here with hindsight and
24 take this as we should have launched a fraud
25 investigation.  But you don't work in this type of

282

1  business, and you don't understand how many people
2  make wild accusations like this.
3    Q.   Okay.
4    A.   You can't launch a full --
5    Q.   By the way, Mike Super sent this on
6  September 7th, 2015; do you see that?
7    A.   Correct.
8    Q.   That was three days after you told Danny
9  Pierce to modify the landlord template; do you
10 remember that?
11   A.   I don't remember the date, but I recall
12 saying that to him.
13   Q.   Did it ever occur to you to ask Danny
14 Pierce if any of these emails you were aware of
15 involve fake properties?
16   A.   I personally have looked at the
17 properties.  I believe them to be real.  They
18 looked real.  I've seen them show up on other
19 websites.  I don't think they are fake ads.
20      I've looked at them personally, and I
21 don't know to this day if they are fake ads.
22      I strongly believe the fraud is that
23 Pierce did not match the prospective renter with
24 the landlord.  It was a stupid email he could have
25 sent to this landlord to connect this person with

283

1  the landlord.
2    Q.   So when you said in the beginning of the
3  deposition that any known scam must be escalated,
4  what you really meant is any known scam brought to
5  your attention by someone who wasn't cursing; is
6  that accurate?
7      MR. COCHELL:  Objection; form of the
8  question, argumentative.
9      Go ahead.
10   A.   I'm saying we got defrauded, and I feel
11 bad sitting here today that this got past me.
12      I looked into these ads.  I saw these
13 properties.  They seem real.  And it got past me,
14 and I feel bad about it.  We made a mistake.
15 Looking back, there are things we could have done
16 better.
17   Q.   You also had a script on the phone for
18 people who complained about Craigslist ads,
19 correct?
20   A.   I believe there was a section of the
21 script regarding that.
22   Q.   Specifically targeting Craigslist ads,
23 correct?
24   A.   Correct.
25   Q.   You also knew that customer service

284

1  created a category within its internal system just
2  for people complaining about Craigslist ads,
3  correct?
4    A.   I think I became aware of that at the PI
5  hearing, and there was like 80-something that were
6  in that category if I recall correctly.
7      MR. COCHELL:  80 what?  What are you
8  talking about?
9      THE WITNESS:  80 customers out of 16,000
10 were categorized as Craigslist.  At the PI
11 hearing, they had 16,000 call records, I believe,
12 or was that 80 from...
13      MR. LEVINE:  Let's take a break so I can
14 gather my exhibits here.  Thank you.
15      (Whereupon, a short break was
16      taken.)
17 BY MR. LEVINE:
18   Q.   Okay.  This is going to be --
19      MR. LEVINE:  Are we back on?
20      THE REPORTER:  Sure.
21      (Whereupon Deposition Exhibit
22      No. 24 was marked for
23      identification by the court
24      reporter.)
25

71 (Pages 281 to 284)

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Brown

FTC v. Credit Bureau Center, et al.                                   12/13/2017

285

1  BY MR. LEVINE:
2      Q.   Okay.  Mr. Brown, I'm now showing you a
3  document that's been marked for identification as
4  Exhibit 24.  Do you recognize this document?
5      A.   Yes.
6      Q.   What is it?
7      A.   It's an email between Heather with CSID,
8  also known as Experian.
9      Q.   And yourself?
10     A.   Yes.
11     Q.   Let's turn to the second page of
12 Exhibit 24.  This is November 12th, 2015.  Do you
13 see that?
14     A.   Yeah.
15     Q.   This is two months after the email
16 exchange in Exhibit 23, correct?
17     A.   Correct.
18     Q.   "Mike," Heather writes, "TransUnion
19 legal called me and requested that you take their
20 logo off their home page ASAP.  There's some
21 negative media attention on that site, something
22 about deceptive listings on Craigslist."
23          Do you see that?
24     A.   I see that.
25     Q.   You respond, "Okay.  Will do.  Is this

286

1  is in response to a customer complaint or when
2  they checked out our updated T&Cs, question mark.
3  If a complaint, can you forward any additional
4  info, email site, link, et cetera, so we can track
5  down any bad affiliates on our end?"
6          Do you see that?
7      A.   Yes.
8      Q.   This is alleging the same type of fraud
9  that Mike Super had alleged, right?
10     A.   No.
11          MR. COCHELL:  Objection, form of the
12 question.
13          Go ahead.
14 BY MR. LEVINE:
15     Q.   Well, it's deceptive ads on Craigslist,
16 right?
17     A.   I don't know.  It says, "Negative media
18 attention, something about deceptive listings."
19          We're speculating as to what it is, let
20 alone who it's from.  Nothing in this email would
21 lead me to believe it's related to Pierce.
22 Nothing in this email would direct me to an ad.
23          In fact, I explicitly asked her, can you
24 forward me any additional information?  I need an
25 email, I need a site, I need a link so I can track

287

1  something.
2      Q.   But you knew it went to eFreeScore.com,
3  right?
4      A.   You're right, and we have a lot of
5  customers.
6      Q.   Did you do anything to determine what
7  the source -- let me back up.
8          Heather references negative media
9  attention on eFreeScore.com, right?
10     A.   I see that.
11     Q.   Were you aware of that negative media
12 attention?
13     A.   No.
14     Q.   Didn't you hire someone just to improve
15 your Google results?
16     A.   Yeah.  We always hire people to improve
17 SEO.
18     Q.   You were aware of the Google reviews of
19 your website, weren't you?
20     A.   Yeah.
21     Q.   You talked about them with Danny Pierce.
22     A.   Yeah.
23     Q.   And a lot of those reviews alleged fake
24 ads, didn't they?
25     A.   Yeah.

288

1      Q.   So you saw fake -- you saw allegations
2  of fake ads on Google, correct?
3      A.   Correct.
4      Q.   You were notified by one of your biggest
5  contractors that there was a lot of attention on
6  fake ads going to your website, correct?
7      A.   No.  That's not what it says.
8      Q.   Negative media attention about
9  Craigslist.
10     A.   It says, "Negative media attention,
11 something about deceptive listings on Craigslist,"
12 yes.
13     Q.   And that didn't make you think, hmm, I
14 have my largest affiliate advertising on
15 Craigslist, I have all these Google complaints
16 about fake Craigslist ads, maybe I should ask my
17 largest affiliate if he's posting fake Craigslist
18 ads?
19     A.   So when I -- and let's put this in
20 perspective, right?  So I have my largest
21 affiliate, Pierce.
22          And at the PI hearing, I believe he
23 presented evidence that Pierce had sent over 2
24 million prospective renters to our website.
25          So out of 2 million people, is it normal

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Brown

FTC v. Credit Bureau Center, et al.                                          12/13/2017

289

1    to hear a customer here and there to say a fake ad
2    because a landlord didn't reply to me?
3         My train of -- my state of mind is that
4    it's not un-normal for a volume of that size to
5    have some customers who are confused say, this is
6    a fake ad because the landlord didn't respond to
7    me. Why didn't they respond to you? Could be any
8    number of reasons.
9         So this is not -- you know, it's easy to
10   look back now with hindsight and say this is
11   wrong; but put it in perspective. And I can't
12   trace this to Pierce, can't trace this to a
13   landlord.
14        And, you know, I asked her for more
15   information to track it. I'm not sticking my head
16   in the sand. This is our partner. This is our
17   credit bureau data provider.
18   Q.   You could have asked Pierce; but you
19   didn't, correct?
20   A.   How would I know this is related to
21   Pierce?
22   Q.   Well, you knew he was posting 5,000
23   Craigslist ads a day. That should have been a
24   clue, right?
25   A.   Actually, I doubted he was posting that

290

1    much, if you recall the conversation.
2         So I know he was posting ads, but guess
3    what? We're marketing to lots of people, and we
4    want them to post ads on Craigslist. We want
5    people to use our website.
6    Q.   But you never asked him, did you?
7    A.   Because he told me he was not using fake
8    ads.
9    Q.   Please give me a yes or no. You never
10   asked Pierce whether he was posting fake ads, did
11   you?
12   A.   No, because he told me he was using real
13   ones.
14   Q.   But never in writing. Okay. All right.
15   A.   And additionally, I'll say because I
16   have looked at the ads, I was able to see they
17   don't look fake.
18        MR. COCHELL: Okay. You have already
19   put that on the record.
20        THE WITNESS: Okay.
21   BY MR. LEVINE:
22   Q.   By the way, when you looked at the ads,
23   you could see the links in the ad, right?
24   A.   No. The ad doesn't have a link.
25   Q.   But you saw some of those links,

291

1    correct?
2    A.   Are you talking about the link in the
3    landlord email?
4    Q.   Yeah.
5    A.   Yes.
6    Q.   Okay. This will be Exhibit 25.
7         (Whereupon Deposition Exhibit
8         No. 25 was marked for
9         identification by the court
10        reporter.)
11        MR. COCHELL: What's the problem?
12        MR. LEVINE: Nothing, nothing.
13        MR. COCHELL: Poor Doug, getting abused
14   again.
15        MR. LEVINE: I know.
16        MR. COCHELL: Wait until tomorrow.
17   BY MR. LEVINE:
18   Q.   Okay. So this is -- I'm showing you a
19   document that's been marked for identification as
20   Exhibit 25. Do you recognize the document?
21   A.   Yes.
22   Q.   What is it?
23   A.   It's an email between myself, and it's
24   cut off on the top, but I believe to Diego, my
25   customer service supervisor.

292

1         I'm asking him to respond to a complaint
2    from a company that's similar to the BBB.
3    Apparently there was eight complaints. And I said
4    I "want to turn these negative eight experiences
5    around."
6    Q.   And you knew they were negative
7    experiences because you looked at the complaints,
8    right?
9    A.   Because they are a complaint.
10   Q.   Did you look at the complaints?
11   A.   I don't recall these specifically.
12   Q.   Okay. So you said earlier when you were
13   talking about the email you got from CSID that you
14   couldn't link the negative media attention to any
15   specific affiliates because she didn't give you
16   any specific consumer names, correct?
17   A.   I'm saying in that case.
18   Q.   Right.
19   A.   Yes.
20   Q.   In this case, in Exhibit 25, you have
21   eight complaints that you attach to your email,
22   correct?
23   A.   Correct.
24   Q.   And these complaints actually have the
25   consumers names, don't they?

73 (Pages 289 to 292)

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Brown

FTC v. Credit Bureau Center, et al.                                      12/13/2017

---

293

1    A.   Correct.
2    Q.   **They have their addresses, don't they?**
3    A.   And I'm not saying there was never a
4    complaint that never had a consumer's name or
5    email on there.  That's not what I'm saying at
6    all.
7    Q.   **Did you ever do any investigation to**
8    **follow up on these complaints?**
9    A.   Yes.  At at least one point in time, I
10   went through, I checked the links, I googled the
11   links, I -- not the link.  I think I googled like
12   a property name, or I saw a link to an ad in a
13   complaint.
14        And I tracked down an ad on Craigslist,
15   and I looked at the ad on Craigslist.  And I
16   copied and pasted the description from the ad, and
17   I located a property description that was the same
18   on a different website.
19   Q.   **Is that --**
20   A.   So I was able to validate that the ad in
21   the complaint was real.
22   Q.   **And when --**
23   A.   In addition to that, I have Pierce
24   telling me that he's doing real ads.  And I
25   chalked it up to a customer that's confused

---

294

1    because at this scale, you're going to get a few.
2    And you know we had eight.
3    Q.   **That investigation you did, when did you**
4    **do it?**
5    A.   I don't recall specifically.  I know
6    there was one around June of 2016 was one of them,
7    but I know I had done them previously --
8    Q.   **Was the investigation of these**
9    **complaints, the complaints attached to exhibit --**
10   A.   I don't recall specifically.  I mean, it
11   was around the same time frame I looked at these;
12   but I don't know if it was this one specifically.
13   Q.   **So five out of eight -- let me back up.**
14   **No.  Five out of eight of the complaints**
15   **attached to Exhibit 25 deal with Craigslist, fake**
16   **Craigslist ads; are you aware of that?**
17   A.   I mean, these customers appear to be
18   complaining for various issues.  One has an issue
19   with Google Chrome, their web browser.  One is
20   saying it's a fake ad.
21   Q.   **So this customer was able to figure out**
22   **the ad was fake, but you were never able to figure**
23   **that out?**
24   A.   No.  What I'm saying is my own
25   investigation, when I looked at the -- a property

---

295

1    link, at least one through some complaints, I
2    located a legitimate property.
3    Q.   **Okay.  Let's turn to Page 4, Gordon**
4    **Benson.  Okay?**
5    A.   Page --
6    Q.   **Gordon Benson is the name at the top; do**
7    **you see that?**
8    A.   Yes.
9    Q.   **First line of his complaint, "Fake**
10   **Craigslist ads are being posted."**
11   **Okay?**
12   A.   Yeah.
13   Q.   **Now, you could have -- Gordon --**
14   **Mr. Benson included his email, phone number,**
15   **address, and name in his complaint, did he not?**
16   A.   He did.
17   Q.   **You could have entered his email and**
18   **immediately determined which affiliate drove him**
19   **to eFreeScore.com, correct?**
20   A.   Right, I could have.  But I have no
21   visibility into an ad.
22        I can maybe trace this to Pierce, or
23   maybe it's someone else, and I cannot see what ad
24   or what property Pierce posted that resulted in a
25   complaint of a fake ad.

---

296

1         And it's not unreasonable, my thoughts
2    at the time, to think that it's -- it's
3    personally -- it's perfectly reasonable to assume
4    a landlord won't always reply to some people; and
5    that doesn't mean it's a fake ad.
6         So I know it wasn't fake because I
7    validated it.  I have other people telling me
8    it's -- it's real.
9    Q.   **You validated the ad, Gordon Benson?**
10   A.   I validated not this ad in this --
11   Q.   **Well, let's --**
12   A.   -- particular complaint because I can't.
13   I can't trace this to the ad.
14   Q.   **Let's stick to Gordon Benson.  Okay?  My**
15   **questions are about Gordon Benson in Exhibit 25.**
16        MR. COCHELL:  And he answered the
17   question.
18        MR. LEVINE:  You don't know what my
19   question is going to be.
20        MR. COCHELL:  No.  He answered.  You
21   said, "Let's stick to Gordon Benson," but --
22        MR. LEVINE:  Oh, okay.
23        MR. COCHELL:  -- his last response was
24   about Gordon Benson.
25        MR. LEVINE:  Thank you.

---

74 (Pages 293 to 296)

Brown

FTC v. Credit Bureau Center, et al.                                      12/13/2017

297

1          MR. COCHELL: Okay?
2    BY MR. LEVINE:
3          Q.   You never looked up Benson's email to
4    see who the affiliate was, did you?
5          A.   No. What I did is --
6          Q.   I'm not asking what you did. I'm
7    just --
8          A.   No. I'm going to tell you what I did.
9    So I sent this complaint to my customer service
10   supervisor, and I said, I want to turn these
11   negative experiences around.
12         They are trained to handle cases of
13   fraud; and if there was an issue, they would have
14   escalated it.
15         Now, clearly looking back at it,
16   hindsight, this was a scam. Now, I don't know if
17   the scam was a fake ad or that he didn't email the
18   response to the landlord. I think the properties
19   are real.
20         Q.   So you think all the consumers are
21   lying, and Danny Pierce was telling the truth?
22         A.   I think out of 2 million prospective
23   renters, we only got 8 that complained, or you
24   said 5 that complained out of 8 right here of a
25   fake ad.

298

1          Most of the ones say, the landlord
2    didn't respond to me; therefore -- therefore, the
3    ad is fake.
4          That's not what it means.
5          Q.   Okay. This is going to be Exhibit 26.
6              (Whereupon Deposition Exhibit
7               No. 26 was marked for
8               identification by the court
9               reporter.)
10   BY MR. LEVINE:
11         Q.   Mr. Brown, I'm handing you a document
12   that's been marked for identification as
13   Exhibit 26. This is a big packet. I'll represent
14   to you it's what was filed in connection with the
15   FTC's complaint.
16         Let's -- I'm going to go through it bit
17   by bit. Okay?
18         A.   Okay.
19         Q.   Let's start, please, on Page 1. Do
20   you -- and -- yes. Do you recognize Page 1 of
21   Exhibit 26?
22         A.   I think I've seen this before on the
23   filing, yeah.
24         Q.   And have you seen it before the filing?
25         A.   I don't recall this specific one. Was

299

1    this an attachment in an email, do you know?
2          Q.   It was later an attachment in an email.
3          A.   And I believe I saw this one.
4          Q.   Okay. Okay. So let's -- so you recall
5    seeing it attached to an email?
6          A.   I know there were some BBB
7    communications I testified to at the PI hearing.
8    I've seen a lot of these communications since. So
9    I don't recall if it was this one specifically I
10   saw, but --
11         Q.   Okay. Let's go to Page 10 of
12   Exhibit 26. Okay? Do you recognize -- I think
13   you're on -- there you go.
14         Do you recognize Page 10 of Exhibit 26?
15         A.   It says Page 1 on the bottom, right?
16         Q.   Yes. Sorry. For the purposes of
17   Exhibit 26, I'll be referring to the docket page
18   number. Okay?
19         A.   Okay. So 326, page ID number?
20         Q.   I'm going to be referring to the page
21   number out of -- the thing -- the Page 10 of 101;
22   does that make sense?
23         A.   Okay.
24         Q.   So we're looking at Page 10 of 101,
25   Exhibit 26.

300

1          A.   Okay.
2          Q.   Do you recognize this email?
3          A.   I believe so.
4          Q.   What is it?
5          A.   It's an email from the Better Business
6    Bureau to me.
7          Q.   Okay. If you turn the page, do you
8    recognize this as the attachment?
9          A.   I believe so.
10         Q.   That's Page 11?
11         A.   I believe so, yeah.
12         Q.   And I'll represent to you --
13         A.   Is this -- I mean, I just want to be
14   sure this is the right attachment because the
15   email is from June 30th, and this is from
16   June 2nd.
17         Q.   So I'll represent to you that my
18   understanding, which is that the BBB sent the
19   letter on June 2nd and then resent it later and
20   attached it. Okay?
21         A.   Okay.
22         Q.   Do you recall receiving this letter on
23   Page 11?
24         A.   Not specifically. But, you know, I got
25   this email I'm sure. And if you're telling me

Brown

FTC v. Credit Bureau Center, et al.                                    12/13/2017

---

301

1    this is the attachment, then I believe so.
2        Q.    Now, June 2016, you were seeking BBB
3    accreditation, correct?
4        A.    Around there.
5        Q.    And you had actually received complaints
6    from some of your partners because the BBB had
7    placed an alert on your -- on their page for your
8    companies, correct?
9        A.    Correct.
10       Q.    And that alert involved fake ads, did it
11   not?
12       A.    I think it said something to the effect
13   of a pattern of complaints.
14       Q.    About fake ads, correct?
15       A.    I don't think it said specifically fake
16   ads. I think it was like a template type text
17   possibly. But maybe you can refresh my memory.
18       Q.    Yeah. Let's turn to Page 7 of
19   Exhibit 26.
20       A.    Okay.
21       Q.    "According to BBB files, records show
22   that the company has a pattern of complaints
23   concerning consumers alleged being misled into
24   signing up for a credit reporting service when
25   they thought they were applying for housing."

---

302

1            Do you see that?
2        A.    Correct.
3        Q.    Okay. And that was the alert you were
4    just describing?
5        A.    Correct.
6        Q.    Okay. So going back to Page 11, the BBB
7    is telling you, "Consumers allege being misled
8    into signing up for a credit reporting service
9    when they thought they were applying for housing."
10           Do you see that?
11       A.    Yes.
12       Q.    So that's consistent, right?
13       A.    Yes.
14       Q.    And that would suggest that there wasn't
15   actually housing because it says, "They thought
16   they were applying for housing," right?
17       A.    This was around the same time that I
18   investigated some of the ads and found a property
19   that did exist.
20           So at the time of seeing these
21   complaints and putting them into perspective of
22   our business, it didn't seem like an issue.
23           And I now know that to be wrong. I
24   obviously made some mistakes.
25           But, again, to put this into

---

303

1    perspective, Pierce sent over 2 million people to
2    the website. And with the Better Business Bureau
3    on CreditUpdates, I think we had about 60
4    complaints, 60 complaints; and my business has
5    been around for over 6 years.
6            Now, sometimes people say wild things;
7    but please put this into perspective and realize
8    where we're coming from. We're not sticking our
9    head in the sand. I looked for these ads. They
10   looked real.
11           We had an A plus rating with the Better
12   Business Bureau, and we're getting this
13   communication. We had an A plus rating.
14       Q.    Okay. So the BBB letter on June 2nd
15   gave you enough concern that you actually looked
16   up some of the ads; is that what -- is that right?
17       A.    I don't remember what triggered it; but
18   it was sometime around then, I looked into the
19   ads.
20       Q.    And how did you go about looking into
21   the ads?
22       A.    So one of the complaints I came across,
23   and I don't recall where, but it had a link to a
24   Craigslist ad. And so luckily, that Craigslist ad
25   was still available online. They are not always.

---

304

1            I was able to access this Craigslist ad.
2    I was able to copy and paste a section in the ad
3    and Google that. And when I googled that, I found
4    the property available on multiple websites.
5            So obviously I came to the conclusion
6    that this is not a fake property; this is the
7    legitimate property.
8        Q.    And this was a complaint that had the
9    consumer's name?
10       A.    I don't recall.
11       Q.    How would the complaint have arrived?
12   How did you receive the complaint?
13       A.    I don't recall the one that I used to
14   track down to the ad where it came from. But it
15   obviously had a Craigslist link.
16       Q.    Did you look up which affiliate had
17   produced the ad?
18       A.    I don't recall. I was more interested
19   in verifying the property was legitimate.
20       Q.    You could have looked up the affiliate
21   who generated the ad, correct?
22       A.    If the ad was related to a customer, a
23   piece of customer data, it's in our database, yes.
24       Q.    Even if it wasn't because you could have
25   looked at the link, right, and figured out who the

---

Brown

FTC v. Credit Bureau Center, et al.                                    12/13/2017

---

305

1    affiliate is?
2        A.   No, because I'm looking at the ad, not
3    the email.
4        Q.   Oh, okay.  But you also looked at
5    emails?
6        A.   I've seen some of the emails, yes.
7        Q.   In connection with the investigation you
8    undertook in or around June 2016, did you also
9    look up any landlord emails?
10       A.   I've seen various landlord emails that
11   seem to be customized for the property.
12       Q.   And did you ever determine which
13   affiliate had generated those landlord emails?
14       A.   I know Pierce was generating those
15   emails.
16       Q.   Okay.  If you'd now please turn to
17   Page 22 -- or actually -- okay.
18            Exhibit 26, Page 22, if you go way to
19   the bottom of 22, there's an email June 30th,
20   2016, at 2:24 p.m.  And then the email is on
21   Page 23; do you see that?
22       A.   What's the -- sorry.  Can you repeat
23   that?
24       Q.   The bottom of Page 22, there's an email
25   from you on June 30th, 2016, at 2:24 p.m.; do you

---

306

1    see that?
2        A.   Yeah.
3        Q.   And the actual email is visible on
4    Page 23; do you see that?
5        A.   Yeah.
6        Q.   Do you recognize this email?
7        A.   Yes.
8        Q.   You wrote it, right?
9        A.   Yes.
10       Q.   All right.  So you write, about halfway
11   through, "It's our policy that once we identify a
12   pattern of potential abuse, we disable the
13   offending party, which we have done."
14            Do you see that?
15       A.   Yes.
16       Q.   Which party did you disable?
17       A.   So what I did, and, you know, I made a
18   mistake, this wasn't the best approach, but I
19   believed that any complaints relating to a
20   landlord is going to be self resolving.  You know,
21   if there's a property where a landlord doesn't
22   reply, that property is not going to be on the
23   market forever.
24            And instead of chasing down and hunting
25   down a landlord, which I, by the way, have no

---

307

1    ability to track down, I took the position that
2    the person has been disabled because I know that
3    this ad is not going to be posted again.
4        Q.   Who was disabled?
5        A.   The landlord.
6        Q.   By whom?
7        A.   Because the ad won't be -- the -- you
8    know, the properties are only available for rent
9    for so long.
10       Q.   Mr. Brown, you said, "We disable the
11   offending party."
12            Who is --
13            MR. COCHELL:  Wait.  Objection.
14   That's -- this sentence doesn't say that.  "It's
15   our policy that once we identify a pattern of
16   potential abuse, we disable the offending party,
17   which we have done."
18            MR. LEVINE:  There it is.
19            MR. COCHELL:  It doesn't say that he
20   disabled anybody.  It's not saying the complaint
21   was resolved by disabling it.  I think you're
22   misstating the document.
23            MR. LEVINE:  I think you're acting like
24   a witness rather than the lawyer.
25            MR. COCHELL:  I think it's a gross

---

308

1    mischaracterization.
2    BY MR. LEVINE:
3        Q.   All right.  You said, "We disable the
4    offending party, which we have done."
5            What did you do, Mr. Brown?
6        A.   So what I'm talking about here is the
7    landlord.  Not every -- like I said, there was no
8    way for me to track down an ad to a landlord.
9        Q.   So you didn't disable anything, did you?
10       A.   I did not disable anything.  And I could
11   have handled this better.
12            But I took this as it's easier to
13   address it this way than it is to -- you know, we
14   can't track down a landlord that we don't have.
15       Q.   So you were not telling the truth to the
16   BBB?
17            MR. COCHELL:  Objection, form of the
18   question.
19       A.   That's not what I'm saying.  What I'm
20   saying is:  The offending party will automatically
21   drop off.
22       Q.   But you said, we disabled it.  And you
23   didn't do that, did you?
24       A.   What I'm saying is the offending party
25   will automatically drop off.

---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Brown

FTC v. Credit Bureau Center, et al.                                    12/13/2017

---

309

1    Q.   I'm not asking --
2    A.   I understand what you're saying, and I'm
3    getting to your answer.
4         So by the time we get a complaint for an
5    ad, most of the time, the ad is not even up
6    anymore.  So which particular ad, did we disable
7    it, or was it disabled automatically?
8    Q.   Okay.  Let's turn to Page 22, top of the
9    page.  There's an email that begins, "Good
10   afternoon, Mike," sent on July 6, 2016, at
11   3:01 p.m.; do you see that, Page 22?
12   A.   Yep.
13   Q.   Do you recognize the email?
14   A.   The top or the bottom one?
15   Q.   Bottom one from Brandi Turner at
16   3:01 p.m.; do you see that?
17   A.   Yep.
18   Q.   You received this email, right?
19   A.   Yes.
20   Q.   Okay.  She says, "I have attached three
21   complaints with similar statements of your company
22   creating false advertisements for homes for rent
23   on Craigslist."
24        Do you see that?
25   A.   Yes.

---

310

1    Q.   Did you think this was a wild
2    allegation?
3    A.   Again, putting this in perspective, we
4    had about 2 million prospective renters visit our
5    website, we had an A plus rating with the Better
6    Business Bureau, and at the time, I believe we had
7    about 50 complaints; and we'd been in business for
8    over 6 years.
9         So I think that it's not unreasonable
10   that a consumer will be confused, 60 of them out
11   of 2 million would be confused that a landlord is
12   fake because he didn't reply.
13        But what I did is I forwarded these, I
14   believe, to the customer service supervisor to
15   look into them and process them, like we do with
16   all complaints.
17   Q.   And you --
18   A.   All complaints are handled with the
19   refund, and the customer's refunded.
20   Q.   Did you do anything else?
21   A.   I already told you, around this time, I
22   looked into the fraudulent -- alleged fraudulent
23   postings on Craigslist.  I validated the ad,
24   seemed legitimate.
25   Q.   So you thought --

---

311

1    A.   So it seemed -- sorry.
2         It seemed like the consumer was
3    mistaken, which is very common in our business.
4    Q.   Okay.  Let's turn to Page 15 of
5    Exhibit 26.  So this is July -- let's go to the
6    bottom.  It says -- actually, move on.  Strike
7    that.
8         Let's go to Page 14 of Exhibit 26,
9    please.  Are you there?
10   A.   Yeah.
11   Q.   All right.  If you go to the bottom of
12   the page, you see an email from you to Brandi
13   Turner from the BBB; do you see that?
14   A.   Yes.
15   Q.   Do you remember sending this email?
16   A.   Yes.
17   Q.   When you asked what the decision of the
18   board is, you're talking about decision on getting
19   BBB accreditation?
20   A.   Yes.
21   Q.   You say, "We are still looking to remove
22   the libelous statements published by the BBB."
23        Do you see that?
24   A.   Yes.
25   Q.   Libelous means false, doesn't it?

---

312

1    A.   Yes.
2    Q.   And that's what you meant?
3    A.   Yes.
4    Q.   So you actually asserted to the BBB that
5    the complaints from consumers were false?
6    A.   I asserted to the BBB that what the BBB
7    published on their websites that people are
8    complaining about fraudulent properties on
9    Craigslist was false.  I know that not to be
10   false.
11   Q.   Now you know that not to be false.
12   A.   I knew that around this time.  I have
13   heard it from Pierce that he's posting ads on
14   Craigslist with real properties.  I've validated
15   the properties myself.
16        And we work with a high volume of
17   customers, and we had 50 complaints.
18        And I believed at the time that BBB was
19   posting false information about these complaints.
20   I didn't believe there was a fake ad.  I looked at
21   an ad.  I knew it to be real.
22   Q.   But these complaints, however you
23   characterize their volume, were imperilling your
24   BBB accreditation clearly, right?
25   A.   No, yeah.  We were, as a good business,

---

78 (Pages 309 to 312)

Brown
FTC v. Credit Bureau Center, et al.                                     12/13/2017

313

1    going -- spending extra money and time to get a
2    BBB accreditation when we had an A plus rating
3    wanting to take our good customer service to the
4    next level.
5        Q.   And you believed that the real source of
6    these complaints was just that Brown wasn't
7    properly routing -- excuse me.
8            You believed the real source of these
9    complaints was that Pierce wasn't properly routing
10   the landlord emails?
11           MR. COCHELL:  Objection, form.
12       A.   At the time, I believed the complaints
13   to be that the landlord did not reply to the
14   customer; and a landlord can not reply to a
15   customer for any number of reasons.  It doesn't
16   mean there's a scam.
17           MR. LEVINE:  Okay.  Let's take -- let's
18   take a break, please.
19               (Whereupon, a short break was
20               taken.)
21           MR. LEVINE:  Let's go back on.
22   BY MR. LEVINE:
23       Q.   All right.  Mr. Brown, I want to
24   understand how you believed Pierce's model worked.
25   So explain it to me in detail, if you will.

314

1        A.   I don't understand.  When you say model,
2    can you clarify for me?
3        Q.   So you believe he had access to an MLS
4    database?
5        A.   Correct.
6        Q.   And you believed he was posting ads for
7    rental properties from that database?
8        A.   Correct.
9        Q.   Did you believe he had the permission of
10   the landlords to do so?
11       A.   You know, you don't need the permission
12   to advertise the MLS data.  The data is in the MLS
13   to be distributed.  That's how the MLS works.
14       Q.   So you believed -- well, that wasn't my
15   question.
16           Did you believe that Pierce was
17   advertising these properties with the
18   authorization of the landlord?
19       A.   So the MLS data when it's distributed is
20   distributed to be published.  So he's publishing
21   the data on a property listing site, which is the
22   intent of the MLS.
23       Q.   Did he have authorization from any of
24   the landlords, yes or no?
25       A.   That's not how the MLS works.  I don't

315

1    think you're understanding the MLS system.
2        Q.   So you're not aware whether he had
3    authorization from the landlords to advertise
4    their properties?
5        A.   I'm saying the MLS is set up to
6    distribute listings on multiple websites.
7            So if I buy access to the MLS data,
8    which I can for $700 and which I have done, you
9    can distribute that on your website, on other
10   websites; you can distribute it anywhere.  People
11   charge for access to that data.
12       Q.   When you say "distribute it," you mean
13   the -- exactly the information contained in the
14   MLS database?
15       A.   However you want to display it.
16       Q.   If I find an ad for Guy Ward's home on
17   the MLS database, I could then advertise Guy
18   Ward's home and say whatever I want about it?
19       A.   I mean, I believe you have a duty to not
20   probably change it significantly.  You can't say
21   his home has a -- you know, something it doesn't
22   have.
23           But if you're using the listing right,
24   there's businesses built on advertising MLS data.
25   Look at Trulia.  Look at Zillow.  They are

316

1    advertising data that's in the MLS database.
2        Q.   So Pierce was advertising data that was
3    in the MLS database on Craigslist.  People
4    responded to the ads on Craigslist, right?
5        A.   Yes.
6        Q.   Where did you believe those responses
7    were going?
8        A.   They went to one of Pierce's property
9    websites.
10       Q.   Directly to one of Pierce's property
11   websites?
12       A.   Or the email for one of Pierce's
13   property websites.
14       Q.   Okay.  And the email contained -- these
15   are the landlord emails that we've talked about
16   earlier.
17       A.   I don't think we've got to that point
18   yet.
19       Q.   Which emails are these?
20       A.   Now I'm confused.  You're confusing me.
21       Q.   When the -- when consumers click on an
22   ad in one of -- when consumers email one of
23   Pierce's Craigslist ads, they get a response,
24   right?
25       A.   Yeah.  Would it help if I just walk

79 (Pages 313 to 316)

Brown

FTC v. Credit Bureau Center, et al.                                    12/13/2017

---

317

1   through the entire process real quick?
2       **Q.   Sure.**
3       A.   So Pierce will advertise a property for
4   rent on Craigslist.  Multiple people can view the
5   property on Craigslist.  A customer or prospective
6   renter will email the email address on the
7   listing.
8           Then one of Pierce's websites or emails
9   will email the prospective renter telling them,
10  get your credit report here, and we'll set you up
11  for a tour.
12          And so they go.  They can click on the
13  link in the email, get their credit report, and
14  then credit report in hand, get matched up with
15  the landlord.
16          So they are providing a service to the
17  customer.  The user is demonstrating good credit
18  to the landlord.  It's a win-win for everyone.
19      **Q.   But you said Pierce could post these ads**
20  **without any authorization from the actual**
21  **landlords, correct?**
22      A.   No.  What I said is the MLS database is
23  intended to be distributed.  And it's distributed
24  on multiple websites.  It can be your own website
25  or a third-party website.

---

318

1       **Q.   Answer my question.  Were you aware of**
2   **any relationships Pierce had with actual**
3   **landlords, yes or no?**
4       A.   No.
5       **Q.   You're not aware, or he didn't have any?**
6       A.   I don't know if Pierce had relationships
7   with any landlords.  I assume not.
8           He had access to the MLS database, or so
9   I believed at the time, to market these
10  properties.
11      **Q.   And these emails said to bring a credit**
12  **report and it could lower the security deposit,**
13  **didn't they?**
14      A.   The emails are customized to each
15  property, or so I believed at the time, like I
16  went over how one will say it has the recently
17  remodeled kitchen.  The other says, we're pet
18  friendly.
19          This is data he should have from the MLS
20  database.  It's all categorized and coded.  So I
21  can customize my email to say, new kitchen, no
22  security deposit, say pet friendly.  These are
23  easy things to do.
24      **Q.   So Pierce had the authority to waive the**
25  **security deposit --**

---

319

1       A.   No.
2       **Q.   Let me finish my question.**
3       **Pierce had the authority to waive the**
4   **security deposit for any property to which he had**
5   **access on the MLS database?**
6       A.   No.  What Pierce should have had if he
7   had access to the MLS database, like he said he
8   did, he would have had the properties or data
9   fields for each property to say:  This one
10  requires a security deposit.  This one does not.
11  This one is three bedrooms.  This one is four
12  bedrooms.  This one allows pets.  This one has a
13  kitchen.  This one has HOA fees.  This one has
14  utilities included.
15          You know, there's any number of fields
16  that come with the MLS data.
17      **Q.   And you saw these landlords -- you saw**
18  **these emails that Pierce sent, right?**
19      A.   Yes.
20      **Q.   And these emails impersonated landlords,**
21  **did they not?**
22      A.   No.
23      **Q.   Okay.**
24      A.   This was an email.  If you look at the
25  email address, it was from -- it was from a

---

320

1   property site, a property listing site.
2           Had you have gone to this property
3   listing site, you will see that they represent
4   they have access to millions of properties.
5       **Q.   All right.  Let's look at one.**
6           **(Whereupon Deposition Exhibit**
7           **No. 27 was marked for**
8           **identification by the court**
9           **reporter.)**
10  BY MR. LEVINE:
11      **Q.   This is going to be exhibit --**
12      MR. COCHELL:  27.
13      MR. LEVINE:  Thank you.
14  BY MR. LEVINE:
15      **Q.   Okay.  I'm showing you a document that's**
16  **been marked for identification as Exhibit 27.  Do**
17  **you recognize it?**
18      A.   I don't recognize this specific one.
19      **Q.   Does this represent a typical one of**
20  **the -- does this represent a typical email that**
21  **you believe Pierce was sending?**
22      A.   I mean, I -- I don't agree with what
23  you're saying is typical because it was my
24  understanding that the emails were custom to the
25  property and unique; so I don't think there's a

---

80 (Pages 317 to 320)

Brown

FTC v. Credit Bureau Center, et al.                                    12/13/2017

---

321

1    typical template.
2        Q.   So you thought that each email was
3    unique.
4        A.   Yes.
5        Q.   And you -- this says, "Nice to talk to
6    you.  Here's some good news.  The unit's still
7    available.  We thought we had the unit rented to
8    someone we gave a walk-through to, but now it
9    seems they can't get out of their current lease,
10   so we need to keeping searching."
11           Do you see that?
12       A.   Yeah.
13       Q.   Did you ever see that in any other
14   emails?
15       A.   I mean, I think in most of the emails I
16   have reviewed, they all say something to the
17   effect of they are still available and something
18   to that effect.
19       Q.   How would Pierce even know that?
20       A.   Well, the MLS database does have the
21   status of the property.
22           And I don't know if this is Pierce is --
23   I mean, who is this from and who is this to?  Is
24   this Pierce pretending to be a landlord?  Is this
25   from a landlord?  Who is -- who are these email

---

322

1    addresses on here?
2        Q.   Well, if you had seen this email, you
3    would have been able to figure out, right, because
4    that's what you did?
5        A.   If I saw this email, I would be able to
6    figure out what?
7        Q.   If you saw this posted online, you would
8    have been able to figure it out, right?
9        A.   It depends if one of these emails
10   addresses is a customer.
11       Q.   If you're a consumer and you get this
12   email, you certainly believe that the email is
13   from the landlord, don't you?
14       A.   So I know this is not an email from a
15   landlord.
16       Q.   How do you know?
17       A.   And the reason I know that is I can tell
18   from the email address.  I believe his emails came
19   from a touring website.  I've never seen
20   mailcycled.com before.
21       Q.   Let's do one more.  This will be
22   exhibit -- I'm sorry.
23           MR. LEVINE:  I lost the stickers.  Where
24   are we?
25           THE REPORTER:  This is -- 27 is the last

---

323

1    one you did.
2        A.   Who is this email from though?
3        Q.   This is going to be Exhibit 28.  I'm
4    sorry.
5            (Whereupon Deposition Exhibit
6             No. 28 was marked for
7             identification by the court
8             reporter.)
9    BY MR. LEVINE:
10       Q.   Mr. Brown, I'm showing you an email
11   that's been marked -- a document that's been
12   marked for identification as Exhibit 28.  Do you
13   recognize the document?
14           MR. COCHELL:  Do you have a copy for me?
15           MR. LEVINE:  I'm sorry.
16           MR. COCHELL:  Thank you.
17       A.   I have never seen this specific one.
18   But it looks like it could be the same template.
19       Q.   And this was, in fact, the same day,
20   September 4th, 2015, that you told Danny Pierce to
21   change his template, didn't you?
22       A.   I requested Pierce for security reasons
23   to tell people to not email the template, to print
24   it out and bring it for the tour because we don't
25   want users to feel phished.

---

324

1            You know what phishing is -- do I need
2    to define what phishing is?
3        Q.   And you were concerned because some of
4    the -- some of the emails apparently said, please
5    email the credit report?
6        A.   Yeah.  It's not a secure process, and
7    it's not a good practice to email a credit report.
8    It's not secure.
9        Q.   But the landlord's email address wasn't
10   in these -- these emails, were they, the actual
11   landlord's email address?
12       A.   If Pierce knew what property the
13   customer contacted, he knew what property it was
14   for.
15       Q.   So you thought consumers were emailing
16   Pierce credit reports that they got from your
17   website, and then Pierce was forwarding them to
18   actual landlords?
19       A.   Yes.
20       Q.   4 to 5,000 posts a day, 80 replies per
21   post, 300,000 emails?
22       A.   I clearly said I did not believe he was
23   doing 4,000 a day.  I said -- I think what I said
24   was clear.
25       Q.   Did you notice that all of the emails

---

81 (Pages 321 to 324)

Brown

FTC v. Credit Bureau Center, et al.                                    12/13/2017

---

325

1    you looked at said that "we typically waive the
2    security deposit"?
3         A.   No.  I recall that not every email says
4    that.
5         Q.   Let's look at these emails side by side,
6    Exhibit 27 and Exhibit 28, shall we?
7         A.   Okay.
8         Q.   One is from February 2015, and the other
9    is from -- Exhibit 27 is from February 2015, and
10   Exhibit 28 is from September 2015; do you see
11   that?
12        A.   Are you talking about Exhibit 28 and 27
13   side by side?
14        Q.   Yeah.  Do you see that?
15        A.   Yes.
16        Q.   And you see, if you look at the second
17   page of Exhibit 28, that's another -- I'm sorry.
18        If you look at the second page of
19   Exhibit 28, that's from October 28, 2015; do you
20   see that?
21        A.   Yes.
22        Q.   So we have three different emails here,
23   and if you notice, each of them says, I'm sure you
24   want the address, but for some reason, I can't
25   advertise the address; do you see that?

---

326

1         A.   Yeah.  Now, the reason --
2         Q.   No.  Let me ask the questions, please.
3         Exhibit 27 says, "I'm sure you want the
4    address, but my husband doesn't want me to
5    advertise the address."
6         Exhibit 28 says, I'm sure "you want the
7    address, but my husband doesn't want me to
8    advertise the address."
9         Exhibit 28, Page 2, says, "I know you
10   need the exact address, but the owner advised us
11   not to divulge the address."
12        Did you believe that Pierce had all this
13   data on husbands and owners and what they wanted
14   and when they wanted it?
15        A.   So I think that's -- he designed this
16   process so a person won't cut them out.  I think
17   that if he disclosed the address in the first
18   reply, now the customer might cut Pierce out of
19   the transaction.
20        Q.   So you knew Pierce was lying about being
21   the landlord.
22        MR. COCHELL:  Objection; form of the
23   question, no time frame.
24   BY MR. LEVINE:
25        Q.   At the time you reviewed these emails,

---

327

1    you knew Pierce was not telling the truth when he
2    was making those claims about the husband or the
3    this or the that?
4         A.   I think you're completely --
5         MR. COCHELL:  Objection, lack of
6    foundation.
7         A.   I think you're completely
8    mischaracterizing this email.
9         My understanding at the time was a
10   renter was interested in a property, and Pierce
11   was matching them up with the landlord.  You know,
12   you can have credit report in hand, demonstrate
13   good credit to the landlord; this would be a
14   valuable service.
15        Q.   So you believe that Pierce was in touch
16   with both the landlords and their spouses?
17        A.   I believe he should have, and the
18   difference between this being a compliance
19   campaign and not, would be forwarding the renter's
20   information to the landlord.
21        Q.   But you agree that these emails in
22   Exhibit 27, 28 certainly would give someone the
23   impression that they are from the owner, right?
24        A.   I mean, this just says that the unit's
25   available, and I can't give you the address, and

---

328

1    I'd love to schedule a walk-through.
2         This could be your property company, it
3    could be a landlord, it could be an assistant.  I
4    don't know.
5         Q.   Let's go back to Exhibit 26 again, but
6    keep these Exhibit 27 and 28 in front of you.
7    Turn to Page 25, which is the page listed at the
8    top, ECF Page 25.  Got it?
9         A.   Yeah.
10        Q.   Go to the bottom.  Look at that.  "I
11   know that you want the precise address of the
12   property, but my husband does not want me to
13   divulge due to safety reasons."
14        Do you see that?
15        A.   Okay.
16        Q.   Did you believe Pierce had a husband who
17   was concerned about safety?
18        A.   I really think that that doesn't matter.
19   I think that regardless, he should have been, and
20   I thought he was, matching up the customer with
21   the landlord.
22        Q.   But you agree that this email makes it
23   appear as though it is being sent from the
24   landlord, don't you?
25        A.   You know, they are all different

---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Brown

FTC v. Credit Bureau Center, et al.                                    12/13/2017

---

329

1    landlord emails --
2        Q.   Well, let's look --
3        A.   -- and it's hard to -- you know, you're
4    picking different ones that say different things.
5        Q.   Well, let's look at the one in
6    Exhibit 26, Page 25.  How about in the first
7    paragraph, it says, "The first prospective
8    tenant" --
9        A.   Page 5?
10       Q.   Page -- same page you're on, Page 25,
11   Exhibit 26.  "Thank you for your interest in the
12   property listed for rent.  You were the second to
13   reach out from the ad.  The first prospective
14   tenant no longer had to move because of his work
15   situation, so we give the opportunity to you."
16       Pierce wasn't talking about himself, was
17   he?  He couldn't have been.
18       A.   So this is -- this is --
19       MR. COCHELL:  Objection; form of the
20   question, lack of foundation.
21   BY MR. LEVINE:
22       Q.   It's clear that Pierce was not talking
23   about himself, isn't it?
24       MR. COCHELL:  Objection, lack of
25   foundation.

---

330

1        A.   It's perfectly reasonable and fine and
2    common practice to create a sense of urgency in a
3    marketing campaign.
4        And it can be in the form of a countdown
5    on a website, five minutes to get your trial.  You
6    can say, only 50 products left in stock, or
7    there's three other people looking at this
8    apartment, right?  It could be in multiple ways.
9        So to say that you're the second person
10   interested in rent, or we're getting a lot of
11   replies or different things, it doesn't make it a
12   bad email.
13       Q.   I'm not -- let's not characterize the
14   email.
15       A.   Or to say, my -- my -- you know, I can't
16   give you the address or my husband doesn't want to
17   give the address, doesn't matter.
18       If he would have been replying with this
19   prospective renter to the landlord, credit report
20   in hand, we wouldn't be here today.
21       Q.   Answer my questions now.
22       To the best of your knowledge, Pierce
23   did not have a husband, did he?
24       A.   No.
25       Q.   So when Pierce in his emails wrote "my

---

331

1    husband," that wasn't true, was it?
2        MR. COCHELL:  Objection; form of the
3    question, lack of foundation.  You have to show
4    that Pierce sent this.
5        MR. LEVINE:  Don't testify, Steve.
6        MR. COCHELL:  Well, I mean --
7        MR. LEVINE:  Let me ask your client the
8    question.
9        MR. COCHELL:  My client is perplexed by
10   your questions.
11       MR. LEVINE:  No.  He's been quite
12   verbose.
13       A.   I mean, you're showing me these
14   different emails, which honestly supports my
15   belief that they are custom to each property.  One
16   says one thing, the other says a different thing.
17   Are these customized for each property?
18       Even to this day, I'm pretty perplexed,
19   and I don't understand.
20       Q.   So if they are customized to each
21   property, then Pierce would have had to consult
22   with each landlord and see how that landlord's
23   husband felt about divulging the address due to
24   safety reasons, right?
25       MR. COCHELL:  Objection; form of the

---

332

1    question, lack of foundation.
2        A.   I think you're mischaracterizing the
3    email.
4        You know, to have a husband, not have a
5    husband, divulge the address, or not divulge the
6    address, you know, it doesn't say he's the
7    landlord.  And, you know, he's free to say if he
8    has a husband or not.
9        Q.   What --
10       A.   And he's free to act as a matchmaking
11   service with prospective renters and landlords.
12       Q.   But your --
13       A.   So I think you're missing --
14       Q.   Your attorney is shaking his head no.
15   But what we do know is that every -- every one of
16   these emails referenced credit reports, right?
17       A.   Correct.  And it doesn't say free credit
18   report, and it doesn't say free credit score.
19       Q.   Well, actually, if you look at
20   Exhibit 27, it does say free report, doesn't it?
21   "Get your free report."
22       A.   Where?
23       Q.   "If you want us to schedule you for a
24   tour, then please visit the link below and get
25   your free report."

---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Brown

FTC v. Credit Bureau Center, et al.                                    12/13/2017

---

333

1      A.   It says just, "You can get your report,
2   just click here."
3           Where are you looking at?
4      Q.   Exhibit 27.  "If you want us to schedule
5   you for a tour" --
6           MR. COCHELL:  Exhibit 27.  I'm sorry.
7   BY MR. LEVINE:
8      Q.   -- "then please visit the link below and
9   get your free report."
10          Do you see that?
11     A.   This is the first time I've seen
12  something mention free report.  These other ones
13  do not say free report.
14     Q.   Okay.  So --
15     A.   Do you know what -- I mean --
16     Q.   So every one of these emails had a
17  request that the consumer obtain a credit report,
18  right?
19     A.   Correct.
20     Q.   So how did Pierce know that every one of
21  these thousands of landlords wanted a credit
22  report, period?
23          MR. COCHELL:  Objection; form of the
24  question, lack of foundation.
25

---

335

1      Q.   Okay.  Look at Exhibit 26, Page 25,
2   bottom of the page.  It says, "We are not
3   concerned with any negative report items."
4           Do you see that?
5      A.   Is it 26?
6      Q.   Exhibit 26.  You're in the right one.
7   Page 25, top of the page.
8           MR. COCHELL:  It's this one right here
9   (indicating).  You can look at it.
10          I'm just highlighting it for him.
11  BY MR. LEVINE:
12     Q.   You see where it says, "We are not
13  concerned with any negative report items"?
14     A.   Okay.
15     Q.   Do you see that?
16     A.   Yeah.
17     Q.   So Pierce felt comfortable telling
18  consumers that this landlord out there didn't care
19  what their credit report -- didn't care what their
20  credit score was?
21          MR. COCHELL:  Objection; form, lack of
22  foundation.
23     A.   I think the data in the MLS database
24  controlled the text on this template.
25          So you might point to this one email

---

334

1   BY MR. LEVINE:
2      Q.   What was your understanding of how
3   Pierce knew that every one of these landlords
4   wanted the consumer to bring a credit report on
5   the tour?
6           MR. COCHELL:  Objection; form, lack of
7   foundation.
8      A.   So I don't know if you have ever rented
9   an apartment.  Credit reports are typically
10  involved in that process.
11          And whether you're a renter, you know,
12  you want to demonstrate good credit to a landlord,
13  or you're a landlord and you want to check the
14  credit of a renter --
15     Q.   Answer my question, Mr. Brown.
16     A.   -- this is a common thing --
17          THE REPORTER:  One at a time.
18     A.   I'm answering the question.
19          This is a common thing that everyone
20  does to run a financial transaction.  You need to
21  demonstrate good credit to be a renter.
22     Q.   But --
23     A.   And to say that a landlord would be
24  upset that a potential renter demonstrated good
25  credit is -- is very silly.

---

336

1   that says "not concerned with negative report
2   items," and you know what, this one on Number 27
3   doesn't say that.  So was it or was it not
4   customized?
5           And there might be something in the MLS
6   data that says that they are not concerned.  You
7   know, bad credit okay would be an example.  If it
8   had the text bad credit okay, that could clearly
9   control what this template says.
10     Q.   What about the last line of every one of
11  these emails we've looked at which say, get me the
12  credit report, and then I'll schedule you for a
13  tour?  We see that in Exhibit 27.
14     A.   Yep.
15     Q.   We see it on Exhibit 28.  We see it on
16  Exhibit 26, Page 25.  We see it on Exhibit 28,
17  Page 2.  You see it on all those, right?
18     A.   Yes.
19     Q.   How was Danny Pierce going to schedule a
20  tour for thousands of landlords?
21     A.   So it's --
22          MR. COCHELL:  Objection; lack of form --
23  lack of foundation, form.
24     A.   So it should be a very simple process,
25  right?  You have a -- you have a prospective

---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Brown

FTC v. Credit Bureau Center, et al.                                    12/13/2017

---

337

1    renter.  You have a property that's for rent.  And
2    you just match them up.
3          Had he have just forwarded this reply to
4    the landlord, credit report in hand, said, here's
5    a customer, schedule a tour with them, end of
6    story, we wouldn't be here today.
7          Q.   So you acknowledge that Danny Pierce
8    wasn't scheduling tours for consumers.
9          A.   This is an automated system.
10         Q.   So you acknowledge that Danny Pierce
11   wasn't scheduling tours for consumers.
12         A.   No.  I believed he was scheduling them
13   through an automated system.
14         Q.   You believed an automated system was
15   scheduling tours of properties for thousands of
16   consumers across the country with thousands of
17   landlords?
18         A.   Yes, exactly.  I believe --
19         Q.   What was that system?
20         A.   I believe just like he had a system to
21   shoot out an email to a prospective landlord, he
22   could have shot out a second email to the landlord
23   saying, here, here you go, got a renter and
24   property, schedule a tour.
25         Q.   Okay.  But that's something different.

---

338

1    That's matching up the consumer with the real
2    landlord, right?
3          A.   That's not something different.  That's
4    exactly what we're talking about.
5          Q.   Okay.  But Danny Pierce himself wasn't
6    saying, well, I've got some availability after
7    3:00 on Friday.  You understand that, right?
8          A.   And -- and you're mischaracterizing this
9    email.
10         Q.   No.  Just answer my --
11         A.   Nowhere does it say that he's scheduling
12   times with people.
13         Q.   It says, "I can then schedule you for a
14   walk-through of the" -- let's look at Exhibit 28.
15   "I can personally schedule a
16   walk-through of the place."
17         That is exactly what the email says.
18         A.   And he can't forward this to the
19   landlord to do that personally and schedule it,
20   whether it's --
21         Q.   It's first person, Mr. Brown, "I can
22   personally schedule."
23         And you -- and that is not true, is it?
24         A.   Let me make sure I'm looking at your
25   first --

---

339

1          Q.   Exhibit 28, first page.
2          Your attorney is laughing, and I might
3    too.
4          MR. COCHELL:  Yeah.  There seems to
5    be --
6          MR. LEVINE:  Don't --
7          MR. COCHELL:  -- a disconnect with logic
8    here --
9          MR. LEVINE:  I agree.  I agree.
10         THE WITNESS:  There's a big disconnect
11   in logic, so --
12   BY MR. LEVINE:
13         Q.   But answer my question.
14         A.   The answer to your question is, look, he
15   used a template; and he replied to customers, and
16   he was supposed to match these up with the
17   renters --
18         Q.   And the --
19         A.   -- and he didn't do that.  And that's
20   the fraud.
21         Q.   And the template included false
22   information, didn't it?
23         A.   You know, saying like you're --
24         Q.   Did it or didn't it?
25         A.   You're -- I can't answer that question

---

340

1    yes or no.
2          Q.   You can't --
3          A.   What I can say is that you're -- you're
4    mincing words to say I said he would do this, he
5    said he would do this.  You know what?  He should
6    have been matching them up with the landlord.
7          If he said I did, you know what?  He's
8    controlling this through an automated system, or
9    we thought he was; so, I mean, I don't know what
10   your point is.
11         Q.   When Pierce says, "I can personally
12   schedule a walk-through of the place," that isn't
13   true, is it?
14         A.   I don't know if that's true or not --
15         Q.   So you thought --
16         A.   -- because we don't know if he is
17   scheduling this.
18         I mean, we assume because we're here
19   today that he's not doing that.  But at the time,
20   we did not know he wasn't scheduling tours with
21   people.
22         Q.   So --
23         (Brief pause.)
24         A.   And --
25         Q.   Go on.

---

85 (Pages 337 to 340)

Brown

FTC v. Credit Bureau Center, et al.                                    12/13/2017

---

341

1       A.   -- on your Exhibit 28 --
2       Q.   Mm-hmm.
3       A.   -- who is this email from and to?
4       Q.   You were just whispering to your
5    counsel.  Is there something else you wanted to
6    ask me?
7       A.   Just the question I just asked.  Who is
8    this email to?  Is this from --
9       Q.   You're the witness, Mr. Brown.  And you
10   testified that you were familiar with these
11   emails.
12      A.   I said I recognized similar templates to
13   these emails.
14      Q.   Right.
15      A.   But, you know, these are all to the same
16   person, you know, 27 and 28.  So is this landlord
17   email being sent to the same person over and over
18   from different customers?  It doesn't make any
19   sense.
20      Q.   It looks suspicious, doesn't it?
21      A.   It looks very suspicious.
22      Q.   Yet when you saw all these ads before
23   this lawsuit, you did nothing to follow up, did
24   you?
25      A.   Because I don't think I've seen a

---

342

1    situation where a landlord email is being sent
2    multiple times from different email addresses to
3    the same person.
4            Who is this FrazerTrug@gmail.com?  Is
5    that a customer?
6       Q.   Did you believe landlords were getting
7    commissions from you or from Danny Pierce?
8       A.   I don't know if he was getting
9    commissions or not.
10      Q.   How did the transaction end if it was
11   done as you thought it would?  So Pierce forwards
12   the email to the landlord, and then what?
13      A.   That could be it.  There could be more.
14   So my understanding at the time was he matched up
15   the prospective renter with the landlord.
16           I know he also did some other activities
17   to monetize the customer, marketing other
18   rent-to-own products.  I don't know how or when
19   that took place afterwards, but that's my
20   understanding.
21      Q.   And presumably, he would have received a
22   commission from the landlord if he refers a
23   consumer to that landlord, right?
24      A.   He definitely could have.  That would
25   have been a great business.

---

343

1       Q.   Just so I understand then, the emails
2    that we've been looking at have links to your
3    website, right -- your websites, right?
4       A.   You know, I can't tell looking at this
5    exhibit.
6       Q.   Okay.  But --
7       A.   But I don't know.
8       Q.   You knew Danny Pierce's emails had links
9    to your website, you already testified to that,
10   right?
11      A.   Correct.
12      Q.   Okay.  So the idea was that consumers
13   would get their credit report from you, right?
14      A.   Correct.
15      Q.   And then whatever happened afterward,
16   landlord, no landlord, property available, no
17   property available, you still had the sale on your
18   end, right?
19      A.   I think you're mischaracterizing this
20   whole activity.
21           It's not property available, no property
22   available.  This is a property that's supposed to
23   be in an MLS database, meaning the property is
24   available.
25      Q.   Let's talk just about the chronology

---

344

1    though.  You -- the consumer has to sign up with
2    eFreeScore or CreditUpdates before ever having any
3    interaction with the actual landlord, correct?
4       A.   It's not a requirement.  You know, the
5    customer could reply and say, hey, I already have
6    a credit report.
7            And if it was an automated system, it
8    would kick it over to the landlord, and it's up to
9    them what they want to do.
10      Q.   But the way the system was set up was to
11   encourage customers to get credit reports from
12   you, and then the tour would be scheduled,
13   correct?
14      A.   Yeah.  A credit report is very important
15   in the rental process.
16      Q.   So in terms of your own income on
17   Pierce's traffic, it made no difference whether
18   the landlords were real or fake, did it?
19      A.   That's a completely inaccurate
20   statement.  If it was a fake landlord email, I
21   would have not have done business with them; and I
22   would have terminated the relationship, like I've
23   done in many other cases with other people.
24      Q.   Okay.  So you still -- okay.  Okay.
25   Let's move on.

---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Brown
FTC v. Credit Bureau Center, et al.                                    12/13/2017

345

1      Now, at some point -- you said this in a
2  declaration, and I can get it out.  But at some
3  point in late 2015 or early 2016, you changed your
4  landing pages, correct?
5      MR. COCHELL:  Changed what?
6  BY MR. LEVINE:
7      Q.  Your landing pages, correct?
8      MR. COCHELL:  Got it.
9      A.  Can you refresh my memory?
10     Q.  Sure.  Let's go to the Skype
11 conversation, which is Exhibit 19.
12     A.  Yep.  I have it in front of me.
13     Q.  Okay.  Let's turn to Page 77, and I'm
14 talking about the pages at the top.
15         Actually, I'm sorry, let's go to
16 Page 78, please.  So it looks to me like you were
17 talking to Danny Pierce about designing a new
18 landing page to get better results.  Take a look,
19 and tell me if that is accurate.
20     A.  Where am I looking?
21     MR. COCHELL:  Page 78 of 159?
22 BY MR. LEVINE:
23     Q.  You know, I have a shortcut.  Let's put
24 Exhibit 19 to the side.  And I want to introduce
25 you to a new exhibit.  This should be faster.

346

1      MR. LEVINE:  Okay.  We're on which?
2      THE REPORTER:  The last one I have is
3  28.
4      MR. COCHELL:  Yeah.  It should be 29.
5      MR. LEVINE:  Thank you.  Okay.
6  BY MR. LEVINE:
7      Q.  Okay.  I'm showing you a document that's
8  been marked for identification as Exhibit 29.
9         (Whereupon Deposition Exhibit
10             No. 29 was marked for
11             identification by the court
12             reporter.)
13 BY MR. LEVINE:
14     Q.  You see there's already an exhibit
15 sticker on it, but my exhibit sticker trumps.
16         So Mr. Brown --
17     MR. COCHELL:  Let's not get the
18 president involved.
19     MR. LEVINE:  Exactly, right.
20 BY MR. LEVINE:
21     Q.  You recognize this document, right?
22     A.  Yes.
23     Q.  It's a declaration you filed in
24 November, right?
25     A.  Yes.

347

1      Q.  Okay.  Now, Paragraph 2, you say, "The
2  landing pages that are the subject of this lawsuit
3  were activated and used by CBC starting in or
4  about December 2015 to January 2016," right?
5      A.  Correct.
6      Q.  Those landing pages, when you say they
7  are the subject of the lawsuit, you base that on
8  the landing pages that were attached to the
9  complaint?
10     A.  Yes.
11     Q.  So those were the landing pages in use
12 in around 2016, but you're saying that they
13 changed; is that accurate?
14     A.  To make this more accurate, this --
15 these were the pages that were in use specifically
16 for Pierce and Lloyd for that time period.  So
17 it's not the case across the whole sites.  It was
18 designed actually specifically per Pierce for
19 Pierce's traffic.  We plugged it into the system
20 on that date.
21     Q.  And when you say these pages, I think
22 that's what you said, you're referring to the
23 pages that were attached to the FTC's lawsuit,
24 correct?
25     A.  Yes.

348

1      Q.  Okay.  Now, you say in Paragraph 3E,
2  okay, that "Danny Pierce's texts which showed that
3  the landing page at issue became 'live' on
4  December 1st, 2015."
5         Do you see that?
6      A.  Yes.
7      Q.  Okay.  And if you go -- if you go to
8  Exhibit E of -- of Exhibit 29 --
9      A.  My --
10     Q.  -- it's the final page of this exhibit.
11     A.  Okay.
12     Q.  Okay?  This looks like an excerpt from
13 your Skype conversation, right?
14     A.  This appears to be Document 42-2,
15 Page 80 or Page 79.
16     Q.  Okay.  You say, "The new LP."
17         That means landing page, right?
18     A.  Yes.
19     Q.  And you say, "It's like 60 to 70 percent
20 better than before," is that right?
21     A.  Yeah.  But I don't know if it's accurate
22 because then right after that, I say we are at 1
23 in 13 and now we are at 1 in 15.
24     Q.  But the goal was to increase
25 performance.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Brown

FTC v. Credit Bureau Center, et al.                          12/13/2017

---

349

1    A.   Definitely.
2    Q.   And by performance, I mean revenue.
3    A.   It's to increase the conversion rate.
4    Q.   Okay.  Fair.
5         Now, if we return to Exhibit 19,
6    Page 78, I think it's where we were, you say also
7    at a -- you say at 8:26 p.m., "Also changing the
8    header image of the order page -- pages to remove
9    the word order."
10        Do you see that?
11   A.   Yeah.
12   Q.   Okay.  Why were -- well, let's start
13   with which page is the order page?
14   A.   So all of them excluding the landing
15   page.  So I refer to them as what are Page 1, 2,
16   and 3; personal information, credit card, social,
17   date of birth.
18   Q.   So you were removing the word "order"
19   from each of the -- each of those pages?
20   A.   No.  What I'm referring to is the header
21   image.  There's three steps it says.  It will say
22   like order, confirm view, or sign up, confirm
23   view, something along those lines, something
24   substantially similar to that on the order page.
25        So I think there was some issue we

---

350

1    corrected.  You know, it wouldn't make sense to
2    have one page be order when all three of them are
3    order.
4    Q.   So in the end, none of the pages said
5    order, correct?
6    A.   No.  They -- it definitely says order on
7    the credit card page.  When you place your order
8    here, when you click "submit secure order," that's
9    the language that's on the credit card page.
10        There's no mistake on the credit card
11   page.  The terms and the price and the order
12   details are there.
13   Q.   Okay.  This is going to be Exhibit 30.
14        (Whereupon Deposition Exhibit
15        No. 30 was marked for
16        identification by the court
17        reporter.)
18   BY MR. LEVINE:
19   Q.   Mr. Brown, I'm showing you a document
20   marked for identification as Exhibit 30.  You
21   recognize this as the complaint in the lawsuit,
22   right?
23   A.   Correct.
24   Q.   Let's first turn to Page 35, please.
25   And these are the pages at the top.

---

351

1         Actually, so let's start on -- I
2    apologize.  Let's start on Page 32 of Exhibit 30.
3    Okay?  Are you there?
4    A.   Yeah.
5    Q.   Okay.  So order does not appear in this
6    page, does it?
7    A.   So what I'm saying, and what I said in
8    this message, is very clear on the top of the
9    website, I said I'm changing the header image.
10   See right now, it says, "Complete, confirm,
11   verify."
12   Q.   Yeah.
13   A.   It doesn't make sense to have one of the
14   steps be called order on a three-step order
15   process.  What are the other two steps for, right?
16        So on the top of the page, you'll see it
17   says "Page 1, order" on the -- in the browser
18   toolbar, right?
19        And you come to Page 35 of this
20   document, the confirm page, it says, "When you
21   place your order here, you will begin your
22   membership in eFreeScore.  You will be billed $1
23   today and start your trial membership.  After your
24   7-day trial period, you will be charged 29.94
25   every month.  If you wish to cancel, just call us

---

352

1    at 800-934-1938 to stop your membership."
2    Q.   Okay.
3    A.   And this is in a header that says
4    "payment information," and you have to both submit
5    and continue on to the next page affirmatively
6    giving consents and enrollments in this negative
7    option membership.
8    Q.   Where did the order image previously
9    appear?
10   A.   It was on Number 1 where it says
11   "complete".  That would have said order instead.
12   Q.   Instead of complete?
13   A.   Correct.
14   Q.   And "Number 2, confirm" and "Number 3,
15   verify" would have been the same?
16   A.   Correct.
17   Q.   Okay.  You knew lots of people were
18   complaining that they didn't know they signed up
19   for credit monitoring, right?
20   A.   I think that's inaccurate statement,
21   grossly inaccurate statement.
22        You know, we had a very large customer
23   base; and our customers overwhelmingly knew what
24   they were signing up for and exercised their
25   rights in the trial period and after and benefited

---

88 (Pages 349 to 352)

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Brown

FTC v. Credit Bureau Center, et al.                                    12/13/2017

353

1    from our products and services.
2        Q.   Do you remember working on a website
3    called SimpleRefund.org?
4        A.   Yes.
5        Q.   And the goal of that website was to
6    reduce chargebacks, right?
7        A.   Correct.
8        Q.   And you were working with some folks to
9    set up the website and design the pages, correct?
10       A.   Correct.
11           MR. LEVINE:  All right.  This will be
12   Exhibit?
13           MR. WARD:  31.
14           MR. LEVINE:  31.
15           (Whereupon Deposition Exhibit
16              No. 31 was marked for
17              identification by the court
18              reporter.)
19   BY MR. LEVINE:
20       Q.   Okay.  Mr. Brown, do you recognize
21   Exhibit 31?
22       A.   Yes.
23       Q.   What is it?
24       A.   It's a website called SimpleRefund.
25       Q.   And you were involved in creating

354

1    Exhibit 31?
2        A.   Yeah.  You know, the way this came about
3    is one of our competitors, which is much larger
4    than us, we noticed had a similar process where
5    they'd create a website and try to rank it in
6    Google.
7            And basically if there's a customer who
8    has an issue, we want to direct them to us.  We
9    would love to help them out and issue them a
10   refund if they have an issue.
11           It's cheaper if they contact us and not
12   their bank, and we want to provide good customer
13   service.
14       Q.   But it says, "SimpleRefund is a company
15   that gets you refunds for charges you don't
16   recognize and did not authorize."
17           Do you see that?
18       A.   Correct.
19       Q.   So you were aware that there was a
20   problem for people complaining about charges they
21   didn't authorize, weren't you?
22       A.   Yeah.  So this -- like I said, we're in
23   the complaint business.  It's not uncommon for
24   people to say, I don't recognize this, I didn't do
25   this, this is fraud, Pierce or not, anyone in

355

1    general.
2            People want refunds.  And you know what?
3    When they complain, after reasonable business
4    efforts to try to retain them and keep them happy,
5    we'll offer them a refund.
6            That's just a good business practice in
7    general.  I don't see anything wrong with this.
8        Q.   Okay.  Elsewhere in the website, you had
9    text that included, "Credit card charge from
10   CreditUpdates.com you didn't approve."
11           Do you recall that?
12       A.   Correct.
13       Q.   Okay.
14       A.   These are to rank in Google for
15   keywords.  So if someone searches for
16   CreditUpdates, not familiar, they come to this
17   website.
18       Q.   You even had a canned response for
19   people who got charges they didn't recognize,
20   didn't you?
21       A.   I believe so.
22       Q.   You don't believe so?
23       A.   I believe so.
24       Q.   Oh, you believe so.  Okay.
25           Now, you've said on numerous occasions

356

1    in this case that your company had a liberal
2    refund policy; is that right?
3        A.   Correct, after reasonable business
4    efforts to retain customers.
5        Q.   And refund, what does refund mean to
6    you?
7        A.   It means refund the customer.
8        Q.   How much, the total amount they paid, or
9    what?
10       A.   There's no fixed amount.  Some customers
11   will want just the refund of a dollar.  Some
12   customers will want half of the month refunded.
13   Some customers will want a full month.  You know,
14   in some cases, they go up to two months.  But I
15   think I've seen some cases where there's more.
16           But it's really on a case-by-case basis
17   to do what's necessary to try to create a
18   satisfied customer.
19       Q.   But, in fact, your policy was to not
20   give refunds, wasn't it?
21       A.   I disagree with that statement.
22           MR. LEVINE:  Okay.  Are we on 32.
23           THE REPORTER:  Looks like it.
24
25

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Brown

FTC v. Credit Bureau Center, et al.                                    12/13/2017

---

357

1          (Whereupon Deposition Exhibit
2          No. 32 was marked for
3          identification by the court
4          reporter.)
5          MR. COCHELL: Just so you know, we're
6   probably at the end. I'm not sure. It's about
7   5:30.
8          MR. LEVINE: Okay. How about we take a
9   break after this, and we'll -- Guy and I will
10  confer.
11         MR. COCHELL: Sure.
12         MR. LEVINE: This is the last before the
13  break, I promise.
14  BY MR. LEVINE:
15     **Q. All right. I'm showing you a document**
16  **that's been marked for identification as**
17  **Exhibit 32. Do you recognize it?**
18     A. Yes.
19     **Q. And what is it?**
20     A. It's an email between myself and a
21  copywriter, Josh Margulies.
22         He's sending me two customer service
23  email templates. Apparently one of the templates
24  is for when a customer requests a refund and they
25  are canceled and get a refund, and another

---

358

1   template for when a customer asks for a refund and
2   no refund is provided.
3      **Q. And you say on June 8th, 2016, "Needs to**
4   **be a soft rejection for a refund," right?**
5      A. Correct.
6      **Q. And Josh responds, "I tried to be very**
7   **gentle when explaining that we cannot issue a**
8   **refund," right?**
9      A. Yeah. So I think you're reading
10  something into this that's not there.
11         So I asked Josh to create a template for
12  both possibilities, when a customer is refunded
13  and when they are not refunded.
14         Now, keep in mind, we run a white label
15  business; and we have many websites on our
16  platform. I don't even control the refund policy
17  on some of the websites. It's up to our white
18  label provider, so we need a template for both
19  scenarios.
20     **Q. Okay. Well, let's look at the template,**
21  **which is attached to 32. First template, second**
22  **full paragraph, says, "Unfortunately, our policy**
23  **is that we are not able to issue a refund on past**
24  **payments."**
25         **Was that your policy?**

---

359

1      A. Again, you're completely
2   mischaracterizing this email.
3          We asked Josh --
4      **Q. I'm not asking about an email, just so**
5   **you understand my question.**
6      A. So -- so I think the statistics that we
7   went over were over, I think it was, $800,000 in
8   refunds were issued clearly shows that we had a
9   refund policy in place and customers were
10  refunded.
11     **Q. So is this --**
12     A. And we had to have an email template to
13  satisfy both possible scenarios. If a customer is
14  refunded or not refunded, we have to send the
15  appropriate template to that email.
16     **Q. So it was not your policy to give**
17  **refunds because you just said that you often did**
18  **not give refunds, right?**
19     A. I don't think I said that.
20     **Q. You often did not -- there were times**
21  **when you did not give refunds to customers,**
22  **correct?**
23     A. Can you be more specific?
24         I mean, we have hundreds of websites, I
25  think, on this platform by multiple partners that

---

360

1   have different rules for refunds. I need more
2   specific --
3      **Q. Well, Josh was writing a script for your**
4   **people in Colombia, right?**
5      A. No. He's writing an email template
6   that's sent in an automated fashion --
7      **Q. Right.**
8      A. -- to be sent to consumers on who knows
9   what website. It could be a white label website,
10  could be a cobrand website, could be my website,
11  could be anyone's --
12     **Q. So Josh was writing emails to be sent**
13  **from -- strike that.**
14         **So when Josh says, "Our policy is that**
15  **we're not able to issue a refund," it's your**
16  **testimony that doesn't reflect CBC's actual**
17  **policy?**
18     A. I'm saying Josh was instructed to create
19  two emails, an email where a customer is refunded
20  and an email where they are not; and they are
21  plugged into a system.
22     **Q. Well, actually --**
23     A. So if a customer gets a refund, they are
24  sent the email that reflects you got a refund so
25  we can communicate accurately to the customer what

---

90 (Pages 357 to 360)

Brown

FTC v. Credit Bureau Center, et al.                    12/13/2017

361

1    we did for them.
2        Q.   All right.  Let's look at the second
3    email template, "No refund."
4            If you look at the second page -- excuse
5    me, the third page of Exhibit 32, it says,
6    "Unfortunately, our policy is that we're not able
7    to issue a refund on past payments."
8            So both these email templates, you're
9    saying no refund, right?
10       A.   I think you're completely
11   mischaracterizing --
12       Q.   I'm reading it.
13       A.   I think you're completely
14   mischaracterizing the email.
15           Again, going back to the email, I said,
16   hey, "Josh, can you make some email copy for
17   Diego," the customer service supervisor.
18           "He needs a template for when, one,
19   customer requests to cancel and refunded.  Number
20   two, customer asks for a refund and no refund
21   provided."
22           There's two templates, one for refunded,
23   one for not.
24       Q.   So you're --
25       A.   This has nothing to do with a refund

362

1    policy.  This is about creating good customer
2    service templates to accurately communicate what
3    happens when it happens.
4        Q.   Go to the second page, first email
5    template.  You say that this is a template for
6    when you have given refunds?
7            MR. COCHELL:  Objection,
8    mischaracterizes the testimony.
9        A.   So you're mischaracterizing the email.
10           Look, my instructions are clear.  We
11   need two templates.
12       Q.   I'm not asking about the instructions.
13       A.   No.  Look, I'm answering your question.
14   And it's not a yes or no answer.
15           My instructions are clear:  Template
16   one, refunded; template two, no refund provided.
17           Apparently what Josh delivered was not
18   what I asked because look at what he sent
19   apparently.  Email one, no refund.  Email two, no
20   refund.
21           That doesn't reflect what I asked him to
22   do, right?
23       Q.   That was my question.  Thank you.
24           MR. LEVINE:  We'll take a break now, and
25   we can hopefully wrap this up.  Okay?

363

1            MR. COCHELL:  Sure.
2            MR. LEVINE:  Okay.
3                (Whereupon, a short break was
4                taken.)
5    BY MR. LEVINE:
6        Q.   All right.  Mr. Brown, you are under
7    oath still, you understand?
8        A.   Yes.
9        Q.   I think my questions will be brief.
10           My understanding is that you have opened
11   new bank accounts since the filing of this case;
12   is that correct?
13       A.   Correct.
14       Q.   And are those bank --
15       A.   No, sorry, bank account.
16       Q.   Single account.
17           THE REPORTER:  What?  Oh, okay, single.
18       A.   Are you talking about ones -- I'm sorry.
19   Take a step back.
20           So since what date?
21       Q.   Since the filing of this lawsuit.
22       A.   I've opened one bank account since the
23   filing of this lawsuit.
24       Q.   And that bank account is in your own
25   name?

364

1        A.   Yes.
2        Q.   Did you open any corporate bank
3    accounts?
4        A.   No.
5        Q.   And the second question -- or thank you.
6            When did you open that bank account?
7        A.   I don't recall specifically; but, you
8    know, I want to say about two months ago.
9        Q.   And which bank did you open it at?
10       A.   Banco Popular.
11       Q.   Is that a Mexican bank?
12       A.   It's a Puerto Rican bank.
13       Q.   Oh, Puerto Rican?
14           Is that the bank where you had an
15   account prior to this lawsuit?
16       A.   No.
17       Q.   Okay.  Okay.  The -- I also wanted to
18   ask you about the disposition of your cars, if you
19   could just tell me the status of that.
20       A.   Yeah.  So, you know, first of all, I
21   have a buyer lined up for the BMW who made an
22   offer for $14,000.
23           I need to check with the balance of the
24   loan with the Wells Fargo Dealer Services company.
25   I think, but I'm not positive, that the loan is

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Brown

FTC v. Credit Bureau Center, et al.                                              12/13/2017

---

365

1  slightly higher than that amount; so I think it's
2  going to take some negotiation to get the party to
3  the correct figure, but I'm not positive.  I need
4  to contact the bank.
5          Regarding the Jeep, you know,
6  unfortunately, the FTC waited until two hurricanes
7  damaged St. Croix and the Virgin Islands.  It's a
8  little difficult right now to sell a Jeep.  I
9  haven't had any responses or interest in my car
10 yet.
11     Q.   When did you -- how are you advertising
12 the Jeep?
13     A.   It was posted on Craigslist.
14     Q.   Had you --
15     A.   Love that site, right?
16     Q.   What?
17         THE REPORTER:  What?
18     A.   We all love that site.
19         MR. COCHELL:  But it's a real -- it's a
20 real ad.
21         THE WITNESS:  It's a real ad, yeah, I
22 promise.
23 BY MR. LEVINE:
24     Q.   And when --
25     A.   I did it myself.

---

366

1      Q.   And when did you post that ad?
2      A.   I -- I don't recall specifically.
3          MR. COCHELL:  Can you print out a copy?
4  Can we like generate the ad --
5          THE WITNESS:  Yeah, yeah.  I can print
6  it out for you and --
7          MR. COCHELL:  -- and generate a copy of
8  the bank account and give it to them --
9          THE WITNESS:  Yeah.
10 BY MR. LEVINE:
11     Q.   And you put a --
12         MR. COCHELL:  -- tomorrow.
13 BY MR. LEVINE:
14     Q.   You put a price or best offer?
15     A.   I don't remember if I put or best offer,
16 but I did put a price --
17     Q.   Do you remember what the price is?
18     A.   I think it was $22,000, but don't hold
19 me to it.  It was right around there.
20         MR. LEVINE:  Okay.  I think we are all
21 done.  This concludes the deposition of Michael
22 Brown.
23         MR. COCHELL:  We'll reserve our
24 questions for trial or summary judgment.
25         THE REPORTER:  What about signature?

---

367

1          MR. COCHELL:  We'll review and sign.
2          (Whereupon the deposition
3          adjourned.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

368

1  STATE OF ILLINOIS  )
2                     ) SS
3  COUNTY OF C O O K  )
4
5
6  I,_____,
7  do hereby certify that I have read the foregoing
8  transcript of my deposition consisting of pages
9  ____ through ___ , inclusive; and I find it is a
10 true and correct transcript of my deposition so
11 given as aforesaid.
12
13
14 _____
15
16
17 Subscribed and sworn to
18 before me this ____ day
19 of _____, 2017.
20
21 _____
22 Notary Public
23
24
25

---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Brown

FTC v. Credit Bureau Center, et al.                                    12/13/2017

369

1    IN RE THE CASE OF:  FEDERAL TRADE COMMISSION vs.
2    CREDIT BUREAU CENTER, LLC, et al.
3    taken on:  December 13, 2017
4
5    PAGE    LINE      REASON AND CHANGE
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
25

370

1    STATE OF ILLINOIS  )
                        ) SS:
2    COUNTY OF C O O K  )
3
4
5         I, Layli Phillips, RPR, CRR,
     CSR, in and for the County of Cook and State of
     Illinois, do hereby certify that MICHAEL BROWN on
6    December 13, 2017, was by me first duly sworn to
     testify to the truth, the whole truth, and nothing
7    but the truth, and that the above deposition was
     recorded stenographically by me and transcribed by
8    me.
9         I FURTHER CERTIFY that the foregoing
     transcript of said deposition is a true, correct,
10   and complete transcript of the testimony given by
     the said witness at the time and place specified.
11
          I FURTHER CERTIFY that I am not a
12   relative or employee or attorney or employee of
     such attorney or counsel, or financially
13   interested directly or indirectly in this action.
14        IN WITNESS WHEREOF, I have set my hand.
15
16
     s/Layli Phillips
17   Layli Phillips
     Registered Professional Reporter
18   Certified Realtime Reporter
     Certified Shorthand Reporter
19   Certificate No. 084.003900
20
21
22
23
24
25

93 (Pages 369 to 370)

FTC v. Credit Bureau Center, et al.                                      12/13/2017

**A**

**A.A** 2:3
**a.m** 1:17 184:11
**AA** 86:4
**Abasolo** 105:22
**ability** 9:2,5,8,11,15
  34:13 41:1 114:4
  217:8 307:1
**able** 10:19 13:22
  34:12 62:1 65:15
  104:19 138:23
  149:2 151:7,14,17
  152:3,11 175:1,4,8
  176:4,6 194:19
  196:1 205:5,9
  217:21 218:19
  222:14 290:16
  293:20 294:21,22
  304:1,2 322:3,5,8
  358:23 360:15
  361:6
**abuse** 306:12 307:16
**abused** 268:8
  291:13
**abusive** 276:5,12
  281:11,20
**accent** 56:12
**accept** 142:8 167:22
  175:11 176:7,13
  191:25
**acceptable** 150:16
**accepting** 130:2
  160:24
**access** 34:12 60:20
  60:22,25 61:2,4,14
  65:2 87:9,14,17,22
  88:19 91:23 133:9
  151:3,6 194:15,16
  194:18 201:12,14
  201:16 203:14,17
  203:20 204:2,9,15
  205:12,24 206:5,9
  206:25 207:12,18
  207:25 208:3,8,14
  208:25 210:4,5,11
  210:12 211:9,12

212:16 213:1,1,3,7
  213:20,20,22
  214:4 215:15,18
  215:25 216:3,17
  216:19 217:6
  218:3,6,18,19
  219:13 220:1,15
  226:15,19,20
  227:20,23,25
  228:7 229:3 234:5
  251:19,25 256:5,7
  258:12,21 259:18
  259:19 267:18
  304:1 314:3 315:7
  315:11 318:8
  319:5,7 320:4
**accessed** 220:2,10
  220:11
**accessing** 215:23
  216:21
**accomplishing**
  129:5
**account** 29:3 60:18
  60:22 104:8
  105:23 111:4,6,8
  113:18 115:23
  116:6,8 119:5,13
  119:20,25 122:1,3
  122:7,12 124:3,17
  125:6,10 126:12
  127:1,5,6 128:12
  128:15,19 129:5
  132:23 133:20,22
  134:8 135:14
  137:2,2,22,23
  138:23 139:3
  141:11,25 148:8
  149:21,24 153:1
  153:12 154:12
  156:23 157:3
  159:9,15 163:9
  164:15,19 165:2
  165:10,12,19
  167:6,10,14
  204:24 208:12,15
  219:5,6,7,9 227:6
  227:14 229:2,4

274:2 276:16,17
  279:20 363:15,16
  363:22,24 364:6
  364:15 366:8
**accounts** 37:21 38:1
  38:4,6,10 53:20,22
  53:25 54:3 60:21
  121:8 127:18
  139:6 164:12
  192:8 227:11
  363:11 364:3
**accreditation** 301:3
  311:19 312:24
  313:2
**accuracy** 237:15
**accurate** 10:24 25:1
  36:12 47:10 64:21
  68:22 69:24 70:6
  98:9 110:21
  130:13 134:25
  150:14 205:22
  227:24 231:20,21
  232:14,18 233:25
  236:4 243:13
  283:6 345:19
  347:13,14 348:21
**accurately** 121:9
  124:23 360:25
  362:2
**accusations** 281:21
  282:2
**achieve** 68:20 69:12
**acknowledge** 337:7
  337:10
**acronyms** 132:4
**act** 21:13 22:4 43:8
  71:1 332:10
**acting** 307:23
**action** 218:10 227:2
  370:13
**actions** 139:13
**activated** 347:3
**active** 108:21,22
**actively** 25:23 63:10
**activities** 43:5
  342:16
**activity** 23:1 343:20

**actual** 306:3 317:20
  318:2 324:10,18
  344:3 360:16
**ad** 247:2 252:20,24
  253:3,16 254:14
  264:5,25 265:6,8
  266:2,2,3,4,8,16
  266:17,23 267:1,2
  267:7,8 270:9
  276:8,10 278:8,18
  279:7,13,21
  286:22 289:1,6
  290:23,24 293:12
  293:14,15,16,20
  294:20,22 295:21
  295:23,25 296:5,9
  296:10,13 297:17
  297:25 298:3
  303:24,24 304:1,2
  304:14,17,21,22
  305:2 307:3,7
  308:8 309:5,5,6
  310:23 312:20,21
  315:16 316:22
  329:13 365:20,21
  366:1,4
**add** 39:6 111:1
  270:1 277:18
**adding** 108:22
**addition** 43:14
  113:7 293:23
**additional** 62:2
  85:12 126:5 168:1
  249:9 286:3,24
**additionally** 37:3
  50:11 69:13
  290:15
**address** 60:1,7
  79:15 85:24 91:12
  92:2 103:15 122:9
  133:2,5,7 138:5,16
  162:17 276:10
  280:19 295:15
  308:13 317:6
  319:25 322:18
  324:9,11 325:24
  325:25 326:4,5,7,8

326:10,11,17
  327:25 328:11
  330:16,17 331:23
  332:5,6
**addresses** 59:24
  60:4,23 105:19
  293:2 322:1,10
  342:2
**addressing** 61:24
**adds** 281:16
**adjourned** 367:3
**adjust** 13:1 160:5,11
  160:14,15
**admin.MyScore3...**
  218:18 220:14
**ads** 246:4,5,7 248:7
  252:5 253:7,13,25
  255:24 256:1,16
  257:8 260:5,9,13
  261:25 262:16,16
  264:10,23 265:16
  265:22 267:17,22
  267:25 268:2,21
  269:3 271:7,19
  273:10 274:9
  275:19 278:2
  279:8,11 280:12
  281:15 282:19,21
  283:12,18,22
  284:2 286:15
  287:24 288:2,6,16
  288:18 289:23
  290:2,4,8,10,16,22
  293:24 294:16
  295:10 301:10,14
  301:16 302:18
  303:9,16,19,21
  312:13 314:6
  316:4,23 317:19
  341:22
**advance** 72:18
**advertise** 314:12
  315:3,17 317:3
  325:25 326:5,8
**advertisement** 22:6
**advertisements**
  309:22

Brown

FTC v. Credit Bureau Center, et al.                                    12/13/2017

**advertising** 250:15
250:17,22 259:17
263:1,3 288:14
314:17 315:24
316:1,2 365:11
**advertising'** 274:12
**advice** 30:1
**advised** 326:10
**advocate** 113:8
**affect** 9:5,8,11,15
24:19
**affiliate** 22:21,25
23:2,4,9,16,21
24:2,6 27:19 28:11
40:23 43:2,3,12,18
43:22 44:2,25 45:2
45:10,12 46:7 47:8
47:13,20 48:3,20
50:7,14,19 51:2,4
51:17 52:15,18
53:9 63:7,8,15,18
65:12,24 66:1,12
66:16,19,19 70:18
70:22 74:6,25 75:3
75:5 85:15 89:16
96:2,5,7,12 97:1,6
97:9,10,14,16,17
98:7,17,18,19
102:10 108:5,11
109:9 122:17
152:14,15 170:1
173:15 177:10
179:4 180:15
181:10,14 182:25
184:21 186:11,12
187:25 188:1,2,7
188:22,23 189:10
189:11,11 190:11
190:13 193:25
194:20 197:1
198:20 202:9
217:21 238:22
244:9 248:2 249:7
268:19 277:7
281:22 288:14,17
288:21 295:18
297:4 304:16,20

305:1,13
**affiliate's** 85:2,3
**affiliates** 24:12 28:3
28:15 29:1,7 42:13
42:19,23 43:9 47:2
49:6,7,8 51:24
66:22 99:13 161:2
172:11 173:3
176:20,20 177:12
177:12 179:17
186:23 188:6
200:13 252:16
258:25 274:10
286:5 292:15
**affinity** 23:10
**affirm** 13:8
**affirmatively** 352:5
**afforded** 168:5
**aforesaid** 368:11
**afternoon** 309:10
**afterward** 343:15
**agent** 18:5 77:23
136:2
**agents** 7:23 59:13
62:23 66:4 265:24
277:12,13
**ago** 7:6 24:8 25:6
90:8 166:10 364:8
**agree** 39:11 65:15
116:11 122:22,24
186:7 232:23,25
320:22 327:21
328:22 339:9,9
**agreed** 107:25 108:1
234:19
**agreement** 7:12,17
29:21 30:3 35:16
35:17 36:18 37:1,4
37:6,9 43:3 107:25
116:16,19,23
147:7 164:10
**agreements** 35:19
**agrees** 8:24
**ahead** 29:18 81:3
136:15 138:10
187:19 214:2
215:6 235:11

239:5 283:9
286:13
**aid** 274:21 275:7,12
**air** 11:4 61:23
124:18,21 128:2
**aka** 24:17 241:19
**al** 1:7 369:2
**alarming** 265:21
**alcohol** 9:14
**alert** 13:18 301:7,10
302:3
**alias** 60:15
**allegation** 256:3
262:18 310:2
**allegations** 22:5
288:1
**allege** 302:7
**alleged** 255:23,25
286:9 287:23
301:23 310:22
**alleging** 19:20 286:8
**allow** 168:9,11
**allowed** 116:17
165:22 166:3,15
224:6 248:17
**allowing** 221:25
222:3 223:13
**allows** 224:2 319:12
**alphanumeric** 63:21
63:24,25
**amazing** 195:11
**Amazon** 49:25 50:4
205:8,9 219:5,6,7
219:8 222:7 227:6
227:11,14 229:2,3
**amended** 42:9
**American** 23:11
**amount** 115:21
127:4 154:8
160:25 192:4
212:22 242:25
243:3 356:8,10
365:1
**amounts** 242:24
243:2
**analyze** 240:25
241:2

**analyzing** 122:12
243:15
**and/or** 20:11 42:14
**Andrew** 97:15 98:3
98:18 99:15,17,23
100:1
**answer** 9:2,21,23
10:11,18,23 11:1,5
12:13,23 13:9 14:5
23:6,7 36:25 42:9
57:4 96:15 98:13
127:11 135:24
151:13 153:14
161:4 187:11,12
207:4,7,12 212:19
223:19,20 235:3
235:11 240:2
241:12 250:14
271:13 281:1,5,6
309:3 318:1
330:21 334:15
338:10 339:13,14
339:25 362:14
**answered** 206:18,21
224:15 235:10
278:23 296:16,20
**answering** 10:16
334:18 362:13
**anybody** 116:15
307:20
**anymore** 93:19
100:19 101:8
218:4 309:6
**anyone's** 139:24
360:11
**Anyway** 181:23
**apartment** 264:5,25
330:8 334:9
**apartments** 246:5
264:10,23
**API** 67:22 69:6
**apologize** 78:11
81:8 128:9 183:14
351:2
**apparently** 101:15
144:10 236:6
292:3 324:4

357:23 362:17,19
**appear** 73:6 131:1
294:17 328:23
351:5 352:9
**APPEARANCES**
2:1
**appeared** 145:12
248:24
**appears** 101:9
103:21 107:17
110:16,23 115:15
149:13 166:14
178:23 183:24
185:2 348:14
**applicant** 264:13
**application** 87:25
274:20,21 275:12
**applications** 264:12
275:11
**applied** 270:6
**apply** 119:5 146:1
264:13
**applying** 146:11
301:25 302:9,16
**appreciate** 39:13
142:5 216:15
**approach** 306:18
**appropriate** 160:18
275:2 359:15
**approve** 355:10
**approved** 127:6
138:22 190:21
**approximately**
17:11,18,21 25:9
90:10 115:16
218:12 220:17
246:25
**apps** 185:20
**April** 35:4 210:20
263:23 278:6,9,19
**area** 273:11
**arguing** 213:13
238:17
**argumentative**
114:3 213:12
236:8 239:20
278:23 283:8

Brown

FTC v. Credit Bureau Center, et al.

12/13/2017

[373]

argumentive 155:6
arrive 233:15
arrived 304:11
ASAP 113:11 179:8
  180:3 285:20
aside 243:20 257:25
asked 12:15 81:8
  142:1 145:25
  163:10,17 169:7
  186:15 188:25
  200:18 203:1
  206:11 207:21
  234:14 235:4,10
  237:22 241:5
  251:6 252:19
  267:9 277:6
  278:22 281:4
  286:23 289:14,18
  290:6,10 311:17
  341:7 358:11
  359:3 362:18,21
asking 12:12 13:16
  32:12 51:22
  135:21 143:2
  151:14 152:10
  154:3,3 164:6
  175:5 182:19
  184:20 189:5,6
  206:8,15 207:18
  208:3 234:21
  259:25 268:24
  269:1 270:23
  271:16 292:1
  297:6 309:1 359:4
  362:12
asks 159:1,4 358:1
  361:20
aspect 39:2
asserted 312:4,6
asset 164:1
assholes 281:14
assigned 8:2 63:15
assist 10:18
assistant 328:3
assisted 219:3
assisting 18:6
assists 132:23

associate 66:24
assume 8:23 12:15
  40:5 65:3,6 77:14
  82:5,5,11 87:8
  88:17 93:13 96:2,3
  97:10 113:17
  118:17,18 135:2
  163:9 174:23
  296:3 318:7
  340:18
assuming 31:18,19
assurance 61:12,16
  61:18,21
attach 292:21
attached 294:9,15
  299:5 300:20
  309:20 347:8,23
  358:21
attachment 299:1,2
  300:8,14 301:1
attempt 75:17
attention 28:3
  229:16 283:5
  285:21 286:18
  287:9,12 288:5,8
  288:10 292:14
attorney 6:11 14:2
  15:8 46:22 233:11
  241:7 332:14
  339:2 370:12,12
attorneys 238:13
attorneys' 76:14
attributable 232:21
audibly 10:12
August 113:6
  115:17
authentication
  34:10
authority 30:13,17
  30:19 256:2
  318:24 319:3
authorization
  314:18,23 315:3
  317:20
authorize 354:16,21
authorized 80:18
auto 81:15,17

automated 254:18
  337:9,13,14 340:8
  344:7 360:6
automatically 81:13
  83:18 84:1 308:20
  308:25 309:7
availability 338:6
available 187:22
  303:25 304:4
  307:8 321:7,17
  327:25 343:16,17
  343:21,22,24
average 253:2,3,16
aware 31:25 61:5
  87:21 89:17 95:6,7
  95:15 176:23
  177:3,5,7 228:16
  228:22 234:21
  256:3 262:14,21
  282:14 284:4
  287:11,18 294:16
  315:2 318:1,5
  354:19
AWS 49:18,25 65:4
  75:7 208:11,15
  212:9

_____

B

B 3:7 205:17
B-a-r-d-w-e-l-l 28:8
back 39:19 42:10
  50:7 53:14 55:18
  58:24 63:7 73:4
  78:22 83:9 87:9
  91:11 100:2 102:3
  102:4,5,7 117:12
  124:14 128:22
  150:17 168:24
  172:1 175:20
  183:9,14 193:23
  200:19,22 208:13
  211:14 213:4
  217:12 218:16
  229:7 238:3
  242:23 244:20
  251:4,23 255:24
  259:5 262:11

265:9 268:7
275:23 283:15
284:19 287:7
289:10 294:13
297:15 302:6
313:21 328:5
361:15 363:19
background 15:11
Backing 59:22
backlog 172:21
backup 219:21
bad 172:5 224:5
  256:13 283:11,14
  286:5 330:12
  336:7,8
bait 273:14,15
balance 106:2
  110:17,20 112:21
  120:21,23 121:13
  189:20,24 364:23
balances 111:5
  112:17 116:6,7
balancing 120:7,9
  120:10,10,16,17
  120:18 126:22
  196:13
Banco 364:10
bank 37:17 38:1,4,6
  38:10 53:20,22,25
  54:2 104:9,21
  111:4,6,8 112:24
  113:17,20 116:6,8
  117:22 118:1
  119:8,9 124:6
  135:1 136:10
  137:2 144:10
  153:7 154:7
  155:23 161:11
  168:8 192:2 193:2
  199:3,16 354:12
  363:11,14,15,22
  363:24 364:2,6,9
  364:11,12,14
  365:4 366:8
Banker 82:8
banks 120:25 121:2
  136:3,4,6 138:12

138:19,19 141:11
142:7,13 150:21
168:10 190:22
191:24 192:3
Bardwell 27:17
  29:11,13,20 30:4
  base 36:11 129:1
  130:12 347:7
  352:23
based 83:23 234:4
  234:20 253:24
basically 69:20
  246:16 354:7
basis 35:11 96:11
  97:22 98:20
  149:11,16 160:3
  234:8,14 235:7
  246:1 279:1
  356:16
Bates 112:16
battling 236:10
BBB 64:3,6,12,13,17
  64:23 292:2 299:6
  300:18 301:2,6,21
  302:6 303:14
  308:16 311:13,19
  311:22 312:4,6,6
  312:18,24 313:2
bear 75:18
beat 245:17
bedrooms 319:11,12
beginning 90:12
  203:4 283:2
begins 309:9
behalf 12:21
belief 331:15
believe 11:22 12:3
  14:3 15:1 16:22
  22:10 24:18 25:23
  26:19,25 28:7,20
  29:19 31:4,24
  32:18 40:9 42:8
  43:20 45:13,18
  48:6 51:19,22
  52:10 57:10,19
  61:19 74:19 81:11
  81:17 85:21 90:25

92:15 94:8,25
95:25 96:22 97:11
103:13 104:6
105:4 110:10
123:12 129:19
130:4 143:8 144:1
146:2,20 148:7
160:23 169:21
170:15 171:19
179:21 184:2
203:7 204:7
215:14 218:11
221:7 225:16,22
232:22 235:16
243:13 248:21
250:2 252:13
256:4,5 257:14
258:3,11 260:12
277:8,15 279:9,12
279:13 282:17,22
283:20 284:11
286:21 288:22
291:24 299:3
300:3,9,11 301:1
310:6,14 312:20
314:3,9,16 315:19
316:6 320:21
322:12,18 324:22
326:12 327:15,17
328:16 337:18,20
342:6 355:21,22
355:23,24
**believed** 187:5
221:8 256:7 258:5
259:7 306:19
312:18 313:5,8,12
313:24 314:6,14
318:9,15 337:12
337:14
**believing** 97:22
204:18 222:1
254:6 268:8
**bell** 55:22
**benefit** 10:15 20:10
**benefited** 352:25
**benefits** 19:18 34:12
34:15

**Benson** 295:4,6,14
296:9,14,15,21,24
**Benson's** 297:3
**best** 4:6 22:8 23:15
44:10 132:21
239:19 306:18
330:22 366:14,15
**better** 64:5 73:4
94:5 137:8 195:16
277:21 283:16
300:5 303:2,11
308:11 310:5
345:18 348:20
**beyond** 16:25 18:6
53:2 125:4
**big** 5:6 9:19 50:3
78:14 180:22
190:15 268:18
298:13 339:10
**biggest** 190:14
288:4
**bill** 112:23 113:15
**billed** 351:22
**billing** 35:21 121:9
**bills** 102:11 103:1
114:1 116:3
**birth** 79:16 349:17
**bit** 15:11 18:3 59:22
65:19 95:11 126:3
188:8 298:16,17
**blame** 241:7
**blank** 33:22 224:19
**blaring** 242:21
**blaringly** 242:12
**blend** 196:11,13
199:15
**blending** 199:2
**blew** 135:3
**block** 63:12
**blue** 171:17,19,22
175:22 245:8
**BMW** 364:21
**board** 311:18
**bottom** 42:12 68:13
107:6 112:8 128:5
172:19 174:20
175:21 177:19

178:10 184:6
190:1,7 226:3
229:15,18,19
230:25 233:12
273:24 299:15
305:19,24 309:14
309:15 311:6,11
328:10 335:2
**bought** 252:4
**bounced** 185:13
186:15 187:7
**boy** 181:23
**Brandi** 309:15
311:12
**break** 11:3,6 46:16
46:18,22 78:16,19
94:2 102:18,22
125:13 154:12
157:7 159:22
168:21 194:19
241:24 242:4
243:14 245:13
246:1 252:4 262:9
284:13,15 313:18
313:19 357:9,13
362:24 363:3
**brief** 340:23 363:9
**briefly** 176:15
**bring** 154:1,5
318:11 323:24
334:4
**broke** 16:17 158:23
159:24
**broken** 9:19 172:16
**brought** 14:18 22:5
22:12,19 24:15
65:12 274:3 283:4
**Brown** 1:10 6:1,7,20
6:21,22 7:9 11:19
12:7 13:18 14:1,16
42:13 46:21 72:14
76:18 87:2 90:22
106:17 110:7
115:6 123:9
130:22 132:13
140:22 162:11
168:24 183:21

193:14 194:25
205:16 207:3
225:11 233:13
285:2 298:11
307:10 308:5
313:6,23 323:10
334:15 338:21
341:9 346:16
350:19 353:20
363:6 366:22
370:5
**browser** 86:1 220:7
294:19 351:17
**built** 315:24
**bureau** 1:6 6:8 12:9
14:18 15:13,16,22
16:4 64:5 70:1
258:1 289:17
300:6 303:2,12
310:6 369:2
**bureaus** 69:5,12,16
**burned** 264:4
**business** 19:5,9 20:1
20:13,15,18 24:5
29:7,8 30:22 33:25
40:20 57:6 59:20
64:5 67:3,8 69:2
69:15,19 82:19
92:15,17,19,22
95:9 96:21 104:20
109:7,9 113:2,9
114:21 121:7,11
121:22 122:14
129:10,11,22
136:8,11 139:16
139:16,22,25
142:5,24 143:14
147:2,11,14
148:22,24,25
155:12 166:1
176:7 186:22
187:3 188:10
194:17 196:16
198:19 199:23,25
208:18 212:24
217:23 238:10,19
238:24 239:13

246:19 259:22
265:12 270:15
280:15 282:1
300:5 302:22
303:2,4,12 310:6,7
311:3 312:25
342:25 344:21
354:23 355:3,6
356:3 358:15
**businesses** 113:22
167:22 315:24
**butcher** 55:13
**buy** 251:24 315:7
**buyer** 364:21

_____

**C**

**C** 88:9 169:22 368:3
370:2
**C-o-l-o** 55:7
**caffeine** 278:12
**calculate** 245:15
246:11
**calculated** 234:1
**calculating** 253:9
**calculator** 231:4
232:9,19
**call** 52:3,4 57:11
58:3 61:7 62:6
63:22 64:10 66:7
119:9 211:1 227:7
228:4 234:23
270:22,25 284:11
351:25
**called** 1:10 5:14 6:2
12:8 20:2 31:24
33:20 71:3,13
74:12 77:11 89:18
92:13 120:1 126:4
142:10 146:20
152:18 220:24
255:5 256:11
269:18 285:19
351:14 353:3,24
**calling** 19:1,23
152:22
**calls** 57:11 58:4,5,6
58:7 61:6,10 62:3

62:20 63:5,10
64:19 66:5 237:14
279:5
**campaign** 248:1
256:24 267:10
327:19 330:3
**cancel** 19:2,16,24
129:12 351:25
361:19
**canceled** 43:14
47:21 48:19 50:9
53:10 357:25
**cancellations** 48:22
50:9
**cancelling** 19:16,17
19:20,22
**canned** 355:18
**capable** 18:5 160:24
**capacity** 12:7,8,13
12:17,17,25 15:25
23:20
**captures** 217:16
**car** 365:9
**card** 4:3 44:12,15
52:10,11 79:17
80:17 104:11,19
119:8,11 123:15
128:19 129:3,11
129:15 138:20
139:11 140:1,5,6
140:10 142:10,11
144:6 146:4
161:14 166:2
274:22 275:7
349:16 350:7,9,10
355:9
**cards** 45:3 275:13
**care** 128:3 187:1
335:18,19
**carefully** 172:9
**cars** 364:18
**Cartagena** 59:10
**case** 1:5 15:12 43:25
52:2 53:8 78:1
84:20 113:10,19
239:19 262:15
292:17,20 356:1

363:11 369:1
**case-by-case** 356:16
**cases** 27:4,5 65:14
85:25 297:12
344:23 356:14,15
**cash** 102:16 104:18
104:24 110:21,24
111:7 112:24
113:3
**Cat** 94:21 95:23
**categorized** 284:10
318:20
**category** 284:1,6
**cause** 25:13
**causing** 128:18
**CB** 131:22
**CB's** 131:16
**CBC** 6:20 16:5,13
16:19,21 17:5,7
22:15 25:16 26:1,5
26:6,10,13,18,20
31:13,14,17 35:8
35:15,23,25 36:2,3
36:15,20 37:4,20
39:8 44:16 45:22
49:15 53:14,15,20
54:5,7,10,25 58:17
63:14 64:9 67:3,20
70:18 79:1 99:12
100:17 102:11
103:1 117:24
122:21 136:13
137:17 139:2
140:1,6 147:8,20
233:12 236:20
258:4 259:19
271:7 347:3
**CBC's** 36:11 67:8
83:4 117:15
159:15 170:1
217:22 360:16
**cc** 106:1
**cease** 91:14
**center** 1:6 6:8 12:9
14:19 15:13,16,22
16:5 52:3,4 258:1
369:2

**Century** 82:8
**CEO** 15:13,16,19,20
**certain** 69:11
125:12,17,18,20
125:22 136:4
147:21 150:4,18
153:22 154:8
160:25 167:15
190:16 237:13
246:6
**certainly** 68:3
113:24 322:12
327:22
**certainty** 136:9
**Certificate** 370:19
**certified** 1:14 204:4
209:3 370:18,18
**certify** 368:7 370:5
370:9,11
**cetera** 45:3 286:4
**chain** 97:2 98:6
112:5
**chalked** 293:25
**change** 119:14
121:2 124:4
139:15 168:10
315:20 323:21
369:5
**changed** 104:20
124:6,12 345:3,5
347:13
**changes** 113:20
160:18,20
**changing** 349:7
351:9
**channel** 64:24 108:5
108:7,20 109:10
**characterization**
150:14
**characterize** 312:23
330:13
**charge** 19:23 119:10
280:14,17 315:11
355:9
**chargeback** 117:19
117:21,22,23
118:6,9,10,15,21

118:25 119:19
120:22 121:12
122:5 124:17,21
124:25 125:2,17
126:2,4,8,13
128:17 130:5
131:23 134:1,9
142:13 166:9
190:25 192:20
193:21 194:7,20
195:13 196:5
197:13,17 198:9
200:4,12,20 201:4
201:6,9 229:13,17
229:20 230:13,18
231:1,16,19
233:21,25 239:16
242:25 243:7,8
**Chargeback-to-sale**
125:21
**chargebacks** 4:18
104:8 113:18
118:23 120:19
122:6,20 123:1
124:7,23 125:6,8,9
125:13 126:11
127:7,14,19,21,24
128:1,3,11,22
129:6,8,14,16
130:9,10,20,24
131:11,18 133:22
134:18 135:4,6,7
142:24 153:10,17
153:21 154:13,17
158:23 159:8
160:2 163:16,22
165:8,20,25 166:5
168:6,12,14,15
190:18 191:13,22
191:25 192:3,11
192:18 193:9,15
194:11,14,24
195:1 196:8,24
198:20 200:20
202:23 230:14
231:10,22 232:12
232:19 233:19

235:13,17,18
238:4 240:6,14
353:6
**charged** 118:10
190:23 351:24
**charges** 122:8
354:15,20 355:19
**chase** 267:1,2
**chasing** 306:24
**chat** 4:19 46:14
47:15 186:2
222:21 224:12,21
225:14,17,23
**chats** 179:25 268:22
268:25 269:5
**cheaper** 354:11
**check** 62:8,8 79:13
118:19 169:2
172:16 232:18
274:13 334:13
364:23
**checked** 286:2
293:10
**checking** 173:15
**Chicago** 1:16 2:5
56:12
**child** 93:4
**China** 40:12 203:1
216:19,21 217:21
222:12
**Chinese** 40:5
**ChoicePoint** 23:12
**choose** 176:12 233:2
**Chrome** 294:19
**chronologically**
47:5
**chronology** 204:14
343:25
**Civil** 1:11 223:25
**claims** 276:6,24
327:2
**clarification** 85:6
**clarify** 12:12 13:13
14:7 26:7 30:2
49:9,11 62:17 71:8
71:18 97:19
149:22 151:16

Brown

FTC v. Credit Bureau Center, et al.

12/13/2017

[ 376 ]

252:14 314:2
**clarifying** 65:5
**clarity** 19:8 262:23
**clean** 217:14
**clear** 9:24 10:2
211:2 221:21
324:24 329:22
351:8 362:10,15
**cleared** 203:24
**clearly** 159:7 165:5
226:21 274:3
276:4 297:15
312:24 324:22
336:8 359:8
**click** 174:16 222:9
246:11,14 265:1
266:19,20 316:21
317:12 333:2
350:8
**clicked** 265:19
**clicking** 248:9,18
**client** 240:1 331:7,9
**clients** 274:1,11
276:15
**close** 28:10 30:6
104:8 113:18
125:5 127:7 134:8
198:12
**closed** 126:12
128:19 133:20
165:12,13,19
**closer** 240:16
**cloud** 50:3 205:9,10
**clue** 289:24
**CM** 226:25
**coaching** 58:3
**cobrand** 360:10
**cobranded** 65:25
**cobranding** 83:11
**Cochell** 2:8,8 3:12
6:19,19 13:2,15,20
13:24 14:4,12
24:20 29:16 36:22
41:15,19,22 45:20
45:25 46:5 48:12
48:16 51:8,14
56:12,14,25 57:4

62:12 75:14 76:2,5
76:9 78:13,18 90:1
90:3,20 91:17,21
98:10 99:20,24
102:14 108:12
110:4 111:19,21
114:2,12 116:13
128:20 130:14,18
130:25 131:5,7,14
131:24 132:4
155:5,13,20
156:10 157:12
162:2,5 164:20
166:18 168:18
169:6,10 176:25
178:14,16 182:16
186:20 187:8,12
187:17 190:4,6,9
191:18 197:25
198:3,6 201:19
206:1,11 207:5,21
208:19 209:16
211:16,19 213:9
213:11,25 214:19
215:1,4 223:10,12
223:15,18,21,24
224:2,6 225:8
226:22 228:11
232:11,15 234:10
234:13,25 235:9
236:8,14 239:3,20
239:23 241:11,24
242:1 271:3 273:2
278:13,22 283:7
284:7 286:11
290:18 291:11,13
291:16 296:16,20
296:23 297:1
307:13,19,25
308:17 313:11
320:12 323:14,16
326:22 327:5
329:19,24 331:2,6
331:9,25 333:6,23
334:6 335:8,21
336:22 339:4,7
345:5,8,21 346:4

346:17 357:5,11
362:7 363:1
365:19 366:3,7,12
366:23 367:1
**code** 82:24 84:17,18
84:18,21,24 85:3,6
89:12 170:4
174:16 203:25
204:18 205:6,6
229:20 230:20
231:10 235:15
236:23 242:13,19
243:2
**coded** 318:20
**codes** 82:3
**coffee** 262:7
**Cohn** 141:6 143:13
**Coldwell** 82:8
**collect** 79:6,8,14
**Colombia** 52:4 55:5
58:10,18,25 360:4
**colon** 41:25 148:13
**Colt** 99:8,10 100:14
100:15,23 101:1
169:16,23
**column** 76:20 77:5
82:2 83:2 84:4,6
84:16 85:8,10,19
86:2,4 88:8 89:3
**columns** 76:19,24
88:7,13
**come** 58:7 76:6
79:20 81:2 83:15
90:6 95:11 121:24
126:6 128:22
182:20 243:16
273:15 280:5
319:16 351:19
355:16
**comes** 79:18,19
236:6 241:6
246:13 256:11
268:7
**comfortable** 119:17
130:2,2 136:10
142:14 161:12,16
335:17

**coming** 97:5 128:18
174:22 280:9
303:8
**comma** 15:3
**comment** 39:13
251:23
**commission** 1:3 2:2
6:16,18 342:22
369:1
**commissions** 342:7
342:9
**committed** 164:3,5
164:9 258:25
**committing** 164:11
**common** 311:3
330:2 334:16,19
**communicate**
360:25 362:2
**communication**
4:21 64:25 113:7
114:18 272:20
303:13
**communications**
43:8 299:7,8
**companies** 23:11
42:15 67:20 75:4
82:8 95:1,5,6,8,15
95:17 124:10
142:4 301:8
**company** 13:6,10
14:6 31:24 32:16
33:13,15,17,19,22
33:23,25 34:3
45:12,14 47:23
48:5,6 49:15 53:17
54:7,9,13,20 55:4
55:6 57:14,18
67:23 68:20 70:1
78:25 82:2,4,6,11
87:8 89:18 92:13
92:13,14 95:2,9,22
95:24 96:20 98:24
99:2,4,5 100:12
103:24 110:17
117:24 137:4,7,9
139:24 145:25
147:8 150:4 169:7

169:14,16,21
180:22 292:2
301:22 309:21
328:2 354:14
356:1 364:24
**compare** 231:10
**compensated** 7:13
23:12
**compensating** 23:1
**competitive** 69:13
**competitors** 354:3
**complain** 265:13
280:16 355:3
**complained** 271:19
283:18 297:23,24
**complaining** 246:17
246:18 270:10
284:2 294:18
312:8 352:18
354:20
**complaint** 5:8,13
15:1 22:9,11,12
215:8 255:23,25
256:4 265:7,12,20
267:8 274:18,20
280:15 286:1,3
292:1,9 293:4,13
293:21 295:9,15
295:25 296:12
297:9 298:15
304:8,11,12
307:20 309:4
347:9 350:21
354:23
**complaints** 64:7,12
64:13,18,21,23
263:8 270:7,15,15
271:6,9,11 275:7
288:15 292:3,7,10
292:21,24 293:8
294:9,9,14 295:1
301:5,13,22
302:21 303:4,4,22
306:19 309:21
310:7,16,18 312:5
312:17,19,22
313:6,9,12

Brown
Case: 1:17-cv-00194 Document #: 206-2 Filed: 03/24/18 Page 101 of 137 PageID #:5178
FTC v. Credit Bureau Center, et al.                                    12/13/2017
[377]

complement 261:8
complete 10:12
  226:6 351:10
  352:11,12 370:10
completely 10:23
  114:16 137:15
  138:2 147:15
  156:21 166:7
  167:4 205:22
  219:14 222:6
  226:17 327:4,7
  344:19 359:1
  361:10,13
completing 44:12
complex 213:6
compliance 21:19
  21:21,22 22:2 25:1
  29:9 40:21 125:1
  126:6 128:18
  154:1,2,5,6 155:19
  156:20 160:12
  161:10 164:14,17
  165:23,24 205:19
  256:23 327:18
compliant 119:20
  125:1 161:20
complicated 213:15
  213:16 215:19,22
  216:20
complications 76:8
complied 227:13,15
comply 43:6 134:5
  149:16
complying 203:24
  204:19 205:20
  222:1 227:3
components 219:17
computer 75:18
  78:14 89:9
concept 119:22
concepts 65:20,21
concern 31:21 62:2
  152:23 303:15
concerned 156:14
  186:17 187:6
  324:3 328:17
  335:3,13 336:1,6

concerning 301:23
concerns 61:24
concludes 366:21
conclusion 25:25
  26:3 304:5
conduct 42:14
conducting 6:11
confer 357:10
conference 57:11
  78:17
confident 28:9
  146:5
confidential 8:6
confirm 108:3
  349:22,22 351:10
  351:20 352:14
confused 163:24
  214:21 250:13
  289:5 293:25
  310:10,11 316:20
confusing 210:23
  316:20
confusion 39:7
  211:7 213:23
connect 282:25
connected 174:7
connection 5:7 7:8
  91:24 222:13,18
  298:14 305:7
Connelly 32:23
consents 352:6
consider 15:18 34:7
consideration 36:7
  121:25
consisted 219:16
consistent 73:13
  113:7 302:12
consistently 201:23
consisting 368:8
constant 139:20
  180:14,24 182:7
  193:24 194:4
  195:8,23
constantly 134:4
  139:21 196:2
consult 331:21
consumer 19:6,9

24:17 67:23 77:17
  77:20,24 80:8
  117:23 119:9,14
  270:19 292:16
  310:10 311:2
  322:11 333:17
  334:4 338:1
  342:23 344:1
consumer's 293:4
  304:9
consumer-facing
  20:1
ConsumerInfo.com
  24:17
consumers 19:5,6,7
  19:10,11,11,12,15
  19:19,21 23:19
  61:6 67:11 71:25
  248:9,9,25 292:25
  297:20 301:23
  302:7 312:5
  316:21,22 324:15
  335:18 337:8,11
  337:16 343:12
  360:8
consumers' 121:9
contact 32:21,25
  33:2,4,6 56:21,23
  90:6 117:24 118:1
  280:13,24 281:2,8
  354:11 365:4
contacted 32:24
  276:8 324:13
contacts 56:20
  136:3,5 142:6
  146:3
contain 248:11
contained 315:13
  316:14
contempt 27:12
  209:1,2 211:8
  228:18,23
content 226:24,25
contention 124:22
context 68:2 96:14
  120:15,18,18
  277:10

continue 129:12
  175:1 177:21
  178:11 186:24
  238:10 352:5
continued 112:20
  113:8 114:7
continues 194:5
continuing 172:25
contract 31:3 34:19
contracted 32:3
  34:16
contractor 27:8,10
  27:15 31:1,4 55:3
  136:2 218:24
  238:23
contractors 26:20
  26:23 27:1,6 30:14
  30:17,20,24 39:20
  40:23 54:21
  209:20 288:5
contracts 54:8
  104:15
contractual 162:3,4
contradictory
  281:21
control 153:4 160:4
  160:8 165:11
  175:8,11,12,13
  176:12 207:10
  209:9 214:9 336:9
  358:16
controlled 54:2
  150:11 335:24
controlling 340:8
conventionally
  12:19
conversation 4:14
  46:14 93:8,11,17
  108:4 183:24
  189:15 222:22
  244:21 290:1
  345:11 348:13
conversations 24:24
  24:25 33:9 59:19
  59:21 215:14
conversion 80:5,12
  80:12 349:3

conversions 79:21
  79:24 80:7 180:19
converted 80:8 89:3
Cook 370:5
copied 219:8 221:6
  223:1,9 293:16
copies 157:24 205:1
  225:20
copious 51:9
copy 11:13,13 22:1
  47:16 111:19
  204:22,23,25
  205:2,11 222:4,23
  222:25 227:2,14
  227:17,19 228:2
  228:17,19,22,25
  261:5 304:2
  323:14 361:16
  366:3,7
copywriter 4:22
  5:16 271:10,18
  272:1,21 277:21
  280:5 357:21
copywriters 271:14
corner 73:7
corp 138:5
corporate 12:25
  13:9 14:13 364:2
corporation 12:10
  12:17,21 13:7,21
  15:13,17,22 16:5
  136:17 137:1
  140:8 146:13,16
  146:19
correct 6:24 8:15
  15:14,23,24 16:13
  16:14,16,20 19:13
  22:16 23:17 25:8
  26:5,10,21,24
  27:14 28:13 29:21
  31:2,3 34:4,5 36:4
  36:16 38:18 39:16
  39:22,23 40:2,25
  41:3 42:3 43:23
  46:23,25 47:11
  48:20,21 49:20,21
  50:2 51:6 52:5

Brown

FTC v. Credit Bureau Center, et al.                    12/13/2017

[378]

53:20 54:6 55:8,9
56:18,19 59:12
60:6,12 64:22
66:20 70:19,20
72:19 75:8 80:6
89:13 91:9 95:24
98:4,5 101:18
103:2,3,25 104:1,3
109:10,11,16
110:12,14,19
112:12,13,21
116:4 117:15
118:16,23 120:2
121:18,19 123:18
126:20 127:22
129:25 130:1
133:7,10 134:16
135:17,19 137:10
140:4,9,14 141:17
142:17 143:7
146:12,14 147:16
151:4,5,10,21
153:22,24 158:10
158:13,15,16,20
158:25 159:11,16
161:6 162:20,25
163:17 164:19
165:3,20 166:6
170:2,5 171:23
172:3 175:3,9
176:5,21 181:3
184:4 185:1
188:17,18,21,22
192:12,22 194:20
195:20,23 196:24
197:11 198:25
199:23 202:10
204:10,16 207:20
209:1,10 210:6
212:19 214:7
215:23 219:7
220:12 221:12
222:5,24 223:3,9
225:19,24 226:13
228:8 230:10,11
230:16,17,23
237:6,9,16 238:11

238:12,15,16,21
238:24,25 241:16
241:20 243:22
244:6 248:15
252:9,10 253:25
257:11,13 262:1
269:12 272:25
273:17,19 280:1,2
282:7 283:19,23
283:24 284:3
285:16,17 288:2,3
288:6 289:19
291:1 292:16,22
292:23 293:1
295:19 301:3,8,9
301:14 302:2,5
304:21 314:5,8
317:21 332:17
333:19 343:11,14
344:3,13 345:4,7
347:5,24 350:5,23
352:13,16 353:7,9
353:10 354:18
355:12 356:3
358:5 359:22
363:12,13 365:3
368:10 370:9
**corrected** 51:15,15
131:14 350:1
**correction** 272:10
**corrections** 10:25
**correctly** 61:23
284:6
**cost** 67:23 68:21
69:10 128:6
246:13 247:5,13
247:15
**costed** 247:9
**costs** 69:23 70:5,14
245:10,13,15
246:1,9,24 253:9
**counsel** 8:21 12:1
205:21 214:1
239:7 341:5
370:12
**counselor** 51:7
89:24

**count** 217:17,18,18
229:17,21 230:13
230:18 231:1,16
231:19 233:25
240:14 243:7,8
**countdown** 330:4
**counting** 124:23
**country** 55:7 252:8
337:16
**counts** 242:14,19
243:8
**County** 368:3 370:2
370:5
**couple** 20:4,4 62:16
65:20 172:4
**course** 20:12 68:17
102:10 114:9
168:19 194:18,21
196:15 238:2
244:7 250:8 268:6
269:9
**court** 1:1 8:17 11:16
33:24 39:11 41:9
68:7 72:11 73:8
74:1,5,15 90:18
103:9 105:8
106:14 109:23
111:14 115:3
123:6 132:10
140:19 144:18
157:19 162:8
170:9 183:18
202:15 211:22,24
222:2 225:3 227:3
263:14 272:5
284:23 291:9
298:8 320:8 323:7
346:11 350:16
353:17 357:3
**courtroom** 8:12,14
**Courts** 1:12
**cover** 68:21 69:23
**covered** 51:10,12
**CPA** 151:25
**CR** 179:9 180:4,7
181:25
**craft** 154:9

**Craigslist** 243:22
244:6 246:4,6,10
247:2 251:8 260:5
262:15,16 265:22
267:13 271:19
273:10 274:5,18
274:19 277:14
283:18,22 284:2
284:10 285:22
286:15 288:9,11
288:15,16,17
289:23 290:4
293:14,15 294:15
294:16 295:10
303:24,24 304:1
304:15 309:23
310:23 312:9,14
316:3,4,23 317:4,5
365:13
**crazy** 266:13
**create** 9:23 140:8
203:1 210:1
215:11 217:9
241:5 271:14
274:1 276:15
330:2 354:5
356:17 358:11
360:18
**created** 209:22
230:2,3,7,9 235:25
276:13 284:1
**creating** 17:6
309:22 353:25
362:1
**credentials** 215:23
**credit** 1:6 4:3 6:8
12:9 14:18 15:13
15:16,22 16:4 20:7
20:9,10,11 21:13
22:2 31:6,11,24
32:3,5,6,11,15,18
32:20 33:13,18,20
34:4,6,8,15,17,20
44:16 52:10,11
67:9,22 69:5,5
71:22 79:13,16
80:17 82:21,23

86:11,12,12,13,13
103:1 104:10,11
104:19,21 114:5
119:8,11 121:2
122:1,1 123:15
124:4,13 129:3,11
129:15 138:20,21
139:11 140:1,5,6
140:10 142:10,11
142:22,24 143:3,9
143:14,16 144:2,6
146:3,20 147:8,12
147:22 159:19
161:14,15,15
166:2 180:7
182:12 183:4
196:3 212:24
250:25 256:19,20
258:1 261:2,6,10
264:5,14,23,25
267:5 268:16
274:13 289:17
301:24 302:8
317:10,13,14,17
318:11 324:5,7,16
327:12,13 330:19
332:16,17,18
333:17,21 334:4,9
334:12,14,21,25
335:19,20 336:7,8
336:12 337:4
343:13 344:6,11
344:14 349:16
350:7,9,10 352:19
355:9 369:2
**CreditUpdates**
79:13 303:3 344:2
355:16
**CreditUpdates.com**
20:16 66:8 273:16
355:10
**CRM** 48:24 49:4,6,8
49:13,14,22 50:10
65:2,3,6,19,21
66:16 72:6 73:2
75:7 76:1,11 77:9
77:10,19 78:24

Brown

FTC v. Credit Bureau Center, et al.

12/13/2017

[379]

80:9 83:8 85:22
86:19 87:23 88:1,6
88:13,15 89:11,16
152:4 170:4 174:7
203:9,14,18
204:10,16,20
205:24 206:5,25
207:13 208:8,14
209:9 210:5 211:4
211:9,12,25 212:8
212:9 213:16
214:4,10 215:18
215:20,25 216:3
216:12,16,17,19
216:22 217:2,3,5
217:11,22 218:6
218:10,16,18,25
219:2,3,8,16,18,22
219:25 223:9
226:15,24 227:16
227:19,24 228:1,2
228:8
**CRMs** 49:7
**Croix** 365:7
**cross** 17:24
**CRR** 1:20 370:4
**crunch** 104:18,24
110:21
**CS** 3:23 112:4
**CS123** 34:16,23
**CS123.com** 34:1
**CSID** 3:20 4:1 5:2
31:3,11 32:1 39:21
69:4 71:12 103:1
103:18 105:2,16
105:23 106:5,23
107:23 108:11
110:11,22 112:21
112:25 113:25
114:4 115:11,13
115:15 116:3,5,10
116:25 117:17
285:7 292:13
**CSID's** 68:21
**CSR** 1:20 370:5
**current** 115:24
130:6 197:21

198:8 321:9
**currently** 202:1,5,6
204:25 269:1
**cursing** 283:5
**curve** 129:13
**custom** 255:11
320:24 331:15
**customer** 5:4 7:20
7:22 17:25 18:4,6
18:10,12,18,22
20:2 21:4 23:20,25
35:20 36:11 49:2
52:19 54:5,7,18,25
56:7,9,17 57:22,25
58:12,14 59:8,14
59:23 61:3,5,7,23
62:5,6,7,9,18,22
62:23 63:2,4 64:2
64:6,16,20 65:1,11
65:13,23 66:4,5,6
66:7,8,11,17,18,19
66:24 77:22,23
79:1,4,9,18,19
80:15 81:25 83:12
86:7,17 87:10
114:7 118:9,11
131:20 147:7,13
152:13,15 164:8
190:14 196:10
253:19 260:25
261:1 266:22,23
266:24 267:3
272:21 273:20
275:3,9 276:4,5,12
276:23 277:2,17
277:19,21 279:5
279:16,18,22,24
279:25 280:7,20
281:12,17 283:25
286:1 289:1
291:25 293:25
294:21 297:9
304:22,23 310:14
313:3,14,15 317:5
317:17 322:10
324:13 326:18
328:20 337:5

342:5,17 344:5
352:22 354:7,12
356:7,18 357:22
357:24 358:1,12
359:13 360:19,23
360:25 361:17,19
361:20 362:1
**customer's** 62:2
86:1 266:21
310:19
**customers** 18:25
19:1,11 23:3,22
32:12 34:9,10,23
35:7,8,9,22 43:16
43:16 44:11 48:21
53:10 63:9 69:3,20
69:21,23 70:2 72:1
72:3 86:10 104:17
126:16 129:12
154:16 246:8
260:19,22 265:13
266:10 267:14
271:18 279:6
280:6 284:9 287:5
289:5 294:17
312:17 339:15
341:18 344:11
352:23 356:4,10
356:12,13 359:9
359:21
**customers'** 43:15
61:24
**customize** 255:6
318:21
**customized** 305:11
318:14 331:17,20
336:4
**customizing** 254:19
**cut** 129:23 166:25
186:18 257:7
291:24 326:16,18
**cutting** 97:1,4
**CVV** 122:10

———————
**D**
———————
**D** 3:1
**D-a-r-c-y** 28:7

**d/b/a** 146:22
**damage** 215:10
**damaged** 365:7
**damages** 240:9,16
**damn** 177:22 178:12
**Danny** 3:17 4:15
89:10,15,16,20
90:7,8 91:2,5 92:7
92:9 93:2,2,9 94:9
96:16,23 97:3,5,8
97:15,16,20,25
98:17,19 101:18
102:1 122:14
149:6 170:1 171:8
172:25 174:13
176:10 179:14
183:25 184:3,3,11
185:9,19 190:23
190:25 191:8
193:20,21 194:23
195:5,16,22 196:9
197:1,4,12,21,24
198:8 199:10,18
200:11 201:5,15
201:22 229:12
230:15 232:15,21
238:5 243:21
244:5,21 265:23
277:6,16 282:8,13
287:21 297:21
323:20 336:19
337:7,10 338:5
342:7 343:8
345:17 348:2
**Danny's** 92:2
101:20 185:23
187:21 199:15
200:19 201:10
277:16
**Danny@Revable....**
92:4
**DannyDPierce@g...**
92:2
**Darcy** 27:17,21,24
28:11
**dark** 113:9
**dash** 74:12

**dashboard** 173:21
174:5,7,9
**data** 33:14 34:4,6
35:20,21 36:14
67:22 70:5,14 71:7
71:11,13,15,17,18
71:20,24 77:8 87:6
87:16,19,21,24
103:1 114:5
151:15,18 194:13
201:12,24 202:2
203:8,25 204:3,4
204:18,20 205:5
209:3 210:20,24
210:24 211:2,4,9
211:12 212:24
215:25 216:3,12
217:14,22 218:22
219:19,22,24
220:24 221:3,3,8,8
221:10,16,17,18
221:19,23,24
222:5,7 224:18
227:4,9,14,20,25
228:7,17,20,23,25
229:11 233:4,24
234:2,4,9 235:8,23
236:4,6,10 237:8
238:19,24 239:1
239:18 240:17,23
240:24 241:1
243:11 247:3,5
269:14,19 289:17
304:23 314:12,12
314:19,21 315:7
315:11,24 316:1,2
318:19 319:8,16
326:13 335:23
336:6
**database** 49:1,3
87:9,13 88:13,15
88:16 149:7 151:2
151:4,12,20,21
161:3,7 194:15,18
197:18 201:12,15
201:16,25 202:3
205:1,3,7,11,12

208:25 210:25
213:18,18 215:15
217:3,5 222:8,23
222:25 223:4,6
224:10 226:5,25
227:1,3,15,18,19
230:2 233:5,24
234:5 235:24
236:4,5,7 241:15
241:17 243:16
251:20,25 256:8
256:11 260:24
261:4,5 267:19
269:7,17,18,21
304:23 314:4,7
315:14,17 316:1,3
317:22 318:8,20
319:5,7 321:20
335:23 343:23
**date** 26:4 35:3 79:16
97:3 177:19,24
178:3 198:3
215:17 221:15
272:24 273:4
282:11 347:20
349:17 363:20
**dates** 7:5 178:6
214:11
**David** 27:9,11,15
31:1 33:10,12,13
33:19,21,21,25
34:3 55:21 56:3
59:9,18 210:20
211:8 225:23
**day** 31:18 109:14
113:21 133:14,15
136:16 139:18,20
141:16,21 172:1
173:24 174:17
182:23 191:9
216:14 246:10,12
247:17 250:13
251:7 252:6,15
253:1,7 254:4,10
254:12 282:21
289:23 323:19
324:20,23 331:18

368:18
**days** 114:17 163:16
165:8 222:18
270:25 271:1
282:8
**De** 132:25 134:14
135:13 141:17
**dead** 61:23
**deal** 21:7,10,16 23:4
27:9 53:1 154:9
294:15
**Dealer** 364:24
**dealing** 93:3 180:15
**deals** 195:16
**dealt** 21:21 23:7
229:10
**Dearborn** 1:16 2:4
**death** 166:16,22
197:5,5
**deceiving** 44:11
**December** 1:17 3:13
35:14 36:19 41:16
108:6 134:18
184:10 347:4
348:4 369:3 370:6
**deceptive** 22:7,10
42:14 285:22
286:15,18 288:11
**decided** 20:18
100:18 104:21
125:5 137:21
140:12 168:8
239:1
**decides** 117:23
**decipher** 201:20
**decision** 166:1
311:17,18
**decisions** 121:24
**declaration** 3:14
5:11 67:5,7 68:16
204:3 210:21,22
236:18 247:8
251:24 252:11
345:2 346:23
**decline** 161:17
**declined** 42:15 43:4
43:9 46:8 47:8

258:24
**decrease** 29:6
127:16,17,18,19
128:25
**decreasing** 129:13
**dedicated** 188:5
**deem** 221:19
**deescalate** 275:3
**defendant** 24:16
39:9 98:3
**defendants** 1:8 2:7
76:13
**defense** 41:25
**define** 21:9 22:24
36:8 80:11 324:2
**defined** 70:22 126:8
**definitely** 45:18
87:5,18 94:15
109:4 114:4 117:3
118:10 128:4
148:9,19 150:13
164:10 175:4,5,10
201:9 259:23
342:24 349:1
350:6
**defrauded** 283:10
**delay** 78:11 183:15
**delegated** 62:24
**delete** 221:20
**deleted** 204:20
205:13 209:3
221:10
**deliver** 67:10
**delivered** 362:17
**demonstrate** 327:12
334:12,21
**demonstrated**
334:24
**demonstrating**
317:17
**denominator** 231:16
233:3
**dep** 13:5
**department** 7:20
18:10,14,15,17
54:5 59:23 61:4
64:16 270:21

271:1 275:10
276:12 277:19,22
281:14,18
**departments** 54:18
54:19,22 55:1
**depend** 222:17
**depending** 79:9
**depends** 125:24
322:9
**deponent** 6:2
**deposed** 6:23 7:2
**deposit** 318:12,22
318:25 319:4,10
325:2
**deposition** 1:10 6:7
6:12 11:14 12:6
14:22 15:8 41:7
68:5 72:9,19 73:13
76:15 90:16 103:7
105:6 106:12
109:21 111:12
115:1 123:4 132:8
140:17 144:16
157:17 162:6
168:17 170:7
183:16 193:13
202:13 225:1
263:12 272:3
283:3 284:21
291:7 298:6 320:6
323:5 346:9
350:14 353:15
357:1 366:21
367:2 368:8,10
370:7,9
**depositions** 1:13
3:11 11:24 12:6,20
223:22
**describe** 18:1 23:1
36:10 42:23 174:4
**described** 29:14
69:22,24 71:12
109:1 171:2
262:22
**describes** 123:1
**describing** 302:4
**description** 3:9

63:16 216:15
293:16,17
**descriptor** 121:8
**design** 40:21 353:9
**designate** 86:15
**designates** 84:18
**designed** 326:15
347:18
**designing** 345:17
**destroy** 220:24
221:1
**destroyed** 204:4
228:17,22
**detail** 66:13 313:25
**details** 66:3,4
198:11,18 350:12
**determination**
28:19
**determine** 119:16
128:14 150:15
152:11,14 287:6
305:12
**determined** 152:8
238:8 295:15
**develop** 57:12
**developed** 18:18
57:21 62:20 64:13
233:14
**developers** 234:7
**developing** 18:8
40:20,20 57:8
108:5
**development** 18:14
**dialogue** 173:14
**die** 185:14
**Diego** 5:4 55:21 56:3
56:21 59:9,18
273:20 291:24
361:17
**difference** 217:2
256:22,24 262:25
263:3 327:18
344:17
**differences** 201:9
**different** 14:5 20:5
21:17 23:8,13 34:8
65:20,21 66:1,22

Brown

FTC v. Credit Bureau Center, et al.

12/13/2017

[381]

76:24,25 82:19,24
82:25 84:10 114:8
120:25,25 121:17
121:17 125:15
129:24 136:4,5
139:13 142:6,7,12
156:15 162:17
174:11 184:12
186:6 190:17
191:24,24 192:2
196:3 216:11
218:22 239:17
243:4 250:8
252:18 255:3
259:16 293:18
325:22 328:25
329:4,4 330:11
331:14,16 337:25
338:3 341:18
342:2 360:1
**differently** 239:8
**difficult** 23:6,6
25:24 93:19 365:8
**dip** 174:3
**dips** 173:25
**direct** 24:17 67:22
223:18 241:11
260:25 286:22
354:8
**directed** 45:20
83:13,15 154:25
210:1 221:20
**directing** 71:2
148:24,24
**direction** 202:25
209:22 220:25
221:11 223:2,11
234:4
**directly** 55:3 58:1
69:15 97:1,4 98:8
101:2,6,10 145:19
316:10 370:13
**director** 15:15,19
16:1,11
**directories** 188:2
**disable** 306:12,16
307:10,16 308:3,9

308:10 309:6
**disabled** 43:2 307:2
307:4,20 308:22
309:7
**disabling** 307:21
**disagree** 271:8
356:21
**disagreement**
234:15
**disagrees** 234:13
**disaster** 270:4
**disclaimer** 77:2
**disclosed** 187:22
326:17
**disclosure** 7:12,17
**disconnect** 339:7,10
**discuss** 26:15
**discussed** 14:2 47:3
47:7 50:19 70:18
133:16 160:18
262:15
**discussing** 26:15
**discussion** 39:12,20
59:17 117:10
176:16 183:7,12
200:8,23 244:2
**display** 315:15
**disposition** 364:18
**dispute** 7:15
**dissatisfied** 118:3
**distinction** 16:9
161:24
**distinctions** 13:14
**distinguish** 19:5
**distinguishing** 19:4
**distribute** 315:6,9
315:10,12
**distributed** 314:13
314:19,20 317:23
317:23
**District** 1:1,1,12
**divergence** 13:17,21
89:24,24 90:1
**divide** 231:5,7 232:5
**divided** 232:6
**dividing** 232:25
**DIVISION** 1:2

**divulge** 326:11
328:13 332:5,5
**divulging** 331:23
**DNS** 216:8 218:15
**docket** 3:14 67:19
68:11 73:4,14
211:15,18 299:17
**document** 11:20
41:5,12,17 42:22
67:14 68:1 72:15
73:6 76:10 90:23
103:5,12 105:11
106:17 110:2,7
111:10 112:2,3
115:8 123:10
132:14 140:23,24
144:12 157:22
158:1,3 162:12
170:12,14 171:2
171:18 177:13
183:22,23 184:7
202:11,18,19
206:15,19 225:11
230:3 235:12
242:7 263:10
272:15,17 285:3,4
291:19,20 298:11
307:22 320:15
323:11,13 346:7
346:21 348:14
350:19 351:20
357:15
**documents** 10:17
14:21 33:24
206:12 209:10
**doing** 16:18,23
18:11,21 20:1
25:21 53:9 97:14
97:16,17 98:16,18
98:19 100:16,24
109:14 122:14
136:20 138:25
140:15 150:22
153:5 175:17
180:25 185:24
186:15 198:11
251:7 255:5 257:5

270:13 293:24
324:23 340:19
**dollar** 44:15 86:11
86:11 115:17
119:12,13 161:15
192:5 246:22
356:11
**dollars** 103:25
115:19 119:7
127:5 138:22
240:13
**domain** 147:9
220:19
**domains** 173:9
**domestic** 142:16
143:13,14
**domestically** 142:20
142:22 143:4,19
143:25 144:3
**Dominic** 103:17
**doubt** 135:13
201:11
**doubted** 289:25
**doubting** 254:3
**Doug** 2:4 6:17 76:6
291:13
**download** 222:10
**draft** 271:10,18
**drag** 14:13
**dramatically** 160:2
166:5
**draw** 229:16
**drawing** 33:22
224:19
**drive** 23:2
**driven** 47:22
**drop** 193:16 308:21
308:25
**drop-down** 78:3
**drove** 257:18,20
295:18
**drug** 9:7
**due** 103:20,21 104:8
113:18 115:19,20
115:21 125:6
127:7 139:12
156:17 168:11,12

328:13 331:23
**duly** 6:3 370:6
**Dustin** 124:1
**Dustin@Vantage...**
123:23
**duties** 18:12
**duty** 315:19

**E**

**E** 3:1,7 348:8
**earlier** 24:23 72:17
84:22 101:22
122:13 126:22
138:18 145:4,9
164:13,17 165:1
166:4 169:8
176:14 196:14
200:11,18 216:4
230:16 275:18
292:12 316:16
**early** 57:6,12,14
215:7,9 237:25
345:3
**earnings** 246:11,12
**easier** 308:12
**EASTERN** 1:2
**easy** 138:14 139:2
227:21 289:9
318:23
**ECF** 73:9 328:8
**effect** 8:13 9:14 51:3
93:18 254:24
301:12 321:17,18
**effects** 9:7,10
**efficiently** 8:9
**effort** 152:17
**efforts** 355:4 356:4
**eFreeCreditRepo...**
273:16
**eFreeScore** 344:2
351:22
**eFreeScore.com**
20:15 66:7 248:25
280:13 287:2,9
295:19
**eight** 292:3,4,21
294:2,13,14

FTC v. Credit Bureau Center, et al.                    12/13/2017

[382]

**either** 8:21 51:1
98:1 182:4 188:15
188:20 198:16
199:11 262:25
267:23
**else's** 88:13
**email** 3:12,17,19,20
3:21,22,23 4:1,2,5
4:7,10,11,12,20
5:1,3,9,10,15
41:15,24 44:19,20
44:23,24 45:5,16
45:19,23 46:2
47:16 48:7,9 50:21
50:22,24 51:1 52:9
52:13,20 59:23,25
60:4,7,10,21,22
79:15 90:9 91:2,12
91:12,13,14 92:2
93:3,12 101:7,13
101:14,16,20
102:9 103:14
105:15,18 107:7
107:12,14,15,17
109:1 110:16
111:2 112:3,5,12
112:15 113:5,14
115:11,21 116:2
123:14,21 124:2
130:9,17,19
131:12 132:18,19
132:20 133:2,4,6
133:10,15,16
136:19,21 138:3
141:2,16,19,21
142:9,21 143:15
144:24 145:6,10
148:11 150:23
152:9,16,19
154:21,24 155:8
156:5,22 157:5
158:8,11,17 159:7
159:23 162:16,17
162:21 163:1,5
165:14 166:8
168:3 209:11
246:7 247:4

248:24 249:25
250:2,18 255:1,7,8
255:18,22 260:15
263:20 265:5,17
271:10 272:25
273:1,5,18 275:24
276:10 280:1,5,5
280:10,10 282:24
285:7,15 286:4,20
286:22,25 291:3
291:23 292:13,21
293:5 295:14,17
297:3,17 299:1,2,5
300:2,5,15,25
305:3,19,20,24
306:3,6 309:9,13
309:18 311:12,15
316:12,14,22
317:6,6,9,13
318:21 319:24,25
320:20 321:2,25
322:2,5,12,12,14
322:18 323:2,10
323:23 324:5,7,9
324:11 325:3
327:8 328:22
330:12,14 332:3
335:25 337:21,22
338:9,17 341:3,8
341:17 342:1,2,12
344:20 357:20,23
359:2,4,12,15
360:5,19,20,24
361:3,8,14,15,16
362:4,9,19,19
**emailed** 90:8 94:9
160:16 255:24
275:17 280:3
**emailing** 114:10
116:3 324:15
**emails** 44:21 45:21
45:22 51:3 60:14
60:23 61:2 113:25
117:1 159:21
162:22,23 244:15
244:17 248:8,10
248:11 249:13

250:3,8,10 251:2
254:2 255:3,12,14
255:16 256:14
257:9 258:14,15
259:2 260:7,9,13
261:25 262:4,17
266:12 274:8
282:14 305:5,6,9
305:10,13,15
313:10 316:15,19
317:8 318:11,14
319:18,20 320:24
321:14,15 322:9
322:18 324:4,10
324:21,25 325:5
325:22 326:25
327:21 329:1
330:25 331:14
332:16 333:16
336:11 341:11,13
343:1,8 360:12,19
**EMB** 133:21
**employee** 20:25
26:13,16,18
370:12,12
**employees** 20:21,23
21:3 30:15 37:10
57:25 105:3
**employment** 25:23
25:25
**enabling** 7:22
**encompass** 23:9
34:7 235:18
**encompasses** 24:4
227:1
**encountered** 113:19
**encourage** 344:11
**engage** 43:5
**engaged** 24:23,25
42:14 43:1 50:19
55:3
**engine** 258:12
**engineer** 17:15,24
20:21 21:1,4 24:1
241:5
**engineering** 18:14
18:17 23:25

**engines** 86:6
**enjoy** 19:18
**enroll** 253:12,19
**enrolling** 260:21
**enrollments** 352:6
**enter** 7:23 81:13
**entered** 295:17
**Enterprises** 94:21
95:23
**entice** 273:15
**entire** 24:3,10 205:2
222:23 223:4,6,9
317:1
**entirely** 233:5 236:1
**entities** 31:10
**entitled** 246:19
**entity** 82:15,17,22
82:24
**envision** 28:23
**error** 233:6 234:6
234:22 235:21,22
240:8
**errors** 242:10
243:12,13
**escalate** 53:1,6 63:1
64:20 274:22
275:14 277:23
**escalated** 52:3,20,22
283:3 297:14
**escalating** 275:6
**especially** 112:24
195:14
**essentially** 12:19
13:10 59:11 66:21
67:7 96:16,17
110:22 119:6
190:11 274:10
**establish** 100:5
**established** 74:22
216:18
**establishing** 138:1
**estate** 82:7,10
265:24 275:1
277:12,12,14
**estimate** 245:16
247:18
**estimated** 253:6

**et** 1:6 45:3 286:4
369:2
**EU** 142:12
**EurekaPayments....**
123:24
**eve** 214:8
**events** 80:15
**eventually** 18:13
25:25 62:21,24
64:15
**evidence** 99:21
114:13 131:8
239:2 288:23
**evidently** 192:10
**EVO** 104:10 139:18
**exact** 24:9 26:4 44:9
221:15 326:10
**exactly** 17:17 49:9
52:8 71:19 114:14
190:10 191:23
192:6 210:17
237:3,4 315:13
337:18 338:4,17
346:19
**examination** 1:11
6:5 72:23
**Examinations** 3:3
**examined** 6:4
**example** 44:14 66:5
82:21 85:14 88:2,3
121:2 126:21,23
127:4 139:16
144:5 191:16
195:7,8 217:4
242:21 254:22
271:12 336:7
**examples** 83:9
188:15,19 192:2
**exceed** 125:2,8
**exceeding** 134:9
**Excel** 222:10
**excerpt** 348:12
**excerpted** 3:15
72:22
**excessive** 125:9
126:11 129:6,9,16
130:20

Brown

FTC v. Credit Bureau Center, et al.                    12/13/2017

[383]

exchange 36:20
  44:12,15 88:9
  148:2 158:18
  285:16
excluding 349:14
exclusive 36:14
excuse 16:12 35:23
  50:17 97:15
  101:15 124:9
  133:5 137:5
  141:20 206:10
  213:10 226:3,11
  262:6,16 313:7
  361:4
executed 35:15,17
  164:9
exercised 352:24
exhibit 3:11,12,14
  3:15,17,19,20,21
  3:22,23 4:1,2,5,7
  4:10,11,12,13,14
  4:16,19,20,21 5:1
  5:3,6,9,10,11,13
  5:14,15 6:25 11:9
  11:11,14,21 41:6,7
  41:19 53:12 67:17
  68:4,5,11 70:15
  72:8,9,16 75:13,13
  75:16 76:8 90:15
  90:16,24 91:10,11
  103:6,7 105:6,12
  106:11,12,19
  107:6 109:20,21
  110:9 111:11,12
  112:12,13 113:5
  115:1,7,7 116:19
  117:7 123:4,11
  130:10 131:1,2
  132:8,15 133:13
  133:16 134:13,21
  140:17,24 141:13
  141:15,17,20,20
  141:22 142:19
  143:2 144:14,16
  145:12 146:16
  147:16 151:23
  157:10,16,17

158:2,6,7,15,19
  159:10,11 160:1,3
  161:25 162:6,12
  162:21,22,23
  170:7,13 177:14
  177:18 183:16,23
  184:9 189:15,16
  193:13,14 202:12
  202:13 209:22
  211:14,16,17
  217:12 220:7
  225:1,6,13 226:3
  229:7 231:12
  232:23 233:22
  234:9,20,23 235:8
  236:15 237:19,21
  241:20 242:8,9
  243:14,20 244:20
  244:23,24 263:11
  263:12 272:2,3,16
  273:8 275:20,22
  275:25 284:21
  285:4,12,16 291:6
  291:7,20 292:20
  294:9,15 296:15
  298:5,6,13,21
  299:12,14,17,25
  301:19 305:18
  311:5,8 320:6,11
  320:16 322:22
  323:3,5,12 325:6,6
  325:9,10,12,17,19
  326:3,6,9 327:22
  328:5,6 329:6,11
  332:20 333:4,6
  335:1,6 336:13,15
  336:16,16 338:14
  339:1 341:1 343:5
  345:11,24,25
  346:8,9,14,15
  348:8,8,10 349:5
  350:13,14,20
  351:2 353:12,15
  353:21 354:1
  357:1,17 361:5
exhibits 157:15
  284:14

exist 31:18 67:21
  183:2 263:2,4,9
  264:13 274:14
  302:19
existed 78:24
existence 31:13,14
  31:17 177:6
existing 113:16
  129:1 130:11
  137:9,25 191:12
  192:9,10,17,20,23
  193:3,5
exists 31:19
expect 10:3 226:5
expected 160:2
  267:12
expecting 243:7
expensive 67:9 69:7
Experian 7:9 16:25
  17:8,14 20:18 21:8
  21:18 23:5,9,16,21
  24:2,15,17 25:4,5
  25:8 69:4 106:25
  279:3 285:8
Experian's 24:3,11
experience 20:17
  119:2
experiences 292:4,7
  297:11
explain 76:1 167:12
  313:25
explained 47:6
  65:11 67:1 255:4
explaining 358:7
explicitly 286:23
exported 76:11
exports 216:12
Express 23:12
extra 61:8 257:1
  313:1
extracted 86:24
extremely 103:21
eyes 76:14

———————
        F
———————
F 89:3
F-r-a-g-a-l-a 39:21

Fabian 105:1
fabricating 258:21
face 196:2
fact 48:9 126:9
  195:13 215:18
  233:19 269:18
  286:23 323:19
  356:19
factor 193:10
factors 121:25
  122:12
facts 216:24
failed 250:24
failing 250:18
failure 251:1
fair 13:1 21:13
  25:17,20 36:9 46:4
  54:9 63:15 77:3
  83:17 85:1 87:12
  89:21 120:17
  131:23 171:8
  238:7 349:4
fairly 171:10,10
faith 150:21
fake 183:1 255:16
  262:15,16,17
  263:1 264:5,10,11
  264:23,24 265:6,8
  265:16,17,17
  266:3,4,8,12,12,13
  267:7,8,15,17,22
  267:25,25 268:18
  270:8,9,18 271:6
  273:10 275:19
  276:7 278:2,18
  279:7,7,8,11,13,21
  279:24 280:12
  281:15 282:15,19
  282:21 287:23
  288:1,2,6,16,17
  289:1,6 290:7,10
  290:17 294:15,20
  294:22 295:9,25
  296:5,6 297:17,25
  298:3 301:10,14
  301:15 304:6
  310:12 312:20

344:18,20
falling 174:10
false 309:22 311:25
  312:5,9,10,11,19
  339:21
familiar 21:11,14
  22:21 36:6 41:18
  42:5 48:24 64:2
  70:23 76:9,21
  79:22 80:1 87:4,5
  88:18 89:2 92:5
  117:18 118:12,25
  120:6 259:1,14
  261:24 341:10
  355:16
far 202:9
Fargo 364:24
fashion 360:6
fast 111:20 133:22
  256:21
faster 88:4 345:25
Fat 94:21 95:23
FCR 21:10
FCRA 21:11,16,19
  21:20 22:2
fear 9:18
feature 61:8
February 37:24
  133:13,14,19
  134:1,14 172:13
  172:15 185:6
  204:15 214:12,17
  214:24,24 215:7
  325:8,9
fed 60:17,23
Federal 1:3 2:2 6:15
  6:18 369:1
fee 37:20 70:7
  118:10
feed 34:4,6 67:22
  70:5 71:7,11,13,15
  71:17,18,19,21,22
  71:23,24 72:2
  114:5
feedback 148:6,10
feel 62:6 87:2
  185:10 189:21

195:16 199:19
256:13,22 283:10
283:14 323:25
**fees** 69:7 319:13
**felt** 137:3 331:23
335:17
**FEMA** 270:3,4,7
271:16
**Ferguson** 93:1,15
94:7 96:9,12
101:17
**field** 81:15,18 88:24
89:3
**fields** 240:20 319:9
319:15
**fifth** 116:2
**figure** 119:3 153:22
166:8 294:21,22
322:3,6,8 365:3
**figured** 304:25
**file** 38:16,20,22 73:8
76:11 77:14 86:25
222:10,10
**filed** 5:6,11 15:12
26:14,15 31:19
32:2 38:14,19,23
38:25 91:16,20
204:12 210:20
214:13 215:2,3,8
217:25 218:9
220:21 257:10
261:20 298:14
346:23
**files** 301:21
**filing** 30:6 33:2
175:3 203:15
298:23,24 363:11
363:21,23
**filings** 15:2
**filled** 169:4
**filter** 174:11
**final** 167:2 174:19
348:10
**financial** 4:9 37:18
141:3 334:20
**financially** 370:12
**financials** 117:15

**find** 25:24 50:16
92:21 104:19
137:22 215:10
223:23,25 224:2
250:14 315:16
368:9
**fine** 242:3 330:1
**finish** 208:20 213:25
275:22 278:4
319:2
**fire** 30:14
**FIRM** 2:8
**first** 4:8 6:3 7:1,16
8:10 21:5 28:7
43:18,20,21 44:5
47:3,4,7 57:20
62:16,16 64:11
69:6 77:5 79:15
81:23,24 87:2 88:8
90:6 92:24 101:20
108:3 119:10
134:12,21 141:3
141:22 148:19
220:18 226:3
236:18 245:7
266:20,21,21
275:23 276:7,9
281:5 295:9
326:17 329:6,7,13
333:11 338:21,25
339:1 350:24
358:21 362:4
364:20 370:6
**first-call** 61:25
**five** 188:15 195:2,12
196:6 197:4
198:13,23 199:3
199:17 222:15,20
226:6 233:21
275:17 278:2,6,19
294:13,14 330:5
**five-** 116:7
**fixed** 69:23 70:5
356:10
**flagged** 143:6 276:7
**flagging** 273:9
281:16

**flexible** 110:23
112:24
**flow** 102:17 104:18
110:24 111:7
113:3
**FMC** 82:9
**focusing** 108:4
**folks** 56:8 59:8
110:11 353:8
**follow** 43:10 57:23
62:25 125:12
153:6,8 163:14
169:11 293:8
341:23
**follow-up** 30:1 62:2
**followed** 163:19
**following** 62:10
218:4
**follows** 6:4 42:2
148:17 221:17
**food** 274:21 275:6
275:12
**forced** 116:11,15
**forcefully** 61:1
**forecasting** 149:1
**foregoing** 368:7
370:9
**forever** 129:13
306:23
**forget** 268:10
**form** 24:20 29:16
36:22 52:21 56:25
98:10 102:14
108:12 114:2
116:13 147:24
155:5,13,20
156:10 164:20
166:18 176:25
186:20 187:8,17
213:11 219:20
226:22 234:10,25
235:9 239:3
278:23 283:7
286:11 308:17
313:11 326:22
329:19 330:4
331:2,25 333:23

334:6 335:21
336:22,23
**format** 76:23 173:22
201:21 215:25
216:5 217:6 228:9
**formed** 35:14
**forms** 99:13
**forum** 39:12
**forward** 65:6 286:3
286:24 338:18
**forwarded** 148:2
310:13 337:3
**forwarding** 158:11
324:17 327:19
**forwards** 342:11
**found** 16:21 92:16
136:10 302:18
304:3
**foundation** 36:23
186:21 327:6
329:20,25 331:3
332:1 333:24
334:7 335:22
336:23
**founded** 17:4
**founder** 16:19
**founding** 16:18
**four** 17:20 51:9,19
51:22 319:11
**fourth** 116:2 200:3
**Fragala** 4:21 31:15
39:21 47:16 96:20
98:25 99:1,1
100:11 136:24,25
140:3,5 145:3,19
145:25 148:5,16
149:19 150:24
152:17 158:9
162:18 196:19,20
196:23 197:2
263:21 264:9
268:10 272:20
275:17 278:10,18
**Fragala's** 40:16
**frame** 62:13 177:1
294:11 326:23
**frankly** 189:12

240:5
**fraud** 19:21 43:1,13
43:23 44:1,7,10,25
45:7,18 47:21 50:8
50:18,23 51:1,6,18
51:25 52:1,7,11,14
52:15,17,17 53:10
63:7,11,12,14
250:23 251:1
257:5 258:25
262:14,21 265:11
270:9,15,18 279:6
279:23 281:24
282:22 286:8
297:13 339:20
354:25
**fraudulent** 42:14
182:13 257:4
263:2 269:21,23
274:10 310:22,22
312:8
**fraudulently** 43:17
**FrazerTrug@gm...**
342:4
**free** 19:19 20:2,10
20:11 22:2,6 30:21
86:13,13 87:2
104:11,22 113:21
121:3 188:11
189:21 256:19,20
332:7,10,17,18,20
332:21,25 333:9
333:12,13
**FreeCreditReport...**
19:3 20:6,14 279:4
**FreeCreditScore**
19:3
**FreeCreditScore....**
20:5,14
**frequent** 139:17
**frequently** 78:13
112:22 116:5
**fresh** 11:4 137:8
**Friday** 115:20 338:7
**friendly** 255:2,10
318:18,22
**front** 42:22 219:17

Brown

FTC v. Credit Bureau Center, et al.                                   12/13/2017

[385]

219:23,25 229:8
  328:6 345:12
**Frontgate** 82:9
**frozen** 37:22,25 38:2
  38:7,11
**FTC** 3:13 6:8,11
  14:18 21:23 22:4,6
  22:15 24:15 41:16
  139:12 204:21
  227:8 255:23,25
  270:11 365:6
**FTC's** 5:7 298:15
  347:23
**Fucking** 281:15
**full** 243:15 249:25
  282:4 356:13
  358:22
**full-on** 265:11
  279:23
**fully** 129:20
**funds** 54:2
**funny** 56:14
**further** 7:23,24
  123:2 147:12
  168:16 237:19
  242:6 253:13
  370:9,11
**future** 131:22

———————
**G**
**G** 2:3 55:11
**gain** 61:1
**gained** 213:4
**game** 274:11
**Garcia** 105:2
**gather** 284:14
**general** 52:22 87:23
  93:17 131:17
  142:25 177:10
  264:21 355:1,7
**generally** 14:24
  173:20 242:25
**generate** 203:9
  205:5 217:22
  236:1,3 237:22
  238:23 243:22
  244:6 366:4,7

**generated** 81:12,15
  83:18 99:14 149:5
  161:1 175:9
  202:24,25 203:3
  204:5,13 220:22
  234:3,4 235:22
  236:19 241:3
  258:4 259:11
  304:21 305:13
**generating** 154:16
  154:16 161:6
  233:7 305:14
**gentle** 358:7
**George** 273:11
**getting** 12:14 19:15
  44:15 50:7 51:21
  57:10 70:5 71:21
  71:22,23 139:6
  150:24 184:21
  185:15 192:25
  194:24 247:2,5,16
  253:8,16 291:13
  303:12 309:3
  311:18 330:10
  342:6,8
**ghostwriting** 148:11
**gift** 44:11,15 45:3
  274:22 275:7,13
**girl** 146:6
**give** 11:6,12,13 18:2
  26:4 44:14 46:3
  65:18 77:1 96:14
  125:23 126:5
  152:23 157:24
  198:22 206:12,14
  206:19 227:11
  229:23 254:22
  275:9 290:9
  292:15 327:22,25
  329:15 330:16,17
  356:20 359:16,18
  359:21 366:8
**given** 36:10,15 85:2
  85:3 112:24
  118:16 362:6
  368:11 370:10
**gives** 125:18

giving 148:6,19
  227:13 352:6
**gladly** 224:22
**go** 8:7,24 29:18
  34:11 39:19 42:10
  42:12 44:4 53:14
  55:18 58:17 59:6
  61:20 64:23 69:4
  69:18 70:21 76:17
  78:23 80:18 81:3
  88:4 94:1 99:9
  100:2 105:14
  112:7 117:8 119:1
  119:6 122:8,12
  125:16,17,22
  126:2,12 129:8
  134:3,12 136:15
  138:10,15,24
  140:12 147:19
  151:23 160:2,19
  161:16,19 166:5
  167:17,25 171:24
  172:13 174:2
  181:21 183:9,11
  184:5 185:6
  186:25 187:19
  191:10 192:11
  193:12 197:19
  198:18 199:1
  200:19 204:23
  211:14 212:13
  214:2 215:6 229:7
  235:11 236:3
  238:3 239:5
  240:18,21,25
  242:1 243:3,18
  244:20 245:22
  248:13 251:4
  258:15 262:6,11
  267:1 275:23
  283:9 286:13
  298:16 299:11,13
  303:20 305:18
  311:5,8,11 313:21
  317:12 328:5,10
  337:23 340:25
  345:10,15 348:7,7

356:14 362:4
**go-to** 127:11
**goal** 109:13 129:6
  130:8,10,20
  348:24 353:5
**goes** 120:22 193:23
  239:13 266:17
**going** 6:13 9:1,21,22
  10:1,3 11:10 12:15
  13:7 16:4 19:5
  29:25 47:9 49:13
  49:22 51:20 53:14
  54:21 63:6 65:6
  67:2,16 69:7,8
  71:8 72:7,8 73:3
  73:12 75:17,25
  76:7,14,18 79:20
  80:25 82:13 83:9
  83:16,25 86:22
  88:4,5,10 89:21
  106:11 109:19
  111:20 113:9
  124:13 129:13
  132:7 136:1,16
  149:11 150:7,17
  151:8,9 160:17
  163:22 164:2
  167:12 168:9
  172:21,22 173:8
  173:16 175:12
  180:18 184:12
  189:23 196:2
  201:6 202:12
  206:14 209:16
  213:5 222:13
  223:18 224:7
  225:5 231:9,15
  234:16 235:24
  248:8 251:23
  253:12 259:8
  260:19 267:14
  269:13 273:25
  278:15 284:18
  288:6 294:1
  296:19 297:8
  298:5,16 299:20
  302:6 306:20,22

307:3 313:1 316:7
  320:11 323:3
  336:19 350:13
  361:15 365:2
**good** 8:8 46:17
  57:21 58:8 61:9,21
  62:4,7,20 72:5
  101:2 108:10
  114:6,18 118:6
  121:6,6 142:1
  144:9 150:21
  178:1 186:22
  193:3 195:9 197:7
  210:24 212:22
  214:19 239:7,14
  247:4 277:19
  309:9 312:25
  313:3 317:17
  321:6 324:7
  327:13 334:12,21
  334:24 354:12
  355:6 362:1
**Google** 60:18 86:6
  265:16 287:15,18
  288:2,15 294:19
  304:3 354:6
  355:14
**googled** 293:10,11
  304:3
**Gordon** 40:7 203:11
  203:14 216:18
  230:2 241:19
  295:3,6,13 296:9
  296:14,15,21,24
**government** 247:12
  274:21 275:7,12
**grab** 78:6
**grain** 252:16 254:7
**graphical** 173:22
**graphs** 173:22
**gray** 171:17,20,21
  245:3
**great** 27:9 108:6,19
  165:15 169:9
  240:24 255:9
  342:25
**greater** 111:8

FTC v. Credit Bureau Center, et al.                              12/13/2017

**greedy** 246:21
**greeting** 61:22
**Gregory** 241:10
**gross** 307:25
**grossly** 352:21
**groundwork** 25:16
**grow** 29:7 100:16
　108:11 109:8
　147:11,21
**growing** 28:2 109:6
　109:7 187:3
**grown** 106:3 110:20
**growth** 107:17
　108:7,20 109:1,4,4
　109:5 130:3
　147:24
**guarantee** 163:15
　163:20,25,25
　164:1 165:6
**guess** 39:15 60:21
　228:3 244:1
　254:15 261:4
　290:2
**guessing** 88:14
**guidance** 149:1
**guidelines** 58:8
　124:25 125:2,5
　153:6,9,9,11,16,18
　153:19 164:15,19
　165:2 167:7,10
　192:7 193:2
**guy** 2:3 6:15 75:20
　76:5 86:20 156:19
　179:8,19,22 180:4
　180:10,21 181:3
　181:13,19 182:6,8
　185:9 186:4 187:1
　188:9,12,22,23
　189:1,8,10 224:15
　245:16 247:19,21
　247:24 248:2
　273:21 280:25
　281:11 315:16,17
　357:9
**guys** 180:20 181:2,5
　181:8,11,13
　182:15,22 187:1,5

187:7 188:12,13

---

**H**

**H** 3:7 82:2
**half** 17:18 18:24
　21:5 194:25
　222:15,20 240:13
　356:12
**halfway** 306:10
**hall** 242:2
**hand** 75:20 150:21
　150:21 220:6
　242:25,25 250:25
　317:14 327:12
　330:20 337:4
　370:14
**handed** 276:1
**handing** 298:11
**handle** 64:14,17
　297:12
**handled** 29:14 64:12
　308:11 310:18
**handling** 251:17
**happen** 80:11,21
　174:1 221:6
**happened** 93:6
　172:5 264:4,24
　270:5 343:15
**happening** 137:16
**happens** 137:20
　165:9 266:6 362:3
　362:3
**happily** 46:5 136:11
**happy** 11:6 62:6,7
　89:8 179:9 180:4
　180:12,18,19,23
　180:25 181:16,18
　181:20 182:8,9
　193:25 194:2
　209:12 277:25
　355:4
**hard** 24:8 42:21
　44:9 50:20 52:8,12
　135:12 266:14
　329:3
**hat** 29:24
**hate** 185:14

**hats** 40:22 56:5
**Havins** 106:20
　107:7 110:11
　112:15 113:5
**he'll** 196:1 246:7
**head** 10:12 51:7
　59:16 106:9
　212:16 289:15
　303:9 332:14
**headache** 257:6
**header** 349:8,20
　351:9 352:3
**heading** 224:22
**hear** 91:17 289:1
**heard** 94:15 223:24
　265:16 266:11,12
　312:13
**hearing** 3:16 15:5
　65:22 72:18,23
　73:24 101:20
　204:6,9,15 206:3,6
　207:1 208:9 209:1
　209:2 210:2,6,9
　211:9 213:4
　214:12,16,23
　215:7,13 216:20
　217:14 218:7
　219:10 220:16
　221:14 226:20
　228:7,18,23
　237:24 238:14,18
　241:8 284:5,11
　288:22 299:7
**heat** 262:7
**Heather** 5:1 106:20
　107:7 110:11
　112:15 113:5
　285:7,18 287:8
**held** 17:23 117:10
　183:7,12 200:8,23
　244:2
**help** 18:2 45:17 55:4
　76:1 78:2,10 85:5
　96:14 113:9
　140:10 146:9,10
　146:11 147:13,23
　148:9 150:8

155:18 156:19
　160:10 164:14
　245:23 316:25
　354:9
**helped** 140:5 154:9
　221:7 270:3
**helping** 57:11
　126:23 155:10,22
　179:18 196:18,23
　270:12
**helps** 80:21 85:8
　179:22
**hey** 100:22 119:8
　124:5 149:14
　261:2 267:2 344:5
　361:16
**Hi** 112:10
**high** 70:5,7 116:6
　119:1 121:13,15
　122:11 133:23
　134:2 165:20
　166:11 192:11,21
　194:7,11 312:16
**High-Risk** 126:4
**higher** 130:5 191:1
　192:24 195:17
　200:12,17 201:23
　202:7 233:21
　235:17 365:1
**highlight** 231:13
**highlighting** 335:10
**highly** 217:5 219:19
**hindsight** 265:9
　267:11 279:15
　281:23 289:10
　297:16
**hire** 271:25 287:14
　287:16
**hired** 28:4 32:14
　271:10,17
**histories** 186:2,2
**history** 18:3 65:19
　100:6 101:2
　260:19
**hit** 70:10 126:10
　128:5
**hmm** 288:13

**HOA** 319:13
**hold** 7:1 17:13 49:11
　124:9,10,18
　175:25 231:9
　366:18
**holding** 220:6
**home** 59:15 136:8
　137:22 261:3
　285:20 315:16,18
　315:21
**Homeland** 270:21
**homes** 309:22
**honest** 129:20
**honestly** 188:13
　331:14
**honor** 150:5,8
**honoring** 108:1
　160:6
**hope** 75:25
**hopefully** 14:10
　362:25
**hosted** 99:12 100:17
**hot** 198:13
**hour** 7:14 173:24
　174:17
**hours** 222:15,20
　226:6
**housing** 301:25
　302:9,15,16
**Houston** 2:9
**human** 235:25
**Humboldt** 133:21
　139:19 143:6,10
　143:18,21,24
**hundred** 28:9 44:14
　69:2,20 115:17,19
　119:7 127:5
　134:10,11 135:4,6
　135:7 138:22
　146:5 149:11,15
　154:12 155:9
　157:1 158:23
　159:8,22,24
　161:15 172:1
　193:17 197:13
**hundreds** 202:7
　359:24

hunting 306:24
hurricane 270:13
hurricanes 365:6
husband 326:4,7
    327:2 328:12,16
    330:16,23 331:1
    331:23 332:4,5,8
husbands 326:13
hype 268:19
hyperlink 266:9

## I

ICE 270:25
ID 31:24 32:3,5,15
    32:18,20 33:18,20
    34:17,19,22 66:12
    66:19 77:6,13,15
    77:16,25 80:18
    81:9,11,16 82:15
    82:17 83:1,3,3,21
    83:23 84:6,9,10,13
    85:10,11,18,20
    88:2,3,9,11,20
    118:16 119:23
    120:1 129:25
    135:16 146:25
    147:16 299:19
idea 99:17 101:11
    121:6 163:18
    174:12 177:9
    178:25 343:12
ideas 163:10,17,19
identical 22:9
identifiable 205:14
identification 11:11
    11:16,20 41:5,9
    68:7 72:11,15
    90:18,23 103:5,9
    105:8,12 106:14
    106:18 109:23
    110:8 111:11,14
    115:3,7 123:6,10
    132:10,14 140:19
    140:23 144:13,18
    157:19,23 158:2
    162:8,12 170:9,13
    183:18,22 202:15

225:3,12 263:11
263:14 272:5,16
284:23 285:3
291:9,19 298:8,12
320:8,16 323:7,12
346:8,11 350:16
350:20 353:17
357:3,16
identified 110:10
identifier 63:17,20
    63:23,25 65:10,12
    65:16 77:13 85:2
    85:11 119:24
identifiers 84:22,23
    85:12
identify 45:17 46:2
    46:3 62:1 84:13
    88:24 142:15
    152:3,17 306:11
    307:15
identifying 6:14
identity 3:24 34:11
    34:14 112:4
IDs 63:15 66:16
Illinois 1:1,15,16 2:5
    368:1 370:1,5
illness 9:4
image 349:8,21
    351:9 352:8
imagine 24:5 253:21
iMessage 244:21
immediately 149:13
    159:1,2 203:21
    257:7 295:18
imperilling 312:23
impersonated
    319:20
implement 67:21
imply 177:11
important 180:11
    344:14
impression 62:5
    327:23
improve 287:14,16
inability 111:3
inaccurate 195:15
    196:25 198:22,24

222:6 236:2
242:22 344:19
352:20,21
incentive 44:12
incident 27:7
include 149:5 269:8
included 24:12
    38:20 39:8 248:16
    249:3,4 295:14
    319:14 339:21
    355:9
includes 72:22
    258:17
including 35:21
    191:25
inclusive 368:9
income 37:14,16
    38:9,13 344:16
incorrect 191:3
    233:16,17
increase 29:5 176:1
    184:12 187:2
    348:24 349:3
increasing 108:22
    175:23
incrementing 81:15
    81:17
indicating 75:24
    110:16 124:20
    178:19 220:6
    227:22 241:22
    335:9
indication 107:22
    107:24 156:22
    257:4
indirectly 370:13
individual 12:7,16
    12:20 13:5 19:6
    28:6 48:5,10 67:11
    122:2 158:14
    180:23
individually 12:24
    14:5
individuals 14:19
    158:15
industry 139:14
    189:4,5

info 286:4
information 66:10
    78:25 79:3,6,7
    80:16 87:12
    148:20,22 169:18
    198:21 205:15
    217:9 286:24
    289:15 312:19
    315:13 327:20
    339:22 349:16
    352:4
infrastructure
    217:10 219:18
    227:20
initial 163:1
injunction 39:8
    204:6,9 206:3,6,10
    207:1 208:9 210:2
    210:6,9 214:5,9
    216:19 217:14
    218:7 219:9
    220:16 221:14
    226:20 228:7
    236:11,13 237:6,9
    237:24 238:14,18
    239:2 241:8
inner 198:19
input 83:19
insight 187:20 188:9
    189:12
instance 89:23
    182:3 184:17,24
    194:10
instances 42:25 44:9
    63:6 188:25
instantly 213:19
instructed 64:20
    104:10 215:11
    360:18
instructions 152:21
    362:10,12,15
insurance 34:14
insure 8:7 22:1
    61:21 160:6 165:1
    205:19
intended 317:23
intent 314:22

interact 69:15 87:7
    131:19 216:13
    281:18
interacted 95:20
interacting 148:7
interaction 59:7
    124:3 344:3
interchangeably
    190:13
interest 329:11
    365:9
interested 129:16
    259:23 304:18
    327:10 330:10
    370:13
interesting 183:5
interface 87:7 88:19
    88:21 89:4
internal 74:16,23
    75:7 211:23 212:6
    212:14,17 284:1
Internet 222:13,17
interpret 68:18
interpreted 154:18
interrupt 157:12
intimately 57:7,20
    62:18 64:11
introduce 33:11
    67:16 76:7 345:24
introduced 33:10
invention 7:11,17,18
investigate 53:7
    152:21 154:22
    276:25 277:3,5
investigated 302:18
investigating 44:25
    51:1
investigation 265:11
    279:23 281:25
    293:7 294:3,8,25
    305:7
invoice 116:9
invoices 103:20
    112:17
involve 29:2 61:17
    82:24 248:4
    282:15

involved 23:14
  27:12 52:7 57:7,21
  58:3 62:18 64:11
  95:21 99:16,18
  100:6 153:9,11,16
  153:21 159:15
  160:23 244:14
  248:20 260:21
  301:10 334:10
  346:18 353:25
involves 71:1 262:15
  262:16
involving 82:21,23
  278:6
IP 85:24 185:16
  280:19
irrelevant 219:22
  220:24 221:2,3,8
  221:16,19 227:4
Irving 218:23
  220:23,23 221:1
  222:19,24 223:1
  225:18 228:16,17
  228:19
Islands 365:7
issue 14:10 21:9
  52:20 63:3 73:2
  102:17 113:15
  124:7,17 131:20
  168:2 174:18
  189:18 294:18
  297:13 302:22
  348:3 349:25
  354:8,9,10 358:7
  358:23 360:15
  361:7
issued 104:10 153:6
  359:8
issuers 128:19
issues 21:7,21 63:1,2
  63:2,2 168:5 173:9
  294:18
item 237:10,12
items 335:3,13
  336:2

—————————
J
—————————

J 169:22
Jamie 169:21,23
Jan 105:22
January 30:11
  104:2 110:21
  134:18 174:21
  203:6 204:13,16
  213:3 214:13
  215:8 217:25
  219:1 226:4,11,12
  230:10 232:20
  237:25 241:1
  347:4
JC 169:16,22 268:11
  268:11
Jeep 365:5,8,12
Jens 272:22
Jensen 105:1
Jerry 105:1
job 8:20 18:7 29:4
  264:11,12,14
  270:7 274:13,20
  275:11
joined 89:3
Josh 4:22 5:16
  271:23 272:21
  273:23 275:2
  277:20 278:1,3,5,8
  278:13 357:21
  358:6,11 359:3
  360:3,12,14,18
  361:16 362:17
judge 1:6 13:8 74:2
  205:23 212:14
  219:12 226:14
judgment 366:24
Juhee 105:2,5
July 107:10 112:8
  112:21 115:16
  175:21 179:6
  197:19 199:1
  251:6 309:10
  311:5
jump 147:23
June 294:6 300:15
  300:16,19 301:2
  303:14 305:8,19

305:25 358:3

—————————
K
—————————

K 368:3 370:2
keep 100:24 115:23
  129:4,4 179:8
  180:4,12,25
  181:15,18,20,20
  185:13 186:16
  187:3 192:8
  193:16 196:9
  198:12 281:15
  328:6 355:4
  358:14
keeping 126:17
  130:11 153:21
  180:12 321:10
Ken 123:25
KenMusante@Va...
  123:24
Kennelly 1:6 205:23
  212:14
kept 18:9 238:17
key 276:14
keyword 86:3,7,9,16
  86:17
keywords 355:15
kick 344:8
kill 218:10,10
killed 216:9 218:14
  218:15,20 220:18
  220:21
killing 30:18 193:15
  193:22
kind 18:10,11,25
  19:14 20:25 44:7
  50:3,18 52:14 53:2
  56:5 67:2 78:25
  93:21 96:1 112:5
  126:21 127:10
  139:17 141:12
  166:16,22 173:23
  219:20 261:8
kitchen 254:25
  255:9 318:17,21
  319:13
knew 94:12 97:13

97:14 101:17,18
  102:8 178:21
  182:14 185:23
  244:5,8,11,14,17
  246:23,24 260:9
  269:13 283:25
  287:2 289:22
  292:6 312:12,21
  324:12,13 326:20
  327:1 334:3 343:8
  352:17,23
know 9:20,22 10:18
  10:24 11:4 12:11
  12:25 13:7,11,13
  16:9 17:7 23:7,24
  29:23 30:24 32:10
  34:16,22 37:3,19
  38:20 40:6 46:11
  46:13 52:24 55:12
  58:2 60:9,10,24
  63:3,6,17 65:21
  66:10,24 70:2
  71:21,23 72:25
  74:2,23 76:19 78:1
  78:9,10 79:14
  80:12,20 81:20
  82:15 85:7 88:1,2
  90:12 92:18,20,24
  94:14 95:8,13,19
  95:20 96:16 97:11
  97:20,20,24 98:25
  99:12,15 100:14
  101:5,6,23,24
  106:20 108:1
  111:1 112:23
  114:6,7,16,18
  118:18,20 123:25
  123:25 132:6
  135:11 141:7
  142:12 143:23
  152:1,5,7 163:4
  164:16 168:13
  171:10,17,25
  175:11 177:6,10
  179:16,16,18,24
  180:14,19 181:7,7
  181:10,11,15

182:22,23 183:2
  184:1 186:1,8,13
  186:14 188:4,11
  189:3 190:10
  191:23 192:24
  195:13 199:19
  200:5 201:8
  205:22 207:11,16
  208:10,17 209:2,5
  209:10,19 210:17
  210:19 212:22
  220:9 222:21
  224:21 225:25
  232:10,11 233:4
  233:18 236:12
  237:14 239:10
  240:5,10 242:9
  243:15,16 245:18
  245:25 246:3,4,21
  247:1,2,3 248:7
  249:15 250:10,15
  250:20 252:15
  253:10 256:13,18
  256:20 257:3,23
  258:6,10,13,20
  259:4,13 260:1,12
  263:5,9 264:3
  265:15,21 269:6
  269:23 270:1,9,17
  270:17 271:23,24
  275:15 276:9,18
  276:21 279:20
  280:18 282:21
  286:17 289:9,14
  289:20 290:2
  291:15 294:2,5,7
  294:12 296:6,18
  297:16 299:1,6
  300:24 302:23
  305:14 306:17,20
  307:2,8 308:13
  312:9,11 314:11
  315:21 318:6
  319:15 321:19,22
  322:14,16,17
  324:1 326:9
  327:11 328:4,11

Case: 1:17-cv-00194 Document #: 206-2 Filed: 03/24/18 Page 113 of 137 PageID #:5190
Brown
FTC v. Credit Bureau Center, et al.                                    12/13/2017

[389]

328:25 329:3
330:15 332:4,6,7
332:15 333:15,20
334:8,11 336:2,7
339:23 340:5,7,9
340:14,16,20
341:15,16 342:8
342:16,18 343:4,7
344:4 345:23
348:21 350:1
352:18,22 354:2
355:2 356:13
357:5 364:8,20
365:5
**knowing** 101:21
**knowledge** 18:7
20:17 55:4 98:1
101:4 182:21
330:22
**known** 15:23 23:2
43:7 52:25 60:13
63:1,1 64:21
101:15 106:25
161:5 222:3
258:23 275:8,10
275:11 277:22
283:3,4 285:8
**knows** 100:19 360:8

**L**

**l-i-n-e** 56:10
**ll** 212:3
**label** 35:16,16,17,19
36:1,3 65:23,25
66:9 83:6,10 92:14
96:21,22 99:3,11
99:14 100:13,16
147:6,7,13,24
149:25 150:12
151:9 152:20
153:1 159:18
160:11 164:8,9
196:20 358:14,18
360:9
**lack** 62:12 177:1
186:21 327:5
329:20,24 331:3

332:1 333:24
334:6 335:21
336:22,23
**lady** 141:12
**laid** 25:12,16
**land** 86:7,17
**landing** 21:25 345:4
345:7,18 347:2,6,8
347:11 348:3,17
349:14
**landlord** 250:19,25
255:12,14,16
256:25 262:17
265:4,20 266:5
267:1,2,2 276:20
282:9,24,25 283:1
289:2,6,13 291:3
296:4 297:18
298:1 305:9,10,13
306:20,21,25
307:5 308:7,8,14
310:11 313:10,13
313:14 314:18
316:15 317:15,18
321:24,25 322:13
322:15 326:21
327:11,13,20
328:3,21,24 329:1
330:19 331:22
332:7 334:12,13
334:23 335:18
337:4,21,22 338:2
338:19 340:6
341:16 342:1,12
342:15,22,23
343:16,16 344:3,8
344:20
**landlord's** 324:9,11
331:22
**landlords** 258:14,15
266:6 314:10,24
315:3 317:21
318:3,7 319:17,20
324:18 327:16
332:11 333:21
334:3 336:20
337:17 342:6

344:18
**landscape** 74:13
**language** 350:9
**large** 190:11 222:9
352:22
**largely** 139:12
**larger** 231:23 354:3
**largest** 170:1 202:9
277:7 288:14,17
288:20
**Larry** 4:8 141:2,5,6
142:1 143:12,17
**late** 112:23 116:9,10
116:17 345:3
**latest** 276:1,1
**laughing** 339:2
**launch** 261:19
279:23 282:4
**launched** 265:10
281:24
**LAW** 2:8
**lawful** 43:6
**lawsuit** 5:13 7:10
8:5 14:17 21:23
22:18 24:14,16,24
25:4 26:13,14 28:1
30:7,10,12 31:18
32:2 33:3,3,5,7
37:22,25 38:2,7,11
58:22 59:1 91:15
91:19,24 175:3
177:7 195:15
203:6,15,21
204:12 214:13
216:5 217:25
218:1,9 220:20
257:10 261:20,25
341:23 347:2,7,23
350:21 363:21,23
364:15
**lawyer** 162:3,5
307:24
**lawyer's** 29:25
**lawyers** 224:3
**Layli** 1:14,20 370:4
370:17
**layman's** 7:18

**lead** 13:17 77:25
81:16 235:16
286:21
**leads** 71:23,25 144:1
**leapfrog** 98:8
**learn** 45:2 93:14
**learned** 18:5 45:7
50:23,25 52:1
**learning** 15:10
**lease** 321:9
**leave** 25:11 257:25
**lecture** 227:12
**led** 8:1 234:23
**left** 17:14 25:8
171:21 186:18
189:1 330:6
**legal** 21:7,9 42:3
285:19
**legitimate** 250:17,21
267:14 269:8
270:14 276:8,20
279:6 295:2 304:7
304:19 310:24
**legwork** 185:20
**lenders** 82:10
265:25
**Lending** 82:9
**lengthy** 61:19
**let's** 7:1 14:11 20:20
44:5 46:9 49:11
54:12 55:18 65:6
67:15,17 74:24
77:3 78:9,22 84:4
89:10 90:14
105:14 133:12
134:12 146:15
147:19 157:9
169:12 171:24
179:5 181:21
183:9,11 184:5
185:5 189:14
191:4,7 193:11,12
194:22,22 197:19
205:15 206:20
208:13 217:12
222:8 228:10,11
229:7,11 232:6

243:18,18 244:20
245:7 251:3,5
252:4 257:25
262:3,11 266:19
269:22,24 272:8
273:7 280:23
284:13 285:11
288:19 295:3
296:11,14,21
298:16,19 299:4
299:11 301:18
309:8 311:4,5,8
313:17,17,21
320:5 322:21
325:5 328:5 329:2
329:5 330:13
338:14 343:25
344:25 345:10,13
345:15,23 346:17
349:12 350:24
351:1,2 358:20
361:2
**letter** 300:19,22
303:14
**level** 66:13,23 313:4
**levels** 66:2
**Levine** 2:3 3:5 6:6
6:10 11:18 13:15
13:22,25 14:9,14
14:15 24:22 36:24
41:11,21 46:4,6,20
48:15,17 51:12,16
56:13,15,16 57:2
62:14 68:9 72:13
74:9,11 75:15,23
76:4,7,16 78:5,8
78:21 79:24,25
80:25 81:5,6 90:2
90:4,5,21 91:22
94:4 98:12 99:22
102:20,24 103:11
105:10 106:8,10
106:16 110:1,6
111:16,20,22,24
115:5 117:8,12,13
123:8 128:9,10,24
130:16,21 131:3,6

Case: 1:17-cv-00194 Document #: 206-2 Filed: 03/24/18 Page 114 of 137 PageID #:5191
Brown
FTC v. Credit Bureau Center, et al.                    12/13/2017

[390]

131:9,25 132:6,12
137:12 140:21
155:15 157:9,14
157:21 162:4,10
164:22,24 168:23
169:9,12 170:11
177:2,16,17
178:15 182:18
183:9,14,20
187:10,14 190:5,8
191:20 198:2,5,7
200:10 201:3
202:17 206:2,14
206:17 207:24
208:7,21 209:18
211:17,20 213:14
223:13,20,23,25
224:5,8,9 225:5,9
225:10 228:13
232:13,17 234:12
234:16,18 235:2
236:9,16,17
239:21 240:1
241:13,25 242:3
244:4 262:11,13
263:16 271:5
273:3 278:11,15
278:17 284:13,17
284:19 285:1
286:14 290:21
291:12,15,17
296:18,22,25
297:2 298:10
307:18,23 308:2
313:17,21,22
320:10,13,14
322:23 323:9,15
326:24 329:21
331:5,7,11 333:7
334:1 335:11
339:6,9,12 345:6
345:22 346:1,5,6
346:13,19,20
350:18 353:11,14
353:19 356:22
357:8,12,14
362:24 363:2,5

365:23 366:10,13
366:20
**libelous** 311:22,25
**liberal** 356:1
**License** 1:21
**lie** 233:22 236:5
**lied** 200:1,3
**lights** 185:13 186:16
**limit** 134:4,5,10,11
135:3,5,6,12
138:19,24 150:5,6
160:19 161:15,16
**limitations** 134:6
**limits** 147:21 150:18
150:22 167:15,17
176:6 190:16
191:24
**Lindley** 105:2
**line** 56:7,10 92:18
96:17 100:25
103:20 128:5
138:21 212:2,3,3
212:13 230:24
237:10,12 242:18
243:6 268:8 295:9
336:10 369:5
**lined** 364:21
**lines** 42:12 45:1
190:6 349:23
**Ling** 27:11,15 31:1
33:10,12,21
210:20,21 211:8
225:23
**Ling's** 27:9 33:13,19
33:21,25 34:3
**link** 97:2 100:7
241:22 248:22,24
249:3,4,4,6,7,9,9
249:14 265:1,19
266:20,20 286:4
286:25 290:24
291:2 292:14
293:11,12 295:1
303:23 304:15,25
317:13 332:24
333:8
**linked** 260:10 267:8

**links** 248:11,13,16
248:16 249:12,24
290:23,25 293:10
293:11 343:2,8
**LinkTrust** 74:14,15
75:3,9 212:5
**list** 30:23 39:19 85:6
104:13 247:13
**listed** 188:1 328:7
329:12
**listen** 58:5,6 63:10
167:9 226:21
**listened** 279:4
**listing** 258:9,16
263:7 314:21
315:23 317:7
320:1,3
**listings** 258:18
259:18,20,22
285:22 286:18
288:11 315:6
**literally** 71:19 83:7
125:7 156:24,25
174:16
**little** 15:11 18:3,24
38:21 39:3 51:21
59:22 65:18 78:3
78:17 95:11 116:9
126:3 128:8
158:17 163:24
188:8 250:12
365:8
**live'** 348:3
**LLC** 1:6 369:2
**Lloyd** 85:7 96:24
97:14,20,22,24,25
98:1,3,3,19 99:15
99:17,23 100:1
101:4,11 177:6
221:23 240:9
276:20 347:16
**LMAO** 185:11
**load** 120:6,9,10,11
120:15,17,18,21
120:23 189:20,24
196:13
**loaded** 220:7

**loan** 119:6,13
138:20 277:13
364:24,25
**local** 271:1
**located** 40:10
293:17 295:2
**locked** 210:18
**log** 218:15
**log-in** 88:9,11,20
**logic** 82:20,25 339:7
339:11
**logo** 285:20
**long** 17:16 24:8
58:25 59:4 96:17
101:15 194:5
216:2 222:10
268:7 307:9
**longer** 93:3 101:17
104:22 113:21
129:8 329:14
**look** 13:3 41:14,17
73:8 112:16 113:4
144:14 172:14,15
182:24 184:10
189:17 191:7
206:22 207:21
226:2 229:15
230:12,18 236:22
238:1 240:14
242:13 243:1
245:7,17 246:17
246:20 256:16,16
263:7 289:10
290:17 292:10
304:16 305:9
310:15 315:25,25
319:24 320:5
325:5,16,18
328:10 329:2,5
332:19 335:1,9
338:14 339:14
345:18 358:20
361:2,4 362:10,13
362:18
**looked** 81:3 172:5
181:7 257:9
282:16,18,20

283:12 290:16,22
292:7 293:15
294:11,25 297:3
303:9,10,15,18
304:20,25 305:4
310:22 312:20
325:1 336:11
**looking** 17:7 68:11
79:13 82:2 84:16
86:9 113:6 123:2
148:25 159:20
175:21 177:13
178:8 179:6 184:6
184:9 191:5
230:24 245:2
250:20 258:8
265:9 283:15
297:15 299:24
303:20 305:2
311:21 330:7
333:3 338:24
343:2,4 345:20
**looks** 42:8 73:19
91:2 106:2 119:11
132:20,22 134:13
142:9 145:18
158:22 163:8
170:15 172:15
194:25 240:12
243:6 258:17
323:18 341:20,21
345:16 348:12
356:23
**Loop** 2:9
**lose** 128:12 166:21
203:20 208:14,25
210:14
**losing** 156:16,23
193:17
**lost** 51:21 213:3
322:23
**lot** 15:1 19:17,19,21
19:23 23:8,14
57:16 69:14,20,22
69:25 70:2 82:7,10
86:10 124:10
127:1 132:4

138:18,19 154:16
187:20 189:13
238:19 239:7
246:21 247:5,11
247:16 251:14,14
253:21 267:10
271:6 287:4,23
288:5 299:8
330:10
**lots** 193:6 290:3
352:17
**love** 12:11 45:23
49:9 114:21 121:3
139:18,19,19
234:2 236:3
250:13 328:1
354:9 365:15,18
**low** 177:22 178:12
**lower** 19:24 125:25
127:12,13,16
129:14,14 192:24
195:14 240:9
318:12
**LP** 348:16
**Luca** 132:25 134:14
135:13 141:17
**luckily** 303:24
**Luisa** 132:24,24
134:13 138:4
141:12,17,21,24
**lunch** 157:7,10
162:1 168:21,25
169:19
**lying** 56:9 210:21
211:10 269:9
297:21 326:20

**M**
**M** 47:15 55:21 56:21
205:16 273:20
**M-I-D-s** 120:4
**magically** 218:19
**mailbox** 60:15,16
**mailcycled.com**
322:20
**main** 7:11
**maintain** 116:6

222:4
**major** 24:4
**making** 227:2
246:21 276:5
281:20 327:2
**man** 27:21
**manage** 20:21 21:3
28:3,14 135:22
153:3 179:18
191:13,21 192:7
192:18 193:1,8
196:23
**management** 24:25
29:4 37:4,5,7,9,19
49:2 226:24,25
**manager** 27:19
28:11 56:1,3,4
105:23 186:11
189:11 248:1
251:22 272:23
**managers** 55:24
62:23 181:10
182:25 187:25
**manages** 177:12
**managing** 15:15,19
16:1,11 113:2,3
186:9,12,23 188:6
188:6
**manually** 81:14
83:21
**March** 35:4 148:1
151:4 210:20
213:4 264:6
**Margulies** 4:23 5:16
271:23 272:21
273:23 278:1,5,8
357:21
**Maria** 132:24,24
134:13 135:13
136:3,7 141:12,17
141:21,24 142:3
146:6
**mark** 66:24 68:4
128:20 286:2
**marked** 11:10,15,20
41:5,8 68:6 72:10
72:15 90:17,23

103:5,8 105:7,12
106:13,18 109:22
110:3,8 111:11,13
115:2,7 123:5,10
132:9,14 140:18
140:23 144:13,17
157:18,23 158:2
162:7,12 170:8,13
183:17,22 202:14
225:2,12 236:14
263:11,13 272:4
272:16 284:22
285:3 291:8,19
298:7,12 320:7,16
323:6,11,12 346:8
346:10 350:15,20
353:16 357:2,16
**market** 139:12
252:12 257:16
261:1 269:21
306:23 318:9
**marketer** 65:12
96:7,13 122:17
**marketers** 23:16,21
40:23 70:19 98:7
**marketing** 22:22,25
23:5,8,9,10,11,14
24:2,7 40:19 70:22
95:4,24 96:1,2
97:15,16,17 98:17
98:18,19 197:2
265:24,24,25
270:14 290:3
330:3 342:17
**markets** 252:8
**Mary** 55:22
**Mastercard** 123:1
124:25 125:12
134:6,8 165:25
167:11
**Mastronunzio**
103:17
**match** 121:9 250:24
282:23 337:2
339:16
**matched** 255:20
317:14 342:14

**matching** 256:24
327:11 328:20
338:1 340:6
**matchmaking**
332:10
**math** 232:6,24,25
234:19,22
**mathematical**
235:21
**matter** 6:8 7:7 22:13
22:15 27:13
188:13 189:13
328:18 330:17
**Matthew** 32:23
**MBrown@MySco...**
105:20
**MBrown@Zoom...**
103:14
**McKenney** 2:4 6:17
6:17 78:7
**mean** 13:3,4 15:4
46:1 59:25 65:7,8
69:25 70:25 71:11
71:25 76:19,24
80:14 82:7 88:13
88:15 94:21 100:4
112:22 114:15
118:8 120:20,20
121:15 124:2
129:2 134:3 142:2
142:3 147:5 150:1
150:2 151:11
156:13 159:20,24
161:7 165:4 173:2
176:11 179:15,19
182:20 183:4
185:25 186:7
189:24 191:21,23
194:12 195:24
196:1 198:17
205:11 209:4
213:6 215:24
221:4 231:24
233:5 247:1,24
248:6 252:14
254:3 258:7
294:10,17 296:5

300:13 313:16
315:12,19 320:22
321:15,23 327:24
331:6,13 333:15
340:9,18 349:2
356:5 359:24
**meaning** 129:3
131:23 343:23
**means** 61:25 76:20
88:11 116:8
190:10 192:6
269:14,19 298:4
311:25 348:17
356:7
**meant** 84:3 152:1
174:23 191:17
245:24 246:24
259:24 283:4
312:2
**measure** 121:20
**media** 169:17,22
268:11,11 285:21
286:17 287:8,11
288:8,10 292:14
**medication** 9:11
**medium** 184:1
**meeting** 58:23
**members** 108:21,22
108:23
**membership** 19:2
129:1 130:12
217:16,17,18
351:22,23 352:1,7
**memberships** 43:15
47:22 48:19 50:8
**memory** 45:5 48:7
52:9 67:13 136:22
170:18 179:25
206:4,7,13 207:15
207:22,23 208:10
209:11 215:16
224:16,23 301:17
345:9
**mention** 99:23
256:19,19 333:12
**mentioned** 24:23
43:18,22 99:19

Case: 1:17-cv-00194 Document #: 206-2 Filed: 03/24/18 Page 116 of 137 PageID #:5193
Brown
FTC v. Credit Bureau Center, et al.                                        12/13/2017

[392]

138:18 191:9
257:12
**mentions** 156:18
**merchant** 104:7
117:24 118:7,12
118:15,16,20,22
119:1,3,4,5,12,21
119:22,23,24
120:1,3 121:4,7,17
121:21 122:3
123:16,21 124:3
125:10 128:12,13
128:18 129:25
130:1 132:23
135:16 137:2
138:12 139:3
140:9,13 141:11
142:16 146:25,25
147:15 148:8
149:21,24 150:3
152:25 153:6,20
155:23 156:17,23
159:9,15 160:7,12
161:11 163:7,9
164:15,19 165:2,7
165:10 166:14,21
167:14 190:21
**merchants** 104:12
104:12,15,22
113:14,16 121:23
125:16 137:5,19
**merchants'** 164:12
**message** 186:2
193:12 260:18
351:8
**messages** 4:13 15:2
170:17 171:3
179:21 189:6,6
274:2
**met** 59:9,11
**metric** 164:2,4,5,7
**Mexican** 364:11
**Michael** 1:10 6:1,19
6:21 12:7 169:6
366:21 370:5
**MID** 120:1 121:12
121:14 130:13

135:19,22 136:18
143:13 145:16
146:1,11
**middle** 81:24 181:22
203:5
**midnight** 136:16
**MIDs** 120:3,19
143:14 191:9
192:12,22 199:4
**Mike** 7:9 112:10
157:24 159:7
193:14 205:16
273:8 279:10,25
280:7,11 281:2
282:5 285:18
286:9 309:10
**Mike@MyScore3...**
91:12 105:19
110:14 133:6
**million** 236:19,22
237:11 240:7,13
240:16 288:24,25
297:22 303:1
310:4,11
**millions** 320:4
**mincing** 340:4
**mind** 39:18 42:11
102:18 119:15
231:12 241:23
256:11 262:6
289:3 358:14
**mine** 52:18 102:10
188:3
**mini** 227:11
**minimum** 37:19
69:11 79:14 247:9
**minimums** 70:10,11
**minute** 41:14 117:9
**minutes** 185:12
228:12 330:5
**mischaracterizati...**
308:1
**mischaracterize**
148:12
**mischaracterizes**
138:2 182:17
362:8

**mischaracterizing**
156:21 159:6
216:23 219:15
240:4 255:17
327:8 332:2 338:8
343:19 359:2
361:11,14 362:9
**misheard** 259:6
**misinterpreting**
154:25
**misled** 301:23 302:7
**missing** 269:15
332:13
**misspoke** 279:17
**misstates** 99:20
114:12 130:15
137:15 234:11
**misstating** 131:7
147:18 166:7
307:22
**mistake** 131:24
234:1,24 283:14
306:18 350:10
**mistaken** 221:5
235:8 264:15,17
311:3
**mistakes** 234:7
241:4,6 302:24
**misunderstanding**
52:16
**mitigate** 126:25
**mixed** 196:15
**MLS** 251:19,25
252:12 256:7
259:22 263:7
267:19 269:7,14
269:17,19,20
314:3,12,12,13,19
314:22,25 315:1,5
315:7,14,17,24
316:1,3 317:22
318:8,19 319:5,7
319:16 321:20
335:23 336:5
343:23
**Mm-hmm** 44:6
53:16 55:20 71:10

79:5 80:2 94:11
96:8 97:7 105:13
107:3 144:25
171:4 173:7 185:8
191:6 208:24
231:17 242:15
245:4 247:20
262:5 263:24
341:2
**model** 20:13,15 67:3
67:8 143:3,9,16
144:2,11 313:24
314:1
**modify** 238:8 282:9
**modifying** 21:25
**moment** 75:19
229:23 232:1
243:17
**moments** 185:25
**monetize** 260:19
342:17
**money** 111:3 128:6
193:17 246:9,21
313:1
**monitor** 172:25
173:20 175:2
**monitored** 62:20
172:8
**monitoring** 20:8,9
29:3,9 31:7,11
32:6,11,15 34:13
57:8 63:5 67:9
125:18 126:4,8,13
128:17 134:9
142:23,24 143:3,9
143:14,16 144:2
166:24 167:19
168:1,4 172:10
173:12,18 352:19
**month** 27:25 30:7
30:11 69:3 108:23
119:7 121:4,5
127:7,17 129:1,12
135:8,9 138:23
149:15 153:13
155:9 157:2
158:18,22 159:24

173:23 229:20
247:9 251:25
252:12 351:25
356:12,13
**monthly** 70:9,11
**months** 108:21
109:13 119:10,15
124:19 125:19,23
162:23 166:4,10
222:18 229:17
230:1,5,6,19,21,22
230:25 232:20
235:13,14 236:23
242:18,21 275:18
278:2,6,19 285:15
356:14 364:8
**Moody** 99:8,10
100:15,15 169:16
**Moody's** 100:23
**mouse** 78:5,6
**move** 84:4 138:13
138:14 191:12
192:17 193:4,7,11
209:16 228:10
272:13 311:6
329:14 344:25
**moved** 228:2
**movie** 90:3
**moving** 130:12
137:24 243:19
**multiple** 49:16 51:3
52:11 54:18,25
56:5 75:5 80:15,20
84:11 85:12 95:6,7
100:6 116:23,24
120:3,19 136:2
137:18,19 138:12
141:11 179:23
181:8,10 187:25
188:1,6,20 190:15
196:17 199:13
219:16 242:9
248:19 255:12
268:6 304:4 315:6
317:4,24 330:8
342:2 359:25
**MyScore** 15:23 16:1

Case: 1:17-cv-00194 Document #: 206-2 Filed: 03/24/18 Page 117 of 137 PageID #:5194
Brown
FTC v. Credit Bureau Center, et al.                                        12/13/2017

[393]

16:5,15 17:5 109:3
**MyScoreDB-Me...**
87:1

**N**

N 3:1
**name** 6:10 28:5,7,8
32:16 33:23 39:24
39:25 40:3,4,5,6
45:9,14 47:12 48:2
54:12 55:10,11,12
76:11 79:15,15
81:23,24 86:25
89:11 92:25 94:6
94:21 95:10 98:25
99:5,10 101:20
103:18 123:25
132:25 133:1
138:5,16 139:3
144:24 169:7,16
170:16 205:15
225:25 266:21,21
271:23,24 293:4
293:12 295:6,15
304:9 363:25
**named** 33:23 98:23
169:21
**names** 42:21 55:21
100:5 105:25
144:23 220:19
292:16,25
**naming** 100:4
**nation** 58:9
**nature** 7:10 32:19
36:21 59:17
262:21
**navigate** 135:18
**near** 73:16,17 111:6
190:1 242:25
**nearly** 22:9 240:13
**necessarily** 47:5
66:14 87:15
126:25 254:6
**necessary** 180:12
356:17
**need** 11:3 36:17
37:1,8,17 44:19

45:4 48:7 50:22
65:17,18 66:10
67:10 68:19 69:20
69:22 70:10 111:7
115:22 119:7
133:21 136:21
138:4 149:7 151:1
161:3 169:11
179:24 192:16
195:24 201:24
202:2 208:10
215:16 242:1
261:5 268:22
278:11 286:24,25
286:25 314:11
321:10 324:1
326:10 334:20
358:18 360:1
362:11 364:23
365:3
**needed** 33:13 34:3
85:13 137:4
199:15
**needs** 358:3 361:18
**negative** 104:12
121:4 139:17
285:21 286:17
287:8,11 288:8,10
292:4,6,14 297:11
335:3,13 336:1
352:6
**negligible** 247:15
**negotiate** 182:11
194:9 195:17
**negotiation** 180:15
180:16,24 182:8
193:24 194:4
195:9,23,24 196:1
213:24 365:2
**neither** 217:6
**net** 112:25 113:1,1
**network** 151:25
177:11 187:25
188:1,23 189:11
**never** 39:18 42:11
87:10,10 110:4
128:16,19 134:7

156:18 189:18
223:24 224:4,6
228:19,24 241:23
267:21 290:6,9,14
293:3,4 294:22
297:3 322:19
323:17
**new** 28:20 104:9,19
108:23 109:14
126:16 127:15
129:10,18,22,23
129:23 130:2,5,12
136:17,17 137:4
137:22 138:1,4,5,5
138:5,5,6,16,16,16
138:17,17 139:24
140:8 145:25
146:13,16,19
148:7 149:10
172:22 185:16
191:9 192:12,21
208:18,23 212:24
219:5,6,7,8 229:2
229:3 234:16
318:21 345:17,25
348:16 363:11
**news** 321:6
**Nice** 321:5
**niche** 257:15
**Nick** 137:20 145:8
145:11,18 148:2,3
149:14 151:24
154:11 155:8
158:11,21
**nodding** 10:12
59:16 106:9
**non-tainted** 211:1
**noncompliance**
42:16 256:23
**nonexcessive** 129:17
**nonexistence** 250:16
**nonexistent** 257:5
263:1
**normal** 125:16
172:22 173:14
288:25
**normally** 198:10,18

**NORTHERN** 1:1
**Notary** 368:22
**note** 13:12
**noted** 184:6
**notes** 51:9
**notice** 3:11 11:24
12:2,6 86:10 143:1
264:4,24 276:14
324:25 325:23
**noticed** 18:13,17
213:17 354:4
**notified** 145:16
288:4
**November** 5:12
108:5 181:22
189:17 285:12
346:24
**number** 3:9 23:13
23:23 41:19 63:19
73:7,9 79:16 82:14
92:6,7,9 118:4
122:11,11 125:19
138:6,17 144:23
146:24,25 159:21
161:11 163:22
170:25 171:1
197:25 198:22
232:4,8 233:1,16
239:10 240:7
243:25 245:14
246:2,6 253:2,10
253:11,14 254:5
254:12 266:7
273:9 279:8,11,22
280:12 281:4
289:8 295:14
299:18,19,21
313:15 319:15
336:2 352:10,14
352:14 361:19
**numbers** 73:5
237:15 240:8
**numerator** 231:19
233:2
**numerous** 40:18
121:24 256:8
355:25

**O**

O 368:3,3 370:2,2
**o'clock** 79:19
**O-f-f-e-r-i-t** 74:10
**oath** 8:11,12 46:24
168:25 363:7
**Object** 239:24
**objection** 13:20
24:20 29:16 36:22
56:25 62:12 89:25
90:1 98:10 99:20
99:24 102:14
108:12 114:2,12
116:13 130:14,14
131:3 155:5,13,20
156:10 164:20
166:18 176:25
182:16 186:20
187:8,17 208:6
213:9 223:17
226:22 234:10,25
235:9 236:8 239:3
239:20 241:11
278:22 283:7
286:11 307:13
308:17 313:11
326:22 327:5
329:19,24 331:2
331:25 333:23
334:6 335:21
336:22 362:7
**obligations** 42:3
69:11
**obtain** 237:20
333:17
**obtaining** 132:23
135:19
**obvious** 242:12
**obviously** 142:3
181:15 212:22
233:16,17 242:20
254:3 264:20
302:24 304:5,15
**occasion** 21:24
**occasionally** 173:25
**occasions** 21:17

58:16 256:9
355:25
**occur** 242:20 282:13
**occurs** 10:22,24
14:6
**October** 173:6
325:19
**offending** 306:13
307:11,16 308:4
308:20,24
**offer** 44:13 71:4
122:3 179:8 180:3
180:7 181:25
182:10,12 184:13
186:9 188:6 191:8
193:16 196:3
257:21,22 258:1
259:8,12 260:10
260:17 261:10,10
261:14,15,18,22
268:17 269:11,16
277:11 355:5
364:22 366:14,15
**offered** 20:7,9,10
140:10 146:10
147:12,23
**Offerit** 74:7,9,25
86:24 87:8,10,16
87:20,22 88:16,19
89:4 249:19
**offers** 183:4 188:3
257:17 268:16
**officers** 277:13
**offshore** 142:1,11
**oh** 17:3 50:14 51:14
59:14 84:4 85:19
111:23 165:16
169:9 178:16
202:20 215:3
225:21 226:8
237:1 296:22
305:4 355:24
363:17 364:13
**okay** 6:7 7:7 10:1
11:7,8 13:24 14:7
14:8,16 16:10,23
17:12 24:14 25:19

32:19 34:3 39:5
41:14,22 43:18
44:4,5 46:5,7,16
47:1,18 48:15
49:23,24 50:6,7,13
50:13 51:4 52:19
53:12,15,18,19
54:22,23 55:18
56:11 59:14 65:9
67:1,1 68:24 70:13
70:15 71:9 72:4,23
72:24 73:15,23
74:1,5,22 75:9,12
75:12 76:20 77:3
77:12,15 78:2,18
79:21 80:25 81:5,7
81:12,23 82:2 83:1
84:3,3,15 85:19,22
86:2,19,21 88:4
89:2,6,6,15 91:4
91:21 93:2 98:16
99:9 102:11,25
104:5 106:8
108:18 109:17,19
109:19 110:2,25
111:10 112:10
113:1,25 114:22
117:18 122:23
123:3 129:22
131:16 132:1,3,13
133:12,19 134:22
140:16,22 141:24
144:4,8,23 147:19
153:8 157:5,15,22
158:21 162:2,11
165:6 168:16,24
169:5,24 170:6,12
170:21,24 171:11
171:13,16,21,24
173:5 174:19
175:18 176:14
177:13 178:1,3,5,8
178:10,20 179:2,5
181:6,21 183:21
184:1,3,8 185:5,7
189:14 190:9
191:4 193:11,19

197:1,4,16,19
200:6 202:11
207:21 208:21,23
210:14 211:19
215:5,6 225:7,17
225:23 226:2
228:10,10,21
229:6,16 230:12
231:4 232:2,4
234:12 237:1,18
237:18 243:10,18
243:19 244:20
245:2,7 247:18
251:3 252:19
253:13,15 254:21
255:8 258:1,2
259:4 260:3
262:11 263:10
268:3 270:16,20
271:2 272:2,9,13
272:15 273:7
274:17 276:3
278:24 281:10,13
282:3 284:18
285:2,25 290:14
290:18,20 291:6
291:18 292:12
295:3,4,11 296:14
296:22 297:1
298:5,17,18 299:4
299:4,11,12,18,19
299:23 300:1,7,20
300:21 301:20
302:3,6 303:14
305:4,16,17 309:8
309:20 311:4
313:17 316:14
319:23 320:15
325:7 328:15
333:14 335:1,14
336:7,8 337:25
338:5 343:6,12
344:24,24,24
345:13 346:1,5,7
347:1 348:1,2,7,11
348:12,16 349:4
349:12 350:13

351:3,5 352:2,17
353:20 355:8,13
355:24 356:22
357:8 358:20
362:25 363:2,17
364:17,17 366:20
**old** 129:11
**once** 16:8 179:12
194:14 199:7
201:12 306:11
307:15
**ones** 231:11 276:8
290:13 298:1
329:4 333:12
363:18
**online** 146:20 147:8
159:18 181:8
182:25 187:23,24
249:17,20 250:4
254:23 303:25
322:7
**open** 112:17 122:2
126:18 129:5
135:15 364:2,6,9
**opened** 53:22
363:10,22
**opening** 76:10
**operate** 59:23
238:10
**operated** 89:17
99:11 259:15
**operates** 36:2
**operating** 100:15
**operation** 78:25
180:13 194:17
223:6
**operations** 58:13,15
62:19 217:23
**opportunities**
260:14
**opportunity** 129:4
168:5 240:25
260:16 329:15
**opposed** 166:10
**opposing** 237:8
**opposition** 237:4,5
**option** 104:12 121:4

126:17 133:21
137:24 138:8,13
139:17 143:11
144:2 223:6 352:7
**options** 142:2,12
143:13,16
**order** 23:2 34:12
51:20 61:1,8 68:20
69:21 86:7 111:7
119:19 149:16
192:8 204:19
205:20,21 217:17
217:17,18 222:2
227:4,15 238:9
274:13 349:8,9,13
349:18,22,24
350:2,3,5,6,7,8,11
351:5,14,14,17,21
352:8,11
**orders** 4:17 23:2
109:14 130:2
149:10,18,19
150:10 202:23
**organization** 187:21
**organized** 53:17
**original** 76:23
**outcome** 8:4
**outline** 75:20,23
**outside** 53:5 55:5
277:20
**outstanding** 112:17
**overall** 62:4 230:22
**overnight** 215:21
**overseas** 40:10
**oversee** 28:25
245:16 247:19,24
248:2
**overseeing** 29:2
248:4
**overwhelmingly**
352:23
**owe** 112:20 115:16
**owed** 103:24
**owes** 110:17
**owing** 106:5
**owned** 7:12 35:9,12
38:4,6 50:4 159:18

196:21 257:18
**owner** 13:5 16:3,13
  26:9 37:12 147:20
  185:11 255:21
  326:10 327:23
**owners** 169:15
  326:13
**ownership** 35:20
  36:11,14,15,20,21
  207:10 209:6

———————

**P**

**p.m** 133:20 134:15
  148:2 171:25
  185:6 189:18
  191:5,8 193:14
  194:23 197:20
  199:1 245:8
  305:20,25 309:11
  309:16 349:7
**packet** 5:6 298:13
**page** 3:3,9 12:5
  67:20 68:11,12,13
  73:4,5,6,9,14,15
  73:18,20 80:16,17
  112:7,9 113:4
  116:18 117:4
  132:1 133:12
  134:12,20,21
  141:19,22 142:19
  146:15 148:19
  151:23 157:6
  171:16 172:12,14
  172:21 173:6
  174:20 175:20
  177:19 178:1,2,7,9
  178:10,14,15,16
  179:2,5 181:23
  184:5,9 185:5
  189:16,25 191:4
  193:12,13 194:22
  194:23 197:19,25
  198:2 211:15,15
  211:17,18 212:3,4
  212:13 226:3,4
  244:22,24 251:5
  252:24 272:24

273:2,4,7,24,25
  275:24 285:11,20
  295:3,5 298:19,20
  299:11,14,15,17
  299:19,20,21,24
  300:7,10,23 301:7
  301:18 302:6
  305:17,18,21,24
  306:4 309:8,9,11
  311:4,8,12 325:17
  325:18 326:9
  328:7,7,8 329:6,9
  329:10,10,10
  335:1,2,7,7 336:16
  336:17 339:1
  345:13,16,18,21
  348:3,10,15,15,17
  349:6,8,13,13,15
  349:15,24 350:2,7
  350:9,11,24 351:2
  351:6,16,17,19,20
  352:5 361:4,5
  362:4 369:5
**pages** 21:25 61:20
  184:6 345:4,7,14
  347:2,6,8,11,15,21
  347:23 349:8,19
  350:4,25 353:9
  368:8
**paid** 37:20 61:8
  114:19 116:10
  194:1 195:11
  356:8
**paragraph** 42:2,5
  68:12 109:12
  329:7 347:1 348:1
  358:22
**parallel** 140:15
**parameters** 149:21
  149:24 150:2
**part** 18:16 34:9
  37:22 39:6 46:1
  54:20 77:10
  108:10 139:12
  147:14,15 190:4
  199:12 210:16
  250:12

**part-time** 18:11
**partial** 204:3
**particular** 21:20
  52:2 53:1 81:18
  132:19 137:23
  166:2 237:10
  249:14 256:10
  257:15 296:12
  309:6
**partner** 19:9 65:24
  96:20 98:23 99:10
  100:11 155:12
  177:21 178:11,22
  179:3,16,17
  181:13 182:5
  184:11,18,20,25
  185:23 186:3,15
  186:18 188:4,9,16
  196:20 289:16
**partners** 35:18
  66:22 114:18
  178:24 180:25
  186:23 188:21
  212:24 301:6
  359:25
**partnership** 23:10
  40:20
**parts** 224:17
**party** 306:13,16
  307:11,16 308:4
  308:20,24 365:2
**pass** 86:1,6
**passing** 86:16
**password** 61:1
**paste** 304:2
**pasted** 47:16 293:16
**pattern** 301:13,22
  306:12 307:15
**pause** 340:23
**pay** 28:2 102:11
  103:1 104:9,11
  111:3 112:23
  116:3,17 139:18
  175:12 195:10
**paying** 102:25
  113:25 116:9
  246:22

**payment** 107:19,25
  110:23 112:25
  113:8,10,10 114:8
  116:11,24 117:2
  352:4
**payments** 107:23
  115:23 117:17
  124:22 145:9
  158:12 358:24
  361:7
**payout** 180:18
  195:18
**payouts** 182:11
  274:12
**penalty** 8:16 166:16
  166:22
**pending** 11:5
**people** 10:22 19:17
  19:23 21:18 30:24
  59:14 77:22 100:6
  136:1 139:15
  179:23 183:2
  196:16 202:8
  222:7,8 241:4
  244:11 246:6,10
  248:18 258:8,9
  264:12 265:21
  266:1,12,13
  268:13 270:4,6,8
  270:10,12 273:10
  273:15 274:4
  276:5 277:13,14
  277:20 278:24
  280:10,16,16
  282:1 283:18
  284:2 287:16
  288:25 290:3,5
  296:4,7 303:1,6
  312:7 315:10
  316:3 317:4
  323:23 330:7
  338:12 340:21
  344:23 352:17
  354:20,24 355:2
  355:19 360:4
**percent** 28:9 122:8
  146:5 163:16

165:7 175:23
  193:17 195:2,13
  196:6 197:4,7,7
  198:13,23 199:3
  199:17 233:19
  238:4 348:19
**percentage** 134:11
  166:9 198:9
  232:12 243:4
**perfect** 195:7
**perfectly** 217:16
  296:3 330:1
**performance** 348:25
  349:2
**performing** 66:15
**period** 18:9 20:22
  25:22 31:12 33:1
  37:23 44:17 47:18
  55:2,15 101:17
  126:6 137:18
  167:18,25 333:22
  347:16 351:24
  352:25
**periods** 54:16,17
  102:16 114:15
  139:8,10
**perjury** 8:17
**permission** 314:9,11
**perplexed** 331:9,18
**person** 7:24 8:2
  136:3,5 179:13
  186:8,9 273:8
  276:14 281:20
  282:25 307:2
  326:16 330:9
  338:21 341:16,17
  342:3
**personal** 59:19
  147:12,14,22
  205:14 349:16
**personally** 9:3 39:1
  64:12 110:4
  254:16 282:16,20
  296:3 338:15,19
  338:22 340:11
**personnel** 65:1
**perspective** 288:20

Brown
Case: 1:17-cv-00194 Document #: 206-2 Filed: 03/24/18 Page 120 of 137 PageID #:5197
FTC v. Credit Bureau Center, et al.                                    12/13/2017
[396]

289:11 302:21 303:1,7 310:3
pertaining 1:13
pet 255:2,10 318:17 318:22
pets 319:12
phase 28:21
Phillips 1:14,20 370:4,16,17
phished 323:25
phishing 324:1,2
phone 23:19 58:7 62:3 63:5,10 79:15 82:13 92:6,7,9 138:6,17 156:1 170:25 171:1 227:7 231:5 279:4 279:22 283:17 295:14
phony 250:11,16 274:12
phrase 148:17
phrased 38:5
PI 3:15 15:1,3,4 65:22 72:18 203:24 204:14 210:13,15 214:12 214:16,23 215:7 215:13 284:4,10 288:22 299:7
pick 120:21
picking 329:4
picks 161:12
piece 34:10 227:16 227:21 304:23
pieces 31:8
Pierce 85:7 89:10,15 89:16,20 90:7,8 91:5 92:17,22 93:2 93:9 94:9 96:17 98:17 101:4,5,9,11 101:15,18 102:1 122:14 149:6 170:2,18,20 171:9 171:19 174:13 175:9,13,13,17,22 176:4,6,10,23

177:3,8,20 178:10 178:21 179:14 180:11 181:2,22 182:4 184:3,11,18 184:25 188:16,20 188:21 189:8 190:23 195:12 197:1,12 199:10 199:18 215:10,12 221:22 230:15 232:15,21 233:18 233:20 236:19 238:5 240:9,12 243:21 244:5,22 245:9 246:4 248:17,21 249:12 250:3,24 251:11 251:11,17,19 252:3,5 254:16 255:19,24 256:1 257:15 259:11 266:2,17,22,25 267:8,9,16,18,24 268:1,12,20 269:2 276:19 277:6,9 282:9,14,23 286:21 287:21 288:21,23 289:12 289:18,21 290:10 293:23 295:22,24 297:21 303:1 305:14 312:13 313:9 314:16 316:2 317:3,19 318:2,6,24 319:3,6 319:18 320:21 321:19,22,24 323:20,22 324:12 324:16,17 326:12 326:18,20 327:1 327:10,15 328:16 329:16,22 330:22 330:25 331:4,21 333:20 334:3 335:17 336:19 337:7,10 338:5 340:11 342:7,11

345:17 347:16,18 354:25
Pierce's 92:7,9 172:8 173:1,20 186:24 188:16 190:25 193:20,21 195:6 200:12 201:5,22 202:6 229:12 249:6 260:4 261:25 313:24 316:8,10 316:12,23 317:8 343:8 344:17 347:19 348:2
Pirtle 115:12
pissy 181:24
place 58:23 75:10 80:15 142:20,22 143:4,18,25 153:21 250:23 254:19 338:16 340:12 342:19 350:7 351:21 359:9 370:10
placed 27:9 301:7
places 249:17
Plaintiff 1:4 2:2
plan 108:10 109:2 129:23
planned 108:1
platform 24:3 35:21 36:1,4 50:3 75:1,3 75:6 86:24 87:24 358:16 359:25
play 56:4 102:3,4
playing 58:7 274:10
please 9:19 10:24 68:10 73:3 113:10 128:8 137:12 139:9 144:15 146:16 158:6 159:7 172:16 173:5 175:20,25 177:18 187:14 189:15 213:12 229:8,23 231:6 240:1 244:22

274:22 275:2 290:9 298:19 303:7 305:16 311:9 313:18 324:4 326:2 332:24 333:8 345:16 350:24
pledging 164:1
plugged 347:19 360:21
plus 115:17 186:1 245:16 247:19 303:11,13 310:5 313:2
point 28:22 29:12,12 29:19 34:24,25 35:2 60:8 63:3 64:15 83:16 86:5 86:15 96:19,25 100:18,21 101:3 101:11 121:16,21 126:13 161:9,23 168:8 174:19 178:17,19 181:17 188:5 189:25 203:20 208:3 210:7,8,13,14 213:2,21 221:23 235:21 239:10 246:3 250:6 259:19,21 261:15 269:15 271:4 293:9 316:17 335:25 340:10 345:1,3
pointed 121:1
pointing 127:12 216:8 220:4
points 7:11
police 271:1
policies 104:10 121:3 124:4
policy 52:23,24 53:3 53:5 64:24 104:21 122:1 124:6,13 131:17 306:11 307:15 356:2,19

358:16,22,25 359:9,16 360:14 360:17 361:6 362:1
poor 261:2 267:5 291:13
pop 263:7
Popovetsky 218:23 220:24 222:4,19 222:24 224:11 225:18 226:4 228:17
Popular 364:10
portfolio 165:22 166:3,15 168:9
portion 3:15 24:4 72:22 168:17 238:10
position 17:12,13,16 17:23 28:4 39:14 39:15 189:13 307:1
positive 364:25 365:3
possibilities 358:12
possibility 154:22
possible 8:9 100:4 119:2 233:6 236:1 253:19 359:13
possibly 273:25 301:17
post 245:14,15,16 246:9,14,22 247:19 253:14 264:12 290:4 317:19 324:21 366:1
posted 248:7 249:18 249:20 252:5 256:1 295:10,24 307:3 322:7 365:13
posting 246:4,5 247:1 253:20 257:4 265:22 267:12,17,22,25 268:2,21 269:3

Brown

FTC v. Credit Bureau Center, et al.                                    12/13/2017

[397]

274:5 277:14
288:17 289:22,25
290:2,10 312:13
312:19 314:6
postings 310:23
posts 251:6,8 324:20
potential 306:12
307:16 334:24
potentially 88:10
power 104:9,10
139:18 217:11
219:23
powers 219:18
practice 121:7 324:7
330:2 355:6
practices 58:8 61:9
precise 65:7 217:22
328:11
precisely 30:5
predefined 150:18
predicted 88:10
prediction 166:4
preferable 118:11
preferred 239:8
preliminary 39:8
168:7 204:6,8
206:2,6,9 207:1
208:9 210:2,6,8
214:5,9 217:13
218:7 219:9
220:16 221:13
226:20 228:6
236:11,13 237:5,9
237:23 238:14,18
239:2 241:8
prep 17:6 212:23
preparation 14:22
15:8 46:2 204:5
210:1 227:5
prepared 203:22
217:13
presentations 78:14
presented 101:7
236:12 242:7
288:23
presenting 76:22
presently 45:6

president 346:18
presumably 342:21
pretending 321:24
pretty 13:6 21:14
28:2 51:9 172:8
217:14 331:18
prevent 149:10
previous 10:23
121:2 205:21
239:7 251:23
272:11
previously 15:23
143:11 177:6
193:24 240:19
294:7 352:8
price 19:24 193:16
350:11 366:14,16
366:17
pricing 69:13
primarily 63:5
principal 169:15,20
principals 99:6
100:14
print 73:20 220:10
323:23 366:3,5
prior 29:10,10 178:6
204:20 210:5,8
218:6,6 230:6
364:15
Privacy 43:8
private 198:19
probably 7:6 13:7
36:7 51:3 76:9
127:13 163:7
189:19 213:17
246:22 250:2
315:20 357:6
problem 122:21
132:3 240:20
291:11 354:20
problems 139:6
156:9
Procedure 1:12
224:1
procedures 57:9,13
57:22,23 58:8 61:9
62:10,21,25 64:14

167:11 275:9
proceed 12:22
proceeded 227:11
proceeding 27:12
process 34:11 61:16
61:18,19 64:10
80:19 104:16
119:7,12,18
129:12 135:19,20
137:5,6,21 148:7
154:10 167:5,12
192:4 215:21
222:11 223:7
247:1,2,3 310:15
317:1 324:6
326:16 334:10
336:24 344:15
351:15 354:4
processer 4:4
104:11 119:4,11
123:15,16,21
128:13 129:3,11
129:15 135:14
140:9,13 141:25
142:10,16 150:18
153:20 156:17,17
160:7,13 163:7
165:7 166:2,14
processes 57:8,12,21
57:23 62:21,25
64:13 82:19 275:9
processing 104:19
113:15 119:3
138:20 139:12
140:2,4,6,7,11
142:11 144:6
146:4 150:3
166:21 167:2
190:16,21 196:9
processors 118:12
118:15,20,22
119:1,21 121:17
produce 45:23
48:13 61:2 233:9
produced 45:22
46:1 76:13 86:25
170:19,23 233:8

233:10,11 304:17
producing 204:21
product 79:10
products 34:8 330:6
342:18 353:1
Professional 370:17
profile 77:5,13,14
84:20,20 113:20
profiles 77:11,12
121:1 183:1
profit 246:17
profitable 114:6
119:20 131:19
profits 184:13
245:18
program 125:18
126:3,5,8,13
128:17 134:9
167:19 168:1,4
173:19 260:22
274:4
programmer 40:14
programming 18:7
programs 125:15
167:9 275:1
prohibited 104:13
prohibitive 67:24
69:10
prohibits 224:1
project 270:3
272:23
promise 73:12
161:25 162:3,3,4
357:13 365:22
promising 44:11
45:3
promote 188:2
prompted 107:14,14
pronounce 40:6
pronouns 46:10
properly 313:7,9
properties 82:9
244:12 250:11,16
250:17,21,21
251:15,18,20
252:2 253:20
256:1,6,14,16

257:5 258:20
262:17 263:6
269:8,17 277:17
282:15,17 283:13
297:18 307:8
312:8,14,15 314:7
314:17 315:4
318:10 319:8
320:4 337:15
property 251:21
252:5 254:20
255:7,11,21
256:12 258:19
259:18 263:2,4
267:14 269:21,23
293:12,17 294:25
295:2,24 302:18
304:4,6,7,19
305:11 306:21,22
314:21 316:8,10
316:13 317:3,5
318:15 319:4,9
320:1,1,2,25
321:21 324:12,13
327:10 328:2,12
329:12 331:15,17
331:21 337:1,24
343:16,17,21,21
343:22,23
proposed 107:19
113:10 246:2
proprietary 198:21
prospective 72:2
250:18,24 253:21
255:20 282:23
288:24 297:22
310:4 317:5,9
329:7,13 330:19
332:11 336:25
337:21 342:15
provenance 229:10
provide 31:8 32:6
35:25 36:19 82:18
85:5 149:2 258:11
262:24 354:12
provided 31:5,6,11
32:10 36:1 37:5

FTC v. Credit Bureau Center, et al.                                    12/13/2017

[398]

76:23 92:14
163:18 192:8
241:21 258:11
358:2 361:21
362:16
**provider** 33:14
35:15,24 36:13
124:4 205:9,10
289:17 358:18
**providers** 141:11
148:8
**provides** 71:12
**providing** 317:16
**proving** 239:9
**Public** 368:22
**publicly** 187:23,24
**published** 311:22
312:7 314:20
**Publishers** 190:12
**publishing** 314:20
**pubs** 189:19 190:12
**Puerto** 270:4,13,23
364:12,13
**pull** 34:13 69:5
75:17
**pulled** 256:20
**pumping** 274:11
**purchased** 147:9
**purchasing** 67:9
**purge** 221:8
**purged** 219:21
221:3,4,16 224:19
**purported** 113:18
235:22 260:23
**purportedly** 104:8
125:6 227:18
**purpose** 33:11
**purposes** 76:15
85:12 299:16
**pursuant** 1:11 14:17
**push** 181:24
**put** 53:12 75:10 76:2
89:8 124:21 127:4
127:5 128:2 158:5
190:15 214:17
243:19 277:10
288:19 289:11

290:19 302:25
303:7 345:23
366:11,14,15,16
**puts** 83:21
**putting** 185:15
249:13 273:10
302:21 310:3

---

**Q**

**QA** 55:5 57:8 62:21
**QA'ed** 61:10
**qualify** 274:13
**quality** 61:11,12,16
61:18,21
**Qualman** 145:8,11
158:12
**query** 205:12
233:15,16 236:1
**question** 9:20,22
10:2,17 11:5,6
13:16 23:7 24:21
29:17 30:1 31:16
31:22 39:17 57:1
65:18 67:4 84:25
88:10 96:15 98:11
98:14 102:15
108:13,15,17
114:3 116:14
128:20 130:7
135:25 153:14
155:6,14,21
156:11 159:3
164:21,23 166:19
166:20 177:1
182:19 186:21
187:9,13,18
191:19 192:19
199:9,12 202:4
206:23,24 207:3,8
207:12 208:5,23
213:11 214:3
224:4,8 226:23
228:5 230:4
234:11,17 235:1,3
235:5,10 237:15
239:4 240:2
249:10 259:10

267:20,23 271:13
271:15 278:4,23
280:24 281:1,5,7
283:8 286:2,12
296:17,19 308:18
314:15 318:1
319:2 326:23
329:20 331:3,8
332:1 333:24
334:15,18 339:13
339:14,25 341:7
359:5 362:13,23
364:5
**questioner** 223:10
**questions** 9:2,2 10:2
12:12,15,23 51:21
61:20 80:19
168:16 213:12
223:14 237:19
272:8 296:15
326:2 330:21
331:10 363:9
366:24
**quick** 28:2 167:13
214:12 231:25
317:1
**quickly** 69:18 90:14
129:17
**quite** 29:11 61:18
137:17 259:1
331:11
**Quora** 249:22
**Quora.com** 249:23
**quote** 163:1
**quotes** 124:18,21
128:2
**quoting** 130:16,17
130:18 163:4

---

**R**

**R** 2:8
**radar** 126:9 275:15
**ran** 54:10 58:17
95:19
**random** 51:20
**rank** 354:5 355:14
**rate** 118:16 121:12

122:5,7,10,10
130:6 134:1
190:25 192:21
194:7,20 195:13
196:5 197:13
200:4,12 201:5,6
239:16 349:3
**rates** 118:21 119:1
119:18,19 201:9
233:21
**rating** 303:11,13
310:5 313:2
**ratio** 125:21,22,24
125:25 167:16
**ratios** 167:24
**ravaged** 270:13
**raw** 216:11 219:19
**reach** 29:6 116:24
164:2,4,5,7 232:8
329:13
**reached** 31:25 90:9
91:5 100:21 142:5
146:2
**reaches** 101:6
**reaching** 93:5
**reactions** 215:9
**read** 41:23 42:6
74:23 100:2 102:5
102:6 108:14
137:13 154:21
155:3,7 179:24
187:15 189:21
200:22 201:1
265:7 368:7
**reading** 108:14
192:14 358:9
361:12
**reads** 41:25
**ready** 191:10 229:24
262:12
**real** 39:25 40:3,4
82:7,10 214:11
231:25 234:2
256:16,17 257:9
263:3,7,7 265:24
268:2,21 269:3,8
274:25 277:11,12

277:13 282:17,18
283:13 290:12
293:21,24 296:8
297:19 303:10
312:14,21 313:5,8
317:1 338:1
344:18 365:19,20
365:21
**reality** 127:8 188:10
**realize** 30:14 54:19
235:24 303:7
**realized** 166:6
**really** 51:14 89:8
115:22 167:13
181:24 188:13
216:16 238:7,8
283:4 328:18
356:16
**Realtime** 370:18
**Realty** 82:10
**reason** 18:16 22:14
67:20 87:6 100:20
104:6,23 118:3
122:24 124:8
129:19,21 130:4
169:22 193:8
195:17 200:5
267:6 277:8,15
322:17 325:24
326:1 369:5
**reasonable** 296:3
330:1 355:3 356:3
**reasons** 18:20 19:14
69:14,25 118:4
193:6 266:7
269:24 289:8
313:15 323:22
328:13 331:24
**recall** 7:5 14:25
17:10,17 18:23
23:18 24:8,9,11,13
25:6,24 27:7 30:3
33:8 35:3 37:21
38:19,23 40:4
42:19,21 43:13,24
44:18 45:6 50:21
50:25 51:19,23

FTC v. Credit Bureau Center, et al.                                                   12/13/2017

52:2,6,21 57:5,10
59:2,20 67:25
68:14 73:23 79:2
81:7,9 88:22,23,23
89:1 92:13 93:13
93:16,23,24,25
95:10,16,17 99:6
99:11 104:25
106:5 107:12,16
132:21 133:1
145:22 156:12
160:22 169:18
171:7 176:15
180:1,2 181:4
207:5,14 208:16
209:4,6,8 210:16
210:17 218:17
221:15 227:7
229:13 238:6
249:19 250:1,3,7
258:13 260:18
268:5 269:4
282:11 284:6
290:1 292:11
294:5,10 298:25
299:4,9 300:22
303:23 304:10,13
304:18 325:3
355:11 364:7
366:2
**receive** 115:23
304:12
**received** 26:24
101:19 102:8
141:16 301:5
309:18 342:21
**receiver** 207:2
208:11,15 209:5
210:17 212:18
215:15 218:9,14
220:18,21 227:6,8
**receivership** 39:2,10
207:10
**receiving** 152:16
300:22
**recognize** 11:19,23
13:23 19:22 41:12

89:5 90:24 92:1,6
103:12,17 105:1,4
105:15,22 111:17
111:25 115:8
123:11,19 132:15
132:18,19,25
133:2 140:24
144:15,21 158:3
162:13 170:14
183:23 202:18,19
263:17 272:17
280:17 285:4
291:20 298:20
299:12,14 300:2,8
306:6 309:13
320:17,18 323:13
346:21 350:21
353:20 354:16,24
355:19 357:17
**recognized** 341:12
**recollection** 22:8
23:15 44:10 89:12
91:5 207:25
225:15 226:9
**recommendation**
27:10
**record** 6:14 8:22,23
8:24 9:24 49:8
75:19 78:17 84:19
94:1 117:8,11
137:13 168:20
183:6,8,10,13
187:15 200:7,9,22
200:24 201:1
205:16 244:1,3
262:7,12 290:19
**recorded** 61:6 66:20
79:1,3 80:9 83:23
84:1 118:21
151:11 370:7
**recording** 61:8
66:23
**recordings** 61:14
62:9
**records** 205:14
284:11 301:21
**recreate** 217:9

240:22
**recruit** 270:4
**recurring** 104:16
**redirect** 248:22,23
**reduce** 128:22 129:7
130:9,10,20
131:18 353:6
**reducing** 127:21,23
127:25 128:21
130:23 131:10,16
**redundancy** 121:10
**redundant** 72:5
**refer** 16:4 19:8,11
36:17 72:25 73:1
74:23 79:21,23
84:17 86:3 89:20
179:23 188:16
192:9 194:11
264:22 349:15
**reference** 37:1,8,17
45:4 131:22
152:24 247:21
268:22,25
**referenced** 51:5
147:16 159:9
269:6 332:16
**references** 287:8
**referencing** 269:4
**referral** 85:24 96:19
98:22 100:11
**referrals** 96:18
100:23 101:1
**referred** 71:17
96:20 98:23 99:1
100:12 146:8
153:20 169:14,15
179:20,21 216:13
268:11,11,12
**referring** 22:12 37:2
37:2 44:23 47:5,6
73:14 89:21 109:5
116:19 120:15
131:1 144:6 152:6
179:13 182:4,6
184:18,25 211:24
216:12 230:6
249:18 251:8

255:15 264:20
266:15,16 299:17
299:20 347:22
349:20
**refers** 77:7 81:9
82:4,16 84:7 180:7
188:20 342:22
**refilled** 169:3
**reflect** 174:9 243:7
243:11 360:16
362:21
**reflected** 38:10,14
48:23 50:9,12
235:8 237:5
**reflecting** 48:9
**reflects** 136:21
165:4 360:24
**refresh** 45:5 48:7
67:13 91:4 136:22
170:17 179:25
206:4,7,12 207:15
207:22,23,25
208:10 209:11
215:16 224:14,22
225:15 301:17
345:9
**refreshes** 226:9
**refreshing** 52:9
**refund** 117:25 118:2
118:5,8,11 119:9
119:18 122:7
131:20 242:13,19
242:24 243:2,3,8
279:14 310:19
354:10 355:5
356:2,5,5,7,11
357:24,25 358:1,2
358:4,8,16,23
359:9 360:15,23
360:24 361:3,7,9
361:20,20,25
362:16,19,20
**refunded** 43:15
48:21 53:10 63:8
310:19 356:12
358:12,13 359:10
359:14,14 360:19

361:19,22 362:16
**refunds** 4:17 50:11
202:23 240:6,12
240:14 242:20
354:15 355:2
356:20 359:8,17
359:18,21 360:1
362:6
**regarding** 21:18
38:25 39:4 125:13
146:3 164:12
194:13 265:4
283:21 365:5
**regardless** 328:19
**Registered** 370:17
**regularly** 155:24
171:8,10
**regulations** 43:10
142:13 165:25
**rejecting** 234:9
**rejection** 358:4
**relate** 152:13
**related** 18:18 24:1
34:15 274:18,20
274:20,25 286:21
289:20 304:22
**relating** 306:19
**relationship** 32:20
49:2 95:12 100:7
101:10 129:4
143:9,10 167:21
250:9 344:22
**relationships** 30:20
137:18,25 138:12
142:7 318:2,6
**relative** 370:12
**relevant** 66:14
221:17
**relied** 135:21 147:15
236:10 237:8
**relinquished** 209:8
214:9 218:6
**rely** 203:9
**relying** 135:18
**remedial** 166:23
**remember** 19:14
21:20 22:18 27:20

27:23 28:18 29:20
30:4 39:1 40:3
45:9,14,16 46:12
47:12,14,14,18
48:2,14 51:5,17,25
55:15 57:6 58:20
60:16 75:9 82:4
86:3 90:10 94:19
95:2 99:5 133:4
136:20 146:7
169:20 181:1
200:21 202:1,5,6
206:8,19,20 212:1
226:8 236:20
251:2 265:3
268:24 269:2
282:10,11 303:17
311:15 353:2
366:15,17
**remembered** 102:1
169:6
**remembering** 10:18
**remembers** 206:16
**Remind** 163:21
**remodeled** 254:24
255:9 318:17
**removal** 273:9
**remove** 311:21
349:8
**removed** 204:17
205:6 221:23
**removing** 227:4
349:18
**rent** 250:16,17,22
253:20 256:2
257:12 258:8,18
259:13 307:8
309:22 317:4
329:12 330:10
337:1
**rent-to-own** 256:12
257:22 258:12
259:14,15 260:22
260:24 261:3,4,5
268:17 269:7,16
269:18 275:1
342:18

**rental** 244:12 247:3
247:5 251:20
257:16 258:5,16
258:17 259:8,9
264:16 267:13
275:18 314:7
344:15
**rentals** 251:17
**rented** 321:7 334:8
**renter** 250:19,24
255:20 256:25
282:23 317:6,9
327:10 330:19
334:11,14,21,24
337:1,23 342:15
**renter's** 327:19
**renters** 253:21
288:24 297:23
310:4 332:11
339:17
**reopen** 165:17
**rep** 17:25 141:10
**repeat** 39:17 137:11
137:12 141:18
187:13 214:22
230:4 235:5
259:10 305:22
**repeatedly** 114:10
**rephrase** 10:5 30:18
31:21 38:3 54:16
56:15 60:21 98:15
108:15 159:3
235:6 241:14
260:2
**replaced** 205:15
**replacement** 21:2
133:22
**replied** 339:15
**replies** 143:17
252:19,24 253:3,7
253:15,24 254:14
254:17 324:20
330:11
**reply** 148:5,13,16,17
148:20 155:2,7,7
155:10 246:7
265:20 266:6,6

267:3,6 289:2
296:4 306:22
310:12 313:13,14
326:18 337:3
344:5
**replying** 330:18
**report** 4:16 22:2
44:16 73:20 79:14
86:11,13 158:22
180:7 182:12
183:4 196:3
202:22 203:2,9,22
204:5,13 215:11
217:10 218:12
230:7 233:7,8,9,10
233:11,15 235:25
238:23 250:25
256:19 261:6,10
264:5,14,23,25
268:16 317:10,13
317:14 318:12
324:5,7 327:12
330:19 332:18,20
332:21,25 333:1,9
333:12,13,17,22
334:4 335:3,13,19
336:1,12 337:4
343:13 344:6,14
**Reported** 1:20
**reporter** 1:15 9:23
10:15 11:12,17
28:6 41:10 68:8
72:12 74:8 79:23
90:19 103:10
105:9 106:15
109:24 111:15
115:4 123:7 128:7
132:11 139:9
140:20 144:19
157:20 162:9
170:10 183:19
187:14 202:16
225:4 263:15
272:6 284:20,24
291:10 298:9
320:9 322:25
323:8 334:17

346:2,12 350:17
353:18 356:23
357:4 363:17
365:17 366:25
370:17,18,18
**reporter's** 8:20
**reporting** 21:13
301:24 302:8
**reports** 20:10 22:6
34:13 69:6 71:22
82:22 205:10
324:16 332:16
334:9 344:11
**represent** 41:15
72:21 74:1 170:19
181:9 268:3
298:13 300:12,17
320:3,19,20
**representative** 12:9
115:13 123:21
141:10
**represented** 256:8
257:18 260:16
267:18,21 268:1
268:14
**representing** 188:2
**request** 150:4,5,8
153:23 154:7
155:22 156:25
175:16 333:17
**requested** 137:14
187:16 201:2
285:19 323:22
**requesting** 175:17
**requests** 149:17
160:7 175:15
357:24 361:19
**require** 7:23 123:2
**required** 67:8
**requirement** 344:4
**requires** 215:23
319:10
**reread** 108:16
**rerouting** 121:14
**resent** 300:19
**reserve** 124:9,19
366:23

**reserves** 124:10,14
**reset** 61:1
**resided** 203:25
**resolution** 61:25
**resolve** 62:1
**resolved** 62:7
307:21
**resolving** 306:20
**resource** 245:15
**respect** 7:16 64:19
160:20
**respond** 93:5 114:11
114:17 159:2,4
163:11 185:12
191:10 197:6
198:10 245:13
274:17,18 285:25
289:6,7 292:1
298:2
**responded** 126:15
185:3 316:4
**responding** 254:17
**responds** 134:17
185:19 251:11
358:6
**response** 154:9
155:8 265:5 274:1
276:15 286:1
296:23 297:18
316:23 355:18
**responses** 256:18
316:6 365:9
**responsibilities**
29:14 39:3 40:17
40:18
**responsibility** 28:24
40:16 64:17
**responsible** 273:9
**responsive** 114:16
**rest** 149:15 153:13
155:9 157:1 197:6
197:14 201:23
222:5 239:13
**restart** 278:7
**restate** 164:22
**restoration** 82:23
**restraining** 238:9

restroom 102:18
resulted 295:24
results 287:15
    345:18
resume 175:6,16
resuming 174:22
retain 355:4 356:4
retained 27:21,24
retaining 29:10,12
    29:13,20
retrieve 10:19
return 47:1 53:13
    70:15 349:5
returning 24:14
returns 38:14,16,19
    38:24
Revable 89:18,21
    181:8,9,16,20
    182:24
revenue 4:16 70:12
    173:4 198:21
    202:22 236:20
    349:2
revenues 215:12
reverse 253:8
review 14:21,24
    64:6 76:14 159:8
    209:14 231:25
    242:6 367:1
reviewed 72:17
    321:16 326:25
reviews 287:18,23
revisit 240:11
Rican 364:12,13
Rico 270:4,13,23
rid 221:2
ridiculous 251:22
right 11:9 13:24
    14:16 15:10 30:25
    34:8 36:7 40:24
    47:23 50:1 54:24
    56:13,13 58:3
    64:10 67:12 68:12
    70:8 72:1 73:13
    75:23 78:22 80:15
    81:25 83:10 86:14
    90:4,14,22 95:10

100:7 101:4 102:2
107:2 108:18
109:2,6 112:5
114:11 117:6
118:7,21 119:23
121:22 123:9,17
124:11,16 127:2
127:17 128:12
130:24 135:8,16
136:18 137:6
138:8 141:13
144:12 145:4,9,13
145:16,20 147:3
148:3,11 151:20
152:4,8,10 153:10
153:17 154:1,19
155:12,16,19
157:16 158:12
162:19 163:7
164:4 166:12,13
166:22 167:3
168:18 171:22
172:9 173:12
174:5 175:16
180:8,13,17 182:5
182:6,9,15 184:19
185:3,21 186:23
188:3 190:9
193:17 195:6
196:14,19 200:13
203:12 204:12
205:9 207:19
209:20,23 210:2
212:8,17 214:6,13
216:6 217:3,7,25
219:9 221:17
222:16,20 224:24
226:2,12 227:1
229:7,13 230:2,3
230:19 232:24
233:2,3,15 234:20
235:13 237:1,2,12
237:13 238:1,4,20
239:10,12,14,15
241:9 245:3,8
246:5,12 247:6,22
248:11,18,20

250:11 251:9
253:9,12,23
254:11 255:2,16
257:10,21 259:16
260:5,7,10 266:8
267:9 268:13
273:5,21 279:17
280:3,16,21 286:9
286:16 287:3,4,9
288:20 289:24
290:14,23 292:8
292:18 295:20
297:24 299:15
300:14 302:12,16
303:16 304:25
306:8,10 308:3
309:18 311:11
312:24 313:23
315:23 316:4,24
319:18 320:5
322:3,8 327:23
330:8 331:24
332:16 333:18
335:6,8 336:17,25
338:2,7 341:14
342:23 343:3,3,10
343:13,18 346:19
346:21,24 347:4
348:13,17,20,22
350:22 351:10,15
351:18 352:19
353:6,11 356:2
357:15 358:4,8
359:18 360:4,7
361:2,9 362:22
363:6 365:8,15
366:19
right-hand 73:7
rights 352:25
ring 55:22
rising 174:10
risk 113:20 119:17
    121:1,17 126:25
    128:14 136:10
    142:8,14 156:22
    157:4 161:13,17
    161:21 165:15

risks 138:25
risky 121:21
Roger 92:11,12,16
    93:3,9,15,17,22
    94:6,6,10 95:6,18
    95:21 96:6,9,12,23
    96:25 97:5,9,11,13
    97:16,17,23 98:2
    98:16,18 100:21
    101:17,23,25
    102:8 268:11,12
Roger's 92:18,24
    94:6,25 95:5
rogue 151:24 152:5
    152:18,22,24
    154:14,23 156:7
    156:13,18
ROI 177:21 178:11
Rojas 55:21 56:3,21
role 20:20 55:5 56:5
    58:7
roll 157:13
Rolodex 142:4
Room 1:16 2:4
routed 23:20,22
routine 9:1
routing 313:7,9
row 229:17,19
rows 229:16
RPR 1:20 370:4
RTO 256:11 257:12
    257:16 258:4,6,7
    259:5,9,12,13
    260:13,15,16
    261:7,9,10,13,15
    261:18,21
rule 10:7,11 16:17
    22:2 161:10
    223:25 224:2
rules 1:11 8:7 9:18
    21:19 43:10
    122:25 125:12
    142:13 360:1
run 179:22 188:11
    205:10,12 218:12
    277:18 334:20
    358:14

running 95:18 179:9
    180:4,13 187:2,6
    193:17 198:12
    216:6 245:9
runs 129:1 157:3
    185:20 198:13

_____

### S

S 3:7 83:2
s/Layli 370:16
safety 328:13,17
    331:24
sake 19:8
sale 343:17
sales 40:19 99:14,16
    99:18 121:14
    141:10 245:14
    246:2 253:2 254:5
    254:12
sales/rentals 275:1
salesperson 98:23
    100:12
salt 252:16 254:8
Samuel 2:3 6:10
sand 289:16 303:9
Sara 4:5 132:21
sat 92:12
satisfactorily 62:1
satisfied 356:18
satisfy 69:12 359:13
save 14:9 80:16
    86:22
saw 145:9 158:15
    159:10 255:12
    256:14,14 257:8
    260:4,7 265:4
    273:18 283:12
    288:1,1 290:25
    293:12 299:3,10
    319:17,17 322:5,7
    341:22
saying 35:11 69:1
    108:19 127:24
    136:13 147:17
    156:12 159:24
    182:8,14 188:9
    193:23 195:9,10

FTC v. Credit Bureau Center, et al.                                              12/13/2017

[402]

195:21 212:21,21
218:3,8 223:8
226:18,21 232:3
235:7 238:6
242:24 246:1,17
246:20 253:18
254:4 261:2
262:20 270:8,10
270:19 276:9,23
277:22 279:1
281:14 282:12
283:10 292:17
293:3,5 294:20,24
307:20 308:19,20
308:24 309:2
315:5 320:23
337:23 338:6
339:23 347:12
351:7 360:18
361:9
**says** 41:25 42:13
73:9 74:5,15 93:2
93:3 101:6,7
112:10,16 113:6
114:14 115:20,22
119:8 127:16
130:19 135:10,13
138:4 142:19,21
143:2,3,5,5,21
147:18 154:11,14
156:24,25 158:21
159:7,21,21
165:15,17,21
166:8 175:22
181:23 184:11
185:9 186:3,3,6
190:10 196:9
197:4,21,24 198:8
212:5,14 226:4
229:17,20 230:5
230:20 233:12
235:12,14 242:13
242:16 245:9
254:7,10,23 255:1
255:8,10 264:2,18
265:3 266:4,5,8
273:14 274:9

279:24 286:17
288:7,10 299:15
302:15 309:20
311:6 318:17
321:5 325:3,23
326:3,6,9 327:24
329:7 331:16,16
333:1 335:2,12
336:1,6,9 338:13
338:17 340:11
349:21 350:6
351:10,17,20
352:3,10 354:14
358:22 360:14
361:5
**scale** 67:8 68:20
246:9 294:1
**scaleable** 67:10,21
**scaling** 177:21
178:11 277:11
**scam** 19:21 264:21
264:21 270:15
278:1,5,19,20
279:6 283:3,4
297:16,17 313:16
**scams** 52:25,25 63:1
64:21 264:3,9,11
264:16,19 266:15
275:8,10,11,18
277:23
**scenario** 117:25
118:9 139:20
**scenarios** 113:23
156:14 358:19
359:13
**schedule** 107:19,25
108:2 113:11
116:11 328:1
332:23 333:4
336:12,19 337:5
337:24 338:13,15
338:19,22 340:12
**scheduled** 344:12
**schedules** 116:24
117:2
**scheduling** 337:8,11
337:12,15 338:11

340:17,20
**scope** 215:10,12
218:1
**score** 20:2 40:1
86:12 203:11
204:9 205:2
207:19 209:19
210:5,11 214:4,14
216:1 222:4
225:18 228:21,22
228:24 233:10
234:3 238:23
241:9,15,17,19
256:20 332:18
335:20
**ScoreOutlook**
166:12
**ScoreOutlook.com**
146:17,22 147:10
149:4 150:19,25
151:9 159:17
196:21
**scores** 20:11 34:14
86:12,13
**screens** 78:14
**screenshots** 268:18
**script** 283:17,21
360:3
**scripting** 40:21
**scripts** 185:20
**scroll** 87:3
**search** 86:6 258:11
258:19
**searched** 86:7
**searches** 355:15
**searching** 86:11
321:10
**second** 7:14 69:8
95:16,22 109:12
109:12 112:7,9
113:4 116:18
133:12 141:19
146:15 151:23
200:7 231:9
280:22 285:11
325:16,18 329:12
330:9 337:22

358:21 361:2,4
362:4 364:5
**secret** 239:6
**section** 22:3,3 178:8
283:20 304:2
**secure** 324:6,8 350:8
**security** 79:16
270:22 318:12,22
318:25 319:4,10
323:22 325:2
**see** 31:21 41:24
42:17 44:19 45:23
48:7 50:22 52:25
53:3,4,5 62:9
65:11,16 66:6,9
67:15,17 68:1
73:10,21 74:17
76:5 77:5 78:4,9
82:7 85:6 87:10,11
103:22 105:20
106:3 107:6,20
108:8,24 109:15
110:18 112:8,18
113:12,13 115:18
115:25 126:19
127:21 131:11,15
133:17,24 134:15
134:19,23 136:21
138:7 141:22
143:17,20 144:23
144:24,24 145:3,8
146:24 148:1,18
149:7 151:1,7,14
151:15,17 153:12
154:8 158:19,24
159:5 161:3
162:23 163:2,12
163:23 172:2,6,17
172:22,23 173:16
173:25 174:2,16
174:22,24 175:4
176:2 177:23
178:4,7,13 179:10
179:14 180:5
182:1 184:15
185:14,17 187:24
190:2 191:14

192:13 195:3
197:8 198:14
199:5,17 201:24
202:2 206:21
216:14 217:19
222:8 224:12
225:25 226:7
229:22,25 230:23
231:2 234:2
235:23 236:24
242:9 243:17
245:11,20 249:20
250:6,12 251:12
252:21,23 253:4
254:23 255:1,8
263:6,8,21 264:7
265:19 271:12
273:12 274:6,15
274:23 275:4
279:21 280:13
282:6 285:13,23
285:24 286:6
287:10 290:16,23
295:7,23 297:4
302:1,10 305:21
306:1,4,14 309:11
309:16,24 311:12
311:13,23 320:3
321:11,13 325:9
325:14,16,20,25
328:14 331:22
333:10 335:4,12
335:15 336:13,15
336:15,16,17
346:14 348:5
349:10 351:10,16
354:17 355:7
**seeing** 48:14 50:20
52:13 108:6,19
173:15 206:20
250:3 299:5
302:20
**seek** 140:13
**seeking** 25:23
238:14 244:12
301:2
**seen** 39:24 42:7

Brown

FTC v. Credit Bureau Center, et al.                              12/13/2017

48:13 71:6,7,7,11
71:15 224:4
249:15,16,17,18
250:8 256:15
282:18 298:22,24
299:8 305:6,10
322:2,19 323:17
333:11 341:25
356:15
**seized** 216:7
**select** 27:1,5,8,10
**self** 306:20
**sell** 365:8
**selling** 259:18,19
**send** 29:8 107:15
113:10 129:24
173:3 182:9
192:21 196:2
241:9,17 246:7
250:18 268:15
359:14
**sending** 100:22
129:10,18 184:13
244:15 247:3
269:10 274:2
280:12 311:15
320:21 357:22
**sends** 175:14 253:11
**senior** 17:15 20:20
**sense** 8:24 9:24 10:5
10:13,20 11:1
12:10 14:1 16:6
49:15 69:17 74:3
116:1 261:11
276:23 299:22
330:2 341:19
350:1 351:13
**sent** 3:12 4:22 41:16
51:1 93:12 101:14
101:16 112:12,13
133:16 134:13,25
141:19,20,21
158:17 162:22
182:13 227:18
241:9,15,20 250:4
255:24 268:15,18
272:21 282:5,25

288:23 297:9
300:18 303:1
309:10 319:18
328:23 331:4
341:17 342:1
360:6,8,12,24
362:18
**sentence** 107:18
108:3 109:13
131:15 264:22
276:14 307:14
**sentences** 199:13
**SEO** 287:17
**separate** 15:20
60:14 148:23
**separation** 82:18
**September** 91:8
92:16 94:10
122:15 177:20
178:4 272:25
273:5,24 274:8,19
279:10 282:6
323:20 325:10
**sequel** 235:25
**seriously** 43:11
**served** 12:2
**server** 216:6
**servers** 216:7,7
**serves** 239:19
**service** 4:8 5:4 7:20
7:22 17:25 18:4,7
18:10,12,19,22
20:2 21:4 23:20,25
31:7 35:15,23,24
35:25 36:13 52:19
54:5,7,18,25 56:7
56:18 57:22,25
58:13,15 59:8,14
59:23 61:4,6,7
62:9,18,22,23 63:4
64:2,6,16,20 65:1
65:11 66:4 67:9,22
71:12 77:22,23
141:3 196:10
272:22 273:20
275:10 276:5,12
277:19,21 279:5

281:12,18 283:25
291:25 297:9
301:24 302:8
310:14 313:3
317:16 327:14
332:11 354:13
357:22 361:17
362:2
**ServiceFirst@ear...**
141:4
**services** 31:24 32:1
32:3,5,11,15,18,20
33:18,20 34:17,20
37:4,5,7,9,19
49:25 68:21 103:2
353:1 364:24
**servicing** 34:9
**set** 60:7,8,9 61:7
99:2 100:12
101:10 122:25
136:16 137:2,4
139:24 140:3
145:25 147:6
176:6 212:23
213:19 215:20,22
228:3 315:5
317:10 344:10
353:9 370:14
**setting** 138:16
**settlement** 8:6
**setup** 69:7 70:7
**seven** 17:11 229:18
230:25
**shaking** 51:7 332:14
**share** 225:9
**sheds** 188:8
**sheet** 73:15
**shifting** 139:20
**shit** 195:2
**shoot** 337:21
**short** 20:22 46:16,18
78:17,19 94:2
102:22 242:4
262:9 284:15
313:19 363:3
**shortcut** 345:23
**Shorthand** 1:14

370:18
**shortly** 37:24 93:11
**shot** 337:22
**show** 11:10 86:23
103:4 207:22
233:24 238:19
239:13,16 242:12
243:3 249:12,14
282:18 301:21
331:3
**showed** 78:2 348:2
**showing** 41:4 72:14
90:22 103:4
105:11 106:17
110:2,7 111:10
115:6 123:9
132:13 140:22
144:12 157:22
158:1 162:11
170:12 183:21
202:11 225:7,11
258:9 263:10
272:15 285:2
291:18 320:15
323:10 331:13
346:7 350:19
357:15
**shows** 173:22
231:23 359:8
**shut** 189:1 216:8
**side** 23:25 24:2
53:13 158:5,5
325:5,5,13,13
345:24
**sidebar** 209:17
**sign** 80:17 140:9
261:3 344:1
349:22 367:1
**sign-ups** 174:16
**signal** 86:20
**signatory** 53:24
**signature** 117:4
366:25
**signed** 43:17 48:20
352:18
**signer** 136:17 138:4
138:17

**significant** 139:5
**significantly** 315:20
**signify** 81:21
**signing** 29:20 30:3
69:3 301:24 302:8
352:24
**signs** 79:12 80:16
**silly** 334:25
**similar** 15:18 20:13
20:15,18 29:3
31:10 32:1 35:16
42:8 82:17 243:4,9
292:2 309:21
341:12 349:24
354:4
**simple** 65:17 67:20
160:16 336:24
**SimpleRefund** 5:14
353:24 354:14
**SimpleRefund.org**
353:3
**simply** 16:5 94:10
168:8 215:1,23
**single** 67:23 180:10
182:4 279:24
363:16,17
**sit** 51:15 97:21
281:23
**site** 23:3 59:12 71:2
71:3 79:10 83:1,3
83:3,11,12,15,21
83:23 84:6,10,12
84:12,14 100:17
100:23 121:8
149:10 150:12,16
150:17,17,19
160:6 269:18
285:21 286:4,25
314:21 320:1,1,3
365:15,18
**sites** 83:4,7 84:8,11
190:16,17 347:17
**sits** 222:7
**sitting** 182:20
219:23 263:5
269:1 283:11
**situation** 63:7 144:9

Brown

FTC v. Credit Bureau Center, et al.

12/13/2017

[404]

145:24 257:2
329:15 342:1
**situations** 63:9
**six** 42:12 57:19 64:9
108:20 119:10,15
125:24 190:6
229:18
**six-figure** 116:7
124:10
**six-month** 167:18
167:25
**sizable** 213:18
**size** 289:4
**skip** 81:1
**Skype** 4:14 47:15
184:2 189:6,15
345:10 348:13
**Slack** 4:19 224:24
225:17
**slash** 21:4 233:12
**slave** 185:11
**slevine1@ftc.gov**
2:6
**slightly** 365:1
**slow** 176:5 222:13
**slower** 128:8 183:10
**slowly** 18:5
**small** 69:2,9,19 70:1
220:20 256:24
**smaller** 69:14
**snatched** 18:15
**social** 79:16 349:16
**soft** 138:24 358:4
**software** 7:19,21
17:15,24 18:13,14
18:18 20:21 21:1,4
23:25 24:1 241:5,6
**sole** 13:5 16:3,13
26:9,13,16,17
35:20 37:12
147:20
**solely** 19:18
**solution** 67:10
**solutions** 67:21
**soon** 93:7 191:11
**Sorenson** 272:22
**sorry** 19:25 25:7

32:16 33:19,21
50:15 63:22 75:21
84:5 91:17 99:9
111:20,25 117:22
131:15 132:18
134:20 135:24
138:10 141:18
172:13 175:18
177:24 178:16
191:18 197:22
198:4 201:10
203:5 212:3
214:15 225:7
235:5 237:1
241:19 243:25
244:23 247:10
266:5 273:4
279:10,17 299:16
305:22 311:1
322:22 323:4,15
325:17 333:6
345:15 363:15,18
**sort** 7:25 25:16 43:1
43:23 50:6 56:7
57:10 63:2 66:23
80:22 87:9 88:10
95:4 111:7 113:14
119:17 121:10
257:5 267:13
**sorts** 265:25
**sound** 57:12 64:13
67:12 180:21
**sounded** 74:5
**sounds** 20:8 29:11
30:17 46:17 52:14
71:19
**source** 63:11,13
66:25 71:16,16
84:16,18,19,21,23
85:3,6,24 86:1
88:24 89:12 151:8
151:18,24 152:4,5
152:12,18,22,24
154:15,15,23
156:8,13,18 170:4
174:10,16 185:16
186:18 189:1

194:20 201:8
203:25 204:18
205:6,6 217:18
229:20 230:15,20
231:10,18 235:15
236:23 242:13,19
243:1 287:7 313:5
313:8
**sources** 191:2
196:17
**South** 1:15 2:4,9
**space** 144:7 277:14
**speak** 10:8 15:7
128:7 155:24
194:14 196:8
197:18 201:13
203:17 217:7
233:4
**speaking** 12:16,24
63:13 65:13
**speaks** 264:18
**specific** 7:5 26:8
36:17 45:4 50:21
66:12 93:16
120:14 199:14
234:8,22 235:20
264:21 292:15,16
298:25 320:18
323:17 359:23
360:2
**specifically** 14:25
18:23 24:6 25:6
27:7 28:4 33:8
35:3 42:22 43:13
44:18 46:14 50:21
52:13 57:5 58:14
59:2,20 60:25
107:16 149:8
160:22 174:15
181:9 205:13
209:4,7 227:8
250:1,7 258:7
260:23 268:5
283:22 292:11
294:5,10,12 299:9
300:24 301:15
347:15,18 364:7

366:2
**specifics** 24:9 78:23
**specified** 370:10
**specify** 31:12
**specifying** 135:5
**speculating** 286:19
**spell** 28:5
**spelling** 28:9
**spend** 59:4 228:11
**spending** 313:1
**spent** 117:14,16
256:25
**spinning** 255:5,6,6
**spoke** 46:22
**spot** 13:14
**spotted** 243:12
**spouses** 327:16
**spreadsheet** 86:23
87:3 89:7
**SRCochell@Coch...**
2:10
**SS** 368:2 370:1
**St** 273:11 365:7
**staff** 56:18 62:9
**stage** 168:7
**stamp** 73:8 80:22
112:16
**stamped** 11:12
**stamps** 274:21
275:7,12
**stand** 51:14 53:11
131:14
**stands** 61:10
**star** 205:16,16,17,17
205:17,17
**starred** 205:18
**start** 6:13,25 15:10
17:9 20:20 26:1
46:9 54:12 74:24
136:18 169:10,12
171:16 206:20
224:7 262:3
278:15 298:19
349:12 351:1,2,23
**started** 18:4 26:5,6
47:14 108:4
122:13 208:18

**starting** 17:1 181:23
185:10 347:3
**starts** 73:19
**state** 1:15 289:3
368:1 370:1,5
**stated** 39:15 48:18
159:25 192:13
227:9,10
**statement** 121:10
122:22 196:25
271:8 344:20
352:20,21 356:21
**statements** 37:18,18
134:14,25 136:9
309:21 311:22
**States** 1:1,12 2:2
**stating** 124:24
**statistics** 359:6
**stats** 196:7 197:18
198:20 199:24
217:9 241:5
**status** 321:21
364:19
**stay** 75:19 149:14
150:4,6 155:8,18
156:20 157:1
164:14,18 167:14
193:2
**stayed** 165:2
**stenographically**
370:7
**step** 80:23 167:2
184:14 253:12
260:20 363:19
**Stephanie** 55:11
**STEPHEN** 2:8
**steps** 80:20 140:13
166:24 349:21
351:14,15
**Steve** 6:19 40:1
131:4 203:1,8,8,11
204:2,9 205:2
207:19 209:19
210:4,11 214:4,14
215:11 216:1
221:7,10,10 222:3
225:18 228:21,22

228:24 233:9
234:3 237:22
238:23 241:8,15
241:17,19,21
331:5
**stick** 38:5 107:19
189:14 296:14,21
**sticker** 346:15,15
**stickers** 322:23
**sticking** 289:15
303:8
**stinks** 194:3
**stock** 330:6
**stop** 119:3 270:18
352:1
**stopped** 129:10,18
149:9
**stopping** 149:18,19
**stops** 165:10
**story** 337:6
**strategies** 184:12
**Street** 1:16 2:4
**strict** 126:3
**strike** 32:4 34:22
48:23 58:24 66:17
109:17 190:24
209:17 249:11
311:6 360:13
**strong** 78:12 172:20
**strongly** 282:22
**struggled** 102:11
**stunk** 194:6
**stupid** 282:24
**sub** 85:10,11 177:4
**subaffiliate** 85:18
85:20 176:15
177:8
**subaffiliates** 85:16
176:24 177:4,8
249:8
**subcontracts** 177:11
**subject** 8:16 103:20
109:3 347:2,7
**submit** 350:8 352:4
**Subscribed** 368:17
**substantially** 349:24
**subtracted** 240:6

**succeeded** 78:15
**successfully** 64:14
64:17 122:9 126:1
248:8
**suddenly** 113:20
124:16 126:10
**suffering** 9:4
**sufficient** 142:4
**suggest** 126:17
302:14
**suggests** 94:12
**suit** 78:12
**summary** 366:24
**Super** 273:8 279:10
279:25 280:7,11
281:2 282:5 286:9
**supervise** 27:3
**supervised** 56:17
**supervising** 56:6,7
**supervision** 166:24
**supervisor** 5:5
55:10 56:1,4
272:22 291:25
297:10 310:14
361:17
**supervisors** 56:17
62:22 63:4
**supervisory** 55:5
56:5
**support** 60:10
110:24 111:7
**support@Credit...**
60:12
**support@eFreeSc...**
60:5
**supports** 331:14
**supposed** 129:5
221:9,22 339:16
343:22
**supposedly** 240:23
**sure** 12:4 28:16,17
36:8 42:24 46:17
60:2 61:10 67:15
68:3 72:5 74:2
76:4 81:18 95:10
97:11 102:20
114:21 117:1

120:5 157:11
160:18 163:6
168:18 199:12
212:15 229:24
241:25 248:1,7
269:6 273:13
284:20 300:14,25
317:2 325:23
326:3,6 338:24
345:10 357:6,11
363:1
**suspect** 240:20
269:20,25
**suspicious** 53:4,6
341:20,21
**switch** 127:1
**sworn** 6:3 368:17
370:6
**Synovus** 142:10
**syntax** 255:6
**system** 8:1 24:10,11
49:3 80:12 82:18
215:19 226:24
227:1 254:18
284:1 315:1 337:9
337:13,14,19,20
340:8 344:7,10
347:19 360:21
**systems** 74:6 146:21
147:9 159:19
248:19

_____
          **T**
_____

**T** 3:7 84:6
**T&Cs** 286:2
**table** 77:14 146:24
229:15
**tables** 76:25 213:17
**tag** 223:21
**tainted** 210:23
211:1
**take** 8:20 9:3 11:3
12:19,20 13:5,9
29:25 41:14,17
43:11 46:15 58:5,6
78:16 80:15 111:2
114:17 121:25

136:11 143:8
144:10,14 161:22
199:3,17,19
215:20 216:2
218:9 222:18
223:16 231:12,15
252:15 253:12
281:24 284:13
285:19 313:3,17
313:18 345:18
357:8 362:24
363:19 365:2
**taken** 1:13 46:19
78:20 94:3 102:23
168:22 212:17
242:5 262:10
284:16 313:20
363:4 369:3
**takes** 222:15
**talk** 14:11 44:5
49:22 56:14 67:6
67:17 89:10 93:7
93:21 94:17 142:9
193:1 199:2
229:11 243:18
251:3 269:22,24
280:23 321:5
343:25
**talked** 23:19,24
25:15 84:22 93:9
93:25 94:14,16,19
95:21 105:25
107:1 145:3
160:17 166:23
176:14 196:14
205:8 233:14
267:10 287:21
316:15
**talking** 19:12 49:14
53:15 55:18 57:16
65:4 89:11 102:25
109:4 117:2,14,16
123:17 126:22
131:12 142:11
143:7 148:18
163:8 179:17
181:2,4 195:5

196:4 210:25
212:2,9 216:16,17
229:12 254:2
257:25 275:25
280:21 284:8
291:2 292:13
308:6 311:18
325:12 329:16,22
338:4 345:14,17
363:18
**talks** 113:14
**targeting** 277:11
283:22
**task** 8:2 66:14
**tasks** 18:11
**taught** 264:2,19
**tax** 38:14,16,19,23
**taxes** 38:25
**TCPA** 43:7 46:9
47:10
**teaming** 223:21
**tech** 63:1
**technical** 248:2
**technology** 7:13
**Telephone** 43:7
**Teleservices** 54:14
55:19,25 56:24
59:5,6
**tell** 10:4 25:20,20
30:25 31:20,20
32:14,14 41:18
46:21 48:12 68:19
68:24,24 76:20
77:6 78:10 84:6
87:3 88:12 124:12
136:9,15 144:14
147:5 148:5 149:7
149:9 168:15
174:13 176:4,6
191:16 195:25
207:9 222:22
229:24 232:9
235:24 242:23
264:14 268:20
275:18 276:22
281:9 297:8
322:17 323:23

343:4 345:19
364:19
**telling** 100:7 115:15
124:5 148:16
149:12 153:2
195:22 199:10,21
293:24 296:7
297:21 300:25
302:7 308:15
317:9 327:1
335:17
**tells** 151:24 156:17
280:11
**template** 244:18
254:19,20,23
271:11,18 275:3
276:13 280:10
282:9 301:16
321:1 323:18,21
323:23 335:24
336:9 339:15,21
358:1,11,18,20,21
359:12,15 360:5
361:3,18 362:5,5
362:15,16
**templates** 271:14
341:12 357:23,23
361:8,22 362:2,11
**temporary** 238:9
**ten** 7:6 231:22
253:20
**tenant** 329:8,14
**term** 19:10 22:21,25
36:7 42:3 48:24
54:21 70:23 71:6,7
79:21 80:1 88:20
117:18 118:13
120:6 126:11
190:12
**terminate** 30:17,19
41:1 50:18 167:20
**terminated** 42:13,20
43:2,13,23 44:1,7
47:2,21 48:10 50:8
50:14 51:18,24
53:9 63:8 104:15
125:9 143:6,21,24

145:15,16 157:4
166:12,13 344:22
**terminating** 43:14
44:24 51:2,5
**terminations** 51:10
**terms** 7:18 70:21
80:11 110:24
112:25 114:8
344:16 350:11
**testified** 6:4 26:9
72:17 101:22,24
154:1 164:13,17
164:25 181:1
200:11 208:1
209:25 211:8,21
211:25 212:7
214:6 215:17
216:4 230:15
299:7 341:10
343:9
**testify** 9:5,8,12,15
122:13 212:25
259:7 331:5 370:6
**testifying** 8:13,17
73:23
**testimony** 130:15,17
148:15 165:4
182:17 198:23
199:7 201:4
207:16,23,24
208:2,4 209:9
213:22 214:8
216:24 218:3,5
233:23 234:11
272:11 360:16
362:8 370:10
**Texas** 2:9
**text** 4:13 15:2 22:1
41:17 148:16
156:3 170:17
171:2 179:6,21
186:2 189:6,21
245:22 255:6
260:18 301:16
335:24 336:8
355:9
**texted** 171:7,8

**texts** 348:2
**thank** 22:17 48:15
65:5 70:16 75:15
84:15 89:7 90:20
111:21 177:16
188:24 198:6
211:13 214:19,20
225:8,21 229:6
278:11 284:14
296:25 320:13
323:16 329:11
346:5 362:23
364:5
**Thanks** 61:13 93:5
102:21 190:9
**theft** 34:14
**themes** 274:12
**they'd** 114:5 354:5
**thing** 12:4 14:13
70:4 88:5 165:24
224:18 232:16
299:21 331:16,16
334:16,19
**things** 69:18,22 75:5
75:18 76:24
139:13 148:14
173:15 174:12
180:25 186:6
212:23 238:17
243:13 252:18
265:13,16,18
266:11,13 278:25
283:15 303:6
318:23 329:4
330:11
**think** 10:17 13:3,16
13:22 14:4 16:24
21:13 22:3,8,25
25:23 27:25 28:21
34:4 37:24 39:25
50:13 51:5,10,12
57:19 60:24 62:11
65:22 67:6 80:25
81:7 86:19,21 89:6
90:12,14 93:1
94:14 95:4 101:24
114:14 116:15,16

117:6,16 120:20
122:16 125:23
135:24 136:22,22
137:7,15 138:21
140:16 146:6,7,9
147:18 148:12
149:14 150:13
154:25 156:7
157:8,14 159:6
161:4 162:18
165:4 166:7
170:16,22 179:15
182:23 186:1
192:1,14 194:13
196:7,25 197:17
200:16 201:11,13
203:4 210:3,23
213:17 216:23
217:1 231:5 233:4
235:19 237:16
238:7 239:6,9,12
239:15,16 240:3,5
240:7,11,15,21,24
243:15 245:9
247:10 249:21,22
250:20,23 251:1
251:19,21,24
254:13,18 255:17
255:19,19,21
259:6,25 262:23
264:17,18 269:14
271:3 282:19
284:4 288:13
293:11 296:2
297:18,20,22
298:22 299:12
301:12,15,16
303:3 307:21,23
307:25 310:1,9
315:1 316:17
320:25 321:15
324:23 326:15,16
327:4,7 328:18,19
332:2,13 335:23
341:25 343:19
347:21 349:6,25
352:20 356:15

358:9 359:6,7,19
359:25 361:10,13
363:9 364:25
365:1 366:18,20
**thinking** 203:23
**third** 74:16 131:15
157:5,5 182:3
211:23,23 212:5
229:19 361:5
**third-party** 31:23
317:25
**thought** 6:13 180:12
185:15 205:20
214:17 251:17
253:23 254:16
301:25 302:9,15
310:25 321:2,7
324:15 328:20
340:9,15 342:11
**thoughts** 296:1
**thousand** 115:17,19
119:7 127:5
138:22
**thousands** 202:7
277:12 333:21
336:20 337:15,16
**three** 17:20 51:13
61:20 66:22 74:6
86:12,12,13
125:23 224:3
282:8 309:20
319:11 325:22
330:7 349:21
350:2
**three-** 167:18,25
**three-step** 351:14
**threshold** 125:17,20
**throw** 126:16
191:11 192:16
**ticketing** 7:19
**tickets** 7:23,25
**tie** 266:2
**tied** 157:15
**ties** 257:7
**tightening** 139:11
144:5
**till** 129:1

Brown

FTC v. Credit Bureau Center, et al.                                    12/13/2017

[407]

**time** 11:3 14:6,10
17:13,18 18:9
20:22 21:8 22:20
25:22,24 26:13,14
28:15,19 31:12,13
33:1 34:24,25 35:2
37:23 44:17 47:18
51:25 54:10,24
55:2,15 58:16 60:9
62:13 64:15 69:9
80:8,22 83:16 86:5
86:16 94:9,13
96:19,25 97:20
100:18,21 101:3
101:14,16,20
102:16 104:7,16
111:9 114:1,15,19
115:23 117:14,16
122:20 126:13
128:8 137:3,18
139:9,10 146:2
161:5,25 162:5
176:9 177:1
178:21 179:12
181:17 185:25
188:5 194:5
195:14 200:3
203:23 204:8,18
205:21 206:1,15
208:11,15 213:2
213:21 220:15,20
221:21,23 223:12
228:6 230:6
236:25 241:24
244:8 246:3
258:22 259:19,21
261:1,16 265:14
265:18 266:11
269:2 275:8
277:11 278:25
281:15 293:9
294:11 296:2
302:17,20 309:4,5
310:6,21 312:12
312:18 313:1,12
318:9,15 326:23
326:25 327:9

333:11 334:17
340:19 342:14
347:16 370:10
**time-consuming**
222:11
**times** 40:22 52:11
57:24 58:2,17
112:22 116:8
171:14,15 186:3,3
186:6 197:13
200:17 231:22
233:21 268:6
281:4 338:12
342:2 359:20
**Tina** 105:2 106:24
107:1,7 110:10
**today** 6:23 9:3,5,8
9:12,17 12:22
22:14 39:14 60:10
97:21 119:14
172:5 175:16
176:17 177:3,5
182:21,21 203:17
211:21 217:7,10
219:20 224:7
227:18 263:5
283:11 330:20
337:6 340:19
351:23
**toes** 184:14 260:20
**told** 141:24 155:2,4
165:6 168:14
197:12 205:23
219:12 226:14
233:20 234:15
257:23 264:9,11
264:15 269:2
278:1,5,8,18,20
282:8 290:7,12
310:21 323:20
**tolerance** 121:18
161:21
**Tom** 4:11,12,20,21
39:21 47:16 96:20
98:23,25 99:1,1
101:1 136:23,24
136:25 140:3,5

145:3,19,25 146:8
146:10 147:6,23
148:2,5,16,23
149:9,18,23 150:5
150:15,24 151:5
151:24 152:17,21
153:5,25 154:9,11
154:14,20 155:2
155:12,16,17,18
155:22,24 156:7
158:8,9 159:1,4
160:5,10,15
162:16,18,18
163:10 164:4,5,7,8
164:9,10,14,18,25
165:1,6 168:3
196:18,20,23
197:2 263:20,21
264:9,15 268:10
272:20 274:8
275:17 278:10,13
278:18
**Tom's** 148:22
150:12,19 158:11
160:8 163:1
**Tom@mytruston....**
145:6
**tomorrow** 291:16
366:12
**ton** 195:2 199:4
**tons** 270:7
**toolbar** 351:18
**top** 41:24 197:20
252:24 273:25
291:24 295:6
309:8,14 328:8
335:7 345:14
350:25 351:8,16
**topic** 93:17
**total** 135:6 168:1
236:2,4 240:15
356:8
**touch** 135:14 141:25
327:15
**tour** 317:11 323:24
332:24 333:5
334:5 336:13,20

337:5,24 344:12
**touring** 322:19
**tours** 337:8,11,15
340:20
**trace** 63:11 281:22
289:12,12 295:22
296:13
**tracing** 63:13
**track** 24:12 49:7
80:5 118:15,20
248:17 266:14,22
266:23,24,25,25
276:18 279:21
286:4,25 289:15
304:14 307:1
308:8,14
**tracked** 49:6 80:7
118:23 293:14
**tracking** 63:18 66:2
74:6 75:1,3,5
87:23 248:16,19
248:22 249:4,4,6,9
**Trade** 1:3 2:2 6:16
6:18 369:1
**traditional** 259:9
**traffic** 29:6 70:23
71:1,16,17 88:25
99:13 100:22
108:11 109:6
129:18,23,24
130:5,6,13 137:5
137:25 139:22
148:25 149:3,4,5,8
150:9,11,24 151:8
151:24 152:4,5,11
152:18,22,24
153:3 154:15,15
154:23 156:8,13
156:15,18 159:16
159:17 160:4,6,8
160:11,15,21,24
161:1,6 165:10,11
172:5,8,11,16,19
173:1,3,8,17,19,20
173:23 174:1,10
174:14,14,22
175:2,5,6,7,9,12

175:23 176:5
181:16,24 182:10
182:13 186:12,24
186:25 187:2
189:9 190:15
191:1 193:15,20
193:21 194:2,6,25
195:6,9,11 196:3
196:16,17 197:14
199:2,16,16,19
201:5,6,8,22,23
202:7,8 243:5,22
244:6,11,14
257:18,21 258:3,4
258:5,9,12 259:5,8
259:11,14,15
261:7,9,17,21
268:15,15 280:12
344:17 347:19
**train** 289:3
**trained** 57:25
297:12
**training** 28:21 57:7
57:11
**transaction** 326:19
334:20 342:10
**transaction-to-sale**
167:15
**transactions** 104:17
119:8 120:21,24
137:6 161:18
**transcribed** 370:7
**transcript** 3:16 8:8
72:18,22 100:3
102:3 368:8,10
370:9,10
**transcripts** 15:1,4,5
224:21
**transfer** 219:2
222:19 224:17,18
224:20 226:5
**transferred** 36:5
218:25 224:10
**transferring** 219:3
229:1
**translating** 80:11
**translation** 80:10

Brown

FTC v. Credit Bureau Center, et al.                    12/13/2017

[408]

transparency
  246:18
transparent 129:20
  198:12
TransUnion 69:4
  285:18
trending 154:12
  159:22
trial 19:19 104:11
  104:22 113:22
  121:4 330:5
  351:23,24 352:25
  366:24
tried 55:13 78:13
  358:6
triggered 7:25
  303:17
Trina 115:12,22
Tripoli 105:2 107:1
  107:8 110:11
  138:15
trouble 138:11
true 101:23 112:20
  129:21 136:7
  139:4 165:18,18
  176:9,11 188:14
  196:6,7 197:10,14
  197:15 198:16
  199:11 205:24
  207:17 212:20
  226:15 235:19
  236:16 257:23
  262:19 263:6
  271:17,20 331:1
  338:23 340:13,14
  368:10 370:9
Trulia 315:25
truly 129:16
trumps 346:15
trust 240:17 268:8
  268:14
trusted 100:25
  268:14
truth 195:22,25
  199:21 297:21
  308:15 327:1
  370:6,6,7
try 10:1,4 13:12
  29:7 63:3:10,12 65:7

77:3 114:10
  245:23 354:5
  355:4 356:17
trying 14:9 19:16
  52:12 98:7 100:5
  154:4 155:18
  156:19 179:7
  180:3 232:8
  246:11 272:13
  277:18
Tuesday 3:13 41:16
turn 68:10 73:3
  96:23,23 114:4
  116:18,22 133:12
  146:15 172:12,14
  173:5 174:20
  175:18,20 177:18
  179:2,5 185:5
  189:15 191:4
  194:22,22 201:17
  215:15 217:12
  244:22 251:5
  272:24 273:7
  285:11 292:4
  295:3 297:10
  300:7 301:18
  305:16 309:8
  311:4 328:7
  345:13 350:24
turned 44:21 60:18
  91:23 166:5
  201:20 217:4
  255:15
Turner 309:15
  311:13
two 7:11 12:6,20
  14:19 25:15,21
  57:20 58:21 61:19
  62:17 64:11 71:8
  73:5 76:3 95:13,17
  121:7 157:14,24
  159:20 162:22
  166:4,10 182:15
  182:22 185:12
  188:25 224:3
  225:20 229:16
  285:15 351:15

356:14 357:22
  360:19 361:20,22
  362:11,16,19
  364:8 365:6
two-step 223:7
tying 212:15
type 52:6 55:5 79:9
  79:10,10 82:17
  83:7 122:3 136:8,9
  139:15 142:5
  144:11 153:11
  161:12 203:22
  256:23 258:8,17
  258:20 264:3,21
  265:18 267:13
  270:14 278:20
  281:25 286:8
  301:16
types 23:8 66:22
  73:5 82:19 156:15
  211:4 264:19
typical 320:19,20,23
  321:1
typically 13:4 85:17
  111:5 325:1 334:9

―――――――――――
          U
―――――――――――
U 84:16
U.S 144:10
Uh-huh 47:24 48:16
UI 219:18
ultimately 147:2
un-normal 289:4
unable 104:16
  113:15 146:9
  147:11 165:17
  218:15
unclear 38:21 39:3,7
  39:9
uncomfortable
  127:3,10
uncommon 279:5
  354:23
undefined 126:11
underlying 217:2,5
underscore 77:6
understand 6:22

8:10,18 10:3,4
  12:1 14:17 46:24
  49:16 84:25 85:8
  92:23 94:5 95:12
  98:14 99:25 100:8
  108:17 126:24
  130:7 147:17
  151:16 166:20
  167:13 168:25
  189:4 192:19
  199:9 211:3
  215:12 218:1
  245:18,23 248:6
  249:10 255:15
  262:18,19,20
  282:1 309:2
  313:24 314:1
  331:19 338:7
  343:1 359:5 363:7
understanding 72:6
  96:4,12 98:21
  143:12 167:5
  201:17 217:1
  226:17 247:4
  252:3,4 257:14
  300:18 315:1
  320:24 327:9
  334:2 342:14,20
  363:10
understood 10:8
  14:14 96:6 131:21
  211:24 243:21
  248:5 257:17
undertake 152:17
undertook 305:8
underway 226:5
underwriter 4:3
  123:15
underwriting@V...
  137:21
Underwriting@V...
  123:20
unemployment
  275:13
unfortunately
  120:22 163:11
  358:22 361:6

365:6
unhappy 43:17
unique 63:20 255:4
  320:25 321:3
unit 321:7
unit's 321:6 327:24
United 1:1,12 2:2
unpaid 106:2
unreasonable 296:1
  310:9
untainted 238:20
  239:14
unusable 217:6
  219:19
unusual 13:11
updated 173:10
  286:2
upper 73:7
upset 274:1,3,4
  334:24
urgency 330:2
URL 138:5,16
  218:17 249:18
USAA 23:12
use 67:22 77:11,12
  77:14,15,16,19,24
  81:9,11,13 82:12
  83:22 84:20,20
  87:25 88:1,2,3
  276:18,18 317:17
userprofiles.XLSX
  76:12
users 323:25
uses 189:8
Utah 273:11
utilities 319:14

―――――――――――
          V
―――――――――――
v 6:8 7:9 22:15

Brown

FTC v. Credit Bureau Center, et al. 12/13/2017

[409]

85:10,19
**validate** 237:16
293:20
**validated** 296:7,9,10
310:23 312:14
**valuable** 327:14
**values** 139:22
**Vantage** 124:22
125:3,4,7 126:14
126:15,23 130:12
145:8,18 148:3,3
153:23 158:12
**VantagePayments**
145:12
**variances** 170:23
**various** 42:15
249:21 294:18
305:10
**vary** 79:11
**vast** 273:9 279:8,11
280:11
**vendors** 26:20
**verbose** 331:12
**verge** 156:16
**verification** 34:11
80:18 122:9,10
**verify** 240:19
351:11 352:15
**verifying** 304:19
**version** 84:6,8,12,13
84:13 170:22
**versions** 84:12
**versus** 14:5 200:20
243:2
**view** 81:19 87:6
119:22 138:19
139:15 227:20
317:4 349:22,23
**violate** 46:9 47:9
**Virgin** 365:7
**Virtual** 54:14 55:19
55:24 56:24 59:4,6
59:22
**Visa** 122:25 124:24
125:11,16 126:8
134:5,8 135:7,12
142:12 143:6

165:24 167:11,20
167:22
**Visa's** 126:9
**visibility** 266:17
295:21
**visible** 66:3 87:25
306:3
**Vision** 82:9
**visit** 58:9,12,14
310:4 332:24
333:8
**visitor** 71:2
**visitors** 8:22 253:11
253:14
**volume** 127:2,4,10
127:13,15,16,17
127:18,19 128:25
129:7,14 138:13
138:14 150:9,11
153:12 154:8
160:23,25 172:10
173:23 175:5
190:20 191:11,12
192:5,7,9,10,17,18
192:20,23 193:2,3
193:5,7 196:12
197:6 253:24
267:13 289:4
312:16,23
**vs** 1:5 369:1

———————————
**W**
———————————
**W-2s** 26:24
**wage** 7:14
**wait** 9:19 291:16
307:13
**waited** 365:6
**waiting** 86:20
**waive** 318:24 319:3
325:1
**walk** 214:11 316:25
**walk-through** 321:8
328:1 338:14,16
340:12
**Walmart** 44:15 45:3
**want** 6:25 7:6 8:7
12:4 14:12,13

15:10 17:17 30:23
38:18 39:19 41:4
43:16 44:4 45:23
47:1 49:11 62:6
66:6 69:5,9,17
70:1,21 72:5 73:1
74:13 75:22 76:6
76:17 77:1 81:1
86:23 88:8 94:5
97:19 100:19
107:18 109:8
111:1 118:4
124:13 127:23
128:14,22 131:10
131:18 135:14,23
150:20 154:8
157:12 161:23
167:21,22 169:10
171:16 173:2,19
176:7 181:15
182:9 184:13
185:6 186:23,24
187:2,3,3 192:3,4
193:7,25 195:10
195:11 199:14,18
199:18 211:14
212:15 229:16
232:4,10 239:18
243:1 245:22
260:20 275:23
281:17 290:4,4
292:4 297:10
300:13 313:23
315:15,18 323:25
325:24 326:3,4,6,7
328:11,12 330:16
332:23 333:4
334:12,13 344:9
345:24 354:8,12
355:2 356:11,12
356:13 364:8
**wanted** 7:13 19:18
19:24 28:2,25
29:21 43:5 46:9
114:19 125:5
127:20 128:22
137:22 153:12

175:6 204:7 227:6
227:10 326:13,14
333:21 334:4
341:5 364:17
**wanting** 19:2 128:21
139:16,21 180:17
313:3
**wants** 177:21
178:11 181:24
185:9 188:11
198:20 232:11
279:14
**Ward** 2:3 6:15,15
46:15 75:21 77:11
78:16 81:3 94:1
106:9 111:23
157:7 168:20
177:15 183:6
200:7 214:15,23
215:6 223:4,8,11
223:16 278:10
353:13
**Ward's** 315:16,18
**wasn't** 55:3 57:15
101:23 124:22
129:23 152:19
154:6,24 167:8
191:2 193:3
197:14 198:16
200:12,16 202:4
205:24 212:20
216:20 217:23
226:15 233:18
236:14 248:25
267:23 269:13
270:18 271:15
275:15,16 279:16
283:5 296:6
302:14 304:24
306:18 313:6,9
314:14 324:9
329:16 331:1
337:8,11 338:5
340:20 356:20
**waste** 69:9
**wasting** 281:15
**water** 169:2

**way** 12:18,22 16:4
24:12,15 47:4
49:25 50:23 53:17
54:19 68:18 71:15
79:20 80:21 96:5
98:1 119:4,21
125:11 135:3,20
141:14 148:9
174:11 175:2,22
195:12 207:5
227:21 239:19
241:22 246:16
253:18 255:4
259:17 261:9
274:3 282:5
290:22 305:18
306:25 308:8,13
344:10 354:2
**ways** 18:6 23:13,23
25:3 71:8 109:8
126:24 259:16
260:20,21 330:8
**we'll** 13:12,19 20:12
31:5 46:3 63:14
72:25 78:16 100:2
157:10 162:1
208:2 251:3
317:10 355:5
357:9 362:24
366:23 367:1
**we're** 12:4 13:7
22:13,14 26:14,15
37:2 49:22 51:20
70:16 75:12,15,25
76:14 86:19,22
89:6 109:4 113:15
117:2,6 127:6
132:1 134:4
139:21 142:10
150:22 156:8
161:10 165:15
168:8 172:10
175:21 180:25
181:21 182:20
190:21 193:25
196:4 209:16
227:3 243:19

FTC v. Credit Bureau Center, et al.                                    12/13/2017

[410]

251:5 253:16
254:2 255:2
257:25 265:12,23
265:24,25 277:11
277:18,19,22
280:4,9,9 286:19
290:3 299:24
303:8,8,12 318:17
330:10 338:4
340:18 346:1
354:22 357:5
360:15 361:6
**we've** 70:17 74:22
112:25 127:25
185:25 188:14
216:18 229:10
258:24 316:15,17
336:11 343:2
**wears** 56:5
**web** 49:25 216:6,7,7
220:7 294:19
**website** 5:14 40:21
43:17 63:2 65:24
65:25,25 66:1,6,9
66:10 86:8,18 87:7
92:15 96:21,22
99:3,11,14 100:13
100:16 147:25
149:25 152:20,25
153:1 159:18
160:9,11,12,15
176:8,12 196:21
220:5,8,11,13
248:14,23 253:11
253:15 258:16,16
261:1 265:17
270:8,17 279:7,24
287:19 288:6,24
290:5 293:18
303:2 310:5 315:9
317:24,25 322:19
324:17 330:5
343:3,9 351:9
353:2,5,9,24 354:5
355:8,17 360:9,9
360:10,10
**websites** 18:8 20:5,7

22:1 23:21,23 36:2
201:7 216:9,13
218:10,15,20
220:3,19 249:21
256:9 258:10
266:11 282:19
304:4 312:7 315:6
315:10 316:9,11
316:13 317:8,24
343:3 358:15,17
359:24
**week** 28:1 30:8,11
58:21,25 59:3
175:24 218:12,13
220:18
**weeks** 172:4 218:3
**weighed** 27:16
**weight** 27:9
**weird** 201:21 266:10
**Wells** 364:24
**went** 10:7 65:22
68:24 117:1
135:15 150:12
159:8 174:17
192:1 259:11
275:19 287:2
293:10 316:8
318:16 359:7
**weren't** 142:15
186:19 287:19
354:21
**West** 2:9
**WHEREOF** 370:14
**whispering** 341:4
**white** 35:16,16,17
35:19 36:1,3 65:23
65:25 66:8 83:6,10
92:14 96:21,22
99:3,11,14 100:13
100:16 147:6,7,13
147:24 149:25
150:12 151:8
152:20 153:1
159:18 160:11
164:8,9 196:20
358:14,17 360:9
**wild** 276:5,24,25

278:25 279:2
280:14 281:21
282:2 303:6 310:1
**willing** 161:21
**win-win** 317:18
**wind** 113:21 121:3
124:5
**window** 218:8,11
220:20
**winds** 168:11
**wish** 351:25
**witness** 3:17,23 4:1
4:2,5,7,11,12,15
4:20 5:2,3,11,15
6:3 14:8 46:17
74:3 102:21
157:11 214:21
215:3,5 223:5,19
224:3 241:12
284:9 290:20
307:24 339:10
341:9 365:21
366:5,9 370:10,14
**witness's** 234:11
**woman** 27:21,22
**wondering** 98:20
**word** 45:18 74:9
164:16 173:19
349:9,18
**words** 10:12 45:16
100:1 150:3
195:19 340:4
**wore** 29:23 40:21
**work** 7:21,24 17:6,7
18:3 24:19 43:4,9
46:8 47:9 59:15
70:1 93:19,22 98:8
99:2 104:22 114:8
124:6 125:24
127:20,23 130:23
131:10 136:2
139:21 142:16
149:20,23 150:1
150:20,21 160:15
164:7 167:21,24
168:2,5 185:14,16
212:23 258:24

261:9 275:2
281:25 312:16
329:14
**work-at-home**
59:13
**worked** 7:22 16:25
21:18 24:3 97:23
97:25 98:1 101:2
118:22 127:25
150:5,15 155:16
155:17 160:5,10
164:14,18,25
165:1 180:10
181:12,12 207:19
279:3,3 313:24
**worker** 203:1
**working** 23:11 24:9
42:15 93:19 95:8
95:14 101:7,9
125:2 145:19
149:20,23 153:5,8
153:25 164:3,10
176:10 183:3
196:10 268:7
277:20 280:4
353:2,8
**workings** 198:19
**workout** 126:5
167:18
**works** 97:20 106:23
119:4 125:11,14
135:20 167:23
179:13 245:19
246:23 314:13,25
**world** 166:17
**worth** 257:6
**wouldn't** 70:1 111:2
207:24 251:15
330:20 337:6
350:1
**wrap** 362:25
**write** 133:19 148:14
171:25 172:5
173:8 175:25
189:18 191:7
306:10
**writes** 177:20

178:10 191:8
273:8,23 285:18
**writing** 268:20
269:3 290:14
360:3,5,12
**wrong** 30:25 68:19
68:25 74:13 86:20
100:5 239:11
255:22 289:11
302:23 355:7
**wrote** 67:19 68:15
107:7 136:19
154:11 160:1
180:2 233:15
235:25 237:3
306:8 330:25

---

**X**

**X** 3:1,7 73:9 253:10
253:11,14

---

**Y**

**Y-a-n-g** 40:8
**Yang** 40:7 203:11
203:14 216:18
222:3 230:2
241:20
**yeah** 8:3,3 14:12
18:2 19:11,17
21:10,15,22 30:21
44:3 52:12 60:13
62:16 64:1 65:5
73:19 76:4 78:7
85:23 86:5 90:2
91:7,25 94:16
97:12 101:19
103:13 110:22
112:22 113:13
118:17 122:16
131:17,24 135:20
136:25 138:8
141:6,14 142:21
143:22 148:6,19
153:2 163:24
164:22 167:1
169:1,6,12 172:7
172:24 173:2,11

Brown

FTC v. Credit Bureau Center, et al.                                    12/13/2017

[ 411 ]

174:6,8,15,25
175:4 176:3,8,11
178:23 179:11
180:6,9 181:4
182:2 184:16
185:2,4,18 189:8
190:3,8 195:4,7
197:9,23 198:15
199:6,18 200:2,5
204:7 209:21
210:7,10 211:6
212:11,12 215:1
217:20 224:25
226:10 229:14
231:3,14,20
236:21 241:25
242:3,17 243:23
245:1,6 247:23
248:12 251:10,13
254:1,15 262:8,23
266:10 270:2
273:6 274:7
275:21 276:3
285:14 287:16,20
287:22,25 291:4
295:12 298:23
300:11 301:18
306:2,5 311:10
312:25 316:25
321:12 324:6
325:14 326:1
328:9 335:16
339:4 344:14
346:4 348:21
349:11 351:4,12
354:2,22 358:9
364:20 365:21
366:5,5,9
**year** 17:10 22:18
27:20,23 62:17
64:11 108:6
112:11,13 168:2
186:1
**years** 7:6 17:11,20
18:21 25:16,21
40:19 57:6,12,14
57:16,16,19 62:16

64:9 114:9 303:5
310:8
**yep** 136:19 144:20
172:18 185:22
191:15 229:9
230:21 251:16
309:12,17 336:14
345:12
**yesterday** 195:1

**Z**

Z 86:2
**Zenfia** 35:10,12,13
35:14,19,24,25
36:5,10,19 37:3,10
37:12,14,20 38:1,5
38:7,14,21,24 39:2
39:7,14 204:1
227:9
**Zenfia's** 35:22 37:21
38:9,13 204:24
**zero** 73:2 111:6,6
174:22 246:18
266:17
**Zillow** 315:25
**Zini** 241:10

**0**

**084.003900** 1:21
370:19

**1**

**1** 3:11 11:11,15,21
80:16 163:15
165:7 171:16
187:1,6 188:12
197:7 245:16
247:18,19 273:4
298:19,20 299:15
348:22,23 349:15
351:17,22 352:10
**1,000** 109:14,17
235:17
**1:00** 79:18
**1:01** 79:20
**1:31** 199:1
**1:52** 189:18

**10** 3:23 68:12
111:11,13 113:5
212:4 299:11,14
299:21,24
**10-14-14** 171:24
**10,000** 235:13
**10,204** 230:13,22
231:1,6,8 232:7
**100** 197:5
**101** 73:14 211:15,18
299:21,24
**103** 3:19
**105** 3:20
**107** 3:21
**107,000** 106:3,5
**1099s** 26:24
**10th** 30:11 214:13
215:8
**11** 3:11 4:1 115:2,7
116:19 117:7
300:10,23 302:6
**11-24-15** 190:5
**11:54** 193:14
**11:59** 194:23
**110** 3:22
**112** 3:23
**115** 4:1
**117,000** 110:17
**11th** 172:15 184:10
**12** 4:2 109:13 123:5
123:11 124:19
130:10 131:1,2
133:16 145:12
184:5,9 229:17,20
230:1,5,6,19,21,22
230:25 232:20
235:13,14 236:23
242:18,21
**12-2-15** 191:5,8
**12-month** 217:17
230:13 231:15,18
**12,000** 108:22 270:6
**12:54** 197:20
**123** 4:2
**128** 134:17
**12th** 3:13 41:16
197:19 199:1

285:12
**13** 1:17 4:5 132:7,9
132:15 133:13
134:13,21 140:16
141:13,17,20,22
175:20 348:23
369:3 370:6
**13(b)** 22:3
**132** 4:5
**134** 134:18
**13th** 214:16,24
**14** 4:7 140:18,24
141:15,20 142:19
143:2 311:8
**14,000** 364:22
**140-plus** 213:17
**141** 4:7
**144** 4:10
**14th** 214:15,24
**15** 4:10 144:14,17
146:16 147:16
151:23 157:16
158:6,15,19
159:11,21 160:1,3
311:4 348:23
**150** 200:16
**158** 4:11
**159** 345:21
**16** 4:11 157:18
158:2,7 159:10
162:23 212:13
**16,000** 284:9,11
**162** 4:12
**16th** 148:1 172:20
**17** 4:12 162:7,12,21
162:22 185:5
**17-cv-194** 1:5 6:9
22:15
**170** 4:13
**17th** 273:24
**18** 4:13 134:14
170:8,13 177:15
177:18 244:20,24
**183** 4:14
**18th** 133:14,19
**19** 4:14 183:17,23
184:9 189:15,16

193:14 212:14
345:11,24 349:5
**190** 73:10
**19th** 172:13 181:22
**1st** 173:6 175:21
348:4

**2**

**2** 3:12 41:6,8,21
80:17 142:19
188:12 197:7
273:24 288:23,25
297:22 303:1
310:4,11 326:9
336:17 347:1
349:15 352:14
**2-25-16** 193:14
194:23
**2:13** 148:1
**2:24** 305:20,25
**2:50** 191:8
**2:54** 191:5
**2:57** 133:20
**20** 4:16 193:12,13
202:12,14 209:22
217:12 220:7
228:12 229:7
232:23 233:22
234:9,20,23 235:8
237:19,21 241:20
242:8,9 243:14
**20/20** 265:9 267:11
279:15
**2009** 16:24 17:1,2,3
17:4,8 25:8
**201** 73:15 211:15,17
212:3,4
**2010** 26:2
**2011** 16:22
**2014** 3:18 90:13
91:3,8 94:10,18
104:2 106:6
107:10 122:15
**2015** 90:13 112:8,21
113:6 133:14,20
134:2 136:22
148:1 151:4

Brown

FTC v. Credit Bureau Center, et al.

12/13/2017

[412]

172:13,15 173:6
175:22 177:20
178:4 184:10
189:17 263:23
272:25 273:5,24
274:8,19 278:6,9
278:19 279:11
282:6 285:12
323:20 325:8,9,10
325:19 345:3
347:4 348:4
**2016** 35:13,14 36:19
38:15,16,19,23
179:6 181:22
185:6 197:20
199:2 251:6 294:6
301:2 305:8,20,25
309:10 345:3
347:4,12 358:3
**2017** 1:17 30:9 35:5
38:24 174:21
214:17,25 219:1
226:12 230:10
232:20 368:19
369:3 370:6
**202** 4:16 212:13
**20th** 272:25 273:5
**21** 4:19 82:8 178:2,4
178:14 225:2,6,13
226:3,3
**21,816** 242:16,19
**21st** 274:19
**22** 4:20 179:6
263:11,13 275:22
305:17,18,19,24
309:8,11
**22,000** 366:18
**225** 4:19
**23** 4:21 272:2,4,16
273:8 275:25
285:16 305:21
306:4
**230** 1:15 2:4
**23rd** 214:12
**24** 5:1 284:22 285:4
285:12
**24th** 189:17 251:6

**25** 5:3 177:19 178:7
178:9,10,15,16
291:6,8,20 292:20
294:15 296:15
328:7,8 329:6,10
335:1,7 336:16
**25th** 133:13
**26** 5:6 298:5,7,13,21
299:12,14,17,25
301:19 305:18
311:5,8 328:5
329:6,11 335:1,5,6
336:16
**2616** 2:9
**263** 4:20
**27** 5:9 320:7,12,16
322:25 325:6,9,12
326:3 327:22
328:6 332:20
333:4,6 336:2,13
341:16
**272** 4:21
**28** 5:10 323:3,6,12
325:6,10,12,17,19
325:19 326:6,9
327:22 328:6
336:15,16 338:14
339:1 341:1,16
346:3
**285** 5:1
**29** 5:11 173:6 346:4
346:8,10 348:8
**29.94** 351:24
**291** 5:3
**296** 233:13
**298** 5:6
**2nd** 177:20 178:4
300:16,19 303:14

_____

**3**

**3** 3:14 67:20 68:4,6
68:11,11,12,13
75:13 108:23
197:7 272:24
273:2,7,25 275:24
349:16 352:14
**3:00** 338:7

**3:01** 309:11,16
**3:11** 134:14
**30** 5:13 112:25
175:23 350:13,15
350:20 351:2
**30(b)(6)** 12:9
**300,000** 254:2
324:21
**3030** 1:16 2:4
**30th** 300:15 305:19
305:25
**31** 5:14 353:13,14
353:16,21 354:1
**312** 2:5
**31st** 219:1 226:4,12
**32** 5:15 197:19
198:2,3 351:2
356:22 357:2,17
358:21 361:5
**320** 5:9
**323** 5:10
**326** 299:19
**34** 179:5
**346** 2:10 5:11
**35** 85:7 89:12 170:4
174:16 203:25
204:18 205:6,7
217:18 229:20
230:15,20 231:10
231:18 235:15
236:24 242:13,19
243:2 350:24
351:19
**350** 5:13
**353** 5:14
**357** 5:15
**36** 244:22,24,25
**37** 251:5 252:24
**3E** 348:1

_____

**4**

**4** 3:15 72:8,10,16
75:14,16 172:12
172:14 189:16
211:14,16,17
251:11,18,20
252:1,5,14 253:1,7

253:24 254:4,10
254:11 295:3
324:20
**4,000** 108:21 324:23
**40** 274:21
**400,000** 240:15
**41** 3:12
**42-2** 189:14 193:13
348:14
**435** 117:4
**44,000-plus** 44:21
**46,000-plus** 103:24
**471,000** 243:2
**49** 181:21
**4th** 113:6 323:20

_____

**5**

**5** 3:17 22:3 90:15,17
90:24 172:21
297:24 329:9
**5,000** 108:23 251:11
251:18,20 252:1,5
252:15 253:1,7,25
254:4,10,11
289:22 324:20
**5:30** 357:7
**5:44** 245:8
**50** 187:1,5,7 188:12
197:13 310:7
312:17 330:6
**50-1** 3:14 67:19
68:12
**50,000** 115:16
**53,000** 115:21
**59** 174:20
**5th** 185:6

_____

**6**

**6** 3:5,19 103:6,8
124:19 240:16
303:5 309:10
310:8
**6.8** 236:19,22
237:11 240:7
**6:16** 185:6
**6:21** 171:25
**60** 113:1 163:16

165:8 303:3,4
310:10 348:19
**60604** 2:5
**6274** 112:16
**68** 3:14
**699** 247:9 252:12

_____

**7**

**7** 3:20 105:7,12
301:18
**7-12-16** 198:5
**7-24-16** 245:2,8
**7-day** 351:24
**70** 348:19
**700** 251:25 257:1
315:8
**714** 170:25
**72** 3:15
**75,000** 127:6
**77** 345:13
**77054** 2:9
**78** 345:16,21 349:6
**79** 348:15
**7th** 279:10 282:6

_____

**8**

**8** 3:21 106:11,13,19
107:6 191:4
297:23,24
**8:26** 349:7
**80** 233:18 253:3,6
253:24 254:13
284:7,9,12 324:20
348:15
**80-something** 284:5
**800-3500** 2:10
**800-934-1938** 352:1
**800,000** 359:7
**884,000** 243:3
**89.4** 232:19
**8th** 35:14 214:16,23
274:8 358:3

_____

**9**

**9** 3:22 109:19,20,22
110:9 112:12,13
124:19 212:3

Brown

FTC v. Credit Bureau Center, et al.                           12/13/2017

**9,000** 235:15
**9,126** 230:19,21
  231:5,8 232:6
**9:02** 1:17
**9:41** 184:11
**90** 113:1 233:19
  238:4
**906-9949** 170:25
**91** 3:17
**960-5612** 2:5
**9th** 112:8 174:21