**Danny Pierce**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

- - - - - - - - - - - - - - - - - - - - - - x

FEDERAL TRADE COMMISSION,

              Plaintiff,      CASE NO.:

     -against-        17-ev-194

CREDIT BUREAU CENTER, LLC, et al.,

              Defendants.

- - - - - - - - - - - - - - - - - - - - - - x

               One Bowling Green
               New York, New York

               January 30, 2018
               9:35 a.m.

        DEPOSITION OF DANNY PIERCE,

pursuant to Fed.R.Civ.P.30, and Subpoena,

held at the above-noted time and place before

Debra J. Gumpel, a Notary Public of the State

of New York.



EXHIBIT
C

**Danny Pierce**

2

APPEARANCES:

UNITED STATES FEDERAL TRADE COMMISSION
Attorneys for Plaintiff
230 South Dearborn Street
Chicago, Illinois 60604-1505

BY:  GUY G. WARD, ESQ.
     gward@ftc.gov
     SAMUEL LEVINE
     slevinel@ftc.gov


STEPHEN R. COCHELL, ESQ.
Attorney for Defendants,
Credit Bureau Center, et. al.
TBN 24044255
2616 South Loop West, Suite 470
Houston, Texas 77054

BY:  STEPHEN R. COCHELL, ESQ.


HINCH, NEWMAN, LLP.
Attorneys for Danny Pierce
40 Wall Street, 35th Floor
New York, New York 10005
BY:  RICHARD B. NEWMAN, ESQ.
     rnewman@hinchnewman.com

          ***   ***   ***

3

DANNY PIERCE

D A N N Y   P I E R C E, the witness herein, after having been first duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

EXAMINATION BY
MR. COCHELL:

Q    State your name for the record, please.

A    **Danny Pierce.**

Q    What is your current address?

A    **60 Salter Place, Floor 2, Belleville, New Jersey 07109.**

MR. COCHELL:  Let the record reflect that this is the deposition of Danny Pierce, which is being taken pursuant to the rules, and pursuant to the subpoena issued to Mr. Pierce and accepted by his lawyer, who is present today.

Q    Mr. Pierce, let me introduce myself. My name is Stephen Cochell.  I represent Credit Bureau Center and Michael Brown, who are defendants in a case pending

4

DANNY PIERCE

before the District Court in Chicago.

I will be asking you a series of questions today.  If you don't understand any of my questions, please stop me and ask me to rephrase or to repeat the question.  If your lawyer or any of the other attorneys in the room object to any of my questions, please wait until they get their objection on the record.  Unless your lawyer directs you not to answer the question, under the rules, you're obligated to answer the question as it was asked.  Do you understand that?

A    **Yes.**

Q    You have already gotten one of the rules correct. You answered audibly.  You can't say uh-huh or un-uh or shake your head. The other thing is, when people start talking over each other, the court reporters gets pretty cranky, and they start telling people to shut up and answer one at a time. Well, maybe they don't say shut up, but they do say, please one at a time. If you start talking quickly, the court reporter may tell you to slow down.  All of it is to preserve the

5

DANNY PIERCE

record.  Do you understand that?

A    **Yes.**

Q    Are you under any medication or have any condition today that would prevent you from remembering events or from testifying today?

A    **No.**

Q    What is your date of birth?

A    **2-12-83.**

Q    I'm a little hard of hearing, so if you could just maybe speak up. Did you say it was 2-23-83?

A    **2-12-83.**

Q    Okay. That's exactly my problem. I hear part of it but not all of it.  If you would, you currently live in New Jersey, is that correct, sir?

A    **Yes.**

Q    Were you born and raised in New Jersey?

A    **I was born in Colorado.  I was raised in New Jersey.**

Q    How far did you get through school?

**Danny Pierce**

6

DANNY PIERCE
1
2     A    Started college, and then I
3 started working as a software engineer, and I
4 just stopped going to college.
5     Q    Right.
6     A    It's a common thing.
7     Q    Are you married?
8     A    No.
9     Q    Have you ever been married?
10    A    No.
11    Q    With respect to college, where did
12 you attend college?
13    A    Community College.
14    Q    Which one?
15    A    Essex County College.
16    Q    How long did you actually go to
17 Essex County?
18    A    I would say two years, year and a
19 half.
20    Q    Did you go continuously, or --
21    A    Yes.  I started off when I was
22 still in high school as a non-matriculating
23 student, and then I just continued after high
24 school.
25    Q    So you decided to stop going,

7

DANNY PIERCE
1
2 why?
3     A    Because I found a job, and I liked
4 the job, so I stayed with the job.
5     Q    What job was that?
6     A    It was for a company called
7 Cotopaxi.  It was a manufacturing company.
8 First I started actually with graphic design
9 with them, and then I moved on to software
10 engineering when a different job opened up.
11    Q    Is it fair to say that you believe
12 your expertise is in software engineering, or
13 is that one of your expertise?
14         MR. LEVINE:  I would object,
15      to the extent you're asking him if
16      he's an expert.
17    Q    With respect to your employment
18 skills, where do you think your employment
19 skills lie primarily?
20         MR. NEWMAN:  I object to the
21      form.  By the way, this is Richard
22      Newman. I represent Mr. Pierce.
23    A    Computers.
24    Q    By computers, hardware, software,
25 what?

8

DANNY PIERCE
1
2     A    Software design.
3     Q    How did you develop these
4 skills?
5     A    Just as a kid, I took computers,
6 and I like them, so--
7     Q    Fair enough.  So you worked for
8 Essex --
9     A    Cotopaxi.  It's a mountain in
10 Ecuador, but the company was named after it.
11 It's C-O-T-O-P-A-X-I.
12    Q    How long did you work there?
13    A    When I was 20 years old I started
14 as a graphic designer, and I actually can't
15 remember the date that I stopped working
16 there. I think it was around 2012 or 2011.
17    Q    So you started in what year?
18    A    I don't even know the year.  I was
19 20 years old.
20    Q    What's your current age?
21    A    Thirty-four.
22    Q    So you worked there 13 or 14
23 years?
24    A    Yes, quite a while.
25    Q    So you would have started working

9

DANNY PIERCE
1
2 there some time maybe in 2000?
3     A    Maybe 2001.  I'm not doing the
4 math, but I would assume 2001, 2002-ish.
5     Q    Have you worked for any other
6 companies as an employee other than
7 Cotopaxi?
8     A    No.
9     Q    What was the reason for your
10 departure from Cotopaxi?
11    A    I wanted to start doing
12 contracting full time.
13    Q    By contracting, what are you
14 referring to?
15    A    Software engineering.
16    Q    Did you start your own company?
17    A    I started a few companies
18 throughout the years.
19    Q    What companies did you start?
20    A    Media 818.
21    Q    Media --
22    A    818.  The number is 818.
23    Q    Was this in New Jersey that you
24 started these companies?
25    A    I was in New Jersey, but I believe

**MS Legal Support    Registration #813**
**713-650-1800    production@mslegalsupport.com**

**Danny Pierce**

10

DANNY PIERCE
1
2  that was a Nevada company.
3      Q    What kind of company was that?
4      A    It was just a media company. I did
5  contracting through it, and I was building a
6  website. Actually two different websites that
7  never actually launched.
8      Q    So you had a company, you formed
9  it in Nevada; is that correct?
10     A    Yes.
11     Q    And then you started to develop a
12  website, but never developed a website?
13     A    Yes.
14     Q    So the company never really did
15  business?
16     A    It did business as far as the
17  contracting work, but that's pretty much the
18  extent of that.
19     Q    What kind of things did you
20  contract?
21     A    Software development.
22     Q    What kind of software did you
23  develop?
24     A    Mostly like back-end web pages.
25     Q    By back-end web page, what does

11

DANNY PIERCE
1
2  that mean?
3      A    Content management systems, mini
4  RP's.
5      Q    Mini --
6      A    Employee Relationship Managers.
7      Q    When you left Cotopaxi, what was
8  your formal title?
9      A    I actually -- we didn't really
10  have titles there, but I was -- I would assume
11  just software engineer, developer.
12     Q    Were there other software
13  engineers working for the company at
14  Cotopaxi?
15     A    There was not.
16     Q    So you were it?  You were the
17  chief software developer?
18     A    Yes.  I was the developer.
19     Q    Fair enough.
20     A    I'm not sure what the title would
21  be.
22     Q    What kind of business did they
23  do?
24     A    They're a manufacturing company.
25     Q    What did they manufacture?

12

DANNY PIERCE
1
2      A    Mostly custom-designed products,
3  like pens and promotional items.  Like you go
4  to a trade show and you get the give-aways,
5  the logos of the company.  That's what they
6  do.
7      Q    With respect to, I guess, Media
8  818, how long did you operate that company?
9      A    To be honest, I'm not even sure of
10  the dates. It's been around for a while.
11     Q    It's been what?
12     A    It was around for a while. I'm not
13  sure how actually long it was.
14     Q    What's the last thing you remember
15  about operating that company?
16     A    A site that we're developing,
17  while I was developing.  And that was pretty
18  much the end of it.
19     Q    When you talk about developing a
20  site, are you including like search engine
21  optimization?  Is that part of what you
22  consider development?
23     A    No.  This was actually a web
24  application for like picture sharing.  So it
25  really wasn't any search engine optimization

13

DANNY PIERCE
1
2  in there.
3      Q    So we've covered Media 818.  What
4  other companies did you form and operate in
5  New Jersey?
6      A    A company called CPA Staxx,
7  S-T-A-X-X.
8      Q    What kind of company was that?
9      A    That was an affiliate networking
10  company, affiliate network.
11     Q    How did you get involved in
12  affiliate networking?
13     A    I'm not even too sure. I think it
14  was -- I'm not too sure.  It's so long ago.
15     Q    Affiliate networking refers to
16  what it?
17     A    Just affiliate marketing.  Could
18  be SEO, paid traffic.
19     Q    How long did you operate CPA
20  Staxx?
21     A    About two years.
22     Q    Did you operate other companies
23  simultaneously or at the same time as CPA
24  Staxx?
25     A    I did not.

4 (Pages 10 to 13)

**Danny Pierce**

14

DANNY PIERCE

1
2    Q    Did you have any partners in CPA
3  Staxx?
4        **A    I was the main person in the**
5  **company.**
6        Q    When you say the main person, what
7  other persons were there in CPA Staxx?
8        **A    I had affiliate managers and**
9  **managers that managed other people.**
10       Q    What kind of marketing did CPA
11 Staxx do?
12       **A    We managed affiliates.**
13       Q    What did they do?
14       **A    Paid traffic.**
15       Q    So affiliates did paid traffic?
16       **A    Yes.**
17       Q    What do you mean by paid
18 traffic?
19       **A    Face book ads, Google ads, Yahoo**
20 **ads.**
21       Q    How many affiliates did you have
22 with CPA Staxx?
23       **A    Wouldn't be able to give a number**
24 **off the top of my head.**
25       Q    Approximately?

15

DANNY PIERCE

1
2        **A    I would say two, three hundred.**
3        Q    These affiliates would do what for
4  CPA Staxx?
5        **A    Send traffic to offers.**
6        Q    So you would get offers.  How
7  would it work in practice?  How would they
8  come to you, or why would they affiliate with
9  you, with CPA Staxx?
10       **A    I don't understand the question.**
11       Q    So you have two or three hundred
12 affiliates working with you.  Why would they
13 affiliate with you?  What is the benefit to
14 them?
15       **A    I'm not sure what the question is.**
16       Q    What is it that you offered them
17 that had value?
18       **A    Also not sure what the question**
19 **is.**
20       Q    How did you make money from them,
21 if at all?
22       **A    We made a percentage of what they**
23 **made.**
24       Q    What is it that you did for
25 them?

16

DANNY PIERCE

1
2        **A    We kept the offers coming to**
3  **them.**
4        Q    How did you get offers to route to
5  them?
6        **A    It depends.**
7        Q    Give me some examples.
8        **A    Advertisers would come to us.  We**
9  **would advertise, look for other advertisers.**
10 **It was a lot of word of mouth. Just an**
11 **industry as a whole.**
12       Q    Prior to opening up CPA Staxx, you
13 had no experience in affiliate networking?
14       **A    Excuse me?  Can you repeat that?**
15       Q    Did you have any experience in
16 affiliate networking prior to opening up CPA
17 Staxx?
18       **A    I did not.**
19       Q    You did not?
20       **A    No.**
21       Q    Is that correct?
22       **A    Yes.**
23       Q    What gave you the idea to open up
24 CPA Staxx?
25       **A    It was a new business.**

17

DANNY PIERCE

1
2        Q    So you just came across the idea
3  and you opened it one day?
4        **A    Yes.**
5        Q    You mentioned Media 818, CPA
6  Staxx. What other companies did you form and
7  operate?
8        **A    The last one was Revable,**
9  **R-E-V-A-B-L-E.**
10       Q    Did you have any partners in
11 Revable?
12       **A    I did not.**
13       Q    What did Revable do?
14       **A    That was the run-off from the**
15 **remaining affiliates from CPA Staxx.**
16       Q    When you say remaining affiliates,
17 apparently, and correct me if I am wrong, you
18 decided to discontinue CPA, using CPA Staxx?
19       **A    Yes.**
20       Q    Why is that?
21       **A    Mostly I didn't like the name.**
22       Q    So you formed a different
23 company?
24       **A    Yes.**
25       Q    Did you realize you could have

**MS Legal Support    Registration #813**
**713-650-1800    production@mslegalsupport.com**

**Danny Pierce**

18

DANNY PIERCE
1  just changed the name from CPA Staxx to
2  Revable?
3  **A    I did not.**
4  Q    Did you have any complaints lodged
5  against you while you were operating CPA
6  Staxx, or did CPA Staxx have any complaints
7  lodged against it?
8       MR. LEVINE:  Objection to
9           vagueness.
10 Q    You can answer?
11 **A    I don't believe so.**
12 Q    With Revable, when did you start
13 Revable?  Do you recall?
14 **A    I don't.**
15      **(Whereupon, a form post for**
16      **Revable, was marked as Defendant's**
17      **Exhibit 1, for identification, as**
18      **of this date.)**
19 Q    Let me show you what's been marked
20 as Defendant's Exhibit 1. Let me ask you if
21 you recognize that document. Do you recognize
22 that?
23 **A    It looks like a form post.**
24 Q    Does that accurately describe

19

DANNY PIERCE
1  Revable as of October 27, 2015?
2       MR. LEVINE:  Objection.
3           Vagueness.
4  **A    Yes.**
5  Q    You can put that to the side. With
6  respect to companies, did you form any other
7  companies or any other companies other than
8  Media 818, CPA Staxx, and Revable?
9  **A    No.**
10 Q    Did you operate any companies
11 other than Media 818 and CPA Staxx and
12 Revable?
13 **A    No.**
14 Q    With respect to CPA Staxx, when
15 you had affiliates, did you have contracts
16 with them, written contracts?
17 **A    We had an affiliate agreement.**
18 Q    That's a written contract,
19 right?
20 **A    Yes.**
21 Q    Did that contract require the
22 affiliates to comply with all local, state,
23 and Federal laws?
24 **A    Yes.**

20

DANNY PIERCE
1  Q    With respect to Revable --
2       MR. NEWMAN:  I'm sorry.  Can
3  you be more specific which
4  affiliates you're referring to?
5       MR. COCHELL:  I'm asking the
6  next question.
7       MR. NEWMAN:  Well, I would
8  like to clarify that.
9       MR. COCHELL:  But this is my
10 deposition, so I get to ask the
11 questions.  You can re-ask at some
12 point.
13 Q    What I would like to do is ask
14 you, sir, about Revable. Did you just transfer
15 all the affiliates that you had from CPA Staxx
16 into Revable?
17 **A    No.  The ones that re-signed up to**
18 **Revable.**
19 Q    So you had to re-sign up?
20 **A    Yes.**
21 Q    With respect to Revable, how many
22 affiliates, approximately, did you have with
23 Revable?
24      MR. NEWMAN:  Objection as to

21

DANNY PIERCE
1  form. What period of time?
2       MR. COCHELL:  At any time.
3  Q    At the highest level of activity
4  that Revable had.
5  **A    About 20, 30 maybe.**
6  Q    So you went from two or three
7  hundred -- How many affiliates did CPA Staxx
8  have?  I thought you said two hundred to three
9  hundred. That's what my notes say.
10 **A    Yes.**
11 Q    So you went from 200 to 300
12 affiliates to 20 or 30 affiliates?
13 **A    Yes.**
14 Q    Did you maintain a list of all of
15 your affiliates?
16      MR. LEVINE:  Objection to
17 vagueness.
18 **A    I did.**
19 Q    When this lawsuit was filed, did
20 the FTC get an order requiring you to turn all
21 over your data?
22      MR. LEVINE:  I object.
23 You're asking him to opine on a
24 legal proceeding?

**MS Legal Support    Registration #813**
**713-650-1800    production@mslegalsupport.com**

**Danny Pierce**

22

1    DANNY PIERCE
2         MR. COCHELL:  Well, let me
3    finish the question.
4         MR. LEVINE:  I apologize.
5    Q    Did you receive an order from the
6    Court requiring you to turn over a copy of
7    your database for Revable?
8         MR. LEVINE:  Same
9    objection.
10   Q    You can answer the question.
11   A    I don't know.
12   Q    Did you turn over your database
13   and information that you generated through
14   your operations at Revable to the FTC?
15   A    Yes.
16        MR. LEVINE:  Mr. Pierce, if
17   you would give me a second.  I
18   would object to vagueness and
19   compound.  Off the record.
20        (Whereupon, a discussion was
21   held off the record.)
22   Q    With respect to Revable, did you
23   have any employees at Revable?
24   A    I did not.
25   Q    On Exhibit 1, there was somebody

23

1    DANNY PIERCE
2    listed as an affiliate manager named Urcan?
3    A    Yes.
4    Q    What was his last name?
5    A    I can't even spell his last
6    name.
7         MR. COCHELL:  I think I have
8    it somewhere.  I will give it to
9    you later.
10   Q    What did Urcan do?
11   A    He was affiliate manager.
12   Q    What does that mean?
13   A    He managed affiliates.
14   Q    What does that mean?
15   A    I'm not sure what you're asking.
16   Q    What does an affiliate manager do?
17   A    Manage affiliates.
18   Q    How does he do it?
19   A    Keeps in communication with them,
20   finds offers that they're looking for. Just an
21   account manager.
22   Q    He doesn't tell them what to do;
23   is that right?
24   A    No.  He doesn't control their
25   websites.

24

1    DANNY PIERCE
2         MR. LEVINE:  Objection.
3    Vagueness.
4    Q    From time to time, lawyers will
5    make objections for the record, but unless
6    your lawyer directs you not to answer, or
7    words to that effect, that means you can go
8    ahead and answer.
9    A    Okay.
10   Q    They're just preserving objections
11   for trial. So that doesn't mean that an
12   affiliate manager controls the websites, or
13   directs the websites, as an affiliate manager.
14        MR. NEWMAN:  Is that a
15   question or statement?
16        MR. LEVINE:  Objection.
17   Q    Isn't that right?
18   A    I'm not sure what you're --
19   Q    Okay. He can't tell them how to
20   run their websites, isn't that correct, sir?
21        MR. LEVINE:  Objection.
22   Vagueness.
23   A    I'm still not sure what you're
24   asking.
25   Q    They have a separate company, and

25

1    DANNY PIERCE
2    they affiliate for purposes of marketing,
3    right?
4    A    Yes.
5    Q    As an affiliate manager, he would
6    make recommendations to them as to who they
7    might advertise to; is that a fair
8    statement?
9         MR. NEWMAN:  Do you
10   understand the question?
11        THE WITNESS: Yeah.  I don't
12   understand it.
13   Q    So it goes back to, what does an
14   affiliate manager do?
15   A    Manages the affiliate.
16   Q    I have heard that, but if you
17   could tell me how he did that.  He would just
18   say, you should consider advertising to this
19   group of people?  What would he do?  What gave
20   him value?
21   A    He would manage the relationship
22   between the affiliate in that company, and
23   gauge the offer, and monitor cap. Cap is how
24   many sales can be sent to an offer per day.
25   Just manage the affiliate, make sure they were

**MS Legal Support     Registration #813**
**713-650-1800     production@mslegalsupport.com**

**Danny Pierce**

26

1    **DANNY PIERCE**
2    **happy, make sure they were paid.**
3         Q    By managed offer, let's make sure
4    we have that accurate. The offer is what?
5         **A    Not manage the offer. Manage the**
6    **offers cap, which is the amount of sales that**
7    **are allowed to go to the offer per day.**
8         Q    You did not engage in what some
9    people call as white label marketing; is that
10   correct?
11        MR. LEVINE:  Objection to
12            vagueness.
13        **A    I'm not sure.**
14        Q    Do you know what white label
15   marketing is?
16        **A    Yes, I do.**
17        Q    Did you not engage in white label
18   marketing; is that correct?
19        **A    In regards to --**
20        Q    In regards to activities to
21   Revable.
22        MR. NEWMAN:  Objection. Lack
23            of foundation.
24        **A    We had white labeled offers.**
25        Q    Because you mentioned affiliates.

27

1         DANNY PIERCE
2    Are affiliates different from white label
3    partners?
4         **A    The white labels partners would be**
5    **considered advertisers.**
6         Q    With respect to CBC, how did you
7    come to know about CBC?
8         **A    I was reached out to --**
9         Q    That's interesting, but if you
10   could give me more detail. What do you mean?
11        **A    It was one of Mike Brown's -- I**
12   **guess, would be account manager -- reached out**
13   **to me.**
14        Q    Who is that?
15        **A    Roger Ferguson.**
16        Q    How did you know Roger Ferguson?
17        **A    I knew him from affiliate**
18   **marketing world, conferences.**
19        Q    Did you ever work through Roger
20   Ferguson?
21        MR. LEVINE:  Objection.
22            Vague.
23        **A    Work through as in --**
24        Q    Were you an affiliate,
25   sub-affiliate, or a contractor of some sort

28

1         DANNY PIERCE
2    for Roger Ferguson?
3         MR. NEWMAN:  Objection.
4            Compound.
5         **A    I mean, I don't know how to answer**
6    **that.  I'm not sure if I was an independent**
7    **contractor, sub-affiliate, or anything of**
8    **his.**
9         Q    Were you ever an affiliate with a
10   company that Roger Ferguson owned or
11   controlled?
12        **A    No.**
13        Q    Did you ever receive a percentage
14   of business from Roger Ferguson for activities
15   that you have provided for or on behalf of
16   Roger Ferguson or any businesses that he
17   controlled?
18        MR. LEVINE:  Objection.
19            Vague. Compound.
20        **A    I don't know.  Can you rephrase**
21   **that?**
22        MR. COCHELL:  Please repeat
23            the question.
24            (Whereupon, the question was
25            read back by the reporter.)

29

1         DANNY PIERCE
2         MR. LEVINE:  Same
3            objection.
4         **A    I did not.**
5         Q    So describe the extent of your
6    relationship with Roger Ferguson when you
7    first became aware of Credit Bureau Center or
8    Michael Brown.
9         MR. LEVINE:  Objection.
10           Vague.
11        **A    I'm not sure.**
12        Q    What were you discussing with
13   Roger Ferguson before you learned about the
14   existence of Michael Brown and CBC?  Why would
15   you even talk to him?
16        MR. LEVINE:  Objection.
17           Vague and compound.
18        **A    I'm not sure.  It's so long ago.**
19        Q    So the first time that you talked
20   to Roger Ferguson about business was to
21   discuss Credit Bureau Center and Michael
22   Brown?
23        MR. LEVINE:  Objection.
24           Vague.
25        **A    No.**

8 (Pages 26 to 29)

**Danny Pierce**

30

DANNY PIERCE

1
2  Q   The first time that you discussed
3  conducting any business activity with Roger
4  Ferguson was when he mentioned the existence
5  of Credit Bureau Center and Michael Brown, is
6  that correct, sir?
7          MR. LEVINE:  Objection.
8          Asked and answered, and vague.
9  **A   No.**
10  Q   So describe what happened.  What
11  did he tell you about Credit Bureau Center and
12  Michael Brown the first time you talked to him
13  about it?
14  **A   I don't remember.**
15  Q   So can you describe whether you
16  had communications with Credit Bureau Center
17  and Michael Brown through Roger Ferguson?
18          MR. LEVINE:  Objection.
19          Vague.
20  Q   At any time.
21  **A   If I had communication with**
22  **Michael Brown through Roger?**
23  Q   Yes.
24          MR. LEVINE:  Same
25          objection.

31

DANNY PIERCE

1
2  **A   I mean, I would tell Roger**
3  **something, and he would relay it.  I'm**
4  **assuming.**
5  Q   You're assuming, but you don't
6  recall any communications conducted that way?
7          MR. LEVINE:  Objection.
8          Mischaracterizing testimony.
9  **A   I can't be certain.**
10  Q   So how did you come to form a
11  relationship with Credit Bureau Center and
12  Michael Brown?
13  **A   I e-mailed Michael Brown.**
14  Q   Do you recall approximately when
15  that was?
16  **A   2014, October maybe.**
17  Q   When you e-mailed him, what was
18  it?  Did he e-mail you or did you e-mail
19  him?
20  **A   I e-mailed him.**
21  Q   What was the nature of your e-mail
22  to him?
23  **A   To contact me if he still wanted**
24  **that traffic.**
25  Q   If he still wanted that traffic?

32

DANNY PIERCE

1
2  **A   Yes.**
3  Q   What are you referring to?
4  **A   The traffic that was going to his**
5  **offer.**
6  Q   By his offer, what are you
7  referring to?
8  **A   His company, his credit report,**
9  **web page.**
10  Q   So you considered that to be one
11  offer?
12  **A   Yes.**
13  Q   With respect to the relationship,
14  what happened after that, after that initial
15  e-mail?
16  **A   With --**
17  Q   Mr. Brown.
18  **A   He contacted me.**
19  Q   What did you discuss?
20  **A   That I were to be the main**
21  **contact.**
22  Q   Main contact for what?
23  **A   For any communication between me**
24  **and Mike Brown.**
25  Q   Any communication between you and

33

DANNY PIERCE

1
2  Mike Brown. Seems kind of broad to me. What
3  are you saying here?
4  **A   That I would deal with him**
5  **directly.**
6  Q   All right. Then you guys formed
7  some sort of business relationship after
8  that?
9  **A   Yes.**
10  Q   Some time in 2014?
11  **A   Yes.**
12  Q   Did you sign an affiliate
13  agreement with him?
14  **A   I don't know.**
15  Q   But you became an affiliate of
16  CBC?
17  **A   Yes.  Nothing was changed on**
18  **the -- nothing was changed. The point of**
19  **contact was changed.**
20  Q   By point of contact, what are you
21  talking about?
22  **A   Me and Mike Brown.**
23  Q   Who was the previous point of
24  contact?
25  **A   Roger Ferguson.**

9 (Pages 30 to 33)

**Danny Pierce**

34

1      **DANNY PIERCE**
2      Q    I see. So Roger Ferguson had an
3  affiliate relationship with Mike Brown and CBC
4  prior to you?
5      **A    Yes.**
6      Q    So did you make referrals to CBC
7  through Roger Ferguson?
8          MR. LEVINE:  Objection.
9      Vague.
10     **A    No.**
11     Q    What was the significance of Roger
12 Ferguson being your point of contact?
13     **A    I don't know.**
14     Q    What did he do as your point of
15 contact?
16     **A    He contacted Mike Brown.**
17     Q    For what?  If you know.  If you
18 don't know, that's fine.
19     **A    He was the account manager.**
20     Q    When you say the account manager,
21 the account manager for what?
22     **A    For Michael Brown.**
23     Q    He was the account manager for
24 Credit Bureau Center; is that what you're
25 saying?

35

1      DANNY PIERCE
2      **A    I believe so.**
3      Q    So if I understand, just to wrap
4  up here, you had no business that you referred
5  to CBC that Roger Ferguson managed; is that
6  correct?
7          MR. LEVINE:  Objection.
8      Vague.
9      **A    I'm not sure what you mean.**
10     Q    You made no referrals to CBC
11 through Roger Ferguson?
12         MR. LEVINE:  Objection.
13     Vague. I don't know what you mean
14     by referrals.
15     **A    I'm not sure what you mean by**
16 **referrals either.**
17     Q    Okay. So Roger Ferguson was an
18 account manager for CBC, according to you,
19 right?
20     **A    Yes.**
21     Q    So what did he manage for CBC?
22     **A    I'm not sure.**
23     Q    Did you have any relationship with
24 a company called JC Media?
25     **A    I don't think so. It doesn't sound**

36

1      **DANNY PIERCE**
2  familiar.
3      Q    Did you review any documents in
4  preparation for today's deposition?
5      **A    I did not.**
6      Q    Other than appearing at the
7  preliminary injunction, and appearing for your
8  deposition today, have you ever had any
9  meetings with FTC staff or lawyers in person
10 or by telephone?
11     **A    I have not.**
12     Q    He had, through Revable, what I
13 understand, and correct me if I am wrong,
14 something called an RTO database.
15         MR. LEVINE:  Objection.
16     Vague.
17     **A    RTO database, I did not.**
18     Q    Let me ask you something.  With
19 respect to Revable's relationship to CBC, did
20 you drive business to CBC's website through
21 Revable activities?
22         MR. LEVINE:  Objection.
23     Vague.
24     **A    What do you mean?**
25     Q    My question, sir, is, did you have

37

1      DANNY PIERCE
2  a business relationship through Revable with
3  CBC that resulted in you driving business to
4  CBC for their credit report and scoring
5  business?
6          MR. LEVINE:  Objection.
7      Vague and compound.
8      **A    I'm still not sure what you are**
9  **asking.**
10     Q    What was the relationship between
11 Revable and CBC?  What did you do for him, if
12 anything?
13     **A    I had affiliates that sent traffic**
14 **to their website.**
15     Q    You had an affiliate that sent
16 traffic to their website.  What website was
17 that?
18     **A    Andrew Lloyd.**
19     Q    Did he have a name of a company?
20     **A    I think he was independent.**
21     Q    If I understand your prior
22 testimony correctly, you never told Michael
23 Brown that you had an affiliate that was
24 actually driving the traffic to CBC; isn't
25 that correct, sir?

**MS Legal Support    Registration #813**
**713-650-1800    production@mslegalsupport.com**

**Danny Pierce**

38

DANNY PIERCE
1
2     MR. LEVINE:  Objection.
3     Mischaracterizing the testimony,
4     and vagueness.
5     **A    It never came up, but he knew that**
6     **I had affiliate, affiliates.**
7     Q     You never mentioned it to him, and
8     he never was advised specifically that Andrew
9     Lloyd was working for, or through Revable?
10    MR. LEVINE:  Objection.
11    Vague.
12    **A    It never came up.**
13    Q     You think you knew, but you never
14    told him; is that correct?
15    MR. LEVINE:  Same
16    objection.
17    **A    He knew.**
18    MR. COCHELL: I move to
19    strike.
20    Q     My question is, you think he knew,
21    but you never told him specifically that
22    Andrew Lloyd was an affiliate for Revable;
23    isn't that correct?
24    MR. LEVINE:  Objection.
25    Speculation, vague, compound.

39

DANNY PIERCE
1
2     MR. COCHELL:  Form and
3     foundations are the proper
4     objections, counsel.
5     MR. COCHELL:  Ask the
6     question again.
7     (Whereupon, the question was
8     read back by the reporter.)
9     MR. LEVINE:  Same
10    objections.
11    **A    I mean, he didn't know his name,**
12    **but he knew there was an affiliate that was**
13    **sending traffic to his office website.**
14    Q     He knew that how?
15    MR. LEVINE:  Objection.
16    Calls for speculation.
17    **A    Because I was an affiliate**
18    **network.**
19    Q     So you're assuming that he knew
20    based on the fact that you were an affiliate
21    network, is that correct, sir?
22    **A    I didn't run the traffic.  That**
23    **was what my affiliate did for him.**
24    Q     I'm sorry?
25    **A    My affiliate ran the traffic for**

40

**DANNY PIERCE**
1
2     **him.**
3     Q     To who?
4     **A    To his website.**
5     Q     To who, to whose website?
6     **A    To Mike Brown's website.**
7     Q     With respect to Andrew Lloyd, did
8     Andrew Lloyd have something called an RTO
9     database?
10    **A    He did not.**
11    Q     Did he have a website that
12    represented that it was an RTO database?
13    **A    He did not.**
14    MR. LEVINE:  Objection.
15    Vague.
16    (Whereupon, a document, was
17    marked as Defendant's Exhibit 2,
18    for identification, as of this
19    date.)
20    Q     Marked as Exhibit 2 for
21    identification, I ask you, sir, if you
22    recognize that document.
23    MR. LEVINE:  I'm sorry.  Is
24    there a question?
25    MR. COCHELL:  Yes.  I said,

41

DANNY PIERCE
1
2     I'm showing him an exhibit.  I
3     asked if he recognized the
4     document.
5     **A    I don't.**
6     **(Whereupon, a document**
7     **entitled Rent Find, was marked as**
8     **Defendant's Exhibit 3, for**
9     **identification, as of this date.)**
10    Q     Let me show you what's been marked
11    as deposition Exhibit 3, and I ask you, sir,
12    if you recognize that document?  I'm sorry.
13    Did I just give you another copy of the
14    database?
15    **A    Yes.**
16    MR. LEVINE:  I'm sorry.
17    What are we looking at?
18    MR. COCHELL:  Deposition
19    Exhibit 3.  This is powered by
20    Rent Find.
21    Q     Did you recognize that document,
22    sir?
23    **A    I do not.**
24    Q     Were you familiar with any of the
25    websites that Andrew Lloyd operated and were

**MS Legal Support     Registration #813**
**713-650-1800     production@mslegalsupport.com**

**Danny Pierce**

42

1 DANNY PIERCE
2 used to respond to offers by CBC?
3 MR. LEVINE: Objection.
4 Vague, compound, lack of
5 foundation.
6 **A I do not.**
7 Q So you never looked at any of
8 Andrew Lloyd's websites that were part of his
9 affiliate relationship with you; is that
10 correct?
11 MR. LEVINE: Objection.
12 Vague, lack of foundation,
13 compound.
14 MR. NEWMAN: Could you be
15 clear? When you say you never
16 looked, are you referring to him
17 specifically, or --
18 MR. COCHELL: Yes. That's
19 what I said, you.
20 MR. NEWMAN: Well, you could
21 mean you specifically or somebody.
22 MR. COCHELL: I will ask
23 that question.
24 Q Let me ask it a different way. Did
25 you personally review any of the websites that

43

1 DANNY PIERCE
2 were operated by Andrew Lloyd and were part of
3 his, I guess, response to CBC's offer?
4 MR. LEVINE: Objection.
5 Vague, lack of foundation,
6 compound.
7 **A I did not, but he didn't use a**
8 **website to promote Michael Brown's offer.**
9 Q I see. What you're saying by that
10 answer is that this wasn't his website, you
11 have never seen his website, but you're
12 commenting that it wasn't used to promote
13 Michael Brown's website?
14 MR. LEVINE: If you
15 understand what he's talking
16 about.
17 MR. COCHELL: We're talking
18 about deposition Exhibit 3.
19 MR. LEVINE: I believe
20 Mr. Pierce testified he didn't
21 recognize the exhibit, so I don't
22 know what we're talking about.
23 Q So you have no idea of what
24 Mr. Lloyd did on his websites to promote or
25 somehow refer to CBC's website; is that

44

1 DANNY PIERCE
2 correct?
3 MR. COCHELL: Make your
4 objections. Let him answer the
5 question, counsel.
6 MR. LEVINE: I'm going to
7 make my objection. It's vague.
8 It lacks foundation. It assumes
9 facts that are not in evidence,
10 and you're asking him to describe
11 a document he says he does not
12 recognize.
13 MR. COCHELL: I will ask the
14 question again. The court
15 reporter will restate it. Your
16 objection is on the record. Let
17 the witness answer.
18 (Whereupon, the question was
19 read back by the reporter.)
20 **A I wasn't aware that he was using a**
21 **website.**
22 Q Andrew Lloyd was using a
23 website?
24 **A Yes.**
25 Q Do you think it's probable that

45

1 DANNY PIERCE
2 someone, Urcan, your affiliate manager, was
3 familiar with Andrew Lloyd's website?
4 MR. LEVINE: Objection. It's
5 speculation.
6 **A Urcan wasn't involved in the**
7 **company when CBC offer came on to the network.**
8 MR. LEVINE: You said Urcan
9 was not?
10 THE WITNESS: He was not.
11 Q At what point did Urcan become
12 involved?
13 **A He was never involved.**
14 Q Was he involved in the company
15 after you had a relationship with CBC?
16 **A No.**
17 Q How long did Urcan work with you
18 as an affiliate manager?
19 **A I can't be certain.**
20 Q How many months, approximately?
21 Was it more than one? Was it more than
22 five?
23 **A More than five, but he wasn't an**
24 **affiliate manager when we had CBC on the**
25 **network.**

**MS Legal Support     Registration #813**
**713-650-1800     production@mslegalsupport.com**

**Danny Pierce**

---

46

1            **DANNY PIERCE**
2     Q    Was he an affiliate manager in
3 2014?
4     **A    No.**
5     Q    Was he an affiliate manager in
6 2015?
7     **A    No.**
8     Q    When was he an affiliate manager
9 for Revable?
10     **A    First he was affiliate manager for**
11 **CPA Staxx. I'm not certain of the dates. I**
12 **think with -- I want to say I can't be certain**
13 **of the dates, off the top of my head.**
14     Q    So was it some time in 2014?
15           MR. LEVINE: Objection.
16     Asked and answered.
17           MR. NEWMAN: Asked and
18     answered.
19     **A    I can't be certain of the dates.**
20     Q    Did you become aware of any
21 templates that were used by Andrew Lloyd as an
22 affiliate in connection with CBC?
23           MR. LEVINE: Objection,
24     Vague.
25           MR. NEWMAN: Objection as to

---

47

1            DANNY PIERCE
2     form.
3           MR. LEVINE: Vague and
4     foundation.
5           MR. NEWMAN: Could you be
6     more specific with respect to
7     templates? Do you know what a
8     template is?
9           THE WITNESS: Yes.
10     Q    TEMPLATES are used by companies,
11 kind of like a form letter that's used, and
12 it's modified to match a potential customer,
13 correct?
14     **A    Yes.**
15     Q    Did you ever see potentially any
16 templates that were used by Andrew Lloyd in
17 connection with driving traffic to CBC?
18           MR. LEVINE: Vague.
19     Objection.
20     **A    I wouldn't be able to answer that.**
21 **I'm not sure if it was direct. I'm not**
22 **sure.**
23     Q    You're not sure what about?
24     **A    If I saw any templates, I'm not**
25 **sure what template you're talking about.**

---

48

1            **DANNY PIERCE**
2     Q    Well, I'm asking about any
3 template. Did you see any templates that are
4 used?
5     **A    I don't think so.**
6           **(Whereupon, an e-mail was**
7     **marked as Defendant's Exhibit 4,**
8     **for identification, as of this**
9     **date.)**
10     Q    With respect to Michael Brown, I
11 want to ask you what's been marked as
12 deposition Exhibit 4, sir, and ask if you
13 recognize that document?
14     **A    Yes.**
15     Q    This starts off with, please
16 change your template to say something like,
17 don't e-mail me the report, just print it out.
18 Do you see that?
19     **A    Yes.**
20     Q    So this was referring to a
21 template that was being used by Andrew Lloyd;
22 is that correct?
23     **A    Yes.**
24     Q    You never actually saw the
25 template that was being used by Andrew Lloyd;

---

49

1            DANNY PIERCE
2 is that correct?
3           MR. LEVINE: Objection.
4     Vague.
5     **A    I don't think in full.**
6     Q    With respect to the template, with
7 respect to Defendant's Exhibit 4, it says
8 something happened. The template is -- "Do
9 not send me the report over mail. Bring it to
10 the tour." Is that your part of a text of
11 Defendants' Exhibit 4?
12     **A    Yes.**
13     Q    What were you asking here?
14     **A    I was relaying messages back and**
15 **fourth, I believe.**
16     Q    To who?
17     **A    To Mike Brown.**
18     Q    So it says, mail or e-mail, just
19 trying to reduce complaints and don't want
20 them to feel phished. What was Brown's
21 concern?
22           MR. LEVINE: Objection.
23     Speculation and lack of
24     foundation.
25     **A    I don't know what he was --**

---

13 (Pages 46 to 49)

Danny Pierce

---

50

**DANNY PIERCE**

Q    Do you know what the term phished is?

A    **Yes.**

Q    So he had a concern about people feeling phished.

MR. LEVINE:  Objection.

Q    If they were e-mailing credit reports over e-mail.

MR. LEVINE:  Objection. Mischaracterizing the record and calls for speculation.

A    **I wouldn't be able to answer that. I don't know.**

Q    You can't answer it one way or the other?  What does phishing mean?

A    **People stealing information from other people.**

Q    So it says, I didn't even notice that.  My bad. Are you going to remove the create user name and password from the sign-up process. I always feel like that catches people off guard.  Then it says, need UN/PW. What does UN mean?

A    **User name.**

---

51

**DANNY PIERCE**

Q    So if somebody e-mails a credit report over the internet, there is a risk that their data could be stolen; isn't that correct?

MR. LEVINE:  Objection. You're asking for an opinion from the witness.

A    **I wouldn't know. I don't know.**

Q    You wouldn't know?  Well, you know about phishing, right?

A    **Yes.**

Q    And you know that e-mail is not as secured as other measures that are taken to protect data, correct?

MR. NEWMAN:  Mr. Pierce isn't an expert.

MR. COCHELL:  I'm not asking as an expert. I'm asking what he knows and what he knew back then.

A    **I wouldn't know that.**

Q    Let me ask you this different way. You knew that Mike Brown was expressing a concern about the security of credit reports

---

52

DANNY PIERCE

being sent over e-mail people being driven to his website; isn't that right, sir?

MR. LEVINE:  Objection. Vague, mischaracterizes the record.

A    **No.  He was trying to reduce complaints to his credit report offer.**

Q    So his initial request is, please change your template. Obviously he thought this was your template, or that's what the text seems to say, right?

MR. LEVINE:  Objection. Vague and speculative.

A    **I mean, it's just conversation, not like official.  It's just how it's phrased.**

Q    But he says please change your template to say something like, don't e-mail the report, just take it with you, just print it out, right?

A    **Yes.**

Q    With respect to that particular, it was a request, right?

A    **It was a --**

---

53

**DANNY PIERCE**

MR. LEVINE:  Objection. Vague.

A    **It was a requirement. Told him to do it.**

Q    Did Mike say, this is a requirement, you are required to change the template?

A    **I didn't say it was a requirement, but if we didn't change the template, he wouldn't let us run the traffic anymore.**

Q    So you're assuming that he wouldn't have let you drive the traffic.  Did you have a discussion about that?

MR. LEVINE:  Objection. Mischaracterizes the witness' testimony.

A    **No.  He had certain things that if -- I mean, if we didn't comply with what he wanted, he wouldn't let us send the traffic. He wouldn't pay us.**

Q    You never asked him, is it okay if we just have him e-mail the report?

A    **No, I didn't.**

Q    So you are assuming that he

---

**MS Legal Support    Registration #813**
**713-650-1800    production@mslegalsupport.com**

**Danny Pierce**

54

1          DANNY PIERCE
2   wouldn't have let you drive traffic to CBC
3   unless you changed the template?
4          MR. LEVINE:  Objection.
5   Vague.
6       A   I mean --
7       Q   Isn't it correct you were assuming
8   that to be the case?
9       A   I wasn't assuming.  I knew he
10  wouldn't let us continue if we didn't do what
11  he said to do.
12      Q   I see.  But you never asked him,
13  and he never told you that, correct?
14         MR. LEVINE:  Objection.
15  Compound.  Asked and answered.
16      A   No.  I never asked him that in
17  their conversation.
18      Q   And he never told you that?
19      A   No.
20      Q   Right?
21      A   Yes.
22      Q   It sounds like you were unaware
23  that Andrew Lloyd was creating MLS, a website
24  or ads that had MLS ads for rental homes?
25         MR. LEVINE:  Objection. That

55

1          DANNY PIERCE
2   mischaracterizes the record.
3          MR. COCHELL:  If you could
4   let me finish.
5       Q   Is that correct?  Did you?  Is
6   that correct?
7          MR. LEVINE:  I object.
8   Mischaracterizes the record, and
9   it's vague.
10      Q   Are you saying that?
11         MR. LEVINE:  Same
12  objection.
13      A   I didn't know what he was -- what
14  his like -- I'm confused by the question.
15      Q   Let me ask you this.  You have a
16  substantial business relationship with CBC
17  over a period of about two years, correct?
18      A   Yes.
19      Q   And a substantial part of that was
20  relationship where referrals were generated or
21  traffic that was driven by Andrew Lloyd's
22  website to CBC.
23         MR. LEVINE:  Objection.
24  Vagueness.
25         MR. NEWMAN:  What does

56

1          DANNY PIERCE
2   substantial mean?
3       A   And Andrew Lloyd traffic was from
4   e-mail. Wasn't from the website.
5       Q   So you made a lot of money from
6   traffic driven by e-mails from Andrew Lloyd,
7   is that correct?
8          MR. NEWMAN:  Objection as to
9   form.
10         MR. LEVINE:  Objection.
11  Same objection.
12         MR. NEWMAN:  A lot of
13  money.
14         MR. COCHELL:  I think it's
15  2.4 million or something like
16  that.
17         MR. NEWMAN:  Well, then ask
18  it that way.  A lot of money is --
19         MR. COCHELL:  I'm asking it
20  now.
21      A   I didn't make 2.4. Most of that
22  was to Andrew Lloyd for affiliate
23  commission.
24      Q   How much did you make?
25      A   I'm not sure.

57

1          DANNY PIERCE
2       Q   You don't know?
3       A   I don't know.
4       Q   Was it more than $500,000?
5          MR. NEWMAN:  Can you be more
6   specific?  How much he netted?
7       Q   I'm asking how much revenue did
8   you make over a two-year period that you
9   realized after you paid Andrew Lloyd?
10         MR. LEVINE:  Objection.
11  Vague.
12      A   I would say  -- I don't know for
13  certain.
14      Q   But if you have an approximate,
15  that's fine. Specific numbers will tell us at
16  some point.
17      A   Three hundred thousand maybe.
18      Q   So let me ask you this.  With
19  respect to that $300,000, you made $300,000,
20  and you were familiar that Lloyd was sending
21  e-mails, driving traffic to CBC relating to
22  MLS ads or rental homes; is that correct, sir?
23         MR. LEVINE:  Objection.
24  Vagueness and compound.
25      A   I don't know if there were MLS

15 (Pages 54 to 57)

**Danny Pierce**

58

1　　　　　　**DANNY PIERCE**
2　**ads.  I don't know where his ads were from.**
3　　　Q　　So there were like real estate
4　listings of some sort?
5　　　**A　　I'm not completely sure.**
6　　　Q　　So you're not sure today, and you
7　weren't sure back then, what he was doing?
8　　　　　　MR. LEVINE:  Objection.
9　　　　　　Mischaracterizes the testimony.
10　　　**A　　I just know he was posting**
11　**Craigslist.**
12　　　Q　　So did you know that the postings
13　were phony postings that were a fraud on
14　consumers?
15　　　**A　　I didn't know if they were like a**
16　**fraud, but I knew that they were there to get**
17　**a response, lead generation.**
18　　　Q　　So they were there to get a lead
19　generation, but did you know that he was
20　misleading consumers by posting phony
21　Craigslist ads for rental homes.
22　　　　　　MR. LEVINE:  Objection.
23　　　　　　Lack of foundation and vague.
24　　　**A　　I knew he was posting the ads.**
25　　　Q　　But you didn't know if they were

59

1　　　　　　DANNY PIERCE
2　legitimate ads with legitimate landlords for
3　rental homes; is that correct?
4　　　　　　MR. LEVINE:  Objection.
5　　　　　　Vague.
6　　　**A　　I just knew they were ads and**
7　**pictures.**
8　　　Q　　And they looked legitimate to you?
9　Did you see any of the pictures?
10　　　　　　MR. LEVINE:  Objection. Lack
11　　　　　　of foundation and vague.
12　　　**A　　I really haven't seen the posts**
13　**live.  Like I know they had to have looked**
14　**real.**
15　　　Q　　Did you see some of the posts in
16　the documents circulated in this lawsuit?
17　　　**A　　Yes.**
18　　　Q　　Would it be fair to say that you
19　felt victimized by Andrew Lloyd when you were
20　sued in this lawsuit?
21　　　　　　MR. LEVINE:  Objection.
22　　　　　　Vague.
23　　　**A　　No.**
24　　　Q　　Well, what did you do that was
25　wrong?

60

1　　　　　　DANNY PIERCE
2　　　　　　MR. LEVINE:  Objection.
3　　　　　　Vague.
4　　　**A　　I managed a relationship between**
5　**Brown and Lloyd. Had it on my offer, on my**
6　**network, offer on my network.**
7　　　Q　　What was wrong about that?
8　　　　　　MR. LEVINE:  Same
9　　　　　　objection.
10　　　**A　　I don't know.**
11　　　Q　　You did not think, and today you
12　still do not think that you did anything
13　illegal in managing the affiliate network, or
14　the affiliate activities of Mr. Lloyd and his
15　e-mails to CBC?
16　　　　　　MR. NEWMAN:  I'm going to
17　　　　　　instruct him not to answer that
18　　　　　　question. I'm sorry.  You have to
19　　　　　　rephrase your question.  You're
20　　　　　　making statements.  You're not
21　　　　　　asking questions.
22　　　　　　MR. COCHELL:  These are
23　　　　　　questions.
24　　　　　　MR. LEVINE:  And I'm
25　　　　　　objecting that you're calling him

61

1　　　　　　DANNY PIERCE
2　to make a statement.
3　　　　　　MR. NEWMAN:  Of legal
4　　　　　　conclusions.
5　　　　　　MR. COCHELL:  The record
6　　　　　　shows that I asked him whether he
7　　　　　　felt that he was doing anything
8　　　　　　wrong.  I think that's perfectly
9　　　　　　appropriate. It's not a legal
10　　　　　　question.
11　　　　　　MR. NEWMAN:  That question
12　　　　　　is fine.  It was the subsequent
13　　　　　　question.
14　　　Q　　With respect to the e-mails from
15　Mr. Lloyd to Mr. Brown, did you at the time,
16　think those e-mails were misleading or
17　deceptive to consumers?
18　　　　　　MR. LEVINE:  Vague.
19　　　　　　Objection. Calls for legal
20　　　　　　conclusion and lacks foundation.
21　　　**A　　I didn't think so.**
22　　　Q　　If you had thought that they were
23　misleading or deceptive in some way, you would
24　have told Lloyd to stop sending those e-mails
25　to Brown, and misleading consumers; isn't that

**Danny Pierce**

---

62

DANNY PIERCE

right?

 MR. LEVINE: Same objection, and in addition to the prior objection, it's compound.

 **A I would have terminated the relationship between the two of them.**

 Q If you had known that the ads that circulated to consumers by Lloyd were false or misleading in some respects, you wouldn't have continued doing business with them; is that correct?

 MR. LEVINE: Objection. Vague. Lack of foundation.

 **A Not if I knew the extent of what was going to happen from it, I would have obviously terminated the relationship between both of them.**

 MR. COCHELL: Why don't we take a break.

 (Whereupon, a recess was taken from 10:45 10:57.)

 Q Did you ever meet Michael Brown in person?

 **A I have not.**

---

63

**DANNY PIERCE**

 Q Did you ever meet Andrew Lloyd in person?

 **A I have not.**

 Q Prior to him becoming part of your affiliate network, you never did any business with Andrew Lloyd?

 **A I don't believe so.**

 MR. COCHELL: Pass the witness.

 MR. LEVINE: In that case, we would like a short break before we begin.

 (Whereupon, a recess was taken from 11:00 a.m. to 11:37 a.m.)

 MR. LEVINE: Let the record show that the examination was passed to the plaintiff, and at Mr. Cochell's request, the plaintiff has agreed to let him ask some additional questions.

 Q I just have a couple of documents that I want to show you from Mr. McKinney's deposition. I only have one copy. These are

---

64

DANNY PIERCE

documents you guys can take a look at them real quick.

 MR. LEVINE: Do you mind if I stand behind the witness?

 MR. COCHELL: I'm actually going to do that, too. I don't have a problem.

 Q I show you what's been marked as McKinney Exhibit 8, I believe, and I will represent to you this was produced by the FTC during the course of this case. And you may or may not recognize it. It's one of numerous documents that have been disclosed. Do you recognize McKinney Exhibit 8?

 **A Yes.**

 Q Prior to this lawsuit being filed, did you ever review any MLS or Craigslist ads that Mr. Lloyd used in driving traffic to CBC?

 MR. LEVINE: Objection. Vague. Compound. Lack of foundation.

 **A I didn't review.**

 Q Exhibit 8 is an example of what you would expect to see if somebody was trying

---

65

DANNY PIERCE

to drive traffic for a rental home, or a home to be sold; is that a fair statement?

 MR. LEVINE: Objection. Vague. Calls for speculation.

 **A Just a rental on Craigslist.**

 Q You see homes being advertised on Craigslist for rental or for sale; is that correct?

 **A Yes.**

 Q Historically?

 **A Yes. I mean, it does like have some triggers, like the price for this three bedroom kind of seems low. I don't know what the housing market is in Boston. That's generally what was done. Prices were set, like 30 percent lower or 40 percent lower than the normal.**

 Q When you say the prices were generally set, I mean, are you referring to what Lloyd did?

 **A Yes. The prices were marked down.**

 Q So did you have a discussion with Lloyd about doing that?

---

17 (Pages 62 to 65)

**Danny Pierce**

---

66

DANNY PIERCE

1
2      **A     I wouldn't believe so, but I know**
3   **that's what was being done.**
4      Q     So he never told you that, and you
5   never asked him about how he set the prices or
6   whether he set them 30 percent below the real
7   market?
8            MR. LEVINE:  Objection,
9         Vague and compound.
10     **A     It's just the practice, is what I**
11  **knew what he was doing.**
12     Q     Whose practice is it?
13     **A     Just the practice that was being**
14  **done.**
15     Q     Not just Lloyd, but other people
16  in the industry?
17     **A     I wouldn't say the industry, but I**
18  **mean it's just to get a response, more of a**
19  **response for ad.**
20     Q     I show you what's been marked as
21  McKinney Exhibit 9. Have you ever seen that
22  document?  This is one of hundreds of
23  documents, but this was sent apparently to
24  you, danny@revable.com.
25           MR. LEVINE:  Vague.

---

67

DANNY PIERCE

1
2   Compound.
3      Q     Do you recognize that document?
4      **A     I don't recognize the document.**
5      Q     Was that your e-mail address at
6   the time?
7      **A     Yes.**
8      Q     It talks about, I think this was
9   -- I know you want the exact address property
10  but my husband does not want me to advertise
11  the practice as measure of safety.  Do you see
12  that?
13     **A     Yes.**
14     Q     At the time, did you know that
15  there was no landlord?
16           MR. LEVINE:  Objection.
17        Vague.  What time?
18           MR. COCHELL:  As of the date
19        of the e-mail.
20           MR. LEVINE:  The witness
21        said he does not recognize the
22        e-mail.
23           MR. COCHELL:  Okay.
24     Q     Did you see other e-mails like
25  this in McKinney number 9?

---

68

DANNY PIERCE

1
2      **A     In an exhibit?**
3      Q     Yes.
4      **A     I'm sure I did, yes.**
5      Q     Do you know why this would have
6   been sent to you?
7      **A     For some type of approval.**
8      Q     But do you, sitting here today,
9   have any idea of what was being asked you to
10  approve?
11     **A     Just to relay the copy,**
12  **probably.**
13     Q     Relay the copy to who?
14     **A     The copy of the e-mail, the**
15  **template.**
16     Q     Oh, you mean the content of it?
17     **A     Yes.**
18     Q     Then by clicking there, clicking
19  here, where it says clicking here in
20  deposition Exhibit McKinney 9, that would go
21  to CBC; is that your understanding?
22     **A     Yes.  That would go to Michael**
23  **Brown's website.**
24     Q     So during the time that Lloyd was
25  driving traffic to CBC in 2015 and 2016, you

---

69

DANNY PIERCE

1
2   had no idea of whether this -- for example,
3   looking at Exhibit 8, houses like Exhibit 8
4   that were being used by Lloyd, you have no
5   idea whether they were legitimate ads or
6   whether they were phony ads?
7            MR. LEVINE:  Objection.
8         Vague, compound, lack of
9         foundation.
10     **A     By legitimate or phony, I'm not**
11  **sure what you mean.**
12     Q     Let's assume that there is a real
13  house in a real listing with all of these
14  documents, right, can you do that?
15     **A     Yes.**
16     Q     But then let's assume that in
17  reality that house was not on the market.
18     **A     Okay.**
19     Q     But this ad had been lifted and
20  was being used, and therefore, was not a real
21  ad, so to speak.
22           MR. NEWMAN:  Are you asking
23        him to assume that?
24     Q     Can you assume that?
25     **A     I mean -- I guess, yes.**

---

18 (Pages 66 to 69)

**Danny Pierce**

70

DANNY PIERCE
1
2     Q     Did you know, based on these
3  assumptions, as you now know today, did you
4  know that these sorts of ads that did not
5  actually represent a house that was -- let me
6  back up.  Did you know that the houses that
7  were being driven to CBC by Lloyd were not
8  actually for rental?
9           MR. LEVINE:  Objection.
10     Lack of foundation and vague.
11     **A     I don't think they were for rent,**
12  **no.**
13     Q     At the time did you believe that
14  they were not for rent, that you knew they
15  were not for rent?
16     **A     Yes.  They weren't for rent, not**
17  **by Lloyd.**
18     Q     But they would have been for rent
19  by other people?
20           MR. LEVINE:  Objection.
21     Vague and lack of foundation.
22     **A     I mean, they could have been at**
23  **one point.  Who know if this house was a**
24  **rental or if it was not a rental.**
25     Q     So let's go back to my

71

DANNY PIERCE
1
2  hypothetical. Assume that this house was not
3  for rent, okay, at the time this was being
4  used by Lloyd. Can you do that?
5     **A     Okay.**
6     Q     Assume that this was used to drive
7  traffic to CBC, and mislead a consumer about
8  the existence of a house that was supposedly
9  for rent when it was not. Can you do that?
10           MR. LEVINE:  These are not
11     questions.
12           MR. COCHELL:  No.  These are
13     assumptions.  These are a
14     hypothetical foundation
15     question.
16     Q     So my question to you, sir,
17  knowing those facts, or assuming those facts,
18  did you know at the time that this sort of
19  rental was being circulated by Lloyd to CBC
20  for the purpose of misleading consumers?
21           MR. LEVINE:  Objection.
22     Vague. Compound. Lack of
23     foundation.
24     **A     That's all it was -- it was posted**
25  **to created a response, response for**

72

DANNY PIERCE
1
2  **Craigslist -- I mean, credit report lead.**
3     Q     This house, for example,
4  deposition Exhibit 8, did you know houses that
5  were being advertised like this through Lloyd
6  were not actually for rent?  Did you know that
7  at the time?
8           MR. LEVINE:  Objection. Are
9     your assumptions still holding?
10     It's vague.
11           MR. COCHELL:  Yes.
12     **A     I mean, I wouldn't be able to**
13  **answer that.**
14     Q     What?
15     **A     I don't know if the house was for**
16  **rent or if it wasn't for rent.**
17     Q     Well, okay. I'm asking you to
18  assume that it wasn't for rent. Did you know
19  that there were scores of houses like this
20  being driven to CBC where consumers complained
21  that the house was not actually for rent.
22           MR. LEVINE:  You're pointing
23     to Exhibit 8.
24           MR. COCHELL:  I'm pointing
25     to Exhibit 8.

73

DANNY PIERCE
1
2           MR. LEVINE:  Objection.
3     Vague.
4     **A     Yes.**
5     Q     Did you know at the time that
6  these sorts of misleading ads were being
7  circulated by Lloyd with referrals to CBC.
8           MR. LEVINE:  Objection.
9     Lack of foundation.  Vague.
10     **A     Yes.  These adds were being posted**
11  **to send traffic to CBC.**
12     Q     Did you know they were phony ads?
13           MR. LEVINE:  Same
14     objection.
15     **A     Yes.**
16     Q     How did you know?
17     **A     Because I know he's not renting**
18  **these places out. He's not a realtor. He**
19  **doesn't own the place. It's not his --**
20     Q     All right, so --
21     **A     He has no connection to this**
22  **property.**
23     Q     So why did you continue doing
24  business with him, if you knew that he was
25  sending ads that he had no connection to?

19 (Pages 70 to 73)

**Danny Pierce**

74

DANNY PIERCE

1
2    A    Because it was okay with
3    advertisers and this is the traffic that Mike
4    Brown wanted.
5    Q    Okay, but I'm trying to find out,
6    why would you send totally phony ads, or why
7    would you participate in sending totally phony
8    ads to anyone?
9            MR. LEVINE:  Objection.
10           Vague.  Argumentative.
11   A    Well, at the time I didn't think
12   it was deceptive, and I didn't see the
13   consequences from it.  I didn't have a lawyer
14   overlook what I was doing and what I was
15   allowing to happen.  I just assumed that it
16   was fine, because Mike Brown wanted the
17   traffic.  He continuously took the traffic,
18   and I just went on based on that, that
19   everything was fine with it, because a company
20   was charging customers from this traffic.
21           MR. NEWMAN:  Can we go off
22           the record for a moment?
23           (Whereupon, a discussion was
24           held off the record.)
25   Q    So when you say Mike Brown wanted

75

DANNY PIERCE

1
2    that traffic, he wanted traffic from real
3    estate agents, right?
4            MR. LEVINE:  Objection.
5            Calls for speculation.
6    A    He just wanted credit report
7    traffic, just traffic for his credit report.
8    Q    Did you ever have a discussion
9    with Lloyd about whether these ads were
10   genuine in the sense that there was a landlord
11   or seller of the property?
12           MR. LEVINE:  Objection.
13           Vague.
14   A    I did not.
15   Q    Did it ever occur to you to have
16   that sort of discussion with him?
17   A    I did not.
18   Q    Did Lloyd ever tell you that there
19   was, with respect to these, the landlord
20   e-mail in Exhibit 9, did he tell you that he
21   had fabricated something, deposition Exhibit
22   9, to make it appear that there was a landlord
23   when, in fact, there was not?
24           MR. LEVINE:  Objection.
25           Compound.  Lack of foundation.

76

DANNY PIERCE

1
2    A    No.  It's just how it went.  They
3    responded to this ad, and they got THIS
4    e-mail.
5    Q    Okay.  So you never wondered
6    whether there was a landlord that actually was
7    trying to rent a home?
8            MR. LEVINE:  Objection.
9            Asked and answered, and vague.
10   A    There wasn't a landlord.  Andrew
11   Lloyd was not representing a landlord. He was
12   just posting the ad.
13   Q    Well, how do you know he wasn't
14   representing a landlord?
15   A    Because he was posting like five
16   thousand of these a day. It's quite a lot of
17   people for one person to manage.
18   Q    Okay.  You never had a discussion
19   with Mike Brown about that?
20           MR. LEVINE:  Objection.
21           Vague.
22   A    No, but he knew the whole -- what
23   the whole deal was with this.
24           MR. COCHELL:  Move to
25           strike.

77

DANNY PIERCE

1
2    Q    My question was, you never had a
3    discussion with Mike Brown about this; is that
4    correct?
5            MR. LEVINE:  Objection.
6            Asked and answered.
7            MR. COCHELL:  I would like a
8            clear cut answer.
9            MR. LEVINE:  It was clear.
10           He answered it. I object.
11   A    I mean, I never had a conversation
12   personally with him about the postings.
13   Q    As I understand it, your testimony
14   is that Mike knew you had an affiliate, or
15   affiliates working for you, because you had an
16   affiliate management system?
17           MR. LEVINE:  Objection.
18           Mischaracterizes the testimony,
19           and vague.
20           (Continued on the next page.)
21
22
23
24
25

**MS Legal Support    Registration #813**
**713-650-1800    production@mslegalsupport.com**

**Danny Pierce**

---

**78**

```
 1              DANNY PIERCE
 2    A    I had an affiliate network.
 3    Q    Okay. All right.
 4           MR. COCHELL:  That's all the
 5    questions we have. Pass the
 6    witness.
 7           MR. LEVINE:  I have no
 8    questions.
 9           (Time noted:  12:05 p.m. )
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

**80**

```
 1
 2                    INDEX
 3    WITNESS:  DANNY PIERCE
 4    EXAMINATION BY:            PAGE
 5    MR. COCHELL                    3
 6           ***   ***   ***
 7                 EXHIBITS
 8    DEFENDANT'S EXHIBITS DESCRIPTION      PAGE
 9    1      Form Post, Revable    18
10    2          Document          40
11    3          Document entitled,   41
             Rent Find
12
13    4          E-mail            48

             ***   ***   ***
14
15
16
17
18
19
20
21
22
23
24
25
```

---

**79**

```
 1
 2    A C K N O W L E D G M E N T
 3
 4      I, DANNY PIERCE, hereby certify that
 5    I have read the transcript of my
 6    testimony taken under oath in my
 7    deposition of the 30th day of
 8    January 2018; that the transcript is
 9    a true, complete and correct record
10    of what was asked, answered and said
11    during this deposition, and that the
12    answers on the record as given by me
13    are true and correct.
14
      _____
15            DANNY PIERCE
16
      Subscribed and sworn to before me
17
      this ____ day of _____, 2018.
18
      _____
19
      Notary Public
20
21
22
23
24
25
```

---

**81**

```
 1
 2              CERTIFICATION
 3
 4      I, Debra J. Gumpel, a Shorthand Reporter
 5    and Notary Public in and for the State of New
 6    York, do hereby certify:
 7      That the testimony of DANNY PIERCE, was
 8    held before me at the aforementioned time and
 9    place.
10      That said witness was duly sworn before
11    the commencement of the testimony and that the
12    testimony was taken stenographically by me and
13    is a true and accurate transcription of my
14    stenographic notes.
15      I further certify that I am not related
16    to any of the parties to the action by blood
17    or marriage and that I am in no way interested
18    in the outcome of this matter.
19      IN WITNESS WHEREOF, I have hereunto set
20    my hand this _____ day of _____, 2018.
21
22
          ---------------------
23            DEBRA J. GUMPEL
24          --oOo--
25
```

**MS Legal Support     Registration #813**
**713-650-1800     production@mslegalsupport.com**