**Thomas Fragala - 2/28/2018**

## Page 1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

FEDERAL TRADE COMMISSION,

    Plaintiff,

vs.          Case No. 17-CV-00194
CREDIT BUREAU CENTER, LLC,
and MIKE BROWN, et al.,
    Defendants.
_____/

DEPOSITION OF THOMAS FRAGALA
La Jolla, California
February 28, 2018

Cindy Duynstee, CSR, RPR
Certificate No. 12938

## Page 2

```
 1        Pursuant to Notice to Take Deposition, on
 2   Wednesday, February 28, 2018, commencing at the hour of
 3   9:28 a.m., at 4365 Executive Drive, Suite 1100, in the
 4   City of La Jolla, County of San Diego, State of
 5   California, before me, Cindy Duynstee, Certified
 6   Shorthand Reporter in and for the State of California,
 7   personally appeared:
 8            THOMAS FRAGALA,
 9   called by the Defendant, who, being by me first sworn,
10   was thereupon examined as a witness in said cause.
11            A P P E A R A N C E S
12   FOR THE PLAINTIFF (FEDERAL TRADE COMMISSION):
13        FEDERAL TRADE COMMISSION
          BY:  GUY G. WARD, ESQ.
14        230 S. Dearborn Street, Suite 3030
          Chicago, Illinois 60604
15        (312) 960-5612
          Gward@ftc.gov
16
17   FOR THE WITNESS:
18        DLA PIPER
          BY:  BRIAN J. BOYLE, ESQ.
19        1650 Market Street, Suite 4900
          Philadelphia, Pennsylvania 19103
20        (215) 656-2424
          Brian.boyle@dlapiper.com
21   FOR THE DEFENDANT:
22        THE COCHELL LAW FIRM
          BY:  STEPHEN R. COCHELL, ESQ.
23        2616 South Loop West, Suite 470
          Houston, Texas 77054
24        (346) 800-3500
          Srcochell@gmail.com
25
```

## Page 3

```
 1              I N D E X
 2   DEPOSITION OF THOMAS FRAGALA
 3   February 28, 2018
 4   EXAMINATION BY                      PAGE
 5   BY MR. COCHELL                       5
 6
 7              E X H I B I T S
 8   FOR DEFENDANT
 9   EXHIBIT NO.  DESCRIPTION            PAGE
10   Exhibit 1   Tom Fragala's LinkedIn Profile;    8
                 6 pages.
11
     Exhibit 2   Saturday, November 30, Daily Recap;   20
12               2 pages.
13   Exhibit 3   April 5, 2014, e-mail; 1 page.    21
14   Exhibit 4   Referral Agreement; 4 pages.     31
15   Exhibit 5   October 29, 2012, E-mail; 2 pages.   33
16   Exhibit 6   Prospect Referral Claim Form for    35
                 ScamSafe, Inc. (dba Truston);
17               1 page.
18   Exhibit 7   CreditUpdates Brochure           39
                 Requirements; 2 pages.
19
     Exhibit 8   CreditUpdates Partner Program Guide   42
20               Requirements; 5 pages.
21   Exhibit 9   Letter template; 1 page.        46
22   Exhibit 10  May 22, 2014, E-mail; 2 pages.   55
23   Exhibit 11  October 3, 2014, E-mail; 1 page.   56
24   Exhibit 12  September 23, 2014, E-mail; 1 page.   58
25
```

## Page 4

```
 1   Exhibit 13  White Label Total Platform Agent   59
                 Agreement; 23 pages.
 2
     Exhibit 14  September 26, 2014, E-mail;    68
 3               5 pages.
 4   Exhibit 15  September 27, 2014, E-mail;    69
                 5 pages.
 5
     Exhibit 16  August 7, 2015, E-mail; 1 page.   71
 6
     Exhibit 17  October 6, 2015, E-mail; 4 pages.   74
 7
 8   Exhibit 18  October 8, 2015, E-mail; 5 pages.   78
 9
     Exhibit 19  March 25, 2016, E-mail; 1 page.   80
10
     Exhibit 20  Chat with Mike Brown; 1 page.   89
11
     Exhibit 21  June 29, 2015, E-mail; 2 pages.   91
12
13   Exhibit 22  September 17, 2015, E-mail;    97
                 4 pages.
14   Exhibit 23  September 28, 2015, E-mail;    111
                 4 pages.
```
```
15   QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER
16               (None.)
17
18       REQUESTED INFORMATION
19               (None.)
20
21
22
23
24           EXHIBIT
25             E
```

© StenoWorks
The Court Reporting Store

**1 (Pages 1 to 4)**

**Thomas Fragala - 2/28/2018**

1  LA JOLLA, CALIFORNIA; FEBRUARY 28, 2018; 9:28 A.M.
2
3  THOMAS FRAGALA,
4  having been sworn, testified as follows:
5
6  EXAMINATION
7  MR. COCHELL: Let the record reflect that this is the
8  deposition of Tom Fragala, which is being taken pursuant
9  to the Federal Rules of Civil Procedure and pursuant to
10  an agreed subpoena by counsel.
11  BY MR. COCHELL:
12  Q. Mr. Fragala, let me reintroduce myself. My
13  name is Steve Cochell. I represent Michael Brown and
14  Credit Bureau Center in litigation that's been filed by
15  the Federal Trade Commission, which is pending in the
16  Northern District of Illinois in Chicago.
17  I'll be asking you a series of questions today.
18  If you don't understand any of my questions, please stop
19  me and ask me to rephrase, or I'll have the court
20  reporter repeat the questions.
21  If your lawyer objects or if one of the other
22  attorneys, Mr. Ward, objects today, please stop your
23  testimony, don't answer until he gets his objection on
24  the record.
25  Unless your lawyer directs you not to answer a

1  question, under the rules, you're obligated to answer
2  the question as it was asked.
3  Do you understand that?
4  A. Yes.
5  Q. And you've already won the lottery on, you
6  know, the rules -- so called rules of depositions. You
7  have to answer verbally. The court reporter can't take
8  down a shrug of your head or your arms or legs or
9  whatever. You know, you can just, you know -- but you
10  have to answer verbally. So if I say, you know, "You
11  have to answer verbally," I'm not harassing you; I'm
12  just asking you to talk.
13  Okay. So if you would, for the record, please
14  state your name and your current address.
15  MR. BOYLE: Counsel, before we start, Madam
16  Court Reporter, do you need entries of appearance on the
17  record?
18  THE REPORTER: If you'd like. They're going to
19  be on the appearance page.
20  MR. BOYLE: Okay. That's fine.
21  I'm sorry. Go ahead.
22  MR. COCHELL: Yeah, no problem.
23  BY MR. COCHELL:
24  Q. What is your current home address?
25  A. You originally asked me for my full name. Do

1  you want me to start with that?
2  Q. Yeah, you can do that.
3  A. Thomas Fragala. My current home address is
4  6511 Camino Del Rey.
5  Q. And how long have you lived there, sir?
6  A. For approximately seven years.
7  Q. And Camino Del Rey is located in what city?
8  A. Bonsall.
9  Q. And are you married, sir?
10  A. No.
11  Q. Do you have children?
12  A. Yes.
13  Q. How many children do you have?
14  A. Two.
15  Q. And what are their ages and sexes?
16  A. 11 and 13, and they are both boys.
17  Q. All right. Are you currently employed?
18  A. Yes.
19  Q. How are you employed?
20  A. I'm employed by Online Credit Systems LLC,
21  doing business as Truston.
22  Q. And do you have an ownership interest in Online
23  Credit Systems, d/b/a Truston?
24  A. Yes. I'm the sole owner and member.
25  Q. Have you ever been a partner with anyone in

1  Credit Online Systems [sic]?
2  MR. BOYLE: Object to form.
3  BY MR. COCHELL:
4  Q. Do you understand the question?
5  A. I believe I don't understand what the name of
6  the company was that you used.
7  Q. I thought I said Online Credit Systems. Is
8  that the name of your company?
9  A. Yeah, it was transposed. Online Credit
10  Systems.
11  I've never had a partner in that company, no.
12  Q. Why don't I just call it Truston?
13  A. Very good.
14  Q. You'll understand that going through?
15  A. (Nods head.)
16  Q. Are you an owner or do you have an ownership
17  interest in any other company?
18  A. No.
19  Q. I'm going to show you what I've marked as
20  Exhibit 1 for identification; and ask you, sir, if you
21  recognize that document, which purports to be a resume
22  with your name on it.
23  (Exhibit 1 was marked for
24  identification.)
25  THE WITNESS: I do recognize some of the

**2 (Pages 5 to 8)**

**Thomas Fragala - 2/28/2018**

1  information on this.
2  BY MR. COCHELL:
3  Q. Okay. Let me ask you something. In your --
4  what is your occupation?
5  **A. I am the founder and CEO and owner of Truston.**
6  Q. What kind of business is Truston?
7  **A. Truston's primary business is acting as an**
8  **independent sales agent referring prospective business**
9  **customers to different entities that provide online**
10 **identity protection platform or online credit monitoring**
11 **platform to businesses, and then those businesses may**
12 **market those services to consumers.**
13 Q. Are you familiar with the term "white label
14 marketing"?
15 **A. I'm familiar with the term "white label"; not**
16 **white label marketing.**
17 Q. Please describe your understanding of the term
18 "white label."
19 **A. Can you explain in which context.**
20 Q. In any context. Perhaps the context in which
21 you do business.
22 **A. Yes.**
23 **So white label refers to, in the context of my**
24 **business, a company that puts their own brand name and**
25 **logo -- or has their brand name and logo on a credit**

**Page 9**

1  **monitoring and identity protection website, and then**
2  **the -- those services are provided to consumers under**
3  **that brand name and typically under a domain name owned**
4  **by that business, but the back-end services are provided**
5  **by another company.**
6  Q. And by "back-end services" in your line of
7  business, what are you referring to?
8  **A. The benefits that the consumer uses, and so --**
9  **and the web pages that the consumer uses to access those**
10 **benefits. For example, credit monitoring.**
11 Q. Now, let's get back to Exhibit 1. And here --
12 I take it from -- let me just back up just a little bit
13 more.
14 I'd like you to just briefly describe your
15 background educationally. This says that you
16 graduated -- I'm referring to page 4 of Exhibit 1. This
17 says that you graduated from Rensselaer Polytechnic
18 Institute in or about 1986 with a degree in computer
19 science; is that correct?
20 MR. BOYLE: Object to form. Are you asking him
21 whether that's what the document says or whether that's
22 accurate?
23 BY MR. COCHELL:
24 Q. Is that accurate?
25 **A. No.**

**Page 10**

1  Q. Tell me, did you attend Rensselaer Polytechnic
2  Institute?
3  **A. Yes.**
4  Q. Did you get a degree there?
5  **A. No.**
6  Q. Did you get a -- did you major in computer
7  science?
8  **A. Yes.**
9  Q. And how long were you at Rensselaer?
10 **A. For one year.**
11 Q. And where did you go after that?
12 **A. I transferred to Merrimack College.**
13 Q. And where is Merrimack located?
14 **A. In North Andover, Massachusetts.**
15 Q. And how long did you attend Merrimack?
16 **A. For three years.**
17 Q. And did you get a degree?
18 **A. Yes.**
19 Q. What was your degree from Merrimack?
20 **A. Computer science.**
21 Q. And did you then attend another school after
22 that?
23 **A. Yes.**
24 Q. What school was that?
25 **A. University of Massachusetts at Lowell.**

**Page 11**

1  Q. And did you get a degree from there?
2  **A. Yes.**
3  Q. What degree is that?
4  **A. Computer science, master's degree.**
5  Q. And how many years did you attend?
6  **A. I was there for about two years.**
7  Q. Okay. So with respect to further education,
8  did you attend another school after you attended the
9  University of Massachusetts in Lowell?
10 **A. No, I did not attend a school after that.**
11 Q. Did you get a certificate or did you
12 participate in an educational experience after
13 University of Massachusetts at Lowell?
14 **A. Yes.**
15 Q. And what was that, sir? Describe.
16 **A. It was a course in financial technology through**
17 **an online program with MIT.**
18 Q. And how long did that take you to complete?
19 **A. It was approximately 12 weeks.**
20 Q. Now, let me ask you something. Looking at
21 Defendant's Exhibit 1, do you -- this has information
22 that appears to be specific to you. Do you recall ever
23 creating a resume similar to Defendant's Exhibit 1?
24 MR. BOYLE: Object to form.
25 /////

**Page 12**

**3 (Pages 9 to 12)**

**Thomas Fragala - 2/28/2018**

BY MR. COCHELL:

1  BY MR. COCHELL:
2  Q. Like I said earlier, once your attorney's
3  objection is on the record, you then need to answer the
4  question.
5  **A. Yes. I was thinking about the question.**
6  **I wouldn't describe this as a resume. This**
7  **appears to be information taken from a LinkedIn profile**
8  **that I may have updated since this was produced.**
9  Q. All right. Is it an accurate reflection of
10  your LinkedIn profile?
11  MR. BOYLE: Object to form.
12  THE WITNESS: I believe it is an accurate
13  reflection of my LinkedIn profile at one time, yes.
14  BY MR. COCHELL:
15  Q. Is there anything inaccurate in this document,
16  Exhibit 1?
17  MR. BOYLE: I'm going to object to form. He
18  testified earlier that he didn't recognize the document;
19  he recognized some material in the document. So if
20  you're asking him to authenticate it, I think he's
21  already answered that question.
22  BY MR. COCHELL:
23  Q. Please answer the question as asked, please.
24  **A. Can you please repeat the question.**
25  MR. COCHELL: Read it back, please.

Page 13

1  (The following question was read:
2  "Question: Is there anything
3  inaccurate in this document,
4  Exhibit 1?")
5  MR. WARD: I'll make an objection as ambiguous.
6  MR. BOYLE: I'll join in that objection.
7  THE WITNESS: This appears to be an older
8  version of my LinkedIn profile as I best can ascertain.
9  BY MR. COCHELL:
10  Q. Okay. Fair enough. You can put it to the
11  side.
12  Let me show you what's been marked as -- hold
13  on just a minute.
14  Have you ever worked with a company called
15  Credit Bureau Center?
16  **A. My understanding is, Credit Bureau Center is a**
17  **successor company to MyScore, and I did some work with**
18  **MyScore. I don't recall if it was ever called Credit**
19  **Bureau Center when I worked there.**
20  Q. Okay. Fair enough. And do you know Mike
21  Brown?
22  **A. Yes.**
23  Q. And who is Mike Brown in relationship to
24  MyScore?
25  **A. I believe he was the CEO of MyScore LLC.**

Page 14

1  Q. And did you work with Mike Brown as part of
2  your association with MyScore?
3  **A. I was never an employee, director, or officer**
4  **of that company. I acted as an independent sales agent,**
5  **and I also did some consulting.**
6  Q. And when did you first become aware of MyScore?
7  **A. I believe it was in 2011. MyScore was an**
8  **entity that I referred to one of the companies that I**
9  **was referring potential customers to, and that was my**
10  **original connection with MyScore.**
11  Q. And did you enter into an agreement, written or
12  oral, with MyScore about your referrals?
13  **A. The original referral was, I referred them to a**
14  **company in order to get a credit monitoring system to**
15  **build a product. That was 2011. So they were a**
16  **customer of the company that I referred them to as an**
17  **independent sales agent.**
18  Q. And so when you say "they," are you referring
19  to MyScore and Mike Brown?
20  **A. That's correct. MyScore, at the time, signed**
21  **an agreement with a company I referred them to in order**
22  **to provide and build a credit monitoring service.**
23  Q. I see. Okay.
24  And that would have been part of a white label
25  arrangement? Is that a fair statement?

Page 15

1  **A. Yes, with the third-party company that I**
2  **referred MyScore to.**
3  Q. And did you -- when you refer companies such as
4  MyScore to a client that you have, do you get a referral
5  fee or do you derive some benefit from that referral?
6  MR. BOYLE: Object to form.
7  Go ahead.
8  THE WITNESS: Can you please read back the
9  question.
10  (The following question was read:
11  "Question: When you refer companies
12  such as MyScore to a client that you
13  have, do you get a referral fee or do
14  you derive some benefit from that
15  referral?")
16  THE WITNESS: I don't refer companies like
17  MyScore to a client; it's to a company I have a sales
18  referral agreement with. And in that context, I would
19  receive a commission only upon sales invoices that are
20  paid.
21  BY MR. COCHELL:
22  Q. I see. All right.
23  And after this initial referral to MyScore in
24  or about 2011, did you subsequently make subsequent
25  referrals to MyScore for white label arrangements?

Page 16

**4 (Pages 13 to 16)**

**Thomas Fragala - 2/28/2018**

Page 17

1    MR. BOYLE:  Object to form.  Ambiguous.
2    THE WITNESS:  Can you please repeat the
3 question.
4        (The following question was read:
5    "Question:  And after this initial
6    referral to MyScore in or about 2011,
7    did you subsequently make subsequent
8    referrals to MyScore for white label
9    arrangements?")
10    THE WITNESS:  I don't understand the question
11 fully.
12 BY MR. COCHELL:
13    Q.  Okay.  You did this one transaction in 2011
14 with MyScore.  Did you engage in subsequent similar
15 transactions?
16    A.  With other companies.
17    Q.  With other companies.
18    A.  Yes.  And so the company I referred MyScore to,
19 I would continue from time to time to refer other
20 prospective customers to that company.
21    Q.  And with respect to -- did you enter -- did you
22 at some point enter into a written agreement with
23 MyScore?
24    A.  Yes.
25    Q.  Tell me about that agreement.

Page 18

1    A.  That was also an independent sales agreement
2 where I would -- where I could potentially refer
3 prospective customers to MyScore in order to -- for them
4 to become customers of MyScore and potentially generate
5 revenue for both entities, myself and MyScore.
6    Q.  Did you ever --
7    A.  Can I clarify?
8    Q.  Go ahead.
9    A.  I said "myself."  I meant to say "my company."
10    Q.  Sure.  That's fair.
11    With respect to -- are you familiar with a
12 company called JC Media?
13    A.  JC Media.  I don't recall that name.
14    Q.  Over the next several years from after your
15 initial referral of one of your companies to MyScore,
16 how many other companies did you refer to MyScore?
17    MR. WARD:  Object to the form.  Ambiguous.
18    MR. BOYLE:  Same objection.
19    THE WITNESS:  I don't recall.
20 BY MR. COCHELL:
21    Q.  Was it more than 10?
22    MR. BOYLE:  Same objection.
23    THE WITNESS:  Are you asking if I referred more
24 than 10 to MyScore LLC?
25 /////

Page 19

1 BY MR. COCHELL:
2    Q.  Yes, sir.
3    A.  I believe that's accurate, yes.
4    Q.  More than 50 companies?
5    MR. BOYLE:  Same objection.
6    THE WITNESS:  I believe so, yes.
7 BY MR. COCHELL:
8    Q.  In addition to -- let me ask you this:  I'd
9 like to -- you mentioned that you provided consulting to
10 MyScore.  Can you describe what that consulting was.
11    MR. BOYLE:  Object to form.  Misstates prior
12 testimony.
13    Go ahead.  You can answer the question if you
14 know.
15    THE WITNESS:  From time to time, I would do
16 some small consulting projects that Mr. Brown would ask
17 me to work on, and it was in a variety of different
18 areas.
19 BY MR. COCHELL:
20    Q.  Can you describe those different areas.
21    A.  One area was to assist in putting together and
22 working with his contractors to put the pieces together
23 for a new website brand that was launching that did
24 credit monitoring.
25    Q.  And which website brand was that?

Page 20

1    A.  I don't recall the brand name right now.
2    Q.  Fair enough.
3    What other projects do you recall consulting
4 with MyScore about?
5    A.  I don't recall any other projects at this time.
6    Q.  Did you become familiar with the operations of
7 MyScore in connection with performing your various
8 consulting projects?
9    MR. BOYLE:  Object to form.  Ambiguous.
10    THE WITNESS:  My role was quite limited, so in
11 a very limited way I -- during my -- in the course of
12 doing some small consulting projects.
13 BY MR. COCHELL:
14    Q.  Let me show you what's been marked as Exhibit 2
15 for identification, and ask you, sir, if you can
16 recognize that document, which purports to be an e-mail,
17 dated December 1st, 2013, entitled "Daily Recap."
18        (Exhibit 2 was marked for
19        identification.)
20 BY MR. COCHELL:
21    Q.  Do you recognize that document, sir?
22    MR. BOYLE:  Object as to foundation.  Just note
23 for the record there's no Bates stamp on this document.
24    THE WITNESS:  I don't recognize this, no.
25 /////

**5 (Pages 17 to 20)**

**Thomas Fragala - 2/28/2018**

BY MR. COCHELL:

Q. Have you seen similar documents during your consultations with MyScore, that is, checklists of projects and project templates?

MR. BOYLE: Object to form.

THE WITNESS: I don't recall seeing another document that looks like this.

BY MR. COCHELL:

Q. Okay. You never saw something called a "Daily Recap"?

MR. BOYLE: Object to form.

THE WITNESS: No. Not that I recall, no.

BY MR. COCHELL:

Q. I'd like to show you what's been previously marked as Exhibit No. 3.

(Exhibit 3 was marked for identification.)

BY MR. COCHELL:

Q. Do you recognize that document, sir?

A. No, I don't recognize this document.

Q. Do you recall anything called a Basecamp Project involving MyScore?

A. I believe Basecamp is the name of a web application.

Q. And do you know or do you recognize the name

Page 21

---

MR. BOYLE: Object to form. Ambiguous. Calls for speculation.

MR. WARD: Same objection.

THE WITNESS: I wasn't doing consulting for MyScore in 2014.

BY MR. COCHELL:

Q. All right. Were you engaged in any activities for MyScore in or about April of 2014?

A. As I recall, only referring customers -- potential customers.

Q. And that's the only activity you performed as a consultant or otherwise for MyScore?

MR. WARD: Object to form.

MR. BOYLE: Object to form.

BY MR. COCHELL:

Q. Is that correct, sir?

MR. BOYLE: Hold on.

Object to form. Asked and answered.

Go ahead.

THE WITNESS: I would facilitate in making sure that the customer onboarding process was happening to ensure that it was, as best I could, successful so I could earn some commissions.

BY MR. COCHELL:

Q. Sure.

Page 23

---

Julio Reyes in connection with your activities with MyScore?

A. Yes.

Q. Now, it says here on Exhibit 3, four other people were invited. This is three-quarters of the way down. Says: "Our team, Gordon Yang and Tom Fragala." Does that refresh your memory as to this Basecamp Project or what activities you might have been involved with in connection with defendant's Exhibit 3 and the Basecamp Project?

MR. WARD: Object to form.

MR. BOYLE: Same objection.

THE WITNESS: No, I still don't recall this document.

BY MR. COCHELL:

Q. Okay. With respect to -- there's also a reference in the middle of the page of Defendant's Exhibit 3. It says: "Verify LP and All Copy for FTC, FACTA, and FCR compliance."

Do you see that, sir?

A. Yes.

Q. Okay. And just for the record, do you -- would this have been an issue -- an internal issue for MyScore during your period of consultation in or about April of 2014?

Page 22

---

By "onboarding process," what do you mean?

A. I would just ensure that -- that the -- Mr. Brown and anyone else on the team began the process of working with the customer.

Q. In the onboarding process, was it routine, in your experience in working with MyScore, to have a to-do list, so to speak?

MR. BOYLE: Object to form.

Go ahead.

THE WITNESS: I don't recall.

BY MR. COCHELL:

Q. Did you -- did you have meetings with Mike Brown and other people by telephone during the onboarding process in 2014 for your customers that you referred?

A. As I recall, it was common to have an initial phone call after the agreement was signed so that Mr. Brown could explain what the following steps would be after that.

Q. And would you then -- was it routine for Mr. Brown or someone else to issue a to-do list similar to Defendant's Exhibit 3 as part of the onboarding process?

MR. BOYLE: Object to form. Asked and answered.

Page 24

---

**6 (Pages 21 to 24)**

**Thomas Fragala - 2/28/2018**

| | |
|---|---|
| 1       THE WITNESS: I don't recall if it was routine | 1   people that you -- or customers or individuals or |
| 2  to use Basecamp at that time. | 2  companies that you referred to CBC or MyScore? |
| 3  BY MR. COCHELL: | 3       MR. BOYLE: Object to form. |
| 4      Q. Just for the record, what do you understand | 4       THE WITNESS: I don't recall having a |
| 5  Basecamp to do? | 5  discussion about FTC compliance. |
| 6      **A. I understand Basecamp to be a project** | 6  BY MR. COCHELL: |
| 7  **management app.** | 7      Q. Did you ever talk about -- are you familiar |
| 8      Q. And by a "project management app," what did it | 8  with the term FACTA, F-A-C-T-A, as an abbreviation? |
| 9  do? | 9      **A. Yes, I'm familiar with that acronym.** |
| 10     **A. Provided portal for teams to collaborate.** | 10     Q. And what does it stand for? |
| 11     Q. And would it generate checklists for people as | 11     **A. I don't recall what all the terms are in that** |
| 12  part of its application? | 12  **acronym.** |
| 13     **A. I don't recall if it generated checklists,** | 13     Q. Generally what do you think it refers to, |
| 14  **per se.** | 14  FACTA? |
| 15     Q. Do you -- during the onboarding process, was it | 15     **A. Fair and Accurate Credit, I believe is the --** |
| 16  important to assure that -- and I forget whether you | 16  **some of the key terms in that acronym.** |
| 17  refer to them -- you didn't refer to them as your | 17     Q. Are you familiar with the acronym FCRA? |
| 18  clients, they were your customers that you referred to | 18     **A. Yes.** |
| 19  MyScore? I just want to make sure I use the right -- | 19     Q. And what does that refer to? |
| 20     **A. They weren't my customer's. I might** | 20     **A. I believe that refers to the Fair Credit** |
| 21  **colloquially refer to them as a customer simply because,** | 21  **Reporting Act.** |
| 22  **you know, they came through me. But they were always** | 22     Q. And do you know if -- did you assist MyScore in |
| 23  **customers of MyScore and signed an agreement only with** | 23  developing processes and procedures to assure compliance |
| 24  **MyScore, not with Truston.** | 24  with the FTC or other laws involving credit monitoring? |
| 25     Q. And so I should just -- you know, in connection | 25       MR. WARD: Object to form. Ambiguous. |
| **Page 25** | **Page 27** |

| | |
|---|---|
| 1  with your referrals to MyScore. Okay. | 1       MR. BOYLE: Same objection. |
| 2      So in connection with your referrals to | 2       THE WITNESS: Can you please repeat the |
| 3  MyScore, did you participate in meetings where the | 3  question. |
| 4  subject of FTC compliance or compliance with other laws | 4      (The following question was read: |
| 5  was discussed by Mike Brown, you, and any others, you | 5      "Question: Did you assist MyScore in |
| 6  know, who participated in the onboarding process? | 6      developing processes and procedures to |
| 7       MR. BOYLE: Object to form. | 7      assure compliance with the FTC or |
| 8       THE WITNESS: Could you please read back the | 8      other laws involving credit |
| 9  question. | 9      monitoring?") |
| 10      (The following question was read: | 10       THE WITNESS: I don't recall. |
| 11      "Question: So in connection with your | 11       MR. WARD: Off the record just for a second. |
| 12      referrals to MyScore, did you | 12  I'm sorry, Stephen. |
| 13      participate in meetings where the | 13       MR. COCHELL: Sure. |
| 14      subject of FTC compliance or | 14      (Brief discussion held off the |
| 15      compliance with other laws was | 15      record.) |
| 16      discussed by Mike Brown, you, and any | 16  BY MR. COCHELL: |
| 17      others, you know, who participated in | 17     Q. With respect to customers that you referred to |
| 18      the onboarding process?") | 18  MyScore, did you conduct any due diligence or vet these |
| 19       THE WITNESS: I don't recall ever discussing | 19  potential referrals? |
| 20  FTC or other compliance in a call with customers of | 20       MR. BOYLE: Object to form. Ambiguous. |
| 21  MyScore. | 21       MR. WARD: Same objection. |
| 22  BY MR. COCHELL: | 22       THE WITNESS: After that aircraft goes by, |
| 23      Q. I'm referring to meetings that you had during | 23  could you repeat the question, please. |
| 24  an onboarding process with Mike Brown. Did you have | 24      (The following question was read: |
| 25  discussions with Mike Brown about FTC compliance for | 25      "Question: With respect to customers |
| **Page 26** | **Page 28** |

**7 (Pages 25 to 28)**

**Thomas Fragala - 2/28/2018**

| | |
|---|---|
| 1    that you referred to MyScore, did you | 1    THE WITNESS:  As a sales agent, generally that |
| 2    conduct any due diligence or vet these | 2  responsibility was with MyScore and Mr. Brown. |
| 3    potential referrals?") | 3  BY MR. COCHELL: |
| 4    THE WITNESS:  I would speak to customers over | 4    Q. Sir, my question is whether you had such |
| 5  the phone and try to understand a little bit about their | 5  discussion. |
| 6  business before referring them to MyScore. | 6    Did you have such a discussion with customers |
| 7  BY MR. COCHELL: | 7  prior to referring them to MyScore? |
| 8    Q. Did you ever do a Google search to determine | 8    **A. I don't recall having those discussions.** |
| 9  whether there were any red flags associated with the | 9    Q. I'm going to show you what's been marked as |
| 10  customers being referred to CBC -- or MyScore I mean? | 10  Defendant's Exhibit 4 for identification, and ask you, |
| 11    MR. BOYLE:  Object to form.  Ambiguous. | 11  sir, if you recognize that document. |
| 12    THE WITNESS:  I don't recall. | 12    (Exhibit 4 was marked for |
| 13  BY MR. COCHELL: | 13    identification.) |
| 14    Q. Did you ever talk to the customers referred to | 14    MR. BOYLE:  I'll object as to foundation, and |
| 15  MyScore about their advertising and potential legal | 15  note for the record that this document does not bear a |
| 16  issues associated with advertising prior to referring | 16  Bates stamp. |
| 17  them to MyScore? | 17  BY MR. COCHELL: |
| 18    MR. BOYLE:  Object to form.  Ambiguous. | 18    Q. Let me invite your attention particularly to |
| 19  Compound. | 19  page 2 of Exhibit 4. |
| 20    MR. WARD:  Same objection. | 20    Do you recognize that signature? |
| 21    THE WITNESS:  Could you please repeat the | 21    **A. Yes.** |
| 22  question. | 22    Q. Okay.  Is that your signature? |
| 23    (The following question was read: | 23    **A. I do recognize it as my signature, yes.** |
| 24    "Question: Did you ever talk to the | 24    Q. Do you recognize this referral agreement? |
| 25    customers referred to MyScore about | 25    **A. Yes, this appears to be similar to or a copy of** |
| **Page 29** | **Page 31** |

| | |
|---|---|
| 1    their advertising and potential legal | 1  **a referral agreement that I recognize.** |
| 2    issues associated with advertising | 2    Q. Is this a form agreement that you've used with |
| 3    prior to referring them to MyScore?") | 3  MyScore and other companies that you may refer customers |
| 4    THE WITNESS:  I don't understand the question | 4  to? |
| 5  fully.  Could you break it into individual questions, | 5    MR. BOYLE:  Object to form.  Ambiguous.  And |
| 6  please. | 6  asked and answered. |
| 7  BY MR. COCHELL: | 7    MR. WARD:  Same objection. |
| 8    Q. With respect to customers who want you -- who | 8    THE WITNESS:  That was two questions, sir, at |
| 9  want to have -- your customers want to have Internet | 9  the end. |
| 10  advertising, correct, before you refer them to MyScore? | 10  BY MR. COCHELL: |
| 11    **A. They were MyScore's customers, not my** | 11    Q. Okay.  This is the -- did you draft this |
| 12  **customers.** | 12  agreement, this referral agreement, Defendant's |
| 13    Q. I'm talking about referring them to MyScore. | 13  Exhibit 4? |
| 14  It's because they had a desire to have advertising on | 14    **A. I believe so, yes.** |
| 15  the Internet, fair statement? | 15    Q. Did you refer -- did you use this referral |
| 16    MR. BOYLE:  Object to form. | 16  agreement in connection with agreements for referral to |
| 17    THE WITNESS:  Some did; some -- I believe some | 17  other companies other than MyScore? |
| 18  did not. | 18    **A. I don't recall if I use it for other companies.** |
| 19  BY MR. COCHELL: | 19    Q. Did you refer customers to other companies |
| 20    Q. With respect to their desire for advertising, | 20  other than MyScore? |
| 21  did you ever have a discussion with these customers | 21    **A. Yes.** |
| 22  about the legalities or the legal issues associated with | 22    Q. Which other companies? |
| 23  using the Internet as a white label company? | 23    MR. BOYLE:  Object to form.  Ambiguous. |
| 24    MR. BOYLE:  Object to form.  Ambiguous. | 24    THE WITNESS:  CSIdentity Incorporated. |
| 25    MR. WARD:  Same objection. | 25  ///// |
| **Page 30** | **Page 32** |

**8 (Pages 29 to 32)**

**Thomas Fragala - 2/28/2018**

Page 33

1  BY MR. COCHELL:
2      Q. And are they associated with Experian?
3      **A. They are now. They have been acquired and are**
4  **now part of Experian.**
5      Q. And what kind of -- so CSID offered what kind
6  of services for your customers that you referred to
7  them?
8      **A. Online credit monitoring and related services,**
9  **like, identity protection.**
10     Q. With respect to --
11         I'm going to show you what's been marked as
12 Exhibit 5 for identification.
13             (Exhibit 5 was marked for
14              identification.)
15 BY MR. COCHELL:
16     Q. This purports to be an e-mail from you to Mike
17 Brown, dated October 29th, 2012.
18         Do you recognize this e-mail, sir?
19     **A. I don't recognize the e-mail, no.**
20     Q. Is -- was this your e-mail address,
21 tom@mytruston.com, on October 29th, 2012? Was that your
22 e-mail address?
23     **A. Yes.**
24     Q. Even though you don't recognize this document,
25 do you agree with me that it's probable that you sent

Page 34

1  this e-mail?
2         MR. BOYLE: Object to form. By way of further
3  objection, I'm just going to clarify that the question
4  is ambiguous as to whether you're referring to the top
5  e-mail in the chain or something different.
6         THE WITNESS: Are you referring to the top
7  e-mail between myself and Mr. Brown?
8  BY MR. COCHELL:
9      Q. I am.
10     **A. I believe it's likely I sent this. I can't**
11 **think of a reason why it wouldn't be an e-mail that I**
12 **sent.**
13     Q. Sure. Okay. That's fair.
14         With respect to, if you recall, earlier I asked
15 you if you were familiar with a company called JC Media,
16 and you answered you didn't recall, or words to that
17 effect. And I'd like to ask you: Do you recognize
18 another name Vanuity, which is referred to in Exhibit 5
19 at the top of the page for contact information for
20 JC Media.
21         Do you see that, the subject?
22     **A. Oh, next to JC Media?**
23     Q. Yeah. It references Vanuity. Do you recognize
24 that name?
25     **A. I don't recognize that name, no.**

Page 35

1      Q. Do you recognize the name Jaime Cochran?
2      **A. No.**
3      Q. Do you recall sending the referral form for
4  JC Media to MyScore?
5         MR. BOYLE: Object to form. Ambiguous.
6         MR. WARD: Same objection.
7         THE WITNESS: No, I don't recall.
8  BY MR. COCHELL:
9      Q. All right. Did -- do you recall if Jaime
10 Cochran or JC Media -- let me ask you something. Do you
11 know a fellow named Roger Ferguson?
12     **A. I don't recognize that name.**
13     Q. I'm going to mark the next one as -- I believe
14 it's No. 6.
15             (Exhibit 6 was marked for
16              identification.)
17 BY MR. COCHELL:
18     Q. I ask you, sir, if you recognize that document?
19     **A. I recognize it as a referral claim form that**
20 **appears to be one that I used in my work -- in working**
21 **with MyScore. I don't recall this specific one, though.**
22     Q. All right. Do you think it's likely that this
23 was a referral form that you sent to MyScore?
24         MR. BOYLE: Object to form. Ambiguous.
25         MR. WARD: Same objection.

Page 36

1         THE WITNESS: I don't know.
2  BY MR. COCHELL:
3      Q. With respect to -- there's a name here of
4  Prospect Referral Claim Form For ScamSafe, Inc.
5         Is that a company that also did business as
6  Truston?
7      **A. Yes.**
8      Q. And what did ScamSafe, Inc. do? What kind of
9  services or -- did it provide to the public?
10     **A. It provided -- ScamSafe, Inc.'s primary line of**
11 **business was referring clients to companies that**
12 **provided credit monitoring services, like, as a platform**
13 **to businesses.**
14     Q. And did you have a website for ScamSafe, Inc.?
15     **A. ScamSafe, Inc. did business as Truston, so the**
16 **Truston website.**
17     Q. So on the website would it say Truston or
18 ScamSafe?
19     **A. It would say Truston.**
20     Q. And so ScamSafe was just a corporation that did
21 business as Truston?
22         MR. BOYLE: Objection. Asked and answered.
23 BY MR. COCHELL:
24     Q. Is that correct, sir?
25     **A. Yes.**

**9 (Pages 33 to 36)**

**Thomas Fragala - 2/28/2018**

1    Q. With respect to ScamSafe, was ScamSafe
2  associated with Online -- I believe it's Online Credit
3  Services was the name of the company that you owned?
4  Online Credit Systems. Was that associated with Online
5  Credit Systems?
6        MR. BOYLE: Object to form. Ambiguous.
7        THE WITNESS: ScamSafe, Inc. was a company that
8  I was a part owner of prior to Online Credit Systems.
9  BY MR. COCHELL:
10       Q. And who else owned part of ScamSafe?
11       **A. Several other shareholders.**
12       Q. What percentage did you own with ScamSafe?
13       **A. It varied over time.**
14       Q. Okay. Tell me how it varied over time.
15       **A. So as investors put in money, my percentage --**
16  **including myself, my percentage may change as -- and**
17  **as -- yeah, that's primarily how it would change.**
18       Q. Is ScamSafe still operating?
19       **A. No.**
20       Q. What happened to ScamSafe?
21       **A. ScamSafe was wound up and dissolved in December**
22  **of 2015.**
23       Q. Why was that?
24       **A. I'm sorry. I didn't hear the question.**
25       Q. Why was that?

**Page 37**

1        **A. Because the company had operated for a long**
2  **period of time and it was -- I was the sole debtor and**
3  **the company was not generating enough profit to -- for**
4  **the shareholders to -- they no longer needed the company**
5  **to be operated, and so I basically made the decision**
6  **to -- with their approval, of the shareholders, to wind**
7  **up and dissolve the company.**
8        Q. Who were the other shareholders?
9        MR. BOYLE: Object to form. Ambiguous.
10  BY MR. COCHELL:
11       Q. At the time of dissolution?
12       **A. They were -- several other individuals. Would**
13  **you like --**
14       Q. Yes, I'm asking for their names.
15       **A. Arthur Rice, Eric Kanowski [phonetic].**
16       Q. Okay. Anyone else?
17       **A. Jonathan Ives and myself.**
18       Q. And what percentages -- what percentage did you
19  own of ScamSafe at the time of dissolution?
20       **A. I don't recall.**
21       Q. Did you own a majority of the stock?
22       **A. It's difficult to answer the question because**
23  **there's different types of stock and there's things,**
24  **like, stock warrants, and so I don't recall my**
25  **percentage.**

**Page 38**

1        Q. Did you have control over ScamSafe?
2        MR. BOYLE: Object to form. Ambiguous.
3  BY MR. BOYLE:
4        Q. Did you have a controlling interest in
5  ScamSafe?
6        MR. BOYLE: Same objection.
7        THE WITNESS: I believe at the time of
8  dissolution, I had less than 50 percent ownership as far
9  as voting shares.
10  BY MR. COCHELL:
11       Q. Did you operate the company ScamSafe?
12       **A. Yes.**
13       Q. Were any of these three individuals engaged in
14  the day-to-day operations of the company?
15       **A. Never. They were never employees or --**
16       Q. Officers?
17       **A. -- or officers of the company.**
18       Q. All right. I'd like to ask you a question
19  about this document here, Exhibit 7, and ask you, sir,
20  if you recognize that document.
21           (Exhibit 7 was marked for
22            identification.)
23  BY MR. COCHELL:
24       Q. Do you recognize that document, sir?
25       **A. I would like to continue reading it --**

**Page 39**

1        Q. Okay. Sure.
2        **A. -- before I answer.**
3        MR. BOYLE: I'll note for the record there's no
4  Bates stamp on this document.
5        THE WITNESS: I don't recall this document.
6  BY MR. COCHELL:
7        Q. It reflects here that you were the author, Tom
8  Fragala, tom@MyScore360.com?
9        **A. Yes.**
10       Q. Is that an e-mail address that you used in or
11  about February of 2016?
12       **A. Yes, I believe so.**
13       Q. Is it likely that this is a document that you
14  generated on or about that day?
15       MR. BOYLE: Object to form. Ambiguous. Asked
16  and answered.
17       THE WITNESS: I don't recall this document.
18  BY MR. COCHELL:
19       Q. Is this document, Exhibit 7, consistent with
20  the kind of consulting projects that you performed for
21  MyScore?
22       MR. BOYLE: Object to form.
23       MR. WARD: Same objection.
24       THE WITNESS: I may have done projects similar
25  to this, yes.

**Page 40**

**10 (Pages 37 to 40)**

**Thomas Fragala - 2/28/2018**

BY MR. COCHELL:
1
2    Q. Do you recall having a discussion with Mike
3  Brown in or about February of 2016 about MyScore's
4  desire to increase the number of credit repair
5  organizations that use credit updates to provide the
6  scores and reports for all their clients?
7         MR. BOYLE:  Object to form.
8         (Reporter clarification.)
9         MR. COCHELL:  To provide scores and reports for
10  all their clients.
11  BY MR. COCHELL:
12    Q. Do you recall having discussions with Mike
13  Brown about that?
14         MR. BOYLE:  Same objection.
15         THE WITNESS:  No.
16  BY MR. COCHELL:
17    Q. Are you saying that that discussion never
18  occurred in or about February of 2016?
19         MR. BOYLE:  Asked and answered.
20         THE WITNESS:  No.
21  BY MR. COCHELL:
22    Q. So the discussion may have occurred, you just,
23  sitting here today, don't recall?
24         MR. BOYLE:  Asked and answered.
25  /////

**Page 41**

BY MR. COCHELL:
1
2    Q. Is that correct, sir?
3    **A. Yes.**
4    Q. All right.  Show you what's been marked as
5  Exhibit 8 for identification, and ask you, sir, if you
6  recognize that document.
7         (Exhibit 8 was marked for
8         identification.)
9         MR. BOYLE:  I'll object to the foundation and
10  note for the record that this document does not bear a
11  Bates stamp.
12         THE WITNESS:  Can you please repeat the
13  question.
14         (The following question was read:
15         "Question:  Show you what's been
16         marked as Exhibit 8 for
17         identification, and ask you, sir, if
18         you recognize that document.")
19         THE WITNESS:  No.
20  BY MR. COCHELL:
21    Q. The document purports to be entitled "Credit
22  Updates Partner Program Guide Requirements," author Tom
23  Fragala, tom@MyScore360.com, and the Skype address is
24  tfragala.
25    So if I understand your testimony correctly,

**Page 42**

1  you don't recall creating this document on or about
2  March 1st of 2016; is that correct, sir?
3         MR. BOYLE:  Object to form.
4         THE WITNESS:  Yes.
5  BY MR. COCHELL:
6    Q. All right.  With respect to this type of
7  document, have you ever created a partner program guide
8  similar to this?
9         MR. BOYLE:  Object to form.  Ambiguous.
10         MR. WARD:  Same objection.
11         THE WITNESS:  I don't remember.
12  BY MR. COCHELL:
13    Q. With respect to -- do you recall having a
14  discussion with Mike Brown about a partner program guide
15  and the requirements for it?
16         MR. BOYLE:  Object to form.  Ambiguous.
17  BY MR. COCHELL:
18    Q. In or about March of 2016?
19         MR. BOYLE:  Same objection.
20         MR. WARD:  Same objection.
21         THE WITNESS:  No, I don't recall.
22  BY MR. COCHELL:
23    Q. You've had a chance to review the document
24  itself; is that correct, sir?
25    **A. Yes.**

**Page 43**

1    Q. With respect to the last page of the document,
2  Defendant's Exhibit 8, it says:  "Your account manager
3  is Tom Fragala, (323) 400-4173", and then,
4  "tom@MyScore360.com."
5    Do you see that, sir?
6    **A. Yes.**
7    Q. Were you ever an account manager for
8  individuals or companies that you referred to MyScore?
9         MR. BOYLE:  Object to form.  Compound.
10         THE WITNESS:  Could you repeat the question,
11  please, or read it back.
12         (The following question was read:
13         "Question:  Were you ever an account
14         manager for individuals or companies
15         that you referred to MyScore?")
16         THE WITNESS:  It's difficult to answer the
17  question because you referred to individuals that I
18  refer, and I wouldn't -- I don't recall ever referring
19  individuals.
20  BY MR. COCHELL:
21    Q. Companies.
22    **A. Companies.  Okay.**
23    **I never had an official title or role with**
24  **MyScore because I was never an employee.  I may have**
25  **been colloquially referred to as an account manager.**

**Page 44**

**11 (Pages 41 to 44)**

**Thomas Fragala - 2/28/2018**

1    Q. Do you ever recall -- would it have -- why
2  would you have been called an account manager?
3       MR. BOYLE: Object to form. Calls for
4  speculation.
5  BY MR. COCHELL:
6    Q. Colloquially or otherwise?
7       MR. BOYLE: Same objection.
8       THE WITNESS: I don't know.
9  BY MR. COCHELL:
10    Q. If there was a problem that arose with MyScore,
11  would individuals that you referred to MyScore contact
12  you to discuss any issues with MyScore?
13       MR. BOYLE: Object to form.
14       MR. WARD: Object to form. Ambiguous.
15       THE WITNESS: Could you please read back the
16  question.
17       (The following question was read:
18       "Question: If there was a problem
19       that arose with MyScore, would
20       individuals that you referred to
21       MyScore contact you to discuss any
22       issues with MyScore?")
23       THE WITNESS: Do you mean MyScore the entity,
24  the company, or the products and services they provided?
25  /////

**Page 45**

1  BY MR. COCHELL:
2    Q. Products and services they provided.
3    A. Typically the individual consumers that used
4  it, the users, would call customer service; and so my
5  role did not include being a customer service
6  representative. From time to time a company that I
7  referred to MyScore and became a customer of MyScore
8  might reach out to me with some questions.
9    Q. All right. You previously testified that you
10  did not recall having a discussion with Mike Brown about
11  Credit Updates Partner Program Guide Requirements,
12  Defendant's Exhibit 8.
13       Do you deny that you had a discussion with Mike
14  Brown about this document, Defendant's Exhibit 8?
15       MR. BOYLE: Object to form. Asked and
16  answered.
17       THE WITNESS: No.
18  BY MR. COCHELL:
19    Q. I'd like to show you what's been marked as
20  Exhibit 9 for identification, and ask you, sir, if you
21  recognize that document.
22       (Exhibit 9 was marked for
23       identification.)
24       MR. BOYLE: I'll object as to foundation, and
25  note that this document does not bear a Bates stamp.

**Page 46**

1       THE WITNESS: I don't recall this document.
2  BY MR. COCHELL:
3    Q. Are you familiar with a company or a service
4  called ScoreApprove?
5    A. I'm familiar with the service called
6  ScoreApprove, yes.
7    Q. What, if any, involvement did you have with
8  ScoreApprove?
9       MR. BOYLE: Object to form.
10       THE WITNESS: ScoreApprove was a service that,
11  for a period of time, I referred potential customers to
12  MyScore about.
13  BY MR. COCHELL:
14    Q. And this document, Defendant's Exhibit 9,
15  although you may not recall it specifically, from
16  reading it, do you know what the objective of this
17  document was?
18       MR. BOYLE: Object to form. Ambiguous. And
19  calls for speculation.
20       MR. WARD: Same objection.
21       THE WITNESS: Could you repeat the question,
22  please. Read it back, please.
23       (The following question was read:
24       "Question: And this document,
25       Defendant's Exhibit 9, although you

**Page 47**

1       may not recall it specifically, from
2       reading it, do you know what the
3       objective of this document was?")
4       MR. WARD: Same objection.
5       THE WITNESS: No.
6  BY MR. COCHELL:
7    Q. Are you familiar with the term "Welcome
8  Letter"?
9       MR. BOYLE: Object to form. Ambiguous.
10       MR. WARD: Same objection.
11       THE WITNESS: Not in this specific context, no.
12  BY MR. COCHELL:
13    Q. Well, you're referring to the document that I
14  have in front of you. You don't -- you're not familiar
15  with the term "Welcome Letter" in general?
16    A. It's such a broad term.
17    Q. In the context of working with MyScore, did
18  they have a welcome letter that they used, as you
19  understand it?
20       MR. BOYLE: Object to form.
21       MR. WARD: Same objection.
22       THE WITNESS: I don't recall a welcome letter.
23  BY MR. COCHELL:
24    Q. With respect to this particular letter, does
25  this appear to be a letter that seeks to promote

**Page 48**

**12 (Pages 45 to 48)**

**Thomas Fragala - 2/28/2018**

1    interest in ScoreApprove?
2         MR. BOYLE: Object to form. Ambiguous. Calls
3    for speculation.
4         MR. WARD: Same objection.
5         THE WITNESS: I don't recognize the document,
6    so I'd just be guessing if that was the objective.
7    BY MR. COCHELL:
8         Q. Okay. Did, at some point, you refer Experian
9    to MyScore?
10        **A. I don't recall referring Experian to MyScore.**
11        Q. Do you recall encouraging Mr. Brown to enter
12   into a relationship with Experian for referrals?
13        MR. BOYLE: Object to form. Ambiguous.
14        MR. WARD: Same objection.
15        THE WITNESS: I don't understand the question.
16   BY MR. COCHELL:
17        Q. Do you recall -- did you ever derive any
18   benefit from a relationship between Experian and
19   MyScore?
20        MR. BOYLE: Object to form.
21        MR. WARD: Same objection.
22        THE WITNESS: I referred MyScore to Experian
23   sometime in 2011.
24   BY MR. COCHELL:
25        Q. Okay. And what did you refer them for?

**Page 49**

1         **A. For MyScore to obtain the ability to create**
2    **credit monitoring websites, so a B-to-B relationship,**
3    **where they could use Experian's API.**
4         Q. What does API refer to?
5         **A. API is an acronym that most people would say**
6    **means application programming interface.**
7         Q. And in lay terms, how would you explain that to
8    the court or jury?
9         **A. It's challenging to describe that to a court.**
10   **And API means a lot of different things to different**
11   **people because there's many different types of APIs.**
12        **So in this context, it would be a way for one**
13   **company to receive data and then present that data on**
14   **their own website.**
15        Q. I see. All right.
16        Now, with respect to the referral of MyScore to
17   Experian, what percentage of -- how did you get
18   compensated for that referral?
19        **A. My recollection is, I would be compensated on**
20   **paid sales invoices. So sometime after the invoice was**
21   **paid, I may receive a sales commission.**
22        Q. So do you recall what your percentage was?
23        MR. BOYLE: Object to form.
24        THE WITNESS: I don't recall my percentage at
25   the time.

**Page 50**

1    BY MR. COCHELL:
2         Q. Do you recall 7.5 percent was your percentage?
3         MR. BOYLE: Object to form. Asked and
4    answered.
5         THE WITNESS: With Experian?
6    BY MR. COCHELL:
7         Q. Yes.
8         **A. At one point, it was 7.5 percent, but I believe**
9    **at another time it was a different number.**
10        Q. And what number was that?
11        **A. I believe it may have been a lower number, but**
12   **I don't remember the exact number.**
13        Q. Do you remember if -- do you remember someone
14   named Jens as a project manager for MyScore?
15        MR. BOYLE: Object to form.
16        Go ahead.
17        THE WITNESS: Either now or after this question
18   can we take a break?
19        MR. COCHELL: Of course we can. We can take it
20   now.
21        THE WITNESS: It's a good transition period.
22        MR. COCHELL: Yes. It's not that important a
23   question.
24        MR. BOYLE: Are you sure you don't want --
25   okay.

**Page 51**

1         MR. COCHELL: No, it's not like -- it's not a
2    trick question.
3         MR. BOYLE: Yeah, no problem.
4         THE WITNESS: Okay.
5         MR. BOYLE: Thanks, Counselor.
6         (Recess was held from 10:46 a.m. to
7              10:54 a.m.)
8    BY MR. COCHELL:
9         Q. Do you remember someone named Jens who was a
10   project manager -- a contractor, for MyScore?
11        **A. Yes. I believe his name was pronounced "Yens."**
12        Q. "Yens." Okay.
13        And what kind of work did you do with Jens?
14        MR. BOYLE: Object to form. Foundation.
15        MR. WARD: Same objection.
16   BY MR. COCHELL:
17        Q. If any?
18        What, if any, work did you do with Jens on
19   behalf or with MyScore?
20        **A. I recall a few things that Jens did. I don't**
21   **recall what my work with Jens would have been.**
22        Q. Okay. So let's start with what your work with
23   Jens would have been.
24        MR. BOYLE: Object to form. Asked and
25   answered.

**Page 52**

**13 (Pages 49 to 52)**

**Thomas Fragala - 2/28/2018**

1    THE WITNESS: I don't recall what my work with
2  Jens would have been.
3  BY MR. COCHELL:
4    Q. Do you recall what Jens did?
5    **A. I believe he did some, like, technical work and**
6  **I believe some project management work, is my**
7  **recollection.**
8    Q. Do you recall what the project management work
9  was?
10    **A. I don't recall.**
11    Q. Do you recall what the technical work was that
12  he performed?
13    **A. I don't recall because he would have been**
14  **directed by Mr. Brown.**
15    Q. So you don't recall one way or the other
16  whether he was directed by Mr. Brown or not?
17    **A. No, I recall he would have been directed by**
18  **Mr. Brown.**
19    Q. I understand that, but you don't recall what
20  kind of work he performed for MyScore; is that correct,
21  sir?
22    **A. Yes, I don't recall all the specifics.**
23    Q. And -- one moment, please.
24    Is it possible that you referred more than
25  100 companies to CBC during the time that you had a

**Page 53**

1  referral arrangement with them?
2    MR. BOYLE: Object to form. Ambiguous. And
3  calls for speculation.
4    THE WITNESS: When you say "CBC," are you
5  referring to MyScore?
6  BY MR. COCHELL:
7    Q. MyScore.
8    THE WITNESS: Could you please read back the
9  question.
10    (The following question was read:
11    "Question: Is it possible that you
12    referred more than 100 companies to
13    CBC during the time that you had a
14    referral arrangement with them?")
15    THE WITNESS: I don't remember how many
16  companies I referred to MyScore.
17  BY MR. COCHELL:
18    Q. Do you recall how much revenue that you
19  received from MyScore during 2014?
20    **A. I don't remember how much revenue I received**
21  **during that time period from MyScore.**
22    Q. Do you recall how much revenue you received
23  from MyScore in 2015?
24    **A. No.**
25    Q. Do you recall how much revenue you received

**Page 54**

1  from MyScore in 2016?
2    **A. No.**
3    Q. I'd like to show you what's been marked as
4  Exhibit -- I believe it's 10; I forgot to mark it -- 10
5  for identification, and ask you, sir, if you recognize
6  that document.
7    (Exhibit 10 was marked for
8    identification.)
9    THE WITNESS: Could you please read back the
10  question.
11    (The following question was read:
12    "Question: Like to show you what's
13    been marked as Exhibit 10 for
14    identification, and ask you, sir, if
15    you recognize that document.")
16    THE WITNESS: I don't recognize this document.
17  BY MR. COCHELL:
18    Q. Okay. Do you deny sending this document to
19  Mike Brown or sending it to mike@MyScore360.com?
20    MR. BOYLE: Object to form.
21  BY MR. COCHELL:
22    Q. On or about May 22nd, 2014?
23    MR. BOYLE: Same objection.
24    THE WITNESS: No.
25  /////

**Page 55**

1  BY MR. COCHELL:
2    Q. Just sitting here today, you just don't recall
3  this document; is that correct?
4    MR. BOYLE: Asked and answered.
5    THE WITNESS: Yes.
6  BY MR. COCHELL:
7    Q. Do you -- from looking at this document, do you
8  recognize -- well, let me back up.
9    Mike Brown had an e-mail, mike@MyScore360.com;
10  is that correct
11    MR. BOYLE: Object to form.
12    THE WITNESS: Yes, that's my recollection.
13  BY MR. COCHELL:
14    Q. Do you recall this gentleman named Mir Ali?
15    **A. No.**
16    Q. Looking at this document today, this doesn't
17  refresh your memory in any way; is that a fair
18  statement?
19    **A. Yes.**
20    Q. All right. You can put it to the side.
21    I'd like to show you this document, Defendant's
22  Exhibit 11, and ask you, sir, if you recognize that
23  document.
24    (Exhibit 11 was marked for
25    identification.)

**Page 56**

**14 (Pages 53 to 56)**

**Thomas Fragala - 2/28/2018**

1        THE WITNESS: I don't recognize this document.
2   BY MR. COCHELL:
3        Q. Do you know a gentleman named Russel Hibbert?
4        **A. Yes. I believe he was connected to or involved**
5   **in a company that I referred to MyScore.**
6        Q. Okay. And do you recall referring a company
7   called My Camp or MyCamp.com to MyScore?
8        **A. I don't recall if that's the company name, but**
9   **Russel Hibbert, I believe that's the company name, yes.**
10   **Not 100 percent sure.**
11        Q. And do you recognize someone named -- well, let
12   me rephrase.
13        Do you recognize the name Steven Campbell, who
14   is a CC on this particular document, Exhibit 11?
15        **A. Yes, I recognize the name.**
16        Q. And what was his involvement, if anything, with
17   MyScore, if you know?
18        MR. BOYLE: Object to form.
19        THE WITNESS: I believe he was a company
20   that -- he worked for a company that I referred to
21   MyScore.
22   BY MR. COCHELL:
23        Q. Do you know what his position was?
24        **A. I don't recall his title.**
25        Q. Okay. You can put that to the side.

**Page 57**

1        This is Exhibit 12, I believe.
2        (Exhibit 12 was marked for
3        identification.)
4   BY MR. COCHELL:
5        Q. Do you recognize this document, sir?
6        **A. I don't remember this particular document.**
7        Q. Do you remember having a discussion with Mike
8   Brown asking you to send him the names of any credit
9   related domains that you own?
10        **A. I don't recall that conversation.**
11        Q. All right. So sitting here today, you don't
12   recall those -- that discussion occurred, but you don't
13   deny that it occurred; is that a fair statement?
14        MR. BOYLE: Object to form. Asked and
15   answered. And mischaracterizes prior testimony.
16        THE WITNESS: Can you rephrase the question,
17   please.
18   BY MR. COCHELL:
19        Q. You don't deny having a discussion with Mike
20   Brown where he asked you to send him your credit related
21   domains that you own?
22        **A. No.**
23        Q. Show you what's been marked as Defendant's
24   Exhibit 13 for identification, and ask you, sir, if you
25   recognize that document.

**Page 58**

1        (Exhibit 13 was marked for
2        identification.)
3   BY MR. COCHELL:
4        Q. Let me invite your attention to page 16 of
5   Defendant's Exhibit 13.
6        Is that your signature that appears on the
7   right-hand side of the document under "Agent"?
8        **A. I'm still working on the first question you**
9   **asked, sir.**
10        Q. Okay. Fine.
11        THE WITNESS: Could you please read back the
12   question.
13        (The following question read:
14        "Question: Show you what's been
15        marked as Defendant's Exhibit 13 for
16        identification, and ask you, sir, if
17        you recognize that document.
18        "Let me invite your attention to
19        page 16 of Defendant's Exhibit 13.
20        "Is that your signature that
21        appears on the right-hand side of the
22        document under 'Agent'?")
23        MR. BOYLE: Object to form. Compound.
24        MR. WARD: Same objection.
25        THE WITNESS: Could you repeat the question

**Page 59**

1   into individual questions.
2   BY MR. COCHELL:
3        Q. With respect to Defendant's Exhibit 13, do you
4   recognize this document?
5        **A. Yes.**
6        Q. How do you recognize this document?
7        **A. It appears to be a copy of or similar to an**
8   **agreement between MyScore and Online Credit Systems that**
9   **I'm familiar with.**
10        Q. Let me invite your attention to page 16 of
11   Defendant's Exhibit 13.
12        Is that your signature that appears on the
13   right-hand side under the typed-in word "Agent"?
14        MR. BOYLE: Object to form.
15        THE WITNESS: I don't know if that's my
16   signature. It appears similar to a signature that I
17   might make.
18   BY MR. COCHELL:
19        Q. Is that your printing underneath, under where
20   it says: "Print name, title, and date"?
21        MR. BOYLE: Object to form.
22        THE WITNESS: It does appear to be similar to
23   my handwriting.
24   BY MR. COCHELL:
25        Q. Having -- and you've taken a few minutes to

**Page 60**

**15 (Pages 57 to 60)**

**Thomas Fragala - 2/28/2018**

1  review this document, Defendant's Exhibit 13; isn't that
2  correct, sir?
3  **A. Yes.**
4      Q. Having reviewed it, do you have any doubts that
5  this is not, in fact, the White Label Total Platform
6  Agent Agreement between MyScore LLC and Online Credit
7  Systems LLC?
8      MR. BOYLE: Object to form. Ambiguous. And
9  asked and answered.
10     THE WITNESS: I can only say it looks similar
11 to what I -- to my recollection over the years.
12 BY MR. COCHELL:
13     Q. All right. And this -- according to page 16,
14 it appears that the signature that appears on
15 Defendant's Exhibit 13 at page 16 was made on or about
16 October 27th, 2014; is that correct, sir?
17     MR. BOYLE: Object to form.
18     THE WITNESS: That appears to be the date on
19 the date line, yes.
20 BY MR. COCHELL:
21     Q. With respect to the first page of Defendant's
22 Exhibit 13, it says that the principal place of business
23 for Online Credit Systems LLC was 340 South Lemon
24 Avenue, No. 2688, in Walnut, California 91789, it
25 appears. Is that where you -- is that where Online

**Page 61**

1  BY MR. COCHELL:
2      Q. Is there a domain that appears on this document
3  that you have doubts as to whether you owned the domain
4  in or about September of 2014?
5      **A. I don't remember the specific dates of**
6  **ownership of these domains.**
7      Q. Do you doubt that you never owned one of
8  these -- one or more of these domain names here listed
9  in Defendant's Exhibit 12?
10     MR. BOYLE: Object to form. Ambiguous.
11     THE WITNESS: Could you please rephrase the
12 question. I didn't understand it.
13 BY MR. COCHELL:
14     Q. Yeah.
15     Looking at these domains, do you believe that
16 you owned one or more of these -- let me see. Let me go
17 at it from the negative.
18     Do you -- sitting here today, do you believe
19 that you never owned one or more of these domain names
20 listed here in Defendant's Exhibit 12 at any time?
21     MR. BOYLE: Object to form.
22     THE WITNESS: Could you please read back the
23 question.
24     (The following question was read:
25     "Question: Let me go at it from the

**Page 63**

1  Credit Systems LLC had its principal place of business?
2      MR. BOYLE: Object to form.
3  BY MR. COCHELL:
4      Q. As of October of 2014?
5      MR. BOYLE: Same objection.
6      THE WITNESS: That was the corporate address
7  that the company used.
8  BY MR. COCHELL:
9      Q. Was that -- did you maintain an office there?
10     **A. No.**
11     Q. Was it just, like, a mail drop of some sort?
12     **A. Yes, a virtual mailbox.**
13     Q. Okay. Fair enough.
14     Just getting back to Defendant's Exhibit 12,
15 this is the list of domain names.
16     You had a chance to look at those domain names,
17 right? Correct?
18     **A. I'm rereading them.**
19     Q. Sure.
20     **A. Yes. I have read through the list.**
21     Q. These are the -- and you -- are these all
22 domain names that you owned?
23     MR. BOYLE: Object to form. Ambiguous.
24     THE WITNESS: I don't recall if I owned all of
25 these.

**Page 62**

1  negative.
2      "Do you -- sitting here today,
3  do you believe that you never owned
4  one or more of these domain names
5  listed here in Defendant's Exhibit 12
6  at any time?")
7  BY MR. COCHELL:
8      Q. I withdraw the question. I don't think it
9  makes sense.
10     What I'm trying to find out is, do you believe
11 it's likely that, at the time -- that you never owned
12 one of these e-mails -- these domains?
13     MR. BOYLE: Object to form. Ambiguous.
14     THE WITNESS: At what time? At the time of
15 this message?
16 BY MR. COCHELL:
17     Q. Yeah. At the time of this message.
18     THE WITNESS: Could you read back the question,
19 please.
20     (The following question was read:
21     "Question: What I'm trying to find
22     out is, do you believe it's likely
23     that, at the time -- that you never
24     owned one of these e-mails -- these
25     domains?")

**Page 64**

**16 (Pages 61 to 64)**

**Thomas Fragala - 2/28/2018**

1    THE WITNESS:  I'm struggling to answer "yes" or
2  "no" to a question I don't fully understand.
3  BY MR. COCHELL:
4    Q. Let me ask it a different way.
5    Do you believe it's likely that you owned all
6  of these e-mail -- all of these domains in or about
7  September of 2014?
8    **A. I don't remember sending this e-mail, so I**
9  **don't -- and I don't remember if I owned all of these**
10 **domains at the time of this, September 23rd of 2014.**
11   Q. All right.  Okay.  Let's turn back to
12 Defendant's Exhibit 13.
13   Does this document fairly and accurately
14 describe the terms and conditions of the agreement
15 between MyScore LLC and Online Credit Systems LLC?
16   MR. BOYLE:  Object to form.  Ambiguous.
17   THE WITNESS:  Could you please read back the
18 question.
19    (The following question was read:
20 "Question:  Let's turn back to
21 Defendant's Exhibit 13.
22    "Does this document fairly and
23 accurately describe the terms and
24 conditions of the agreement between
25 MyScore LLC and Online Credit Systems

1  LLC?")
2    THE WITNESS:  My understanding is, this would
3  be an agreement with terms and conditions in it.  So I
4  don't understand the question.
5  BY MR. COCHELL:
6    Q. Does this document accurately describe your
7  agreement as the managing officer, member, of Online
8  Credit Systems LLC with MyScore LLC?
9    MR. BOYLE:  Object to form.  Ambiguous.  And
10 the document speaks for itself.
11   THE WITNESS:  Could you please read back the
12 question.
13    (The following question was read:
14 "Question:  Does this document
15 accurately describe your agreement as
16 the managing officer, member, of
17 Online Credit Systems LLC with MyScore
18 LLC?")
19   THE WITNESS:  I don't know if this is the exact
20 agreement that was signed, but it does look familiar, as
21 I testified earlier.
22 BY MR. COCHELL:
23   Q. All right.  Let me ask you this:  There's a
24 section in here called "Independent Contractor."  Let me
25 see.  I believe that is page --

1    What page are you on?
2    **A. I'm on page 10.**
3    Q. Yeah, page 13 of Exhibit 13, there's a section
4  called "Independent Contractor."
5    Does that provision accurately describe how you
6  conducted your business with MyScore LLC, as an
7  independent contractor?
8    MR. BOYLE:  Object to form.  Ambiguous.  And
9  objection to the extent the question seeks a legal
10 conclusion.
11   MR. WARD:  Same objection.
12 BY MR. COCHELL:
13   Q. Were you an independent contractor?
14   MR. BOYLE:  Object to form.  Ambiguous.  Seeks
15 legal conclusion.
16   THE WITNESS:  This agreement was related to
17 providing credit monitoring services to consumers.  I
18 never performed or did any business related or pursuant
19 to this agreement subsequent to its being signed.
20 BY MR. COCHELL:
21   Q. All right.  Let me ask you something.  With
22 respect to -- so when you say that you never performed
23 any services under this agreement, you're talking about
24 credit monitoring services?  Did I understand you
25 correctly?  I might not have heard you completely.

1    **A. Yes.  Yes, I never offered any credit**
2  **monitoring services pursuant to this agreement -- or my**
3  **company never offered any credit monitoring services**
4  **pursuant to this agreement.**
5    Q. I see.  I see.
6    And -- all right.  Okay.  You can put that to
7  the side.
8    I want to show you what's been marked as
9  Exhibit 14 for identification.  Ask you, sir, if you
10 recognize that document.
11    (Exhibit 14 was marked for
12 identification.)
13   THE WITNESS:  I don't recognize this, no.
14 BY MR. COCHELL:
15   Q. Are you familiar with a company called Northern
16 Finance Group?
17   **A. I don't recall the name.**
18   Q. In this there's a discussion with Jens Sorensen
19 and what appears to be you regarding a logo for Northern
20 Finance Group.
21   Do you see that on page 2 and 3 of Exhibit 14?
22   MR. BOYLE:  Object to form.
23   MR. WARD:  Same objection.
24   THE WITNESS:  Can you please rephrase the
25 question.

**17 (Pages 65 to 68)**

**Thomas Fragala - 2/28/2018**

**Page 69**

1  BY MR. COCHELL:
2      Q. Yeah. With respect to your interactions with
3  Jens Sorensen, do you recall having any discussions with
4  him about the logo of a potential referral, such as that
5  described in Exhibit 14?
6      MR. BOYLE: Object to form.
7      THE WITNESS: No.
8  BY MR. COCHELL:
9      Q. You can put that to the side.
10      I'd like to show you what's been marked as
11  15 for identification, and ask you, sir, if you
12  recognize that document.
13      (Exhibit 15 was marked for
14      identification.)
15      THE WITNESS: Could you please read back the
16  question.
17      (The following question was read:
18      "Question: I'd like to show you
19      what's been marked as 15 for
20      identification, and ask you, sir, if
21      you recognize that document.")
22      THE WITNESS: No.
23  BY MR. COCHELL:
24      Q. Okay. With respect to both Exhibits 14 and 15,
25  14 appears to be -- let me rephrase.

**Page 70**

1      With respect to 14, this appears to be an
2  e-mail from you to Jens Sorensen, at least that's your
3  e-mail address at the top of Defendant's Exhibit 14 on
4  the first page; is that correct, sir?
5      MR. BOYLE: Object to form.
6      MR. WARD: Object to form. Compound.
7      THE WITNESS: Could you please rephrase into a
8  simple question, please.
9  BY MR. COCHELL:
10      Q. This is your e-mail address that appears at the
11  top of Defendant's Exhibit 14. Correct?
12      A. Yes, next to my name.
13      Q. Do you deny that you sent this e-mail on or
14  about September 26th, 2014?
15      MR. BOYLE: Object to form. Asked and
16  answered.
17      THE WITNESS: No.
18  BY MR. COCHELL:
19      Q. With respect to Defendant's Exhibit 15, do you
20  deny that you sent this e-mail on or about
21  September 27th, 2014?
22      MR. BOYLE: Object to form. Asked and
23  answered.
24      THE WITNESS: That's not my e-mail there.
25  /////

**Page 71**

1  BY MR. COCHELL:
2      Q. You definitely e-mailed it, is that --
3      A. No, it says: "From Mike Brown," at the top.
4      Q. I'm sorry. Do you deny receiving it on or
5  about September 27th, 2014?
6      MR. BOYLE: Object to form.
7      MR. WARD: Same objection.
8      THE WITNESS: No.
9  BY MR. COCHELL:
10      Q. Do you consider it likely that you received
11  both Defendant's Exhibit 14 and 15?
12      MR. BOYLE: Object to form. Compound. Calls
13  for speculation. Ambiguous.
14      MR. WARD: Same objection.
15      THE WITNESS: I would just be guessing. I
16  can't answer that question "yes" or "no."
17  BY MR. COCHELL:
18      Q. All right. Let me show you what's been marked
19  as Defendant's Exhibit 16. I gave you the highlighted
20  copy. Let me just give you a clean copy.
21      A. Sure.
22      (Exhibit 16 was marked for
23      identification.)
24  BY MR. COCHELL:
25      Q. Do you recognize this e-mail, dated August 7th,

**Page 72**

1  2015?
2      A. No.
3      Q. Do you deny sending this e-mail to Jens
4  Sorensen on or about August 7th, 2015?
5      MR. BOYLE: Object to form.
6      MR. WARD: Same objection.
7      THE WITNESS: No.
8  BY MR. COCHELL:
9      Q. Do you recognize the name Juan Urbina, at the
10  bottom?
11      A. Yes -- I'm sorry. I was saying "yes" to the
12  bottom, not "yes" -- I'm still thinking about the
13  question.
14      Q. Okay. Sure. Okay.
15      A. Yes.
16      Q. All right. And who is Juan Urbina?
17      A. I believe Juan worked for a company that was
18  referred by my company to MyScore.
19      Q. I'd like to mark another document. This will
20  be number 17 for identification, and ask you, sir, if
21  you recognize that document.
22      (Exhibit 17 was marked for
23      identification.)
24      MR. BOYLE: Was there a question? If there
25  was, please read it back.

**18 (Pages 69 to 72)**

Thomas Fragala - 2/28/2018

Page 73

1        (The following question was read:
2        "Question: I'd like to mark another
3        document. This will be number 17 for
4        identification, and ask you, sir, if
5        you recognize that document.")
6        THE WITNESS: No.
7    BY MR. COCHELL:
8        Q. That is your e-mail address at the top,
9    tom@MyTruston.com; is that correct?
10       **A. Yes.**
11       Q. And do you deny sending that e-mail on or about
12   October 6th, 2015?
13       MR. BOYLE: Object to form.
14       MR. WARD: Same objection.
15       THE WITNESS: No.
16   BY MR. COCHELL:
17       Q. There is an expression here, and I just wanted
18   to find out on the first -- where it says: "Jens, for
19   SX3 it is 1995, no trial, and no rev share."
20       SX3, was this customer Juan Urbina, or he owned
21   SX3 software?
22       **A. I don't know.**
23       MR. BOYLE: Object --
24       Hold on.
25       Object to form.

Page 74

1        MR. WARD: Same objection.
2    BY MR. COCHELL:
3        Q. You don't know if he owned SX3?
4        **A. I don't know if he owned SX3.**
5        Q. But you know he was a representative --
6        MR. BOYLE: Object to form.
7    BY MR. COCHELL:
8        Q. -- of SX3?
9        MR. WARD: Same objection.
10       MR. BOYLE: Object to form. Mischaracterizes
11   testimony. Foundation.
12       Go ahead. If you know, you can answer.
13       THE WITNESS: Could you please repeat the
14   question.
15       (The following question was read:
16       "Question: But you know he was a
17       representative of SX3?")
18       THE WITNESS: I can't confirm unequivocally
19   that he was a representative of SX3; but in my
20   communication with him, he was -- my understanding is,
21   he was associated with SX3.
22   BY MR. COCHELL:
23       Q. Okay. All right. So when he called, you
24   thought you were talking to someone who was employed by
25   SX3. Fair statement?

Page 75

1        **A. Yes.**
2        Q. Now, getting back to Defendant's Exhibit 17.
3    There's an expression on the first sentence; it says:
4    "No rev share."
5        What does that mean, if you know?
6        MR. BOYLE: Object to form.
7        THE WITNESS: I believe the term of "rev share"
8    would mean a revenue share.
9    BY MR. COCHELL:
10       Q. Right. Okay. Now, in the context of credit
11   report and the monitoring business that you had with
12   MyScore, was it unusual for a company to agree not to
13   share in revenues as part of a white label program?
14       MR. WARD: Objection. Compound.
15       MR. BOYLE: Same objection.
16       THE WITNESS: Could you please rephrase the
17   question.
18   BY MR. COCHELL:
19       Q. It doesn't need rephrasing. I'm going to ask
20   you that question again.
21       MR. COCHELL: Please read it back.
22       (The following question was read:
23       "Question: Now, in the context of
24       credit report and the monitoring
25       business that you had with MyScore,

Page 76

1        was it unusual for a company to agree
2        not to share in revenues as part of a
3        white label program?")
4        MR. WARD: Objection. Mischaracterizes the
5    testimony.
6        MR. BOYLE: Same objection. In addition, it's
7    ambiguous.
8        THE WITNESS: I believe it's accurate to say
9    that most companies I referred to MyScore, which are the
10   only ones I had any visibility into, had some sort of
11   rev share or commission as part of their affiliate
12   relationship.
13   BY MR. COCHELL:
14       Q. And with respect to -- why would a company --
15   to your knowledge, why would any company agree to a
16   white label program but not insist on revenue sharing as
17   part of the white label program?
18       MR. BOYLE: Object to form. Calls for
19   speculation.
20       THE WITNESS: I don't recall SX3 being a white
21   label customer.
22   BY MR. COCHELL:
23       Q. My question is different.
24       Without regard to SX3, why would any company
25   agree to a white label program without insisting on a

**19 (Pages 73 to 76)**

**Thomas Fragala - 2/28/2018**

1    revenue sharing for them?
2         MR. BOYLE: Same objection.
3         THE WITNESS: Could you please read back the
4    question.
5       (The following question was read:
6    "Question: Without regard to SX3, why
7       would any company agree to a white
8       label program without insisting on a
9       revenue sharing for them?")
10       THE WITNESS: I don't recall any specific
11    cases, other than SX3, as to why -- where there -- or a
12    company did not receive some sort of revenue share or
13    commission.
14    BY MR. COCHELL:
15       Q. My question is a little different.
16       Why would a company agree -- and you're saying
17    you don't recall anyone doing that. Is there any
18    circumstance why a company would agree to a no rev share
19    in a white label program?
20         MR. BOYLE: Object to form. Calls for
21    speculation.
22         MR. WARD: Same objection.
23         THE WITNESS: Could you please read back the
24    question.
25       (The following Requested record read.

**Page 77**

1       "Question: Why would a company
2       agree -- and you're saying you don't
3       recall anyone doing that. Is there
4       any circumstance why a company would
5       agree to a no rev share in a white
6       label program?")
7       THE WITNESS: I don't recall any specific cases
8    where a company agreed to not be paid a rev share, other
9    than SX3. So I can't think of any specific reasons why
10    a company would, and I don't recall the -- right now the
11    specifics about why SX3 did not.
12    BY MR. COCHELL:
13       Q. Let me show you what's been marked as
14    Defendant's Exhibit 18, and ask you, sir, if you
15    recognize that document.
16       (Exhibit 18 was marked for
17        identification.)
18       THE WITNESS: No.
19    BY MR. COCHELL:
20       Q. That is your e-mail address appearing at the
21    top of the first page of Defendant's Exhibit 18?
22       **A. Yes.**
23       Q. And you don't deny sending this e-mail on or
24    about October 8th, 2015?
25         MR. BOYLE: Object to form.

**Page 78**

1         MR. WARD: Object to form.
2    BY MR. COCHELL:
3       Q. Is that correct, sir?
4         MR. BOYLE: Same objection.
5         THE WITNESS: Could you please rephrase the
6    question.
7    BY MR. COCHELL:
8       Q. You don't deny sending Defendant's Exhibit 18
9    on or about October 8th, 2015, from your e-mail address
10    Tom@MyTruston.com; is that correct, sir?
11         MR. BOYLE: Same objection.
12         MR. WARD: Same objection.
13         THE WITNESS: I do not deny sending this
14    e-mail.
15    BY MR. COCHELL:
16       Q. Okay. With respect to this e-mail on the first
17    page at the bottom, this talks about -- there's a
18    reference to: "This is a special case because he's a
19    software vendor."
20       In the context of the MyScore business, what --
21    why would a software vendor be any different from any
22    other customer?
23         MR. BOYLE: Object to form.
24         MR. WARD: Object to form. Ambiguous.
25         THE WITNESS: I don't recall all software

**Page 79**

1    vendors being different from all other customers. I
2    believe in this message that SX3 was a software vendor,
3    and so I was pointing out that -- so perhaps I believe
4    they were different from typical affiliates.
5    BY MR. COCHELL:
6       Q. In what respect?
7       **A. That there was no rev share associated with**
8    **that.**
9       Q. And so why would SX3 become a new customer for
10    MyScore?
11         MR. BOYLE: Object to form. Calls for
12    speculation.
13    BY MR. COCHELL:
14       Q. If you know.
15         MR. WARD: Same objection.
16         THE WITNESS: I don't remember the specifics
17    about SX3.
18    BY MR. COCHELL:
19       Q. Okay. Fair enough.
20       I'm going to show you another document, which
21    I'm going to mark -- I believe it's 19 -- and ask you,
22    sir, if you recognize that document.
23       (Exhibit 19 was marked for
24        identification.)
25         THE WITNESS: I don't recall this document.

**Page 80**

**20 (Pages 77 to 80)**

**Thomas Fragala - 2/28/2018**

1  BY MR. COCHELL:
2  Q. With respect to Defendant's Exhibit 19, this
3  was a document that purports to be sent by Mike Brown at
4  Mike@MyScore360.com to Diego M. at Diego@MyScore360.com.
5  Do you see that, sir?
6  MR. BOYLE: Object to form.
7  THE WITNESS: Yes.
8  BY MR. COCHELL:
9  Q. And who is Diego M.?
10  **A. I don't know.**
11  Q. Okay.
12  **A. I don't recall who Diego M. was at this time.**
13  Q. Do you know who David Rojas was?
14  **A. I don't recall who David Rojas was at this**
15  **time.**
16  Q. Do you know -- and this -- this e-mail purports
17  to have been copied to you at Tom@MyScore360.com,
18  correct?
19  MR. BOYLE: Objection to form.
20  THE WITNESS: I see that I am copied on this
21  e-mail, yes.
22  BY MR. COCHELL:
23  Q. And Tom@MyScore360.com was an e-mail that you
24  used in or about March of 2016; is that correct?
25  **A. For a limited amount of communication, yes.**

Page 81

1  Q. With respect to that communication, how was it
2  limited?
3  **A. I believe that was an alias that was used. So**
4  **some e-mails might be sent to that alias as opposed to**
5  **my MyTruston.com e-mail address.**
6  Q. And all of these e-mails, did you have other
7  e-mail addresses that you used during that time period?
8  MR. BOYLE: Object to form. Ambiguous.
9  THE WITNESS: I don't recall any other business
10  e-mail addresses that I used in a substantial way.
11  BY MR. COCHELL:
12  Q. Okay. Well, which business e-mails did you use
13  during 2015 and 2016?
14  **A. My primary e-mail address was**
15  **Tom@MyTruston.com, and I recall occasionally using**
16  **Tom@MyScore360.com.**
17  Q. Were they both -- if you sent -- if someone
18  sent you an e-mail to Tom@MyScore360.com, would that be
19  automatically directed to your other e-mail address with
20  Truston?
21  MR. BOYLE: Object to form. Asked and
22  answered.
23  THE WITNESS: I don't recall how it was
24  configured within the e-mail systems because there's
25  different ways to do that.

Page 82

1  BY MR. COCHELL:
2  Q. But the goal was to have them all in one inbox.
3  Would they all be routed into your inbox from these two
4  different sources?
5  **A. I may have had multiple inboxes, so I don't**
6  **recall.**
7  Q. You may have had multiple inboxes, and I -- I'm
8  sorry. I just don't know what you could be referring
9  to. I mean, you'd have an inbox for MyScore.com and an
10  inbox for Truston. Is that what you're saying?
11  MR. BOYLE: Object to form. Mischaracterizes
12  the testimony.
13  Go ahead.
14  MR. COCHELL: I'm just asking him to clarify.
15  THE WITNESS: Well, the e-mail address, the
16  domain name you used was not the domain name here. You
17  said MyScore.com, which is not this e-mail address.
18  BY MR. COCHELL:
19  Q. All right. So it could have gone into -- okay.
20  So I think that answers my question. Thank you. All
21  right.
22  Let me ask you something. You -- this appears
23  to be -- Defendant's Exhibit 19 appears to be an issue
24  where a customer was defrauded.
25  You understand that from looking at the e-mail,

Page 83

1  correct?
2  MR. BOYLE: Object to form.
3  MR. WARD: Object to form. Lack of firsthand
4  knowledge.
5  THE WITNESS: I don't recall this e-mail, so
6  I'm not familiar with this particular case and what
7  happened or may not have happened to this consumer.
8  BY MR. COCHELL:
9  Q. Do you recall any instances where Mr. Brown
10  terminated an affiliate or white label partner
11  for fraud?
12  MR. BOYLE: Object to form.
13  THE WITNESS: Can you please read back the
14  question.
15  (The following question was read:
16  "Question: Do you recall any
17  instances where Mr. Brown terminated
18  an affiliate or white label partner
19  for fraud?")
20  THE WITNESS: I don't recall any specific
21  instances.
22  BY MR. COCHELL:
23  Q. Do you recall -- recognizing that you don't
24  recall any specific instances, do you recall -- do you
25  believe it's likely that Mr. Brown terminated a white

Page 84

**21 (Pages 81 to 84)**

**Thomas Fragala - 2/28/2018**

| | |
|---|---|

1 label partner -- any white label partner for improper
2 practices or fraud?
3      MR. BOYLE: Object to form. Ambiguous. Calls
4 for speculation.
5      MR. WARD: Same objection.
6      THE WITNESS: I would just be guessing. I just
7 don't recall.
8 BY MR. COCHELL:
9      Q. So you don't recall one way or the other; is
10 that fair?
11      MR. BOYLE: Object to form. Asked and
12 answered.
13      MR. WARD: Same objection.
14      THE WITNESS: I don't recall if any -- yes.
15 The answer to the question is yes, I don't recall.
16 BY MR. COCHELL:
17      Q. All right. With respect to complaints by
18 customers -- let me ask you something. Just -- do you
19 have any other companies that you've formed since
20 Truston and Online Credit Reporting Systems?
21      MR. BOYLE: Object to form.
22      THE WITNESS: The name of my company is Online
23 Credit Systems, and I have not formed any other
24 companies subsequent to that.
25 /////

**Page 85**

1 BY MR. COCHELL:
2      Q. So you've identified Truston as a company
3 that -- or as that you do business as through Credit
4 Online Systems [sic]; is that correct?
5      **A. Yes, Truston is a fictitious business name.**
6      Q. And are there any other fictitious business
7 names that you use or that Credit Online Systems [sic]
8 uses --
9      MR. BOYLE: Object to form.
10 BY MR. COCHELL:
11      Q. -- in marketing to customers?
12      MR. BOYLE: Object to form. Compound.
13      THE WITNESS: Can you please read back the
14 question.
15      (The following question was read:
16      "Question: And are there any other
17      fictitious business names that you use
18      or that Credit Online Systems [sic]
19      uses in marketing to customers?")
20      THE WITNESS: Could you please rephrase the
21 question so that it's referring to just one entity.
22 BY MR. COCHELL:
23      Q. Other than Truston, are there any other d/b/a's
24 that Credit Online Systems [sic] uses in marketing?
25      **A. Online Credit Systems does not have any other**

**Page 86**

1 registered fictitious business names.
2      Q. I'm not asking if they're registered. Do you
3 use any other names other than Truston for Credit Online
4 Credit Systems or whatever it's called?
5      MR. BOYLE: Object to form.
6 BY MR. COCHELL:
7      Q. Other than Truston, do you have any other
8 d/b/a's that you use for Online Credit Systems?
9      MR. BOYLE: Same objection.
10      THE WITNESS: I don't use any other d/b/a's in
11 the course of doing business as Online Credit Systems.
12 BY MR. COCHELL:
13      Q. When you say you "don't use any other d/b/a's
14 in your Credit Online Systems [sic]," I just want to
15 make sure we're clear about this; I'm not talking about
16 d/b/a's that are registered. Are you saying that you
17 don't use any other d/b/a's registered or unregistered
18 with Credit Online Systems [sic]?
19      **A. I'm not aware of how you could use -- of using**
20 **a d/b/a other than one that you have registered.**
21      Q. I'd like you to answer my question, sir. Okay?
22 I've asked a very simple question.
23      Other than that issue of Truston, do you use any
24 other name in connection with Credit Online Systems
25 [sic], whether it's registered or unregistered

**Page 87**

1      MR. BOYLE: Object to form. Asked and answered
2 several times.
3 BY MR. COCHELL:
4      Q. Can you give me a "yes" or "no" answer to that?
5      MR. BOYLE: Same objection.
6      THE WITNESS: No.
7 BY MR. COCHELL:
8      Q. Do you have an ownership interest in any
9 businesses that offer credit monitoring and credit
10 reports to the public?
11      **A. For sale directly to consumers?**
12      Q. Direct or indirect.
13      **A. Well, Online Credit Systems offers to assist**
14 **companies to create an online -- like, online credit**
15 **monitoring products to offer to consumers. So in that**
16 **regard, Truston talks about helping companies offer**
17 **credit monitoring services.**
18      Q. My question, sir, is whether you have an
19 ownership interest in any other company that offers
20 online credit reporting and monitoring services?
21      **A. Not other than Online Credit Systems, no.**
22      Q. With respect to -- let me see.
23      During the time that you had a consulting
24 relationship with CBC, did you have occasion to conduct
25 chats with Mr. Brown?

**Page 88**

**22 (Pages 85 to 88)**

**Thomas Fragala - 2/28/2018**

1    A. My agreement was with --
2    Q. With MyScore? I'm sorry.
3       MR. BOYLE: Object to form.
4       THE WITNESS: Could you please repeat the
5    question.
6       (Requested record read.)
7       THE WITNESS: Yes.
8    BY MR. COCHELL:
9    Q. I'd like to hand you No. 20 for identification,
10   and ask you, sir, if you recognize that document.
11      MR. BOYLE: Counsel, you think we'll be ready
12   for lunch pretty soon?
13      MR. COCHELL: Yeah.
14      (Exhibit 20 was marked for
15       identification.)
16   BY MR. COCHELL:
17   Q. Do you recognize that document, sir?
18   A. No, I don't recognize this document.
19   Q. Do you recall having any chats with -- do you
20   recall having any discussions with Mr. Brown about
21   complaints on Google regarding Score Outlook?
22      MR. BOYLE: Object to form. Ambiguous.
23      THE WITNESS: I don't recall any specific
24   chats.
25   /////

**Page 89**

1    BY MR. COCHELL:
2    Q. I understand that. I'm not asking about
3    specific chats. Do you recall having any discussions
4    whatsoever with Mr. Brown about complaints on Google
5    regarding Score Outlook?
6    A. No, I don't recall.
7    Q. Okay. You can put that to the side.
8       With respect to -- pardon me.
9       MR. COCHELL: Well, perhaps this is a good time
10   for lunch.
11      MR. BOYLE: Okay.
12      (Recess was held from 12:12 p.m. to
13       1:10 p.m.)
14   BY MR. COCHELL:
15   Q. We're back on the record.
16      All right. Mr. Fragala, I'm going to ask you a
17   few more questions. One of the form questions -- or
18   basic questions that I almost always ask at the
19   beginning of a deposition is whether you're on any
20   medication or suffer from any condition today that would
21   prevent you from remembering events as part of your
22   testimony?
23   A. No.
24   Q. What is your date of birth?
25   A. December 18th, 1966.

**Page 90**

1    Q. I'm sorry. I couldn't hear you.
2    A. December 18, 1966.
3    Q. I'm going to hand you what's been marked as
4    Exhibit 21 for identification, and ask you, sir, if you
5    recognize that document.
6       (Exhibit 21 was marked for
7        identification.)
8       THE WITNESS: Can you repeat the question,
9    please.
10      (The following question was read:
11      "Question: I'm going to hand you
12      what's been marked as Exhibit 21 for
13      identification, and ask you, sir, if
14      you recognize that document.")
15      THE WITNESS: I don't recall this document, no.
16   BY MR. COCHELL:
17   Q. I'm sorry?
18   A. No, I don't recall it.
19   Q. Do you deny sending that e-mail on the first
20   page on Exhibit 21?
21      MR. BOYLE: Object to form.
22      THE WITNESS: No.
23   BY MR. COCHELL:
24   Q. Nothing about this e-mail refreshes your memory
25   about -- none of the facts that are stated in this

**Page 91**

1    e-mail refreshes your memory as to what this exchange
2    was with Diego in customer service?
3       MR. BOYLE: Object to form. Asked and
4    answered.
5       THE WITNESS: No, I don't recall the specific
6    items mentioned in there.
7    BY MR. COCHELL:
8    Q. Do you recall ever having an issue where you
9    were being contacted by eFreeScore customers?
10      MR. BOYLE: Object to form.
11      THE WITNESS: In my -- no.
12   BY MR. COCHELL:
13   Q. So do you have -- there's something -- like,
14   the first sentence -- and I just want to probe a little
15   bit here -- it says: "I got a call from an eFreeScore
16   customer to my OCS corp phone number."
17      What does "OCS" refer to?
18      MR. BOYLE: Object to form.
19      THE WITNESS: I think in this context it refers
20   to Online Credit Systems.
21   BY MR. COCHELL:
22   Q. And this refers to -- this must be for the new
23   merchant accounts through My Camp because the customer
24   said the number shows up on the bank website next to the
25   amount and eFreeScore com.

**Page 92**

**23 (Pages 89 to 92)**

**Thomas Fragala - 2/28/2018**

Page 93

1     Do you see that?
2     **A. Yes.**
3     Q. So what new merchant accounts were obtained
4 through My Camp?
5     **A. As I recall now, one or two merchant accounts**
6 **were obtained through My Camp to assist -- through --**
7 **obtained by OCS, by Online Credit Systems, to assist**
8 **MyScore because he had lost the merchant accounts, as I**
9 **recall, and he needed some additional merchant accounts**
10 **to process transactions through.**
11     Q. And so My Camp is -- what are -- are they,
12 like, processors or what are they? What is My Camp?
13     MR. BOYLE: Object to form.
14 BY MR. COCHELL:
15     Q. If you know.
16     **A. As I recall, they were involved in a credit**
17 **card processing, sort of, ecosystem.**
18     Q. All right. Is it fair to say that it was
19 unusual for you to get actual calls from customers from
20 a credit monitoring service?
21     **A. Yes.**
22     Q. Have you ever served in a customer service
23 capacity prior to June 29th, 2015?
24     **A. Well, I wasn't acting in a customer service**
25 **role at that time either, but yes, I have not.**

Page 94

1     Q. And are you -- are you familiar with customer
2 service operations generally in the credit monitoring
3 business?
4     MR. BOYLE: Object to form.
5     THE WITNESS: No, not generally. I've never
6 held a role in customer service as either a regular
7 representative or as a manager.
8 BY MR. COCHELL:
9     Q. Are you familiar with the term "friendly fraud"
10 in the credit monitoring industry?
11     **A. Yes.**
12     Q. What does that mean?
13     MR. WARD: Object to form.
14     MR. BOYLE: Same objection.
15     THE WITNESS: I believe it could mean different
16 things to different people. And by "people" I mean
17 companies. Obviously, there's countless companies that
18 process credit card transactions, so it might mean
19 something to one company and something else to another.
20 BY MR. COCHELL:
21     Q. What does it mean to you? What is your
22 understanding of the term "friendly fraud" in the credit
23 monitoring industry?
24     **A. My understanding is when a credit card customer**
25 **purports that a credit card charge was not valid, when**

Page 95

1 **it was likely that it was valid.**
2     Q. Do you know the frequency of those sorts of
3 calls?
4     MR. BOYLE: Object to form. Ambiguous.
5     MR. COCHELL: Same objection.
6     THE WITNESS: Can you explain what types of
7 calls.
8 BY MR. COCHELL:
9     Q. Yeah, the friendly fraud calls.
10     Is that part of the credit monitoring business?
11     MR. BOYLE: Object to form. Ambiguous.
12     THE WITNESS: I don't know the frequency or
13 amount of those types of calls.
14 BY MR. COCHELL:
15     Q. All right. And you've never studied that or
16 had a discussion with Mike Brown about that, friendly
17 fraud calls?
18     MR. BOYLE: Object to form. Compound.
19     THE WITNESS: Could you please break it into
20 two separate questions.
21 BY MR. COCHELL:
22     Q. Have you ever had a discussion with Mike Brown
23 about friendly fraud calls being made on eFreeScore or
24 credit card updates?
25     **A. CreditUpdates? I don't recall having those**

Page 96

1 **specific discussions.**
2     Q. With eFreeScore, did you have those discussions
3 with Mike Brown about friendly fraud?
4     **A. I don't recall.**
5     Q. With respect to the kinds of -- are you
6 familiar with scams that have been operated with respect
7 to credit reporting industries?
8     MR. BOYLE: Object to form. Ambiguous.
9     THE WITNESS: Could you please provide a more
10 specific example.
11 BY MR. COCHELL:
12     Q. I'll get back to it. I'll ask a few other
13 questions first.
14     Did you ever have a discussion with Mike Brown
15 about Craigslist?
16     **A. Yes.**
17     Q. Did you have a discussion with Mike Brown about
18 the use of Craigslist ads in driving business to
19 eFreeScore or CreditUpdates?
20     MR. BOYLE: Object to form.
21     THE WITNESS: Could you please repeat the
22 question -- could you please read back the question.
23     (The following question was read:
24     "Question: Did you have a discussion
25     with Mike Brown about the use of

**24 (Pages 93 to 96)**

**Thomas Fragala - 2/28/2018**

| | |
|---|---|
| 1 Craigslist ads in driving business to | 1 BY MR. COCHELL: |
| 2 eFreeScore or CreditUpdates?") | 2 Q. I'm sorry? |
| 3 THE WITNESS: I had a discussion about | 3 MR. COCHELL: I haven't heard the answer |
| 4 Craigslist in the context of some of the MyScore brands, | 4 because you were talking over him. |
| 5 yes. | 5 THE WITNESS: I don't recall reading the |
| 6 BY MR. COCHELL: | 6 message at the time. |
| 7 Q. What does that mean? | 7 BY MR. COCHELL: |
| 8 **A. It had come to my attention through an** | 8 Q. Okay. Do you recall reading any of these |
| 9 **affiliate that there was some complaints online about** | 9 e-mails at the time, in September of 2015, Defendant's |
| 10 **Craigslist related to those two domains.** | 10 Exhibit 22? |
| 11 Q. And which affiliate reported that, if you | 11 **A. I recall the existence of the e-mail, so yes, I** |
| 12 recall? | 12 **must have read it.** |
| 13 **A. I don't recall which affiliate it was.** | 13 Q. Now, with respect to this e-mail, did you take |
| 14 Q. I'll show you what's been marked as 22 for | 14 any steps to figure out who this gentleman, Mike Super, |
| 15 identification, and I ask you, sir, if you recognize | 15 was whose name appears under -- in the top third of the |
| 16 that document. | 16 first page of Deposition Exhibit 22? |
| 17 (Exhibit 22 was marked for | 17 **A. No. It was not my responsibility to deal with** |
| 18 identification.) | 18 **customer service type issues.** |
| 19 THE WITNESS: Yes. | 19 Q. Did you suggest to anybody that they try to |
| 20 BY MR. COCHELL: | 20 figure out who Mike Super is? |
| 21 Q. Now, with respect to this particular e-mail, | 21 **A. I don't recall doing that.** |
| 22 you were copied at Tom@MyTruston.com; is that correct? | 22 Q. Did you -- the name Mike Super, does -- are you |
| 23 This is the first e-mail on the first page of | 23 familiar with the use of fake names on the Internet? |
| 24 Exhibit 22. | 24 MR. BOYLE: Object to form. |
| 25 **A. Yes, on the -- well, on the first line I was** | 25 MR. WARD: Same objection. |
| **Page 97** | **Page 99** |

| | |
|---|---|
| 1 **not copied; I was in the "to" line.** | 1 THE WITNESS: I'm aware one could use a fake |
| 2 Q. Okay. I stand corrected. Thank you. | 2 name in an e-mail account. |
| 3 And this was from Diego. Did you understand | 3 BY MR. COCHELL: |
| 4 that Diego was with customer service at this point? | 4 Q. Okay. All right. Fair enough. Do you recall |
| 5 **A. Yes.** | 5 if there was a Skype session to discuss this e-mail on |
| 6 Q. Okay. And what did you do when you first saw | 6 the first page of Defendant's Exhibit 22? |
| 7 this e-mail, the first one, September 17th, 2015, at | 7 MR. BOYLE: Object to form. |
| 8 11:31 a.m., Defendant's Exhibit 22? | 8 Counsel, are you asking whether the first page |
| 9 MR. BOYLE: Object to form. | 9 of the exhibit says that or whether there was a Skype |
| 10 THE WITNESS: Can you please read back the | 10 session? |
| 11 question. | 11 MR. COCHELL: Read back the question. |
| 12 (The following question was read: | 12 (The following question was read: |
| 13 "Question: And what did you do when | 13 "Question: Do you recall if there was |
| 14 you first saw this e-mail, the first | 14 a Skype session to discuss this e-mail |
| 15 one, September 17th, 2015, at | 15 on the first page of Defendant's |
| 16 11:31 a.m., Defendant's Exhibit 22?") | 16 Exhibit 22?") |
| 17 THE WITNESS: I don't recall what I did. | 17 THE WITNESS: I don't recall now if there was a |
| 18 BY MR. COCHELL: | 18 Skype session. Did you say "Skype" or "chat"? |
| 19 Q. Did you read it? | 19 BY MR. COCHELL: |
| 20 MR. BOYLE: Asked and answered. | 20 Q. Skype. |
| 21 THE WITNESS: I don't recall. | 21 **A. I don't recall if there was a Skype session** |
| 22 BY MR. COCHELL: | 22 **about this.** |
| 23 Q. You don't recall reading it? | 23 Q. Do you recall having a discussion with Josh |
| 24 **A. I don't --** | 24 Margulies about this e-mail on the first page of |
| 25 MR. BOYLE: Asked and answered. | 25 Deposition Exhibit 22? |
| **Page 98** | **Page 100** |

**25 (Pages 97 to 100)**

**Thomas Fragala - 2/28/2018**

| | |
|---|---|
| 1     **A. As I read this, I recall that there was an** | 1   document. |
| 2  **e-mail communication between Josh and I.** | 2     MR. BOYLE:  Same objection. |

Page 101

BY MR. COCHELL:

---

1     **A. As I read this, I recall that there was an**
2  **e-mail communication between Josh and I.**
3     MR. BOYLE:  Counsel, just you may have given
4  him your work product here.  It looks like it's the
5  highlighted one.
6     MR. COCHELL:  What's that?
7     MR. BOYLE:  You may have given him the work
8  product here.
9     MR. COCHELL:  Oh, my gosh.
10    MR. BOYLE:  Just so you know.
11    MR. COCHELL:  Yeah, that's fine.  I'll just
12  hand him this one.  This just highlights some dates and
13  so on.
14     All right.  So I forget what I asked.  I know
15  it was something incredibly intuitive and incisive.
16     (The last question and answer were
17       read as follows:
18     "Question:  Do you recall having a
19     discussion with Josh Margulies about
20     this e-mail on the first page of
21     Deposition Exhibit 22?
22       "Answer:  As I read this, I
23     recall that there was an e-mail
24     communication between Josh and I.")
25  /////

**Page 101**

---

1   document.
2     MR. BOYLE:  Same objection.
3  BY MR. COCHELL:
4     Q. I don't want to be accused of mischaracterizing
5  a document.  Would you read what this e-mail says.  It
6  says:  "Mike," and then can you read the sentence
7  underneath it.
8     **A. Yes.**
9     **"Aren't most/all of these Craigslist ads done**
10  **by essentially fraudulent affiliates who are playing the**
11  **game of pumping in as many clients to get the payouts**
12  **by, quote, 'advertising,' unquote, phony things, like**
13  **get a credit check in order to qualify for a job (that**
14  **doesn't exist)?"**
15     Q. By "essentially fraudulent affiliates," what
16  did you mean by that?
17     **A. As I recall, my meaning was affiliates who had**
18  **signed up with MyScore to get an affiliate link, would**
19  **use those affiliate links in a deceptive way.**
20     Q. And with respect to you said:  "Most/all of
21  these Craigslist ads," I'm wondering, did you have prior
22  experience with a Craigslist ad that was fraudulent?
23     MR. BOYLE:  Object to form.
24     THE WITNESS:  Not that I recall.
25  /////

**Page 103**

---

1  BY MR. COCHELL:
2     Q. But you don't recall a phone discussion with
3  Josh individually?
4     **A. No.**
5     Q. Do you recall a phone discussion with Josh with
6  other people on it, a conference call, about this
7  e-mail, Defendant's Exhibit 22?
8     **A. No.**
9     Q. With respect to the second page of Exhibit 22,
10  do you recall sending this e-mail from you to Josh
11  Margulies?  This would be September 18th, 2015, at
12  9:19 a.m.
13     **A. Well, I don't recall, like, doing it at the**
14  **moment.  This -- I do recall that this -- you know, that**
15  **this happened.**
16     Q. Right.  Right.  Okay.
17     So you were asking Josh and copying Diego,
18  David Rojas, Mike Brown, and Jens Sorensen a question:
19  "Aren't most all of these Craigslist ads done by
20  essentially fraudulent affiliates who are playing the
21  game of pumping in as many clients to get the payouts
22  by, quote, 'advertising,' unquote, phony things, like
23  get a credit check in order to qualify for a job," and
24  in parenthesis, "(that doesn't exist)."
25     MR. WARD:  Objection.  Mischaracterizes the

**Page 102**

---

1  BY MR. COCHELL:
2     Q. So why did you say:  "Aren't most/all of these
3  Craigslist ads done by essentially fraudulent
4  affiliates"?
5     **A. At one point Mr. Brown -- as you recall earlier**
6  **in the testimony you had asked if -- about Craigslist**
7  **ads, and I said an affiliate had told me about online**
8  **complaints about Craigslist ads, which I don't recall**
9  **the date of.**
10     Q. Okay.
11     **A. When I had mentioned that to Mr. Brown, he had**
12  **told me at the time that it was, I believe in his words,**
13  **"rogue affiliates" that were causing that.**
14     Q. And what did he say he would do if he found one
15  of these rogue affiliates?
16     **A. I don't recall what he said.**
17     Q. Did he seem concerned about rogue affiliates
18  when you had that discussion?
19     MR. BOYLE:  Object to form.
20     THE WITNESS:  I don't recall the state of his,
21  like, emotions or thought process at the time.
22  BY MR. COCHELL:
23     Q. Sure.  Okay.
24     With respect to -- so when you used this term
25  "Aren't most/all of these Craigslist ads" -- when you

**Page 104**

---

**26 (Pages 101 to 104)**

Thomas Fragala - 2/28/2018

Page 105

1 used that phrase, that wasn't based on any knowledge
2 that you personally had other than what Mike Brown told
3 you in passing; is that correct?
4     **A.** Yes.
5     Q. So I'd like to invite your attention to
6 Exhibit 21. Take a look at the fourth paragraph down
7 where it says: "Mike, you might want to be on the
8 lookout for a job scam."
9     Do you see that?
10     **A.** Yes.
11     Q. Looking -- now that you have Exhibit 21 and
12 Exhibit 22, do you think that -- does that refresh your
13 memory about where you may have gotten this idea that
14 there might be a job scam on Craigslist?
15     MR. BOYLE: Object to form. Asked and
16 answered.
17     MR. WARD: Same objection.
18     THE WITNESS: Yes.
19 BY MR. COCHELL:
20     Q. I'd like to invite your attention to the next
21 e-mail exchange on page 2 of Defendant's Exhibit 22,
22 which has September 21st, 2015, at 11:39 a.m., and this
23 is from Mike Brown to Tom Fragala, Tom@MyTruston.com.
24     Do you see that, sir?
25     **A.** Yes.

Page 106

1     Q. Do you recall this exchange with Mike Brown?
2     **A. As I read this, yes, it does jog my memory.**
3     Q. And did -- did you have a discussion with Mike
4 Brown about this e-mail exchange?
5     MR. BOYLE: Object to form. Ambiguous.
6     THE WITNESS: I don't recall having a verbal
7 discussion with him.
8 BY MR. COCHELL:
9     Q. Now, here this seems to -- did you ever hear
10 from Mike Brown that there was a problem as of
11 September 2015 with Craigslist ads involving real
12 estate?
13     **A. Pursuant to the discussion I mentioned earlier,**
14 **when an affiliate had brought to my attention some**
15 **online complaints and I then had asked Mr. Brown about**
16 **that, that was my understanding -- my level of**
17 **understanding about these types of things.**
18     Q. But I'm asking, though, a very specific
19 question. When you had a discussion with him, you had a
20 discussion with him about jobs, a job scam on
21 Craigslist, right?
22     **A. The discussion I referred to was just online**
23 **Craigslist complaints in general.**
24     Q. Oh, okay. But you never had a discussion with
25 him about whether there were Craigslist scams for real

Page 107

1 estate sales, rentals, or rent-to-own programs?
2     MR. BOYLE: Were you done with your previous
3 answer?
4     THE WITNESS: I don't recall.
5     MR. BOYLE: Well, let's just -- can you --
6     I'm sorry, can you read that question back.
7     (The following question was read:
8     "Question: But you never had a
9     discussion with him about whether
10     there were Craigslist scams for real
11     estate sales, rentals, or rent-to-own
12     programs?")
13     MR. WARD: Object to the form.
14 Mischaracterizes the testimony.
15     MR. BOYLE: Same objection.
16     THE WITNESS: I don't recall specifically what
17 that discussion was that I mentioned earlier in the
18 testimony as far as the specifics of the types of
19 Craigslist issues.
20 BY MR. COCHELL:
21     Q. So specifically as of today sitting here and
22 having reviewed this today, you have no specific recall
23 of any discussion with Mike Brown about Craigslist scams
24 involving real estate sales, rentals, or rent-to-own
25 programs; isn't that correct?

Page 108

1     MR. BOYLE: Object to form. Mischaracterizes
2 prior testimony.
3     MR. WARD: Same objection.
4     THE WITNESS: Can you please repeat the
5 question or can you restate it.
6     (The following question was read:
7     "Question: So specifically as of
8     today sitting here and having reviewed
9     this today, you have no specific
10     recall of any discussion with Mike
11     Brown about Craigslist scams involving
12     real estate sales, rentals, or
13     rent-to-own programs; isn't that
14     correct?")
15     THE WITNESS: I do recall the discussion about
16 Craigslist ads with Mr. Brown when he mentioned the
17 rogue affiliate concept. I don't remember specifically
18 if it was about real estate type style scams versus
19 other types of scams.
20 BY MR. COCHELL:
21     Q. You don't recall one way or the other, right?
22     **A. That's right.**
23     Q. All right. Fair enough.
24     With respect to -- now, if you had thought that
25 this e-mail from Mike Super on the first page of

**27 (Pages 105 to 108)**

**Thomas Fragala - 2/28/2018**

Page 109

1  Defendant's Exhibit 22 showed a serious problem with
2  real estate scams on eFreeScore or CreditUpdates, you
3  would have expressed concern at that point; isn't that
4  correct, sir?
5      MR. BOYLE: Object to form.
6      MR. WARD: Object to the form. Ambiguous.
7      THE WITNESS: It feels like I'm being asked to
8  guess if -- what I would have done in the past if I had
9  seen a particular type of e-mail from some random
10 person. I find it challenging to answer "yes" or "no"
11 to that.
12 BY MR. COCHELL:
13     Q. Well, let me ask you something. Do you conduct
14 your business with integrity and honesty?
15     MR. BOYLE: Object to form.
16     THE WITNESS: Yes. I always try to, yes.
17 BY MR. COCHELL:
18     Q. And if you thought that Mike Brown was running
19 a scam involving Craigslist real estate, you would have
20 terminated your relationship with him at that point;
21 isn't that correct, sir?
22     MR. BOYLE: Object to form.
23     THE WITNESS: If I had known he was running --
24 if I had known for sure that he was running scams, yes,
25 I would have certainly done that.

Page 110

1  BY MR. COCHELL:
2      Q. Well, even if you suspected it, you would have
3  started e-mailing him and asking him about it, right?
4      **A. If I took his word for it when he explained to**
5  **me what he felt the source was.**
6      Q. What did he say the source was?
7      MR. BOYLE: Object to form. Asked and
8  answered.
9      THE WITNESS: As I mentioned earlier, "rogue
10 affiliates" is my recollection of the term he used.
11 BY MR. COCHELL:
12     Q. And the issue rogue affiliates occurred in the
13 context of this e-mail, Defendant's Exhibit 22, or was
14 that at a prior date?
15     **A. It was at a prior date to the conversation we**
16 **discussed earlier.**
17     Q. And so you don't recall a specific discussion
18 with Mike Brown about this particular series of e-mails,
19 Defendant's Exhibit 22; is that correct, sir?
20     MR. WARD: Object to form. Mischaracterizes
21 the testimony.
22     MR. BOYLE: Same objection.
23     THE WITNESS: Other than what I mentioned
24 earlier, how I did recall this -- one of the e-mails in
25 this exchange?

Page 111

1  BY MR. COCHELL:
2      Q. Right.
3      **A. Yeah, I don't remember having a specific verbal**
4  **conversation about this e-mail exchange with Mr. Brown.**
5      Q. And just out of an abundance of fairness
6  because perhaps you didn't see this e-mail, it does say
7  that -- on the bottom of page 2 of Exhibit 22 it says,
8  from you to Josh Margulies it says: "I spoke with Mike
9  to clarify his last e-mail."
10     **A. That's right. I don't recall that specific**
11 **conversation.**
12     Q. All right. One moment, please.
13     Sometimes I remember and sometimes I don't.
14     MR. BOYLE: What's that?
15     MR. COCHELL: To give the witness the non-
16 highlighted portions.
17     (Exhibit 23 was marked for
18         identification.)
19 BY MR. COCHELL:
20     Q. I show you what's been marked as Deposition
21 Exhibit 23, and ask you, sir, if you recognize that
22 document.
23     A. Yes.
24     Q. Do you recall that one of the issues was trying
25 to figure where Mike Super -- how Mike -- whether Mike

Page 112

1  Super was a customer of eFreeScore?
2      MR. WARD: Object to form. Ambiguous.
3      MR. BOYLE: Same objection.
4      THE WITNESS: I don't recall any attempt to
5  determine if this so-called Mike Super was a customer.
6  BY MR. COCHELL:
7      Q. You don't know if there was an attempt made or
8  not; is that a fair statement?
9      A. Yes.
10     Q. So here there's two -- Josh Margulies came up
11 with two new templates for the customer's service GDrive
12 folder.
13     Did you look at these particular templates?
14     MR. BOYLE: Object to form.
15     THE WITNESS: I don't recall looking at them.
16 But from the context of this e-mail, and I believe this
17 e-mail to be likely legitimate, it appears that I did.
18     MR. COCHELL: Okay. Why don't we take a 5- or
19 10-minute break. I think I can cut this short.
20     (Recess was held from 1:48 p.m. to
21         1:56 p.m.)
22     MR. COCHELL: We're back on the record.
23 BY MR. COCHELL:
24     Q. I just want to get back to this a little bit on
25 Defendant's Exhibit 22. And if I understand it

**28 (Pages 109 to 112)**

**Thomas Fragala - 2/28/2018**

1 correctly, you did not ask -- you did not think that --
2 at the time, you did not think that Mr. Brown was
3 running a scam involving Craigslist real estate ads or
4 rent-to-own ads, right?
5     MR. BOYLE: Object to form. Mischaracterizes
6 prior testimony.
7     MR. WARD: Same objection.
8     THE WITNESS: Could you just slightly rephrase
9 it so I can be sure of whether it's a "yes" or a "no,"
10 please.
11     MR. COCHELL: Yeah, read it back. I think --
12 please.
13     (The following question was read:
14     "Question: I just want to get back to
15     this a little bit on Defendant's
16     Exhibit 22. And if I understand it
17     correctly, you did not ask -- you did
18     not think that -- at the time, you did
19     not think that Mr. Brown was running a
20     scam involving Craigslist real estate
21     ads or rent-to-own ads, right?")
22     THE WITNESS: Yes, I did not think he was
23 running a scam.
24 BY MR. COCHELL:
25     Q. Now, with respect to the -- did you ever send

**Page 113**

1 him any e-mails or ask him any questions about the
2 Craigslist real estate or rent-to-own issues?
3     MR. BOYLE: Object to form. Asked and
4 answered.
5     MR. COCHELL: I can rephrase it.
6 BY MR. COCHELL:
7     Q. Did you ever send him an e-mail saying: "I'm
8 concerned about, you know, Craigslist real estate
9 rent-to-own ads on Craigslist and how that impacts our
10 business"?
11     MR. BOYLE: Object to form.
12     MR. WARD: Object to the form. Ambiguous.
13     THE WITNESS: I don't recall sending a specific
14 e-mail. I do recall, as I mentioned earlier, calling
15 him up and discussing it with him about how an affiliate
16 had brought it to my attention.
17     And it wasn't our business, as I know you know
18 that; but it might affect me long term.
19 BY MR. COCHELL:
20     Q. Right.
21     And, of course -- I mean, in a sense, while
22 you're not legal partners, you were partnering with, you
23 know, eFreeScore and CreditUpdates as part of your
24 business, right?
25     MR. BOYLE: Object to form. It's ambiguous.

**Page 114**

1 BY MR. COCHELL:
2     Q. I use it as very -- partnering in a very
3 colloquial way; that you were working with them for
4 mutual benefit, both of you get, you know, economic
5 benefit from this partnering relationship.
6     MR. BOYLE: Same objection. It's ambiguous.
7 BY MR. COCHELL:
8     Q. Is that a fair statement?
9     **A. Well, assuming that it was, and I'm not saying**
10 **I would characterize it as partnering. I wouldn't**
11 **partner with a domain name or a brand; it would be with**
12 **the entity MyScore.**
13     Q. Sure.
14     **A. And -- colloquially, one, I might use the term**
15 **"partnered with," but in no way to insinuate or imply**
16 **that there was any kind of business relationship other**
17 **than referring affiliates to the company.**
18     Q. Right. Other than your independent contractor
19 relationship between, you know, Credit Online Systems
20 [sic] and -- that's the business relationship you had
21 with eFreeScore, right?
22     MR. BOYLE: Object to form. Compound.
23 Ambiguous.
24     MR. COCHELL: All right. I'll withdraw the
25 question.

**Page 115**

1 BY MR. COCHELL:
2     Q. Do you know if eFreeScore and CreditUpdates had
3 a policy of terminating affiliates or white label
4 partners that violated the FTC or other regulations or
5 statutes involving deception of consumers?
6     MR. BOYLE: Object to form.
7     MR. WARD: Same objection.
8     THE WITNESS: I don't recall a specific policy,
9 but it would seem logical to not associate with those
10 kind of entities anymore.
11 BY MR. COCHELL:
12     Q. I'll just show you -- go back to -- I'd like to
13 show you, again, Exhibit 13 for identification. If you
14 could just pull it from your stack right there.
15     **A. Yes.**
16     Q. I'd like to invite your attention to page 7 of
17 Defendant's Exhibit 13. At the top left-hand side,
18 9.2.2 -- well, actually it starts at the previous page
19 where it says: "The Company represents to Agent that
20 the white label total platform shall meet the service
21 level set forth on Exhibit D attached hereto."
22     And then: "9.2. Agent covenants and agrees
23 that Agent will avoid deceptive, misleading, or
24 unethical practices that are or might be detrimental to
25 the Company or the Company's business or reputation."

**Page 116**

**29 (Pages 113 to 116)**

**Thomas Fragala - 2/28/2018**

1    Do you see that?
2    **A. Yes.**
3    Q. Did you understand that to be MyScore LLC's
4    policy with its white label program?
5    MR. BOYLE: Object to form. Asked and
6    answered.
7    MR. WARD: Same objection.
8    THE WITNESS: Yes. However, CreditUpdates'
9    affiliates I don't believe signed this type of
10   agreement.
11   BY MR. COCHELL:
12   Q. Okay. So this was the agreement with MyScore.
13   I'm sorry.
14   **A. And similar to agreements that were signed by**
15   **white label customers as opposed to CreditUpdates'**
16   **affiliates.**
17   Q. So just to kind of recap. If I understand your
18   testimony correctly, then, you agree that it was
19   MyScore -- MyScore's policy is expressed in 9.2-1,
20   page 6, of Defendant's Exhibit 13?
21   MR. BOYLE: Object to form. Ambiguous. And
22   misstates prior testimony.
23   MR. WARD: Objection. Lack of first-hand
24   knowledge and improper lay opinion.
25   MR. BOYLE: I'll join in that as well.

**Page 117**

1    BY MR. COCHELL:
2    Q. Is that your understanding of the policy set
3    out in 9.2-1, that the company expects its agents to
4    avoid deceptive, misleading, or unethical practices that
5    are or might be detrimental to the company or the
6    company's business or reputation? Is that correct, sir?
7    MR. BOYLE: Objection. Calls for speculation.
8    Calls for legal conclusion.
9    MR. WARD: Same objection. Lack of first-hand
10   knowledge. Improper lay opinion testimony.
11   THE WITNESS: I don't believe I'm qualified to
12   say if something in a term and condition in this
13   agreement would find its way to becoming a day-to-day
14   policy within MyScore.
15   And also, this -- these terms were only --
16   would only apply pursuant to a white label customer as
17   opposed to some of the affiliates of eFreeScore or
18   MyScore -- sorry -- eFreeScore or CreditUpdates.
19   BY MR. COCHELL:
20   Q. All right. Very lawyer-like answer.
21   MR COCHELL: All right. Pass the witness.
22   MR. WARD: We don't have any questions.
23   Thank you, Mr. Fragala.
24   MR. BOYLE: Let's take a short break and -- but
25   before I forget -- or lest I forget to put this on the

**Page 118**

1    record, we'll read and sign. Just give me two minutes.
2    MR. COCHELL: Sure. You're welcome.
3    (Recess was held from 2:06 p.m. to
4    2:07 p.m.)
5    MR. BOYLE: I have no questions for the
6    witness, so I think we're done here. Thank you,
7    everyone.
8    MR. COCHELL: Okay, Mr. Fragala, thank you very
9    much.
10   * * *
11   (The proceedings were concluded at
12   2:07 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 119**

1    DECLARATION UNDER PENALTY OF PERJURY
2
3    I, THOMAS FRAGALA, the witness herein, declare
4    under penalty of perjury that I have read the foregoing
5    in its entirety; and that the testimony contained
6    therein, as corrected by me, is a true and accurate
7    transcription of my testimony elicited at said time and
8    place.
9
10   Executed on this_____day of_____.
11
12
13
                    _____
14                  THOMAS FRAGALA
15
16
17
18
19
20
21
22
23
24
25

**Page 120**

**30 (Pages 117 to 120)**

**Thomas Fragala - 2/28/2018**

```
 1    STATE OF CALIFORNIA.   )
                             ) SS.
 2    COUNTY OF SAN DIEGO.   )
 3
 4        I, Cindy Duynstee, Certified Shorthand Reporter
 5    No. 12938 for the State of California, do hereby
 6    certify:
 7        That, prior to being examined, the witness
 8    named in the foregoing deposition was duly sworn to
 9    testify to the truth, the whole truth, and nothing but
10    the truth;
11        That said deposition was taken down by me in
12    shorthand at the time and place therein named and was
13    thereafter reduced by me to typewritten form, and that
14    the same is a true, correct, and complete transcript of
15    said proceedings;
16        Before completion of the deposition, review of
17    the transcript [X] was [ ] was not requested.  If
18    requested, any changes made by the deponent (and
19    provided to the reporter) during the period allowed are
20    appended hereto.  I further certify that I am not
21    interested in the outcome of the action.
22        IN WITNESS WHEREOF, I have this date subscribed
23    my name.  Date:_____
24
25        _____
                Cindy Duynstee, CSR 12938
25
```

**Page 121**

**31 (Page 121)**

**Subject:** Daily Recap for Saturday, 30 November
**From:** "Basecamp (MyScore's Basecamp)" <notifications@basecamp.com>
**Date:** 12/1/13, 11:09 AM
**To:** M.Brown@MyScore360.com

Ba: **Basecamp**

# Daily Recap

## Saturday, 30 November

## 1 project was updated:

- WLTS: New Customer Project Template for Your Review

## WLTS: New Customer Project Template for Your Review

### 1 person contributed

### 21 to-dos were added

#### 1. Kick Off (Initiation) Tasks
- □ 1.2. Add customer(s) to the project   Julio Reyes · Mon, Nov 25
- □ 1.1. Complete Kick-Off Call   Tom Fragala · Mon, Nov 25



#### 2. Design (Planning) Tasks
- □ 2.7. Provide Custom Template. Please provide estimated delivery time for this task and if additional assistance is required. If 2.6 is done, add the following comment: N/R.
  Julio Reyes · Thu, Nov 28
- □ 2.5. Select Offer Package and provide corresponding Customers Prices (Credit monitoring and/or Repair) on this task   Julio Reyes · Thu, Nov 28
- □ 2.6. Select landing page. For credit monitoring, choose from:
  www.freescorecomplete.com, www.efreescore.com, www.creditreportnation.com, www.zoomcreditscore.com, www.idlockup.com or www.simplecreditsolution.com) If credit repair, select from (www.creditdisputecenter.com, www.creditdisputeonline.com). If 2.7 is required, add the following comment: N/R   Julio Reyes · Thu, Nov 28
- □ 2.4. Upload your Company Logo (Up to 30 px) - Please note that it wouldn't stop site launch, but its required for final launch or confirmation that either isn't needed. Indicate: provided, requested or not needed.   Julio Reyes · Tue, Dec 10
- □ 2.3. Point Domain Name to Our DNS Servers (ben.ns.cloudflare.com gina.ns.cloudflare.com)   Julio Reyes · Tue, Nov 26
- □ 2.2. Provide your domain name (ex: www.newsite.com)   Julio Reyes · Tue, Nov 26
- □ 2.1. Create OfferIT Affiliate Tracking Account with New Offer and provide your username. Please go to this link: http://myscore.offerit.com/external.php?page=signup

Case: 1:17-cv-00194 Document #: 206-5 Filed: 03/24/18 Page 33 of 61 PageID #:5274

Julio Reyes · Tue, Nov 26

### 3. Development (Execution) Tasks

☐ 3.1. Configure website (Task 1 to 6, except 4, must be completed)  Gordon Yang · Mon, Dec 2

☐ 3.4. Soft launch (push site)  Mike Brown · Thu, Dec 5

☐ 3.2. Setup SSL Certificate  Mike Brown · Mon, Dec 2

☐ 3.3. Approve SSL Certificate  Julio Reyes · Wed, Dec 4

### 4. Review (Monitor and Control) Tasks

☐ 4.5. Perform modifications to the site, if required. If not required, add the following comment: N/A

☐ 4.1. Verify design, content and buttons are correct  Julio Reyes · Fri, Dec 6

☐ 4.4. Verify company logo is uploaded, sign off from customer (provided/requested/not needed)  Julio Reyes · Tue, Dec 10

☐ 4.6. Review traffic reports with customer  Mike Brown · Wed, Dec 11

☐ 4.3. Perform Traffic Tests  Julio Reyes · Mon, Dec 9

☐ 4.2. Verify LP and All Copy for FTC, FACTA, and FCRA Compliance.  Mike Brown · Fri, Dec 6

☐ 4.7. Site launch approval, QA Acceptance.  Julio Reyes · Thu, Dec 12

### 5. Launch (Closing) Tasks

☐ 5.1. Site launch, closing project acceptance  Julio Reyes · Fri, Dec 13

---

Stop receiving this daily email.

10/11/2017        Zenova Mail - Julio Reyes started a new Basecamp project: WLTS: New Customer



**Mike Brown <mike@zenova.com>**

## Julio Reyes started a new Basecamp project: WLTS: New Customer
1 message

**Julio Reyes (Basecamp)** <notifications@basecamp.com>                       Sat, Apr 5, 2014 at 2:46 PM
Reply-To: Julio@myscore360.com
To: M.Brown@myscore360.com



Julio Reyes just started this new project on Basecamp.

**WLTS: New Customer**

We're letting you know because you're the owner of the Basecamp account. Visit this project on Basecamp

---

**Here's what's happened on the project so far:**

21 to-dos were added and 4 were assigned to you

**3. Development (Execution) Tasks**
❏ 3.2. Setup SSL Certificate    Mon, Apr 7
❏ 3.4. Soft launch (push site)    Thu, Apr 10

**4. Review (Monitor and Control) Tasks**
❏ 4.2. Verify LP and All Copy for FTC, FACTA, and FCRA Compliance.    Fri, Apr 11
❏ 4.6. Review traffic reports with customer    Wed, Apr 16

4 other people were invited

**Our team:** Gordon Yang and Tom Fragala

**The client:** Steve Paige and shon@advancecapital.com

---

If you don't want to receive any more email about it, turn off email notifications for this project (You'll still have full access to the project).

DEFENDANT'S
EXHIBIT
3
PENGAD 800-631-6989

CBC/BRO002022

## Exhibit A

Prospect Referral Claim Form for ScamSafe, Inc. (dba Truston)

| | |
|---|---|
| Date: | 10/17/2012 |
| | |
| Prospect Company: | Vanuity LLC |
| Contact Name: | Jamie Cochran |
| Address: | 4455 S 700 E Ste 206 |
| | Salt Lake City, UT 84107 |
| Phone#: | |
| Email Address: | jamie@vanuity.com |
| Referral Claim Date (if earlier than Date above): | 10/17/12 |

**Email Referral Form to Company at:** **m.brown@efreescore.com** or any subsequent email provided by Company



# CreditUpdates Brochure Requirements

Author Tom Fragala [tom@myscore360.com, skype: tfragala]
V 1.0 2/15/16

## Goal

Create a PDF brochure or flyer for Credit Repair Organizations (CRO) to interest them in becoming a
CreditUpdates.com affiliates and using the site for all their credit reports/scores for all their clients..

## Team

Cage's team will create design and document
Josh will write the copy and deliver the text.

### Explanation

MyScore is trying to increase the number of CROs that use CreditUpdates to provide the scores and
reports for all their clients, to be used in the credit repair process. We're also changing the payouts for all
the current CRO affiliates/partners and the brocure will contain that information.

We need a brochure similar to the enterprise ScoreApprove flyer done in the past. A two-page PDF that
will be emailed primarily, not printed.

MyScore signs up these CROs, who always need credit reports and scores for their clients, as affiliates
and provide them a special URL with a code that identifies those that use the URL as clients of the CRO,
so the CRO gets credit for the order.

Project folder:
https://drive.google.com/a/myscore360.com/folderview?id=0B71hWbhMbu08XzZYcWVSMThKMzA&usp=
sharing

ScoreApprove flyer to help with idea:
https://drive.google.com/a/subture.com/file/d/0B_vD_ANau2kHbTN5Slg2ckJZOXM/view?usp=sharing

or if you can't access look for copy in folder for this project

## Requirements

### Design

Leave space on the brochure with 2-3 screenshots of the credit report site itself and of the admin tool.



## Existing slide deck

There is an existing Powerpoint slide deck "brochure"t that is up to date and can be used as the basis for the content of this new brochure. It can be found in this project folder here (pdf format):
https://drive.google.com/open?id=0B71hWbhMbu08MmIIaWRjVGtKamc

You do not need to use the same tables, formats, titles as the existing slide deck, feel free to change those components.

## Copy

### Features & Benefits, etc.

See existing slide deck above for the features and benefits for CROs, plus all other existing copy.

Please suggest not just copy but how to lay it out in sections for best effect.

# CreditUpdates Partner Program Guide Requirements

Author Tom Fragala [tom@myscore360.com, skype: tfragala]
V 1.0 3/1/16

## Goal

Create a PDF flyer for CreditUpdates Partners to provide a general guide, set of best practices and FAQ to help program be more profitable for MyScore.

## Team

Cage's team will create design and document
Josh will write the copy and deliver the text.

## Explanation

We need detailed guide for the partner program to be provided after the partner signs up as an affiliate. The doc should explain program specifics, answer common questions and go over best practices to encourage best use of the program to boost revenue for MyScore and partners. Also have a section with the payout tables again. This will be probably a 2-page flyer.

Examples of a much larger and more detailed partner program guides is in the project folder (Salesforce ISV guide): https://drive.google.com/open?id=0B71hWbhMbu08Qm9Dc2lOaEZZclk or here https://partnernet.symantec.com/cs/groups/partner/documents/programguide/tus1cpeappgin0055299.pdf These are far more than what we need of course.

## Design

A 1 or 2-page document that looks like a professional partner program guide.

## Copy

Below is a draft of copy.

---

**Online Orders**

DEFENDANT'S
EXHIBIT

PENGAD 800-631-6989

For online orders, you have a special link that looks something like this:
https://www.CreditUpdates.com?&sv=NNN&essv=1 where the NNN is the code that identifies you as a partner.

It's very important to note that the CreditUpdates server will drop a "cookie" through a visitor's web browser, so that in future visits the visitor will see the original offer. The "&essv=1" at the end of the link is not required but it will reset any cookies previously set so you will always see your correct offer.

### Phone or In-person Orders

Partners that are approved may also perform sign-ups on behalf of consenting prospects, either in person or on the phone, using our Phone Order System. There is a very long link for this that begins with https://order.myscore360.com/order/page1... and has a number of required codes included it. Contact your account manager if you have questions.

After clicking on the Phone Order Link, you will see a landing page. Here you may optionally enter a "Source Code" to indicate the source of your orders. The Source Code can then be used as a filter in the Admin reporting portal. A source code can be any set of characters or numbers such as an employee's name, a call center rep's ID or a marketing campaign. To save a step and reduce typos, you can embed the source code in the phone order link by adding "&sc=NNN" at the end, where NNN is the arbitrary source code, for example, "Mary".

### Reports

A Partner Report is available from the Admin portal. Partners access the partner at https://admin.myscore360.com and must first register at https://admin.myscore360.com/auth/register. You must have an "API Key" in order to complete registration and see your report. You should be sent this after you are set up in the Partner Program. Your account manager can help with the Admin portal.

### Credit Card Usage

Subscribers may only sign up no more than two accounts per credit card. Partners are now allowed to use a company credit card to sign up clients. The clients must sign up using their own credit card.

### Best Practices

*(This doesn't need to be a bullet list in the guide.)*

- Use CreditUpdates as a "required" step in the sign up process. Our most successful partners do this tell clients they must sign up for CreditUpdates and stay subscribed throughout the entire credit repair process.. Not only does it lead to more revenue, but if you have one source of credit reports, you'll have less confusion and problems for both clients and staff.
- Increase retention of your call center reps and other staff by providing them a small commission for every CreditUpdates signup. For example, in order to ensure every client gets signed up successfully with CreditUpdates, one of our partners pays $5.00 for every sign up. This can help lower turnover in the call center.
- Have your staff enter a source code when using the phone order interface. This can be any combination of letters or number, or someone's name for example. This will allow you to breakdown your admin reports by source code to track signups by employee or call center rep or any other designation.
- Embed the source code into your phone order URL and have each rep bookmark it, so they won't have to enter source code each time. You can do this by adding "&sc=XXXX" at the end of your

- phone order URL where XXXX is the source code of your choosing (it doesn't have to be 4 characters).
- o Encourage your clients to stay subscribed to CreditUpdates not only during the credit repair process but after that is completed as well. This benefits everyone. The clients can stay on top of their credit with an eye towards getting a loan or just maintaining their financial wellness. This helps you gain more revenue and also could lead to a higher payout because it will improve retention and should lower refresh rates over time.
- o Use the no-trial offer. For credit repair, many CROs have told us they don't need a trial offer because credit reports are required anyway and they want the recurring revenue. You can also qualify for our highest payouts if you use the no-trial option. Do not tell your clients to cancel during the trial. This will drastically reduce your retention rates and you will be removed from the partner program.
- o Inform your clients that CreditUpdates includes two ID protection benefits and RewardsTotal with free coupons and discounts. The ID protection is complete restoration support and $1 million ID theft insurance. RewardsTotal is unlimited access to thousands of coupons and discounts on movies, shopping, restaurants, entertainment, amusement parks, health products, and more.

**Frequently asked questions**

- o Should I use the Trial or No-trial offer?
  We recommend the no-trial offer. For credit repair, many CROs have told us they don't need a trial offer because credit reports are required anyway and they want the recurring revenue. You can also qualify for our highest payouts if you use the no-trial option. Do not tell your clients to cancel during the trial. This will drastically reduce your retention rates and you will be removed from the partner program.
- o How often am I paid the revenue share?
  Payouts are made monthly in the first or second week of the month following. We are working on new processes to have the payouts provided more quickly.
- o How do my clients sign up for CreditUpdates?
  To sign up online using their browser, you should provide every client your custom web address (URL) which has your unique code embedded in it. You are sent this URL after you sign up as a partner. Your client must use this URL for you to get credit for the sale.
- o How often can the client pull a new updated credit report?
  Credit report and score refreshes are available once every 30 days. Previously pulled reports are saved and available to be viewed at any time.
- o What if my client visits our partner link, but later signs up directly at "www.creditupdates.com" instead of my link? I don't get credit, right?
  You should get credit! The CreditUpdates site drops a "cookie" on the visitors computer, which saves your special code. So if that visitor returns later from the same computer, they'll see the original offer and you'll get credit.
- o I want to take orders over the phone or at my office in person. What do I do?
  You can take orders on behalf of consenting clients using the client's credit card. You should have been provided a special link, just for taking these orders. This is different from your main online setup link. Contact us if you need this link.
- o Who should I contact if the CreditUpdates site is down or phone order page is showing errors?
  Please send email to partner-support@myscore360.com. You can also email or call your account manager directly.
- o What should I do if I can't place an order because there is an error?
  Please copy/paste the error text into an email if possible. A screenshot is also very helpful

especially for some complicated issues. Please ask your staff to always make a note of the error before they close the browser window. Send an email with the error information to partner-support@myscore360.com.

- Who should I contact about payment issues?
  You can also use partner-support@myscore360.com for payout questions.
- Who should I contact if a client is having problems with CreditUpdates?
  Usually you should have the individual contact CreditUpdates customer service. Everyday: 5 AM to 9 PM PST (800) 720-6627 From Outside the US Call: +1 (925) 298-6179 Support@CreditUpdates.com
- Can I get paid out more often than once a month?
  As of March 2016 all payouts are exclusively on a once monthly payment schedule.

## Payouts

### Trial Offer

| Pay Out Per sub re-bill | Retention Rate Avg new subs | Refresh Rate Avg all subs |
|---|---|---|
| $7 | 60%+ | 0-25% |
| $5 | | 26-50% |
| $2 | | 51-100 |
| $2 | | 71-100% |
| $5 | <60% | 0-25% |
| $2 | | 26-50% |
| $0 | | 51-100 |
| $0 | | 71-100% |

### No Trial Offer

| Pay Out Per sub rebill | Refresh Rate Avg all subs |
|---|---|
| $9 | 0-25% |
| $7 | 26-50% |
| $5 | 51-70% |
| $3 | 71-100% |

The No trial offer is strongly recommended.

Somewhere on the flyer there should be area with account manager contact info:

Your account manager is: Tom Fragala (323) 400-4173 tom@myscore360.com

**Subject options:**
We have mortgage leads waiting for you
A proven source of additional mortgage leads
More mortgage leads without the work
Exclusive, qualified mortgage leads waiting inside

Hi [FirstName],

I know every vendor and his brother are offering access to some "hot new mortgage lead source" these days.

But what if I told you that you could get *exclusive qualified leads* sent directly to your CRM every day, just by giving out an irresistible free tool to Real Estate Agents one time? That's exactly how ScoreApprove works.

Click here to find out more about ScoreApprove >>

FYI, ScoreApprove is a free sales tool that lets homebuyers do a fast, soft credit pull for their RE Agent and Lender. It saves them time, and they love it!

For you, this is a powerhouse lead gen opportunity. The steps are simple:

1. You create a ScoreApprove account (takes 1 minute)
2. Next, you invite RE Agents by simply entering their email addresses into ScoreApprove's easy-to-use invite tool
3. Your invited agents sign up, and start using ScoreApprove to quickly see their homebuyers' credit and financing capability (remember, agents *love* ScoreApprove, so signups are virtually guaranteed)
4. Each time a homebuyer checks their credit and financing potential, YOU get an exclusive qualified lead sent directly to your CRM

You can try ScoreApprove totally free for 2 full months! No risk, no obligation...we don't even require a credit card to sign up.

Click here to find out more about ScoreApprove >>



DEFENDANT'S
EXHIBIT
G

Regards,
Tom Fragala

PS: If you have any questions, feel free to give me a buzz at 888.888.8888

Mir Ali LiveConnectGlobal / MediaBeep - Skype chat history

**Subject:** Mir Ali LiveConnectGlobal / MediaBeep – Skype chat history
**From:** Tom Fragala <tom@mytruston.com>
**Date:** 5/22/14, 4:33 PM
**To:** "mike@myscore360.com" <mike@myscore360.com>

Mike,

So you have a transcript of the chat with Mir Ali:

DEFENDANT'S
EXHIBIT
10
PENGAD 800-631-6989

[5/15/2014 11:15:18 AM] *** Tom Fragala added Mike Brown ***
[5/15/2014 11:16:44 AM] Mike Brown: Hello
[5/15/2014 11:16:49 AM] mediabeepmir: Hello MIKE
[5/15/2014 11:18:09 AM] Mike Brown: Tell me more about the type of traffic you are doing. What data you dialing? What offers you pushing? How many reads per call? What type of incent you doing?
[5/15/2014 11:18:29 AM] mediabeepmir: SEARCH, PPV, CALL
[5/15/2014 11:18:49 AM] mediabeepmir: we are dialing tax and payday data
[5/15/2014 11:23:41 AM] Mike Brown: Ok. Everyone we have worked with that has done Payday data had the campaign back out really bad. Those customers don't typically have the fund on their card after the trial is over.

We do have a new product called PaydayBureau.com which I think will be a great fit though
[5/15/2014 11:24:34 AM] mediabeepmir: yea interested on it aswell
[5/15/2014 11:24:47 AM] mediabeepmir: WE DONT DIAL ON DECLINED PAYDAY DATA
[5/15/2014 11:24:57 AM] mediabeepmir: WE DIAL ON DATA THAT HAS ATLEAST $100 with them and are near to payday
[5/15/2014 11:25:21 AM] mediabeepmir: and can cover charges of $100+ for the service charge or upfront for any loan company might asked
[5/15/2014 11:25:30 AM] mediabeepmir: thats is why we are still in business for long.
[5/15/2014 11:27:59 AM] Mike Brown: brb
[5/15/2014 11:28:10 AM] mediabeepmir: also, paydaybureau looks a good fit aswell
[5/15/2014 12:57:07 PM] mediabeepmir: Im not sure if you forgot but i am still waiting
[5/15/2014 12:57:53 PM] Tom Fragala: mike was pulled into something. not sure when he'll be back.
[5/15/2014 12:58:10 PM] mediabeepmir: oh ok
[5/15/2014 12:58:23 PM] mediabeepmir: so what do you wthink how we can move forward
[5/15/2014 12:58:51 PM] Tom Fragala: let's continue the chat with mike to find out.
[5/15/2014 12:59:02 PM] mediabeepmir: ok
[5/15/2014 1:15:57 PM | Edited 1:17:15 PM] Mike Brown: Do you guys dial the new TCPA complaint data? Can you show me an example of the optin for the data?
[5/15/2014 1:25:25 PM] mediabeepmir: sure
[5/15/2014 1:25:29 PM] mediabeepmir: give me a moment
[5/15/2014 1:25:42 PM] mediabeepmir: 5/12/2014 6:33 198.96.90.35 Inez Fordham p.o. box 4633 inglewood CA 90309 inezfordham@yahoo.com 4242233716 4242333716 Anytime $1,000.00 180522340 6/30/1961 c1970086 CA Rent 1 10 52 No Employment No employee $1;751–2;000 0 6 5555555555 Bi–Weekly 5/22/2014 6/22/2014 Paper Check edd Checking bancorp 31101169 9.62E+14 1 6
[5/15/2014 1:26:06 PM] Mike Brown: can you give me an example of the site where the consumer does the optin to be called?

EXHIBIT
McKenney
22
12/14/17

12/11/17, 11:19 AM

Mir Ali LiveConnectGlobal / MediaBeep - Skype chat history

[5/15/2014 1:31:42 PM] mediabeepmir: paydaytotal.com
[5/15/2014 1:32:29 PM] Mike Brown: I don't see any optin or disclosure on this page?
[5/15/2014 1:32:42 PM] Mike Brown: Are you dialing by hand or autodialer?
[5/15/2014 1:32:48 PM] mediabeepmir: hand
[5/15/2014 1:49:03 PM] Mike Brown: hand dial and then they speak directly to a human right? No press 1 style campaign?
[5/15/2014 1:51:12 PM | Edited 1:51:33 PM] Mike Brown: If we did something together we would at least need you up update the disclosures. You have no optin for the consumer to be dialed for telemarketing purposes. Unless you also do your own in—house payday lending you may get around that requirements by having an existing business relationship but you don't do the payday lending do you?
[5/15/2014 1:54:56 PM] mediabeepmir: i can update those for you
[5/15/2014 1:55:09 PM] mediabeepmir: also i buy data from different vendor
[5/15/2014 1:56:33 PM] Mike Brown: ok the vendor you buy data from do they disclose your business name in the telemarketing disclosure? Need to make sure its there too. TCPA and FTC are very strict...
[5/15/2014 1:57:32 PM] mediabeepmir: I guess not since im buying old aged data not realtime
[5/15/2014 2:02:42 PM] Mike Brown: what % of the calls are on old aged data without the optin? We can only work on the optin data with the proper disclosure
[5/15/2014 2:06:29 PM] mediabeepmir: ok if that is the case we can setup that way
[5/15/2014 2:06:34 PM] mediabeepmir: so we are compliant
[5/15/2014 2:19:04 PM] mediabeepmir: I can add the disclosure and optin
[5/15/2014 4:48:12 PM] Tom Fragala: mike?
[5/16/2014 7:23:37 AM] mediabeepmir: Hi mike and TOM
[5/16/2014 8:07:50 AM] mediabeepmir: im anxious to know if there's any possibilities for us to work toghether on paydaybureau
[5/16/2014 11:42:56 AM] Mike Brown: Once you add the proper disclosures we can work together on the PaydayBureau offer. I should also tell you we are in the middle of switching the offer from credit card to ACH so we won't be ready to start with the offer till the changes are completed which could be a few weeks
[5/16/2014 11:43:34 AM] mediabeepmir: should work

10a -Fragalia00000457

From: Mike Brown <mike@myscore360.com>
Sent: Saturday, September 27, 2014 6:48 PM
To: Tom Fragala <tom@mytruston.com>
Cc: Jens Sorensen <jens@myscore360.com>
Subject: Re: logo - Christopher Ohlsen, Northern Finance Group - API Keys

Jens for the co-branding we just update the logo for the site version. The
logo needs to be added to our code base and pushed. So sent the logo to
steve to save it somewhere and have him send you the URL to update the site
version logo in the admin tool

On Fri, Sep 26, 2014 at 4:46 PM, Tom Fragala <tom@mytruston.com> wrote:

> thanks Jens!! by the way, not sure if i mentioned this, but i'm hoping
> this can be a co-branded efreescore site, which is why i provided the logo.
>
> On Fri, Sep 26, 2014 at 4:14 PM, Jens Sorensen <jens@myscore360.com>
> wrote:
>
>> Hi Mike,
>>
>>
>>
>> -          I set up a new Site Version for Christopher Ohlsen, Northern
>> Finance Group. (
>> https://admin.myscore360.com/admin/settings/edit_site_version/167)
>>
>> -          I created an API key with the role of "Affiliate - Rev Share"
>> (https://admin.myscore360.com/admin/settings/edit_api_key/73)
>>
>> -          I created an API key with the role of "50 - White Label Site
>> Admin" (https://admin.myscore360.com/admin/settings/edit_api_key/74)
>>
>>
>>
>> Site Admin Key:            89b8ef41917e650410163b89b1a67349d456e1d0
>>
>> Affiliate Key:
>> b5b9f59f361d496de1d359e12694295bafd55499
>>
>>
>>
>> Please confirm this is the setup you intended for Christopher.
>>
>>
>>
>> *Mike TODO**: I am not sure where to point the "Logo URL" field under
>> the Site Version setup page*. Can you please do this or instruct me on



DEFENDANT'S
EXHIBIT
15

PENGAD 800-631-6989

10a -Fragalia00000457

>> how to upload the logo myself? (
>> https://admin.myscore360.com/admin/settings/edit_site_version/167)
>>
>>
>>
>> Please also let me know if you would like me to send these keys to
>> Christopher or wish to do so yourself. I can provide him instructions for
>> using the Site Admin Key, but I am not sure how the Affiliate Key works yet.
>>
>>
>>
>> Jens
>>
>>
>>
>>
>>
>>
>>
>>
>>
>> *From:* Jens Sorensen [mailto:jens@myscore360.com]
>> *Sent:* Friday, September 26, 2014 3:43 PM
>> *To:* 'Tom Fragala'; mike@myscore360.com
>> *Subject:* RE: logo
>>
>>
>> Hi Tom,
>>
>>
>>
>> I think Mike is actually waiting on me to get them set up with an API key.
>>
>>
>>
>> I'll start working on that right now.
>>
>>
>>
>> Jens
>>
>>
>>
>>
>>
>> *From:* Tom Fragala [mailto:tom@mytruston.com <tom@mytruston.com>]
>> *Sent:* Friday, September 26, 2014 3:30 PM

Page 2

10a -Fragalia00000457

```
>> *To:* mike@myscore360.com
>> *Cc:* Jens Sorensen
>> *Subject:* Re: logo
>>
>>
>>
>> Mike,
>>
>>
>>
>> Is this ready yet? It's supposed to take just a few minutes right?
>>
>>
>>
>> -tom
>>
>>
>>
>>
>>
>> On Thu, Sep 25, 2014 at 9:16 AM, Tom Fragala <tom@mytruston.com> wrote:
>>
>> Mike,
>>
>>
>>
>> When will you get Northern Finance Group set up with efreescore.com?
>> Their logo is below.
>>
>>
>>
>> --tom
>>
>>
>>
>> ---------- Forwarded message ----------
>> From: *Customer Service* <info@northernfinancegroup.com>
>> Date: Thu, Sep 25, 2014 at 9:06 AM
>> Subject: RE: logo
>> To: Tom Fragala <tom@mytruston.com>
>>
>> Hi Tom,
>>
>>
>>
>> This is the logo that we are currently using. I'm not sure how it will
>> look alongside the efreescore.com logo. Should I be expecting a call
>> from Mike? Also, the phone/in-person payment portal is an important element
```

Page 3

```
                               10a -Fragalia00000457
>> to me. Please let me know what the next step is. I would like to get set up
>> ASAP. Thanks!
>>
>>
>>
>>
>>
>> -Christopher Ohlsen
>>
>>
>>
>> *From:* Tom Fragala [mailto:tom@mytruston.com]
>> *Sent:* Wednesday, September 24, 2014 12:48 PM
>> *To:* Christopher Ohlsen
>> *Subject:* logo
>>
>>
>>
>> Chris,
>>
>>
>>
>> Please send me a logo in PNG or JPG format that is no more than 60 pixels
>> high and about 400-500 pixels wide. It will need to fit in the top of page
>> header on efreescore.com
>>
<http://t.signauxun.com/link?url=http%3a%2f%2fefreescore.com&ukey=agxzfnNpZ25hbHNjcn
hyGAsSC1VzZXJQcm9maWxlGICAgN-Z9NILDA&k=02400e27ad854c73a9ba2e7aa153fa74>
>> to the right of the existing logo, so please make sure it will look good in
>> that location.
>>
>>
>>
>> Thanks,
>>
>> tom
>>
>>
>>
>>
>>
>>
>>
>> --
>>
>>
>>
>> _____
```

```
                               10a -Fragalia00000457
>>
>> Tom Fragala  |   TRUSTON  |   www.mytruston.com
>>
>> 340 S Lemon Ave #2688  Walnut CA 91789
>>
>> tel 800.960.5512 x710  |   fax 800.960.4199
>>
>
>
>
> --
>
> _____
> Tom Fragala  |   TRUSTON  |   www.mytruston.com
> 340 S Lemon Ave #2688  Walnut CA 91789
> tel 800.960.5512 x710  |   fax 800.960.4199
>
```

11 - Fragalia00000493

```
From:  Fragala, Tom <tom@mytruston.com>
Sent:  Friday, August 7, 2015 9:14 PM
To:  Jens Sorensen <jens@myscore360.com>; Ralph Thornton
<ralph.thornton@sbcglobal.net>; Ralph Thornton <ralph@myscore360.com>
Cc:  Mike Brown <mike@myscore360.com>
Subject:  New customer SX3
```

FYI, new creditupdates customer. They will be doing a bit of an integration like TurboDIspute, except they have desktop software. Get details from Mike.

Jens, you don't have to set them up just yet, until Mike (or Juan or I) gives you the heads up.

They are doing NO revenue share at this time. I have an email out to Juan on the offer, I assume 19.95, not sure if trial or not.

Mike I don't believe we have that determined yet correct?

Juan Urbina
SX3 Software LLC
4815 E Carefree Hwy
Cave Creek, Arizona 85331
juan@sx3software.com
602-235-0109 x 201


--
Tom Fragala | TRUSTON | mytruston.com
340 S Lemon Ave #2688  Walnut CA 91789
tel 800.960.5512 x710 | fax 800.960.4199



9/25/2017                                    Truston Mail - efreescore refund

# Truston.

Fragala, Tom <tom@mytruston.com>

## efreescore refund
5 messages

**Tom Fragala** <tom@onlinecreditsystems.com>                    Mon, Jun 29, 2015 at 12:18 PM
To: Diego Customer Service <diego@myscore360.com>
Cc: Mike Brown <mike@myscore360.com>

Diego,

i got a call from an efreescore customer to my OCS corp phone number (i literally have never received a call to that #). This must be for the new merchant accounts through MiCamp because the customer said the number shows up on the bank website next to the amount and E FREE SCORE COM.

Looks like MiCamp screwed up and put that number as the city name Mike, instead of customer service. Gotta get that fixed right away, I'm not equipped to handle customer service calls.

Diego, the sub is Victoria Poon, date of transaction today on her debit card (i assume it's just an authorization right now). She's in NY/Brooklyn, 347-780-9544 is her phone number. She says she has no idea how or why the 29.94 was charged. I asked if if maybe she did it as part of a job application, maybe craigslist. She says she is looking for a job, but doesn't have any memory of signing up at all or craigslist job.

Mike you might want to be on the look out for a job scam.

Please issue a refund. You may want to call her and tell her it was issued to prevent a charge back. I asked her to not call the card issuer yet.

Thanks,
Tom


--

Tom Fragala
Online Credit Systems LLC
tom@onlinecreditsystems.com
805-570-5285 mobile

**Tom Fragala** <tom@onlinecreditsystems.com>                    Mon, Jun 29, 2015 at 9:40 PM
To: Diego Customer Service <diego@myscore360.com>
Cc: Mike Brown <mike@myscore360.com>

I have another one. He also said he has no idea what efreescore is and def didn't sign up. however, he is also looking for a job, although he swears he didn't sign up for efreescore. maybe a coincidence, maybe not. said he didn't use craiglist to look for a job either, again, doesn't mean he did or didn't.

Please issue a refund immediately and let him know. I asked him to not call his credit card issuer yet:
310-699-2444
His name: Kambiz Asheghian
asheghian@yahoo.com

[Quoted text hidden]

DEFENDANT'S
EXHIBIT
21
PENGAD 800-631-6989

**Diego M** <diego@myscore360.com>                               Tue, Jun 30, 2015 at 1:24 PM
To: Tom Fragala <tom@onlinecreditsystems.com>
Cc: Mike Brown <mike@myscore360.com>

Hello Tom,

Both accounts were refunded. I also called and spoke mr Kambiz, and he was happy to know it was taken care of. For Victoria. I left a voice mail explaining refund was issued and account was cancelled with no future charges.

[Quoted text hidden]

---

**Tom Fragala** <tom@onlinecreditsystems.com>                                    Tue, Jun 30, 2015 at 1:50 PM
To: Diego M <diego@myscore360.com>

thank you. there were two more his morning that called. i told to call customer service. please check on them also.
chevonne frank 661-886-3054
feliz pasetes 224-619-5444

i forwarded my toll free number to the scorelook customer service number (mike told me to use that number). so that's where the calls will go. i tested it and it works well.

[Quoted text hidden]

---

**Diego M** <diego@myscore360.com>                                              Tue, Jun 30, 2015 at 2:28 PM
To: Tom Fragala <tom@onlinecreditsystems.com>

Hello Tom,

here is the update on the following accounts.

chevonne frank 661-886-3054- This account did not some up. also tried with wildcard search and had no luckcfeliz pasetes 224-619-5444- This client Called in today and was retained with lowered price.

[Quoted text hidden]

# Truston.

Fragala, Tom <tom@mytruston.com>

## Template request for client complaining, but cant find account
10 messages

**Diego M** <diego@myscore360.com>                                    Thu, Sep 17, 2015 at 11:31 AM
To: David Rojas <darb714@gmail.com>, Mike Brown <M.Brown@myscore360.com>, Jens Sorensen
<Jens@myscore360.com>, josh <josh@joshuamargulies.com>, Tom Fragala <tom@mytruston.com>

Hello Josh,

Can we possibly create a response for upset clients, who we dont have an account for. and are sending messages and
are clearly upset about the way they brought to the program. some people are upset about the Craigslist posting. The
template for unsatisfied client, wouldnt really fit this , since we cant find an account for him. Here is an example:

## Fake ads

**Mike Super** reported 10 days ago (Mon, 7 Sep at 6:50 PM) via Email
To: <support@creditupdates.com>

*I am the person responsible for flagging for removal vast number of fake ads your
people are putting on Craiglist in the St. George, Utah area. Your meganbundy,
latoyaschwab or maryhilliard are probably all fake names. I have also been in
contact with more than several of the legitimate rental properties that you are using
as bait to entice people to come to your site, beit **creditupdates.com** or
**efreecreditreport.com** or whatever else you are using. I have been saving copies of
all of your ads and I am*

**Mike Super** reported a day ago (Wed, 16 Sep at 11:50 AM) via Email
To: <support@creditupdates.com>

*You assholes just keep on wasting your time putting in your fake fucking ads in the St.
George area and I will keep flagging them for removal….and I am not alone now. I have
warned a lot of people here about you pricks*

**Josh Margulies** <josh@joshuamargulies.com>                            Thu, Sep 17, 2015 at 12:02 PM
To: Diego M <diego@myscore360.com>, David Rojas <darb714@gmail.com>, Mike Brown <M.Brown@myscore360.com>,
Jens Sorensen <Jens@myscore360.com>, Tom Fragala <tom@mytruston.com>

Hi Diego

Yes, for sure. I'd be happy to work on this.

Now, this one is a little tricky, it may be worth a Skype session so we can brainstorm together, to figure out
how to best maneuver it, since we really need a strategy to calm them down and say certain trigger words
that may be effective at defusing their strong emotions, if that makes sense.

DEFENDANT'S EXHIBIT
22
PENGAD 800-631-6989

Would you be available tomorrow sometime?

Josh Margulies
Conversion Copywriter
917 841-5012
www.JoshuaMargulies.com

**From:** Diego M
**Sent:** Thursday, September 17, 2015 2:31 PM
**To:** David Rojas; Mike Brown; Jens Sorensen; josh; Tom Fragala
**Subject:** Template request for client complaining, but cant find account
[Quoted text hidden]

---

**Fragala, Tom** <tom@mytruston.com>        <mark>Fri, Sep 18, 2015 at 9:19 AM</mark>
To: Josh Margulies <josh@joshuamargulies.com>
Cc: Diego M <diego@myscore360.com>, David Rojas <darb714@gmail.com>, Mike Brown <M.Brown@myscore360.com>,
Jens Sorensen <Jens@myscore360.com>

Mike,

Aren't most/all of these Craiglist ads done by essentially fraudulent affiliates who are playing the game of pumping in as
many clients to get the payouts by "advertising" phony things like get a credit check in order to qualify for a job (that
doesn't exist)?

--Tom

[Quoted text hidden]
--
Tom Fragala | TRUSTON | mytruston.com
340 S Lemon Ave #2688  Walnut CA 91789
tel 800.960.5512 x710 | fax 800.980.4199

---

**Mike Brown** <mike@myscore360.com>        <mark>Mon, Sep 21, 2015 at 11:39 AM</mark>
To: "Fragala, Tom" <tom@mytruston.com>
Cc: Josh Margulies <josh@joshuamargulies.com>, Diego M <diego@myscore360.com>, David Rojas
<darb714@gmail.com>, Mike Brown <M.Brown@myscore360.com>, Jens Sorensen <Jens@myscore360.com>

If ever a Craigslist related complaint related to a job application, application for food stamps, government aid, or $40+
giftcard, please escalate to me.

Anything related to real estate, sales/rentals, rent-to-own programs, please work with Josh to make an appropriate
template that will deescalate the customer
[Quoted text hidden]

---

**Fragala, Tom** <tom@mytruston.com>        <mark>Tue, Sep 22, 2015 at 9:47 AM</mark>
To: Mike Brown <mike@myscore360.com>

Mike i have a question about this. Ping me when you get a moment.
[Quoted text hidden]

---

**Fragala, Tom** <tom@mytruston.com>        <mark>Tue, Sep 22, 2015 at 11:21 AM</mark>
To: Josh Margulies <josh@joshuamargulies.com>, Diego Customer Service <diego@myscore360.com>

I spoke with Mike to clarify his last email.

For this one:
*If ever a Craigslist related complaint related to a job application, application for food stamps, government aid, or $40+
giftcard, please escalate to me.*

...don't bother with a template, Mike feels trying to explain what is happening would be impossible and confusing and make things worse.

For these,
*Anything related to real estate, sales/rentals, rent-to-own programs, please work with Josh to make an appropriate template that will deescalate the customer*
... as he says, you guys work together (and copy me) on creating template or templates.

Mike said in the templates to mention that CreditUpdates (or efreescore etc) is integrated directly with the credit bureaus and is certified McAfee secure (security tested daily), to boost people's confidence.
[Quoted text hidden]

---

**Josh Margulies** <josh@joshuamargulies.com>                    Tue, Sep 22, 2015 at 12:57 PM
To: "Fragala, Tom" <tom@mytruston.com>, Diego Customer Service <diego@myscore360.com>

Thank you for the explanation Tom!
Diego, I have a Jewish holiday in a couple of hours that will last through tomorrow night, I will be in touch Thursday, if that works for you.

--Josh


Josh Margulies
Conversion Copywriter
917 841-5012
www.JoshuaMargulies.com

**From:** Fragala, Tom
**Sent:** Tuesday, September 22, 2015 2:21 PM
**To:** Josh Margulies; Diego Customer Service
**Subject:** Fwd: Template request for client complaining, but cant find account
[Quoted text hidden]

---

**Josh Margulies** <josh@joshuamargulies.com>                    Fri, Sep 25, 2015 at 12:38 PM
To: Diego Customer Service <diego@myscore360.com>, Mike Brown <mike@myscore360.com>
Cc: Jens Sorensen <jens@myscore360.com>, Tom Fragala <tom@myscore360.com>

Hi All

I've placed two new templates in the Customer Service GDrive folder, both labeled "Craigslist Complaint", one with refund offer, one without. I know this is a sensitive email topic, as always, please edit or send feedback, I tried to make the copy really calm the customer down and reiterate their total safety and security, as per Diego's help and guidance. With that said, I know there are a lot of details here that need to be worded properly to achieve the desired outcome.

Thank you!


Josh Margulies
Marketing Copywriter
Cell: 917 841-5012
www.JoshuaMargulies.com


-------- Original Message --------
Subject: Fwd: Template request for client complaining, but cant find account
[Quoted text hidden]

**Tom Fragala** <tom@myscore360.com>                                    Mon, Sep 28, 2015 at 2:01 PM
Reply-To: tom@myscore360.com
To: Josh Margulies <josh@joshuamargulies.com>
Cc: Diego Customer Service <diego@myscore360.com>, Mike Brown <mike@myscore360.com>, Jens Sorensen
<jens@myscore360.com>

Looks good to me from a copy perspective.
[Quoted text hidden]

---

**Josh Margulies** <josh@joshuamargulies.com>                          Mon, Sep 28, 2015 at 2:01 PM
To: Tom Fragala <tom@myscore360.com>

Hi
I'm offline right now for the holiday - through late Wednesday evening.
As always, I will get back to you as quickly as possible once I'm back up.

Sorry for any inconvenience.

Regards,
Josh

Josh Margulies
Conversion Copywriter
Cell: 917 841-5012
www.JoshuaMargulies.com

| From: | Tom Fragala <tom@myscore360.com> |
|---|---|
| Sent: | Monday, September 28, 2015 9:01 PM |
| To: | Josh Margulies <josh@joshuamargulies.com> |
| Cc: | Diego Customer Service <diego@myscore360.com>; Mike Brown <mike@myscore360.com>; Jens Sorensen <jens@myscore360.com> |
| Subject: | Re: Fwd: Template request for client complaining, but cant find account |

Looks good to me from a copy perspective.

On Fri, Sep 25, 2015 at 12:38 PM, Josh Margulies <josh@joshuamargulies.com> wrote:
> Hi All
>
> I've placed two new templates in the Customer Service GDrive folder, both labeled "Craigslist Complaint", one with refund offer, one without. I know this is a sensitive email topic, as always, please edit or send feedback, I tried to make the copy really calm the customer down and reiterate their total safety and security, as per Diego's help and guidance. With that said, I know there are a lot of details here that need to be worded properly to achieve the desired outcome.
>
> Thank you!
>
> Josh Margulies
> Marketing Copywriter
> Cell: 917 841-5012
> www.JoshuaMargulies.com



DEFENDANT'S
EXHIBIT
23

>
> -------- Original Message --------
> Subject: Fwd: Template request for client complaining, but cant find account
> From: "Fragala, Tom" <tom@mytruston.com>
> Date: Tue, September 22, 2015 2:21 pm
> To: Josh Margulies <josh@joshuamargulies.com>, Diego Customer Service < diego@myscore360.com>
>
> I spoke with Mike to clarify his last email.
>
> For this one:
> *If ever a Craigslist related complaint related to a job application, application for food stamps, government aid, or $40+ giftcard, please escalate to me.*
>
> ...don't bother with a template, Mike feels trying to explain what is happening would be impossible and confusing and make things worse.
>
> For these,
> *Anything related to real estate, sales/rentals, rent-to-own programs, please work with Josh to make an appropriate template that will deescalate the customer*
> ... as he says, you guys work together (and copy me) on creating template or templates.

Mike said in the templates to mention that CreditUpdates (or efreescore etc) is integrated directly with the credit bureaus and is certified McAfee secure (security tested daily), to boost people's confidence.

---------- Forwarded message ----------
From: Mike Brown <mike@myscore360.com>
Date: Mon, Sep 21, 2015 at 11:39 AM
Subject: Re: Template request for client complaining, but cant find account
To: "Fragala, Tom" <tom@mytruston.com>
Cc: Josh Margulies <josh@joshuamargulies.com>, Diego M <diego@myscore360.com>, David Rojas <darb714@gmail.com>, Mike Brown <M.Brown@myscore360.com>, Jens Sorensen <Jens@myscore360.com>

If ever a Craigslist related complaint related to a job application, application for food stamps, government aid, or $40+ giftcard, please escalate to me.

Anything related to real estate, sales/rentals, rent-to-own programs, please work with Josh to make an appropriate template that will deescalate the customer

On Fri, Sep 18, 2015 at 9:19 AM, Fragala, Tom <tom@mytruston.com> wrote:
Mike,

Aren't most/all of these Craiglist ads done by essentially fraudulent affiliates who are playing the game of pumping in as many clients to get the payouts by "advertising" phony things like get a credit check in order to qualify for a job (that doesn't exist)?

--Tom

On Thu, Sep 17, 2015 at 12:02 PM, Josh Margulies <josh@joshuamargulies.com> wrote:
Hi Diego

Yes, for sure. I'd be happy to work on this.

Now, this one is a little tricky, it may be worth a Skype session so we can brainstorm together, to figure out how to best maneuver it, since we really need a strategy to calm them down and say certain trigger words that may be effective at defusing their strong emotions, if that makes sense.

Would you be available tomorrow sometime?

Josh Margulies
Conversion Copywriter
917 841-5012
www.JoshuaMargulies.com

From: Diego M
Sent: Thursday, September 17, 2015 2:31 PM
To: David Rojas; Mike Brown; Jens Sorensen; josh; Tom Fragala
Subject: Template request for client complaining, but cant find account

Hello Josh,

Can we possibly create a response for upset clients, who we dont have an account for. and are sending messages and are clearly upset about the way they brought to the program. some people are upset about the Craigslist posting. The template for unsatisfied client, wouldnt really fit this , since we cant find an account for him. Here is an example:

## Fake ads

**Mike Super** reported 10 days ago (Mon, 7 Sep at 6:50 PM) via Email
To: <support@creditupdates.com>

*I am the person responsible for flagging for removal vast number of fake ads your people are putting on Craiglist in the St. George, Utah area. Your meganbundy, latoyaschwab or maryhilliard are probably all fake names. I have also been in contact with more than several of the legitimate rental properties that you are using as bait to entice people to come to your site, beit creditupdates.com or efreecreditreport.com or whatever else you are using. I have been saving copies of all of your ads and I am*

**Mike Super** reported a day ago (Wed, 16 Sep at 11:50 AM) via Email
To: <support@creditupdates.com>

*You assholes just keep on wasting your time putting in your fake fucking ads in the St. George area and I will keep flagging them for removal....and I am not alone now. I have warned a lot of people here about you pricks*

--
Tom Fragala | TRUSTON | mytruston.com
340 S Lemon Ave #2688  Walnut CA 91789
tel 800.960.5512 x710 | fax 800.960.4199

--
Tom Fragala | TRUSTON | mytruston.com
340 S Lemon Ave #2688  Walnut CA 91789
tel 800.960.5512 x710 | fax 800.960.4199