UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| **FEDERAL TRADE COMMISSION** § | | Case No. 17-cv-194 |
| **Plaintiff,** § | | |
| § | | |
| v. § | | |
| § | | Judge Kennelly |
| § | | |
| **CREDIT BUREAU CENTER, LLC,** *et al.*, § | | |
| § | | |
| **Defendants.** § | | Magistrate Judge Valdez |

**SUPPLEMENTAL DECLARATION OF MIKE BROWN IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**MIKE BROWN**, under the penalty of perjury and in accordance with 28 U.S.C. §1746, states and declares that the following is true and correct:

1. It appears that there is some confusion as to the websites that pre-existed the Subject Websites that were developed with Pierce and activated December 1, 2015. The FTC has referred as "publicly accessible sites" but all the sites were publicly accessible. To eliminate any confusion, I am attaching the pre-existing website for creditupdates.com. The landing page is different from the Subject Websites but all the other pages (Create My Membership, a Payment Page [credit card information] and a page for Social Security Information) are the same as the Subject Websites. **Exhibit 1.**

2. The FTC has raised an issue involving my knowledge of industry practices. I have been involved in credit monitoring, marketing, and referral programs for over 15 years. I began working at Experian in 2002 as part of their Customer Service team. My experience was discussed in my deposition at pages 16-25. Ex. B, Brown Depo. at 16-25. In 2005, Experian embroiled in a lawsuit, in which the FTC required Experian comply with additional

1

standards. Because of this, I became familiar and knowledgeable with industry practices and standards within the credit monitoring and affiliate managing industries. Specifically, I developed familiarity with negative option disclosures; the FTC Act, proper disclosures for marketing products as free and the free credit report rule. I have continued monitoring industry practices by reviewing the FTC website, consent decrees & press releases, industry news blogs (e.g. ftcadlaw.com)

3. The FTC has also raised an issue whether I took steps to address fraudulent conduct. I forgot to mention certain instances where I terminated or refused to enter into affiliate relationships due to fraud or affiliate practices. However, I discussed these instances in my deposition but did not use the company name where we terminated affiliate relationships due to fraud or questionable practices. When an independent contractor showed signs or explicitly stated that it would not follow the provisions set forth in the contract, then we terminated the relationship.

    a. CBC terminated two affiliate relationships with the affiliate network Boost Networks and refunded consumers because of suspected fraud detected from my detailed investigations of chargebacks and fraud alerts (one of at least three service CBC subscribed to mitigate fraud). After arranging a telephone call with the affiliate network, it did not satisfy my concerns from the chargebacks and fraud alerts. Accepting fraudulent affiliate transactions would open my company up to liability on multiple fronts including the FTC. Dkt. 11-3, McKenney Declaration at Ex. 23.

    b. CBC declined to work with an affiliate Mir Ali of LiveConnectGlobal when they approached one of my sales agents Tom Fragala to drive traffic to CBC. After probing and learning about their business practices I determined they did not comply with the TCPA by failing to get consumers express informed consent to be contacted by this company. Accepting these types of referral would have opened up my company to liability on multiple fronts including the FTC.

    c. CBC disabled a company Complete Credit Plus after 76 fraudulent accounts after by customer service supervisor Diego Munoz escalated this fraud to me. I

immediately instructed Tom Fragala to contact this company about the fraud and instructed customer service to cancel and refund all affected customers

d. Prevention of fraud and protection of consumers was always important to me. Early in my business working with my Affiliate tracking platform through Too Much Media we discussed affiliate fraud detection systems. I worked to enable at least 3 fraud detection systems including MaxMind, Verifi, Ethoca and shortly before the lawsuit, I was on track to enable another through a reseller for Kount, a fraud protection service. I did this because I know supporting or allowing fraud in anyway would not comply with FTC and regulations. Dkt. 11-3 Ex. 20 McKenney Declaration.

4. Another issue was raised as to whether the website RentFind is relevant to this case. I specified Rentfind a number of times in my declaration (206-1 ¶'s 13(f), 35(c), 39(a)-(c), 57(l)). I also mentioned RTO data base which was a subset of users who wanted to buy a home, as opposed to renting the home. I thought RTO and Rentfind were operated by Pierce. On July 23, 2016 I investigated whether Pierce's Craigslist listings were fraudulent. I want to make it clear that tracking down Craigslist postings to a particular person is extremely difficult. With that said, I took the following steps:

   a. I received an email regarding a fraudulent Craigslist listing from either a BBB website that had the email copied and pasted into the email, or another source for a rental listing and set out to investigate where the email originated. Unfortunately, I did not keep a copy of the email.

   b. The best way to determine the source of the email was to copy and paste the email domain name into the url search bar. The email domain name was "tourshoppeb.site." After I typed in the "tourshoppeb.site" domain into the url bar, I came across this website that appears to be run or associated with "Rent Find." **Ex. A,** Brown Declaration at Ex. 6. Therefore, anyone who tried to find Lloyd's website through the emailers domain name would have found a website that seemed very real, advertising legitimate properties for rent.

   c. This site belongs to or is associated with Lloyd because the domain name "tourshoppeb.site" was found in the emails Lloyd *sent* to consumers. However, because I no longer have access to customer emails, Jonathan Slotter searched the domain "tourshoppeb.site" in Andrew Lloyds emails to confirm that this was an active email domain for emails from Lloyd sent to consumers regarding apartment listings during the relevant time period of this lawsuit. Ex. H Slotter Supp. Declaration, April 20, 2018, at ¶4 a-b.

3

    d. Additionally, FTC investigator McKenney noted that Lloyd purchased hundreds of domain names in order to make it impossible to track the websites to him. Dkt. 11-3, McKenney Declaration at ¶¶39-52. Although he does not cite this specific domain name as one that Lloyd owned, it is clear that Lloyd either owned or controlled this domain because he sent emails from the domain.

5. The FTC has objected to a number of calculations and the methodology used to reach those calculations in Defendants Statement of Material Fact, specifically 53-55 and 63-67 and set out in my declaration. It was important for customer service to make accurate and thorough notations in the CRM database. These notations were critical to understanding how CBC was doing economically, and providing data for how we could improve or what we were doing well in. Inputting formulas into the database are necessary in order to access the information. I will address why each formula accurately represents the information and calculations for CBC:

    a. **Retention of Members**: Specifically, retaining customers who wanted to cancel was an important business strategy to CBC. I also wanted to ensure customers felt appreciated. Because of this, I instructed customer service to notate when customers were retained, had their price changed, or their trial period extended. Because of this strategy, customers who were retained often had their price lowered or trial period extended as part of the negotiation to retain them. The most accurate way to determine the number of customers who CBC retained is to filter the call notes with phrases such as "price was changed," "renewal date extended," "retain," or "retained." I gave counsel Jonathan Slotter the formula in order to extract that data from the database.

    b. Customer service was also instructed to make notations when customers did not receive a refund. CBC had a liberal refund policy, however we did not give refunds to everyone, particularly if we had reason to believe they were using our services for several months and then called in to get four (4) or five (5) months of refunds.

    c. I gave counsel Slotter a formula in order to filter out the call notes of "no refund" or "no refund requested," "no refund asked," "no refund was asked" and source code 35, in order to specifically narrow it down to consumers who reached CBC via Revable.

4

    d. With this, we used the revenue generating formula to find out how much these customers spent with CBC. This resulted in a retention rate of 37% covering 2015-2016. To my knowledge, Customer Service did not make any misrepresentations to customers who chose to continue with CBC, who I believe liked the service but wanted a reduction in price.

    e. I gave Slotter a formula to search call notes of "no refund" and to not find call notes that said "no refund requested" in order to determine which users did not receive refunds. CBC/BRO 397. The formula gave 1,081 rows, meaning 1,081 users did not receive refunds. **Slotter Supp. Declaration at Ex. 1**. The original CBC/BRO 397 did not have the row output, although the formula is the exact name. With the 1,081 users who did not receive refunds, we divide this number into the 50,394 users who did receive refunds (CBC/BRO 379) and it comes to 97.85% of users who received refunds.

6. Furthermore, I had no control over Pierce's business, outside of controlling the traffic I accepted from his referrals.

    a. I had a contract with Revable to be an independent contractor.

    b. I did not approve or disapprove of who Pierce or Revable contracted to work on CBC's account. I never even knew if he had or had not hired anyone. I was not privy to this information. The only person I knew who worked with Revable was Roger Furgeson, who I knew to be Revable's Affiliate Manager because he told me that he was Revable's Affiliate Manager in approximately 2013 during a phone call. I also saw his Linked In profile during this general time frame.

    c. I understood that Pierce was driving traffic to CBC through his renting ads. I did not understand the breadth and depth of the scheme in which Lloyd and/or Pierce took to cover their tracks and "drive" customers to CBC. I did not ever approve using Lloyd nor I even know of Lloyd until after this lawsuit was filed, nor was I aware that Revable, Lloyd (or both of them) had obtained thousands of domains as part of their scheme.

    d. I understood that most, if not all my affiliates were driving traffic to CBC through CraigsList, their own websites or some other strategy.

7. The FTC has also alleged that I saw emails sent by Pierce or Lloyd to consumers stating that they would get a free credit report by going to CBC's website. I never saw such emails and I am informed that there were very few such emails produced in discovery.

5

8. The FTC asserts that I knowingly violated the Preliminary Injunction (PI). To be clear, I did not hide anything from the FTC and *complied* with the Preliminary Injunction by giving *written advance notice* of my intent to the FTC to operate Zenfia. I was led to believe, from both my attorneys, and the reactions of the FTC in phone calls about Zenfia, that I was doing everything above board, with full transparency in regards to the database and Zenfia. I advised the FTC and the receiver that the customer information was not owned by CBC, but by Zenfia, a parent company that I also owned. The receiver worked with me and did not disable the database when turning over the credentials of CBC to the Receiver. **Exhibit B**. My understanding regarding the whole situation is that I was doing everything I needed to do in an effort to not violate the PI.

9. I understand that the FTC claims that I may not be entitled to raise the advice of counsel defense, but I was also concerned that I was being represented by attorneys who had a conflict of interest and thought we needed to raise that issue with the Court. I did attempt to retain conflict free counsel, Rachel Hirsch and Bill Rothbard. I am informed that both of them were told that the FTC would object to new counsel and would oppose any funds to be used for counsel. At the hearing, my attorney, Greg Zini, refused to put me on the stand to explain the mitigating circumstances and promised to pay one third of the contempt fees if I agreed to entry of a contempt order. He did not pay any part of the contempt fine.

10. This is a summary of my testimony. If called as witness at trial or hearing, I reserve the right to supplement or clarify my testimony.

Executed on April 20, 2018

*Michael Brown*
Michael Brown



EXHIBIT 1







