**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **FEDERAL TRADE COMMISSION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **CREDIT BUREAU CENTER, LLC,** | ) | |
| **a limited liability company, formerly** | ) | |
| **known as MYSCORE LLC, also doing** | ) | |
| **business as EFREESCORE.COM,** | ) | |
| **CREDITUPDATES.COM, and** | ) | |
| **FREECREDITNATION.COM,** | ) | **Case No. 17 C 194** |
| | ) | |
| **MICHAEL BROWN, individually and as** | ) | |
| **owner and manager of** | ) | |
| **CREDIT BUREAU CENTER, LLC,** | ) | |
| | ) | |
| **DANNY PIERCE, individually, and** | ) | |
| | ) | |
| **ANDREW LLOYD, individually,** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

The FTC alleges that Danny Pierce and Andrew Lloyd operated a deceptive marketing campaign on behalf of Michael Brown and Credit Bureau Center, LLC (CBC). The campaign directed consumers to CBC websites. The FTC alleges these websites misled consumers into enrolling in a monthly credit monitoring service that cost $29.94 per month. The FTC contends this conduct violated several consumer protection laws. Pierce and Lloyd agreed to entry of a preliminary injunction against them, and after an

evidentiary hearing, the Court issued a preliminary injunction against CBC and Brown on February 21, 2017. *See FTC v. Credit Bureau Center, LLC*, 253 F. Supp. 3d 1054 (N.D. Ill. 2017). The parties have now cross-moved for summary judgment.

## Background

The Court briefly reviews the background to this case, relying on the parties' filings and LR 56.1 statements. In these statements, the defendants have failed to provide "a concise response" to the FTC's statements of fact using "specific references to the affidavits, parts of the record, and other supporting materials relied upon[.]" LR 56.1(b)(3)(B). *See also Malec v. Sanford*, 191 F.R.D. 581, 585 (N.D. Ill. 2000) ("The purpose of the 56.1 statement is to identify for the Court the evidence supporting a party's factual assertions in an organized manner: it is not intended as a forum for factual or legal argument.").

The FTC offers facts describing negative feedback to CBC in the form of phone calls, e-mails, and credit card chargebacks. The FTC also offers facts that Brown received e-mails from particular parties involved in CBC's business that notified him of the Craigslist advertising scheme. Though the defendants' burden is to rebut these facts through contrary evidence that show the existence of a genuine factual dispute, the defendants have failed to do so. Instead they rely on an unsupported theory that it is the *customers* who were defrauding *CBC* by lying about the websites' deceptive character and other irrelevant or unfounded responses. This does not meet the requirements of Local Rule 56.1. Thus the Court deems as admitted Defs.' Resp. to Pl.'s Stmt. of Facts ¶¶ 57-61, 72-73, 80-82, 89, and 100.

## I.    CBC and Brown

Michael Brown is the owner, director, and sole employee of CBC.  Independent contractors fulfilled many of CBC's marketing, sales, and customer service functions. CBC owned and operated several websites, including CreditUpdates.com, FreeCreditNation.com, and eFreeScore.com.  For a monthly subscription fee, customers can access credit scores, credit reports, and a credit monitoring service. CBC does this through two lines of business:  a "white label/co-branding" line, in which other businesses can offer CBC's services under their own name, and an affiliate marketing line, in which marketers direct customers to CBC sites.  Affiliates who marketed CBC's services were compensated based on the volume of customers they referred.  The practices of two affiliates are at issue in this suit:  Danny Pierce and Andrew Lloyd.

## II.    Craigslist marketing

Pierce became an affiliate for CBC in January 2014.  As an affiliate marketer, Pierce received an identification number by which Brown could track the volume of his referrals and determine compensation.  Several months after Pierce began working as an affiliate for CBC, he asked Brown to create specific websites to which he could direct the customers he referred.  CBC created these websites on December 1, 2015.   The websites, which are described in detail later in this decision, advertised that consumers could obtain a "free credit score and report."  In smaller type, the websites disclosed that signing up for these services would enroll the customer in a monthly credit monitoring service for $29.94 per month.

Pierce, working as an affiliate marketer for CBC, contracted out some marketing

functions to Andrew Lloyd.  Lloyd began posting to Craigslist ads of attractive rental properties.  Interested customers were invited to e-mail the "landlord" for additional information.  The response e-mails were routed to Lloyd, who responded as though he were the landlord (which he wasn't).  In the reply, Lloyd would ask the customer to obtain a credit report through the CBC websites and would promise to set up a tour of the rental property once the customer had a credit report in hand.  If interested, the customer would then sign up for CBC's services and then follow up with the "landlord"— but would never receive a reply.  (One of these e-mails has been attached to this opinion as Appendix I; screenshots of one of the CBC websites has been attached as Appendix II.)  As Pierce later testified, he knew that Lloyd was posting "phony ads," as Lloyd was "not renting these places out," was "not a realtor" and "doesn't own the place. . . . He has no connection to this property."  D.E. 206, Defs.' Ex. C at 73 (Pierce Dep.).

The marketing effort proved extremely effective.  Pierce was the most successful of CBC's affiliate marketers:  his efforts resulted in 2,741,268 visitors to CBC's websites.  (The next largest affiliate produced 369,869 visitors.)  Pierce's traffic generated $6.8 million in revenue for CBC.

But the effort, unsurprisingly, also generated significant customer complaints.  Customers complained that they were never connected with a landlord after obtaining a credit report and that they did not realize that they had been enrolled in CBC's credit monitoring service.  A contractor who provided customer services for CBC logged numerous calls from dissatisfied customers.  CBC also received customer e-mails complaining about the Craigslist marketing.  In response, CBC's customer service often denied that CBC was involved in the marketing effort or that CBC paid affiliate

marketers for referrals.  Many customers also asked their credit card company to reverse the CBC charges.  Brown also received direct e-mails from many individuals about the Craigslist marketing program.[1]

## III.  Procedural posture

Customers also directed their complaints to the FTC, which commenced an investigation into CBC.  The FTC sued CBC, alleging that the Craigslist marketing program and the CBC websites violated several consumer protection laws.  On January 11, 2017, Judge Sharon Johnson Coleman, acting as emergency judge, imposed a temporary restraining order on the defendants, restraining them from continuing the marketing program and freezing their assets.  The FTC then moved for a preliminary injunction.  As indicated earlier, Pierce and Lloyd agreed to the motion.  CBC and Brown contested it, but the Court entered a preliminary injunction against them on February 21, 2017.

## Discussion

Both parties have moved for summary judgment.  Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material issue of fact."  Fed. R. Civ. P. 56(a).  There is a genuine issue of material fact if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *FTC v. World Media Brokers*, 415 F.3d 758, 763 (7th Cir. 2005).

---

[1] Because the Court does not rely on any facts contained in customer complaints submitted to the Better Business Bureau (BBB), it need not resolve whether the BBB complaints or the affidavit submitted by Erin McCool, a BBB employee, are admissible.

## I.    Liability of CBC

The FTC contends that CBC violated section 5 of the Federal Trade Commission Act (FTCA), 15 U.S.C. § 45(a)(1); the Restoring Online Shoppers' Confidence Act (ROSCA), 15 U.S.C. § 8403; and the Free Credit Reports Rule.  15 U.S.C. § 1681j(g)(1); 12 C.F.R. § 1022.138.  The Court reviews each contention in turn.

### A.    FTCA

The FTCA prohibits "unfair or deceptive acts or practices in or affecting commerce[.]"  15 U.S.C. § 45(a)(1).  "The FTC may establish corporate liability under section 5 with evidence that a corporation made material representations likely to mislead a reasonable consumer.  The FTC is not, however, required to prove intent to deceive."  *FTC v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 635 (7th Cir. 2005) (citations omitted).  A misrepresentation is material if it makes it more likely that the consumer will choose the product being advertised.  *FTC v. Cyberspace.Com LLC*, 453 F.3d 1196, 1201 (9th Cir. 2006); *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 573 (7th Cir. 1989).  The FTC contends that CBC violated the FTCA through (1) the Craigslist marketing scheme that Pierce and Lloyd carried out and (2) the credit report websites that CBC operated.  (Because the websites are virtually identical, the Court refers to "website" in the singular for ease of reference.)  The FTC has moved for summary judgment on its allegations under the FTCA.

### 1.    Craigslist marketing

First, the FTC contends the Craigslist advertising campaign violated the FTCA.  No reasonable jury could find that the Craigslist scheme did not involve unfair or deceptive practices, as it was rife with material misrepresentations that were likely to

deceive a reasonable consumer. *Bay Area Bus. Council, Inc.*, 423 F.3d at 635. Pierce and Lloyd's marketing effort consisted of two parts, both of which were materially misrepresentative. First, they posted to Craigslist advertisements of attractive rental properties with an e-mail address for interested renters to contact. But the properties either did not exist or the marketers did not have authority to rent them. Second, when an interested renter asked about a property, Lloyd responded with a form e-mail that promised a tour of the property once the renter obtained a credit report. But customers found that, credit report in hand, there was no landlord that would provide a tour. There is, therefore, no genuine dispute that the Craigslist scheme was misrepresentative. Moreover, the misrepresentations were material, as the properties themselves and the requirement that a prospective renter first obtain a credit report before touring the property made it more likely that a reasonable consumer would choose to request a credit report from CBC. *Cyberspace.Com LLC*, 453 F.3d at 1201.

The FTC has established that CBC is liable for the Craigslist campaign carried out on its behalf; no reasonable jury could find otherwise. "Principals are liable for the misrepresentations of their agents under the FTC Act." *FTC v. Lifewatch Inc.*, 176 F. Supp. 3d 757, 779 (N.D. Ill. 2016) (*citing FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1029 (7th Cir. 1988)). "To bind the principal, the agent must have either actual authority, apparent authority, or the principal must ratify [the agent's] actions." *Anetsberger v. Me. Life Ins. Co.*, 14 F.3d 1226, 1234 (7th Cir. 1994).

Although the defendants initially contested whether Pierce and Lloyd acted as agents with actual authority, apparent authority, or CBC's ratification, they now concede that CBC ratified Pierce and Lloyd's conduct by accepting the benefits of their efforts

while aware of their misconduct.  *See* Defs.' Am. Reply in Supp. of Defs.' Mot. for Summ. J. at 1 n.1 ("Defendants will not address the FTC's argument on ratification as to CBC's corporate liability.").

But even if the defendants had not conceded the point, the Court would find that CBC ratified Pierce and Lloyd's conduct.  To establish that CBC ratified the affiliates' conduct, the FTC must demonstrate that CBC knew of the conduct but provided "long-term acquiescence" by accepting "the benefits of an allegedly unauthorized transaction."  *Sphere Drake Ins. Ltd. v. Am. Gen. Life Ins. Co.*, 376 F.3d 664, 677 (7th Cir. 2004) (internal quotation marks and citation omitted).  No reasonable jury could find that CBC did not know of the affiliates' fraudulent conduct.  Consumers called to complain about the Craigslist advertisements and "landlord" e-mails that prompted them to enroll in CBC's service, sent e-mails to the same effect, and initiated chargebacks. CBC could easily trace these complaints to Pierce and Lloyd's practices.  Not only could CBC track the traffic it received back to Pierce through an identification number, CBC could also determine that approximately 89 percent of its chargebacks were attributable to Pierce's traffic.

Despite this, CBC continued to permit Pierce and Lloyd to market on its behalf. CBC could have terminated Pierce's affiliate arrangement whenever it liked, yet it never did so, despite mounting complaints.  Thus CBC was aware of the Craigslist scheme but continued to accept the traffic (and revenues) generated by that conduct.  As Pierce testified, he never stopped the Craigslist ads because he "assumed that it was fine, because Mike Brown wanted the traffic.  He continuously took the traffic, and I just went based on that[.]"  D.E. 206, Defs.' Ex. C at 74 (Pierce Dep.).  The Court concludes there

is no issue for trial on the question of agency.  The Craigslist campaign was materially

misrepresentative, and CBC ratified Pierce and Lloyd's conduct.

### 2.    CBC website

Next, the FTC contends that the website to which the interested renters were

directed to obtain a credit report also violated the FTCA.[2]  To determine whether the

website was misrepresentative, the Court first identifies what claims the website

conveys.  *FTC v. QT, Inc.*, 448 F. Supp. 2d 908, 957-58 (N.D. Ill. 2006).  "In determining

what messages or claims [the website] communicates to reasonable consumers, the

Court looks to the overall, net impression made by the advertisement[.]"  *Id.* at 958

(*citing FTC v. Colgate-Palmolive Co.*, 380 U.S. 74 (1965)).  Next, the Court determines

if those claims are misrepresentative, that is, if they have a "tendency" or "capacity" to

deceive a reasonable customer.  *FTC v. US Sales Corp.*, 785 F. Supp. 737, 745 (N.D.

Ill. 1992).  "[M]isrepresentations . . . need not be made with an intent to deceive."  *World

Travel Vacation Brokers*, 861 F.2d at 1029 (citation omitted).  The parties dispute

whether consumers must exercise reasonable care when subjected to express

misrepresentations, but the Court need not resolve this dispute to decide the issue.

First, the Court finds that, based on the net impression conveyed by the website,

the website claims that consumers who enroll in the service will obtain a free credit

score—not that they will enroll in a credit monitoring service with monthly charges.  The

first page that consumers see, the landing page, features a banner that states:  "Get

Your Free Credit Score and Report as of [the date on which the site was visited]."

---

[2] The FTC directs the Court to the images of the websites located at D.E. 11, Pl.'s Ex. 4.
The defendants do not contest that these are the proper sites to analyze; therefore, the
Court restricts its analysis to these sites.  Because the sites are virtually identical, only
the eFreeScore.com images are included in Appendix 2 to this opinion.

There are three panels that describe the offer:  the left panel shows a "Sample Score"; the central panel asks the consumer to add his or her information, which is submitted through a button that states "Your Score – Now!"; and right panel describes the benefits of CBC's service, which promises instant and secure access to one's credit score.  If the website is visited via a desktop computer, the website also states "Monthly membership of $29.94 automatically charged after trial[,]" in light gray text against a white background.  This text is not found on the mobile version of the website.  The landing page does not describe what the membership entails.  If a consumer scrolls down the page, the website displays in small text:  "Monitoring services may take up to 3 days to become active so this service within your membership may not be available during the whole 7-day trial period."

On the next page, the consumer is invited to enroll by completing several fields, including name, address, e-mail address, and phone number.  The website contains two questions in a panel to the right of these fields:  "What is a good Credit Score?" and "Will I find errors on my credit report?"  Consumers are then directed to a page in which they may enter their payment information.  The largest test on the page is the website logo.  There is a large banner in black text below the logo; it reads, "Your credit score is ready once we confirm your identity!"  Below that is a bright-green graphic consisting of a check mark and text stating "Located Credit File."  Above the fields into which consumers may enter payment information, the website requests:  "Tell us which card you would like to use for your $1.00 refundable processing fee and membership[.]"  Below all of the payment information is a paragraph of small-sized text.  The paragraph begins with a heading that reads "Payment Information" and then includes the following

text:

> When you place your order here you will begin your membership in [the website]. You will be billed $1.00 today and start your trial membership. After your 7-day trial period you will be charged $29.94 every month. If you wish to cancel just call us at [the customer service number] to stop your membership.

D.E. 11, Pl.'s Ex. 4 at 15, 43, 65. Consumers may complete the transaction by clicking a large, orange button with "Submit & Continue" superimposed over it. There is no description of what membership entails.

Although CBC contends that the membership disclosures are sufficient to change the website's impression, courts routinely hold that explanatory text is insufficient to cure a misleading description unless the text changes the overall impression. *See Cyberspace.Com*, 453 F.3d at 1200-01; *Porter & Dietsch, Inc. v. FTC*, 605 F.2d 294, 301 (7th Cir. 1979). Here, the net impression is that consumers are signing up to obtain a free credit score, not enrolling into a costly monthly service.[3] The website lacks any description of the monthly membership; consumers can discern that submitting payment information will enroll them in the membership only by reviewing text that is smaller and less noticeable than the surrounding text. In *FTC v. Johnson*, 96 F. Supp. 3d 1110 (D. Nev. 2015), the court considered a website that prominently advertised the customer's ability to access grant money and a free CD. *Id.* at 1141. The website actually signed the consumer up for a membership program, but "[c]laims about grant money and free CDs always overwhelm these brief mentions of . . . memberships[.]" *Id.* The Court

---

[3] Indeed, the Court could not put it much better than the defendants do: "The overall net impression created by the website is that the consumer is signing up for a free credit score and can cancel within seven (7) days [if] they don't want to continue the service." Defs.' Resp. to Pl.'s Mot. for Summ. J. at 20. Notably absent from this impression is any sense of *what* service CBC will render through a monthly subscription.

concludes that CBC's website presents a similar situation, in which "brief mentions" of a costly service are "overwhelm[ed]" by other advertising. No reasonable jury could conclude that the website conferred the net impression that consumers were enrolling in a monthly credit monitoring service.

Because the website claimed that consumers were obtaining a free credit score and report, not a membership in a monthly credit monitoring service, the website was misrepresentative. Moreover, this was a material misrepresentation, as consumers would be less likely to enroll if they knew they were signing up for a $29.94 monthly service of unknown utility instead of than a free credit score and report. No reasonable jury could find otherwise.

Further buttressing this conclusion is the *pervasive* evidence of consumer confusion. Proof of actual deception is "highly probative" evidence of a misleading or deceptive practice. *Cyberspace.Com*, 453 F.3d at 1201. *See also Bay Area Bus. Council*, 423 F.3d at 635 (considering evidence of consumer confusion in analyzing an FTCA violation); *Amy Travel Serv.*, 875 F.2d at 575 (same). The FTC has offered a variety of evidence indicating consumers did not realize they had enrolled in a monthly credit monitoring service until they found CBC charges on their bank statements. Defs.' Resp. to Pl.'s Stmt. of Facts ¶ 61. Numerous consumers provided declarations that generally described their experience requesting a free credit score and noticing an unexpected $29.94 charge several days later. *Id.* Many customers also asked their credit card company to reverse CBC charges, which is known as a "chargeback." Since December 2015, CBC has had over 10,000 chargebacks. *Id.* ¶ 73. The reasonable inference from these chargebacks is that consumers did not realize they enrolled in a

monthly membership service and, when they saw the membership charges, asked the credit card company to withdraw the payment. *Amy Travel Serv.*, 875 F.2d at 574-75 (noting that "excessive credit card chargebacks" are a "signal[]" of consumer "trouble").

The defendants propose a different inference: that all of these customers were engaged in "friendly fraud," in which they purposefully signed up CBC's services and then falsely claimed deception in order to get out of paying for the membership services for which they had enrolled. But the CBC presents no admissible evidence that would support this proposition, and the Court does not consider the "friendly fraud" theory to be the sort of reasonable inference to which CBC is entitled as the non-moving party. The defendants also note that there is evidence that some customers knew they were expected to pay a $1 processing fee for their credit report. Because this notice was contained in the same paragraph as one of the notices of the credit monitoring service, the defendants conclude that some customers knew of the credit monitoring service. But the requirement is not that "every customer" was deceived by the defendant, just "that some customers actually misunderstood the thrust of the message." *World Travel Vacation Brokers*, 861 F.2d at 1029. The Court concludes that the FTC is entitled to summary judgment.

### B.    ROSCA

Under ROSCA, it is unlawful to charge consumers using a negative option feature unless the seller satisfies certain requirements. A negative option feature is "a provision [in an offer] under which the customer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller

as acceptance of the offer."  16 C.F.R. § 310.2(w).  The seller must establish that (1) the material terms of the transaction are "clearly and conspicuously" disclosed and (2) the seller obtains the consumer's "express informed consent."  15 U.S.C. § 8403.[4]  ROSCA also establishes that a violation of the statute is also a violation of a rule promulgated under the FTCA.  *Id.* § 8404(a).  CBC employed a negative option feature, as consumers who requested their free credit report had seven days to opt out of the credit monitoring program before they were enrolled.  The FTC contends that it is entitled to summary judgment, as no reasonable jury could find that the disclosure of the negative option feature was clear and conspicuous or that CBC obtained consumers' express informed consent.

But CBC contends that it is entitled to summary judgment, as Brown designed CBC's website by reference to another site created through an FTC consent decree. The Court disagrees with the premise of CBC's argument, that an attempt to conform to conduct approved under a consent decree renders the conduct lawful.  "The entering of a consent decree . . . is not a decision on the merits and therefore does not adjudicate the legality of any action by a party thereto."  *Beatrice Foods Co. v. FTC*, 540 F.2d 303, 312 (7th Cir. 1976).  Rather than analyze whether CBC's website is sufficiently similar to this other website, the Court determines if any reasonable jury could find that CBC satisfied ROSCA's requirements.

In ROSCA, Congress did not define what satisfies the requirement of "clear[] and conspicuous[] disclos[ure]" of "all material terms of the transaction."  15 U.S.C. § 8403. But other courts have routinely noted that that a disclosure in small type is unlikely to be

---

[4] ROSCA also includes a third element that is not at issue in this case.

clear or conspicuous when accompanied by type that is larger, bolded, or italicized. *Murray v. New Cingular Wireless Servs., Inc.*, 523 F.3d 719, 725 (7th Cir. 2008) (small type is not conspicuous when "the bulk of the page contains much larger type"); *Cole v. U.S. Capital*, 389 F.3d 719, 730 (7th Cir. 2004) (text that "appears to be designed to ensure minimal attention by the reader" is not clear or conspicuous); *FTC v. Health Formulas, LLC*, No. 2:14-cv-01649-RFB-GWF, 2015 WL 2130504, at *17 (D. Nev. May 6, 2015) (disclosures of a negative option were not clear or conspicuous, as the disclosures were "either buried in fine print on the payment page of Defendants' websites or stated in separate Terms and Conditions documents"). As discussed above, CBC embedded its disclosures into pages with larger, bolded text that promised "free" credit reports and scores. The disclosures were not prominent when compared to the rest of the page. Indeed, the disclosures appear "designed to ensure minimal attention by the reader." *Cole*, 389 F.3d at 730. For this reason, the Court is unconvinced by CBC's repeated mention that the text was in twelve-point font: the analysis of the disclosure is necessarily contextual, meaning that the Court must consider the text, whatever size it is, in relation to the other elements on the page. The FTC is entitled to summary judgment; no reasonable jury could find that the disclosures were clear and conspicuous.

ROSCA also requires CBC to obtain a consumer's "express informed consent" before entering into a negative option. CBC contends that it can satisfy this standard, as a consumer is notified of the negative option at three points: on the landing page, the payment page, and in a welcome e-mail to those who enroll. The welcome e-mail is obviously unhelpful to CBC's case, as that e-mail *follows* the transaction, so it cannot

affect whether the consumer rendered express informed consent before entering into the negative option.

CBC's remaining contentions are also insufficient. The Court concludes that summary judgment is warranted where, as here, the website is virtually devoid of *any* mention of the service aside from the statement that the customer is to be billed for it. Except for a handful of disclosures that the consumer will be enrolled in a service that costs $29.94 per month, the consumer would not know that CBC was offering a service. And there is no description of what the service constitutes or why it is beneficial. A website that fails to provide a consumer any information about a service cannot obtain a consumer's express *informed* consent to purchase that service. CBC suggests that credit monitoring was a "bonus" for consumers, but the Court overrules this rather odd argument. If credit monitoring was a "bonus" that CBC had not promised consumers, then consumers could not have expressly consented to be billed for a service they had not been told about.

In sum, the FTC is entitled to summary judgment on its ROSCA claim because no reasonable jury could find that CBC "clearly and conspicuously" disclosed that the site involved a negative option transaction or that consumers rendered their express informed consent.

### C. Free Credit Report Rule

The FTC also brings a claim under the Free Credit Report Rule, which requires any advertisement for a free credit report to disclose that a consumer may obtain a free credit report annually as of right under federal law. 15 U.S.C. § 1681j(g)(1); 12 C.F.R. § 1022.138. Because it is undisputed that there was no notice of the as-of-right annual

free credit report, the only question before the Court is whether CBC advertised a free credit report.

Given that CBC website contained a banner advertising a "free credit score and report," one could justifiably ask what there is to discuss. But the defendants present two arguments against the application of the Free Credit Report Rule. First, the defendants contend that the formatting of their advertisement of a "free credit score and report" places their site outside the reach of the Rule. They note that the text is split into two lines and that the text is colored differently: "free credit score" is in orange text, but "and report" is in black text. CBC contends there is a clear implication: the black lettering of "report" indicates that it, unlike the orange-lettered "free credit score," is not free.

But the defendants' proposed "black-letter" rule runs smack into the reality of actual black-letter law. Under "generally accepted rules of syntax," an initial modifier applies to each noun or phrase in a conjunctive series. *Wash. Educ. Ass'n v. Nat'l Right to Work Legal Def. Found., Inc.*, 187 F. App'x 681, 682 (9th Cir. 2006) (citing The American Heritage Book of English Usage ch. 2 ¶ 10 (Houghton Mifflin 1996)). Any reasonable consumer would read "free" as modifying both "credit score" and "report," no matter the color of the text or its formatting.

Next, CBC argues that the Free Credit Report Rule applies to advertisements of free credit reports alone; it does not apply to advertisements of CBC's services, which include a credit report, score, *and* credit monitoring service. The defendants argue that the FTC, while promulgating the relevant rule, rejected the use of the term "consumer report" because it swept broadly enough to include credit scores. *See* Free Annual File

Disclosures, 75 Fed. Reg. 9725, 9732 (Mar. 3, 2010) (originally to be codified at 16

C.F.R. § 610, now codified at 12 C.F.R. § 1022.130).  Because the FTC purposefully

excluded ads for free credit scores from the scope of the Free Credit Report Rule, their

service—which includes access to a credit score—is also outside the scope of the Rule.

But the FTC, in adopting the rule, expressly addressed and rejected this argument:

> Several commenters urged the Commission to clarify that section 610.4
> does not apply to advertisements for every bundle of products or services
> that may include a "free credit report." . . . The Commission disagrees that
> the types of bundled products do not cause consumer confusion.  Indeed,
> *the Commission believes that advertising for bundled products that
> promote free credit reports, in addition to other products and services,
> such as credit monitoring, is the very type of advertising that is likely to
> confuse consumers.*

*Id.* at 9733 (emphasis added).  CBC's service is therefore within the ambit of the Free

Credit Report Rule.

In their reply brief, the defendant raised two additional arguments against the

application of the Free Credit Report Rule:  the FTC was required to first issue a cease-

and-desist letter before suing under the Rule, and any violation of the Rule is without

damages.  "[A]rguments raised for the first time in the reply brief are waived."  *Mendez

v. Perla Dental*, 646 F.3d 420, 423-24 (7th Cir. 2011).  The Court concludes that FTC is

entitled to summary judgment on its Free Credit Report Rule claim.

Although the defendants have asserted in their summary judgment briefing

several of the defenses they raised in their answer, their briefs do not discuss at least

four:  the FTC's failure to mitigate; standing; mootness; and bad faith / unclean hands.

First Am. Answer at 7-11.   Particularly when the FTC has presented unrebutted

arguments against these defenses, the Court is not required to "construct arguments

regarding the Defendants' affirmative defenses."  *Ramada Franchise Sys., Inc. v. Royal*

*Vale Hosp. of Cincinnati, Inc.*, No. 02 C 1941, 2005 WL 435263, at *10 (N.D. Ill. Feb. 16, 2005). The Court finds the defendants cannot defeat summary judgment through these defenses.

In sum, the Court concludes that the FTC is entitled to summary judgment on each of its claims brought under the FTCA, ROSCA, and the Free Credit Report Rule.

## II. Brown's personal liability

The next issue is whether Brown is personally liable for the conduct for which CBC is liable. To establish Brown's personal liability, the FTC must prove three elements: (1) CBC's corporate liability (which the Court has just found); (2) Brown's knowledge of the practices; and (3) Brown's control over or direct participation in the practices at issue. *Amy Travel Serv.*, 875 F.2d at 573. The FTC can satisfy the knowledge element by presenting "evidence that the individuals had actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth." *Bay Area Bus. Council*, 423 F.3d at 636 (internal quotation marks and citations omitted).

The FTC's claims rest on two practices or acts. First is the creation of the CBC websites, which contain misrepresentations about the monthly subscription service. No reasonable jury could find that Brown did not know of these misrepresentations, as he wrote and edited the contents of the websites. Brown also controlled the practice in question: he owned, operated, and controlled the websites at issue, as he was the sole member, managing director, and owner of CBC. Pl.'s Resp. to Defs.' Stmt. of Facts ¶ 3. Brown is personally liable for the violations associated with this conduct.

Second is the Craigslist marketing scheme, in which Pierce and Lloyd posted false Craigslist advertisements of attractive rental properties and required interested customers to obtain credit reports through CBC websites. The Court concludes that there is no genuine issue for trial here; the evidence is such that no reasonable jury could not find that Brown was not, at the very least, recklessly indifferent towards or intentionally ignorant of the truth. *Bay Area Bus. Council*, 423 F.3d at 636.

Pierce and Lloyd sent e-mails purportedly from landlords to induce interested customers to request their credit reports through CBC; Brown admits he knew that Pierce and Lloyd did not have any relationship with actual landlords. But Brown claims that it does not follow that he knew that Lloyd's e-mails were false. Rather, Brown argues he believed that Lloyd was acting as an affiliate for others who wanted to rent out their properties, just as Pierce acted as an affiliate for CBC.

But this argument cannot account for the numerous signals Brown that received indicating that Pierce and Lloyd were not acting on behalf of actual landlords or advertising real properties. Brown received an e-mail on April 29, 2015 from a contractor who "happened to notice this fake ad for apartment to get credit report", Defs.' Resp. to Pl.'s Stmt. of Facts ¶ 81; a forwarded e-mail from a person who "flagg[ed] for removal vast number of fake ads your people are putting on Craiglist [sic] . . . I have also been in contact with more than several of the legitimate rental properties that you are using as bait to entice people to come to your site," *id.* ¶ 82; an e-mail on September 17, 2015 from his customer service contractor regarding complaints about the Craigslist postings, *id.*; and an e-mail on November 15, 2015 from a company asking for removal of its logo from CBC's website, given its "deceptive listings" on

Craigslist, *id.* ¶ 89.

Additionally, Brown was aware of the campaign's fraudulent character through the voluminous consumer complaints that CBC received via customer calls, *id.* ¶ 57; e-mails, *id.* ¶ 58; and credit card chargebacks. *Id.* ¶ 72 (noting that 72 percent of the 16,828 chargebacks were attributable to Pierce). Brown contends he was not told about these complaints, but the Court finds that argument particularly weak, as the evidence shows that Brown specifically requested his customer service contractor *not* to escalate real estate-related customer complaints to him. *Id.* ¶ 84. "To claim ignorance in the face of the consumer complaints . . . amounts to, at the least, reckless indifference to the corporations' deceptive practices." *Bay Area Bus. Council*, 423 F.3d at 239.

Still, Brown downplays the significance of all of this evidence through a variety of arguments: Pierce and Lloyd's e-mails were not obviously false, given their purported relationship with a real estate website known as RentFind; the e-mails Brown received from others about the Craigslist campaign were not adequately specific to notify him of fraud; the consumer complaints were not properly forwarded to him; and some of the consumer complaints appeared (to him) to be mere "friendly fraud." But, taken together, no reasonable jury could consider all of this evidence without finding that Brown, having received all these signals of fraud, was either recklessly indifferent toward or intentionally ignorant of Pierce and Lloyd's fraudulent practices.

Brown not only knew about the Craigslist scheme; he had the ability to control it. As the chief officer of CBC, Brown had "[a]uthority to control the company," given his "active involvement in business affairs." *Amy Travel Serv.*, 875 F.2d at 573. Brown

may contend he could not control Pierce or Lloyd but, through the click of a button, Brown had the ability to stop receiving the customers that they referred. As Brown testified, "I'm able to tell Pierce and set limits on how much I want to accept. It's my business, my website." *Id.* ¶ 100. As in *Bay Area Business Council*, in which the Seventh Circuit held the defendant personally liable in part because he personally controlled who would conduct telemarketing, the Court holds Brown personally liable because he controlled whether Pierce and Lloyd could continue their conduct. *Bay Area Bus. Council*, 423 F.3d at 637. The Court concludes that the FTC is entitled to summary judgment on the question of Brown's personal liability.

### III.     Injunctive relief

The FTC has requested equitable relief in the form of a permanent injunction against CBC and Brown and equitable monetary relief. The Court reviews each request in turn.

### A.     Permanent injunction

Under 15 U.S.C. § 53(b), the FTC may seek a permanent injunction to restrict a defendant from future violations of the FTCA. To obtain a permanent injunction, "the moving party need only show that there is a reasonable likelihood of future violations in order to obtain relief." *SEC v. Holschuh*, 694 F.2d 130, 144 (7th Cir. 1982). This standard is distinct from the ordinary standard for injunctive relief. *CFTC v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979). In assessing whether there is a reasonable likelihood of future violations, the Court must consider (1) the gravity of the harm, (2) the extent of CBC and Brown's participation, (3) the nature of the infraction and the likelihood that they may become involved in similar conduct in the future; (4) any recognition of

culpability; and (5) the sincerity of assurances against further violations. *Holschuh*, 694 F.2d at 144; *Hunt*, 591 F.2d at 1220.

The Court finds a reasonable likelihood of future violations. First, the gravity of the harm was significant, as CBC and Brown's deceptive practices caused customers to lose millions of dollars on an unwanted service and to needlessly expose their sensitive personal and financial information, including their credit card and Social Security numbers. Moreover, both CBC and Brown were deeply involved in these practices. Third, CBC and Brown's ongoing participation in the credit information industry increases the likelihood that similar conduct could occur again, as these schemes are easy to facilitate. The Court notes that, after the onset of this litigation, it held Brown in contempt for violating the preliminary injunction, which barred him from, among other things, operating a website with a negative option feature without first obtaining express informed consent, processing payments from CBC customers, or transacting any business as CBC. *See* D.E. 106. Though Brown argues that he was misadvised by attorneys when he engaged in this conduct, the Court only relies on this fact to show the ease with which parties can engage in this conduct, not to show Brown's scienter.

Finally, Brown's ongoing litigation of this claim in the face of significant contrary evidence—and the assertion that it is the *consumers* who engaged in misconduct through "friendly fraud"—undercuts any belated recognition of culpability or assurance that similar misconduct will not happen again. The Court concludes that a permanent injunction against CBC and Brown is proper.

Brown argues that the FTC's proposed injunction should be narrowed in two ways. First, he contends that the injunction should not apply to all of CBC's websites,

just those created to receive traffic referred from Pierce and Lloyd. Brown also contends that he should not be enjoined, as he was fooled by Pierce and Lloyd into believing the properties existed, just like CBC's dissatisfied customers. The Court declines to narrow the injunction in either respect. First, the injunction should extend to all sites, as the Court has found a reasonable likelihood of future violations, and any site could be used to facilitate a similar scheme. Second, as already discussed, no reasonable jury could find that Brown did not know of, and have control over, Pierce's practices. Just because it was Pierce and Lloyd who directly facilitated the Craigslist marketing does not mean that Brown should escape an injunction. Brown has not presented a viable reason that he should not be subject to a permanent injunction.

### B. Equitable monetary relief

In addition to the permanent injunction, the FTC seeks relief from CBC and Brown in the amount of consumer losses. "The district court's power to grant a permanent injunction also includes the power to grant other ancillary relief," which "includes the power to order repayment of money for consumer redress as restitution or [rescission]." *FTC v. Febre*, 128 F.3d 530, 534 (7th Cir. 1997) (citing *Amy Travel Serv.*, 875 F.2d at 571). In line with substantial precedent, the Court concurs with the FTC and orders equitable relief in the amount of consumer losses. *See, e.g., FTC v. Trudeau*, 579 F.3d 754, 771 (7th Cir. 2009) ("Consumer loss is a common measure for civil sanctions in contempt proceedings and direct FTC action"); *Febre*, 128 F.3d at 536 ("A major purpose of the Federal Trade Commission Act is to protect consumers from economic injuries. Courts have regularly awarded, as equitable ancillary relief, the full amount lost by consumers.") (citation omitted); *Amy Travel Serv.*, 875 F.2d at 571-72

(same).

CBC and Brown introduce an array of arguments against the FTC's position, which the Court groups into four contentions: the Court lacks the authority to order restitution; the FTC cannot trace the funds, which it must do to obtain restitution; the FTC's proposed relief would violate the Eighth Amendment's prohibition on excessive fines and fees; and the FTC has overstated the amount of losses.

First, CBC and Brown contend that the FTC has requested restitution, but the Court lacks authority under section 13(b) of the FTCA, 15 U.S.C. § 53(b), to provide this relief. Section 13(b) only authorizes the Court to "enjoin any such act or practice" that violates the FTCA. CBC and Brown contend that this provision does not expressly encompass restitution and that the Supreme Court case law that authorized a broad interpretation of this language has been undercut. CBC and Brown concede that the Court "has previously ruled on and generally denied" this contention, but they contend that, had the Court fully considered the legislative history or the text of section 13(b), it would have found in favor of this argument. Defs.' Resp. to Pl.'s Mot. for Summ. J. at 23. The Court disagrees. CBC and Brown still rely upon what this Court already described as a "considerable overstatement" of *Kokesh v. SEC*, 137 S. Ct. 1635 (2017). *See* D.E. 183 at 2 (Order on Defs.' Mot. to Modify Prelim. Inj.). The plain language and legislative history arguments do not change the Court's view on this point, especially in light of the Seventh Circuit authority that continues to control the disposition of this issue before this Court. *See, e.g., Trudeau*, 579 F.3d at 772; *Febre*, 128 F.3d at 534; *Amy Travel Serv., Inc.*, 875 F.2d 571-72.

Next, CBC and Brown contend that the FTC's request for "equitable monetary

relief" is a request for restitution. But, CBC and Brown contend, restitution is unavailing, as the FTC must be able to trace the funds it identifies for restitution, and here the funds have been commingled. CBC and Brown urge the Court to consider several cases in which courts declined to order restitution because the funds requested were not traceable. *See, e.g., Montanile v. Bd. of Trustees of Nat. Elevator Indus. Health Benefit Plan*, 136 S. Ct. 651, 658, 662 (2016) (remanding restitution order in ERISA litigation to determine whether funds were dissipated); *Alexander v. Bosch Auto. Sys., Inc.*, 232 F. App'x 491, 501 (6th Cir. 2007) ("Plaintiffs seeking equitable restitution have the burden of establishing that the funds they seek are traceable and readily identifiable.").

But CBC and Brown elide a significant distinction between the cases cited and the present case. When restitution is ordered as an equitable remedy, it is "directed against some specific thing; they give or enforce a right to or over some specific thing." *Montanile*, 136 S. Ct. at 658-59. CBC and Brown rely primarily on ERISA cases in which plaintiffs seek to reclaim benefits from a defunct employer. ERISA is distinguishable from the FTCA in a significant way: ERISA only authorizes equitable restitution, not legal restitution. The FTCA authorizes legal restitution, which does not impose the same tracing requirements. *FTC v. Commerce Planet, Inc.*, 815 F.3d 593, 601 (9th Cir. 2016) ("the tracing requirements for 'equitable' restitution do not apply in § 13(b) actions"); *FTC v. Bronson Partners, LLC*, 654 F.3d 359, 373-74 (2d Cir. 2011) (in ordering monetary relief under the FTCA, a district court need not "apply equitable tracing rules to identify specific funds in the defendant's possession that are subject to return"). CBC and Brown contend that these cases are not convincing, as they have been undercut by *Kokesh*. But, as the Court has already noted, it has rejected this

reading of *Kokesh*; the Court need not interrogate it in greater depth. The Court concludes that, even if the funds at issue were commingled with other CBC funds, the FTC is not barred from obtaining restitution.

Third, Brown contends that the permanent injunction and the proposed restitution would violate his Eighth Amendment rights. But the order of restitution is not a "fine," nor would it be "grossly disproportional," as Brown must show to establish an Eighth Amendment violation. *See United States v. Bajakajian*, 524 U.S. 321, 339-40 (1998). Brown cites to *SEC v. Metter*, 706 F. App'x 699 (2d Cir. 2017), but the case is not helpful to his position, as the Second Circuit concluded there was no Eighth Amendment violation in an order that "almost precisely equaled the gains from the illicit conduct." *Id.* at 704. Here, the FTC's proposed order is also "directly keyed" to Brown's misconduct. *Id.* The Court overrules Brown's Eighth Amendment argument.

Finally, CBC and Brown challenge how the FTC calculated the amount of losses. The FTC began its calculation with the amount of revenue obtained through traffic that Pierce directed to CBC: $6,832,435.81. The FTC subtracted the amount of refunds CBC paid to customers ($414,860.77), chargebacks that customers successfully obtained ($394,903.68), and the amount already paid by Pierce and Lloyd in settlement of their claims ($762,000), for a net of $5,260,671.36. CBC and Brown present several arguments against this amount.

First, they contend that the revenues must be limited to the period beginning after CBC created websites to which Pierce could direct his traffic. The Court disagrees: the amount of liability is based on the duration of the campaign of misrepresentation conducted through the Craigslist marketing scheme, not the existence of certain

websites. The date on which certain websites became active is irrelevant to the calculation.[5]

Next, CBC and Brown contend that the amount of restitution should be limited to the customers referred by Pierce. The description of how the FTC calculated losses refutes this argument; the losses are already based on revenue obtained through traffic that Pierce referred.

Third, they contend that the FTC should deduct the revenue obtained from customers who contacted CBC's customer service but then chose not to cancel their credit membership. The FTC argues that a setoff would be inappropriate, as CBC lied to customers about its involvement in the Craigslist marketing scheme. *See, e.g.,* Defs.' Resp. to Pl.'s Stmt. of Facts ¶ 60 (recording of a CBC customer service employee telling a customer, "We don't . . . do any Craigslist posts. . . . [W]e're not affiliated with any third party companies posting any rental ads or anything like that."). The Court concurs: CBC and Brown are not entitled to keep the revenue obtained from customers who were retained through additional misrepresentations.

Fourth, CBC and Brown contend that the losses should be limited to the period during which Brown had actual notice of the purported scheme. They contend that Brown did know of the fraudulent marketing until he saw complaints from the Better Business Bureau on June 30, 2016. CBC and Brown's argument is unpersuasive. First, they do not point to any authorities supporting the premise that liability can only attach to particular losses of which the defendant was specifically aware; the Seventh

---

[5] Defendants arguably raise an additional point in their reply brief asking the Court to dismiss any claims relating to CBC's "pre-existing" websites. Defs.' Am. Reply in Supp. of Defs.' Mot. for Summ. J. at 8. This argument is underdeveloped and, to the extent it is a new point, defendants forfeited it by failing to raise it in the initial brief.

Circuit only requires that a defendant be "adequately alerted . . . to the corporation's deceptive trade practices." *Bay Area Bus. Council*, 423 F.3d at 637. But no reasonable jury could conclude that Brown only learned of Pierce's campaign on June 30, 2016. As the record makes clear, Brown was e-mailed in April 2015—just months after the campaign began—by a contractor with concerns about the campaign. As already discussed, this e-mail was joined by numerous other signs of misconduct, all of which occurred well before June 30, 2016. The Court declines to reduce the loss figure on this ground.

CBC and Brown also ask the Court to set off business expenses and the loss of CBC revenues. But restitution seeks to protect consumers from "economic injuries" by recovering the full amount of consumer loss. *Febre*, 128 F.3d at 536. The Court does not think it appropriate to reduce consumer recovery in order to compensate the defendants for the costs of administering a service that relied upon misrepresentations to consumers.

### Conclusion

For the foregoing reasons, the Court grants the FTC's motion for entry of summary judgment against Credit Bureau Service, LLC and Michael Brown [dkt. no. 192]. The Court will separately enter the FTC's proposed final judgment and order. The status hearing set for June 29, 2018, the final pretrial conference set for July 12, 2018, and the trial set for July 16, 2018 are vacated.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: June 26, 2018

## Appendix I

Hello ,

Thank you for wanting more information on our rental. You were the second to e-mail from our advert. The first person I showed did not need to move due to school. We just finished all new renovations and are now prepared to lease with flexible terms. We are flexible on the move in date and lease duration.

I know that you need the exact address of the property but we do want not to disclose the address before you're qualified. We have had a string of break-ins, squatters and thefts at our other properties. We want to avoid that with this rental because of the renovations that have cost lots of money. You are going to be the first to move in with the renovations.

We have plenty of garage parking and utilities are factored into the rent price. The appliances in the kitchen and laundry room are yours to keep. You have the option to customize your paint color and flooring prior to your arrival.

If you would like to set up an appointment, go to the link below and request a copy of your report. We use this site since it's trusted, quick and haven't had any problems printing out the report. All you need to do is fill out the form and you get your report We are not concerned with any negatives, it's more of a formality for us. Simply get your report by CLICKING HERE

Do not send me the report over email, bring it to the tour. We want to rent fast. We are waiving the security deposit and giving half the first months rent.

Let me know when you have an updated version of your report. Then I'll schedule you for a showing.

Thanks again,
Joyce



 





 

  **eFreeScore** (/)

TransUnion.

🔒 Your privacy and security are 100% protected.



① **Complete** ② **Confirm** ③ **Verify**

## Account Setup

All Fields Required

**First Name:**

**Last Name:**

**Address:**

**Zip Code:**

**State:**

IL - Illinois

**City:**

Chicago

**Email:**

**Phone Number : (Optional)**

(123) 456-7890

By clicking Submit and Continue I agree by electronic signature to: (1) be contacted by eFreeScore.com about financial services or credit related offers by a live agent, artificial or prerecorded voice, and SMS text at my residential or cellular number, dialed manually or by autodialer, and by email (consent to be contacted is not a condition to purchase services); and (2) the Privacy Policy (https://www.efreescore.com/site/page/privacy.html) and Terms of Use (https://www.efreescore.com/site/page/terms.html). I understand that consent is not required for purchase and I can forgo providing my phone number.

**Create Your Username:**

**Create Your Password: (Case sensitive 6-36 characters)**

**Verify Your Password:**

 **Secure Site**

We are committed to protecting your information

### What is a good Credit Score?

Most experts agree that a credit score of 720 or higher is what you should aim for to have an excellent credit score. About 60% of people have a credit score 700 or higher. You can see your percentile rank when you view your credit score.

### Will I find errors on my credit report?

Errors are very commonly found on credit reports due to data input errors, incorrectly reported accounts, or even identity theft. You should review and monitor your TransUnion, Equifax, and Experian credit reports to make sure they are accurate.

## We are Here to Help

Call us toll Free at (800) 934-1938

📞 Phone Hours (Pacific Time)
Everyday: 5 AM - 9 PM

**Submit & Continue**

 

(https://www.mcafeesecure.com
/RatingVerify?ref=www.efreescore.com)



  (/)



🔒 Your privacy and security are 100% protected.

① **Complete** ② **Confirm** ③ **Verify**

## Verification Information

All Fields Required

All the information you provide is transmitted over a safe and secure connection.

**Date of Birth:**      **Social Security Number:**

| Month | Day | Year |
|-------|-----|------|

🔒



**Submit & Continue**



(https://www.mcafeesecure.com /RatingVerify?ref=www.efreescore.com)

### Secure Site

We are committed to protecting your information

### What is a good Credit Score?

Most experts agree that a credit score of 720 or higher is what you should aim for to have an excellent credit score. About 60% of people have a credit score 700 or higher. You can see your percentile rank when you view your credit score.

### Will I find errors on my credit report?

Errors are very commonly found on credit reports due to data input errors, incorrectly reported accounts, or even identity theft. You should review and monitor your TransUnion, Equifax, and Experian credit reports to make sure they are accurate.

### We are Here to Help

Call us toll Free at (800) 934-1938

Phone Hours (Pacific Time)
Everyday: 5 AM - 9 PM

All Rights Reserved. Privacy Policy (/site/page/privacy.html) | Terms & Conditions (/site/page/terms.html)

Copyright © 2016 eFreeScore.com - X0.0200-1.2.16-i-e7ce3c60